# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JUAN CASTILLO,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **CASE NO. SA-12-CA-924-XR** |
| | § | |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

**GROSS & ESPARZA, P.L.L.C.**
**MICHAEL C. GROSS**
**State Bar No. 08534480**
**106 South St. Mary's Street, Suite 260**
**San Antonio, Texas  78205**
**(210) 354-1919**
**(210) 354-1920 Fax**

**Attorney for the Petitioner,**
**JUAN CASTILLO**

# **TABLE OF CONTENTS**

PAGE

I.    CONFINEMENT AND RESTRAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   HISTORY OF PRIOR STATE COURT PROCEEDINGS . . . . . . . . . . . . . 2

      A.    TRIAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    STATE HABEAS CORPUS PROCEEDINGS . . . . . . . . . . . . . . . . 4

III.  PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599 . . 5

IV.   STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES . . 6

V.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            TRIAL   DEFENSE   COUNSEL   RENDERED
            INEFFECTIVE  ASSISTANCE  OF  COUNSEL.

            ARGUMENT AND AUTHORITIES
            IN SUPPORT OF CLAIM I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            1. General Law on Ineffective Assistance . . . . . . . . . . . . . . . . . . . 7
                  a.    Standard for Ineffective Assistance . . . . . . . . . . . . . . 7
                  b.    IAC Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                  c.    Burden of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                  d.    Standard of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
                  e.    Presumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
                  f.    Lack of Strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
                  g.    Reasonableness Judged at Time Counsel's Conduct . 10
                  h.    Presumption of Prejudice for Complete Absence
                        of Counsel at a Critical Stage . . . . . . . . . . . . . . . . . . 10
                  i.    Incomplete Investigation . . . . . . . . . . . . . . . . . . . . . . 10

2. Pre-trial Ineffectiveness of Counsel . . . . . . . . . . . . . . . . . . . . . . 10
    a.   Only Visiting Petitioner Once in Jail Before Trial . . . 10
    b.   Failure to Interview Prosecution Witnesses . . . . . . . . 16
    c.   Last Second Trial Preparations . . . . . . . . . . . . . . . . . . . 20
    d.   Failure to Prepare for Sentencing and Mitigation  . . . 27
    e.   Failure to Use Forensic Psychologist . . . . . . . . . . . . . 30
    f.   Failure to Introduce Stipulated Mitigation Evidence . 35
    g.   Failure to Interview and  Use Family Members
        in Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    h.   Frivolous Diversion of Effort into Non-Meritorious
        Motions and Failure to File Needed Motions/Notices  43
3. Trial Ineffectiveness of Counsel
    a.   Lacking Knowledge and Skills in Capital Case . . . . . 48
    b.   Opening Statement for the Defense  . . . . . . . . . . . . . . 49
    c.   Failing to Investigate & Bolstering
        Prosecution's Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    d.   Conceding Guilt in Final Argument Based
        on Misunderstanding of the Law  . . . . . . . . . . . . . . . . 57
    e.   Failing to Object to Sleeping Jurors . . . . . . . . . . . . . . 60
    f.   Not Interviewing Sole Defense Witness Until Third Day
        of Trial and Then Putting Witness on Stand Despite
        His Minimal Assistance and Letting Witness Implode
        on Stand  Because of Lack of Counsel Preparation . . 62
    g.   Ineffective Representation on <u>Faretta</u> Issue . . . . . . . . 64
4. Counsel was ineffective during jury selection . . . . . . . . . . . . . . 66
5. Cumulative Effect of Ineffectiveness of Counsel  . . . . . . . . . . . 68

CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

THE TRIAL COURT VIOLATED THE PETITIONER'S RIGHTS TO SELF-REPRESENTATION AND THEN ABUSED HER DISCRETION IN HAVING THE PETITIONER DEFEND HIMSELF DURING SENTENCING.

ARGUMENT AND AUTHORITIES
IN SUPPORT OF CLAIM II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

      APPELLATE COUNSEL RENDERED INEFFECTIVE
      ASSISTANCE ON THE MOTION FOR NEW TRIAL
      AND THE APPEAL, HAD A CONFLICT OF INTEREST
      ON THE APPEAL, AND PLAGIARIZED PORTIONS OF
      THE BRIEF.

      ARGUMENT AND AUTHORITIES
      IN SUPPORT OF CLAIM III . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

      PERJURY COMMITTED BY A PROSECUTION
      WITNESS UNDERMINED CONFIDENCE IN THE
      VERDICT AND DEATH SENTENCE AND VIOLATED
      THE PETITIONER'S DUE PROCESS RIGHTS.

      ARGUMENT AND AUTHORITIES
      IN SUPPORT OF CLAIM IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

VI.   THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e)
      SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT . . 94

VII.  PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

VIII. VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

IX.   CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

X.    APPENDIX OF EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
    A.   Judgment and Sentence
    B.   Order of Texas Court of Criminal Appeals appointing new habeas
         counsel
    C.   Notice Court of Criminal Appeals granted request deem writ filed timely
    D.   State Writ of Habeas Corpus and Appendix with affidavits and
         documents
    E.   State's Proposed Findings/Conclusions and Order signed by trial judge
    F.   Declaration of Gerardo Gutierrez

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JUAN CASTILLO,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **CASE NO. SA-12-CA-924-XR** |
| | § | |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

## THIS IS A CAPITAL DEATH PENALTY CASE

JUAN CASTILLO, the Petitioner in the above styled and numbered cause, pursuant to 28 U.S.C. § 2254, petitions this Honorable Court to issue a writ of habeas corpus ordering the Petitioner's release from confinement on the ground that the Petitioner is being denied his liberty as a result of an illegal and unconstitutional judgment of conviction for capital murder and sentence of death.

## I.

## CONFINEMENT AND RESTRAINT

The Petitioner is confined on death row at the Polunsky Unit, Texas Department of Criminal Justice, Correctional Institutions Division, Livingston, Texas.

1

Rick Thaler, the Director of the Texas Department of Criminal Justice, Correctional Institutions Division, is the state official responsible for the confinement of the Petitioner. The District Court of Bexar County, Texas, 186th Judicial District, in and for Bexar County, the Honorable Maria Herr presiding, entered the judgment and sentence under attack. *See* attached Judgment of Conviction at Exhibit A. The judgment was signed on September 9, 2005. *Id.* The Petitioner is confined pursuant to this judgment imposing the death penalty for the offense of capital murder in Cause No. 2004-CR-1461A. *Id.* The Petitioner is indigent and has been indigent throughout all prior proceedings in this cause.

## II.

## HISTORY OF PRIOR STATE COURT PROCEEDINGS

### A.

### TRIAL PROCEEDINGS

The indictment alleged the complainant was murdered on December 3, 2003. (T - 4-5).[1] The Petitioner was indicted for capital murder on February 24, 2004. *Id.* The indictment alleged that the Petitioner committed capital murder by shooting the

---

[1] The clerk's record from the trial will be referred to as "T and page number." The court reporter's record from the trial will be referred to as "R and volume and page number." The court reporter's record from the state writ hearing will be referred to as "WHC and volume and page number."

2

complainant with a firearm in the course of committing or attempting to commit robbery. *Id.*

The trial began with jury selection on July 15, 2005. (R - v.3 - 1). After the jury was empaneled and sworn on August 23, 2005, the prosecutor read the indictment which alleged capital murder. (R - v.15 - 1, 17). The Petitioner entered a plea of not guilty. *Id.* at 17. The jury returned a verdict on August 30, 2005 finding the Petitioner guilty of capital murder as charged in the indictment. (R - v.20 - 1, 94). At the beginning of the sentencing phase on August 31, 2005, the Petitioner waived counsel and represented himself. (R - v.21 - 3). The jury returned an affirmative answer to Special Issue Number One and a negative answer to Special Issue Number Two on September 1, 2005. (R - v.22 - 1, 20-21). As required by the jury's verdict, the trial judge sentenced the Petitioner to death. *Id.* at 27.

## B.

### DIRECT APPEAL

The Texas Court of Criminal Appeals, in a published opinion, affirmed the conviction and sentence on May 2, 2007. <u>Castillo v. State</u>, 221 S.W.3d 689 (Tex. Crim. App. 2007). A petition for writ of certiorari was not filed.

3

## C.

## STATE HABEAS CORPUS PROCEEDINGS

On September 9, 2005, counsel was appointed to represent the Petitioner on his state habeas.  *See* Exhibit B.  The state writ was due to be filed on or before December 11, 2006.  *Id.*  In August 2008, the Texas Court of Criminal Appeals was notified that state habeas counsel failed to file the state habeas.  *Id.*  After several chances with the Court of Criminal Appeals, state habeas counsel was found in contempt of court and new state habeas counsel was appointed on April 22, 2009 to represent the Petitioner.  *Id.*  On September 16, 2009, the Court of Criminal Appeals granted without written order the Petitioner's Motion to Declare Application for Writ of Habeas Corpus Timely Filed as of October 11, 2007 to Preserve Federal Statute of Limitations.  *See* Exhibit C.  On November 13, 2009, a state writ of habeas corpus was filed with the 186th Judicial District Court.  *See* Exhibit D.

On July 8, 2010; January 20, 2011; January 21, 2011; and February 1, 2011; hearings were held on this state writ.  On January 12, 2012, the State filed the proposed trial court's Findings of Fact and Conclusions of Law with an Order for the signature of the trial judge.  *See* attached Exhibit E.  The trial judge simply adopted the State's proposed findings of fact and conclusions of law, recommending that relief be denied, and signed page 50 for the judge's signature.  On September 12,

4

2012, the Texas Court of Criminal Appeals adopted the findings of fact and conclusions of law and recommendation of the trial judge and denied relief.

## III.

## PROCEEDINGS IN THIS COURT PURSUANT TO 18 U.S.C. § 3599

On October 1, 2012, the Petitioner filed with this Court a motion for appointment of counsel pursuant to 18 U.S.C. § 3599. This Court appointed counsel on October 2, 2012 to represent the Petitioner in this federal habeas corpus proceeding challenging the Petitioner's state criminal conviction for capital murder and sentence of death. This Court has extended the due date for the filing of the federal habeas corpus petition to on or before June 28, 2013.

Pursuant to 28 U.S.C. § 2244(d)(1), the one-year period of limitation for the filing of the federal petition for writ of habeas corpus begins to run when the judgment becomes final on direct appeal or the expiration of the time for seeking such review. "'[A] conviction becomes final when a defendant's options for further direct review are foreclosed,' whether or not those options have been pursued." United States v. Gamble, 208 F.3d 536, 537 (5th Cir. 2000), citing United States v. Thomas, 203 F.3d 350, 352 (5th Cir. 2000); Kapral v. United States, 166 F.3d 565, 571 (3rd Cir. 1999); Rhine v. Boone, 182 F.3d 1153, 1155 (10th Cir. 1999), cert. denied, 528 U.S. 1084, 120 S.Ct. 808, 145 L.Ed.2d 681 (2000). The one-year limitation period

is tolled, pursuant to 28 U.S.C. § 2244(d)(2), during the pendency of a properly filed state application for post-conviction relief. The Court of Criminal Appeals on direct appeal affirmed the judgment and sentence on May 2, 2007. Castillo v. State, supra. A petition for a writ of certiorari was due to be filed ninety days later on July 31, 2007. The Court of Criminal Appeals deemed the state writ filed as of October 11, 2007. *See* Exhibit C. Seventy-two days elapsed between July 31, 2007 and October 11, 2007 leaving 293 days in the one-year federal limitations period. State habeas relief was denied on September 12, 2012. From September 12, 2012, a period of 293 days results in a due date for the federal habeas as July 2, 2013. This federal writ petition, therefore, has been timely filed after the state application for post-conviction relief became final.

## IV.

## STATEMENT REGARDING EXHAUSTION OF STATE REMEDIES

The Petitioner has exhausted (except for Claim IV) the state remedies for the claims he is presenting in this original federal habeas corpus action. The Petitioner's claims were made in the state habeas action, proven at the hearing on the state writ in the trial court, but denied in state court. The trial judge recommended denial of relief which was approved by the Court of Criminal Appeals. The Petitioner has met the burden, pursuant to 28 U.S.C. § 2254(b)(1), that an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state

court shall not be granted unless it appears that the Petitioner has exhausted the remedies available in the courts of the state.  Claim IV is based upon newly available evidence from a key prosecution witness.

**V.**

**<u>CLAIMS FOR RELIEF</u>**

**CLAIM I**

**TRIAL DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.**

**1.  General Law on Ineffective Assistance**

**a.        Standard for Ineffective Assistance**

Effective assistance of counsel is a right guaranteed by the U. S. CONST. amend. VI., applied to the States through the Fourteenth Amendment, and also guaranteed by TEX. CONST. article I, § 10 and TEX. CODE CRIM. P. art. 1.05. *State v. Thomas*, 768 S.W.2d 335, 336 (Tex. App.—Houston [14th Dist.] 1989, no pet.).  The federal test for effective assistance of counsel is stated in *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052 (1984) and is also the test in Texas. *Hernandez v.* State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

### b.    IAC Test

Under this test, one must show (1) that counsel's representation fell below an objective standard or reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 689; *Rosales v. State*, 4 S.W.3d 288, 231 (Tex. Crim. App. 1999); *Dewberry v. State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999).

### c.    Burden of Proof

To meet the burden on the first prong, one must prove by a preponderance of the evidence that the attorney's representation objectively fell below the standard of prevailing professional norms; to meet the burden on the second prong, one must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.    A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).  If a single juror can place a capital defendant's life history on the mitigating side of the scale, there is a reasonable probability that a single juror would have struck a different balance.  *Wiggins v. Smith*, 539 U.S. 510,  537, 123 S. Ct. 2527, 2543 (2003).  Under Texas capital sentencing, it only takes a single juror to hang a jury and result in a life sentence. TEX. CODE CRIM. P. art. 37.071(g).

### d.    Standard of Proof

The standard of proof is a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998).

### e.    Presumptions

In determining if counsel's performance was deficient, appellate review of counsel's representation if highly deferential, and an appeals court indulges in a strong presumption that counsel's conduct falls within a wide range of reasonable representation. *Strickland*, 466 U.S. at 689; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 1999). A full inquiry into the strategy or tactics of counsel should be made only if, from all appearances after trial, there is no plausible basis in strategy or tactics for counsel's actions. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. 1981). Some claims may be disposed of on direct appeal where trial counsel's ineffective is so apparent from the record. *Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

### f.    Lack of Strategy

When no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as he did. *Andrews*, 159 S.W.3d at 102.

### g.    Reasonableness Judged at Time of Counsel's Conduct

The reasonableness of counsel's conduct to the facts of a particular case is viewed as of the time of counsel's conduct.  *Strickland*, 466 U.S. at 690; *Organ v. Cockrell*, 249 F.3d 349, 360 (5th Cir. 2002).

### h.    Presumption of Prejudice for Complete Absence of Counsel at a Critical Stage

The complete denial of counsel during a critical stage of a judicial proceeding, however, mandates a presumption of prejudice because "the adversary process itself" has been rendered "presumptively unreliable." *United States* v. *Cronic,* 466 U.S. 648, 659, 104 S. Ct. 2039 (1984).  The even more serious denial of the entire judicial proceeding also demands a presumption of prejudice because no presumption of reliability can be accorded to judicial proceedings that never took place.

### i.    Incomplete Investigation

Strategic choices made after less than a complete investigation are reasonably precise to the extent professional judgments support the limitations of an investigation.  In other words, counsel has a duty to make a reasonable investigation and to make a reasonable decision that makes particularly investigations unnecessary. *Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. 2066.

### 2.  Pre-trial Ineffectiveness of Counsel

### a.    Only Visiting Petitioner Once in Jail Before Trial

San Antonio Police arrested Petitioner Castillo on December 10, 2003 (R - v.18 - 55, 59-60).  The District Judge appointed Vincent D. "Denny" Callahan as first chair defense counsel the next day on December 11, 2003 (T - 2).  According to his appointed attorney fee voucher (*see* attached Exhibit D at App'x  Tab 10) and Petitioner's affidavit (*see* attached Exhibit D at App'x  Tab 16), attorney Callahan visited Petitioner in the Bexar County Adult Detention Center once in December 2003,  and ***this visit  was the only time that Mr. Callahan visited Petitioner in jail prior to trial two years later***.  As conceded by the attorney at the Article 11.071 hearing, this was the only visit that attorney Callahan paid to Castillo at the Bexar County Jail from that point until after Mr. Castillo received the death penalty over 20 months later.

