UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JUAN CASTILLO,                          §
       Petitioner              §
                                        §
V.                                      §          CASE NO. SA-12-CA-924-XR
                                        §
RICK THALER,                            §
Director, Texas Department of           §
Criminal Justice, Correctional          §
Institutions Division,                  §
       Respondent.             §

<u>APPENDIX OF EXHIBITS</u>

<u>FOR</u>

<u>PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY</u>

GROSS & ESPARZA, P.L.L.C.
MICHAEL C. GROSS
State Bar No. 08534480
106 South St. Mary's Street, Suite 260
San Antonio, Texas 78205
(210) 354-1919
(210) 354-1920 Fax

Attorney for the Petitioner,
JUAN CASTILLO

# **TABLE OF CONTENTS**

A.    Judgement and Sentence
B.    Order of Texas Court of Criminal Appeals appointing new habeas counsel
C.    Notice Court of Criminal Appeals granted request deem writ filed timely
D.    State Writ Of Habeas Corpus and Appendix with affidavits and documents
E.    State's Proposed Findings/Conclusion and Order signed by trial judge
F.    Sworn Declaration of Gerardo Gutierrez

# Exhibit A

## JUDGMENT OF CONVICTION – CAPITAL MURDER
## SENTENCED TO DEATH – INSTITUTIONAL DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS | NO. 2004-CR-1461A | IN THE 186TH DISTRICT COURT |
| VS | | OF |
| JUAN EDWARD CASTILLO | | BEXAR COUNTY, TEXAS |

JUDGE PRESIDING: MARIA TERESA HERR          DATE OF JUDGMENT:   SEP  9 2005

APPEARANCES   DAVID LUNAN          APPEARANCES   VINCENT D. CALLAHAN
FOR STATE:       TONY REYES           FOR DEFENSE:   BILL HARRIS
OFFENSE CONVICTED OF: CAPITAL MURDER – OTHER FELONY
                19.03 (a)(2) PC          DATE OF CONVICTION: 08/30/2005

DEGREE OF OFFENSE:  CAPITAL FELONY          DATE OFFENSE COMMITTED: 12/03/2003

CHARGING INSTRUMENT: INDICTMENT

PLEA TO JURY:  NOT GUILTY

VERDICT OF JURY:                    FOREPERSON : GEORGE E. ADAMS
We, the jury, find the defendant, Juan Castillo, guilty of Capital Murder as charged in the indictment.

VERDICT OF JURY (PUNISHMENT)
FINDING ON SPECIAL ISSUE(S):

ISSUE NO. 1: Is there a probability that the defendant, Juan Castillo, would commit criminal acts of violence that would constitute a continuing threat to society?    ANSWER: We, the Jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes".
ISSUE NO. 2 : Taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, is there a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?  ANSWER: We, the Jury, unanimously find and determine that the answer to this Special Issue is "No".

DATE SENTENCE IMPOSED:      09/01/2005

SENTENCE OF DEATH
(INSTITUTIONAL DIVISION): DEATH TDCJ-ID
CONCURRENT UNLESS OTHERWISE SPECIFIED:

TIME CREDITED:  N/A                    COSTS: $ 313.00

TOTAL AMOUNT OF                RESTITUTION TO BE PAID TO:
RESTITUTION/REPARATION: $ 0.00          NAME:
                         ADDRESS:

   On the   23rd day of August, 2005      the above numbered and entitled cause was reached and called for trial, and the State appeared by the attorney stated above, and the Defendant and the Defendant's attorney were also present. Thereupon, both sides announced ready for trial, and the Defendant, having been duly arraigned, entered a plea of  NOT GUILTY     to CAPITAL MURDER – OTHER FELONY          . The trial was before a Jury who, after hearing the evidence, the Charge of the Court and the argument of Counsel thereon, rendered a verdict as shown above.
   Thereupon, in accordance with the law, a separate sentencing proceeding was conducted. Evidence was submitted, the Jury was charged by the Court as to certain special issues and rendered a verdict as shown above.

157

NO. 2004-CR-1461A            ATE OF TEXAS VS.      JUAN CAST

It is, therefore, ORDERED, ADJUDGED AND DECREED by the Court that the Defendant is guilty of the offense stated above as found by the verdict of the jury, and, the punishment is fixed in accordance with the Jury's verdict and as required by the Statutes of the State of Texas at DEATH and the State of Texas do have and recover of said defendant all court costs in this prosecution expended for which execution will issue.

The jury having been discharged and thereupon on the __1ST day of September, 2005__ the Court asked the Defendant whether the Defendant had anything to say why said sentence should not be pronounced upon said Defendant, and the Defendant answered nothing in bar thereof. Whereupon the Court proceeded, in the presence of said Defendant and the Defendant's attorney, to pronounce sentence upon said Defendant as follows:

It is ORDERED by the Court that the Defendant, who has been adjudged guilty of the offense stated above, be and is hereby sentenced to DEATH. The Defendant shall be taken by the authorized agent of the State of Texas or by the Sheriff of Bexar County, Texas, and by him safely conveyed and delivered to the Director of the Institutional Division of the Texas Department of Criminal Justice pending receipt of the Mandate from the Court of Criminal Appeals Sitting in Austin, Texas. The Defendant is hereby remanded to the custody of the Sheriff, until such time as the Sheriff can obey the directions of this sentence.

The Court finds that as of the date of sentencing, the defendant has been in custody on this charge for a period of __N/A__.

The Court thereupon fully advised the defendant that the Judgment of Conviction and Sentence of DEATH, is subject to Automatic Review.

SIGNED and ENTERED of Record this ___9th___ day of ___September___ 2005.

Notice of Appeal: __Automatic__

_Maria Teresa Herr_

MARIA TERESA HERR
186TH DISTRICT COURT
BEXAR COUNTY, TEXAS

Prepared by _9171_



159

# Exhibit B



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-70,510-01

### EX PARTE JUAN EDWARD CASTILLO

## ON NOTICE OF NO APPLICATION FOR WRIT OF HABEAS CORPUS FILED IN CAUSE NO. 2004-CR-1461A IN THE 186TH JUDICIAL DISTRICT COURT BEXAR COUNTY

*Per Curiam.*

### O R D E R

This case is before us because the trial court notified this Court that no application for writ of habeas corpus has been filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071.[1]

On September 9, 2005, the trial court appointed Suzanne Kramer to represent

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

applicant in a post-conviction writ of habeas corpus under Article 11.071. On October 27, 2006, the State filed in this Court its brief on applicant's direct appeal. Pursuant to Article 11.071, § 4(a), counsel should have filed applicant's application for writ of habeas corpus in the convicting court no later than December 11, 2006. If a motion for extension was timely filed and granted, then applicant's application would have been due in the convicting court no later than March 12, 2007. Art. 11.071, § 4(b).

In August 2008, it was brought to the attention of this Court that no application had been filed on applicant's behalf. Pursuant to Article 11.071, § 4A, because it was well past the statutory due date and the district clerk had no record that an application had been filed, we ordered Kramer to file an affidavit with this Court setting out good cause for her failure to timely file the application.

In her affidavit, counsel admitted that she misunderstood the law, and that her misunderstanding caused her to file applicant's application several months late. However, she assured this Court that she did file an application on applicant's behalf on September 29, 2007. As proof of the filing, Kramer included with her affidavit an unsigned copy of the application she claimed to have filed. Also attached to the affidavit was a copy of a September 29, 2007, postage receipt and a copy of an envelope with a mail stamp of "11 OCT 2007 PM," a return address of the 186th Judicial District Court, and the name "Juan Castillo" hand written above the return address. In her affidavit, Kramer asserted that the postage receipt showed that she mailed the Castillo writ application to the trial court in

Castillo - 3

September 2007, and the envelope showed that the trial court received the application in October 2007. The problem was that the district clerk of Bexar County still showed no record that an application was filed in the Castillo case, timely or not.

Noting the conflicting information, this Court issued a second order on October 1, 2008, in which it ordered Kramer to produce a second affidavit resolving the discrepancies. In her second affidavit, Kramer reminded this Court that "[i]ncluded in my initial response was a copy of the receipt from the post office indicating the mailing on September 29, 2007 and a copy of the return envelope, indicating receipt of the Writ by the 186th Judicial District Court." However, other than the handwritten notation of "Castillo" on both of these papers, and Kramer's sworn statement that these pertain to her mailing the Castillo application to the trial court, there is no actual proof that the Castillo writ was filed. None-the-less, this Court took Kramer at her word and issued an order on March 18, 2009, giving her ten days to re-file the already completed writ application. Again, Kramer has failed to fulfill her duties in this case.

Because Kramer has failed to show good cause for the untimely filing of the application, and because she has failed to re-file the application as ordered, we find counsel to be in contempt of this Court. Kramer is ordered to pay a fine in the amount of $250.00 in this case. Further, should Bexar County have any outstanding claims from Kramer for attorney's fees in this case, they shall not be paid. Additionally, we are forwarding a copy of this order to the Chief Disciplinary Counsel of the State Bar of Texas.

Castillo - 4

John Economidy is appointed to represent applicant and to file a writ of habeas corpus on applicant's behalf.  Counsel is ordered to file the application in the trial court on or before the 270th day from the date of this order.  Should the application that was allegedly filed in September 2007 ultimately be discovered, it shall be dismissed and not considered for any purpose.

IT IS SO ORDERED THIS THE 22ND DAY OF APRIL, 2009.


Do Not Publish

# Exhibit C



SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
TOM PRICE
PAUL WOMACK
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
CHARLES R. HOLCOMB
CATHY COCHRAN
JUDGES

# COURT OF CRIMINAL APPEALS
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

September 16, 2009

LOUISE PEARSON
CLERK
512-463-1551

SIAN R. SCHILHAB
GENERAL COUNSEL
512-463-1597

Presiding Judge
186th Judicial District
300 Dolorosa St., #3097
San Antonio TX 78205-3028

> **No.:** WR-70,510-01
> **Trial Court No.:** 2004-CR-1461-A
> **Styled:**   CASTILLO, JUAN EDWARD v. The State of
> Texas

Dear Judge:

Please be advised that the Court on this date granted "Motion to Declare Application for Writ of Habeas Corpus Timely Filed as of October 11, 2007 to Preserve Federal Statute of Limitations" without written order.

Sincerely

Sian Schilhab
General Counsel

cc:   District Attorney
Bexar County
300 Dolorosa St No 5072
San Antonio, TX 78205

District Clerk
Bexar County
Margaret G. Montemayor
100 Dolorosa, Room 362
San Antonio, TX 78205

Exhibit D

# NO. WR-70,510-01

## IN THE TEXAS COURT OF CRIMINAL APPEALS

### AND

## IN THE DISTRICT COURT OF BEXAR COUNTY, TEXAS
### 186TH JUDICIAL DISTRICT
### 2004-CR-1661-W

## EX PARTE JUAN EDWARD CASTILLO

## THIS IS A DEATH PENALTY CASE
## APPLICATION FOR POST-CONVICTION
## WRIT OF HABEAS CORPUS

| | |
|---|---|
| **Hearing**<br>**Requested** | **JOHN M. ECONOMIDY**<br>████████████████<br>**San Antonio, Texas** ████<br>**Office:** ████████<br>**Fax:  None**<br>████████████████ |
| **Oral Argument**<br>**Requested** | **Attorney for Applicant**<br>**JUAN EDWARD CASTILLO** |

# NO. WR-70,510-01

## IN THE TEXAS COURT OF CRIMINAL APPEALS

### AND

## IN THE DISTRICT COURT OF BEXAR COUNTY, TEXAS
## 186TH JUDICIAL DISTRICT
## 2004-CR-1661-W

## EX PARTE JUAN EDWARD CASTILLO

## THIS IS A DEATH PENALTY CASE
## APPLICATION FOR POST-CONVICTION
## WRIT OF HABEAS CORPUS

**Hearing**
**Requested**

**JOHN M. ECONOMIDY**
█████████████████
**San Antonio, Texas** ████
**Office:** ████████████
**Fax: None**
█████████████████

**Oral Argument**
**Requested**

**Attorney for Applicant**
**JUAN EDWARD CASTILLO**

## IDENTITIES OF PARTIES AND COUNSEL

- **_Defendant_**: Juan E. Castillo

- **_Deceased Victim_**: Tommy Garcia, Jr.

- **_Trial-Level Prosecutors_**:

  Mr. David Lunan
  Assistant District Attorney
  Bexar County District Attorney's Office
  Cadena-Reeves Justice Center
  ███████████
  San Antonio, Texas████████

  Mr. Michael A. "Tony" Reyes                    (now in private practice)
  Attorney at Law
  ████████████████
  San Antonio, Texas████████

- **_Trial Level Defense Attorneys_**

  Mr. Vincent D. "Denny" Callahan
  Attorney at Law
  ████████████
  San Antonio, Texas████████

  Mr. John W. "Bill" Harris                    (now retired)
  Attorney at Law
  ████████████████████████
  Spring Branch, Texas████████

- **_Defense Appellate Attorney on Original Appeal_**

  Mr. Vincent D. "Denny" Callahan
  Attorney at Law
  ████████████
  San Antonio, Texas████████

i

● ***Prosecution Appellate Attorney on Original Appeal***

    Mr. Edward F. Shaughnessy, III      (now in private practice)

    ██████████████

    San Antonio, Texas ████████

    *formerly with*
    Appellate Division
    Bexar County District Attorney's Office
    Cadena-Reeves Justice Center
    █████████████

    San Antonio, Texas ████████

● ***Defense Article 11.071 Habeas Counsel***

  ● **Original**

    Ms. Suzanne Kramer    (removed by Court of Criminal Appeals)
    Attorney at Law
    ████████████

    San Antonio, Texas ████████

  ● **Present**

    Mr. John M. Economidy
    Attorney at Law
    ███████████████████

    San Antonio, Texas ████████

● ***Prosecution Counsel on Article 11.071 Writ***

    Ms. Crystal Chandler
    Assistant District Attorney
    Appellate Division
    Bexar County District Attorney's Office
    Cadena-Reeves Justice Center
    █████████████

    San Antonio, Texas ████████

# TABLE OF CONTENTS

Identities of Parties and Counsel ..................... i

Table of Contents ......................................... iii

Index of Authorities ..................................... iv

I. Illegal Confinement and Restraint ................ 2

II. Jurisdiction .......................................... 2

III. Procedural History ................................ 2

   A. Trial ............................................. 2

   B. Motion for New Trial and Appeal .................... 5

   C. Article 11.071 Writ ................................ 6

IV. Statement of Facts—Overview of Offense ...... 7

V. Issues Presented ..................................... 26

   A. Claim I ............................................ 26

TRIAL DEFENSE COUNSEL RENDERED
INEFFECTIVE ASSISTANCE OF COUNSEL

   B. Claim II ........................................... 26

THE TRIAL COURT VIOLATED DEFENDANT'S
RIGHT TO SELF-REPRESENTATION AND THEN
ABUSED HER DISCRETION IN HAVING APPLICANT
DEFEND HIMSELF DURING SENTENCING.

## C. Claim III ............................... 26

### APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON THE MOTION FOR NEW TRIAL AND THE APPEAL, HAD A CONFLICT OF INTEREST ON THE APPEAL, AND PLAGIARIZED PORTIONS OF THE BRIEF.

## D. CLAIM IV .............................. 26

### COUNSEL WAS INEFFECTIVE IN JURY SELECTION.

---

### A. Claim I .................................... 27

#### TRIAL DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL
*(Restated)*

1. General Law on Ineffective Assistance ........ 27

   a. *Standard for Ineffective Assistance* .......... 27

   b. *IAC Test* ....................................... 27

   c. *Burden of Proof* ............................... 28

   d. *Standard of Proof* ............................. 28

   e. *Presumptions* ................................. 28

   f. *Lack of Strategy* ............................... 29

   g. *Reasonableness Judge at Time of Counsel's Conduct* ......................... 29

**h.** *Presumption of Prejudice for Complete Absence of Counsel at a Critical Stage* ...... 29

**i.** *Incomplete Investigation* ........................ 30

2. <u>**Pre-trial Ineffectiveness of Counsel**</u> ............... 30

    **a.** <u>*Only Visiting Applicant Once in Jail Before Trial*</u> ............................... 30
    (1) *Factual Basis* .................................. 30
    (2) *Authority* ..................................... 32
    (3) *Argument and Prejudice* ..................... 34

    **b.** <u>*Failure to Interview Prosecution Witnesses*</u> .. 35
    (1) *Factual Basis* .................................. 35
    (2) *Authority* ..................................... 38
    (3) *Argument and Prejudice* ..................... 38

    **c.** <u>*Last Second Trial Preparations*</u> ................ 39
    (1) *Factual Basis* .................................. 39
    (2) *Authority* ..................................... 44
    (3) *Argument and Prejudice* ................... 45

    **d.** <u>*Failure to Prepare for Sentencing and Mitigation*</u> ..................................... 46
    (1) *Factual Basis* .................................. 46
    (2) *Authority* .................................... 46
    (3) *Argument and Prejudice* ..................... 47

    **e.** <u>*Failure to Use Forensic Psychologist*</u> ......... 49
    (1) *Factual Basis* .................................. 49
    (2) *Authority* ..................................... 53
    (3) *Argument and Prejudice* ..................... 53

    **f.** <u>*Failure to Introduce Stipulated Mitigation Evidence*</u> ......................................... 54
    (1) *Factual Basis* .................................. 54
    (2) *Authority* ..................................... 57
    (3) *Argument and Prejudice* ..................... 57

v

    **g.** *Failure to Interview and Use*
       *Family Members in Sentencing* ...............    **59**
       (1) *Factual Basis* .................................    **59**
       (2) *Authority* ......................................    **62**
       (3) *Argument and Prejudice* ....................    **62**

    **h.** *Frivolous Diversion of Effort*
       *into Non-Meritorious Motions*
       *and Failure to File Needed Motions*
       *and Notices* ........................................    **63**
       (1) *Factual Basis* .................................    **63**
       (2) *Authority* ......................................    **65**
       (3) *Argument and Prejudice* ....................    **66**

**3.** **Trial Ineffectiveness of Counsel** ....................    **67**

    **a.** *Lacking Knowledge and Skills in Capital Case*    **67**
       (1) *Factual Basis* .................................    **68**
       (2) *Authority* ......................................    **68**
       (3) *Argument and Prejudice* ......................    **69**

    **b.** *Opening Statement for the Defense* .............    **71**
       (1) *Factual Basis* .................................    **71**
       (2) *Authority* ......................................    **73**
       (3) *Argument and Prejudice* ......................    **73**

    **c.** *Failing to Investigate and Bolstering*
       *the Prosecution's Case* .............................    **74**
       (1) *Factual Basis* .................................    **74**
       (2) *Authority* ......................................    **78**
       (3) *Argument and Prejudice* ......................    **79**

    **d.** *Conceding Guilt in Final Argument Based*
       *on Misunderstanding of the Law* ................    **80**
       (1) *Factual Basis* .................................    **80**
       (2) *Authority* ......................................    **81**
       (3) *Argument and Prejudice* ......................    **82**

e. *Failing to Object to Sleeping Jurors* .............. 83
   (1) *Factual Basis* ..................................... 83
   (2) *Authority* ........................................ 84
   (3) *Argument and Prejudice* ....................... 85

f. *Not Interviewing Sole Defense Witness*
  *Until Third Day of Trial and Then Putting*
  *Witness on Stand Despite His Minimal*
  *Assistance and Letting Witness Implode on Stand*
  *Because of Lack of Counsel Preparation* ......... 85
   (1) *Factual Basis* ..................................... 85
   (2) *Authority* ........................................ 86
   (3) *Argument and Prejudice* ..................... 87

g. Ineffective Repesentation on Faretta Issue ....... 87
   (1) *Factual Basis* ..................................... 87
   (2) *Authority* ........................................ 87
   (3) *Argument and Prejudice* ....................... 88

4. Cumulative Effect of Ineffectiveness of Counsel ..... 89
  (1) *Factual Basis* ..................................... 89
  (2) *Authority* ........................................ 90
  (3) *Argument and Prejudice* ............................. 90

B. Claim II.......................................................... 94

THE TRIAL COURT VIOLATED DEFENDANT'S
RIGHTS TO SELF-REPRESENTATION AND THEN
ABUSED HER DISCRETION IN HAVING APPLICANT
DEFEND HIMSELF DURING SENTENCING.
     (*Restated*)

1. Factual Basis ....................................... 94

2. Authority ............................................ 102

3. Argument and Prejudice ............................... 104

C. Claim III ......................................................... 107

APPELLATE COUNSEL RENDERED INEFFECTIVE
ASSISTANCE ON THE MOTION FOR NEW TRIAL AND
THE APPEAL, HAD A CONFLICT OF INTEREST ON
THE APPEAL, AND PLAGIARIZED PORTIONS OF THE
BRIEF.