Attorney Callahan confirms this in his "interim voucher" of May 2, 2005 (*see* attached Exhibit D at App'x Tab 12).  The front page of the voucher under "initial jail visit" states the $100 flat fee for an initial jail visit is "claimed in itemization 2½ hours, 12-1*3*-03."   The itemization on the first page of "out-of-court hourly worksheet" then states, "12-1*5*-03, Jail Visit, 2.50," in which Callahan gets the wrong date!   Neither this interim voucher nor Attorney Callahan's final voucher (*see* attached Exhibit D at App'x Tab 11) reflect any other visit to Petitioner.[2]  Attorney

---

[2] Two versions of the final voucher are in the Appendix Volume 1.  The first from Callahan's file is where Callahan  claims $26, 310.00 (*see* attached Exhibit C at App'x Tab 11) and the second, from the court's file, is changed to $16,310.00 (*Id*., Tab 10).

Callahan's failure to visit Petitioner in jail also is detailed in a letter Petitioner

Castillo wrote District Judge Herr a letter (*see* attached Exhibit D at App'x  Tab 17)

that said:

> I'd like to dismiss my court-appointed Vincent Callahan
> because I have only seen him twice in the past 13 months.
> Once was in December of 2003 and the last time was in
> your courtroom on 1-6-2004.[3]  I also feel he is not helping
> me . . .

Petitioner sent a written complaint to the trial judge on June 6, 2005 that Mr.

Callahan only visited him on one occasion (T - 27).  On February 27, 2004, the Court

appointed John W. "Bill" Harris, Jr. as second chair defense attorney (T - 6).  Harris's

voucher (<u>see</u> attached Exhibit D at App'x Tab 13) reflects he saw Petitioner initially

on 2-3-05 (front page of voucher under "Initial Jail Visit" and on page 1 of "out-of-

court hourly worksheet," line 7) and then again on that some hourly worksheet (line

10) on "6-14-05 Jail Visit—client, 1 [hour]."  ***Significantly, attorney Harris's two***

***visits to Petitioner in jail  are 11½ and 15½ months after his appointment***.  Mr.

Harris conceded on the first day of the Article 11.071 hearing that he took over 11

months after his appointment before he saw applicant Castillo in the jail.  It is noted

---

[3] This date represents Bexar County's pre-indictment docket.  This is confirmed in a hand-
scrawled  Senate Bill 7 Contact Letter than Callahan faxed to the Bexar County Jail to be given
to Castillo; however, Callahan gets the year wrong (<u>see</u> attached Exhibit D at App'x Tab 21).

that the two defense attorneys colluded to get their vouchers the same when Callahan sent a fax on conferences with co-counsel (*see* attached Exhibit D at App'x  Tab 14).

Callahan twice wrote Castillo, first on January 9, 2004 and again on February 27, 2004, that he would send Castillo copies of his "extensive notes" from reviewing the State's file and the statements of witnesses (*see* attached Exhibit D at App'x Tabs 19 & 20).  No letter in the files of the defense attorneys suggests that this was ever done.

A defense counsel provides ineffective assistance of counsel in violation of the Sixth Amendment when he only sees his client once at jail prior to trial.  *King v. Beto*, 305 F. Supp. 636 (S.D. Tex. 1969), *aff'd*, 429 F.2d  221 (5th Cir. 1970), *cert. denied*, 401 U.S. 936, 91 S. Ct. 921 (1971)(IAC when attorney only saw defendant once); *Ex parte Bratchett*, 513 S.W.2d  851, 853-54 (Tex. Crim. App. 1974)(IAC when counsel saw defendant only once in murder case); *Hernandez v. State*, 943 S.W.2d 930 (Tex. App.—El Paso, 1997)(IAC when counsel only saw client day before trial), *rev'd to apply Strickland vice Ex parte Duffey*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999), *remanded to trial court*, 08-95-00187-CR (August 1, 2000).  Counsel must have more than just understanding and awareness of the State's case but must have a like perception of the defendant's position, and counsel is obligated to investigate

13

defendant's defense, although it might not be a strong one.  *Rummel v. Estelle*, 498 F. Supp. 893 (W. D. Tex. 1980).

A Texas capital counsel is required to engage in a "***continuing interactive dialogue with the capital defendant on all matters that have a material impact on the case,***" including the progress and prospects for factual investigation and what assistance the client might provide, current or potential legal issues, development of a defense theory, presentation of the defense case, potential agreed-upon dispositions of the case, and relevant aspects of the client's relationship with correctional, parole, or other governmental agents.  Guideline 10.2C, Guidelines and Standards for Texas Capital Counsel, State Bar of Texas (*see* attached Exhibit D at App'x Tab 52).[4]

Failure to interview witnesses or discover readily available evidence is an error in trial preparation , not trial strategy.  *Kenly v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991).  Any decision or judgment that flows from lack of diligence in preparation of and investigation is not protected by the presumption in favor of counsel having acted reasonably.  *Id*.

A Texas lawyer has an ethical duty to keep a client reasonably informed about

---

[4] This standard is taken from Guideline 10.5C, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. Ed. Feb. 2003)(App'x Tab 53). The Supreme Court has held such guidelines reasonable.  *Wiggins v. Smith*, 466 U.S. at 688; *Rompilla v. Beard*, 545 U.S. 374, 387.

the status of a matter and promptly comply with reasonably requests for information. A Texas lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the presentation. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03, *reprinted in* TEX. GOV'T CODE tit. 2, subtit. G app. A (TEX. STATE BAR R. art. X, § 9).

First chair defense attorney Callahan saw Castillo at the jail only the day or so after Castillo's arrest in December 2003 and did not see him again at the jail until trial was completed. The one visit occurred before indictment and before discovery was started. Second chair counsel Harris twice saw Castillo 11½ and 15½ months after his appointment. These two defense "attorneys" abandoned their client. No wonder Castillo is repeatedly writing to the trial judge and complaining about the attorneys and their failure to visit him. They had totally abandoned him. Counsel could not and did not receive timely receive face-to-face feedback from their client. Counsel breached their written promise to meet with their client on the psychological evaluation of Dr. Ferrell—they just mailed it over and expected a seventh grade dropout to interpret it.

Attorney Callahan wrote his client months before trial to tell him if he (the client) was going to testify (*see* attached Exhibit D at App'x Tab 45). Even at the close of State's evidence, Callahan still had neither consulted on this issue with his client nor prepared him for testifying. When attorney Callahan wrote Castillo that he

15

suspected the defendant was experiencing depression over his outlook on sentencing (*see* attached Exhibit D at App'x Tab 44), neither attorney took any step to resolve the problems—they only reinforced the problem. This led to the defendant having zero confidence in his attorneys and seeking to represent himself. This was total denial of the effectiveness of counsel at the critical time of pre-trial investigation.

### b.     Failure to Interview Prosecution Witnesses

Attorney Callahan spent two whole hours reviewing the district attorney's file and police reports[5] from his appointment on December 11, 2003 until he submitted his interim voucher on May 2, 2005 (*see* attached Exhibit D at App'x Tabs 12 & 23). This occurred on 3-9-04. (*Id*). He claimed in his final attorney fee voucher (*see* attached Exhibit D at App'x Tab 11) that had a "disc. conf." [discovery conference] for three hours on July 20, 2005 some 15 months later—this is presumably with an assistant district attorney. His notes from this meeting are in the third batch of discovery notes in App'x Tab 23. Significantly, this date is after the July 5, 2005 hearing on the sole motion heard in the case (R - v.2 - 3-7) and after general *voir dire* on July 15, 2005 (R - v.3 - 3) and before individualized *voir dire* began on July 26, 2005 (R - v.4 - 1). Attorney Callahan's notes from these "efforts" are found at App'x Tab 23.

While Attorney Callahan spent an alleged five hours on reviewing the DA's

---

[5] The Bexar County District Attorney has an open file policy whereby defense attorneys can come in and review all police reports, witness statements, and expert witness reports.

open files, second chair attorney Harris spent 7½ hours (3 hours on 3-15-04 and 4½ hours over 14 months later on 6-3-05)(*see* attached Exhibit D at App'x  Tab 13). Attorney Harris also spent 2¼ hours view a videotape in the district attorney's office on August 16, 2005 (*see* attached Exhibit D at App'x  Tab 13, last page).  By comparing this latter date from page 2 of the out-of-court hourly worksheet to the first page of the in-court hourly worksheet, one can see that August 16, 2005 was the day after general *voir dire*, which the voucher notes attorney Harris was "unable to attend."

Attorney Callahan testified at the Article 11.071 hearing that he phoned a single lay witness; but otherwise interviewed no prosecution witness.  Attorney Harris conceded at the Article 11.071 hearing that he interviewed no prosecution witness. Thus, the two defense  attorneys conceded at the Article 11.071 hearing that they failed to interview any other prosecution witnesses, be they lay witness—whether or not connected to accomplices, police, evidence technicians, medical examiner, fingerprint expert, trace evidence examiner, DNA expert, or firearms expert.  A review of the files of these defense attorneys fails to reflect any notes of any interview or telephone call to any prosecution witness.

A review of the vouchers of both defense attorneys shows that ***neither counsel interviewed a single prosecution witness***.  Attorney Callahan testified at the Article 11.071 hearing that he phoned a single lay witness; but otherwise interviewed no

17

prosecution witness. Attorney Harris conceded at the Article 11.071 hearing that he interviewed no prosecution witness. Thus, the two defense attorneys conceded at the Article 11.071 hearing that they failed to interview any other prosecution witnesses, be they lay witness—whether or not connected to accomplices, police, evidence technicians, medical examiner, fingerprint expert, trace evidence examiner, DNA expert, or firearms expert. The two defense attorneys did not interview any prosecution witnesses, be they lay witness—whether or not connected to accomplices, police, evidence technicians, medical examiner, fingerprint expert, trace evidence examiner, DNA expert, or firearms expert. A review of the files of these defense attorneys fails to reflect any notes of any interview or telephone call to any witness.[6]

These attorneys cannot claim that they did not know how to locate witnesses. The names and address and, in most cases, phone numbers of all witnesses are on the police reports, witness statements, and reports for forensic experts that these attorneys claim to have reviewed. Additionally, the court's file had copies of all subpoenas of all prosecution witnesses, and these subpoenas had the addresses of each prosecution witnesses (*see* attached Exhibit D at App'x Tab 24). ***Significantly, the court's file***

---

[6] The efforts of these two men defending a man facing the death penalty are in stark contrast to the splendid efforts shown in the voucher of attorney Ray Fuchs who represented accomplice Francisco Gonzales, who faced the death penalty (App'x Tab 15). This attorney repeatedly saw his client in jail, visited the crime scene, interviewed witness, and, as reflected in the disposition of the case on the voucher, was able to get a lesser charge of murder for his client and a 40-year prison sentence.

*lacks a single subpoena request from these two defense attorneys*.

Attorney Callahan did interview a single defense witness, Ralph Perdigone, in jail on 8-25 [-2005] (*see* attached Exhibit D at App'x  Tabs 10 and 11, out-of-court worksheets, p. 2, lines 9-10).  As will be noted from the in-court worksheet, August 25, 2005 is the third day of the jury trial.  And, as noted earlier in this writ application, *infra* pp. 24-25, this witness imploded and significantly hurt the Petitioner.

Failure to interview witnesses or discover readily available evidence is an error in trial preparation, not trial strategy.  *Kenly v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991).  Any decision or judgment that flows from lack of diligence in preparation of and investigation is *not* protected by the presumption in favor of counsel having acted reasonably.  *Id*.

Defense counsels' failure to interview witnesses caused massive damage to Castillo's defense.  Callahan asked key prosecution witnesses about the credibility of the key witnesses.  Had Callahan interviewed these witnesses, he would have known that he was going to be pummeled with an answer that was adverse to his position.  As a result of this failure, Callahan bolstered the credibility of critical adverse witnesses, especially of the accomplices.  His failure to know the facts of the case also shows that he failed to interview prosecution witnesses.  The witnesses,

particularly homicide detective Angell, are constantly correcting Callahan on the facts and killing his credibility before jurors.

### c.     Last Second Trial Preparations

The Court prepared a scheduling order in this case (T - 22) that clearly put defense counsel on notice of timelines in this death penalty capital murder trial. Instead of formulating a prepared strategy and preparing a defense well in advance of *voir dire* and trial on the merits, both defense attorneys dawdled until the last minute. Attorney Callahan's vouchers (*see* attached Exhibit D at App'x Tabs 10 and 11, second "out-of-court hourly worksheet," lines 4 and 5) reflect that he "prepare[d] cross exam & both final arguments' over a 6.5 hour period on 8-20[-2005]. As can be deduced by comparing August 20 to the "in-court hourly worksheets, ***this trial preparation occurs <u>10 days</u> <u>after jury selection</u> was completed and <u>the day before trial on the merits begins</u>***! Despite his purported and billed preparation for opening statement the day before trial, Callahan did ***not*** give the opening statement at trial on the merits—second chair attorney Harris did (R - v.15 - 23). The defense did not give an opening statement for the sentencing phase of trial (R - v.21 - 8). Attorney Callahan entered notes into a spiral notebook with a purple cover throughout the trial, from *voir dire* to final sentencing. Callahan's entry for 8-29-05 (*see* attached Exhibit D at App'x Tab 9,p. 38) states, "prepare final argument—12:30—". At the Article

20

11.071 hearing, Mr. Callahan suggested he had brain thoughts about preparation but did not commit those thoughts to paper or document the time spent on such thoughts on his voucher.

Attorney Callahan's file contains four pages of notes labeled "IDEAS, Castillo (*see* attached Exhibit D at App'x Tab 25).  The brilliance reflected in these notes clearly are not part of trial preparation for two reasons.  First, the notes reflect state exhibits numbers (e.g., SX  58, SX 132), which were not assigned  until trial on the merits began.  Second, page four of the notes is written on the back page of the memorandum opinion in *Butler v. State* and that opinion is dated September 21, 2005, two days after Petitioner was sentenced to a penalty of death (R - v.22 - 1, 27).  At the Article 11.071 hearing, Mr. Callahan conceded these thoughts were for the Petitioner's appeal rather than for trial.

Attorney Callahan prepared hand-scribbled notes to cross-examine only five of the 24 testifying witnesses called by the prosecution (*see* attached Exhibit D at App'x Tabs 4—8), although second chair counsel examined Francisco Gonzales.  These notes cover the following witnesses:

- ***Francisco Gonzales***, 1½ pages of dynamic questioning plus a single blank sheet.[7] (Not examined by Callahan though.)

---

[7] He was an accomplice who testified at trial. Since the first page of notes is cut in half, counsel has placed a blank sheet —not the blank third page—under this page so it will not copy over

(*see* attached Exhibit D at App'x, Tab 4).

● **Debra Espinoza**, a half sheet of questions, followed by a full page of questions, followed by one-third of a page of questions, followed by a single blank sheet.[8]  (*see* attached Exhibit D at App'x, Tab 5).

● **Teresa Quintero**, a half sheet of questions, followed by 3/4ths of a page of questions, followed by a blank page, followed by two more pages of handwritten notes.[9] (*see* attached Exhibit D at App'x Tab 6).

● **Lucinda Gonzales**, a third of a page, followed by a full page, followed by a blank sheet of paper.[10] (*see* attached Exhibit D at App'x Tab 7).

● **Brian Brown**, a full single page of notes and the notes

---

page 2.

[8] She was an accomplice who testified at trial.  Since the first page of notes has only the top third of the page, counsel has placed a blank sheet—not the blank four page—under this page so it will not copy over page 2.