*(Restated)*

1. **Factual Basis** ........................................ 107

2. **Authority** .......................................... 110

3. **Argument and Prejudice** ......................... 111

D. **CLAIM IV** ......................................... 114

COUNSEL WAS INEFFECTIVE IN JURY SELECTION.
*(Restated)*

1. **Factual Basis** ........................................ 114

2. **Authority** .......................................... 116

3. **Argument and Prejudice** ......................... 117

**Prayer** ............................................... 117

**Signature and Jurat** ................................ 119

**Certificate of Service** ............................. 120

**Appendix** ........................................... **Separate Volume with Own Index**

# Table of Authorities

**Cases**                                                           **Page**

*Acosta v. State*, 233 S.W.3d 349, 352-54, 356
    (Tex. Crim. App. 2007) ………………………………        111

*Andrews v. State*, 159 S.W.3d 98, 103
    (Tex. Crim. App. 2005) ………………………………..        29

*Bahm v. State*, 219 S.W.3d 391, 395
    (Tex. Crim. App. 2007) ………………………………        110

*Baxter v. Thomas*, 45 F.3d 1501, 1512 (11th Cir. 1995) …        46, 53, 57,
                                                                   62

*Belcher v. State*, 93 S.W.3d 593
    (Tex. App.—Houston [14[th] Dist. 2002, pet. dism'd) …        110

*Blasingame v. Estelle*, 604 F.2d 893, 895 (5th Cir. 1979)..        103

*Brown v. Wainwright*, 665 F.2d 607, 610-11
    (5th Cir. 1982)(en banc) ………………………………        103

*Burgess v. State*, 816 S.W.2d 424, 429
    (Tex. Crim. App. 1991) ………………………………..        103

*Chadwick v. State*, 277 S.W.3d 99, 103-04
    (Tex. App.—Austin 2009, no pet.) …………………….        88

*Chapman v. California*, 384 U.S. 18, 24,
    87 S.Ct. 824, 828 (1967) ……………………………        93, 106

*Chimney v. State*, 6 S.W.3d 681, 697
    (Tex. App.—Waco 1999, no pet.) …………………...        66

*Cuyler v. Sullivan*, 446 U.S. 335,
    100 S. Ct. 1708 (1980) ………………………………..        111

*Dewberry v. State*, 4 S.W.3d 735, 757
  (Tex. Crim. App. 1999) ................................... 27

*Diaz v. State*, 905 S.W.2d 302, 308
  (Tex. App. 1995, not pet.) ............................... 87

*Downer v. Aquamarine Operators, Inc.*,
  701 S.W.2d 238, 241-42 (Tex. 1985) ................... 104

*Ex parte Bratchett*, 513 S.W.2d 851, 853-54
  (Tex. Crim. App. 1974) ................................... 32

*Ex parte Duncan*, 650 S.W.2d 825
  (Tex. Crim. App. 1983) ................................... 69

*Ex parte Duffey*, 988 S.W.2d 770, 774
  (Tex. Crim. App. 1999) ................................... 33, 73

*Ex parte Daigle*, 848 S.W.2d 691
  (Tex. Crim. App. 1993) ................................... 111

*Ex parte Felton*, 815 S.W.2d 733
  (Tex. Crim. App. 1991) ................................... 90

*Ex parte Guzman*, 730 S.W.2d 724, 736
  (Tex. Crim. App. 1987) ................................... 87

*Ex parte Marez*, 505 S.W.2d 930
  (Tex. Crim. App. 1974) ................................... 82

*Ex parte Ross*, 522 S.W.2d 214, 220-21
  (Tex. Crim. App. 1975) ................................... 104

*Ex parte Walker*, 777 S.W.2d 427
  (Tex. Crim. App. 1989) ................................... 78

*Ex parte Walker*, 794 S.W.2d 36
  (Tex. Crim. App. 1990) ................................... 69

*Ex parte Welborn*, 785 S.W.2d 391, 396
(Tex. Crim. App. 1990) ………………………….. 90

*Faretta v. California*, 422 U.S. 806,
95 S. Ct. 2525 (1975) …………………………… 4, 87, 88,
94, 96, 102,
108

*Freeman v. State*, 125 S.W.3d 505, 506
(Tex. Crim. App. 2003) ………………………….. 110

*Fuller v. State*, 224 S.W.2d 823, 835
(Tex. App.—Texarkana 2007) ………………….. 78, 82

*Gallegos v. State*, 425 S.W.648, 650
(Tex. Crim. App. 1968) ………………………….. 103

*Greene v. State*, 928 S.W.2d 119, 122
(Tex. App.—San Antonio 1996, no writ) ……………. 78, 82, 90

*Geesin v. State*, 600 S.W.2d 309, 313
(Tex. Crim. App. 1980) ………………………….. 104

*Hernandez v. State*, 943 S.W.2d 930
(Tex. App.—El Paso, 1997) ………………………… 43, 73

*Hernandez v.* State, 726 S.W.2d 53, 57
(Tex. Crim. App. 1986) ………………………….. 27

*Hughes v. Mahaney & Higgins*, 821 S.W.2d 154
(Tex. 1991 …………………………………….. 118

*Indiana v. Edwards*, 554 U.S. 208,
128 S. Ct. 2379 (2008) ………………………….. 88

*Jackson v. State*, 973 S.W.2d 954, 956
(Tex. Crim. App. 1998) ………………………….. 28

*Jaubert v. State*, 74 S.W.3d 1
 (Tex.Crim. App. 2002) ............................................. 66

*Keen v. State*, 85 S.W.3d 405, 412
 (Tex. App.—Tyler 2002, pet. ref'd) ..................... 63, 64

*Johnson v. State*, 614 S.W.2d 148, 152
 (Tex. Crim. App. 1981) ..................................... 109

*Kenly v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991) . 34, 38

*King v. Beto*, 305 F. Supp. 636 (S.D. Tex. 1969),
 *aff'd*, 429 F.2d 221 (5th Cir. 1970),
 *cert. denied*, 401 U.S. 936, 91 S. Ct. 921 (1971) ......... 32

*Lombard v. Lynaugh*, 868 F.2d 1475 (5th Cir. 1989) ........ 111

*Loredo v. State*, 157 S.W.3d 26, 29
 (Tex. App.—Waco 2004) ................................... 66

*Menard v. State*, 193 S.W.3d 55
 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) ........ 84

*Mitchell v. State*, 68 S.W.3d 640, 642
 (Tex. Crim. App. 2002) ..................................... 28

*Montgomery v. State*, 810 S.W.2d 372, 390
 (Tex. Crim. App. 1990) ..................................... 104

*Moore v. Johnson*, 194 F.3d 586, 619-20 (5th Cir. 1999) ... 44, 46, 53, 57, 62, 78

*Organ v. Cockrell*, 249 F.3d 349, 360 (5th Cir. 2002) ....... 29

*Neder v. United States*, 527 U.S. 1, 7
 119 S. Ct. 1827, 1833 (1999) ............................... 93, 106

*Nelson v. State*, 832 S.W.2d 762, 765-66
 (Tex. App.—Houston [1st Dist.] 1992, no pet.) .......... 116

*Pannell v. State*, 666 S.W.2d 96, 98
   (Tex. Crim. App. 1984) ........................................    63, 64

*Robertson v. State*, 187 S.W.3d 475, 484
   (Tex. Crim. App. 2006) ........................................    82

*Rompilla v. Beard*, 545 U.S. 374,
   125 S. Ct. 2456 (2006) ........................................    33, 57 - 59,
    67

*Rosales v. State*, 4 S.W.3d 288, 231
   (Tex. Crim. App. 1999) ........................................    27

*Rummel v. Estelle*, 498 F. Supp. 893 (W. D. Tex. 1980) ...    33

*Salazar v. State*, 562 S.W.2d 480, 482
   (Tex. Crim. App. 1978) ........................................    116

*Schriro v. Landrigan*, 530 U.S. 465,
   123 S.Ct. 1933 (2007) ........................................    47 – 49, 54

*Shaver v. State*, 280 S.W.2d 740, 742
   (Tex. Crim. App. 1955) ........................................    116

*Smith v. State*, 894 S.W.2d 876, 890
   (Tex. App.—Amarillo 1975, pet. ref'd) ..................    87

*Smith v. State*, 286 S.W.3d 333, 335
   (Tex. Crim. App. 2009) ........................................    110

*State v. Thomas*, 768 S.W.2d 335, 336
   (Tex. App.—Houston [14[th] Dist.] 1989, no pet.) .........    27

*Strickland v. Washington*, 466 U.S. 668, 689,
   104 S. Ct. 2052 (1984) ........................................    27, 29, 30,
    33, 44, 48,
    73, 110, 111

*Thieleman v. State*, 187 S.W.3d 455, 456
   (Tex. Crim. App. 2005) ........................................    84

*Tong v. State*, 25 S.W.3d 707, 712
    (Tex. Crim. App. 1999) ………………………………..        29

*United States* v. *Cronic*, 466 U.S. 648, 659,
    104 S. Ct. 2039 (1984) …………………………………        30

*United States v. Dunlap*, 577 F.2d 867 (4th Cir. 1978) ……    101, 103

*United States v. Haese*, 162 F.3d 359, 366-67,
    (5th Cir. 1998), *cert. denied*, 119 S.Ct. 1795 (1999) …..    64

*United States v. Lawrence*, 605 F.2d 1321 (9th Cir. 1979)…    101, 103

*United States v. Majors,* 328 F.3d 791, 794 (5th Cir. 2003) ..    101, 103

*United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993) …    111

*United States v. Williamson*, 183 F.3d 458
    (5th Cir. 259 (2000) ………………………………..        111

*Vasquez v. State*, 830 S.W.2d 948, 950 n. 3 & 4
    (Tex. Crim. App. 1992) …………………………………        78

*Vaughn v. State*, 931 S.W.2d 564, 566
    (Tex. Crim. App. 1996) …………………………………        49

*Weathersby v. State*, 627 S.W.2d 729, 730
    (Tex. Crim. App. 1982) …………………………………        78

*Wiggins v. Smith*, 539 U.S. 510,
    123 S. Ct. 2526 (2003)…………………………………        28, 33, 44,
                                                        46, 48, 57

*Williams v. State*, 252 S.W.3d 353, 355-56
    (Tex. Crim. App.  2008) …………………………………        102

*United States v. Williamson*, 183 F.3d 458
    (5th Cir. 259 (2000) ………………………………..        111

xiv

*United States v. Yanez-Sosa*, 513 F.3d 194, 200
    (5th Cir. 2008) ………………………………………    104

*Williams v. Taylor*, 529 U.S. 362,
    397-98, 120 S.Ct. 1495 (2000) …………………………    46, 53, 57,
    62

*Zani v. State*, 679 S.W.2d 144, 152
    (Tex. App.—Texarkana 1984)(murder),
    *vacated*, 758 S.W.2d 233 (Tex. Crim. App.1988)
    (issue of hypnotically enhanced testimony),
    *on remand*, 767 S.W.2d 825 (Tex. App.—Texarkana
    1989, pet. ref'd) ………………………………………    85

**Constitutions**

U.S. CONST. amend. V …………………………………    93

U.S. CONST. amend. VI …………………………………    27, 94, 107,
    114

U.S. CONST. amend. XIV ……………………………………    93

**Statutes**

TEX. CODE CRIM. PROC. art. 1.05 ……………………………    27

TEX. CODE CRIM. PROC. art. 1.051(g) …………………………    103

TEX. CODE CRIM. PROC. art. 1.13(a) …………………………    4, 68,69

TEX. CODE CRIM. PROC. art. 11.071, § 2 ………………………    1, 6

TEX. CODE CRIM. PROC. art. 11.071 …………………………    2, 6

TEX. CODE CRIM. P. art. 26.052(d)(2)(C) ……………………    112

TEX. CODE CRIM. P. art. 26.052(k) …………………………    113

TEX. CODE CRIM. PROC. art. 37.07 ............................... 62, 66

TEX. CODE CRIM. PROC. art. 37.071(g) ......................... 28

TEX. CODE CRIM. PROC. art. 38.23 ............................. 63

TEX. PENAL CODE § 29.01 ........................................ 80, 82

TEX. PENAL CODE § 29.03 ........................................ 80, 82

TEX. R. APP. PROC. 44.2(a) ...................................... 93, 106

**Miscellaneous**

Guideline 4.1B(2), Guidelines and Standards
    for Texas Capital Counsel, State Bar of Texas .............. 69

Guideline 5.1b, ABA Guidelines for the Appointment
    and Performance of Defense Counsel in Death Penalty
    Cases (Rev. Ed. Feb. 2003) ...................................... 68

Guideline 10.2C, Guidelines and Standards
    for Texas Capital Counsel, State Bar of Texas .............. 33

Guideline 12.1.D, Guidelines and Standards
    for Texas Capital Counsel, State Bar of Texas ............... 112

Guideline 10.5C, ABA Guidelines for the Appointment
    and Performance of Defense Counsel in Death Penalty
    Cases (Rev. Ed. Feb. 2003) ...................................... 33

Guideline 11.1A.3, Guidelines and Standards
    for Texas Capital Counsel, State Bar of Texas ............... 49

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03,
    *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G
    app. A (TEX. STATE BAR R. art. X, § 9)....................... 34

TEX. DISCIPLINARY R. PROF'L CONDUCT 3.01,
*reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G
app. A (TEX. STATE BAR R. art. X, § 9)....................... 65

TEX. DISCIPLINARY R. PROF'L CONDUCT 3.04,
*reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G
app. A (TEX. STATE BAR R. art. X, § 9)....................... 64

TEX. R. EVID. 404(b) ............................................. 62, 65, 66,
108

TEX. R. EVID. 803(6) ............................................. 56

TEX. R. EVID. 609(f) ............................................. 65

TEX. R. EVID. 902(10) ............................................ 56

# IN THE TEXAS COURT OF CRIMINAL APPEALS

## AND

# IN THE DISTRICT COURT OF BEXAR COUNTY, TEXAS 186TH JUDICIAL DISTRICT

| | | |
|---|---|---|
| **Ex parte JUAN EDWARD CASTILLO,** | § § § | **Writ No. W-70,710-01** |
| **Applicant** | § § | **Trial Court: 2004-CR-1661-W** |

## THIS IS A DEATH PENALTY CASE APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

## TO THE HONORABLE MARIA TERESA 'TESSA' HERR OF THE 186TH JUDICIAL DISTRICT COURT:

Now comes, JUAN CASTILLO, Applicant, by and through his attorney of record John M. Economidy, appointed on by the Texas Court of Criminal Appeals on April 22, 2009 under TEX. CODE CRIM. P. art. 11.071, § 2, vice Suzanne Kramer, and moves this court to grant requested relief, to enter an order setting aside Applicant's sentence of death imposed on September 1, 2005, and to order a new trial.

- 1 -

# I.
# Illegal Confinement and Restraint

Pursuant to TEX. CODE CRIM. P. art. 11.071, Juan Castillo, the

Applicant, moves this Court to issue a Writ of Habeas Corpus for his release

from confinement because he is being denied his liberty under an illegal and

unconstitutional conviction and sentence to death.  A copy of the sentence

is set for in the Appendix (hereinafter App'x)  Tab 2.  This application is

being filed in the court of conviction, Criminal District Court Administration

for the 186th Judicial District Court of Bexar County, Texas with the request

that the writ be made returnable to the Texas Court of Criminal Appeals in

Austin, Texas.

# II.
# Jurisdiction

This Court has jurisdiction of the subject matter of the Application for

Writ of Habeas Corpus under TEX. CODE CRIM. P. art. 11.071.

# III.
# Procedural History

## A.  Trial

Applicant was charged by a Bill of Indictment (App'x  Tab 1, CR 4-5)

with capital murder alleged to have occurred on December 3, 2003 based on

murder committed in the course of a robbery of victim Tommy "JR" Garcia,

Jr. The indictment alleged a prior felony.   The indictment was filed
February 24, 2004 (App'x Tab 1; CR 4-5).

On June 13, 2005, defense counsel Callahan filed a single motion, a
motion to suppress accomplice testimony (CR 29).  A hearing was held on
July 5, 2005 and the trial judge denied the motion (RR Vol. 2, pp. 3-7).

General *voir dire* began July 15, 2005 (RR Vol. 3, p. 3).  Individual
*voir dire* began on July 26, 2005 (RR Vol. 4, p. 1), and ended on August 12,
2005 (RR Vol. 14, pp. 1, 148).  Attorney Callahan conducted his *voir dire*
from a single page of  scribbled questions or points on the inside of a purple
spiral notebook [hereinafter "defense counsel's purple notebook] (App'x
Tab 9, "inside front cover").

According to his attorney fee voucher (App'x  Tab  10, page 6, lines
4-5), attorney Callahan "prepared" his cross-examination and "both final
arguments" on August 22, 2005, ***10 days after the jury was selected and
one day <u>before</u> trial began on August 23, 2005*** (RR Vol. 15, p. 1).  His
handwritten "preparation" covered only five witnesses:  accomplice
Francisco Gonzales (1½ pages) (App'x Tab 4), accomplice Debra
Espinoza (2 1/3 pages)(App'x Tab  5),  accomplice Teresa
Quintero (5 pages, one of which was blank and two of which were on the
back of a subpoena list from another case)(App'x Tab 6), Lucinda

- 3 -

Gonzales (2 ½ pages, one of which is blank)(App'x Tab 7),and Bryan Brown (one page plus three words)(App'x Tab 8). He interviewed *no* prosecution witness. With the exception of getting (and then not using) a favorable psychiatric evaluation, attorney Callahan appears not to have prepared any sentencing or mitigation case.

Applicant entered a plea of not guilty before the jury (RR Vol. 15, p. 17). Contrary to TEX. CODE CRIM. P. art. 1.13(a) dictates that only a jury can do sentencing in a contested capital case, defense counsel filed an election of punishment to be assessed by the district judge (CR 118).

Trial on findings stage was held from August 23, 2005 to August 30, 2005 (RR Vol. 15 through RR Vol. 20). After promising the court a three-hour motion for an acquittal (RR Vol. 18, p. 164), attorney Callahan settled on just two sentences (*Id.*, p. 165). Jurors found applicant guilty of capital murder (RR Vol. 20, p. 94; CR 137).

At the start of the sentencing phase, applicant asked to waive counsel and represent himself (RR Vol. 21, pp. 3-7, CR 139). The trial judge purported to have granted this *Faretta* waiver (RR Vol. 21, 3-7).

Jurors answered sentencing questions so as to mandate imposition of the death penalty (RR Vol. 22, pp. 20-21; CR 147-149). The trial judge pronounced a sentence of death (RR Vol. 22, p. 27).

- 4 -

## B. <u>Motion for New Trial and Appeal</u>

Attorney Callahan took a photocopy of a motion for new trial submitted by another attorney in another case and changed the case heading to his case and the signature block to his (App'x Tab 22). Callahan then filed this motion that merely requested a new trial without asserting any points as the basis for the motion. No hearing on the motion was made or granted.

Although the applicant had repeated complained to the court of Mr. Callahan and purported to relieve him for sentencing, the trial court appointed Mr. Callahan to do applicant's automatic appeal. Callahan had done the capital appeal of Kevin Watts and had urged as a point of error that the death penalty was unconstitutional, and the Texas Court of Criminal Appeals had affirmed the conviction and death penalty in State v. Kevin Watts on December 15, 2004, over eight months before applicant's conviction (App'x Tab 46). Although he knew that of the adverse ruling, Callahan took a copy of the brief in that case (App'x Tab 47), changed the names from Watts to applicant, and used the prior brief as a point of error. Callahan similarly copied another brief and adopted it for applicant's brief (App'x Tab 48). Callahan then filed applicant's brief in the Court of

-5-

Criminal Appeals as cause AP 75,246 (App'x  Tab  51), and then filed a

$15,000 attorney fee voucher for the partially plagiarized 30-page brief

(App'x  Tab 49).  The Court of Criminal Appeals upheld the finding of

guilty and sentence to death (App'x Tab 3).  Callahan did not file a petition

for certiorari with the Supreme Court of the United States.

## C.  Article 11.071 Writ

The trial judge appointed Suzanne Kramer as the initial habeas

attorney on September 9, 2005 (Supp. CR 1).  A dispute arose as to whether

Ms. Kramer timely and properly filed a writ under TEX. CODE CRIM.

P. art.  11.071, § 2.  The Court of Criminal Appeals appointed John M.

Economidy as the new habeas attorney, vice Ms. Kramer, on April 22, 2009

Economidy forwarded to the Court on July 15, 2009 a Motion to Declare

Application for Writ of Habeas Corpus Filed as of  October 11, 2007 To

Preserve Federal Statute of Limitations, which was verbally granted without

court order.  The Court set the deadline for Economidy to file the brief as

270 days from the April 22, 2009 order, i.e. January 22, 2010.

# IV.
# Statement of Facts--Overview of Offense

The prosecution theorized that applicant Castillo, his purported girlfriend Debra Espinoza, friend Francisco Rodriguez, and Rodriguez's girlfriend Teresa Quintero used a phone call from Ms. Espinoza to lure 19-year-old Tommy "J.R." Garcia, Jr. to a remote "lover's lane" for sex to perpetrate a robbery of Garcia (Prosecutor's opening, RR Vol. 15, pp. 18-19). The robbery did not go as scheduled, and Castillo repeatedly shot and killed Garcia. (*Id.* p. 20).

*Mary Lou Lopez Garcia*, stepmother of the deceased, said her stepson Tommy worked as a disk jockey for H&M Promotions and wore a distinctive gold necklace that featured a spinning wheel (RR Vol. 15, pp. 29-30).   He owned a black Camaro and had recently been paid (*Id.*, pp. 31, 33).

*Rudy Luna* said that Garcia wore his distinctive necklace with spinning wheel earlier in the day before Garcia's death (RR Vol. 16, p. 23).

*Robert "Rob" Jimenez* said that he was visited at his home the night before Garcia's death by Garcia and mutual friend Frank "Frankie" Russell (Vol. 16, pp. 37-39).  Jimenez got a page from Debra "Debbie" Espinoza, which he ignored (*Id.* pp. 39-40).  He said Mr. Garcia then got a call from

- 7 -

her (*Id.* pp. 40).  He said Garcia left his home with Frank Russell (*Id.*).
Garcia wore his distinctive necklace that night (*Id.* at 49-50).

   ***Frankie Russell*** confirmed Jimenez's account that both were with Mr.
Garcia that evening and that Garcia drove him from Jimenez's home to his
own home (RR Vol. 16, pp. 169-73).  He said Garcia left to go chill with
Debra Espinoza (*Id.* at 173).

   Accomplices Francisco Gonzales and  Debra Espinoza but not Teresa
Quintero testified about the details of luring and shooting Garcia.

   ***Francisco Gonzales*** admitted that he had been to prison and had been
addicted to cocaine for 15 years (RR Vol. 16, p. 85).  He knew Castillo,
whom he called "Juanito." (*Id.* 85-86).  On December 2, 2003, Castillo and
Ms. Espinoza came by his quarters and they agreed to a plan for her to lure a
guy who sold dope and who had money[1] to  lover's lane where the two men,
Gonzales and Castillo, would rob him (RR Vol. 16, pp. 88-89, 94).
Gonzales said his role was to grab and remove Ms. Espinoza from the car
parked on lover's lane (*Id.* at 95-96).  Gonzales said he took "an unloaded"
revolver (*Id.* at 101) and Castillo took a 9 mm handgun (*Id.* at 105).  He
said both men wore ski masks (*Id.* at 106).  Ms. Quintero released both men

---

[1] He never mentions a phone call from Ms. Espinoza to Robert Jimenez (RR. Vol. 16, p.
93).

- 8 -

near the lover's lane and was to pick them up after the robbery (RR Vol. 16, pp. 98-99).

He said he and Castillo hit the parked car with the lovers at the same time, and that Castillo shattered the passenger door window with the butt of his handgun (*Id.* at 109-110). He said Castillo declared to Garcia to "give [him] everything [Garcia] got," and Rodriguez heard a gunshot fire *inside* the Camaro (*Id.* at 111). Gonzales pulled Ms. Espinoza out of the car (*Id.* at 112). Gonzales said Mr. Garcia fled the Camaro and Castillo kept pumping bullets into the young man, even after the victim fell (*Id.* pp. 114-117).

Gonzales said he fled the scene, threw over the fence of a flea market his ski mask and Garcia's car keys and cell phone that Ms. Espinoza had given him, and put his gun in a storm drain (*Id.* at pp. 118-119). He did not meet up with Ms. Quintero (*Id.* at 120).