[9] She was an accomplice witness, but **she did *not* testify**.  Since the first page of notes has only a half page, counsel has placed a blank sheet—not the blank third page—under this page so it will not copy over page 2.

[10]  She was related to accomplice Gonzales.  See this Application, *supra*, p. 14 – 15.  Since the first page of notes has only a half page, counsel has placed a blank sheet—not the blank third page—under this page so it will not copy over page 2.

22

"G.  Love F.G." on a second sheet that is otherwise blank.[11]

(*see* attached Exhibit D at App'x Tab 8).

It is noted that Callahan's first questioning for each of these accomplices and their relatives was to ask them if their friend or relative had a good reputation for truthfulness.  At the Article 11.071 hearing, the trial judge prohibited the defense from examining attorney Callahan on if he used these prepared questions; however, a comparison of these draft questions to the reporter's record for each witness shows that Mr. Callahan in fact used these canned questions.  This tactic failed resulting in bolstering of the key prosecution witnesses.

It is likely that the blank page was left by Mr. Callahan to put down any tardy inspired insight he had after his drafting the questions the day before trial.  Of course, except a single bullet point for Brian Brown, the extra sheets for these "prepared" witnesses were left blank.

Also in the same folder with counsel's inspired questions was the four-page waiver, consent to stipulations of testimony and stipulations used in the guilty plea of accomplice Francisco Gonzales and it had attached to it the six-page typed report on night detective E. Giddings, the typed statement of Francisco Gonzales of 12-6-03 to homicide detective T.[imm] Angell, the rights advisement card used to advise

---

[11] Mr. Brown testified.

23

Gonzales, a two-page typed statement of accomplice Debra Espinoza dated December 7, 2003, an earlier four-page typed statement of accomplice Debra Lynn Espinoza dated 12-04-03, and a three-page report of cause and manner of death from the Bexar County Medical Examiner's Office (*see* attached Exhibit D at App'x Tab 55). Significantly, counsel has not underlined any of these 22 typed pages.  A single sentence on the original document is highlighted in yellow on the second page of Mr. Gonzales' statement on page 2, paragraph 2 where it reads, "…I didn't have a gun with me, and I never touched the gun that Juanito [defendant Castillo] used to shoot that gun."  This highlighted point is ***not*** in the questions prepared by attorney Callahan the day  before trial.

Callahan did not conduct cross-examination of Mr. Gonzales; that task fell to **second chair defense counsel Harris**, who did make the point that Gonzales lied to homicide detective Angell on this point (R - v.15 - 147).  The voucher submitted by attorney Harris (*see* attached Exhibit D at App'x Tab 13) reflects a single entry for trial preparation.  His second out-of-court hourly worksheet contains a entry on line 5 states: "8-22-05  Trial Preparation—Notebook with 2 hours noted under the column identified as 'obtaining and reviewing records.'"  ***This date is Saturday before trial on the merits begins on Monday*** August 24, 2005.  This initial trial preparation occurs more than a week ***after*** jurors have been selected.

24

A review of attorney Harris' ¾-inch case file in this case shows **no prepared questions for Mr. Gonzales—or any other witness in the case.**  It does appear that he took notes during Mr. Gonzales testimony, as he has notes labeled Gonzales and these notes reflect state exhibit (SE) numbers for exhibits introduced at trial (*see* attached Exhibit D at App'x Tab 26).  He also cross-examined prosecution witness Jessica Cantu (R - v.17 - 119-122) and **got her to re-enforce the prosecution's case** by confirming that she certainly did see Petitioner wear around his neck a medallion like the decedent's after his murder.  However, give the devil his due.  Harris got Ms. Cantu to identify two photographs of Petitioner's wearing a crucifix and the crucifix (R - v.24 - Def. Exs 4 and 5) as the necklace she was talking about (R - v.18 - 19).  These photos obviously were not the wheel medallion necklace worn by decedent.  It was the only defense score in the trial.  The success appears to have been fortuitous, not planned, cross-examination, as this part of the cross occurred on the second day of her cross-examination.

In contrast to the preparation of Callahan and Harris, **a review of contents of the prosecutors' three banker boxes in this case shows**:

- The prosecutors had **typed bullet points or questions for each witness** who was called and many other witnesses who were not called.

- The prosecutors had typed, **alphabetical indexes on each person involved in the case with a statement of their involvement and how**

25

***to question them if they were called by the defense***.

Strategic choices made after less than a complete investigation are reasonably precise to the extent reasonable professional judgments support the limitations of an investigation. In other words, counsel has a duty to make a reasonable investigation and to make a reasonable decision that makes particular investigations unnecessary. *Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. at 2066); *Moore v. Johnson*, 194 F.3d 586, 619-20 (5th Cir. 1999). It was, in part, this type of last second preparation that the U.S. Supreme Court condemned in *Wiggins v. Smith*, 539 U.S. at 526, 123 S. Ct. at 2537 ("*On the eve of sentencing*, counsel represented to the court that they were prepared to come forward with mitigating evidence. [emphasis added]").

Attorney Callahan began preparing for five of the State's 24 witnesses only the day before trial on the merits began. This is 10 days after jurors had been selected. He only used his preparation on three of the five witnesses. He never prepared for the remaining 19 witnesses. An attorney cannot prepare a proper strategy for *voir dire* unless he has gone through witness preparation and developed and executed a trial strategy.

Callahan made no effort to go through the statements of the accomplice witness, to compare their contradictions, and to emphasize the contradictions in a vigorous cross-examination. This omission is particularly noticeable when Callahan

26

misadvises the homicide case detective on the number of statements made by Rodriguez and gets corrected before jurors. He repeatedly confused Ms. Espinoza with Lucinda Gonzalez. These are not small things. Because he was unprepared, Callahan destroyed his own credibility and bolstered the credibility of the witnesses against his client.

It was this no-thinking, fly-by-the-seat-of-your-pants mentality that lead Callahan to try to smear the victim and his friends with unsubstantiated assertions that they had been smoking pot and then learn that they had been playing with Play Station. If the strategy was to destroy the credibility of the accomplice witnesses, as detailed in the opening statement, defense counsel failed miserably. Had counsel properly prepared, as detailed in habeas Attorney's sample cross-examination of the two accomplices (*see* attached Exhibit D at App'x  Tab 27), reasonable doubt could have been raised as to Castillo's guilt.

### d.    Failure to Prepare for Sentencing and Mitigation

The U.S. Supreme Court decided *Wiggins v. Smith* on June 26, 2003, which was before the murder in this case.[12]  Defense counsel are charged with knowledge of *Wiggins'* mandate for attorneys in a death penalty case to prepare for and present a mitigation case.  Defense counsel failed in this endeavor.

---

[12] *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2526 (2003).

A review of the clerk's record reveals that defense counsel did ***not*** seek appointment of a mitigation expert or mitigation investigator. Counsel is ineffective during the penalty phase of a capital trial when counsel fails to adequately investigate and present mitigation evidence. *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S.Ct. 1495 (2000); *Moore v.* Johnson, 194 F.3d 586, 613-616 (5th Cir. 1999); *Baxter v. Thomas*, 45 F.3d 1501, 1512 (11th Cir. 1995). *Schriro v. Landrigan*, 530 U.S. 465, 127 S.Ct. 1933, 1942 (2007) holds that a defendant is not entitled to a hearing in federal habeas corpus claim to prove ineffectiveness when counsel did not provide mitigation evidence when the defendant refused to allow introduction of mitigating evidence.

In a death penalty capital murder case, it is imperative for defense counsel to prepare and to present mitigating evidence to give a capital defendant a chance to a life sentence on the mitigation issue in the jury charge. Here, attorney Callahan wrote Castillo he would stipulate and introduce Castillo's educational records (*see* attached Exhibit D at App'x Tab 28). Callahan failed to do so. Callahan wrote Castillo (*see* attached Exhibit D at App'x Tab 29) that he would stipulate and introduce the family and work history of the defendant from defendant's federal conviction presentence investigation report (*see* attached Exhibit D at App'x Tab 35). Callahan failed to do so. Callahan obtained a psychological analysis of Castillo (*see* attached Exhibit D at

28

App'x Tab 30) and even told Castillo that the psychologist would testify that defendant would not be a danger to society if locked up in prison (*see* attached Exhibit D at App'x Tab 33).  Callahan failed to subpoena his sole expert witness in mitigation and then improperly arranged for this witness to testify to such an extent that the psychologist vital testimony on the future dangerousness issue was never presented.  A review of the files of both defense counsel shows that no mitigation evidence was prepared or presented on behalf of Castillo.  At the Article 11.071 hearing, both attorneys Callahan and Harris conceded to the lack of preparation.

In *Wiggins v. Smith*, 539 U.S. at 522, 123 S. Ct. at 2536, the U.S. Supreme Court held that a presentencing report was indeed mitigating evidence, and even then, defense counsel did not go far enough.  Here, counsel had the presentencing report in hand, promised to introduce it into evidence, and then failed to do so.  He also failed to obtain the same information from alternate sources.

Defense counsel cannot rely upon *Schriro v. Landrigan* to excuse their abandonment of the client on the mitigation issue.  This is so for several reasons. This is so for a variety of reasons.  First, Castillo never forbade mitigation evidence—he just did not want his mother to have to testify and look bad.  He never prohibited introduction of evidence otherwise.  Second, defense counsel had such evidence readily available in the form of the school records and a federal sentencing

29

report that they promised Castillo would be admitted and in the form of testimony from forensic psychologist Dr. Jack Ferrell, Jr., but counsel failed to work the stipulated evidence and botched the testimony of Dr. Ferrell. Third, ineffectiveness is gauged on the law at the time of trial, *Strickland*, 466 U.S. at 690, *Vaughn v. State*, 931 S.W.2d 564 (Tex. Crim. App. 1996), and *Schriro v. Landrigan* was not decided until two years after Castillo's trial. Fourth, Texas law mandates that defense counsel introduce mitigation evidence even if the client opposes such an effort. Guideline 11.1A.3, Guidelines and Standards for Texas Capital Counsel, State Bar of Texas (*see* attached Exhibit D at App'x Tab 52).

Had Callahan acted as an effective attorney, he would have prepared evidence that Castillo and his mother had something of a vagabond life. He lacked strong ties with his father and lacked a father figure in his life. He had limited education. Each of those matters constituted significant mitigation evidence that was present and should have been presented to jurors.

### e.    Failure to Use Forensic Psychologist

Defense counsel filed on March 5, 2004 a one-sentence "Defendant's Motion for Appointment of a Mental Health Expert to Determine Competency, Mental Illness, Mental Retardation and/or Sanity," which the trial judge granted (T - 9-11). The motion did ***not*** mention mitigation. Callahan never sought appointment of a

mitigation expert.  Callahan did not engage his court-appointed expert ***until six and a half  months after the authorization***.  Callahan wrote a letter to clinical and forensic psychologist Dr. Jack G. Ferrell, Jr., Ph.D, on September 16, 2004 thanking him "for agreeing to examine Juan Castillo for competency, mental retardation, sanity, and mental illness" (*see* attached Exhibit D at App'x Tab 30).

***Not until March 29, 2005*** did  Dr. Ferrell fax three reports (*see* attached Exhibit D at App'x Tab 30) to Callahan.  One report merely advised the court that Castillo was mentally competent to stand trial and was neither mentally ill nor mentally retarded.  Dr. Ferrell's report carried a number of items that could have been used in mitigation (*Id.*):

- Castillo was raised solely by his single mother and had an unstable childhood with multiple moves.

- While in school, Castillo had social problems as a child, including multiple fights and disputes that produced school counseling.

- Castillo dropped out of school in the 7th grade and did not get a general equivalency diploma (GED).

On April 1, 2005, Callahan forwarded Dr. Ferrell's mental health evaluation to Castillo by a letter (*see* attached Exhibit D at App'x Tab 31), which, with respect to the evaluation, merely stated: "Please find enclosed a copy of the mental health evaluation presented by Dr. Ferrell."  Beyond this one line, Callahan made no attempt

to explain to Castillo the contents and significance of Dr. Ferrell's findings even though Dr. Ferrell's report said that Castillo had dropped out in the seventh grade and had no GED. Callahan never went to the jail to explain to Castillo the extreme importance of Dr. Ferrell's conclusions.

On April 24, 2005, months before trial, Callahan filed a voucher to pay Dr. Ferrell $2,605.00 (*see* attached Exhibit D at App'x Tab 30). Ferrell's billing reflects that he conferred with defense counsel for a whole 15 minutes some 7½ months earlier on October 6, 2004, some seven months after the trial judge had approved appointment. Based on Dr. Ferrell's conclusion, attorney Callahan wrote Dr. Ferrell on July 18, 2005 to be "mentally prepared" to testify on or about 8-26/05 to 8/29/05 (*see* attached Exhibit D at App'x Tab 32). Callahan further writes to Dr. Ferrell in that letter:

> I hope that you would be able to tell the jury in your own words that so long as Juan Castillo is incarcerated that in your opinion there is *no* probability (more likely than not) that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

During the trial, Callahan reiterated this point in a note with Castillo (*see* attached Exhibit D at App'x Tab 33) that had the following exchange:

> Castillo:   What would Dr. Ferrell really have to say?
>
> Callahan:   1. Your mental health is within normal parameters. 2. In jail, you would ***not*** be a future danger. You could argue that it's only

in the free world's society might you be considered a future danger—but not in a 'prison society. State will soon rest. The judge will ask you if you have evidence. I think you should put on Dr. Ferrill (sic) tomorrow morning.

At the Article 11.071 hearing, attorney Callahan concede this note was written *during* the trial. It reflects that lack of exchange of tactics and strategy and information between Applicant and the defense team *prior* to trial.

The very fact that Castillo has to ask Callahan what Ferrell would say strongly suggests that the reports he received were not clear to the 7th grade dropout Castillo. Further, since Callahan only saw Castillo once (the week of his arrest) and never sent Castillo any letter about the sentencing issues that jurors would have to answer, it is clear that Castillo had no idea of the significance of this mitigating matter on the death penalty. Further, the defense team never prepared any direct examination of Dr. Ferrell or prepared for his testimony.

Further it is clear that the defense team failed to arrange for Dr. Ferrell to be present to testify. First, a thorough review of the court's file reveals that the defense team never subpoenaed Dr. Ferrell (or any other witness). At the Article 11.071 hearing, attorney Callahan admitted he did not subpoena Dr. Ferrell and that at the time of sentencing Dr. Ferrell was in Austin rather than San Antonio due to a "communications" mix-up. The defense team never subpoenaed Dr. Ferrell. Second,

in his purple-covered spiral trial notebook (*see* attached Exhibit D at App'x Tab 9, page 57), attorney Callahan makes the following entry for 9-1-05, when the defense starts its case on sentencing:

> "0800:  Jack Ferrell **no show**.
>  def still desires to rep self despite my &
>  Bill's warning.
> Jack Ferrell is north of Austin—2 hours north of Austin
> —2 hrs arrival—1:30 p.m."
>       * * *
> 11:08—judge in
>     —No def. evid
> 11:10—Def rests
>     —close/close
>     —recess to 1230
>       chg conf.
>       no obj by def to chg.
> 12:00—in court
> 12:30—Ferrell—staff error in message
>       recordation
>     —on stand by

The voucher for second chair defense attorney Harris bills one hour on that same day —***the last day of trial*** —for "interview Dr. Ferrell."  This billing confirms that defense counsel had not prepared in advance for Dr. Ferrell's testimony.

As indicated from Callaghan's letter to Dr. Ferrell (*see* attached Exhibit D at App'x Tab 32) and handwritten note to Castillo in at trial (*see* attached Exhibit D at App'x Tab 33), the forensic psychologist would have testified that Castillo would not be a threat to society if he were incarcerated.  This professional judgment goes

34

directly to the heart of a key juror issue in sentencing.  Failure to present this key evidence prejudiced Castillo because he was deprived of having this evidence presented to jurors for their consideration on the special issues.