Second chair defense counsel Bill Harris cross-examined Gonzales (*Id.* at 134).

***Debra "Debbie" Espinoza*** detailed her extensive drug addiction and self-described herself as girlfriend of Castillo (RR Vol. 17, pp. 30-31). She said Castillo and Frank Gonzales came to her house and wanted her to call a guy (*Id.* at 31). She said she was brought in because she knew lots of

- 9 -

persons with money (*Id.*). She said that Castillo told her to call Robert

(Jimenez's) friend with the black car (*Id.* at 32)[2]. So she called Mr. Garcia

for him to pick her up (*Id.* at 34).

When Mr. Garcia picked her up, they went to Clamp Street and

parked (*Id.* at 38). She asserted that in that dark lover's lane she noted that

Mr. Garcia wore a spinner's wheel necklace as the couple commence to

engage in oral sex in the passenger seat of the Camaro (*Id.* at 39). She

testified that the passenger window was broken by her accomplices, that

Frank drug her out the driver's side, and that Castillo yanked Mr. Garcia

from the car, put a gun at his face, and said, "Give me your fucking money"

(*Id.* at 40). She said Castillo initially shot Mr. Garcia and then pumped

multiple bullets into the fleeing young man (*Id.* at 40-41). Both men fled

(*Id.* at 41). She said "Frank [Gonzales] busted it [the spinner medallion

necklace] off of him [Mr. Garcia] (*Id.* at 43). She denied taking the car keys

(*Id.*). She ran to an adjacent home and declared that *she* had been the victim

of a robbery (*Id.* at 44). There she used a phone in that house (*Id.*)

Police later found Ms. Espinoza elsewhere, took her in for

questioning, and she gave multiple and varying accounts of what happened.

---

[2] But she claimed she was not sure she knew Robert Jimenez as a friend of the decedent
(RR Vol. 17, p. 33).

On direct examination, she told the prosecutor that she did not initially tell the truth because, "I was in shock. *I hadn't slept in like six days*, and [didn't want to get into trouble]" (*Id.* at 49).  She was arrested on a motion to revoke that night (*Id.*).  She admitted that she was tearing up, which "was feeling sick and tired, cold" from lack of drugs (*Id.* at 51).[3]  She admitted she did not give a full account to police until her fourth statement (*Id.* at 66). She testified on direct examination that she had pleaded guilty to mere aggravated robbery in exchange for a 40-year sentence (*Id.* at 68).

First chair defense counsel Callahan cross-examined Ms. Espinoza (*Id.* at 70).

Several lay witnesses who were involved that night also testified.

***John Medlick*** and ***George Gruber*** occupied the home on Clamp Street closest to the shooting of Mr. Garcia, and multiple gunshots awoke them (RR Vol. 15, pp. 40-42, 67-68).  Mr. Gruber immediately called 9-11 to report the shooting (*Id.* at 45, 68).  Both men testified that a female (Debra Espinoza) came to their home, pounded on the door for entry, and was hysterical (*Id.* at 44, 69).  She used Gruber's cell phone to call an unidentified person to say, "They shot him! They killed him! (*Id.* at 45, 70). The three went outside and looked at the body (*Id.* at 46, 70-71).  Gruber

---

[3] E.g, detoxing.

said the woman then fled (*Id.* at 72). Medlick said he saw the gold necklace around the dead man's neck (*Id.* at 60). Gruber never saw jewelry on the body and confirmed that a crime scene photograph (State Ex. 9, RR Vol. 23) showed no such gold chain on the body (RR Vol. 15, p. 80). He identified the woman from a photograph of her (State Ex. 59, RR Vol. 23)(RR Vol. 15, p. 79). A policeman testified that Ms. Espinoza was depicted in State Exhibit 59 (RR Vol. 15, p. 206). She also testified that she was the person who went to the house (RR Vol. 17, p. 44).

When he had testified, ***Rob Jimenez*** said that he was the person that Debra Espinoza telephoned and that was how he knew his friend had been murdered and the location of the crime (RR Vol. 16, p. 41). (Ms. Espinoza confirmed this call in her testimony (RR Vol. 17, p. 44 ).[4]) Jimenez said he immediately called Frank Russell, picked him up in his mother's car, and drove to the crime scene on Clamp Street (RR Vol. 16, pp 41-45. ***Frank Russell*** confirmed the call and the drive to the crime scene in his testimony. (RR Vol. 15, p. 174-178).

***San Antonio Policeman Victor Gonzales*** was first responder to the crime scene, protected the scene, met and talked with both Jimenez and

---

[4] The record never explains why Ms. Espinoza would call Jimenez or if he was complicit. This is a possibility in light of her dissembling of hardly knowing Jimenz (RR Vol. 17, p. 33) and that Castillo wanted to rob Robert's friend with the Camaro (*Id.* at 32).

Russell, and radioed a description of the fleeing woman who had left the scene after using the phone at Medlick's and Gruber's home   (RR Vol. 15, pp. 91-98).

Traveling full chat en route to the crime scene, *San Antonio Policeman Danny Higginbotham* saw a male was fleeing the general scene and avoiding eye contact with the flashing lights of the patrol car (RR Vol. 15, pp. 203-204).  Higginbotham radioed the officer in the patrol car trailing him to stop and investigate the male (*Id.* at 204).

That trailing officer, *San Antonio Policeman  Julian Garza* stopped the man, Francisco Gonzalez, who then fled but was caught (RR Vol. 15, pp. 211-215).  He arrested Gonzalez for an outstanding misdemeanor warrant (*Id.* at 216).

*Evidence Technician Luis Tijerina* responded to Garza's location and performed a gunshot residue (GSR) test on Gonzalez (RR Vol. 15, pp. 222-233).

At the crime scene, Officer Higginbotham learned from Rob Jimenez of the involvement of Debra Espinoza.  Officer Higginbotham knew her, went to her residence, and transported her back to the crime scene for night criminal investigators to talk to her.

Lay witness *James Fenimore*, who lived around the corner from

- 13 -

Clamp Street and the crime scene, also was awaken around 2 a.m. that morning by gunshots.   He looked out and saw a damaged car enter his driveway, back out, and depart.  The car he saw was consistent with a car shown in multiple photographs.  (RR Vol. 16, pp. 157-162; State Exs.  77, 83-85, RR. Vol. 23).

*Lucinda Gonzalez*, sister of Francisco Gonzalez, identified the damaged car in those photographs as hers (RR Vol. 16, pp. 173-175).  She had refused appellant's request to borrow her car that night, but she had loaned it to accomplice *Teresa "Bita" Quintero* several hours before the murder and Quintero left with Francisco Gonzales, Castillo, and Debra Espinoza (*Id.* at 176-178).  Quintero returned in the car around 0200 to 0300 without Gonzales and explained that he had been arrested on a warrant for nonpayment of child support (*Id.* at 180-181).

Lucinda Gonzales learned that her brother Francisco had been arrested for capital murder on December 7, 2003.  She claimed she listened in on a phone conversation between Ms. Quintero and Castillo, in which Castillo told Ms. Quintero that "nothing would happen because Frank didn't shoot the guy --I did" (RR 16, p. 184).  Castillo reportedly told Ms. Quintero that after the shooting he ran through an open field and discarded his (ski) mask, gloves, and handgun (*Id.* at 184-185).  She then called a detective (*Id.*

- 14 -

at 185). Several days later, she confronted Castillo on the murder, and Castillo made a gun gesture at her with a pointed finger and told her to keep her mouth shut (*Id.* at 186).

**San Antonio police detective John Menefee** confirmed the call from Lucinda Gonzales and its content. He passed the information to homicide detectives (RR Vol. 16, pp. 197—201).

Police actively processed the crime scene. **San Antonio Evidence Sergeant Matthew Podwika** detailed the collection of such crime scene evidence as blood samples, spent bullet casings, fingerprints, and glassed shattered from the passenger window of the Camaro and pointed out the location of the items on crime scene diagram (State Exs. 61-62, RR Vol. 23)(RR Vol. 15, pp. 111-158). He also authenticated extensive photos of the crime scene and of processing of the Camaro at another location on another day. Significantly, and despite the testimony of Ms. Espinoza that the gun was fired inside the Camaro, Podwika found in the Camaro only a single small drop of blood on the inside of the passenger door (RR Vol. 15, pp. 126, 152). In the car at the impoundment yard, Sgt Podwika found under the front passenger seat and photographed (State Ex. 58, RR Vol. 23) a strain of gold chain with about eight links (RR Vol. 15, pp. 150-151, 156, 161).

- 15 -

*Fingerprint expert Frank Looney* testified that none of the legible fingerprints taken by evidence technicians matched Castillo (RR Vol. 16, pp. 5-11). One print matched *Rudy Luna*, who testified that he had talked to decedent at the K-Mart during daylight before Mr. Garcia was murdered. He said he was home asleep with his wife when Mr. Garcia was shot (RR Vol. 16, pp. 22-27).

*Bexar County Deputy Constable Reginald West* worked part-time security for a flea market near the crime scene, secured a ski mask he found along the fence line because of press reports of the murder in the area shortly after midnight, and authenticated photographs of the ski mask and its disposal site (RR Vol. 16, pp 22-34). *San Antonio Police Evidence Detective Cristofolo Vieyra, Jr*. testified that he collected the mask (State Ex. 125, RR Vol. 24)(RR Vol. 18, pp. 15-25). He also processed for evidence the damaged Honda belonging to Lucinda Gonzalez and detected a presumptive finding of blood on carpet inside, which carpet he sent to trace evidence (*Id*. at 26-42).

On December 4, 2003, *San Antonio Police evidence technician Michael Garcia* responded to *Amanda Rodriguez*. She found a second mask near her residence of Clamp Street. Officer Garcia , placed it in the back of her pick-up, where officer Garcia recovered it (State Exs. 114—118,

RR Vol. 24)(RR Vol. 16, pp. 18-63).

The collected evidence was examined by various experts. *Bexar County Forensic Crime Center senior forensic scientist Michael V. Martinez* testified there was no gun shot residue detected from the swabbings and clothing taken from Francisco Gonzalez (RR Vol. 16, pp. 63-64, 68-70, 74).

*DNA expert Lonnie Ginsberg* testified that he analyzed the two masks for DNA evidence and compared detected DNA to the known DNA of Francisco Gonzales, the decedent, and the Castillo (RR Vol. 18, pp. 124-135). He excluded decedent as the source of the discovered DNA, could not exclude Gonzales, and found inconclusive results with result to the Applicant (*Id.* at 136). He said that the single blood spot taken from the passenger car door belonged to decedent to the exclusion of both Gonzalez and Castillo (*Id.* at 137, 140). Lastly, Mr. Ginsberg concluded that the substance in Ms. Quintero's Honda was not blood, notwithstanding the presumptive finding of the Luminol test (*Id.* at 137, 139).

*Firearms expert Edard W. Love, Jr.* confirmed that all bullet casings recovered at the crime scene were fired from the same gun, which also fired two of the bullets recovered from decedent's body during autopsy (RR Vol. 18, pp. 108-119). The bullets, he said, were fired by a 9 mm pistol (*Id.* at

- 17 -

119, 122).

***Bexar County Medical Examiner and board certified forensic***

***pathologist Dr. Vincent DeMaio*** testified that decedent that physical

examination of the decedent produced $124 in a money clip in the left front

pants pocket and $450 cash in the right rear pants pocket (RR Vol. 18, pp.

150).[5] He said Mr. Garcia bled to death from multiple gunshot wounds (*Id.*

at 161, 163).

***San Antonio Policeman Tim Fuller*** testified as to the details of

arresting Castillo on the evening of December 10, 2003 (RR Vol. 18, pp.

59-60).

Three additional lay witnesses testified.  Seventeen-year-old ***Bryan A.***

***Brown,*** nephew of accomplice Francisco Gonzales, testified to events of

December 2, 2003 (RR Vol. 77, pp. 87-88).  He said that he returned home

from supper at a Jack in the Box with his uncle, his girlfriend Teresa

Quintero, and a cousin, and found Castillo and a female (*Id.* 89-90).  The

then 15-year-old wanted to see Castillo to get a tattoo, and he saw Castillo

wear a handgun and an armored vest (*Id.* at 92).  Castillo let Brown hold

what Brown described as a 9 mm Ruger (*Id.* at 93).  He never saw his Uncle

---

[5] This finding will be significant part of defense counsel's ineffective final argument in
Claim No. I, this writ application, *infra,* p. 80-83.

- 18 -

Frank with a gun that night. When they departed, Castillo left with his

girlfriend, and his Uncle Frank and Ms. Quintero left in his Aunt Lucinda's

Honda (*Id.* at 94). Brown said he rode with Castillo several days later, and

Castillo told him that he had hid a gun and an armored vest in a field (*Id.* at

97). Brown said that Castillo admitted that he shot a guy a bunch of times

(*Id.* at 98). On cross-examination he admitted he loved his uncle but was not

lying for him (*Id.* at 102-104).

A high school classmate of the decedent, ***Jessica Cantu,*** testified that

she had seen Tommy Garcia wear a special gold necklace in the past and

that in the days after his death she saw Castillo wear a necklace that looked

familiar to her as Garcia's necklace (RR Vol. 17, pp. 108-109, 112). When

she told Castillo that the necklace looked familiar, the left the room and

returned without the necklace (*Id.* 113-114). She admitted on cross-

examination that she never got a good look at the necklace (*Id.* at 122).

***Gerardo "Jerry" Gutierrez*** testified for the prosecution that he had

been imprisoned for theft of a vehicle, unauthorized use of a vehicle, and

sexual assault and met Castillo while in the Bexar County Jail (RR Vol. 17,

pp. 5-6). He said he referred to the bespectacled Castillo as "Mr. Six" after

the dancing old man with large glasses depicted in TV advertisements for

an amusement park (*Id.* at 8). Gutierrez said Castillo confided to that he

and two friends, Bita and Frank, had planned to rob a person but events turned wrong when the victim ran.  Castillo reportedly confessed to shooting the victim even as the guy was crawling and screaming for help (*Id.* at 10).  He said he came forward with this account because he had taken so much from society and wanted to give back some.  He said he also knew fellow jail inmate Ralph Pedrigone, who he described as a scammer and a liar (*Id.* at 12-13).  Gutierrez admitted on cross-examination that his nickname was "El Loco Gerry" because he was seeing a psychiatrist (*Id.* at 21-22).  He said he did *not* recall a statement by Francisco Gonzalez's saying in jail, "That's the guy that I killed" (*Id.* at 19).

*San Antonio homicide detective Timm Angell* testified extensively as the case agent in this murder case *without a single objection* from defense counsel (RR Vol. 18, pp. 62-98).  He recounted the hearsay contents of each statement of  accomplice Ms. Espinoza (*Id.* at 64-68).  She admitted agreeing to lure someone to Clamp Street with the understanding that they would be robbed (*Id.* at 68).  She later identified one of the perpetrators as Frank Gonzales (*Id.* at 70).  She initially denied knowing the identity of the shooter (*Id.* at 72).

Detective Angell recounted his interviews of Gonzales (*Id.* at 73).  He said he told Gonzales that he didn't believe he was the person responsible

- 20 -

for shooting the victim but that he was present (*Id.* at 74).  He said Gonzales

identified Castillo (*Id.* at 75).

Once Gonzales had named Castillo, Detective Angel again

confronted Ms. Espinoza (*Id.* 76-77) and she now identified Castillo (*Id.* at

78).  Detective Angel revealed, without defense objection,  her hearsay

verbal comments to him also (*Id.* 79).

The detective then got an arrest warrant for Castillo (*Id.* at 80).

Upon arrest of Castillo, the detective photographed the suspect's hands,

since the robber had broken in the passenger window and, according to Ms.

Espinoza, who had immediately left the crime scene, cut his hands (*Id.* at

81).  He said Castillo had small nicks on his hands (*Id.* at 82-83).  The

detective recounted the taking of statements from John Medlick, George

Gruber, James Fenimore, Teresa Quintero, and persons whose fingerprints

were found on decedent's car (*Id.* at 88-89).  He recounted getting a search

warrant for Castillo's DNA via a bucal swab (*Id.* 89-90).  He recounted the

unsuccessful search for Gonzalez's disposed handgun in a drain over a year

after it was ditched (*Id.* at 96-97).

Detective Angell repeatedly savaged first chair defense counsel

Callahan during cross-examination because counsel never investigated

witnesses or got the facts blatantly wrong.

- 21 -

When counsel asked if suspicion had grown from Ms. Espinoza to Lucinda Gonzales, Detective Angell attacked, "No, that's not correct" (*Id.* at 99) and "No, I was never thinking her as a suspect" (*Id.* at 100).

Apparently Callahan either failed to read or to remember Angell's report, as he asserted that the detective spoke to Lucinda Gonzales on December 8, 2003, and was buried by the response that the detective did not because he was off work that day (*Id.* at 101).

Then Callahan got himself buried by asserting that Ms. Espinoza "was never completely truthful to you ….? and Angell slaughtered him with the following reply that boosted the credibility of his accomplice enemy:

> I'm sorry. If you're asking me, I disagree.
> I think she was—towards the end she was being
> truthful. She left things out, but she wasn't lying
> to deceive me.

(*Id.* at 102). Callahan then asserted that Francisco Gonzalez gave three written statements, and the detective slapped defense counsel that Gonzales only gave one written statement (*Id.* at 103).

On direct examination, Detective Angell had detailed how Ms. Espinoza had called her wanted her name kept out of the media (RR Vol. 88, p. 77). Callahan raised the issue but asserted that the caller was Lucinda Gonzales (*Id.* at 103, line 19). Detective Angell snapped back:

- 22 -

A. No, that's incorrect.

Q: Well, correct it for me.  What is correct?  What
did you tell her regarding her desire not to be
disclosed  to the public?

A. You asked me about Lucinda Gonzales?

Q. Yes, sir.

A. I never talked to Lucinda Gonzales about a warrant
or anything to do with a warrant.

(*Id.* at 103-104).  Attorney Callahan then asserted that it was Debra

Espinoza who overheard a phone conversation with Castillo, and the

Detective had to remind Callahan that the witness who made that remark

was Lucinda Gonzalez (*Id.* at 105).  Wounded by this repeated shattering of

his credibility, Callahan cowered from further questioning (*Id.* at  106).

On redirect, the prosecutor successfully had Detective Angell

slaughter Callahan:

Q: Under all those statements that you read in your
whole investigation, did you find any evidence
of anyone else being the shooter of Tommy Garcia,
Jr., but this man, Juan—

Callahan:  Objection, invade the province of the jury.

Court:  What—Rephrase, then.

Q: Did you have information from any other source
to lead you to investigate the name of any other
person that the jury has not heard about?

- 23 -

A: No.

Callahan never objected again. (*Id.* at 107).

After the State rested, Callahan said he had as a witness a Ralph
Perdigone—"He's over there (jail). *I don't know if Mr. Castillo wants to
testify or not.* He probably would appreciate the time." (*Id.* at 164). The
date is August 25, 2005 (*Id.* at 1).

Callahan's attorney fee voucher of 9-6-2005 (App'x Tab 10,
p. 5) indicates that he has interviewed Perdigone at the jail on the prior day,
August 24, 2005.

Perdigone provides *de minimus* assistance to the Castillo's cause and
proves to be an unmitigated disaster on cross-examination by the
prosecution.

Callahan asked Perdigone if he was present on June 9, 2004 when
Francisco Gonzales responded to a news story (RR Vol. 20, p. 5). Before
jurors, the discredited attorney Callahan had to correct the date to January 9,
2004 (*Id.*). Perdigone said that Gonzales said "That the guy I killed" and
then immediately corrected himself, "I mean they killed." (*Id.*)

The prosecutor then slaughtered Perdigone. He admitted that new
inmates, which Rodriguez was, often brag or exaggerate to bolster their
credibility and standing among inmates (*Id.* at 10). He said Castillo

- 24 -

repeatedly "bugged him" for such a statement for two months  and that it was the defense who provided the date of January 8 (*Id*. at 12-13).  He said Castillo repeated wanted him to contact the district attorney but he refused (*Id*. at 14).   He then admitted that he had been convicted of 14 different felony convictions and that inmates do favors for each other for each other to make money (*Id*. at 16-18).

The defense then rested (RR Vol. 20, p. 21).

The State recalled decedent's mother to testify on her son's cell phone and a phone call she received, since those matters were mentioned by homicide detective Angell (*Id*. at 21-23).

Both sides closed (*Id*. at 24).  After being charged on the law and having deliberated from 2:26  to 6:20 p.m., jurors found Castillo guilty of capital murder as charged in the indictment (RR Vol. 20, p. 94).

# V.
# Issues Presented

## A. Claim I

TRIAL DEFENSE COUNSEL RENDERED
INEFFECTIVE ASSISTANCE OF COUNSEL

## B. Claim II

THE TRIAL COURT VIOLATED DEFENDANT'S
RIGHT TO SELF-REPRESENTATION AND THEN
ABUSED HER DISCRETION IN HAVING APPLICANT
DEFEND HIMSELF DURING SENTENCING.

## C. Claim III

APPELLATE COUNSEL RENDERED INEFFECTIVE
ASSISTANCE ON THE MOTION FOR NEW TRIAL AND
THE APPEAL, HAD A CONFLICT OF INTEREST ON
THE APPEAL, AND PLAGIARIZED PORTIONS OF THE
BRIEF.

## D. CLAIM IV

COUNSEL WAS INEFFECTIVE IN JURY SELECTION.