Although Callahan had promised Castillo back in June 16, 2004 that he would visit the client in jail as various tests were done (*see* attached Exhibit D at App'x Tab 58), Callahan never visited Castillo on Dr. Ferrell's report.  Callahan just mailed Dr. Ferrell's reports to his seventh grade dropout client (*see* attached Exhibit D at App'x Tab 31).  Callahan never conveyed the importance of this evidence until after a finding of guilty had been returned.  Callahan had not even prepared advance questioning for Dr. Ferrell to insure that each critical finding of Dr. Ferrell was included.  It does no good for Callahan to rely on *Schriro v. Landrigan,* as that case was not decided until two years after Castillo's trial.

### f.    Failure to Introduce Stipulated Mitigation Evidence

The district attorney obtained and made available to defense counsel Castillo's school records.  These records are in the prosecutor's files.  Over 16 months after his December 11, 2003 appointment to the case, Callahan wrote Castillo a May 6, 2005 letter in which he states, "The ***prosecutor and I*** **_will_** ***enter into a stipulation*** regarding all of your educational records which will be admitted during the punishment phase of your trial if any" (*see* attached Exhibit D at App'x Tab 28)(emphasis added).

Callahan testified at the Article 11.071 hearing that this was only a verbal gentleman's agreement and the records were never admitted into evidence. Counsel conceded he did not formally pre-file the records for use as a business record. Callahan failed to enter into the stipulation and the records were never admitted into evidence. Counsel did not pre-file the records for use as a business record. Counsel also could have interviewed Petitioner's mother and learned about the client's educational experiences (*see* attached Exhibit D at App. Tab 34), but Callahan failed to do so.

On January 31, 2005, attorney Callahan wrote Castillo that he intended to ask the prosecutor to enter into a stipulation of evidence agreement such that:

> the jury **will be allowed** to read the (federal) Presentence Investigation Report (PSI) of 3/12/04 because it state's (sic) succinctly the **dysfunctional family environment** in which you were raised which may assist the jury in answering the "any mitigation" special issue in the affirmative such that you do not receive the death penalty.

(*see* attached Exhibit D at App'x Tab 29)(second page)(The blank overface on page 1 existed on the original obtained from original writ attorney Kramer's file.)

The portion of the federal presentence investigation report with personal and family data, physical condition, mental and emotional health, substance abuse, and

educational and vocational, and employment record is found at attached Exhibit D at App'x Tab 35.

Callahan failed to obtain the stipulation or to otherwise introduce by alternate means this evidence that he considered important evidence on the mitigation issue. Had Callahan contacted Petitioner's mother, she could have provided such evidence and testified about it (*see* attached Exhibit D at App'x Tab 34). Had attorney Callahan introduced such records, they would have revealed the limited education had by Castillo. Counsel did not fulfill the promise to Castillo in his letter to stipulate to the admission of the records. Counsel conceded at the Article 11.071 hearing that he made no effort to introduce the educational records by a business record affidavit in advance of trial under TEX. R. EVID. 803(6) and 902(10). Castillo attended pre-K to the fourth grade at Surprise Elementary School, Surprise, Arizona. He attended the fourth and part of the fifth grade at Anadaberg Elementary School in Arizona, and the rest of the fifth grade and all of the sixth grade at Kingswood Elementary School, Surprise, Arizona.

Had counsel interviewed Castillo's mother—and he did not, he would have learned by the defendant was then unable to attend school in Ohio for a year and a half after his mother moved back to Canton, Ohio. *See* Mother's affidavit (*see* attached Exhibit D at App'x Tab 34). Ohio school officials would not enroll Castillo in Sowers Elementary School until Arizona school officials provided them his school

record.  Arizona school officials claimed that they had mailed the records.  Because of the stand-off between the two states, defendant did not attend school for a year and a half.

When he moved back to San Antonio with his mother, Castillo attended Rogers Middle School for a short period of time.  He dropped out of school in the seventh grade.  He never got a graduate equivalency degree (GED) (*Id*).  He had no college.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to adequately investigate and present  mitigation evidence.  *Williams v. Taylor*, *supra;  Moore v. Johnson*, *supra*); *Baxter v. Thomas*, *supra*.  The U.S. Supreme Court has repeatedly pointed to the absence of school records as an indicator of ineffectiveness in capital cases.  *Wiggins v. Smith*, 539 U.S. at 525 (frequent, lengthy absences from school); *Rompilla v. Beard*, 545 U.S. at 382, 125 S. Ct. at 2463 (school records are a likely avenue to build a mitigation case).

Castillo was prejudiced by defense counsel's failure to stipulate to the admission of the school records into evidence, as he wrote Castillo he would.  Castillo was prejudiced by counsel's failure to pre-file the education records under a business record affidavit.  Castillo was prejudiced by counsel's failure to interview the defendant's parents to investigate Petitioner's formative years and educational opportunities.  This is so even if the death penalty defendant or his parents are

actively obstructive. *Rompilla v. Beard*, 545 U.S. at 381, 125 S. Ct. at 2462.[13]  Had counsel fulfilled his responsibilities he would have provided jurors with significant evidence on the mitigation issue.

Getting a good education is part of the American dream.  Castillo had limited educational opportunities through no fault of his own.   Limited educational opportunities are a key part of mitigation.  Education is part of the formative process in developing intelligence, morality, judgment and maturity.   Education is the bedrock upon which success in life can be built.  Had jurors known of Castillo's limited educational opportunity they would have answered the mitigation special issue in Castillo's favor.   So, Castillo was clearly harmed for counsel's ineffectiveness in this area.

### g.    Failure to Interview and  Use Family Members in Sentencing

Part of any mitigation case is to contact family members to get them to testify for the death penalty client.  The defense attorneys failed miserably in this endeavor. Castillo had apparently told attorney Callahan not to call his mother as a witness in mitigation.  This inference came gleaned from a March 7, 2005 letter from Callahan to Castillo indicating he "will respect your directive and not call your mother as a

---

[13] "Rompilla's own contribution to any mitigation case were minimal. … To questions about his childhood and schooling, his answers indicated they had been normal … save for quitting school in the ninth grade … There were times when Rompilla was even actively obstructive  … The lawyers spoke with five members of Rompilla's family  … the overwhelming response from the family was that they didn't really feel as though they knew him all that well since he had spent the majority of his adult years and some of his childhood years in custody."

witness in your punishment stage, if any." (*See* attached Exhibit D at App'x Tab 36). This occurred even though the U.S. Supreme Court's June 2005 decision in *Rompilla v. Beard*, 545 U.S. 374, 377, 125 S. Ct. 2456, 2460 (2005) held that an attorney was bound to make such efforts at mitigation despite what the capital defendant or his family wants to do.

Castillo attempted to call Callahan collect in May 2005, as shown by the latter's May 20, 2005 letter (*see* attached Exhibit D at App'x Tab 37). The letter concerns mitigation, but Callahan never bothers to visit defendant on the issue. Although Callahan was appointed to represent defendant on December 11, 2003, Callahan waited until the eve of trial to attempt to contact Castillo's family members. He waited until June 11, 2005 to send a letter to defendant's mother, June Castillo, and he sent his letter to the ***wrong address*** as indicated by the returned envelope (*see* attached Exhibit D at App'x  Tab 38).

Just as significant, Petitioner's mother had repeatedly telephoned and left recorded message at attorney Callahan's office but Callahan never returned her calls. (*See* attached Exhibit D at App'x Tab 34, mother's affidavit).  Callahan waited another month and a half until July 29, 2005 until he wrote defendant's sister in Arizona (*see* attached Exhibit D at App'x  Tab 39).  July 29, 2005 was the day after the third day of  day of individual *voir dire* (R - v.6 - 1).  Finally, as the case on

findings was ending, Callahan gave a note to Castillo in the middle of trial that showed counsel was clueless (*see* attached Exhibit D at App'x  Tab 40):

> Callahan:   Ask your father to testify that he basically abandoned you as a youth so that you grew up without a father.
>
> Castillo:   My dad didn't abandoned me.   My mom basically took me and my sister.
>
> Callahan:   Well, then that.   Point being, you had no father.

Note that Castillo wrote at the bottom of the note, "Is this witness going to be the last one?"  This note suggests that Callahan did not develop this thought until late in the trial.  The inaccuracy of Callahan's assertion shows that the attorney had not delved into Castillo's background to any degree.  Also, it is unclear how Callahan expected Castillo to reach his father for this effort during the last hours of the trial.  Further, review of counsels' file indicate neither defense attorney attempted to contact Petitioner's  father by any means of communication.

Lastly, it is always possible for the defendant to take the stand during sentence and to give his own account.  However, the careful attention that defense counsel gave this possibility and even failed to prepare for the possibility is shown in Callahan's statement immediately ***after the prosecution rested***:

> Callahan:  ***I don't know if Mr. Castillo wants to testify or not***.

(R - v.18 - 164).

Had attorney Callahan taken action in the case to contact and to interview family members who would have learned a wealth of information, as indicated by the mother's subsequent affidavit (*see* attached Exhibit D at App'x Tab 34). Had counsel learned the information, he could have impressed upon the mother to testify and upon the defendant to let her or other family members to testify. It is noted that the mother phoned attorney three times and left messages, her name, and her phone number on the attorney's phone answering machine, and counsel was too lazy to return the calls. After his initial first visit with the defendant, attorney Callahan never returned to visit the defendant in jail over the next 20 months to emphasize how critical mitigation evidence was to the sentencing process. Instead, counsel abandoned the client.

Even though the defense attorneys received tardy notices under TEX. R. EVID. 404(b) and TEX. CODE CRIM. P. art. 37.07 (T - 101, 109), defense attorneys failed to prepare any cross-examination of the prosecution's sentencing witnesses. It matters not that Castillo decided to represent himself during sentencing; the fact is that defense attorneys had never prepared questions to provide Castillo in his tardy self-representation quest. While defense attorneys ignored the important tasks of preparing a mitigation case, Callahan had time to prepare a frivolous motion.

Counsel is ineffective during the penalty phase of a capital trial when counsel fails to adequately investigate and present mitigation evidence. *Williams v. Taylor*, *supra*; *Moore v. Johnson*, *supra*; *Baxter v. Thomas*, *supra*. Jurors have the ability

42

to sentence a capital defendant to life in prison rather than to the death penalty based on the mitigation issue. It is often the most critical part of a capital punishment trial and attorney Callahan totally abandoned Castillo for this phase of trial. Had Callahan been effective in this area, jurors would have known about the tragedy of young Castillo's life. Jurors would have learned that Castillo was hauled around the country and often living in homeless shelters, in a car, or just on the street. Jurors would not have treated a dog like that. They would have learned that Castillo was not exposed to the anticipations and privileges of the American dream and realize that these factors made him less blameworthy than the drug-indulged accomplices. Indeed, they would have learned that Castillo did not indulge in drugs or alcohol. The failure of counsel to investigate and to present this evidence clearly prejudiced Castillo on sentencing.

> **h.** **Frivolous Diversion of Effort into Non-Meritorious Motions and Failure to File Needed Motions/Notices**

Years before Petitioner's case, Texas courts had held that a violation of the State Bar Rules was not a law that caused suppression of evidence under TEX. CODE CRIM. P. art. 38.23. *Pannell v. State*, 666 S.W.2d 96, 98 (Tex. Crim. App. 1984); *Keen v. State*, 85 S.W.3d 405, 412 (Tex. App.—Tyler 2002, pet. ref'd).

Years before Petitioner's case, the federal courts had repeatedly held that entering into a plea agreement with an accomplice was not a violation of the federal

gratuity statute, 18 U.S.C. § 201.  Every court that had heard the issue, had so ruled,

including the Fifth Circuit whose law would apply to a federal habeas case in Texas.

*United States v. Haese*, 162 F.3d 359, 366-67 (5th Cir. 1998), *cert. denied*, 119 S. Ct.

1795 (1999).[14]

Nonetheless, defense attorney Callahan dithered his valuable time for this case

by preparing a motion seeking to suppress the testimony of the accomplices in this

case based on this theory.  He prepared a suppression motion, (T - 29 *et seq)*, and

attached to it Texas Disciplinary Rule of Professional Conduct 3.04 (T - 32) and an

article from *The Champion*, the journal of the National Criminal Defense Lawyers

Association (T - 36-44).  Although the article pointed out the total lack of success of

this motion and *Pannell* and *Keen* insured defeat, Callahan seemed inspired by the

failure.

A hearing was held and the prosecution pointed out that this argument had been

rejected by the federal courts some 80 times (R - v.2 - 5).  The trial judge denied this

frivolous motion that was the zenith of defense counsel's thought in this case.  This

reflects that defense counsel either failed to research the law or did not care what was

the law.

---

[14] The prosecutor's case file had a photocopy of this case ready for use.

44

Now there were certain basic motions and notices that defense counsel should have filed in a death penalty case with accomplices but Callahan failed to prepare or to present the following:

● A notice for uncharged misconduct under TEX. R. EVID. 404(b), adverse sentencing information under TEX. CODE CRIM. P. art. 37.07, and notice of convictions under TEX. R. EVID. 609(f).

● A motion under *Brady* to require the prosecution to produce plea bargain agreements, *sub rosa* agreements, or grants of immunity.

Despite defense counsel's abject failure, prosecutors gave original notice under TEX. R. EVID. 404(b),  TEX. CODE CRIM. P. art. 37.07, and TEX. R. EVID. 609(f) on July 26, 2005 and amended notice on August 15, 2005 without a request from the defense (T - 101 *et seq*, 109 *et seq*).  The first notice occurred on the first day of individual *voir dire* (R - v.4 - 1), and the second notice occurred three days after individualized *voir dire* ended on August 12, 2005 (R - v.14 - 1, 148) and eight days before trial on the merits began on August 23, 2005 (R - v.15 - 1).  Castillo's defense attorneys both conceded at the Article 11.071 hearing that they did not prepare any cross-examination of potential witnesses or motions in limine for these items.

Effective and ethical attorneys do not file frivolous, non-meritorious motions. Such motions waste everyone's time, run up costs, and violate TEX. DISCIPLINARY R. PROF'L CONDUCT 3.01, *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. A (TEX. STATE BAR R. art. X, § 9). Effective attorneys in a criminal case file for notice of misconduct under TEX. CODE CRIM. P. art. 37.07, § 3q and TEX. R. EVID. 404(b). While a response can be limited to matters on the case in chief, *Jaubert v. State*, 74 S.W.3d 1 (Tex. Crim. App. 2002), filing such motions can make defense counsel aware of matters adverse to the client so that counsel can get the appropriate police reports, court judgments, and court transcripts and prepare such adverse evidence. Failure to file such notice cannot be excused as "sound trial strategy" and renders defense counsel ineffective. *Loredo v. State*, 157 S.W.3d 26, 29 (Tex. App.—Waco 2004). The purpose of such notices is to avoid unfair surprise, that is, trial by ambush. *Chimney v. State*, 6 S.W.3d 681, 697 (Tex. App.—Waco 1999, no pet.).

It was ineffective for counsel to file his motion that had absolutely no legal merit. Counsel should have filed notices under Article 37.07 and Rule 404(b) as soon as the case had been indicted and counsel has a case number to place on the heading of the notice. Had attorney Callahan done so, he would have had over a full year to prepare to meet such witnesses and evidence in sentencing. Instead, defense counsel

failed to file such notices and failed to prepare to meet the evidence head-on. Had counsel shown initiative instead of sloth here, then Petitioner would undoubtedly had great confidence in the efforts of his counsel. Instead, Petitioner read his counsel correctly that the counsel was doing nothing in his case.

It is no excuse to say that the prosecution voluntarily gave notice. The prosecution's attorneys did not provide notice until July 26, 2005, the first day of individual *voir dire*. The prosecution did not amend the notice until August 15, 2005, three days after completion of individualized *voir dire* and eight days before trial on the merits. Even then, defense attorneys did not prepare any cross-examination of potential witnesses or motions in limine for these items. Counsel's ineffectiveness in failing to prepare for adverse witnesses in findings and sentencing adversely impacted on Castillo. The U.S. Supreme Court has condemned such dilatory omissions by ineffective counsel as prejudicial to a defendant. *Rompilla v. Beard*, 545 U.S. at 385-86, 125 S. Ct. 2464-65.[15]

---

[15] "There is no question defense counsel were on notice, since they acknowledge that a 'plea letter,' written by one of them *four days prior to trial*, mentioned the prosecutor's plans … It is clear, however, that defense counsel did not look at any part of that file, including the transcript, *until warned by the prosecution a second time*. … The obligation to get the file was particularly pressing here due to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt (emphasis added)."