## A. <u>Claim I</u>

### TRIAL DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.
### (*Restated*)

Applicant was denied his rights under the U.S. Const. amend. VI for the following matters related to ineffective assistance of counsel:

### 1. <u>General Law on Ineffective Assistance</u>

a. ***Standard for Ineffective* Assistance.** Effective assistance of counsel is a right guaranteed by the U. S. CONST. amend. VI., applied to the States through the Fourteenth Amendment, and also guaranteed by TEX. CONST. article I, § 10 and TEX. CODE CRIM. P. art. 1.05. *State v. Thomas*, 768 S.W.2d 335, 336 (Tex. App.—Houston [14th Dist.] 1989, no pet.). The federal test for effective assistance of counsel is stated in *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052 (1984) and is also the test in Texas. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

b. ***IAC Test.*** Under this test, one must show (1) that counsel's representation fell below an objective standard or reasonableness, and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 689; *Rosales v. State*, 4 S.W.3d 288, 231 (Tex. Crim. App. 1999); *Dewberry v.*

- 27 -

*State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999).

c. ***Burden of Proof.***  To meet the burden on the first prong, one must prove by a preponderance of the evidence that the attorney's representation objectively fell below the standard of prevailing professional norms; to meet the burden on the second prong, one must show a reasonable probability that, but for counsel's unprofessional errors,  the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).  If a single juror can place a capital defendant's life history on the mitigating side of the scale, there is a reasonable probability that a single juror would have struck a different balance. *Wiggins v. Smith*, 539 U.S. 510,  537, 123 S. Ct. 2527, 2543 (2003).  Under Texas capital sentencing, it only takes a single juror to hang a jury and result in a life sentence. TEX. CODE CRIM. P. art. 37.071(g).

d. ***Standard of* Proof.**  The standard of proof is a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998).

e. ***Presumptions.***  In determining if counsel's performance was deficient, appellate review of counsel's representation if highly deferential,

and an appeals court indulges in a strong presumption that counsel's conduct falls within a wide range of reasonable representation. *Strickland*, 466 U.S. at 689; *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 1999). A full inquiry into the strategy or tactics of counsel should be made only if, from all appearances after trial, there is no plausible basis in strategy or tactics for counsel's actions. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. 1981). Some claims may be disposed of on direct appeal where trial counsel's ineffective is so apparent from the record. *Andrews v. State*, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

      f. ***Lack of Strategy.*** When no reasonable trial strategy could justify the trial counsel's conduct, counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects the trial counsel's subjective reasons for acting as he did. *Andrews*, 159 S.W.3d at 102.

      g. ***Reasonableness Judged at Time of Counsel's Conduct.*** The reasonableness of counsel's conduct o the facts of a particular case is viewed as of the time of counsel's conduct. *Strickland*, 466 U.S. at 690; *Organ v. Cockrell*, 249 F.3d 349, 360 (5th Cir. 2002).

      h. ***Presumption of Prejudice for Complete Denial of Counsel at Critical Stage.*** The complete denial of counsel during a critical stage of a

- 29 -

judicial proceeding, however, mandates a presumption of prejudice because "the adversary process itself" has been rendered "presumptively unreliable." *United States* v. *Cronic,* 466 U.S. 648, 659, 104 S. Ct. 2039 (1984). The even more serious denial of the entire judicial proceeding also demands a presumption of prejudice because no presumption of reliability can be accorded to judicial proceedings that never took place.

i. ***Incomplete Investigation***. Strategic choices made after less than a complete investigation are reasonably precise to the extent professional judgments support the limitations of an investigation. In other words, counsel has a duty to make a reasonable investigation and to make a reasonable decision that makes particularly investigations unnecessary. *Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. 2066.

### 2. Pre-trial Ineffectiveness of Counsel

#### a. *Only Visiting Applicant Once in Jail Before Trial*.

(1) *Factual Basis*. San Antonio Police arrested applicant Castillo on December 10, 2003 (RR Vol. 18, pp. 55, 59-60). The District Judge appointed Vincent D. "Denny" Callahan as first chair defense counsel the next day on December 11, 2003 (CR 2). According to his appointed attorney fee voucher (App'x Tab 10) and Applicant's affidavit (App'x Tab 16), attorney Callahan visited Applicant in the Bexar County Adult

- 30 -

Detention Center once in December 2003, and ***this visit was the only time***

***that Mr. Callahan visited applicant in jail prior to trial two years later***.

Attorney Callahan confirms this in his "interim voucher" of May 2, 2005

(App'x Tab 12). The front page of the voucher under "initial jail visit"

states the $100 flat fee for an initial jail visit is "claimed in itemization 2½

hours, 12-1*3*-03." The itemization on the first page of "out-of-court hourly

worksheet" then states, "12-1*5*-03, Jail Visit, 2.50," in which Callahan gets

the wrong date! Neither this interim voucher nor Attorney Callahan's final

voucher (App'x Tab 11) reflect any other visit to Applicant.[6]  Attorney

Callahan's failure to visit applicant in jail also is detailed in a letter

Applicant Castillo wrote District Judge Herr a letter (App'x Tab 17) that

said:

> I'd like to dismiss my court-appointed Vincent Callahan
> because I have only seen him twice in the past 13 months.
> Once was in December of 2003 and the last time was in your
> courtroom on 1-6-2004.[7] I also feel he is not helping me ….

Applicant sent a written complaint to the trial judge on June 6, 2005 that Mr.

Callahan only visited him on one occasion (CR 27).

---

[6] Two versions of the final voucher are in the Appendix Volume 1. The first from
Callahan's file is where Callahan claims $26,310.00 (App'x Tab 11) and the second,
from the court's file, is changed to $16,310.00 (*Id.*, Tab 10).
[7] This date represents Bexar County's pre-indictment docket. This is confirmed in a
hand-scrawled Senate Bill 7 Contact Letter than Callahan faxed to the Bexar County Jail
to be given to Castillo; however, Callahan gets the year wrong (App'x Tab 21).

On February 27, 2004, the Court appointed John W. "Bill" Harris, Jr. as second chair defense attorney (CR 6). Harris's voucher (App'x Tab 13) reflects he saw Applicant initially on 2-3-05 (front page of voucher under "Initial Jail Visit" and on page 1 of "out-of-court hourly worksheet", line 7) and then again on that some hourly worksheet (line 10) on "6-14-05 Jail Visit—client, 1 [hour]." *Significantly, attorney Harris's two visits to Applicant in jail are 11½ and 15½ months after his appointment.* [It is noted that the two defense attorneys colluded to get their vouchers the same when Callahan sent a fax on conferences with co-counsel (App'x Tab 14).

Callahan twice wrote Castillo, first on January 9, 2004 and again on February 27, 2004, that he would send Castillo copies of his "extensive notes" from reviewing the State's file and the statements of witnesses (App'x Tabs 19 & 20). No letter is the files of either defense attorneys suggests that this was every done.

(2) *Authority*: A defense counsel provides ineffective assistance of counsel in violation of the Sixth Amendment when he only sees his client once at jail prior to trial. *King v. Beto*, 305 F. Supp. 636 (S.D. Tex. 1969), *aff'd*, 429 F.2d 221 (5th Cir. 1970), *cert. denied*, 401 U.S. 936, 91 S. Ct. 921 (1971)(IAC when attorney only saw defendant once); *Ex parte Bratchett*, 513 S.W.2d 851, 853-54 (Tex. Crim. App. 1974)(IAC when counsel saw

- 32 -

defendant only once in murder case); *Hernandez v. State*, 943 S.W.2d 930

(Tex. App.—El Paso, 1997)(IAC when counsel only saw client day before

trial), *rev'd to apply Strickland vice Ex parte Duffey*, 988 S.W.2d 770, 774

(Tex. Crim. App. 1999), *remanded to trial court*, 08-95-00187-CR (August

31, 2000).   Counsel must have more than just understanding and awareness

of the State's case but must have a  like perception of the defendant's

position, and counsel is obligated to investigate defendant's defense,

although it might not be a strong one. *Rummel v. Estelle*, 498 F. Supp. 893

(W. D. Tex. 1980).

A Texas capital counsel is required to engage in a *"**continuing**

***interactive dialogue with the capital defendant on all matters that have a***

***material impact on the case,***" including the progress and prospects for

factual investigation and what assistance the client might provide, current or

potential legal issues, development of a defense theory, presentation of the

defense case, potential  agreed-upon dispositions of the case, and relevant

aspects of the client's relationship with correctional, parole, or other

governmental agents.  Guideline 10.2C, Guidelines and Standards for Texas

Capital Counsel, State Bar of Texas (App'x Tab 52).[8]

---

[8] This standard is taken from Guideline 10.5C, ABA Guidelines for the Appointment and
Performance of Defense Counsel in Death Penalty Cases (Rev. Ed. Feb. 2003)(App'x
Tab 53).  The Supreme Court has held such guidelines reasonable. *Wiggins v. Smith*, 466
U.S. at 688; *Rompilla v. Beard*, 545 U.S. 374, 387.

Failure to interview witnesses or discover readily available evidence is an error in trial preparation , not trial strategy. *Kenly v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991). Any decision or judgment that flows from lack of diligence in preparation of and investigation is not protected by the presumption in favor of counsel having acted reasonably. *Id.*

A Texas lawyer has an ethical duty to keep a client reasonably informed about the status of a matter and promptly comply with reasonably requests for information. A Texas lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the presentation. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.03, *reprinted in* TEX. GOV'T CODE tit. 2, subtit. G app. A (TEX. STATE BAR R. art. X, § 9).

(3) *Argument and Prejudice*. First chair defense attorney Callahan saw Castillo at the jail only the day or so after Castillo's arrest in December 2003 and did not see him again at the jail until trial was completed. The one visit occurred before indictment and before discovery was started. Second chair counsel Harris twice saw Castillo 11½ and 15½ months after his appointment. These two defense "attorneys" dishonorably and disgracefully abandoned their client. No wonder Castillo is repeatedly writing to the trial judge and complaining about the attorneys and their

- 34 -

failure to visit him.  They had totally abandoned him.

Counsel could not and did not receive timely receive face-to-face feedback from their client.  Counsel breached their written promise to meet with their client on the psychological evaluation of Dr. Farrell—they just mailed it over and expected a seventh grade dropout to interpret it.

Attorney Callahan wrote his client months before trial to tell him if he (the client) was going to testify (App'x Tab 45).  Even at the close of State's evidence, Callahan still had neither consulted on this issue with his client nor prepared him for testifying.

When attorney Callahan wrote Castillo that he suspected the defendant was experiencing depression over his outlook on sentencing (App'x Tab 44), neither attorney took any step to resolve the problems— they only reinforced the problem.  This led to the defendant having zero confidence in his attorneys and seeking to represent himself.

This was not strategy—this was sloth.  This was total denial of the effectiveness of counsel at the critical time of pre-trial investigation.

b. *Failure to Interview Prosecution Witnesses*.

(1) *Factual Basis*.  Attorney Callahan spent two whole hours reviewing the district attorney's file and police reports[9] from his

---

[9] The Bexar County District Attorney has an open file policy whereby defense attorneys can come in and review all police reports, witness statements, and expert witness reports.

appointment on December 11, 2003 until he submitted his interim voucher on May 2, 2005 (App'x Tabs 12 & 23). This occurred on 3-9-04. (*Id*). He claimed in his final attorney fee voucher (App'x Tab 11) that had a "disc. conf." [discovery conference] for three hours on July 20, 2005 some 15 months later—this is presumably with an assistant district attorney. His notes from this meeting are in the third batch of discovery notes in App'x Tab 23. Significantly, this date is after the July 5, 2005 hearing on the sole motion heard in the case (RR Vol. 2, pp. 3-7) and after general *voir dire* on July 15, 2005 (RR Vol. 3, p. 3) and before individualized *voir dire* began on July 26, 2005 (RR Vol. 4, p. 1). Attorney Callahan's notes from these "efforts" are found at App'x Tab 23.

While Attorney Callahan spent an alleged five hours on reviewing the DA's open files, second chair attorney Harris spent 7½ hours (3 hours on 3-15-04 and 4½ hours over 14 months later on 6-3-05)(App'x Tab 13). Attorney Harris also spent 2¼ hours view a videotape in the district attorney's office on August 16, 2005 (App'x Tab 13, last page). By comparing this latter date from page 2 of the out-of-court hourly worksheet to the first page of the in-court hourly worksheet, one can see that August 16, 2005 was the day after general *voir dire*, which the voucher notes attorney Harris was "unable to attend."

- 36 -

A review of the vouchers of both defense attorneys shows that ***neither counsel interviewed a single prosecution witness***. The two defense attorneys did not interview any prosecution witnesses, be they lay witness— whether or not connected to accomplices, police, evidence technicians, medical examiner, fingerprint expert, trace evidence examiner, DNA expert, or firearms expert. A review of the files of these defense attorneys fails to reflect any notes of any interview or telephone call to any witness.[10]

These "attorneys" cannot claim that they did not know how to locate witnesses. The names and address and, in most cases, phone numbers of all witnesses are on the police reports, witness statements, and reports for forensic experts that these attorneys claim to have reviewed. Additionally, the court's file had copies of all subpoenas of all prosecution witnesses, and these subpoenas had the addresses of each prosecution witnesses (App'x Tab 24). ***Significantly, the court's file lacks a single subpoena request from these two defense attorneys.***

Attorney Callahan did interview a single defense witness, Ralph Perdigone, in jail on 8-25 [-2005] (App'x Tabs 10 and 11, out-of-court

---

[10] The efforts of these two men defending a man facing the death penalty are in stark contrast to the splendid efforts shown in the voucher of attorney Ray Fuchs who represented accomplice Francisco Gonzales, who faced the death penalty (App'x Tab 15). This attorney repeatedly saw his client in jail, visited the crime scene, interviewed witness, and, as reflected in the disposition of the case on the voucher, was able to get a lesser charge of murder for his client and a 40-year prison sentence.

worksheets, p. 2, lines 9-10).  As will be noted from the in-court worksheet, August 25, 2005 is the third day of the jury trial.  And, as noted earlier in this writ application, *infra* pp. 24-25, this witness imploded and significantly hurt the Applicant.

(2) *Authority*:  Failure to interview witnesses or discover readily available evidence is an error in trial preparation, not trial strategy.  *Kenly v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991).  Any decision or judgment that flows from lack of diligence in preparation of and investigation is *not* protected by the presumption in favor of counsel having acted reasonably. *Id.*

(3) *Argument and Prejudice*.  Defense counsels' failure to interview witnesses caused massive damage to Castillo's defense.  Callahan asked key prosecution witnesses about the credibility of the key witnesses. Had Callahan interviewed these witnesses, he would have known that he was going to be pummeled with an answer that was adverse to his position. As a result of this failure, Callahan bolstered the credibility of critical adverse witnesses, especially of the accomplices.  His failure to know the facts of the case also shows that he failed to interview prosecution witnesses. The witnesses, particularly homicide detective Angell, are constantly correcting Callahan on the facts and killing his credibility before jurors.

- 38 -

c. ***Last Second Trial Preparations***.

(1) *Factual Basis*.  The Court prepared a scheduling order in this case (CR 22) that clearly put defense counsel on notice of timelines in this death penalty capital murder trial.  Instead of formulating a prepared strategy and preparing a defense well in advance of *voir dire* and trial on the merits, both defense attorneys dawdled until the last minute.  Attorney Callahan's vouchers (App'x Tabs 10 and 11, second "out-of-court hourly worksheet," lines 4 and 5) reflect that he "prepare[d] cross exam & both final arguments' over a 6.5 hour period on 8-20[-2005].  As can be deduced by comparing August 20 to the "in-court hourly worksheets, ***this trial preparation occurs 10 days after jury selection was completed and the day before trial on the merits begins***!  Despite his purported and billed preparation for opening statement the day before trial, Callahan did ***not*** give the opening statement at trial on the merits—second chair attorney Harris did (RR Vol. 15, p. 23).  The defense did not give an opening statement for the sentencing phase of trial (RR Vol. 21, p. 8).  Attorney Callahan entered notes into a spiral notebook with a purple cover throughout the trial, from *voir dire* to final sentencing.  Callahan's entry for 8-29-05 (App'x Tab 9, p. 38) states, "prepare final argument—12:30—".

Attorney Callahan's file contains four pages of notes labeled "IDEAS,

- 39 -

Castillo (App'x Tab 25). The brilliance reflected in these notes clearly are

not part of trial preparation for two reasons. First, the notes reflect state

exhibits numbers (e.g., SX 58, SX 132), which were not assigned until trial

on the merits began. Second, page four of the notes is written on the back

page of the memorandum opinion in *Butler v. State* and that opinion is dated

September 21, 2005, two days after Applicant was sentenced to a penalty of

death (RR Vol. 22, pp. 1, 27).

Attorney Callahan prepared hand-scribbled notes to cross-examine

only five of the 24 testifying witnesses called by the prosecution (App'x

Tabs 4—8), although second chair counsel examined Francisco Gonzales.

These notes cover the following witnesses:

- *Francisco Gonzales*, 1½ pages of dynamic questioning plus a single blank sheet.[11] (Not examined by Callahan though.) (App'x, Tab 4).

- *Debra Espinoza*, a half sheet of questions, followed by a full page of questions, followed by one-third of a page of questions, followed by a single blank sheet.[12] (App'x, Tab 5).

---

[11] He was an accomplice who testified at trial. See this Application, *supra*, pp. 8 - 9. Since the first page of notes is cut in half, counsel has placed a blank sheet —not the blank third page—under this page so it will not copy over page 2.

[12] She was an accomplice who testified at trial. See this Application, *supra*, pp. 9 – 11. Since the first page of notes has only the top third of the page, counsel has placed a blank sheet—not the blank four page—under this page so it will not copy over page 2.

- ***Teresa Quintero***, a half sheet of questions, followed by 3/4ths of a page of questions, followed by a blank page, followed by two more pages of handwritten notes.[13] (App'x Tab 6).

- ***Lucinda Gonzales***, a third of a page, followed by a full page, followed by a blank sheet of paper.[14] (App'x Tab 7).

- ***Brian Brown***, a full single page of notes and the notes "G. Love F.G." on a second sheet that is otherwise blank.[15] (App'x Tab 8).

It is noted that Callahan's first inspired questioning for each of these accomplices and their relatives was to ask them if their friend or relative had a good reputation for truthfulness. As will be shown later in this writ application, this tactic blew up his Callahan's face, resulting in bolstering of the key prosecution witnesses that he had to kill during cross-examination.

It is likely that the blank page was left by Mr. Callahan to put down any tardy inspired insight he had after his drafting the questions the day before trial. Of course, except a single bullet point for Brian Brown, the

---

[13] She was an accomplice witness, but **she did *not* testify**. Since the first page of notes has only a half page, counsel has placed a blank sheet—not the blank third page—under this page so it will not copy over page 2.

[14] She was related to accomplice Gonzales. See this Application, *supra*, p. 14 – 15. Since the first page of notes has only a half page, counsel has placed a blank sheet—not the blank third page—under this page so it will not copy over page 2.

[15] Mr. Brown testified. See this Application, *supra*, page 18-19.)

extra sheets for these "prepared" witnesses were left blank.

Also in the same folder with counsel's inspired questions was the four-page waiver, consent to stipulations of testimony and stipulations used in the guilty plea of accomplice Francisco Gonzales and it had attached to it the six-page typed report on night detective E. Giddings, the typed statement of Francisco Gonzales of 12-6-03 to homicide detective T.[imm] Angell, the rights advisement card used to advise Gonzales, a two-page typed statement of accomplice Debra Espinoza dated December 7, 2003, an earlier four-page typed statement of accomplice Debra Lynn Espinoza dated 12-04-03, and a three-page report of cause and manner of death from the Bexar County Medical Examiner's Office (App'x Tab 55). Significantly, counsel has not underlined any of these 22 typed pages. A single sentence on the original document is highlighted in yellow on the second page of Mr. Gonzales' statement on page 2, paragraph 2 where it reads, "…I didn't have a gun with me, and I never touched the gun that Juanito [defendant Castillo] used to shoot that gun." This highlighted point is *not* in the questions prepared by attorney Callahan the day before trial.

Callahan did not conduct cross-examination of Mr. Gonzales; that task fell to **second chair defense counsel Harris**, who did make the point that Gonzales lied to homicide detective Angell on this point (RR Vol. Vol. 15,

- 42 -

p. 147).  The voucher submitted by attorney Harris (App'x Tab 13) reflects a

single entry for trial preparation.  His second out-of-court hourly worksheet

contains a entry on line 5 states:

> 8-22-05  Trial Preparation—Notebook with
> 2 hours noted under the column identified as
> "obtaining and reviewing records."

***This date is Saturday before trial on the merits begins on Monday*** August

24, 2005.  This initial trial preparation occurs more than a week ***after*** jurors

have been selected.

A review of attorney Harris' ¾-inch case file in this case shows ***no***

***prepared questions for Mr. Gonzales—or any other witness in the case.***

It does appear that he took notes during Mr. Gonzales testimony, as he has

notes labeled Gonzales and these notes reflect state exhibit (SE) numbers for

exhibits introduced at trial (App'x Tab 26).  He also cross-examined

prosecution witness Jessica Cantu (RR Vol. 17, pp. 119-122) and ***got her to***

***re-enforce the prosecution's case*** by confirming that she certainly did see

Applicant wear around his neck a medallion like the decedent's after his

murder!  However, give the devil his due.  Harris got Ms. Cantu to identify

two photographs of Applicant's wearing a crucifix and the crucifix (RR Vol.

24, Def. Exs 4 and 5) as the necklace she was talking about (RR Vol. 18, p.

19).  These photos obviously were not the wheel medallion necklace worn

- 43 -

by decedent. It was the only defense score in the trial. The success appears

to have been fortuitous, not planned, cross-examination, as this part of the

cross occurred on the second day of her cross-examination.

In contrast to the preparation of Callahan and Harris, *a review of*

*contents of the prosecutors' three banker boxes in this case shows*:

● The prosecutors had *typed bullet points or questions for*

*each witness* who was called and many other witnesses who were not called.

● The prosecutors had typed, *alphabetical indexes on each*

*person involved in the case with a statement of their involvement and how*

*to question them if they were called by the defense.*

(2) *Authority*. Strategic choices made after less than a complete

investigation are reasonably precise to the extent reasonable professional

judgments support the limitations of an investigation. In other words,

counsel has a duty to make a reasonable investigation and to make a

reasonable decision that makes particular investigations unnecessary.

*Strickland v. Washington*, 466 U.S. at 690, 104 S. Ct. at 2066);

*Moore v. Johnson*, 194 F.3d 586, 619-20 (5th Cir. 1999). It was, in part, this

type of last second preparation that the U.S. Supreme Court condemned

in *Wiggins v. Smith*, 539 U.S. at 526, 123 S. Ct. at 2537 ("*On the eve of*

*sentencing,* counsel represented to the court that they were prepared to come

forward with mitigating evidence. [emphasis added]").

      (3) *Argument and Prejudice*.  Attorney Callahan began preparing for five of the State's 24 witnesses only the day before trial on the merits began.  This is 10 days after jurors had been selected.  He only used his preparation on three of the five witnesses.  He never prepared for the remaining 19 witnesses.  An attorney cannot prepare a proper strategy for *voir dire* unless he has gone through witness preparation and developed and executed a trial strategy.

      Callahan made no effort to go through the statements of the accomplice witness, to compare their contradictions, and to emphasize the contradictions in a vigorous cross-examination.  This omission is particularly noticeable when Callahan misadvises the homicide case detective on the number of statements made by Rodriguez and gets corrected before jurors.  *See* this Application, pp. 20-23, 76-77.  He repeatedly confused Ms. Espinoza with Lucinda Gonzalez.  These are not small things. Because he was unprepared, Callahan destroyed his own credibility and bolstered the credibility of the witnesses against his client.