### 3.  Trial Ineffectiveness of Counsel

### a.  Lacking Knowledge and Skills in Capital Case

In a capital murder case, it is imperative that defense counsel have a minimum fund of knowledge of the law involving capital punishment.  To be effective, death penalty defense counsel must demonstrate knowledge and skills.  Guideline 5.1b, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. Ed. Feb. 2003)(*see* attached Exhibit D at App'x Tab 53) mandates that capital counsel have demonstrate the following skills:

     a.    substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

     b.    skill in the management and conduct of complex negotiations and litigation;

     c.    skill in legal research, analysis, and the drafting of litigation documents;

     d.    skill in oral advocacy;

     e.    skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

     f.    skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

     g.    skill in the investigation, preparation, and presentation of mitigating evidence; and

      h.    skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

Guideline 4.1B(2), Guidelines and Standards for Texas Capital Counsel, State Bar of Texas (*see* attached Exhibit D at App'x Tab 52) has the same standards.

Callahan's lack of knowledge of the law prejudiced his client and lead to his client's conviction as shown by the following matters:

● He asked questions of adverse witnesses that bolstered the credibility of witnesses as stated previously;

● He failed to control the lead homicide detective and failed to properly object as stated previously;

● His final argument contradicted the opening statement and, because he did not know the basic law, conceded the guilt of his client (R - v.20 - 76 -77);

● He filed a frivolous, non-meritorious motion and ignored those motions and notice requests that would have helped his client and then failed to prepare when the prosecution voluntarily provide the information normally obtained from such motions.

### b.  Opening Statement for the Defense

Although first chair counsel Callahan billed for drafting an opening statement the day before the case in chief opened, it was second chair defense counsel Harris who gave the following brief opening statement (R - v.15 - 23-24):

49

Good morning.  Ladies and Gentlemen of the jury, the State has just given you a very eloquent outline of what they expect to prove in this case.  The presentation of their evidence.  A lot of that evidence the defense will agree with.  We will agree that the murder of Tommy Garcia the morning of December 3d, 2003, was a tragedy.  We will agree that the crime committed by Francisco Gonzales and Debra Espinoza was a terrible crime.  ***What we do not agree with is that Juan Castillo was connected in any way with this crime***.  Most, if not all, of our defense will be through means of cross-examination of the State's witnesses.  When it comes to light, the character, the demeanor, and most importantly, the motivation for the testimony of Francisco Gonzales and Debra Espinoza, there will be reasonable doubt as to their credibility, reasonable doubt as to their believability.  When it comes to light, the character, the demeanor, and the motivation of relatives of Frank Gonzales—Francisco Gonzales, there will be reasonable doubt as to their credibility as well.  In short, when all is said and done, there will be absolutely no believable evidence to indicate that Juan Castillo was involved in this case.  In fact, the evidence ***might suggest*** that if there was a third party, it was Teresa Quintero, or ***maybe*** Rudy Luna, or both.  Listen carefully.  Thank you.

The strategy, if any, reflected in this case appears to be solely to attack the credibility of accomplices Francisco Gonzales and Debra Espinoza, as the opening statement failed to mentioned items favorable to Castillo.  Such favorable evidence included but it is not limited to the following items:

● DNA evidence on a ski mask worn by the assailant was inconclusive as to the defendant but nailed Francisco Gonzales.

● No weapon was found.

● Police captured both Gonzales and Espinoza in the vicinity of the crime scene within an hour of the murder, but Castillo was not there.

● Both Gonzales and Espinoza gave many different versions of their involvement, but always tried to minimize their involvement (e.g. I confess—everyone is culpable but me).

● Both Gonzales and Espinoza were filthy with guilt and have confessed to the crime and now come to jurors.

Assuming attacking the credibility of the accomplices was the defense strategy, defense attorneys failed in that endeavor in opening statement. Significantly, first chair counsel contradicted the points in this opening statement (e.g., Castillo was not connected with this crime in any way; Francisco Gonzales and Debra Espinoza are not credible) in his final argument (e.g. accomplices planned on robbery; Castillo planned on murder. (R - v.20 - 76-77).

The defense in a capital case should develop and present a cogent defense theory. *Hernandez v. State*, 943 S.W.2d 930, 935 (Tex. App.—El Paso, 1997)(IAC when counsel only saw client day before trial), *rev'd to apply Strickland vice Ex parte Duffey*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999), *remanded to trial court*, 08-95-00187-CR (August 31, 2000). Counsel was ineffective in making opening statement as the statement failed to present a cogent defense theory that emphasized the known strengths of Castillo's case. The opening proved to be prejudicial because first chair

counsel contradicted the opening statement in his final argument on findings.

### c. Failing to Investigate & Bolstering Prosecution's Case

In his ***preparation held the day before trial on the merits began***, attorney Callahan wrote out points he was to make for the five witnesses he prepared for (*see* attached Exhibit D at App'x, Tabs 4-8). Not only do the attorney vouchers show that Callahan failed to interview prosecution witness (*see* attached Exhibit D at App'x Tabs 10-12), his questioning confirms it. Although second chair counsel had expressed sympathy for the deceased Tommy "JR" Garcia in his opening statement, Callahan promptly negated that strategy.

First, Callahan asked witness ***Frank Russell*** if he knew of the reputation of accomplice Debra Espinoza with regard to truth and veracity, and Russell slammed Callahan by saying that he did not know if she would tell the truth or not (R - v.15 - 188). Second, having failed to discredit Ms. Espinoza, Callahan then tried to besmirch Russell ***and the deceased*** by accusing them of smoking marijuana that night (*Id*. 190). Russell blows away Callahan by saying he and the decedent were not smoking marijuana --they were playing Play Station (*Id*.).

Having failed to diminish the credibility of neutral witness Russell, Callahan tried to smear Russell through his cross-examination of the other lad who was with the decedent that night, ***Robert "Rob" Jimenez***. Callahan asked Jimenez about

Russell's character for being truthful, and Jimenez, obviously never interviewed by Callahan, slams Callahan by declaring, "He's (Russell) truthful.  He's –he's real. He's a real guy" (R - v.16 - 51).  Having unsuccessfully jousted with that windmill, Callahan then inquired of neutral witness Jimenez if he knew the reputation and character for being truthful of accomplice Debra Espinoza, and Jimenez replied, "Not really, sir. (*Id.* at 52).

Then, when ***Debra Espinoza*** testified, Callahan cross-examined her in contradiction to the strategy of the opening statement so as to enhance the credibility of the other accomplices.  He asked if accomplice Francisco Gonzales was truthful, and Ms. Espinoza replied, "To my knowledge, yes" (R - v.17 - 70).  He asked if accomplice Teresa Quintero was truthful, and she replied, "From my knowledge, she's truthful" (*Id*.)  Then, Callahan asked about Lucinda Gonzales, Francisco's sister who would testify against Castillo, and Ms. Espinoza said Ms Quintero was truthful (*Id*. at 71).  When Callahan asked her if Bryan Brown was truthful, Ms. Espinoza denied knowing Mr. Brown (*Id*.).

When given a gift by the prosecutor, Callahan failed to take advantage of  it. On direct examination, Ms. Espinoza testified for the prosecutor that she had not slept in six days at the time of the murder (R - v.17 - 49).  Callahan never approached the matter on cross, when he could have beaten the witness half to death with a statement

53

that could be used to attack her recall of events because of sleep deprivation.

Any attorney worthy of the name would know that sleep deprivation produces extreme effects on a person, including memory lapses, cognitive ability, judgment impairment, all of which could have been used to attack the competence and recall of witness Espinoza. Indeed, Callahan could probably have used the medical examiner as an expert witness on these effects. He did not do so. Callahan had thus just bolstered the credibility of the key witnesses against Castillo. But it was his handling of case homicide detective ***Timm Angell*** where Callahan—in the presence of jurors—self-inflicted the worst damage to his client's cause (R - v.18 - 96 - 105). There, Detective Angell repeatedly savaged first chair defense counsel Callahan during cross-examination because counsel never investigated witnesses and got the facts blatantly wrong (*Id.*).

Because he had so little knowledge about his client's case and had not properly prepared, Callahan three times confused Lucinda Gonzales with Ms. Espinoza and the detective lectured him on the correct facts (R - v.18 - 100, 101, 103). When Callahan tried to assert that Ms. Espinoza "was never completely truthful," Detective Angell boosted the credibility of accomplice Espinoza through the door opened by Callahan by saying:

> I'm sorry. If you're asking me, I disagree. I think she

> was—towards the end she was being truthful.  She left
> things out, but she wasn't lying to deceive me.

(R - v.18 - 102).

The detective also corrected Callahan on the number of statements made by Francisco Gonzales (R - v.18 - 103).   When the prosecutor tried on redirect examination to get the detective to say that the investigation had narrowed itself to only Castillo, Callahan initially successfully objected but then surrendered by letting the detective, without objection, finger Castillo (R - v.19 - 107):

| | |
|---|---|
| Court: | What—Rephrase, then. |
| Q: | Did you have information from any other source to lead you to investigate the name of any other person that the jury has not heard about? |
| A: | No. |

Not only did Callahan bolster the credibility of the prosecution witnesses, but Callahan bolstered the prosecution's case by showing his lack of familiarity with the case.  When he cross-examined **Officer Higginbotham**, he got the officer to declare that Ms. Espinoza did not have blood on her, a fact that enhanced her credibility by putting her outside the car at the time of the shooting (R - v.15 - 209).  When he cross-examined neutral witness **Rudy Luna**, Callahan confused the decedent's medallion necklace as silver, rather than gold (R - v.17 - 24-25).

55

Counsel is ineffective when he bolsters the prosecution's case. *Moore v. Johnson*, 194 F.3d 586, 611-612 (5th Cir. 1999); *Ex parte Walker*, 777 S.W.2d 427 (Tex. Crim. App. 1989)(IAC found); *Vasquez v*. State, 830 S.W.2d 948, 950 n. 3 & 4 (Tex. Crim. App. 1992)(improper bolstering of prosecution witnesses is not strategy); *Weathersby v. State*, 627 S.W.2d 729, 730 (Tex. Crim. App. 1982) (improper for two detectives to testify that they believed defendant was guilty); *Greene v. State*, 928 S.W.2d 119, 122 (Tex. App.—San Antonio 1996, no writ); *Fuller v. State*, 224 S.W.2d 823, 835 (Tex. App.—Texarkana 2007)(Counsel's conduct in allowing the State unfettered and unchecked bolstering was so outrageous that no competent counsel would have engaged in it); *Hutchinson v. State*, 663 S.W.2d 610, 614 (Tex. App.—Houston [1st Dist. 1983, pet. ref'd)(Lack of a single instance in which counsel's cross-examination of State's witnesses had the effect of challenging their testimony; indeed, counsel's questioning bolstered the State's case). Counsel is ineffective when he permits a detective to testify a defendant is guilty from examination of his investigation. *Weathersby v. State*, 627 S.W.2d 729 (Tex. Crim. App. 1982).

The fears that Castillo expressed months before in his letter to the trial judge about the competence of his defense counsel (*see* attached Exhibit D at App'x Tab 17) came to fruition. In a death penalty case, it is the defense attorney who wins or

loses a case.  Counsel must walk into the court totally prepared weeks in advance with a strategy and mastery of the facts and the law.  Castillo's attorneys had none of this.  As shown by the cross-examinations, they were flaccid and impotent.  Their cross-examination exploded in their face at every turn and boosted the credibility of the prosecution's witnesses and the prosecution's case.  If counsel had prepared cross-examination weeks before juror selection instead of the day before trial, they could have created reasonable doubt as the prosecution witnesses lacked credibility. A prepared cross-examination (*see* attached Exhibit D at App'x Tab 27) would have won the day.  Instead, defense counsel in this case had neither preparation nor credibility and eviscerated their client.

### d.  Conceding Guilt in Final Argument Based on Misunderstanding of the Law

After having bolstered the prosecution's key witnesses, Callahan then conceded guilt during final argument on findings.  The medical examiner had testified that physical examination of the decedent produced $124 in a money clip in the left front pants pocket and $450 cash in the right rear pants pocket (R - v.18 - 150).  In contrast, accomplices Francisco Gonzales (R - v.16 - 89, 94-96, 111) and Debra Espinoza (R - v.17 - 31, 35, 40) testified at length that robbery was the objective that night.  Castillo had reportedly admitted the robbery plan to others, like Geraldo Gutierrez (R - v.17 - 10).  Detective Podwika had recovered a portion of the stolen gold necklace from the

57

decedent's vehicle (R - v.15 - 151; R - v.23 - State Ex. 58).

In his final argument on findings, Callahan seems to be oblivious of the law that an attempt to commit robbery constitutes robbery under TEX. PENAL CODE § 29.01 and 29.03[16], as he argued:

> So some of ***you obviously believe the testimony of both of these people*** (Francisco Gonzales and Debra Espinoza). Then I submit to you if that's true, that what really happened here was that Debra Espinoza and Francisco were planning a robbery, but he (Castillo) was planning a murder. There was no robbery in the mind of Castillo, if you believe both of the accomplice witnesses. And the Judge has authorized you, if you see fit, to find Juan Castillo guilty of murder and not capital murder. So I'm asking you first to vote not guilty in the case in general. *But if you decided as fact finders, and I respect the power that you have. I respect the system. And never ever quarrel with your judgment.* If you believe both of them, then ***I respectfully submit to you*** that ***a reasonable inference is that Juan Castillo committed murder and tricked Francisco, Debra to get Tommy Garcia to the scene so he could kill him***. The one argument I would give you in that recall is you recall the female medical examiner leaning down to the body and holding it over kind of sideways, and another medical examiner reached it, there was this wad of cash, close to $600. ***That's why this wasn't a robbery. This was a murder***, if you believe the testimony of both accomplices. Thank you for your time.

(R - v.20 - 76-77) (emphasis added).

This final argument is in total variance to the opening statement that the

---

[16] Even the indictment in the case spells it out: "cause the death of TOMMY GARCIA ***while in the course of committing and attempting to commit the offense of ROBBERY*** upon TOMMY GARCIA" (T - 4).

accomplices could not be believed and that Castillo had committed no crime--robbery or murder.  Note that Callahan in effect tells jurors that he would not be upset if they returned a finding of capital murder.

If strategy is based on incorrect law, a court need not defer to reasonable strategy. *Robertson v. State*, 187 S.W.3d 475, 484 (Tex. Crim. App. 2006); *Ex parte Marez*, 505 S.W.2d 930 (Tex. Crim. App. 1974);  *Fuller v. State*, 224 S.W.3d 823 (Tex. App.—Texarkana 2007);  *Greene v. State*, 928 S.W.2d 119, 122 (Tex. App.—San Antonio 1996, no writ).

Attorney Callahan ignored in his final argument the opening statement assertion that Castillo was not involved in the crime.  He based his final argument on incorrect law.  Under TEX. PENAL CODE §§ 29.01 and 29.03, aggravated robbery exists if there is an *attempted* robbery.  Attempted robbery is also in the indictment. Here, the accomplices testified that the plan was to rob the decedent and that all of them did a smash and grab at the car at gunpoint and demanded money.  That evidence alone is sufficient to establish aggravated robbery.  Callahan was ignorant of the law, and he asserted there was not a robbery because the medical examiner found cash still on the decedent.  Under Texas law, robbery was already committed by the attempted robbery testified to by the accomplices.

Callahan amazingly argued that, if jurors believed the accomplices, then the accomplices were planning a robbery and ***Castillo was planning a murder***.  The fact

that the medical examiner found cash in the pants of the decedent does not prove that there was no robbery, as Texas law defines robbery to include an attempted robbery. Under his misperception of the law, Callahan argued that there was only plain murder, not capital murder. If the accomplices are believed, as Callahan suggests, then jurors would have to believe the robbery that the accomplices mentioned and the murder that Callahan advocates. Robbery or attempted robbery plus murder is capital murder. Callahan had just argued for conviction of his client for capital murder. This was a profoundly prejudicial argument. Defense counsel's argument admitted the crime and convicted the client.