      It was this no-thinking, fly-by-the-seat-of-your-pants mentality that lead Callahan to try to smear the victim and his friends with unsubstantiated assertions that they had been smoking pot and then learn that they had been

playing with Play Station. *See* this Application, *infra*, pp 74-75.

If the strategy was to destroy the credibility of the accomplice

witnesses, as detailed in the opening statement, defense counsel failed

miserably. Had counsel properly prepared, as detailed in habeas Attorney's

sample cross-examination of the two accomplices (App'x Tab 27),

reasonable doubt could have been raised as to Castillo's guilt.

### d. *Failure to Prepare for Sentencing and Mitigation*.

(1) *Factual Basis*. The U.S. Supreme Court decided *Wiggins v.*

*Smith* on June 26, 2003, which was before the murder in this case.[16]

Defense counsel are charged with knowledge of *Wiggins'* mandate for

attorneys in a death penalty case to prepare for and present a mitigation case.

Defense counsel failed in this endeavor.

A review of the clerk's record reveals that defense counsel did *not*

seek appointment of a mitigation expert or mitigation investigator.

(2) *Authority*: Counsel is ineffective during the penalty phase

of a capital trial when counsel fails to adequately investigate and present

mitigation evidence. *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S.Ct.

1495 (2000); *Moore v. Johnson*, 194 F.3d 586, 613-616 (5th Cir. 1999);

*Baxter v. Thomas*, 45 F.3d 1501, 1512 (11th Cir. 1995).

---

[16] *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2526 (2003).

*Schriro v. Landrigan*, 530 U.S. 465, 127 S.Ct. 1933, 1942 (2007) holds that a defendant is not entitled to a hearing in federal habeas corpus claim to prove ineffectiveness when counsel did not provide mitigation evidence when the defendant refused to allow introduction of mitigating evidence.

(3) *Argument and Prejudice*. In a death penalty capital murder case, it is imperative for defense counsel to prepare and to present mitigating evidence to give a capital defendant a chance to a life sentence on the mitigation issue in the jury charge. Here, attorney Callahan wrote Castillo he would stipulate and introduce Castillo's educational records (App'x Tab 28). Callahan failed to do so. Callahan wrote Castillo (App'x Tab 29) that he would stipulate and introduce the family and work history of the defendant from defendant's federal conviction presentence investigation report (App'x Tab 35). Callahan failed to do so. Callahan obtained a psychological analysis of Castillo (App'x Tab 30) and even told Castillo that the psychologist would testify that defendant would not be a danger to society if locked up in prison (App'x Tab 33). Callahan failed to subpoena his sole expert witness in mitigation and then improperly arranged for this witness to testify to such an extent that the psychologist vital testimony on

- 47 -

the future dangerousness issue was never presented. A review of the files of both defense counsel shows that no mitigation evidence was prepared or presented on behalf of Castillo.

In *Wiggins v. Smith*, 539 U.S. at 522, 123 S. Ct. at 2536, the U.S. Supreme Court held that a presentencing report was indeed mitigating evidence, and even then, defense counsel did not go far enough. Here, counsel had the presentencing report in hand, promised to introduce it into evidence, and then failed to do so. He also failed to obtain the same information from alternate sources.

Defense counsel cannot rely upon *Schriro v. Landrigan* to excuse their abandonment of the client on the mitigation issue. This is so for several reasons. This is so for a variety of reasons. First, Castillo never forbade mitigation evidence—he just did not want his mother to have to testify and look bad. He never prohibited introduction of evidence otherwise. Second, defense counsel had such evidence readily available in the form of the school records and a federal sentencing report that they promised Castillo would be admitted and in the form of testimony from forensic psychologist Dr. Jack Ferrell, Jr., but counsel failed to work the stipulated evidence and botched the testimony of Dr. Ferrell. Third, ineffectiveness is gauged on the law at the time of trial, *Strickland*, 466 U.S.

- 48 -

at 690, *Vaughn v. State*, 931 S.W.2d 564 (Tex. Crim. App. 1996), and
*Schriro v. Landrigan* was not decided until two years after Castillo's trial.
Fourth, Texas law mandates that defense counsel introduce mitigation
evidence even if the client opposes such an effort. Guideline 11.1A.3,
Guidelines and Standards for Texas Capital Counsel, State Bar of Texas
(App'x Tab 52).

Had Callahan acted as an effective attorney, he would have prepared
evidence that Castillo and his mother had something of a vagabond life. He
lacked strong ties with his father and lacked a father figure in his life. He
had limited education. Each of those matters constituted significant
mitigation evidence that was present and should have been presented to
jurors.

### e. *Failure to Use Forensic Psychologist*.

(1) *Factual Basis*.   Defense counsel filed on March 5, 2004 a
one-sentence "Defendant's Motion for Appointment of a Mental Health
Expert to Determine Competency, Mental Illness, Mental Retardation and/or
Sanity," which the trial judge granted (CR 9-11). The motion did ***not***
mention mitigation. Callahan never sought appointment of a mitigation
expert.

Callahan did not engage his court-appointed expert ***until six and a***

- 49 -

*half months after the authorization.* Callahan wrote a letter to clinical and

forensic psychologist Dr. Jack G. Ferrell, Jr., Ph.D, on September 16, 2004

thanking him "for agreeing to examine Juan Castillo for competency, mental

retardation, sanity, and mental illness" (App'x Tab 30).

*Not until March 29, 2005* did Dr. Ferrell fax three reports (App'x

Tab 30) to Callahan. One report merely advised the court that Castillo was

mentally competent to stand trial and was neither mentally ill nor mentally

retarded.

Dr. Ferrell's report carried a number of items that could have been

used in mitigation (*Id.*):

● Castillo was raised solely by his single mother and had an

unstable childhood with multiple moves.

● While in school, Castillo had social problems as a child,

including multiple fights and disputes that produced school counseling.

● Castillo dropped out of school in the 7th grade and did *not*

get a general equivalency diploma (GED).

On April 1, 2005, Callahan forwarded Dr. Ferrell's mental health

evaluation to Castillo by a letter (App'x Tab 31), which, with respect to

the evaluation, merely stated: "Please find enclosed a copy of the mental

health evaluation presented by Dr. Ferrell." Beyond this one line, Callahan

made no attempt to explain to Castillo the contents and significance of Dr. Ferrell's findings even though Dr. Ferrell's report said that Castillo had dropped out in the seventh grade and had no GED. Callahan never went to the jail to explain to Castillo the extreme importance of Dr. Ferrell's conclusions.

On April 24, 2005, months before trial, Callahan filed a voucher to pay Dr. Ferrell $2,605.00 (App'x Tab 30). Ferrell's billing reflects that he conferred with defense counsel for a whole 15 minutes some 7½ months earlier on October 6, 2004, some seven months after the trial judge had approved appointment.

Based on Dr. Ferrell's conclusion, attorney Callahan wrote Dr. Ferrell on July 18, 2005 to be "mentally prepared" to testify on or about 8-26/05 to 8/29/05 (App'x Tab 32). Callahan further writes to Dr. Ferrell in that letter:

> I hope that you would be able to tell the jury in your own words that so long as Juan Castillo is incarcerated that in your opinion there is **no** probability (more likely than not) that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

During the trial, Callahan re-iterated this point in a note with Castillo (App'x Tab 33) that had the following exchange:

Castillo:  What would Dr. Ferrell really have to say?

Callahan: 1.  Your mental health is within normal parameters.
2.  In jail, you would *not* be a future danger.

You could argue that it's only in the free world's society might you be considered a future danger—but not in a 'prison society.

State will soon rest.  The judge will ask you if you have evidence.  I think you should put on Dr. Ferrill (sic) tomorrow morning.

The very fact that Castillo has to ask Callahan what Ferrell would say strongly suggests that the reports he received were not clear to the 7th grade dropout Castillo.  Further, since Callahan only saw Castillo once (the week of his arrest) and never sent Castillo any letter about the sentencing issues that jurors would have to answer, it is clear that Castillo had no idea of the significance of this mitigating matter on the death penalty.

Further, the defense team never prepared any direct examination of Dr. Ferrell or prepared for his testimony.

Further it is clear that the defense team failed to arrange for Dr. Ferrell to be present to testify.  First, a thorough review of the court's file reveals that the defense team never subpoenaed Dr. Ferrell (or any other witness).  Second, in his purple-covered spiral trial notebook (App'x Tab 9, page 57),

- 52 -

attorney Callahan makes the following entry for 9-1-05, when the defense

starts its case on sentencing:

> "0800:  Jack Ferrell **no show.**
>   def still desires to rep self despite my &
>   Bill's warning.
>   Jack Ferrell is north of Austin—2 hours north of Austin
>   —2 hrs arrival—1:30 p.m."
>       * * *
> 11:08—judge in
>       —No def. evid
> 11:10—Def rests
>       —close/close
>       —recess to 1230
>         chg conf.
>         no obj by def to chg.
> 12:00—in court
> 12:30—Ferrell—staff error in message
>         recordation
>       —on stand by

The voucher for second chair defense attorney Harris bills one hour

on that same day —*the last day of trial* —for "interview Dr. Farrell."

This billing confirms that defense counsel had not prepared in advance for

Dr. Ferrell's testimony.

(2) _Authority_:  *Williams v. Taylor*, 529 U.S. 362, 397-98, 120

S.Ct. 1495 (2000); *Moore v.* Johnson, 194 F.3d 586, 613-616 (5th Cir. 1999);

*Baxter v. Thomas*, 45 F.3d 1501, 1512 (11th Cir. 1995).

(3) _Argument and Prejudice_.  As indicated from Callaghan's

- 53 -

letter to Dr. Farrell (App'x Tab 32) and hand-written note to Castillo in at trial (App'x Tab 33), the forensic psychologist would have testified that Castillo would not be a threat to society if he were incarcerated. This professional judgment goes directly to the heart of a key juror issue in sentencing. Failure to present this key evidence prejudiced Castillo because he was deprived of having this evidence presented to jurors for their consideration on the special issues.

Although Callahan had promised Castillo back in June 16, 2004 that he would visit the client in jail as various tests were done (App'x Tab 58), Callahan never visited Castillo on Dr. Ferrell's report. Callahan just mailed Dr. Ferrell's reports to his seventh grade dropout client (App'x Tab 31). Callahan never conveyed the importance of this evidence until after a finding of guilty had been returned.

Callahan had not even prepared advance questioning for Dr. Ferrell to insure that each critical finding of Dr. Ferrell was included. It does no good for Callahan to rely on *Schriro v. Landrigan,* as that case was not decided until two years after Castillo's trial.

f. ***Failure to Introduce Stipulated Mitigation Evidence***.

(1) *Factual Basis.* The district attorney obtained and made available to defense counsel Castillo's school records. These records are in

- 54 -

the prosecutor's files.

Over 16 months after his December 11, 2003 appointment to the case,
Callahan wrote Castillo a May 6, 2005 letter in which he states, "The
***prosecutor and I will enter into a stipulation*** regarding all of your
educational records which will be admitted during the punishment phase of
your trial if any" (App'x Tab 28)(emphasis added). Callahan failed to enter
into the stipulation and the records were never admitted into evidence.
Counsel did not pre-file the records for use as a business record. Counsel
also could have interviewed Applicant's mother and learned about the
client's educational experiences (App. Tab 34), but Callahan failed
to do so.

On January 31, 2005, attorney Callahan wrote Castillo that he
intended to ask the prosecutor to enter into a stipulation of evidence
agreement such that

> the jury **will be allowed** to read the (federal) Presentence
> Investigation Report (PSI) of 3/12/04 because it state's (sic)
> succinctly the **dysfunctional family environment** in which you
> were raised which may assist the jury in answering the "any
> mitigation" special issue in the affirmative such that you do not
> receive the death penalty (emphasis added).

(App'x  Tab 29)(second page)(The blank overface on page 1 existed
on the original obtained from original writ attorney Kramer's file.)

- 55 -

The portion of the federal presentence investigation report with personal and family data, physical condition, mental and emotional health, substance abuse, and educational and vocational, and employment record is found at App'x  Tab 35).

Callahan fails to obtain the stipulation or to otherwise introduce by alternate means this evidence that he considers important evidence on the mitigation issue.  Had Callahan contacted Applicant's mother, she could have provided such evidence and testified about it (App'x Tab 34).

Had attorney Callahan introduced such records, they would have revealed the limited education had by Castillo.  Counsel did not fulfill the promise to Castillo in his letter to stipulate to the admission of the records. Counsel made no effort to introduce the educational records by a business record affidavit in advance of trial under TEX. R. EVID. 803(6) and 902(10).

Castillo attended  pre-K to the fourth grade at Surprise Elementary School, Surprise, Arizona.  He attended the fourth and part of the fifth grade at Anadaberg Elementary School in Arizona, and the rest of the fifth grade and all of the sixth grade at Kingswood Elementary School, Surprise, Arizona.

Had counsel interviewed Castillo's mother—and he did not,  he would

have learned by the defendant was then unable to attend school in Ohio for a

year and a half after his mother moved back to Canton, Ohio. *See* Mother's

affidavit (App'x Tab 34). Ohio school officials would not enroll Castillo in

Sowers Elementary School until Arizona school officials provided them

his school record. Arizona school officials claimed that they had mailed the

records. Because of the stand-off between the two states, defendant did not

attend school for a year and a half.

When he moved back to San Antonio with his mother, Castillo

attended Rogers Middle School for a short period of time. He dropped out

of school in the seventh grade. He never got a graduate equivalency degree

(GED) (*Id*). He had no college.

(2) *Authority*: Counsel is ineffective during the penalty phase of

a capital trial when counsel fails to adequately investigate and present

mitigation evidence. *Williams v. Taylor, supra; Moore v. Johnson, supra*);

*Baxter v. Thomas, supra*. The U.S. Supreme Court has repeatedly pointed to

the absence of school records as an indicator of ineffectiveness in capital

cases. *Wiggins v. Smith*, 539 U.S. at 525 (frequent, lengthy absences from

school); *Rompilla v. Beard*, 545 U.S. at 382, 125 S. Ct. at 2463 (school

records are a likely avenue to build a mitigation case).

(3) *Argument and Prejudice*. Castillo was prejudiced by defense

counsel's failure to stipulate to the admission of the school records into evidence, as he wrote Castillo he would. Castillo was prejudiced by counsel's failure to pre-file the education records under a business record affidavit. Castillo was prejudiced by counsel's failure to interview the defendant's parents to investigate Applicant's formative years and educational opportunities. This is so even if the death penalty defendant or his parents are actively obstructive. *Rompilla v. Beard*, 545 U.S. at 381, 125 S. Ct. at 2462.[17] Had counsel fulfilled his responsibilities he would have provided jurors with significant evidence on the mitigation issue.

Getting a good education is part of the American dream. Castillo had limited educational opportunities through no fault of his own. Limited educational opportunities are a key part of mitigation. Education is part of the formative process in developing intelligence, morality, judgment and maturity. Education is the bedrock upon which success in life can be built. Had jurors known of Castillo's limited educational opportunity they would have answered the mitigation special issue in Castillo's favor. So, Castillo

---

[17] "Rompilla's own contribution to any mitigation case were minimal. ... To questions about his childhood and schooling, his answers indicated they had been normal ... save for quitting school in the ninth grade ... There were times when Rompilla was even actively obstructive ... The lawyers spoke with five members of Rompilla's family ... the overwhelming response from the family was that they didn't really feel as though they knew him all that well since he had spent the majority of his adult years and some of his childhood years in custody."

was clearly harmed for counsel's ineffectiveness in this area.

### g. *Failure to Interview and Use Family Members in Sentencing.*

(1) *Factual Basis.*   Part of any mitigation case is to contact
family members to get them to testify for the death penalty client.  The
defense attorneys failed miserably in this endeavor.

Castillo had apparently told attorney Callahan not to call his mother as
a witness in mitigation.  This inference came gleaned from a March 7, 2005
letter from Callahan to Castillo indicating he "will respect your directive and
not call your mother as a witness in your punishment stage, if any."  (App'x
Tab 36).  This occurred even though the U.S. Supreme Court's June 2005
decision in *Rompilla v. Beard*, 545 U.S. 374, 377, 125 S. Ct. 2456, 2460
(2005) held that an attorney was bound to make such efforts at mitigation
despite what the capital defendant or his family wants to do.

Castillo attempted to call Callahan collect in May 2005, as shown
by the latter's May 20, 2005 letter (App'x Tab 37).  The letter concerns
mitigation, but Callahan never bothers to visit defendant on the issue.
Although Callahan was appointed to represent defendant on December 11,
2003, Callahan waited until the eve of trial to attempt to contact Castillo's
family members.  He waited until June 11, 2005 to send a letter to
defendant's mother, June Castillo, and he sent his letter to the ***wrong***

*address* as indicated by the returned envelope (App'x Tab 38)!

Just as significant, Applicant's mother had repeatedly telephoned and left recorded message at attorney Callahan's office but Callahan never returned her calls. *See* mother's affidavit, App'x Tab 34.

Callahan waited another month and a half until July 29, 2005 until he wrote defendant's sister in Arizona (App'x Tab 39). July 29, 2005 was the day after the third day of day of individual *voir dire* (RR Vol. 6, p. 1). Finally, as the case on findings was ending, Callahan gave a note to Castillo in the middle of trial that showed counsel was clueless (App'x Tab 40):

> Callahan: Ask your father to testify that he basically abandoned you as a youth so that you grew up without a father.
>
> Castillo: My dad didn't abandoned me. My mom basically took me and my sister.
>
> Callahan: Well, then that. Point being, you had no father.

Note that Castillo wrote at the bottom of the note, "Is this witness going to be the last one?" This note suggests that Callahan did not develop this brilliant thought until late in the trial. The inaccuracy of Callahan's assertion shows that the attorney had not delved into Castillo's background to any degree. Also, it is unclear how Callahan expected Castillo to reach his father for this effort during the last hours of the trial. Further, review

- 60 -

of counsels' file indicate neither defense attorney attempted to contact Applicant's father by any means of communication.

Lastly, it is always possible for the defendant to take the stand during sentence and to give his own account. However, the careful attention that defense counsel gave this possibility and even failed to prepare for the possibility is shown in Callahan's statement immediately *after the prosecution rested*:

> Callahan: *I don't know if Mr. Castillo wants to testify or not.*

(RR Vol. 18, p. 164, lines 10-11).

Had attorney Callahan taken action in the case to contact and to interview family members who would have learned a wealth of information, as indicated by the mother's subsequent affidavit (App'x Tab 34). Had counsel learned the information, he could have impressed upon the mother to testify and upon the defendant to let her or other family members to testify. It is noted that the mother phoned attorney three times and left messages, her name, and her phone number on the attorney's phone answering machine, and counsel was too lazy to return the calls. After his initial first visit with the defendant, attorney Callahan never returned to visit the defendant in jail over the next 20 months to emphasize how critical mitigation evidence was to the sentencing process. Instead, counsel

abandoned the client.

Even though the defense attorneys received tardy notices under
under TEX. R. EVID. 404(b) and TEX. CODE CRIM. P. art. 37.07 (CR 101
109), defense attorneys failed to prepare any cross-examination of the
prosecution's sentencing witnesses. It matters not that Castillo decided to
represent himself during sentencing; the fact is that defense attorneys had
never prepared questions to provide Castillo in his tardy self-representation
quest.

While defense attorneys ignored the important tasks of preparing a
mitigation case, Callahan had time to prepare a frivolous motion.

(2) *Authority*: Counsel is ineffective during the penalty phase of
a capital trial when counsel fails to adequately investigate and present
mitigation evidence. *Williams v. Taylor, supra*; *Moore v. Johnson, supra*;
*Baxter v. Thomas, supra.*

(3) *Argument and Prejudice*. Jurors have the ability to
sentence a capital defendant to life in prison rather than to the death penalty
based on the mitigation issue. It is often the most critical part of a capital
punishment trial and attorney Callahan totally abandoned Castillo for this
phase of trial. Had Callahan been effective in this area, jurors would have
know about the tragedy of young Castillo's life. Jurors would have learned

- 62 -

that Castillo was hauled around the country and often living in homeless

shelters, in a car, or just on the street. Jurors would not have treated a dog

like that. They would have learned that Castillo was not exposed to the

anticipations and privileges of the American dream and realize that

these factors made him less blameworthy than the drug-indulged

accomplices. Indeed, they would have learned that Castillo did not

indulge in drugs or alcohol. The failure of counsel to investigate and to

present this evidence clearly prejudiced Castillo on sentencing.

### h. *Frivolous Diversion of Effort into Non-Meritorious Motion and Failure to File Needed Motions and Notices.*

(1) *Factual Basis.* Instead of preparing for the case and chief

and for sentencing, defense counsel plodded Quixote-like towards the

windmills with frivolous efforts.

Years before Applicant's case, Texas courts had held that a violation

of the State Bar Rules was not a law that caused suppression of evidence

under TEX. CODE CRIM. P. art. 38.23. *Pannell v. State*, 666 S.W.2d 96, 98

(Tex. Crim. App. 1984); *Keen v. State*, 85 S.W.3d 405, 412 (Tex. App.—

Tyler 2002, pet. ref'd).

Years before Applicant's case, the federal courts had repeatedly held

that entering into a plea agreement with an accomplice was not a violation of

- 63 -

the federal gratuity statute, 18 U.S.C. § 201. Every court that had heard the issue, had so ruled, including the Fifth Circuit whose law would apply to a federal habeas case in Texas. *United States v. Haese*, 162 F.3d 359, 366-67 (5th Cir. 1998), *cert. denied*, 119 S. Ct. 1795 (1999).[18]

Nonetheless, defense attorney Callahan dithered his valuable time for this case by preparing a motion seeking to suppress the testimony of the accomplices in this case based on this theory. He prepared a suppression motion, CR 29 *et seq*, and attached to it Texas Disciplinary Rule of Professional Conduct 3.04 (CR 32) and an article from *The Champion*, the journal of the National Criminal Defense Lawyers Association (CR 36-44). Although the article pointed out the total lack of success of this motion and *Pannell* and *Keen* insured defeat, Callahan seemed inspired by the failure.

A hearing was held and the prosecution pointed out that this argument had been rejected by the federal courts some 80 times (RR Vol. 2, p. 5). The trial judge denied this frivolous motion that was the zenith of defense counsel's thought in this case.

This dilly-dally reflects that defense counsel either failed to research the law or did not care what the law was.