### e.  Failing to Object to Sleeping Jurors

Almost as bad as admitting guilt in final argument, attorney Callahan confirmed that one or more jurors had been sleeping during trial, and he made no objection. Callahan addressed jurors in his final argument, "But some of you've got your arms crossed, ***some are falling asleep***, some are not listening." (R - v.20 - 76). The evidence certainly shows this. In his purple-covered spiral trial notebook ***after*** making this final argument, Callahan even documents ***further*** sleeping:

> 1:55 (female juror sleeping)
>
> 2:05 (same juror nodding)
>
> 2:18 (same juror nodding)

(*see* attached Exhibit D at App'x Tab 9, pages 53, 54, 55).

In an exchange of two notes with counsel during the trial, Castillo points out the sleeping jurors, and the defense counsel do nothing (*see* attached Exhibit D at App'x Tab 43-44). Attorney Harris conceded at the Article 11.071 hearing to receiving one of these notes, Def. Ex. 2-D. Attorney Callahan finally conceded on the third day of the Article 11.071 hearing that an elderly female juror was sleeping during the findings stage of trial and that he did not object.

Months after trial, Callahan wrote a March 9, 2006 letter to Castillo (*see* attached Exhibit D at App'x Tab 59). After denying in the letter that he sold Castillo out at the jury trial, Callahan wrote in the third paragraph, "If the record supports your allegation that three jurors slept throughout your trial I will also present on appeal that issue." This statement was written with guile as Callahan had to know it would not be in the record unless he made an objection, which he failed to do. However, the above evidence clearly shows Callahan was aware of sleeping jurors, and it was in the record that transcribed the final argument.

A sleeping juror is a basis for a mistrial. Reversal is automatic when there is an objection. *Thieleman v. State*, 187 S.W.3d 455, 456 (Tex. Crim. App. 2005). If the defense attorney fails to object, the issue is waived and not preserved for appeal. *Menard v. State*, 193 S.W.3d 55 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)(aggravated robbery); *Zani v. State*, 679 S.W.2d 144, 152 (Tex.

App.—Texarkana 1984)(murder), *vacated*, 758 S.W.2d 233 (Tex. Crim. App.1988)(issue of hypnotically enhanced testimony), *on remand*, 767 S.W.2d 825 (Tex. App.—Texarkana 1989, pet. ref'd).

The sleeping is confirmed by Castillo's notes to his counsel, by the attorney's own notes in his purple-covered trial notebook, and especially by attorney Callahan's final argument, "But some of you've got your arms crossed, ***some are falling asleep***, some are not listening."   Castillo was prejudiced by defense counsel's failing to object and to seek a mistrial.   Castillo was prejudiced because one or more jurors slept in his trial and did not pay attention to testimony and evidence.   Since these acts occurred before deliberation on findings of guilt, Castillo was prejudiced on findings.

### f.  Not Interviewing Sole Defense Witness Until Third Day of Trial and Then Putting Witness on Stand Despite His Minimal Assistance and Letting Witness Implode on Stand Because of Lack of Counsel Preparation

Callahan's attorney fee voucher of 9-6-2005 (*see* attached Exhibit D at App'x Tabs 10 & 11, p. 5) indicates that he interviewed defense witness Perdigone for the first time on  August 25, 2005.  This is the night of the third day of trial on the merits. Ralph Perdigone provides *de minimus* assistance to the Castillo's cause and proves to be an unmitigated disaster on cross-examination by the prosecution.  Callahan asks Perdigone if he was present in jail on June 9, 2004 when Francisco Gonzales

responded to a news story (R - v.20 - 5).  Before jurors, the discredited attorney

Callahan got the facts wrong—again—and had to correct the date to January 9, 2004

(*Id*.).   Perdigone said that Gonzales said, "That's the guy *I* killed," and then

immediately corrected himself, "I mean ***they*** killed."  (*Id).*

The prosecutor then slaughtered Perdigone.  He admitted that new inmates,

which Rodriguez was, often brag or exaggerate to bolster their credibility and

standing among inmates (*Id*. at 10).  He said Castillo repeatedly "bugged him" for

such a statement for two months  and that it was the defense who provided the date

of January 8 (*Id*. at 12-13).  He said Castillo repeated wanted him to contact the

district attorney but he refused (*Id*. at 14).   This jail house snitch then admitted that

he had been convicted of 14 different felony convictions and that inmates do favors

for each other for each other to make money (*Id*. at 16-18).

Counsel is ineffective if he fails to prepare a witness to testify.   *Ex parte*

*Guzman*, 730 S.W.2d 724, 736 (Tex. Crim. App. 1987); *Smith v. State*, 894 S.W.2d

876, 890 (Tex. App.—Amarillo 1975, pet. ref'd); *Diaz v. State*, 905 S.W.2d 302, 308

(Tex. App. 1995, no pet.).

After interviewing witness Perdigone for the first time on the night of the third

day of trial, defense counsel should have realized two things:  (1)  the witness had

nothing substantial to present, and (2) his extensive criminal record would make him

mince meat for the prosecution on cross-examination. Perdigone had *de minimus* assistance in impeaching the credibility of accomplice Francisco Gonzalez and absolute no assistance in impeaching Debra Espinosa or any other prosecution witness. Having failed in that strategy, defense counsel should have least prepared their witness to testify so he would not implode on the witness stand, as he did. This incredible lack of skill seriously prejudiced Castillo. In opening statement, counsel says he will attack the accomplices, and this is the witness he puts up to impress jurors of the merits of his client's cause.

### g.  Ineffective Representation on <u>Faretta</u> Issue

This issue is discussed, *infra*, in this writ Application as a separate claim. For brevity, this issue incorporates by reference the facts and law set out in the separate claim. For a Texas defendant to be competent to represent himself, the standard is higher than set in *Indiana v. Edwards*, 554 U.S. 208, 128 S. Ct. 2379 (2008)(whether court could deny self-representation for mentally ill defendant). The standard is whether the defendant has the ability to present his own defense without the assistance of counsel. *Chadwick v. State*, 277 S.W.3d 99, 103-04 (Tex. App.—Austin 2009, no pet.).

Petitioner repeatedly put counsel on notice that he was extremely dissatisfied with his failure to visit him and to prepare for the case. He recognized ineffective

counsel.  Defense counsel had an ethical duty to present the matter to the court, and he failed to do so.  Counsel was ineffective about his own ineffectiveness by failing to resolve his problems with Castillo and in failing to bring the matter to the attention of the court.   When counsel suspected that Castillo's outlook resulted from depression, counsel should have immediately have met personally and repeatedly with Petitioner.  He did not do so.  When the matter came to head after jurors had returned findings of guilt, Callahan should have pointed out that Castillo was too depressed to make this decision and he should have screamed that Castillo's request was tardy and should have been denied.  Since Castillo made no opening or closing statement and did not question any witness in sentencing, it can be inferred that he was too depressed to perform sentencing without counsel, and thus he was not competent for self-representation.

Counsel's initial failure to present the request for self-representation to the attention of trial prejudiced Castillo.  Counsel's failure to met with Castillo to resolve the suspected depression and to engender confidence in counsel prejudiced Castillo by deepening his depression and late of faith and confidence in counsel.  When the request was renewed after return of findings, counsel prejudiced Castillo by not pointing out that Castillo was not competent and that the request was tardy.

### 4. Counsel was ineffective during jury selection

The Petitioner was denied his rights under the U.S. CONST. amend. VI because of ineffectiveness of counsel in selection of jurors.  During the start of individualized *voir dire* with venire woman Doris Cedillo, the trial judge told her that *voir dire* was running late that morning because of a mix-up at the jail (R - v.5 - 30). At the end of questioning Ms. Cedillo, defense counsel stated that he was concerned about the comment (*Id*., at p. 35).  Prosecutor Lunan then volunteered, "If they (the defense) wish to challenge for cause based on that issue, I don't object" (*Id*.)  Instead, defense counsel Callahan said he had no objections to the remarks and accepted Ms. Cedillo as a juror (*Id*.).

However, during the individualized *voir* dire, the prosecutor entered into a lively exchange of death penalty law in which Ms. Cedillo responded, "I guess so," "uh-huh," "un-huh," "yes," "yes," "yes, I do," nods head, "uh-huh," "yes," "un-huh," and an inaudible response followed by a clarifying "yes" (*Id.* at 9-18).  The prosecutor told her, "There is nothing in our law that is automatically mitigating" (*Id*. at 19). After this explanation, the prosecutor asked if she followed the explanation, and Ms. Cedillo meekly replied, "I think so" (*Id.* at 21).  When asked by the prosecutor if Ms. Cedillo could participate in a process whereby her vote could result in execution, she replied that she felt she needed to understand more about the law (*Id*. at 23).

After being given yet more instructions on the law and asked if she could do this process, she said she could not answer (*Id*. at 25). When asked what she thought made the matter difficult, Ms. Cedillo replied, "Just understanding everything." (*Id*. at 27). When the Fifth Amendment was explained to her, her response was, "What do you mean?" (*Id*. at 30). She was hopelessly confused on the law. When she was passed to defense counsel, she was asked general questions on whether she could participate in the process, and she responded, "I guess so, " "Yes, I guess so," "Never done it before," and "I think I would" (*Id*. at 33-34). Neither counsel got response from Ms. Cedillo except proof of her confused mine. Ms. Cedillo became the third juror (*Id*. at 35).

The future dangerousness issue was explained to venire man Arthur Carter, and he volunteered to counsel that the issue sought an answer for a "possibility" (R - v.5 - 122). Neither prosecution nor defense corrected this misinterpretation. When the prosecutor provided the venire man a hypothetical set of facts to the future dangerousness issue, Mr. Carter seemed to say he would automatically answer "yes" on this issue (*Id* at 124). Second chair defense counsel Harris posed no questions on sentencing to clarify these misconceptions (*Id*. at 131-134). Mr. Carter became juror number four (*Id*. at 144).

An accused is entitled to an impartial juror composed of persons who are unprejudiced, disinterested, equitable, and just, who have not prejudiced the merits of the case. *Shaver v. State*, 280 S.W.2d 740, 742 (Tex. Crim. App. 1955). The *voir dire* process is designed to insure to the fullest extent possible, that such an impartial jury will perform the duty assigned to it. *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978). Defense counsel can be ineffective in the conduct of *voir dire*. *Nelson v. State*, 832 S.W.2d 762, 765-66 (Tex. App.—Houston [1st Dist.] 1992, no pet.).

Defense counsel provided ineffective assistance for these two venire persons, both of whom sat on the jury. Both of these jurors had misconceptions of capital punishment law. The poisoning of the jury panel left the jury with misinformed jurors, and such jurors prejudiced Petitioner on sentencing. The prosecutor agreed to a challenge of Ms. Cedillo for cause, but defense counsel failed to accept the offer. No sound strategy exists when defense counsel raises the issue of taint of a juror and the prosecutor agrees to a challenge for cause, and then defense counsel fails to assert the challenge for cause. There is no sound strategy in failing to clarify a juror's misconceptions of the law.

### 5. Cumulative Effect of Ineffectiveness of Counsel

The standard of care of defense attorneys are set forth in the case law previously cited in this application, in the affidavits of a death penalty practitioner

(*see* attached Exhibit D at App'x  Tab 42), the Guidelines and Standards for Texas

Capital Counsel, State Bar of Texas (*see* attached Exhibit D at App'x Tab 52), and

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death

Penalty Cases (Rev. Ed. Feb. (2003) (*see* attached Exhibit D at App'x Tab 53).

Although no single act in a case might not be sufficient proof of ineffective

assistance of counsel, counsel's overall performance taken as a whole can compel

such a holding.  *Ex parte Welborn*, 785 S.W.2d 391, 396 (Tex. Crim. App. 1990);

*Greene v. State*, 928 S.W.2d 119, 126 (Tex. App.—San Antonio 1996).  Effectiveness

of counsel is ordinarily gauged by the totality of the representation, but a single error,

if sufficiently egregious, can constitute ineffective assistance of counsel.  *Ex parte

Felton*, 815 S.W.2d 733 (Tex. Crim. App. 1991).

As detailed in the above facts, defense counsel abandoned Castillo at every

level and was ineffective at every conceivable level.  Counsel's acts of commission

and omission individually were sufficient egregious to be ineffective and to prejudice

Castillo.  Defense counsel effectively abandoned their client.  Lead counsel Callahan

only once—right after counsel's appointment—saw the defendant in jail in the over

19 months from arrest to trial and never returned.  He never met with defendant to go

over discovery for input or strategy.  Second chair counsel's visitation was equally

abysmal.  When defense counsel believed the defendant was depressed because he

wanted to defend himself, counsel never met with the client to resolve that depression.

Both defense counsel made their superficial preparations for trial on the merits until *after* jurors in this capital case had been selected. First chair counsel did not begin his trial preparation until the ***day before*** trial on the merits began. Defense counsel's urgent task was to destroy the credibility of the accomplice witnesses and their friends at every point. Instead, defense counsel asked questions of the accomplices and the lead homicide detective that enhanced the credibility of the very witnesses that the defense had to destroy. Counsel's superficial knowledge of the facts of the case repeatedly resulted in multiple witnesses correcting counsel on the basic facts, thus undercutting any credibility counsel might have had left with jurors.

Defense counsel showed his lack of knowledge of capital law by having the defendant signed a demand for sentencing by the judge in a death penalty case, contrary to law. Although defense counsel had advised counsel that they would be introducing Castillo's educational records and mitigation matters from defendant's federal pre-sentence investigation report, defense counsel failed to do so. Defense counsel made no attempt to contact relatives for over a year and a half and only attempted to do so after jurors had been selected and once during the latter stages of trial on the merits. Defense counsel were going to call a forensic psychologist who had examined Castillo but they failed to do so. Instead, although the psychologist

would testify that the accused would not be a threat to society while incarcerated —a very significant matter in a death penalty case, counsel failed to issue a subpoena to the psychologist and botched up his testifying in court.

Lastly, counsel opened his final argument with a statement that he understood that jurors had been sleeping during trial, but he neither objected nor sought a mistrial for the snoozes.  Then, amazingly, lead counsel argued that, while the accomplices planned and executed a robbery, his client *merely* planned and executed a murder. Not only did counsel fail to understand the law of robbery for the argument, counsel conceded the primary issue of the case—his client's guilt.

This cumulative incompetence was not strategy.  This ineffectiveness prejudiced defendant Castillo in both their cumulative acts of commission and omission were so serious that Castillo was deprived of a fair trial on both findings and sentence.  Castillo was abandoned by his counsel from the start.  This case had one chance for a defense victory—to destroy the credibility of the accomplices.  Instead, attorney Callahan embarked on a cross-examination that bolstered the credibility of the state's accomplice witnesses.  By not knowing the facts of the case, Callahan let even the most minor witness destroy his—and Castillo's—credibility.  Counsel did not even prepare for over 20 prosecution witnesses.  Failing to prepare for so many witnesses was tantamount to ritualistic disembowelment.

The prejudice of such ineffectiveness was compounded even further by the lack of preparation and execution in sentencing.  Defendant was prejudiced because his attorneys did not prepare to cross-examine witnesses that the State would call in sentencing.  Defendant was prejudiced because his attorneys failed to prepare a sentencing case and failed to prepare and to present mitigation evidence.  Since the errors are of constitutional dimension, reversal of both findings and sentencing is required as the errors were not harmless beyond reasonable doubt and contributed to the verdict obtained.  *Chapman v. California*, 384 U.S. 18, 24, 87 S. Ct. 824, 828 (1967); *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 1833 (1999); TEX. R. APP. PROC. 44.2(a).

## CLAIM II

## THE TRIAL COURT VIOLATED THE PETITIONER'S RIGHTS TO SELF-REPRESENTATION AND THEN ABUSED HER DISCRETION IN HAVING THE PETITIONER DEFEND HIMSELF DURING SENTENCING.