Now there were certain basic motions and notices that defense counsel

---

[18] The prosecutor's case file had a photocopy of this case ready for use.

should have filed in a death penalty case with accomplices but Callahan
failed to prepare or to present the following:

- A notice for uncharged misconduct under TEX. R. EVID. 404(b),
adverse sentencing information under TEX. CODE CRIM. P. art. 37.07, and
notice of convictions under TEX. R. EVID. 609(f).

- A motion under *Brady* to require the prosecution to produce plea
bargain agreements, *sub rosa* agreements, or grants of immunity.

Despite defense counsel's abject failure, prosecutors gave original
notice  under TEX. R. EVID. 404(b),  TEX. CODE CRIM. P. art. 37.07, and
TEX. R. EVID. 609(f) on July 26, 2005 and amended notice on August 15,
2005 without a request from the defense (CR 101 *et seq*, 109 *et seq*).  The
first notice occurred on the first day of individual *voir dire* (RR Vol. 4, p. 1),
and the second notice occurred three days after individualized *voir dire*
ended on August 12, 2005 (RR Vol. 14, pp. 1, 148) and eight days before
trial on the merits began on August 23, 2005 (RR Vol. 15).

(2) *Authority*:  Effective and ethical attorney's do not file
frivolous, non-meritorious  motions.  Such motions waste everyone's time,
run up costs, and violate TEX. DISCIPLINARY R.  PROF'L  CONDUCT 3.01,
*reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. A (TEX. STATE BAR
R. art. X, § 9).

- 65 -

Effective attorneys in a criminal case file for notice of misconduct under TEX. CODE CRIM. P. art. 37.07, § 3q and TEX. R. EVID. 404(b). While a response can be limited to matters on the case in chief, *Jaubert v. State*, 74 S.W.3d 1 (Tex. Crim. App. 2002), filing such motions can make defense counsel aware of matters adverse to the client so that counsel can get the appropriate police reports, court judgments, and court transcripts and prepare such adverse evidence. Failure to file such notice cannot be excused as "sound trial strategy" and renders defense counsel ineffective. *Loredo v. State*, 157 S.W.3d 26, 29 (Tex. App.—Waco 2004). The purpose of such notices is to avoid unfair surprise, that is, trial by ambush. *Chimney v. State*, 6 S.W.3d 681, 697 (Tex. App.—Waco 1999, no pet.).

(3) *Argument and Prejudice*. It was ineffective for counsel to file his silly little motion that had absolutely no legal merit. Counsel should have filed notices under Article 37.07 and Rule 404(b) as soon as the case had been indicted and counsel has a case number to place on the heading of the notice. Had attorney Callahan done so, he would have had over a full year to prepare to meet such witnesses and evidence in sentencing. Instead, defense counsel failed to file such notices and failed to prepare to meet the evidence head-on. Had counsel shown initiative instead of sloth here, then Applicant would undoubtedly had great confidence in the efforts of his

- 66 -

counsel. Instead, Applicant read his counsel correctly that the counsel was doing nothing in his case.

It is no excuse to say that the prosecution voluntarily gave notice. The prosecution's attorneys did not provide notice until July 26, 2005, the first day of individual *voir dire*. The prosecution did not amend the notice until August 15, 2005, three days after completion of individualized *voir dire* and eight days before trial on the merits.

Even then, defense attorneys did not prepare any cross-examination of potential witnesses or motions in limine for these items. Counsel's ineffectiveness in failing to prepare for adverse witnesses in findings and sentencing adversely impacted on Castillo.

The U.S. Supreme Court has condemned such dilatory omissions by ineffective counsel as prejudicial to a defendant. *Rompilla v. Beard*, 545 U.S. at 385-86, 125 S. Ct. 2464-65.[19]

### 3. <u>Trial Ineffectiveness of Counsel</u>

#### a. <u>*Lacking Knowledge and Skills in Capital Case*</u>

---

[19] "There is no question defense counsel were on notice, since they acknowledge that a 'plea letter,' written by one of them *four days prior to trial*, mentioned the prosecutor's plans ... It is clear, however, that defense counsel did not look at any part of that file, including the transcript, *until warned by the prosecution a second time.* ... The obligation to get the file was particularly pressing here due to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt (emphasis added)."

(1) *Factual Basis*.   In a capital murder case, it is imperative that defense counsel have a minimum fund of knowledge of the law involving capital punishment.  On August 23, 2005, the day the case in chief begins, Callahan and Castillo signed a motion stating the defendant wanted the *judge* to decide punishment (CR 118).  The law in effect then and now holds that *jurors* must determine punishment in a death penalty case.  TEX. CODE CRIM. P. art. 1.13(a).  Callahan's signing the form demonstrated he lacked basic knowledge about death penalty cases.  It was indicative of his lack of knowledge and skills throughout the case that prejudiced his client.

(2) *Authority*:  To be effective, death penalty defense counsel must demonstrate knowledge and skills.  Guideline 5.1b, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. Ed. Feb. 2003)(App'x Tab 53) mandates that capital counsel have demonstrate the following skills:

    a.    substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

    b.    skill in the management and conduct of complex negotiations and litigation;

    c.    skill in legal research, analysis, and the drafting of litigation documents;

    d.    skill in oral advocacy;

- 68 -

e.   skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

f.   skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

g.   skill in the investigation, preparation, and presentation of mitigating evidence; and

h.   skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

Guideline 4.1B(2), Guidelines and Standards for Texas Capital

Counsel, State Bar of Texas (App'x Tab 52) has the same standards.

TEX. CODE CRIM. PROC. art. 1.13(a) holds that jurors must determine

punishment in a death penalty case. This is basic. It is also reversible error

for ineffectiveness of counsel. *Ex parte Walker*, 794 S.W.2d 36 (Tex. Crim.

App. 1990)(Failing to file election form for punishment by juror is

ineffective representation by counsel); *Ex parte Duncan*, 605 S.W. 825 (Tex.

Crim. App. 1983).

(3)  *Argument and Prejudice.*  A basic trainee entering military

boot camp is charged with maintaining a clothing locker in a prescribed

order. Socks, skivvies, and t-shirts must be in an exact location. Those

basic trainees that cannot abide by these standards are discharged from the

- 69 -

(blank)

military.  The reason is clear.  Putting clothing is a particular position in a locker is "monkey see—monkey do" work.[20]  If the trainee cannot perform that simple task, he or she cannot be entrusted to protect fellow service members in combat or to handle weapons of mass destruction.

Similarly, when a defense attorney goes to war in a capital murder case,  capital counsel must know the rules of law and how to put them into play in the courtroom.  Completing an election of punishment form is the simplest, most basic law involving death penalty law, and attorney Callahan botched it up.  This simple demonstration indicates the mediocre knowledge of  death penalty held by Callahan.  His simple lack of knowledge of the law prejudiced his client and lead to his client's conviction as shown by the following matters:

● He asked questions of adverse witnesses that bolstered the credibility of these witness (this Application at pp. 74 - 75);

● He failed to control the lead homicide detective and failed to properly object (this Application at pp.76 - 77);

● His final argument contradicted the opening statement and, because he did not know the basic law, conceded the guilty of his client (this

---

[20]  The description of boiler room operations aboard his gunboat USS San Pablo by engineer Jake Holman, played by actor Steve McQueen, in the 1966 movie *The Sand Pebbles.*

- 70 -

Application at pp. 80 – 81; RR Vol. 20, pp. 76 -77);

● He filed a frivolous, non-meritorious motion and ignored those motions and notice requests that would have helped his client and then failed to prepare when the prosecution voluntarily provide the information normally obtained from such motions (this Application p. 62).

b. ***Opening Statement for the Defense***

(1) *Factual Basis.* Although first chair counsel Callahan billed for drafting an opening statement the day before the case in chief opened, it was second chair defense counsel Harris who gave the following brief opening statement (RR Vol. 15, pp. 23-24)

> Good morning. Ladies and Gentlemen of the jury, the State has just given you a very eloquent outline of what they expect to prove in this case. The presentation of their evidence. A lot of that evidence the defense will agree with. We will agree that the murder of Tommy Garcia the morning of December 3d, 2003, was a tragedy. We will agree that the crime committed by Francisco Gonzales and Debra Espinoza was a terrible crime. ***What we do not agree with is that Juan Castillo was connected in any way with this crime.***
>
> Most, if not all, of our defense will be through means of cross-examination of the State's witnesses. When it comes to light, the character, the demeanor, and most importantly, the motivation for the testimony of Francisco Gonzales and Debra Espinoza, there will be reasonable doubt as to their credibility, reasonable doubt as to their believability. When it comes to light, the character, the demeanor, and the motivation of relatives of Frank Gonzales—Francisco Gonzales, there will be

- 71 -

reasonable doubt as to their credibility as well.

> In short, when all is said and done, there will be absolutely no believable evidence to indicate that Juan Castillo was involved in this case.  In fact, the evidence *might suggest* that if there was a third party, it was Teresa Quintero, or *maybe* Rudy Luna, or both.  Listen carefully.  Thank you.  (emphasis added)

The strategy, if any, reflected in this case appears to be solely to attack the credibility of accomplices Francisco Gonzales and Debra Espinoza, as the opening statement failed to mentioned items favorable to Castillo.  Such favorable evidence included but it is not limited to the following items:

- DNA evidence on a ski mask worn by the assailant was inconclusive as to the defendant but nailed Francisco Gonzales.

- No weapon was found.

- Police captured both Gonzales and Espinoza in the vicinity of the crime scene within an hour of the murder, but Castillo was not there.

- Both Gonzales and Espinoza gave many different versions of their involvement, but always tried to minimize their involvement  (e.g. I confess—everyone is culpable but widdle ole me).

- Both Gonzales and Espinoza were filthy with guilt and have confessed to the crime and now come to jurors as a poor widdle me.

Assuming attacking the credibility of the accomplices was the defense

- 72 -

strategy, defense attorneys failed in that endeavor in opening statement.

Significantly, first chair counsel contradicted the points in this opening statement (e.g., Castillo was not connected with this crime in any way; Francisco Gonzales and Debra Espinoza are not credible) in his final argument (e.g. accomplices planned on robbery; Castillo planned on murder, *see* this Application pp. 80 – 81; RR Vol. 20, pp. 76-77).

(2) *Authority*: The defense in a capital case should develop and present a cogent defense theory. *Hernandez v. State*, 943 S.W.2d 930, 935 (Tex. App.—El Paso, 1997)(IAC when counsel only saw client day before trial), *rev'd to apply Strickland vice Ex parte Duffey*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999), *remanded to trial court*, 08-95-00187-CR (August 31, 2000).

(3) *Argument and Prejudice*. Counsel was ineffective in making opening statement as the statement failed to present a cogent defense theory that emphasized the known strengths of Castillo's case. The opening proved to be prejudicial because first chair counsel contradicted the opening statement in his final argument on findings.

An effective opening statement that details a cogent strategy is reflected in App'x, Tab 41.

- 73 -

c. *Failing to Investigate and Bolstering the Prosecution's Case*

(1) *Factual Basis*. In his **preparation held the day before trial**
**on the merits began,** attorney Callahan wrote out points he was to make for
the five witnesses he prepared for (App'x, Tabs 4-8). Not only do the
attorney vouchers show that Callahan failed to interview prosecution witness
(App'x Tabs 10-12), his questioning confirms it. Although second chair
counsel had expressed sympathy for the deceased Tommy "JR" Garcia in his
opening statement, Callahan promptly negated that strategy.

First, Callahan asked witness *Frank Russell* if he knew of the
reputation of accomplice Debra Espinoza with regard to truth and veracity,
and Russell slammed Callahan by saying that he did not know if she would
tell the truth or not (RR Vol. 15, p. 188). Second, having failed to discredit
Ms. Espinoza, Callahan then tried to besmirch Russell *and the deceased* by
accusing them of smoking marijuana that night (*Id.* 190). Russell blows
away Callahan by saying he and the decedent were not smoking marijuana
--they were playing Play Station (*Id.*).

Having failed to diminish the credibility of neutral witness Russell,
Callahan tried to smear Russell through his cross-examination of the other
lad who was with the decedent that night, *Robert "Rob" Jimenez*. Callahan
asked Jimenez about Russell's character for being truthful, and Jimenez,

obviously never interviewed by Callahan, slams Callahan by declaring,

"He's (Russell) truthful. He's –he's real. He's a real guy" (RR Vol. 16, p.

51). Having unsuccessfully jousted with that windmill, Callahan then

inquired of neutral witness Jimenez if he knew the reputation and character

for being truthful of accomplice Debra Espinoza, and Jimenez replied, "Not

really, sir. (*Id.* at 52).

Then, when ***Debra Espinoza*** testified, Callahan cross-examined her

in contradiction to the strategy of the opening statement so as to enhance

the credibility of the other accomplices. He asked if accomplice Francisco

Gonzales was truthful, and Ms. Espinoza replied, "To my knowledge, yes"

(RR Vol. 17, p. 70). He asked if accomplice Teresa Quintero was truthful,

and she replied, "From my knowledge, she's truthful" (*Id.*) Then, Callahan

asked about Lucinda Gonzales, Francisco's sister who would testify against

Castillo, and Ms. Espinoza said Ms Quintero was truthful (*Id.* at 71).

When Callahan asked her if Bryan Brown was truthful, Ms. Espinoza denied

knowing Mr. Brown (*Id.*).

When given a gift by the prosecutor, Callahan failed to take advantage

of it. On direct examination, Ms. Espinoza testified for the prosecutor that

she had not slept in six days at the time of the murder (RR Vol. 17, p. 49).

Callahan never approached the matter on cross, when he could have beaten

- 75 -

the witness half to death with a statement that could be used to attacked her recall of events because of sleep deprivation.

Any attorney worthy of the name would know that sleep deprivation produces extreme effects on a person, including memory lapses, cognitive ability, judgment impairment, all of which could have been used to attack the competence and recall of witness Espinoza. Indeed, Callahan could probably have used the medical examiner as an expert witness on these effects. He did not do so.

Callahan had thus just bolstered the credibility of the key witnesses against Castillo. But it was his handling of case homicide detective *Timm Angell* where Callahan—in the presence of jurors—self-inflicted the worst damage to his client's cause (RR Vol. 18, pp. 96 - 105). There, Detective Angell repeatedly savaged first chair defense counsel Callahan during cross-examination because counsel never investigated witnesses and got the facts blatantly wrong (*Id.*).

Because he had so little fund of knowledge about his client's case and had not properly prepared, Callahan three times confused Lucinda Gonzales with Ms. Espinoza and the detective lectured him on the correct facts (RR Vol. 18, pp. 100, 101, 103). When Callahan tried to assert that Ms. Espinoza "was never completely truthful," Detective Angell boosted the credibility of

- 76 -

accomplice Espinoza through the door opened by Callahan by saying:

> I'm sorry.  If you're asking me, I disagree.
> I think she was—towards the end she was being
> truthful.  She left things out, but she wasn't lying
> to deceive me.  (RR Vol. 18, p. 102)

The detective also corrected Callahan on the number of statements made by

Francisco Gonzales (RR Vol. 18, p. 103).

When the prosecutor tried on re-direct examination to get the

detective to say that the investigation had narrowed itself to only Castillo,

Callahan initially successfully objected but then surrendered by letting

the detective, without objection, finger Castillo (RR Vol. 19, p. 107):

> Court:  What—Rephrase, then.

> Q:  Did you have information from any other source
>      to lead you to investigate the name of any other
>      person that the jury has not heard about?

> A:  No.

Not only did Callahan bolster the credibility of the prosecution

witnesses, but Callahan bolstered the prosecution's case by showing his

lack of familiarity with the case.  When he cross-examined *Officer*

*Higginbotham*, he got the officer to declare that Ms. Espinoza did not have

blood on her, a fact that enhanced her credibility by putting her outside the

car at the time of the shooting (RR Vol. 15, p. 209).  When he cross-

- 77 -

examined neutral witness **Rudy Luna**, Callahan confused the decedent's

medallion necklace as silver, rather than gold (RR Vol. 17, p. 24-25).

(2) *Authority*:  Counsel is ineffective when he bolsters the

prosecution's case. *Moore v. Johnson*, 194 F.3d 586, 611-612 (5th Cir.

1999);  *Ex parte Walker*, 777 S.W.2d 427 (Tex. Crim. App. 1989)(IAC

found); *Vasquez v.* State, 830 S.W.2d 948, 950 n. 3 & 4 (Tex. Crim. App.

1992)(improper bolstering of prosecution witnesses is not strategy);

*Weathersby v. State*, 627 S.W.2d 729, 730 (Tex. Crim. App. 1982)

(improper for two detectives to testify that they believed defendant was

guilty); *Greene v. State*, 928 S.W.2d 119, 122 (Tex. App.—San Antonio

1996, no writ); *Fuller v. State*, 224 S.W.2d 823, 835 (Tex. App.—Texarkana

2007)(Counsel's conduct in allowing the State unfettered and unchecked

bolstering was so outrageous that no competent counsel would have engaged

in it); *Hutchinson v. State*, 663 S.W.2d 610, 614 (Tex. App.—Houston

[1[st] Dist. 1983, pet. ref'd)(Lack of a single instance in which counsel's cross-

examination of State's witnesses had the effect of challenging their

testimony; indeed, counsel's questioning bolstered the State's case).

Counsel is ineffective when he permits a detective to testify a defendant is

guilty from examination of his investigation. *Weathersby v. State*, 627

S.W.2d 729 (Tex. Crim. App. 1982).

(3) *Argument and Prejudice*. The fears that Castillo expressed

months before in his letter to the trial judge about the competence of his

defense counsel (App'x Tab 17) came to fruition.  In a death penalty case, it

is the defense attorney who wins or loses a case.  Shakespeare could well

have described a criminal defense attorney when Henry V spoke to his men

at Harfleur.[21]  Counsel needs to train to fight and to fight as trained.  Counsel

must walk into the court totally prepared weeks in advance with a strategy

and mastery of the facts and the law.  Castillo's attorneys had none of this.

As shown by the cross-examinations, they were flaccid and impotent.  Their

cross-examination exploded in their face at every turn and boosted the

credibility of the prosecution's witnesses and the prosecution's case.  If

counsel had prepared cross-examination weeks before juror selection instead

of the day before trial, they could have created reasonable doubt as the

prosecution's witness were filthy with guilt and slimy with lies.  A prepared

cross-examination (*see* Habeas counsel's sample cross at App'x Tab 27)

would have won the day.  Instead, defense counsel in this case had neither

---

[21] *Henry V, Act 3, scene i*:  "When the blast of war blows in our ears, then imitate the
action of the tiger; Stiffen the sinews, summon up the blood, Disguise fair nature with
hard-favour'd rage ... Now set the teeth and stretch the nostril wide, Hold hard the breath
and bend up every spirit to his full height."

preparation nor credibility and eviscerated their client.

### d. *Conceding Guilt in Final Argument Based on Misunderstanding of the Law*

(1) *Factual Basis.*   After having bolstered the prosecution's key witnesses, Callahan then conceded guilt during final argument on findings.

The medical examiner had testified that decedent that physical examination of the decedent produced $124 in a money clip in the left front pants pocket and $450 cash in the right rear pants pocket (RR Vol. 18, pp. 150). In contrast, accomplices Francisco Gonzales (RR Vol. 16, pp. 89, 94-96, 111 and Debra Espinoza (RR Vol. 17, pp. 31, 35, 40) testified at length that robbery was the objective that night.  Castillo had reportedly admitted the robbery plan to others, like Geraldo Gutierrez (RR Vol. 17, pp. 10). Detective Podwika had recovered a portion of the stolen gold necklace from the decedent's vehicle (RR Vol. 15, p. 151; RR Vol. 23, State Ex. 58).

In his final argument on findings, Callahan seems to be oblivious of the law that an attempt to commit robbery constitutes robbery under TEX. PENAL CODE § 29.01 and 29.03[22], as he argued:

> So some of *you obviously believe the testimony of both of these people* (Francisco Gonzales and

---

[22] Even the indictment in the case spells it out: "cause the death of TOMMY GARCIA *while in the course of committing and attempting to commit the offense of ROBBERY* upon TOMMY GARCIA" (CR 4).

- 80 -

Debra Espinoza). Then I submit to you if that's true, that what really happened here was that Debra Espinoza and Francisco were planning a robbery, but he (Castillo) was planning a murder. There was no robbery in the mind of Castillo, if you believe both of the accomplice witnesses. And the Judge has authorized you, if you see fit, to find Juan Castillo guilty of murder and not capital murder.

So I'm asking you first to vote not guilty in the case in general. *But if you decided as fact finders, and I respect the power that you have. I respect the system. And never ever quarrel with your judgment.* If you believe both of them, then ***I respectfully submit to you*** that ***a reasonable inference is that Juan Castillo committed murder*** and tricked Francisco, Debra to get Tommy Garcia to the scene so he could kill him.

The one argument I would give you in that recall is you recall the female medical examiner leaning down to the body and holding it over kind of sideways, and another medical examiner reached it, there was this wad of cash, close to $600. ***That's why this wasn't a robbery. This was a murder***, if you believe the testimony of both accomplices. Thank you for your time. (emphasis added)

(RR Vol. 20, pp. 76-77). This final argument is in total variance to the

opening statement that the accomplices could not be believed and that

Castillo had committed no crime--robbery or murder! Note that Callahan in

effect tells jurors that he would not be upset if they returned a finding of

capital murder.

  (2) *Authority*: If strategy is based on incorrect law, a court need

not defer to reasonable strategy. *Robertson v. State*, 187 S.W.3d 475, 484

(Tex. Crim. App. 2006); *Ex parte Marez*, 505 S.W.2d 930 (Tex. Crim. App.

1974); *Fuller v. State*, 224 S.W.3d 823 (Tex. App.—Texarkana 2007);

*Greene v. State*, 928 S.W.2d 119, 122 (Tex. App.—San Antonio 1996, no

writ).

(3) *Argument and Prejudice*. Attorney Callahan ignored in his

final argument the opening statement assertion that Castillo was not

involved in the crime. He based his final argument on incorrect law. Under

TEX. PENAL CODE §§ 29.01 and 29.03, aggravated robbery exists if there is

an *attempted* robbery. Attempted robbery is also in the indictment. Here,

the accomplices testified that the plan was to rob the decedent and that all of

them did a smash and grab at the car at gunpoint and demanded money.

That evidence alone is sufficient to establish aggravated robbery. Callahan

was ignorant of the law, and he asserted there was not a robbery because the

medical examiner found cash still on the decedent. Under Texas law,

robbery was already committed by the attempted robbery testified to by the

accomplices.

Callahan amazingly argued that, if jurors believed the accomplices,

then the accomplices were planning a robbery and ***Castillo was planning a***

***murder***. The fact that the medical examiner found cash in the pants of the

- 82 -

decedent does not prove that there was no robbery, as Texas law defines

robbery to include an attempted robbery. Under his misperception of the

law, Callahan argued that there was only plain murder, not capital murder.