## ARGUMENT AND AUTHORITIES
## IN SUPPORT OF CLAIM II

The Petitioner was denied his rights of self-representation under U.S. Const. amend. VI and of due process under the U.S. Const. amends. V and XIV for the

following reasons.  After being in jail for over a year, Castillo wrote the trial judge

on January 16, 2005:

> I'd like to dismiss my court appointed attorney Vincent Callahan because ***I have only seen him twice in the past 13 months***.  Once in December of 2003 and the last time was in your courtroom on 1-6-2004.  I also feel he is not helping me.  I had asked Mr. Callahan to put a motion to dismiss appointed counsel and he responded with "The law permits you to retain any lawyer of your own choosing but it does not permit you to choose who your court appointed attorney is.  I will stay in touch."  I understand that I do not get to choose which attorney I want to represent me if they are court appointed.  I was under the impression that I could fire a court appointed attorney if I felt that they weren't helping me.  Well, Your Honor I hope you will take this in to consideration upon making your decision.

(T - 14).

The trial judge failed in her responsibilities to make an inquiry under *Faretta v. California*, 422 U.S. 806, 95 S. Ct. 2525 (1975).  The judge took no action.

Attorney Callahan wrote Castillo a letter dated February 18, 2005 (*see* attached Exhibit D at App'x Tab 44) stating, "Dear Mr. Castillo: I received your letter postmarked 2/16/05.  ***I understand <u>the depression that you are presently</u>*** <u>***experiencing***</u>***, but you must not give in to negativity as it would hurt your testimony before the jury***."  Attorney Callahan never—ever—takes action to resolve Castillo's

*depression*.  He does not visit Castillo.  He does not notify jail medical personnel.

He does not raise this disability in pretrial hearings, during general *voir dire*, during

individual *voir dire*, during the case in chief, and, critically, not even after findings

when Castillo renews his effort for self-representation at sentencing.  The comment

suggests that Castillo lacks the present competency to waive legal counsel.

This letter also is significant as it shows that Castillo is contemplating

testifying at trial and Callahan never—ever—takes any action to assist or to prepare

Castillo for testifying.   Callahan has totally abandoned his client.   This is

corroborated by Callahan's statement at the close of the Government's case, "***I don't***

***know if Mr. Castillo wants to testify or not***" (R - v.18 - 164).[17]

Four and a half months later, Castillo filed with the court on June 2 and 26,

2005 a generic Motion to Dismiss Appointed Counsel.  The motion complains about

attorney Callahan and stated a "lost faith in counsel and no longer trust counsel's

advice" (T - 23; *see* attached Exhibit D at App'x Tab 17).  Attached to the motion was

Castillo's letter (T - 27) stating:

> I'm writing you this letter in hopes that you'll grant my
> second motion to dismiss appointed counsel.  Your Honor,
> I'm scheduled for jury section 7.15.05, and I have no

---

[17]   Attorney Callahan had written Castillo months before on June 16, 2004 to ask if Castillo
wanted to testify, but Callahan never sought a follow-up by either a jail visit or
correspondence either to get the answer or to prepare his client to testify.  (*see* attached Exhibit D
at App'x  58).

> attorney representing me that I haven't seen since 1.6.04.
> I couldn't even tell you what he looks like besides that he's
> a white gentleman with white hair.  All I want is a fair trial
> someone who will fight for me.  Your Honor, I'm asking
> please will you grant this motion for me.

The trial judge again ignored her responsibilities under *Faretta*.  A clerk wrote

on the motion, "Denny Callahan 737-3404 6/9 notified."

No one raises the issue again at the July 5, 2005 motion hearing (R - v.2 - 4-8),

general *voir dire* (R - v.3), individual *voir dire* (R - v.4 to R - v.14), the case in chief

(RR 15  to RR 18), or verdict on findings and polling of jurors on that verdict.  After

both sides closed, there is a suggestion that Castillo is upset over the performance of

his two defense attorneys, as the defense informed the court that Castillo sought to

absent himself from the remainder of proceedings and counsel sought an

admonishment from the court to Mr. Castillo over possible misbehavior (R - v.20 -

26-28).  Neither defense attorney notes in his fee voucher that he saw Mr. Castillo at

the jail that night to assuage the client's concerns.

The following morning, the trial judge said that defense counsel had informed

her that Castillo wished to represent himself.  She enters into the following colloquy

(R - v.21 - 3-7):

> Court:    All right. Mr. Castillo, I've been informed
>           through counsel that you wish to represent
>           yourself; is that correct?

75

Def:        Yes, ma'am.

Court:      Well, I have to tell you it's – I think it's not a good idea, but I'm going to run through some reasons why it's not a good idea.  Although, they probably are fairly obvious to you.  You know that you're on trial for capital murder for which you can receive the death penalty.  You've already been convicted of capital murder.  The only issues left are whether you're going to get a life sentence or a death penalty.  I mean, it doesn't get any more critical than that, does it?

Def:        No, ma'am.

Court:      All right.  Have you ever represented yourself before in a criminal case?

Def:        No, ma'am.

Court:      Do you understand—you clearly understand what's at risk in this case, right?

Def:        Yes, ma'am.

Court:      You understand if—at the end of the punishment phase of this trial, the jury could sentence you to death?

Def:        Yes, ma'am.

Court:      Do you understand that if you decide to represent yourself, you're on your own?  I mean, it's not like I can advise you or tell you what you should or shouldn't do.  And you're asking to handle things on your own with no help from anyone?

76

Def:        Yes, ma'am.

Court:      Are you expecting that I'm going to jump in and—

Def:        No, ma'am.

Court:      --suggest to you how you should proceed, because I can't?

Def:        No, ma'am.

Court:      Are you familiar with the Rules of Evidence?

Def:        Not really.

Court:      All right.  So you understand—if you're representing yourself, do you intend, when the State calls a witness, to handle the cross-examination on your own?

Def:        Yes, ma'am.

Court:      And you intend to do that without any knowledge of the Rules of Evidence and what's admissible and what's not admissible?

Def:        Yes, ma'am.

Court:      Understanding the Rules of Evidence is what attorneys use to know what's going to come in, what kind of evidence can get in,   w h a t kind of evidence can't get in.  And you—you proposed that you want to do this on your own without any knowledge of the Rules of Evidence, right?

77

Def:       Yes, ma'am.

Court:     Without any understanding of what can come
           into evidence and what cannot?

Def:       Yes, ma'am.

Court:     I must advise you in my opinion, a trained
           lawyer would defend you and represent you
           far better than you could ever do for yourself.
           Do you understand that?

Def:       Yes, ma'am.

Court:     I think it is unwise of you to try to represent
           yourself.  You're not familiar with the law.
           You're not familiar with court procedure.
           You're not familiar with the Rules of
           Evidence. I strongly urge you not to represent
           yourself.  You understand that that is my
           advice to you, my considered advice, that it
           would be in your best interest to be
           represented by Counsel and let them handle
           the punishment phase of this trial.  And that
           you would be far better off proceeding that
           way than you would be representing yourself.

Def:       I understand.

Court:     In light of the penalty that you might suffer,
           in light of all the difficulties that I have
           explained to you with regard to representing
           yourself, do you still wish to give up your
           right to be represented by a lawyer and
           represent yourself?

Def:       Yes, ma'am.

78

Court:    Is your decision entirely voluntarily?

Def:      Yes, ma'am.

Court:    Do you think emotionally, mentally, psychologically you're in an appropriate place at this point to represent yourself?

Def:      Yes, ma'am.

Court:    Is there anything further that you want to say to the Court?

Def:      No, ma'am.

Court:    Well, in spite of my advice to you, you certainly have the right to represent yourself. I cannot deny that to you.[18]  There's nothing that you have said thus far that would justify my not allowing you to do that.  So I'm going to find that you are knowingly and voluntarily waiving you right to counsel, and I'm going to permit you to represent yourself.  I am, however, going to ask that the attorneys be present in an advisory capacity so that if you need advice during the course of the punishment phase of this trial, they will be there for you for that purpose.  Furthermore, if you should change your mind and decide that you want them to represent you, you just

---

[18] **The trial judge misstates the law**.  While the right to self-representation is unqualified prior to trial, that is not the law where, as here, trial had already started.  *United States v. Majors,* 328 F.3d 791, 794 (5th Cir. 2003)(Defendant request self-representation on second day of drug trial in Waco.  Court properly denied the request to represent self as untimely); *Brown v. Wainwright,* 665 F.2d 607, 610-11 (5th Cir. 1982)(en banc)(request for self-representation on third day of trial was untimely); *United States v. Lawrence*, 605 F.2d 1321 (9th Cir. 1979); *United States v. Dunlap*, 577 F.2d 867 (4th Cir. 1978).

> need to come up here and tell me that.  Do
> you understand?

Def:        Yes, ma'am

The State then made opening statement (R - v.21 - 7) and had its first witness

testify.  After that first witness testifies, Judge Herr took a recess and had Castillo

sign a written waiver on the record (*Id*. at 31).  That waiver (T - 139) stated:

> I have been advised … of my right to representation by
> counsel in the punishment phase of trial in the above-
> referenced case.  I have been fully admonished of the
> danger and disadvantages of self-representation.  I freely,
> voluntarily, and intelligently waive my right to
> representation of counsel and request the Court to proceed
> with my case.

The trial judge informed the jury of Castillo's decision to represent himself and

to waive defense counsel (R - v.21 - 32).  At no time did the judge make any inquiry

of the two defense attorneys.  At no time did either defense attorney ask to be heard.

At no time did Judge Herr ask about Castillo's educational level.

After both sides closed, there is a suggestion that Castillo is upset over the

performance of his two defense attorneys, as the defense informed the court that

Castillo sought to absent himself from the remainder of proceedings and counsel

sought an admonishment from the court to Mr. Castillo over possible misbehavior (R

- v.20 - 26-28).  Neither defense attorney notes in his fee voucher that he saw Mr.

Castillo at the jail that night to assuage the client's concerns.

80

A defendant has a right to self-representation at a criminal trial under the Sixth Amendment of the Constitution of the United States. *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525 (1975); *Williams v. State*, 252 S.W.3d 353, 355-56 (Tex. Crim. App.  2008).   However, this right does not exist unless the defendant competently, intelligently, and voluntarily waives the right.  When an accused asserts his right to self-representation ***"for purposes of entering a guilty plea or proceeding to trial,"*** the trial judge is required to inquire into the request and make admonishments required by TEX. CODE CRIM. P. art. 1.051(g).[19]

This statute does not, however, require a written waiver.  *Gallegos v. State*, 425 S.W.648, 650 (Tex. Crim. App. 1968); *Burgess v. State*, 816 S.W.2d 424, 429 (Tex. Crim. App. 1991).

However, while the right to self-representation is unqualified prior to trial, that is not the case where, as here, trial had already started.  *United States v. Majors*, 328 F.3d 791, 794 (5th Cir. 2003)(Defendant request self-representation on *second day of drug trial* in Waco.  Court properly denied the request to represent self as

---

[19] This statute reads:  "if a defendant wishes to waive the right to counsel ***for purposes of entering a guilty plea or proceeding to trial***, the court shall advise the defendant of the nature of the charges against the defendant and, if the defendant is proceeding to trial, the dangers and disadvantages of self-representation.  If the court determines that the waiver is voluntarily and intelligently made, the court shall provide the defendant with a statement substantially in the following form which, if signed by the defendant, shall be filed with and become part of the proceedings …."

untimely); *Brown v. Wainwright*, 665 F.2d 607, 610-11 (5th Cir. 1982)(en banc)(request for self-representation on *third day of trial* was untimely); *United States v. Lawrence*, 605 F.2d 1321 (9th Cir. 1979); *United States v. Dunlap*, 577 F.2d 867 (4th Cir. 1978).

The Constitution places a "heavy burden" on government to demonstrate defendant voluntarily, knowingly, and intelligently waived his right to counsel. *Blasingame v. Estelle*, 604 F.2d 893, 895(5th Cir. 1979).  The courts must indulge every reasonable presumption against the validity of such a waiver.  *Geesin v. State*, 600 S.W.2d 309, 313 (Tex. Crim. App. 1980).   Counsel waiver forms signed by petition stating that he knew of his right to counsel and right to have counsel appointed if he were indigent and judgment of trial court containing printed form recital that defendant was informed in open court of his right to counsel and his right to appointment of counsel if he were indigent and that he waived such rights were ***not*** conclusive proof that defendant knowingly and intelligently waived his right to counsel but did tend to establish such facts.  *Ex parte Ross*, 522 S.W.2d 214, 220-21 (Tex. Crim. App. 1975).  A trial court abuses its discretion when its ruling, as here, is based on an erroneous knowledge of the law.  *United States v. Yanez-Sosa*, 513 F.3d 194, 200 (5th Cir. 2008); *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim.

82

App. 1990); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Castillo repeatedly requested that the trial judge through letters and motions that his attorneys had abandoned him.   Defense counsel was aware of this dissatisfaction and failed to notify the trial judge, who sadly failed to respond to the communications from Castillo.   When Castillo wrote counsel that he wanted to represent himself because of this abandonment, the  response of attorney Callahan was to write to Castillo that he was "depressed."   Callahan took no action to meet with the client to resolve his disillusion and to counter the depressive moment. Instead both counsel and the court, let this fester through nine days of *voir dire* (July 15, 27—28; Aug 2—3, 4—5, 9—12) and five days of trial on the merits (Aug. 23—26, 29 (R - v.1).   It was only after defense counsel's disastrous performance during the findings stage of trial, capped by defense counsel's final argument, that court and counsel decided to address defendant's request.   At no time in the colloquy did defense counsel mention the evident impact of defendant's depression that adversely impacted his request.   Under that circumstance alone, there was an insufficient inquiry between the court and Castillo.

The trial court abused her discretion in granting the self-representation ***after voir dire*** and findings had been completed.   First, the trial judge clearly misunderstood the law.  This lack of knowledge is shown by the trial judge's stating that "***I cannot  deny that (request for self-representation) to you***" (R - v.21 - 6).  Of course, the judge could.  Trial had been underway for 14 days and the current request was tardy.  She could have denied the request.  The trial judge's admonishment to Castillo certainly showed that she knew that self-representation would be a disaster.[20] And it was.  There was no way that defendant could prepare himself within the confines of incarceration and after trial had gone on for 14 days already.  The trial judge clearly abused her discretion in granting the tardy request at this late stage of trial.

Since the error is of constitutional dimension, reversal of both findings and sentencing is required as the errors were not harmless beyond reasonable doubt and contributed to the verdict obtained.  *Chapman v. California*, 384 U.S. 18, 24, 87 S.

---

[20] "I think it is unwise of you to try to represent yourself.  You're not familiar with the law. You're not familiar with court procedure.  You're not familiar with the Rules of  Evidence.  I strongly urge you not to represent yourself.  You understand that that        is my advice to you, my considered advice, that it would be in your best interest to be presented by Counsel and let them handle the punishment phase of this trial.  And that you would be far better off proceeding that way than you would be representing yourself." (R - v.21 - 5-6).

Ct. 824, 828 (1967); *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 1833 (1999); TEX. R. APP. PROC. 44.2(a).

### CLAIM III

**APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON THE MOTION FOR NEW TRIAL AND THE APPEAL, HAD A CONFLICT OF INTEREST ON THE APPEAL, AND PLAGIARIZED PORTIONS OF THE BRIEF.**

### ARGUMENT AND AUTHORITIES IN SUPPORT OF CLAIM III

Petitioner was denied his rights under the U.S. Const. amend. VI for the following reasons. After trial, attorney Callahan took a photocopy of a motion for new trial submitted by another attorney in another case and changed the case heading to his case and the signature block to his (*see* attached Exhibit D at App'x Tab 22). Callahan then filed this motion that merely requested a new trial without asserting any points as the basis for the motion. No affidavits were attached to the motion for new trial. No hearing on the motion was requested or conducted.