If the accomplices are believed, as Callahan suggests, then jurors

would have to believe the robbery that the accomplices mentioned and the

murder that Callahan advocates. Robbery or attempted robbery plus murder

is capital murder. Callahan had just argued for conviction of his client for

capital murder. This was a profoundly prejudicial argument. Defense

counsel's argument admitted the crime and convicted the client. This

argument was based on stupidity. Stupidity is not strategy.

e. ***Failing to Object to Sleeping Jurors***

(1) *Factual Basis*. Almost as bad as admitting guilt in final

argument, attorney Callahan confirmed that one or more jurors had been

sleeping during trial, and he made no objection. Callahan addressed jurors

in his final argument:

> But some of you've got your arms crossed,
> ***some are falling asleep***, some are not listening.

(RR Vol. 20, p. 76, lines 16-17). The evidence certainly shows this. In his

purple-covered spiral trial notebook ***after*** making this final argument,

Callahan even documents ***further*** sleeping:

- 83 -

>    1:55 (female juror sleeping)
>
>    2:05 (same juror nodding)
>
>    2:18 (same juror nodding)

(App'x Tab 9, pages 53, 54, 55 ). In an exchange of two notes with counsel during the trial, Castillo points out the sleeping jurors, and the defense counsel do nothing (App'x Tab 43). Months after trial, Callahan wrote a March 9, 2006 letter to Castillo (App'x Tab 59). After denying in the letter that he sold Castillo out at the jury trial, Callahan wrote in the third paragraph,

>    If the record supports your allegation that three jurors slept throughout your trial I will also present on appeal that issue.

This statement was written with guile as Callahan had to know it would not be in the record unless he made an objection, which he failed to do. However, the above evidence clearly shows Callahan was aware of sleeping jurors, and it was in the record that transcribed the final argument.

(2) *Authority*: A sleeping juror is a basis for a mistrial. Reversal is automatic when there is an objection. *Thieleman v. State*, 187 S.W.3d 455, 456 (Tex. Crim. App. 2005). If the defense attorney fails to object, the issue is waived and not preserved for appeal. *Menard v. State*, 193 S.W.3d 55 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)(aggravated

- 84 -

robbery); *Zani v. State*, 679 S.W.2d 144, 152 (Tex. App.—Texarkana 1984)(murder), *vacated*, 758 S.W.2d 233 (Tex. Crim. App.1988)(issue of hypnotically enhanced testimony), *on remand*, 767 S.W.2d 825 (Tex. App.—Texarkana 1989, pet. ref'd).

      (3) *Argument and Prejudice*.  The sleeping is confirmed by Castillo's notes to his counsel, by the attorney's own notes in his purple-covered trial notebook, and especially by attorney Callahan's final argument:

> But some of you've got your arms crossed,
> ***some are falling asleep***, some are not listening.

Castillo was prejudiced by defense counsel's failing to object and to seek a mistrial.   Castillo was prejudiced because one or more jurors slept in his trial and did not pay attention to testimony and evidence.  Since these acts occurred before deliberation on findings of guilt, Castillo was prejudiced on findings.

      f. ***Not Interviewing Sole Defense Witness Until Third Day of Trial and Then Putting Witness on Stand Despite His Minimal Assistance and Letting Witness Implode on Stand Because of Lack of Counsel Preparation***.

      (1) *Factual Basis*.  Callahan's attorney fee voucher of 9-6-2005 (App'x Tabs 10 & 11, p. 5) indicates that he interviewed defense witness Perdigone for the first time on  August 25, 2005. This is the night of the

- 85 -

third day of trial on the merits.

Ralph Perdigone provides *de minimus* assistance to the Castillo's cause and proves to be an unmitigated disaster on cross-examination by the prosecution.

Callahan asks Perdigone if he was present in jail on June 9, 2004 when Francisco Gonzales responded to a news story (RR Vol. 20, p. 5). Before jurors, the discredited attorney Callahan got the facts wrong— again—and had to correct the date to January 9, 2004 (*Id.*). Perdigone said that Gonzales said, "That's the guy *I* killed," and then immediately corrected himself, "I mean *they* killed." (*Id)*.

The prosecutor then slaughtered Perdigone. He admitted that new inmates, which Rodriguez was, often brag or exaggerate to bolster their credibility and standing among inmates (*Id.* at 10). He said Castillo repeatedly "bugged him" for such a statement for two months  and that it was the defense who provided the date of January 8 (*Id.* at 12-13). He said Castillo repeated wanted him to contact the district attorney but he refused (*Id.* at 14). This jail house snitch then admitted that he had been convicted of 14 different felony convictions and that inmates do favors for each other for each other to make money (*Id.* at 16-18).

(2) *Authority*: Counsel is ineffective if he fails to prepare a

witness to testify. *Ex parte Guzman*, 730 S.W.2d 724, 736 (Tex. Crim. App. 1987); *Smith v. State*, 894 S.W.2d 876, 890 (Tex. App.—Amarillo 1975, pet. ref'd); *Diaz v. State*, 905 S.W.2d 302, 308 (Tex. App. 1995, no pet.).

(3) *Argument and Prejudice*. After interviewing witness Perdigone for the first time on the night of the third day of trial, defense counsel should have realized two things: (1) the witness had nothing substantial to present, and (2) his extensive criminal record would make him mince meat for the prosecution on cross-examination. Perdigone had *de minimus* assistance in impeaching the credibility of accomplice Francisco Gonzalez and absolute no assistance in impeaching Debra Espinosa or any other prosecution witness. Having failed in that strategy, defense counsel should have least prepared their witness to testify so he would not implode on the witness stand, as he did.

This incredible lack of skill seriously prejudiced Castillo. In opening statement, counsel says he will attack the accomplices, and this is the witness he puts up to impress jurors of the merits of his client's cause.

### g. **Ineffective Representation on Faretta Issue**

(1) *Factual Basis*. This writ Application, pp. 94 – 102, where the *Faretta* matter is treated as a separate claim in this application.

(2) *Authority*: This writ Application, at 102 - 104, where the

- 87 -

*Faretta* matter is treated as a separate claim in this application.

Additionally, for a Texas defendant to be competent to represent himself, the standard is higher than set in *Indiana v. Edwards*, 554 U.S. 208, 128 S. Ct. 2379 (2008)(whether court could deny self-representation for mentally ill defendant). The standard is whether the defendant has the ability to present his own defense without the assistance of counsel. *Chadwick v. State*, 277 S.W.3d 99, 103-04 (Tex. App.—Austin 2009, no pet.).

(3) *Argument and Prejudice*. Applicant repeatedly put counsel on notice that he was extremely dissatisfied with his failure to visit him and to prepare for the case. Applicant may have been a con, but he was no fool. He recognized ineffective counsel. Defense counsel had an ethical duty to present the matter to the court, and he failed to do so. Counsel was ineffective about his own ineffectiveness by failing to resolve his problems with Castillo and in failing to bring the matter to the attention of the court.

When counsel suspected that Castillo's outlook resulted from depression, counsel should have immediately have met personally and repeatedly with Applicant. He did not do so.

When the matter came to head after jurors had returned findings of guilt, Callahan should have pointed out that Castillo was too depressed to

- 88 -

make this decision and he should have screamed that Castillo's request was tardy and should have been denied.  Since Castillo made no opening or closing statement and did not question any witness in sentencing, it can be inferred that he was too depressed to perform sentencing without counsel, and thus he was not competent for self-representation.

Counsel's initial failure to present the request for self-representation to the attention of trial prejudiced Castillo.  Counsel's failure to met with Castillo to resolve the suspected depression and to engender confidence in counsel prejudiced Castillo by deepening his depression and late of faith and confidence in counsel.  When the request was renewed after return of findings, counsel prejudiced Castillo by not pointing out that Castillo was not competent and that the request was tardy.

### 4.  **Cumulative Effect of Ineffectiveness of Counsel**

a. *Factual Basis*.  This writ Application, *infra*, at 27-89.  The standard of care of defense attorneys are set forth in the case law previously cited in this application, in the affidavits of a death penalty practitioner (App'x Tab 42), the Guidelines and Standards for Texas Capital Counsel, State Bar of Texas (App'x Tab 52), and ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. Ed. Feb. (2003) (App'x Tab 53).

- 89 -

b. _Authority_:   Although no single act in a case might not be
sufficient proof of ineffective assistance of counsel, counsel's overall
performance taken as a whole can compel such a holding.  _Ex parte
Welborn_, 785 S.W.2d 391, 396 (Tex. Crim. App. 1990); _Greene v. State_, 928
S.W.2d 119, 126 (Tex. App.—San Antonio 1996).  Effectiveness of counsel
is ordinarily gauged by the totality of the representation, but a single error, if
sufficiently egregious, can constitute ineffective assistance of counsel.  _Ex
parte Felton_, 815 S.W.2d 733 (Tex. Crim. App. 1991).

(3) _Argument and Prejudice_.  As detailed in the above facts,
defense counsel abandoned Castillo at every level and was ineffective at
every conceivable level.  Counsel's acts of commission and omission
individually were sufficient egregious to be ineffective and to prejudice
Castillo.

Defense counsel effectively abandoned their client.  Lead counsel
Callahan only once—right after counsel's appointment—saw the defendant
in jail in the over 19 months from arrest to trial and never returned.  He
never met with defendant to go over discovery for input or strategy.

Second chair counsel's visitation was equally abysmal.  When defense
counsel believed the defendant was depressed because he wanted to defend
himself, counsel never met with the client to resolve that depression.

- 90 -

Both defense counsel made their superficial preparations for trial on the merits until *after* jurors in this capital case had been selected. First chair counsel did not begin his trial preparation until the *day before* trial on the merits began. Defense counsel's urgent task was to destroy the credibility of the accomplice witnesses and their friends at every point. Instead, defense counsel asked questions of the accomplices and the lead homicide detective that enhanced the credibility of the very witnesses that the defense had to destroyed. Counsel's superficial knowledge of the facts of the case repeatedly resulted in multiple witnesses correcting counsel on the basic facts, thus undercutting any credibility counsel might have had left with jurors.

Defense counsel showed his lack of knowledge of capital law by having the defendant signed a demand for sentencing by the judge in a death penalty case, contrary to law. Although defense counsel had advised counsel that they would be introducing Castillo's educational records and mitigation matters from defendant's federal pre-sentence investigation report, defense counsel failed to do so. Defense counsel made no attempt to contact relatives for over a year and a half and only attempted to do so after jurors had been selected and once during the latter stages of trial on the merits. Defense counsel were going to call a forensic psychologist who had

examined Castillo but they failed to do so. Instead, although the psychologist would testify that the accused would not be a threat to society while incarcerated —a very significant matter in a death penalty case, counsel failed to issue a subpoena to the psychologist and botched up his testifying in court.

Lastly, counsel opened his final argument with a statement that he understood that jurors had been sleeping during trial, but he neither objected nor sought a mistrial for the snoozes. Then, amazingly, lead counsel argued that, while the accomplices planned and executed a robbery, his client *merely* planned and executed a murder. Not only did counsel fail to understand the law of robbery for the argument, counsel conceded the primary issue of the case—his client's guilt.

This cumulative incompetence was not strategy. Sloth and stupidity are not strategy. This was dumb and dumber. This ineffectiveness prejudiced defendant Castillo in both their cumulative acts of commission and omission were so serious that Castillo was deprived of a fair trial on both findings and sentence. Castillo was abandoned by his counsel from the start. This case had one chance for a defense victory—to destroy the credibility of the accomplices. Instead, attorney Callahan embarked on a cross-examination that bolstered the credibility of the state's accomplice

- 92 -

witnesses. Callahan's self-immolated himself during the cross-examination of the homicide case detective by throwing more gasoline-fueled questions on this raging fire. By not knowing the facts of the case, Callahan let even the most minor witness destroy his—and Castillo's—credibility. Counsel did not even prepare for over 20 prosecution witness. Failing to prepare for so many witnesses was tantamount to ritualistic disembowelment.

The prejudice of such ineffectiveness was compounded even further by the lack of preparation and execution in sentencing. Defendant was prejudiced because his attorneys did not prepare to cross-examine witnesses that the State would call in sentencing. Defendant was prejudiced because his attorneys failed to prepare a sentencing case and failed to prepare and to present mitigation evidence.

Since the errors are of constitutional dimension, reversal of both findings and sentencing is required as the errors were not harmless beyond reasonable doubt and contributed to the verdict obtained. *Chapman v. California*, 384 U.S. 18, 24, 87 S. Ct. 824, 828 (1967); *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 1833 (1999); TEX. R. APP. PROC. 44.2(a).

## B. <u>Claim II</u>

### THE TRIAL COURT VIOLATED DEFENDANT'S RIGHTS TO SELF-REPRESENTATION AND THEN ABUSED HER DISCRETION IN HAVING APPLICANT DEFEND HIMSELF DURING SENTENCING.
*(Restated)*

Applicant was denied his rights of self-representation under U.S.

Const. amend. VI and of due process under the U.S. Const. amends. V and

XIV for the following reasons:

1. *Factual Basis.*   After being in jail for over a year, Castillo wrote

District Judge Tessa Herr on January 16, 2005:

> I'd like to dismiss my court appointed (sic) attorney Vincent Callahan because *I have only seen him twice in the past 13 months*. Once in December of 2003 and the last time was in your courtroom on 1-6-2004. I also feel he is not helping me. I had asked Mr. Callahan to put a motion to dismiss appointed counsel and he responded with "The law permits you to retain any lawyer of your own choosing but it does not permit you to choose who your court appointed (sic) attorney is. I will stay in touch." I understand that I do not get to choose which attorney I want to represent me if they are court appointed. I was under the impression that I could fire a court appointed attorney if I felt that they weren't helping me. Well, Your Honor I hope you will take this in to consideration upon making your decision.

(CR 14).  The District Judge failed in her responsibilities to make

an inquiry under *Faretta v. California*, 422 U.S. 806, 95 S. Ct.

2525 (1975). The judge took no action.

- 94 -

Attorney Callahan wrote Castillo a letter dated February 18, 2005 (App'x Tab 44) stating:

> Dear Mr. Castillo:
>
> I received your letter postmarked 2/16/05. ***I understand <u>the depression that you are presently experiencing</u>, but you must not give in to negativity as it would hurt your testimony before the jury***.

Attorney Callahan never—ever—takes action to resolve Castillo's ***depression***. He does not visit Castillo. He does not notify jail medical personnel. He does not raise this disability in pretrial hearings, during general *voir dire*, during individual *voir dire*, during the case in chief, and, critically, not even after findings when Castillo renews his effort for self-representation at sentence. The comment suggests that Castillo lacks the present competency to waive legal counsel.

This letter also is significant as it shows that Castillo is contemplating testifying at trial and Callahan never—ever—takes any action to assist or to prepare Castillo for testifying. Callahan has totally abandoned his client. This is corroborated by Callahan's statement at the close of the Government's case, "***I don't know if Mr. Castillo wants to testify or not***" (RR Vol.18, p. 164, lines 10-11).[23]

---

[23] Attorney Callahan had written Castillo months before on June 16, 2004 to ask if Castillo wanted to testify, but Callahan never sought a follow-up by either a jail visit or

Four and a half months later, Castillo filed with the court on June 2 and 26, 2005 a generic Motion to Dismiss Appointed Counsel. The motion complains about attorney Callahan and stated a "lost faith in counsel and no longer trust counsel's advice" (CR 23; App'x Tab 17). Attached to the motion was Castillo's letter (CR 27) stating:

> I'm writing you this letter in hopes that you'll grant my second motion to dismiss appointed counsel. Your Honor, I'm scheduled for jury section 7.15.05, and I have no attorney representing me that I haven't seen since 1.6.04. I couldn't even tell you what he looks like besides that he's a white gentleman with white hair. All I want is a fair trial someone who will fight for me. Your Honor, I'm asking please will you grant this motion for me.

District Judge Herr again ignored her responsibilities under *Faretta*. A clerk wrote on the motion, "Denny Callahan 737-3404 6/9 notified."

No one raises the issue again at the July 5, 2005 motion hearing (RR 2, pp. 4-8), general *voir dire* (RR 3), individual *voir dire* (RR 4 to RR 14), the case in chief (RR 15 to RR 18), or verdict on findings and polling of jurors on that verdict.

After both sides closed, there is a suggestion that Castillo is upset over the performance of his two defense attorneys, as the defense informed the court that Castillo sought to absent himself from the remainder of

correspondence either to get the answer or to prepare his client to testify. (App'x 58).

proceedings and counsel sought an admonishment from the court to Mr.

Castillo over possible misbehavior (RR 20, pp. 26-28).

Neither defense attorney notes in his fee voucher that he saw Mr.

Castillo at the jail that night to assuage the client's concerns.

The following morning, District Judge Herr said that defense counsel

had informed her that Castillo wished to represent himself.  She enters into

the following colloquy (RR Vol. 21, pp. 3-7):

> Court: All right. Mr. Castillo, I've been informed through counsel that you wish to represent yourself; is that correct?
>
> Def. Yes, ma'am.
>
> Court: Well, I have to tell you it's – I think it's not a good idea, but I'm going to run through some reasons why it's not a good idea.  Although, they probably are fairly obvious to you.  You know that you're on trial for capital murder for which you can receive the death penalty.  You've already been convicted of capital murder.  The only issues left are whether you're going to get a life sentence or a death penalty.  I mean, it doesn't get any more critical than that, does it?
>
> Def: No, ma'am.
>
> Court: All right.  Have you ever represented yourself before in a criminal case?

- 97 -

Def.      No, ma'am.

Court:  Do you understand—you clearly understand
        what's at risk in this case, right?

Def:      Yes, ma'am.

Court:  You understand if—at the end of the
        punishment phase of this trial, the jury could
        sentence you to death?

Def:    Yes, ma'am.

Court:  Do you understand that if you decide to
        represent yourself, you're on your own?  I
        mean, it's not like I can advise you or tell you
        what you should or shouldn't do.  And you're
        asking to handle things on your own with no
        help from anyone?

Def:      Yes, ma'am.

Court:   Are you expecting that I'm going to jump in
         and—

Def:      No, ma'am.

Court:  --suggest to you how you should proceed,
        because I can't?

Def:     No, ma'am.

Court:   Are you familiar with the Rules of Evidence?

Def:      Not really.

Court:   All right.  So you understand—if you're
         representing yourself, do you intend, when
         the State calls a witness, to handle the cross-

- 98 -

examination on your own?

Def:    Yes, ma'am.

Court:    And you intend to do that without any knowledge of the Rules of Evidence and what's admissible and what's not admissible?

Def:    Yes, ma'am.

Court:    Understanding the Rules of Evidence is what attorneys use to know what's going to come in, what kind of evidence can get in, what kind of evidence can't get in. And you—you proposed that you want to do this on your own without any knowledge of the Rules of Evidence, right?

Def:    Yes, ma'am.

Court:    Without any understanding of what can come into evidence and what cannot?

Def:    Yes, ma'am.

Court:    I must advise you in my opinion, a trained lawyer would defend you and represent you far better than you could ever do for yourself. Do you understand that?

Def:    Yes, ma'am.

Court:    I think it is unwise of you to try to represent yourself. You're not familiar with the law. You're not familiar with court procedure. You're not familiar with the Rules of Evidence. I strongly urge you not to represent yourself. You understand that that is my advice to you, my considered advice,

- 99 -

that it would be in your best interest to be represented by Counsel and let them handle the punishment phase of this trial. And that you would be far better off proceeding that way than you would be representing yourself.

Def:        I understand.

Court:      In light of the penalty that you might suffer, in light of all the difficulties that I have explained to you with regard to representing yourself, do you still wish to give up your right to be represented by a lawyer and represent yourself?

Def:        Yes, ma'am.

Court:      Is your decision entirely voluntarily?

Def:        Yes, ma'am.

Court:      Do you think emotionally, mentally, psychologically you're in an appropriate place at this point to represent yourself?

Def:        Yes, ma'am.

Court:      Is there anything further that you want to say to the Court?

Def:        No, ma'am.

Court:      Well, in spite of my advice to you, you certainly have the right to represent yourself. I cannot deny that to you.[24] There's nothing

---

[24] **Judge Herr misstates the law**. While the right to self-representation is unqualified prior to trial, that is not the law where, as here, trial had already started. *United States v.*

- 100 -

> that you have said thus far that would justify
> my not allowing you to do that. So I'm
> going to find that you are knowingly and
> voluntarily waiving you right to counsel,
> and I'm going to permit you to represent
> yourself. I am, however, going to ask that
> the attorneys be present in an advisory
> capacity so that if you need advice during
> the course of the punishment phase of this
> trial, they will be there for you for that
> purpose.
>
> Furthermore, if you should change your
> mind and decide that you want them to
> represent you, you just need to come up here
> and tell me that. Do you understand?

Def:       Yes, ma'am

The State then made opening statement (RR 21, p. 7) and had its first

witness testify. After that first witness testifies, Judge Herr took a recess and

had Castillo sign a written waiver on the record (*Id.*, p. 31). That waiver

(CR 139) stated,

> I have been advised ... of my right to
> representation by counsel in the punishment phase
> of trial in the above-referenced case. I have been
> fully admonished of the danger and disadvantages
> of self-representation. I freely, voluntarily, and
> intelligently waive my right to representation of

---

*Majors*, 328 F.3d 791, 794 (5th Cir. 2003)(Defendant request self-representation on second day of drug trial in Waco. Court properly denied the request to represent self as untimely); *Brown v. Wainwright*, 665 F.2d 607, 610-11 (5th Cir. 1982)(en banc)(request for self-representation on third day of trial was untimely); *United States v. Lawrence*, 605 F.2d 1321 (9th Cir. 1979); *United States v. Dunlap*, 577 F.2d 867 (4th Cir. 1978).

counsel and request the Court to proceed with my case.

Judge Herr informed the jury of Castillo's decision to represent himself and to waive defense counsel (RR 21, p. 32). At no time did Judge Herr make any inquiry of the two defense attorneys. At no time did either defense attorney ask to be heard. At no time did Judge Herr ask about Castillo's educational level.

Defendant never cross-examined any witness or make final argument. He did not call witnesses. He did not testify.