Although the Petitioner had repeatedly complained to the court of Mr. Callahan (T - 13, 23) and purported to relieve him for sentencing (R - v.21 - 3-7), the court appointed Callahan to do Petitioner's automatic appeal (T - 160). Callahan did not heed his client's disenfranchisement with him. Additionally, Castillo wrote the

85

district judge on April 11, 2006 asking for the appointment of an appeals attorney from the (Bexar County Appellate) public defender's office because the issue of ineffectiveness of counsel needed to be raised (*see* attached Exhibit D at App'x Tab 60). The letter in the court's file carries a note from "Angela"[21] stating that the matter was discussed with the judge, Callahan, and Angela Moore, the chief of the Bexar County Appellate Public Defender Office. That note states that the original habeas attorney Suzanne Kramer "is raising ineffective assistance on (the) writ, so we will leave everything as it is." (*Id.*) Of course, this meant that Castillo had a useless appeal from an attorney who clearly had a conflict of interest.

After being notified of Castillo's April 11, 2006 letter to the judge, Castillo responded to Castillo's call for a new attorney so that ineffectiveness of counsel could be raised, Callahan finessed the issue by saying that the writ attorney would undertake that endeavor (*see* attached Exhibit D at App'x Tab 61). Callahan never asserted ineffectiveness of counsel against himself in his appeals brief (*see* attached Exhibit D at App'x Tab 49). The ineffectiveness asserted by original habeas attorney Kramer in her writ application concerns only *voir dire*, *Witherspoon* error, lack of objections on non-constitutional matters related to TEX. R. EVID. 404(b) and hearsay, and failure to appeal the *Faretta* issue.

---

[21] Because the note is signed by "Angela" and starts "Angela said," it is doubtful that the note's author is Angela Moore.

Callahan had done the capital appeal of Kevin Watts and had there urged as a point of error that the death penalty was unconstitutional, and the Texas Court of Criminal Appeals had affirmed the conviction and death penalty in *State v. Kevin Watts* on December 15, 2004, over eight months before Petitioner's conviction (*see* attached Exhibit D at App'x Tabs 46, 47).  Although he knew that of the adverse ruling, Callahan took a copy of the brief in that case, changed the names from Watts to Petitioner, and used the prior brief as a point of error.  He did add the case of *Roper v. Simmons*, but did not research and include the citation for the case, even though the San Antonio Bar Association law library carries Supreme Court Reporter and its advance sheets and has West Law.

Callahan similarly copied another brief and adopted it for Petitioner's brief (*see* attached Exhibit D at App'x Tab 48).  He also raised as an appeal issue the nonmeritorious issue that accomplices should not have been permitted to testify even though all the law was against his assertion.  Callahan then filed Petitioner's brief in the Court of Criminal Appeals as cause AP 75,246 (*see* attached Exhibit D at App'x Tab  51).  He then filed a $15,000 attorney fee voucher (*see* attached Exhibit D at App'x Tab 50)  for the partially plagiarized, non-meritorious 30-page brief (*see* attached Exhibit D at App'x  Tab 49).  It is noted that Callahan failed to state in his brief for Castillo whether or not oral argument was requested or waived, and the Court of Criminal Appeals had to query this attorney after the brief was filed (*see*

attached Exhibit D at App'x Tab 51). Callahan never designated items for insertion in the clerk's record or reporter's record—the original writ attorney did (T - 165-166). The Court of Criminal Appeals upheld the finding of guilty and sentence to death. Callahan did not file a petition for certiorari with the Supreme Court of the United States.

To get an evidentiary hearing on a motion for new trial based on ineffective assistance of counsel, one must satisfy both *Strickland* prongs of ineffectiveness and prejudice. *Smith v. State*, 286 S.W.3d 333, 335 (Tex. Crim. App. 2009). When the matter is not determinable from the record, counsel must submit an affidavit showing reasonable grounds for holding the relief should be granted. *Id*. at 337. This affidavit requirement is based on case law, not a requirement of a rule or statute. *Bahm v. State*, 219 S.W.3d 391, 395 (Tex. Crim. App. 2007). Counsel is ineffective when he fails to obtain a ruling on a motion for new trial. *Belcher v. State*, 93 S.W.3d 593 (Tex. App.—Houston [14th Dist.] 2002, pet. dism'd). A motion for new trial is particularly important when ineffectiveness of counsel is raised, as, unlike Castillo's case, evidence of ineffectiveness is not always apparent on the record. *Freeman v. State*, 125 S.W.3d 505, 506 (Tex. Crim. App. 2003).

The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *United States v. Vaquero*, 997 F.2d 78, 89 (5th

88

Cir. 1993).   When criminal defense counsel has a direct conflict of interest, ineffective assistance claims are ***not*** analyzed under the *Strickland* standard; instead, the proper standard is that which the U.S. Supreme Court articulated in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980).  *Acosta v. State*, 233 S.W.3d 349, 352-54 (Tex. Crim. App. 2007).  In such a case, a defendant need show that (1) his counsel by burdened with a conflict of interest, and (2) trial counsel acted on behalf of the other interest.  *Acosta*, at 356.  Counsel has a duty to raise an issue that would require a reversal of a conviction.  *Ex parte Daigle*, 848 S.W.2d 691 (Tex. Crim. App. 1993); *United States v. Williamson*, 183 F.3d 458 (5th Cir. 259 (2000).  This would include ineffective assistance of counsel.  Defendant need not satisfy the prejudice prong of *Strickland* where there is an actual or constructive denial of the assistance of appellate counsel.  *Lombard v. Lynaugh*, 868 F.2d 1475 (5th Cir. 1989).

Attorney Callahan knew, or should have known, that ineffective assistance of counsel should be raised on appeal.  Castillo was complaining to the trial judge about Callahan's ineffectiveness months before trial.  Abandoned by his counsel before trial and during trial, Castillo was forced to try to save his life through purported self-representation.  During the appeal, Callahan learned that Castillo had written the judge, and Callahan's response was to state that the writ counsel would undertake that

task (*see* attached Exhibit D at App'x Tab 61).  The direct conflict of interest was patent, open, and obvious.

The manner in which counsel wrote the plagiarized motion for new trial was indicative of his efforts.  Callahan was looking at a loss of up to $15,000 if he was not appeals counsel on this death penalty case.  Accordingly, Callahan plagiarized two points for his brief and then asserted the frivolous issue on suppression of accomplice witness to produce a 30-page brief whose exact cost was the $15,000 maximum payment allowed.

There is an automatic conflict of interest for the trial defense attorney in a capital case doing the automatic appeal when there is a likelihood that ineffective assistance of counsel will be raised.[22]  That direct conflict arises by operation of TEX. CODE CRIM. P. art. 26.052(d)(2)(c), which holds that capital counsel cannot "have been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of *any* capital case."  TEX. CODE CRIM. P. art. 26.052(k) states that the court may ***not*** appoint the trial defense attorney in a capital case to do the appeal unless the court finds good cause for the appointment.  If

---

[22] The State Bar discourages counsel in a death penalty case from serving as appeals counsel in the same case.  Guideline 12.1D Guidelines and Standards for Texas Capital Counsel, State Bar of Texas (*see* attached Exhibit D at App'x Tab 52).

counsel in ineffective at trial, his raising ineffectiveness on appeal would cost that counsel future capital appointments and concomitant income.[23]

Here, Callahan was burdened with his own self-interest and had a conflict of interest with Castillo's best interests.  Sole purpose of the appeal was to generate quick money.   This finding of conflict interest and acting out on the interest of the attorney is amply demonstrated by the following matters:

- The poor quality of Callahan's brief;

- the brief's fortuitously afforded the attorney the exact number of hours to achieve the maximum $15,000 payout in attorney's fees;

- the failure to assert ineffective assistance errors;

- counsel's failing to follow simple appellate rules to state whether or not oral argument was requested; and

- counsel's failure to petition for a *writ of certiorari*.

---

[23] The fee schedule in effect at the time of Callahan's appointment called for payment in a death penalty appeal of $150/hour for our-of-court time and $200/hour for in court time, with a cap of $15,000 for the appeal (*see* attached Exhibit D at App'x Tab 54).  Paragraph 17 allows up to 100 hours of out-of-court time for trial-level death penalty work.

## CLAIM IV

## PERJURY COMMITTED BY A PROSECUTION WITNESS UNDERMINED CONFIDENCE IN THE VERDICT AND DEATH SENTENCE AND VIOLATED THE PETITIONER'S DUE PROCESS RIGHTS.

### ARGUMENT AND AUTHORITIES IN SUPPORT OF CLAIM IV

A conviction or sentence based on false material evidence violates a defendant's due process rights under the Fourteenth Amendment. *Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010). Where a defendant is convicted in large part upon the false testimony of a jail house informant, regardless of whether or not the prosecutor knew the testimony was false, such perjury undermines confidence in the verdict and sentence and is a violation of the defendant's due process rights. Id. "[A] government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence. A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness.'" Id.

In the case at bar, Gerardo Gutierrez was a jail house informant. *See* Exhibit F. For the first time, in June 2013, Gutierrez and come forward and admitted that he committed perjury at the Petitioner's trial. *Id.* He was called as a prosecution witness at trial. (R - v.17 - 3). During his crucial testimony, he stated that the Petitioner

92

allegedly confessed to the capital murder in this cause.  Gutierrez testified that, "Basically stated that it was him, a friend – two friends, Frank and Bita – Bita – that actually planned to rob this person . . . And the victim took off running, and that he shot at him a couple of times.  And then when he was crawling, like screaming for help, he walked up closer to him and shot him two more times, close range."  *Id.* Gutierrez has now come forward and admitted that this testimony was false.  The jury, however, was allowed to consider this crucial testimony during the guilt/innocence phase of the trial and during the punishment phase of trial in determining a sentence of death.

The Petitioner's conviction and sentence were based on this false material evidence.  This constituted a violation of the Petitioner's due process rights under the Fourteenth Amendment.  The Petitioner was convicted in part upon the false testimony of Gutierrez, a jail house informant.  Such perjury is a violation of the Petitioner's due process rights regardless of whether or not the prosecutor knew the testimony was false.  The perjury testified to by Gutierrez undermines confidence in the verdict and sentence and is a violation of the Petitioner's due process rights. Since the Petitioner's conviction was based in part on this false evidence, fundamental fairness is lacking in the conviction and death sentence especially given

93

the graphic facts in the alleged confession.  The Petitioner should receive a new trial and a new sentencing hearing.

## VI.

## THE PRESUMPTION OF CORRECTNESS OF 28 U.S.C. § 2254(d) & (e) SHOULD NOT ATTACH TO STATE COURT FINDINGS OF FACT.

### The law in general.

28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) state as follows:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . .
>
> (2)    resulted in a decision that was based on an **unreasonable determination of the facts** in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a **determination of a factual issue** made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(emphasis added).

2254(d)(2) provides for habeas relief if the state court's determination of the facts was **unreasonable** in light of the evidence presented in the state court

proceeding.   If the state court's determination of the facts was reasonable, then 2254(e)(1) comes into play and presumes the court's **reasonable** determination to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.   A petitioner is entitled to an evidentiary hearing to present this rebuttal evidence.   *Demosthenes v. Baal*, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); *Patton v. Yount*, 467 U.S. 1025, 1028, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Sumner v. Mata*, 449 U.S. 539, 550, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

The above language from 2254(d)(2) and (e) regarding "determination of the facts" and "determination of a factual issue" language is identical to the language of superseded 28 U.S.C. § 2254(d).   "[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."   *Evans v. United States*, 504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).   "Determination of a factual issue" from superseded 2254(d) refers to basic, primary, or historical facts but not to mixed questions of fact and law, which apply a legal standard to the historical-fact determinations. *Thompson v. Keohane*, 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).   The question of competency to stand trial, for example, is a mixed question of law and fact. *Washington v. Johnson*, 90 F.3d 945, 951 (5th Cir. 1996), *cert. denied*, 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997).

95

The language from 2254(d)(2) regarding whether the determination of the facts was unreasonable in light of the record evidence is substantially the same as the language in superseded 2254(d)(8) regarding whether the factfinding was fairly supported by the state court record. Under superseded 2254(d)(8), a petitioner was entitled to a hearing if the factual determination by the state court was not fairly supported by the record as a whole since such an unreasonable determination of the facts is not afforded a presumption of correctness. *Townsend v. Sain*, 372 U.S. 293, 313, 316, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Parker v. Dugger*, 498 U.S. 308, 316-317, 320, 323-324, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); *Carriger v. Stewart*, 132 F.3d 463, 473-475 (9th Cir. 1997), *cert. denied*, 523 U.S. 1133, 118 S.Ct. 1827, 140 L.Ed.2d 963 (1998); *Jackson v. Herring*, 42 F.3d 1350, 1366 (11th Cir. 1995). A federal hearing is required if the factual determination was unreasonable in light of the evidence in the record where the record evidence strongly contradicts the state court findings of fact so that the federal court cannot rely on the state court findings of fact or where the evidence supporting the petitioner's claim is compelling. *Shillinger v. Haworth*, 70 F.3d 1132, 1136-1138 (10th Cir. 1995); *Cola v. Reardon*, 787 F.2d 681, 698 (1st Cir.), *cert. denied*, 479 U.S. 930, 107 S.Ct. 398, 93 L.Ed.2d

351 (1986); *Fitch v. Estelle*, 587 F.2d 773, 777 (5th Cir.), *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 111 (1979).

In the case at bar, the trial judge merely signed the State's proposed findings of fact and conclusions of law. *See* Exhibit E. The trial judge did not independently compile her own findings of fact and conclusions of law. Since the trial judge merely signed the State's proposed findings of fact and conclusions of law, the presumption of correctness of 28 U.S.C. § 2254(e)(1) should not attach to the state court's findings of fact and conclusions of law.

## VII.

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Court: (1) vacate the Petitioner's conviction for capital murder and death sentence, or in the alternative, vacate the judgment affirming his conviction and death sentence on direct appeal, or in the alternative, vacate the death sentence; (2) order and conduct an evidentiary hearing at which proof may by offered and argument may be offered concerning the allegations of this Petition; (3) permit the Petitioner, because of his indigence, to proceed without prepayment of costs and fees; (4) allow the Petitioner a reasonable time in which to amend this Petition; (5) provide for discovery as requested by the Petitioner and grant the Petitioner the authority to obtain

subpoenas in forma pauperis for witnesses and discovery of documents and other information necessary to prove the facts as alleged in this Petition; (6) grant the Petitioner sufficient funds to secure expert testimony necessary to prove the facts as alleged in this Petition; (7) enter findings of fact and conclusions of law recommending that the Petitioner's conviction and sentence be vacated and that the Petitioner's case be remanded for a new trial or a new sentencing hearing; and (8) grant such other relief as law and justice may require.

Respectfully submitted,

GROSS & ESPARZA, P.L.L.C.

/s/ Michael C. Gross
Michael C. Gross
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas  78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Petitioner,
JUAN CASTILLO

98

## VIII.

## <u>VERIFICATION</u>

**STATE OF TEXAS**                         §
                                           §
**COUNTY OF BEXAR**                         §

Before me, the undersigned authority, appeared Michael C. Gross, Counsel for the Petitioner and on his behalf, on this the 28th day of June 2013, and who being by me duly sworn did depose and say that each and every allegation of fact contained in the foregoing Petition For Writ Of Habeas Corpus is true and correct.

/s/ Michael C. Gross
Michael C. Gross

SWORN AND SUBSCRIBED to on this 28th day of June 2013.

/s/ Christina Garcia
Notary Public In And For The State of Texas

## IX.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of June 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to Laura Turbin, Assistant Attorney General, P.O. Box 12548, Austin, Texas 78711-2548, and I certify that there are no non-CM/ECF participants.

/s/ Michael C. Gross

# X.

## <u>APPENDIX OF EXHIBITS</u>

A.   Judgment and Sentence

B.   Order of Texas Court of Criminal Appeals appointing new habeas counsel

C.   Notice Court of Criminal Appeals granted request deem writ filed timely

D.   State Writ of Habeas Corpus and Appendix with affidavits and documents

E.   State's Proposed Findings/Conclusions and Order signed by trial judge

F.   Declaration of Gerardo Gutierrez