However, review of the files of both defense attorneys reveals that *neither defense counsel prepared for cross-examination of prosecution witnesses in sentencing or for a mitigation case.*

2. *Authority*:  A defendant has a right to self-representation at a criminal trial under the Sixth Amendment of the Constitution of the United States. *Faretta v. California*, 422 U.S. 806, 807, 95 S. Ct. 2525 (1975); *Williams v. State*, 252 S.W.3d 353, 355-56 (Tex. Crim. App. 2008). However, this right does not exist unless the defendant competently, intelligently, and voluntarily waives the right. When an accused asserts his right to self-representation *"for purposes of entering a guilty plea or proceeding to trial,"* the trial judge is required to inquire into the request and

- 102 -

make admonishments required by TEX. CODE CRIM. P. art. 1.051(g).[25]

This statute does not, however, require a written waiver. *Gallegos v. State*, 425 S.W.648, 650 (Tex. Crim. App. 1968); *Burgess v. State*, 816 S.W.2d 424, 429 (Tex. Crim. App. 1991).

However, while the right to self-representation is unqualified prior to trial, that is not the case where, as here, trial had already started. United States v. Majors, 328 F.3d 791, 794 (5th Cir. 2003)(Defendant request self-representation on *second day of drug trial* in Waco. Court properly denied the request to represent self as untimely); *Brown v. Wainwright*, 665 F.2d 607, 610-11 (5th Cir. 1982)(en banc)(request for self-representation on *third day of trial* was untimely); *United States v. Lawrence*, 605 F.2d 1321 (9th Cir. 1979); *United States v. Dunlap*, 577 F.2d 867 (4th Cir. 1978).

The Constitution places a "heavy burden" on government to demonstrate defendant voluntarily, knowingly, and intelligently waived his right to counsel. *Blasingame v. Estelle*, 604 F.2d 893, 895 (5th Cir. 1979).

---

[25] This statute reads: "if a defendant wishes to waive the right to counsel *for purposes of entering a guilty plea or proceeding to trial*, the court shall advise the defendant of the nature of the charges against the defendant and, if the defendant is proceeding to trial, the dangers and disadvantages of self-representation. If the court determines that the waiver is voluntarily and intelligently made, the court shall provide the defendant with a statement substantially in the following form which, if signed by the defendant, shall be filed with and become part of the proceedings ...."

The courts must indulge every reasonable presumption against the validity of such a waiver. *Geesin v. State*, 600 S.W.2d 309, 313 (Tex. Crim. App. 1980). Counsel waiver forms signed by petition stating that he knew of his right to counsel and right to have counsel appointed if he were indigent and judgment of trial court containing printed form recital that defendant was informed in open court of his right to counsel and his right to appointment of counsel if he were indigent and that he waived such rights were ***not*** conclusive proof that defendant knowingly and intelligently waived his right to counsel but did tend to establish such facts. *Ex parte Ross*, 522 S.W.2d 214, 220-21 (Tex. Crim. App. 1975).

A trial court abuses its discretion when its ruling, as here, is based on an erroneous knowledge of the law. *United States v. Yanez-Sosa*, 513 F.3d 194, 200 (5th Cir. 2008); *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

3. *Argument and Prejudice*. Castillo repeatedly screamed to the trial judge through letters and motions that his attorneys had abandoned him. Defense counsel was aware of this dissatisfaction and failed to notify the trial judge, who sadly failed to respond to the communications from Castillo. When Castillo wrote counsel that he wanted to represent himself because of

- 104 -

this abandonment, the response of attorney Callahan was to write to Castillo that he was "depressed." Callahan took no action to meet with the client to resolve his disillusion and to counter the depressive moment.

Instead both counsel and the court, let this cankerous sore fester through nine days of *voir dire* (July 15, 27—28; Aug 2—3, 4—5, 9—12) and five days of trial on the merits (Aug. 23—26, 29 (RR Vol. 1).

It was only after defense counsel's disastrous performance during the findings stage of trial, capped by defense counsel's final argument, that court and counsel decided to address defendant's request. At no time in the colloquy did defense counsel mention the evident impact of defendant's depression that adversely impacted his request. Under that circumstance alone, there was an insufficient inquiry between the court and Castillo.

The trial court abused her discretion in granting the self-representation *after voir dire* and findings had been completed. First, the trial judge clearly misunderstood the law. This lack of knowledge is shown by the trial judge's stating that "*I cannot deny that (request for self-representation) to you*" (RR Vol. 21, p. 6). Of course, the judge could. Trial had been underway for 14 days and the current request was tardy. She could have denied the request.

The trial judge's admonishment to Castillo certainly showed that she

- 105 -

knew that self-representation would be a disaster.[26]  And it was.  There was no way that defendant could prepare himself within the confines of incarceration and after trial had gone on for 14 days already.  The trial judge clearly abused her discretion in granting the tardy request at this late stage of trial and through the capital defendant to the prosecution wolves.

Since the error is of constitutional dimension, reversal of both findings and sentencing is required as the errors were not harmless beyond reasonable doubt and contributed to the verdict obtained.  *Chapman v. California*, 384 U.S. 18, 24, 87 S. Ct. 824, 828 (1967); *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 1833 (1999); TEX. R. APP. PROC. 44.2(a).

---

[26] "I think it is unwise of you to try to represent yourself.  You're not familiar with the law.  You're not familiar with court procedure.  You're not familiar with the Rules of Evidence.  I strongly urge you not to represent yourself.  You understand that that is my advice to you, my considered advice, that it would be in your best interest to be presented by Counsel and let them handle the punishment phase of this trial.  And that you would be far better off proceeding that way than you would be representing yourself." (RR Vol. 21, p. 5-6).

## C. <u>Claim III.</u>

APPELLATE COUNSEL RENDERED INEFFECTIVE
ASSISTANCE ON THE MOTION FOR NEW TRIAL AND
THE APPEAL, HAD A CONFLICT OF INTEREST ON
THE APPEAL, AND PLAGIARIZED PORTIONS OF THE
BRIEF.

(<i>Restated</i>)

Applicant was denied his rights under the U.S. Const. amend. VI

for the following reasons:

1. <u>*Factual Basis*</u>.  After trial, attorney Callahan took a photocopy of a

motion for new trial submitted by another attorney in another case and

changed the case heading  to his case and the signature block to his (App'x

Tab 22).  Callahan then filed this motion that merely requested a new trial

without asserting any points as the basis for the motion.  No affidavits were

attached to the motion for new trial.  No hearing on the motion was

requested or conducted.

Although the applicant had repeatedly complained to the court of Mr.

Callahan (CR 13 & 23) and purported to relieve him for sentencing (RR 21,

pp. 3-7), the court appointed Callahan to do Applicant's automatic appeal

(CR 160).  Callahan did not heed his client's disenfranchisement with him.

Additionally, Castillo wrote the district judge on April 11, 2006

asking for the appointment of an appeals attorney from the (Bexar County

- 107 -

Appellate) public defender's office because the issue of ineffectiveness of counsel needed to be raised (App'x Tab 60). The letter in the court's file carries a note from "Angela"[27] stating that the matter was discussed with the judge, Callahan, and Angela Moore, the chief of the Bexar County Appellate Public Defender Office. That note states that the original habeas attorney Suzanne Kramer "is raising ineffective assistance on (the) writ, so we will leave everything as it is." (*Id.*) Of course, this meant that Castillo had a useless appeal from an attorney would clearly had a conflict of interest.

After being notified of Castillo's April 11, 2006 letter to Judge Herr, Castillo responded to Castillo's call for a new attorney so that ineffectiveness of counsel could be raised, Callahan finessed the issue by saying that the writ attorney would undertake that endeavor (App'x Tab 61).

Callahan never asserted ineffectiveness of counsel against himself in his appeals brief (App'x Tab 49). The ineffectiveness asserted by original habeas attorney Kramer in her writ application[28] concerns only *voir dire*, *Witherspoon* error, lack of objections on non-constitutional matters related to TEX. R. EVID. 404(b) and hearsay, and failure to appeal the *Faretta* issue.

---

[27] Because the note is signed by "Angela" and starts "Angela said," it is doubtful that the note's author is Angela Moore.

[28] Applicant requests this Honorable Court to take judicial notice of the original writ application already filed with the Court of Criminal Appeals.

Callahan had done the capital appeal of Kevin Watts and had there urged as a point of error that the death penalty was unconstitutional, and the Texas Court of Criminal Appeals had affirmed the conviction and death penalty in *State v. Kevin Watts* on December 15, 2004, over eight months before applicant's conviction (App'x Tabs 46, 47).  Although he knew that of the adverse ruling, Callahan took a copy of the brief in that case, changed the names from Watts to Applicant, and used the prior brief as a point of error.  He did add the case of *Roper v. Simmons*, but did not research and include the citation for the case, even though the San Antonio Bar Association law library carries Supreme Court Reporter and its advance sheets and has West Law.

Callahan similarly copied another brief and adopted it for applicant's brief (App'x Tab 48).  He also raised as an appeal issue the nonmeritorious issue that accomplices should not have been permitted to testify even though all the law was against his assertion.

Callahan then filed applicant's brief in the Court of Criminal Appeals as cause AP 75,246 (App'x  Tab  51).  He then filed a $15,000 attorney fee voucher (App'x Tab 50)  for the partially plagiarized, non-meritorious 30-page brief (App'x  Tab 49).  It is noted that Callahan failed to state in his brief for Castillo whether or not oral argument was requested or waived, and

- 109 -

the Court of Criminal Appeals had to query this attorney after the brief was filed (App'x Tab 51).

Callahan never designated items for insertion in the clerk's record or reporter's record—the original writ attorney did (CR 165—166).  The Court of Criminal Appeals upheld the finding of guilty and sentence to death. Callahan did not file a petition for certiorari with the Supreme Court of the United States.

2.  *Authority*.  To get an evidentiary hearing on a motion for new trial based on ineffective assistance of counsel, could must satisfy both *Strickland* prongs of ineffectiveness and prejudice.  *Smith v. State*, 286 S.W.3d 333, 335 (Tex. Crim. App. 2009).  When the matter is not determinable from the record, counsel must submit an affidavit showing reasonable grounds for holding the relief should be granted.  *Id.* at 337.  This affidavit requirement is based on case law, not a requirement of a rule or statute.  *Bahm v. State*, 219 S.W.3d 391, 395 (Tex. Crim. App. 2007).

Counsel is ineffective when he fails to obtain a ruling on a motion for new trial.  *Belcher v. State*, 93 S.W.3d 593 (Tex. App.—Houston [14th Dist. 2002, pet. dism'd).  A motion for new trial is particularly important when ineffectiveness of counsel is raised, as, unlike Castillo's case, evidence of ineffectiveness is not always apparent on the record.  *Freeman v. State*,

125 S.W.3d 505, 506 (Tex. Crim. App. 2003).

The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *United States v. Vaquero*, 997 F.2d 78, 89 (5th Cir. 1993). When criminal defense counsel has a direct conflict of interest, ineffective assistance claims are ***not*** analyzed under the *Strickland* standard; instead, the proper standard is that which the U.S. Supreme Court articulated in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980). *Acosta v. State*, 233 S.W.3d 349, 352-54 (Tex. Crim. App. 2007). In such a case, a defendant need show that (1) his counsel by burdened with a conflict of interest, and (2) trial counsel acted on behalf of the other interest. *Acosta*, at 356.

Counsel has a duty to raise an issue that would require a reversal of a conviction. *Ex parte Daigle*, 848 S.W.2d 691 (Tex. Crim. App. 1993); *United States v. Williamson*, 183 F.3d 458 (5th Cir. 259 (2000). This would include ineffective assistance of counsel.

Defendant need not satisfy the prejudice prong of *Strickland* where there is an actual or constructive denial of the assistance of appellate counsel. *Lombard v. Lynaugh*, 868 F.2d 1475 (5th Cir. 1989).

3. *Argument and Prejudice*. Attorney Callahan knew, or should have known, that ineffective assistance of counsel should be raised on

- 111 -

appeal.  Castillo was screaming at the trial judge for Callahan's
ineffectiveness months before trial.  Abandoned by his counsel before trial
and during trial, Castillo was forced to try to save his life through purported
self-representation.  During the appeal, Callahan learned that Castillo had
written Judge Herr, and Callahan's response was to state that the writ
counsel would undertake that task (App'x Tab 61).  The direct conflict of
interest was patent, open, and obvious.

The manner in which Castillo pencil-whipped the plagiarized motion
for new trial was indicative of his efforts.  Callahan was looking at a loss of
up to $15,000 if he was not appeals counsel on this death penalty case.
Accordingly, Callahan plagiarized two points for his brief and then asserted
the frivolous issue on suppression of accomplice witness to produce a
30-page brief whose exact cost was the $15,000 maximum payment allowed.

There is an automatic conflict of interest for the trial defense attorney
in a capital case doing the automatic appeal when there is a likelihood that
ineffective assistance of counsel will be raised.[29]  That direct conflict arises
by operation of TEX. CODE CRIM. P. art. 26.052(d)(2)(C), which holds that

---

[29] The State Bar discourages counsel in a death penalty case from serving as appeals
counsel in the same case.  Guideline 12.1D Guidelines and Standards
for Texas Capital Counsel, State Bar of Texas (App'x Tab 52).

capital counsel cannot "have been found by a federal or state court to have rendered ineffective assistance of counsel during the trial or appeal of *any* capital case." TEX. CODE CRIM. P. art. 26.052(k) states that the court may *not* appoint the trial defense attorney in a capital case to do the appeal unless the court finds good cause for the appointment. If counsel in ineffective at trial, his raising ineffectiveness on appeal would cost that counsel future capital appointments and concomitant income.[30]

Here, Callahan was burdened with his own self-interest and had a conflict of interest with Castillo's best interests. Sole purpose of the appeal was to generate quick money. This finding of conflict interest and acting out on the interest of the attorney is amply demonstrated by the following matters:

- The poor quality of Callahan's brief;

- the brief's fortuitously afforded the attorney the exact number of hours to achieve the maximum $15,000 payout in attorney's fees;

- the failure to assert ineffective assistance errors;

- counsel's failing to follow simple appellate rules to state whether

---

[30] The fee schedule in effect at the time of Callahan's appointment called for payment in a death penalty appeal of $150/hour for our-of-court time and $200/hour for in court time, with a cap of $15,000 for the appeal (App'x Tab 54). Paragraph 17 allows up to 100 hours of out-of-court time for trial-level death penalty work.

or not oral argument was requested; and

- counsel's failure to petition for a *writ of certiorari*.

## D. **CLAIM IV**

**COUNSEL WAS INEFFECTIVE IN JURY SELECTION.**
(*Restated*)

Applicant was denied his rights under the U.S. CONST. amend. VI because of ineffectiveness of counsel in selection of jurors.

1. *Factual Basis*.

During the start of individualized *voir dire* with venire woman Doris Cedillo, the trial judge told her that *voir dire* was running late that morning because of a mix-up at the jail (RR Vol. 5, p. 30). At the end of questioning Ms. Cedillo, defense counsel stated that he was concerned about the comment (*Id.*, at p. 35). Prosecutor Lunan then volunteered, "If they (the defense) wish to challenge for cause based on that issue, I don't object" (*Id.*) Instead, defense counsel Callahan said he had no objections to the remarks and accepted Ms. Cedillo as a juror (*Id.*).

However, during the individualized *voir* dire, the prosecutor entered into a lively exchange of death penalty law in which Ms. Cedillo responded, "I guess so," "uh-huh," "un-huh," "yes," "yes," "yes, I do," nods head, "uh-huh," "yes," "un-huh," and an inaudible response followed by a

- 114 -

clarifying "yes" (*Id.*, pp. 9-18).  The prosecutor told her, "There is nothing in our law that is automatically mitigating" (*Id.*, p. 19).  After this explanation, the prosecutor asked if she followed the explanation, and Ms. Cedillo meekly replied, "I think so" (Id.,  p. 21).  When asked by the prosecutor if Ms. Cedillo could participate in a process whereby her vote could result in execution, she replied that she felt she needed to understand more about the law (*Id.*, p. 23).

After being given yet more instructions on the law and asked if she could do this process, she said she could not answer (*Id.*, p. 25).  When asked what she thought made the matter difficult, Ms. Cedillo replied, "Just understanding everything." (*Id.*, p. 27).  When the Fifth Amendment was explained to her, her response was, "What do you mean?" (*Id.*, p. 30).  She was hopeless confused on the law.  When she was passed to defense counsel, she was thrown powder puff questions on whether she could participate in the process, and she responded, "I guess so, " "Yes, I guess so," "Never done it before," and "I think I would" (*Id.*, pp. 33-34).  Neither counsel got response from Ms. Cedillo except proof of her confused mine.

Ms. Cedillo became the third juror (*Id.*, p. 35).

The future dangerousness issue was explained to venire man Arthur Carter, and he volunteered to counsel that the issue sought an answer for a

- 115 -

"possibility" (RR Vol. 5, p. 122).  Neither prosecution nor defense corrected

this misinterpretation.  When the prosecutor provided the venire man a

hypothetical set of facts to the future dangerousness issue, Mr. Carter

seemed to say he would automatically answer "yes" on this issue  (*Id*, at

124).  Second chair defense counsel Harris posed no questions on sentencing

to clarify these misconceptions (*Id.*, a pp. 131-134).  Mr. Carter became

juror number four (*Id.*, p. 144).

     2. *Authority*.  For general authority on ineffective assistance of

counsel, see this application, *supra*, at 27-30.

     An accused in a criminal case is entitled to an impartial juror

composed of persons who are unprejudiced, disinterested, equitable,

and just, who have not prejudiced the merits of the case. *Shaver v. State*,

280 S.W.2d 740, 742 (Tex. Crim. App. 1955).  The *voir dire* process is

designed to insure to the fullest extent possible, that such an impartial

jury will perform the duty assigned to it. *Salazar v. State*, 562 S.W.2d 480,

482 (Tex. Crim. App. 1978).

     Defense counsel can be ineffective in the conduct of *voir dire*.

*Nelson v. State*, 832 S.W.2d 762, 765-66 (Tex. App.—Houston [1st Dist.]

1992, no pet.).

- 116 -

3. *Argument and Prejudice*.  Defense counsel provided ineffective assistance for these two venire persons, both of whom sat on the jury. Both of these jurors had misconceptions of capital punishment law.  The poisoning of the jury panel left the jury with misinformed jurors, and such jurors prejudiced applicant on sentencing.  The prosecutor agreed to a challenge of Ms. Cedillo for cause, but defense counsel failed to accept the offer.  No sound strategy exists when defense counsel raises the issue of taint of a juror and the prosecutor agrees to a challenge for cause, and then defense counsel fails to assert the challenge for cause.  There is no sound strategy in failing to clarify a juror's misconceptions of the law.

## *Prayer*

Habeas counsel for Applicant Juan E. Castillo prays for the following relief:

1.  That this Honorable Court grant this application for habeas corpus and remand the case for a new trial on both findings and sentence.

2.  That new, qualified capital counsel be appointed for Mr. Castillo for any remand and re-trial.[31]

3.  That attorney Vincent D. Callahan be removed from any list to be appointed defense attorney at the trial, appeal, or writ level for any

---

[31] This habeas counsel specifically does not want to be the trial defense counsel.

- 117 -

capital felony, first degree felony, or second degree felony under TEX.
CODE CRIM. P. arts. 26.04 and 26.05.

    4. That, if attorney Callahan has been so removed from
appointments, this Honorable Court communicate that adverse
information to Mr. William G. Putnicki, Clerk of the Court, United States
District Court, Western District of Texas, ████████████ San Antonio,
Texas████████.

    5. That Bexar County recover from attorney Callahan for the
amount of his three vouchers in this case: $3,625.00 and $16,310 for trial
level work and $15,000 for the appeal.

    6. That a copy of this writ application and appendix and the court's
opinion in this case be forwarded to the Chief Disciplinary Counsel,
State Bar of Texas, ████████████, Austin, Texas█████for appropriate
disciplinary action.[32]

---

[32] The State Bar Counsel has suggested to the Habeas Attorney that, while Callahan's
acts and omissions in the Castillo capital murder trial may be beyond the four-year statute
of limitations for disciplinary action, his work on the appeals brief will remain within the
limitations period until June 19, 2010, four years after he filed the brief on June 19, 2006
(App'x Tab 49). If legal malpractice claims are tolled during appeals, *Hughes v.
Mahaney & Higgins*, 821 S.W.2d 154 (Tex. 1991), then disciplinary actions should
likewise be tolled during appeals.

Respectfully submitted,

LAW OFFICE OF JOHN M. ECONOMIDY

▐▐▐▐▐▐▐▐▐▐▐▐▐▐

San Antonio, Texas ▐▐▐▐▐

(210) ▐▐▐▐▐▐

economidy@att.net

*John M. Economidy*

**JOHN M. ECONOMIDY**
Attorney for Habeas Applicant
State Bar of Texas ▐▐▐▐▐▐

STATE OF TEXAS

COUNTY OF BEXAR

    I certify that I have read the foregoing writ and that its contents are true and correct to the best of my knowledge and belief.

*John M. Economidy*

**JOHN M. ECONOMIDY**
Article 11.071 Habeas Attorney
▐▐▐▐▐▐▐▐▐▐

San Antonio, Texas ▐▐▐▐▐

▐▐▐▐▐▐▐▐▐▐▐

State Bar of Texas No. ▐▐▐▐▐▐

    SUBSCRIBED AND SWORN TO before me by John M. Economidy on this _6th_ of November, 2009.

*Cynthia A. Salazar*

**NOTARY PUBLIC**
State of Texas

CYNTHIA A. SALAZAR
MY COMMISSION EXPIRES
November 18, 2010

- 119 -

## *Certificate of Service*

I certify that a copy of this Article 11.071 application for writ of

habeas corpus and its appendix have been served on the

13th day of November, 2009 on the following personnel:

> Court of Criminal Appeals
> Supreme Court Building
> ██████████████████████
> Austin, Texas ████████
> (original and 12 copies)  (filed with originating
> court as required by Article 11.071, § 4(a).
> (*extra copy is for court to forward to*
> *State Bar Disciplinary Counsel*)

> Honorable Maria Teresa "Tessa" Herr
> Judge Presiding
> 186th District Court
> Cadena-Reeves Justice Center
> ████████████████
> San Antonio, Texas████████
> (one copy)(hand-delivery)

> Appellate Division
> Bexar County District Attorney
> Cadena-Reeves Justice Center
> ██████████████
> San Antonio, Texas████████
> (one copy)(hand-delivery)

> State Prosecuting Attorney
> ████████████████
> Austin, Texas████████
> (One copy)(Mailed)

- 120 -

Mr. Juan Edward Castillo
TDCJ No. ████████
Polunsky Unit – D/R
██████████
Livingston, Texas ████████
(one copy)(mailed)

Ms. Alma Lagarda
Staff Attorney
Texas Defender Service
████████████████████
Houston, Texas ████████
(one copy)(mailed)

*John M. Economidy*
**JOHN M. ECONOMIDY**

- 121 -