# NO. WR-70,510-01

## IN THE TEXAS COURT OF CRIMINAL APPEALS

### AND

## IN THE DISTRICT COURT OF BEXAR COUNTY, TEXAS
### 186TH JUDICIAL DISTRICT
### 2004-CR-1661-W

## EX PARTE JUAN EDWARD CASTILLO

## THIS IS A DEATH PENALTY CASE
## APPLICATION FOR POST-CONVICTION
## WRIT OF HABEAS CORPUS

### *Appendix:  Tabs 31-61*

| | |
|---|---|
| **Hearing**<br>**Requested** | **JOHN M. ECONOMIDY**<br>███████████████<br>San Antonio, Texa████<br>Office:███████<br>Fax:  None<br>████████████████ |
| **Oral Argument**<br>**Requested** | **Attorney for Applicant**<br>**JUAN EDWARD CASTILLO** |

# APPENDIX: Tabs 31-61
# TABLE OF CONTENTS

***Tab***
31.   Letter, April 1, 2005, attorney Callahan forwarding Dr. Ferrell's
      "mental health evaluation" without explanation of its contents
      --From attorney Harris's files.

32.   Letter, July 18, 2005, attorney Callahan to Dr. Ferrell on testimony
      --From attorney Harris's files

33.   Exchange of notes between Castillo and attorney Callahan during
      trial wherein attorney states that Dr. Ferrell will testify that mental
      health (IQ?) is within normal parameters and that Dr. Ferrell will
      testify that Castillo would not be a future danger in jail.
      --Extracted from purple covered trial note book, App'x Tab 9.
      --From attorney Callahan's files.

34.   Affidavit of defendant's mother, June Castillo

35.   Dysfunctional family history section of federal presentence
      investigation report
                                    iv
      --Extracted from attorney Callahan's files.

36.   March 7, 2005 letter, attorney Callahan to Castillo saying he
      he would respect Castillo's wish not to have mother testify.
      --Taken from attorney Callahan's files

37.   May 20, 2005 letter from attorney Callahan to Castillo about collect
      call.
      --Taken from attorney Callahan's files

38.   Attorney Callahan's June 10, 2005 letter to defendant's mother June
      Castillo with returned envelope.
      --Taken from attorney Callahan's files

39.   Attorney Callahan's letter to Castillo's sister not sent until
      July 29, 2005.

--Taken from attorney Callahan's files

40. Callahan note to Castillo given during trial advising
jailed inmate to get his father to testify.
--Taken from attorney Callahan's files

41. Sample opening argument by present habeas attorney

42. Affidavit on standard of care, San Antonio capital murder
defense attorney Mike Gross

43. Castillo's notes to his attorneys during trial regarding sleeping
jurors.
- "Every day of the trial, Ms. Cedillo is …
--Taken from Castillo trial files.
- "I hope Ms. Cedillo don't fall asleep this morning."
--Taken from attorney Harris's files.

44. Letter, February 18, 2005, attorney Callahan to Castillo regarding
client's depression
--Taken from attorney Callahan's files

45. Letter, attorney Callahan to Castillo on if Castillo intended to
testify
--Taken from attorney Callahan's files

46. Kevin Watts death penalty opinion from Texas Court
of Criminal Appeals
--From attorney's files

47. Plagiarized brief for Kevin Watts death penalty appeal
--Taken from attorney Callahan's files

48. Plagiarized additional point for appeal brief
--Taken from attorney Callahan's files

49. Actual appeal brief in Castillo
--Taken from attorney Callahan's files

50. Attorney Callahan's $15,000 attorney fee voucher for

--Taken from attorney Callahan's files

60.   Ltr, April 11, 2006, Castillo to Judge Herr asking that Callahan
      be replaced with new appellate counsel so that issues on
      ineffectiveness of counsel could be raised.
      Taken from Bexar County District Clerk files

61.   Ltr, May 8, 2006, Callahan to Castillo that writ attorney will
      present a claim on ineffective assistance of counsel in writ
      application.
      --Taken from attorney Callahan's files

# Exhibit 31

# Vincent D. Callahan
## Attorney
### Laurel Heights Station

San Antonio T▮

April 1, 2005

Juan E. Castillo
Bexar County A.D.C. CD-16

San Antonio TX 78207

RE:   *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
      186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

Please find enclosed a copy of the mental health evaluation presented by Dr. Jack Ferrell.

On 3/24/05 at 4:05 p.m. I spoke to Carlos Jason Castillo by telephone. He indicated to me that he would not assist you in your jury trial as an alibi witness. I did ask him to consider my letter about being an alibi witness before he would make a final decision. He indicated only that he would read the letter. On 3/29/05 the prosecutor indicated that he was again submitting one of the recovered ski masks for DNA evaluation. When I receive said test results I will immediately let you know.

On 3/30/05 I attended the Francisco Gonzalez hearing on his Motion to Suppress Statements. Francisco Gonzalez's statement inculpates you in a robbery of the now deceased complainant planned by you, Francisco Gonzalez and Deborah Espinoza. The Trial Court ruled said written statement admissible at his trial (unless he testifies at your trial said statement would not be admissible). To date neither co-defendant has reached a plea bargain agreement with the State. I will stay in touch.

Sincerely,

Vincent D. Callahan
VDC/ar
CC:   Bill Harris, Esq.

# Vincent D. Callahan
## Attorney
### Laurel Heights Station

San Antonio TX ███████
Telephone/Fax ███████

July 18, 2005

Dr. Jack Ferrell
Clinical and Forensic Psychologist
███████████████

San Antonio TX ███████

     RE:   *State v. Juan Castillo*, No. No. 2004-CR-1461-A
             186th Judicial District Court, Bexar County, Texas

Dear Dr. Ferrell:

     Please be mentally prepared to testify on or about 8/26/05 or 8/29/05. For your information the defendant, Juan Castillo, has indicated to myself and co-counsel that he desires the death penalty in the event he is convicted of capital murder.

     I would hope that you would be able to tell the jury in your own words that so long as Juan Castillo is incarcerated that in your opinion there is no probability (more likely than not) that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. To save you any embarrassment while testifying please find enclosed a copy of the State's 404 B notice regarding Mr. Castillo's past criminal behavior. I will stay in touch.

Sincerely,

Vincent D. Callahan
VDC/ar
Enclosure
Cc: Bill Harris, Esq.

# Exhibit 33

Do you think this would be good? maybe; probably not

Ct. for Thurs. off. She won't do it, however, unless you give a good reason

Sir, do you really think that I'm going to have a grown ass man thats 12 years older than me doing as I say?

Yeah, yesterday I cant believe that Mr. Kuntz actually said that F.M.G. idolizes me.

argument was made by Bill Carter

What would Dr. Ferrell really have to say?
1. Your mental health is within normal parameters
2. In jail you would not be a future danger to society

State will do the rest. The DA will ask if you have evidence, I think you should put on Dr. Ferrill tomorrow morning

you could argue that it's considered a fact, only in the free world might you be considered a future danger in prison society

11-24-98 — 1-12-99, 4-26-00 — 7-31-00, 12-19-00 — 12-29-00,
5-11-01 — 4-3-02, 6-29-02 — 6-30-02, 7-20-02 — 9-4-03, 12-10-03 — present
6-7-02 + Federal custody

finish 1st

Who is this?
Aint that leading a witness? yes

all on The 404 b list — They're close to end

How many more witnesses do the state have?
I don't know where all that came from. I know about the guns & vests though.
Can I keep this form here? What medallions are they talk ing about

# Exhibit 34

## AFFIDAVIT OF JUNE R. CASTILLO

I, June R. Castillo, make the following sworn statement.

"My name is June Ridgway Castillo. My husband and some friends also call me Paula. I have personal knowledge of the matters set forth in this affidavit. I have no felony convictions. I am of sound mind and over age 18.

"I was born in Canton, Ohio on ███████████ I did not complete high school but I do have some college hours. I was a go-go dancer in Ohio. I left Ohio and arrived in San Antonio, Texas on December 26, 1968. I married Elias "Leo" Mojica-Castillo in Seguin, Texas on February 20, 1970. From this marriage, we had two children, a daughter Manuelita Castillo, now Kirby, born in San Antonio, Texas on █████████ ███████ and a son, Juan Eduardo Castillo, born in San Antonio, Texas on ████████ My daughter now lives in Whitman, Arizona.

"When Juan was age two, he had a tumor on his penis, which was surgically removed at Bexar County Hospital, now called University Hospital. This operation required removal of much of the skin on Juan, and it was very painful to him.

"I left San Antonio, Texas when Juan was two years old and went to Arizona to live. My husband did not come with us. Juan attended schools in Arizona from pre-kindergarten through the sixth grade in Arizona. Juan attended schools in Arizona up until he was age 12.

"He first attended Surprise Elementary School in Surprise, Arizona, which is a small town 'just over the train tracks' from El Mirage, Arizona. There, he attended pre-kindergarten through part of the fourth grade. These times were difficult. When Juan was age 7, there was a time when I considered putting Juan and his sister up for adoption. I even when so far as to pack their little clothes into black plastic trash bags. I did not go through with that action.

"In the latter part of the fourth grade through part of the fifth grade, Juan attended Anadaberg Elementary School in Whitman, Arizona. We did not have electricity the entire time we lived in Whitman. I would only buy groceries for each particular day and would place perishables in an ice chest and keep them cold with ice. I cooked food outside on a barbecue pit. This quality of life lasted a year. Class bullies picked on Juan while he was in Anadaberg Elementary School. White students picked on him because he was half-and-half: half Mexican and half Caucasian. Other school kids made fun on his Hispanic side. This bullying resulted in Juan's having to defend himself.

"In the summer before Juan entered the sixth grade, we moved to El Mirage, Arizona, and Juan attended fifth and sixth grades at Kingswood Elementary School in El Mirage, Arizona. His sixth grade classroom was divided down the middle with a partition wall; different classes were taught on each side of the wall.

1

"In the summer after Juan was in the sixth grade, his then 16-year-old sister Manuelita ran away from home. She had been almost a babysitter to Juan, as I was working days as manager of a movie rental place and then worked the graveyard shift at a gas station. She was gone three days, and I reported her as a missing child. Around the same time, police found the body of a murdered female whom police thought fit the description of Manuelita. I viewed the body, but it was not Manuelita. I had anger problems during that period of my life, and I acted out of those problems with both Manuelita and Juan. Manuelita ran away from home with her boyfriend, married and had children, and remains estranged from me to this day. This left me very depressed.

"Shortly thereafter, Juan and I left Arizona and moved around while Juan was age 12. This was in 1993. Juan did not attend schools during this time period. We lived in motels, homeless shelters, and in my old car, which we called 'Old Faithful.' We first went to San Diego, California. I had a female friend there who arranged for us to stay in different motels or hotels. That is the way we lived for several months. After I had a dispute with this lady, we started living in my car. We then went to Olivehurst, California, which is north of Sacramento. There, Juan and I stayed with my father until June. I then learned that my mother in Canton, Ohio was ill.

"Juan and I then left for Canton, Ohio. The trip took us about a month because I was constantly running out of money. We would stay in homeless shelters or in the car until we earned enough money to fill up the gas tank and move on. Juan thought the shelters were 'cool' because the staff would give us breakfast. Everyone in the shelter used the same bathroom. At a shelter in Gary, Indiana, there was a wild shoot out, and we hit the road.

"We got to Canton and my mother's place in 1993 and remained there through September 1994. Ohio would not admit Juan into school because Arizona school officials reportedly had not sent his school transcripts to Ohio. Arizona officials indicated that they had sent the paperwork. Thus, Juan was caught between officials of two states arguing with each other. As a result, Juan did not attend school in Ohio for the year and a half we were there. My mother had us leave. We tried staying with one of my nieces, but that did not work out. We had to live in my car. We got help from an organization that gave us money to live in some apartments called the Lynnwood Projects. Furniture was spare. We slept on mattresses on the floor. We lived in a predominately African-American neighborhood. Juan grew up in that culture and acted and spoke like African-Americans do.

"In September, Juan and I moved back to San Antonio. We first stayed with a relative on Pennystone Street. Juan was then age 13. Juan attended Rogers Middle School in 1974. I worked as a cashier at a K-Mart. Juan dropped out of school in the 7th grade. We left the home of the relative and lived in a motel for several months. Then, in February 1994, I bought a home on Gillette Boulevard in South San Antonio. I eventually lost the house because I got behind on mortgage payments. Juan's father Leo did not move into this home for another year and a half. Leo Castillo was diagnosed with a severe case of emphysema in late 1995 and was thereafter declared disabled. He still is

2

disabled. I have diabetes type II that is controlled by medication. I have mitral valve calcification and am at significant risk of getting bacterial endocarditis.

"While back in San Antonio, Juan attended an elementary school and an alternate school and dropped out in the seventh grade. When Juan was age 15, I put Juan on a Greyhound bus, and he visited his sister. This was the first time in years that he had seen Manuelita. He felt cooped up with her and felt like he was a burden. He stayed with a old school friend for a while, but also left that family because he felt he was a burden on them. Juan then lived on the streets in Arizona. He would wash dishes at a Denny's or an IHOP in return for meals. He lived on the streets or would sneak into a motel room to clean up. Juan returned to San Antonio several months later.

When Juan returned to San Antonio, his biological father Leo answered his phone call, and Juan came home to live. Juan worked as a waterproofer installing calking on buildings. Then he worked in the kitchen for a company called Aramark. Juan lived me at the time of the allegation."

"Further affiant sayeth not."

Signed on this day of October 24, 2009.

JUNE R. CASTILLO

STATE OF TEXAS

COUNTY OF BEXAR

SUBSCRIBED AND SWORN TO before me a notary public by **June R. Castillo** on the 24th day of October, 2009.

JOHN M. ECONOMIDY
Notary Public,
State of Texas
Comm. Exp. 04-24-12

NOTARY PUBLIC
State of Texas

3

# Exhibit 35

# IN UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | **PRESENTENCE INVESTIGATION REPORT** |
| | § | |
| JUAN EDWARDO CASTILLO | § | Docket No. SA-03-CR-080(1)FB |

**Prepared for:** Honorable Fred Biery
U.S. District Judge

**Prepared by:** Diana M. Lewis
Senior U.S. Probation Officer

San Antonio, Texas ▮▮▮▮▮▮

**Special Assistant U.S. Attorney**
Gerald H. Matheny
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100

**Defense Counsel**
Celeste Ramirez

**Sentence Date:** April 1, 2004

**Offense:** **Count One:** Possession of Firearm by Convicted Felon (18 U.S.C. 922[g][1]).  10 years/$250,000 fine.

**Release Status:** Arrested on July 22, 2002 by state authorities.  Placed in federal custody on May 7, 2003.  Released on $50,000 unsecured bond on September 4, 2003.  Arrested by state authorities on capital murder charges on December 10, 2003.  Federal bond revoked on December 23, 2003.

**Detainers:** None.

**Codefendants:** None.

**Related Cases:** None.

**Date Report Prepared:** March 12, 2004          **Date Report Revised:**

**Identifying Data:**          Juan Edwardo Castillo

**Date of Birth:**             ██████████
**Age:**                       22
**Race:**                      White/Hispanic
**Sex:**                       Male

**S.S. No:**                   ██████████
**FBI No:**
**USM No:**
**Other ID No:**               TXDL No.  None
                               TXSID No. ████████
                               TXID  No. ████████
                               SAPD No.  ████████
                               BCSO No.  ████████
                               SID    No. ████████

**Education:**                 Sixth Grade
**Dependents:**                Two (children)
**Citizenship:**               United States

**Legal Address:**             ██████████
                               San Antonio, Texas ████

**Aliases:**                   None



2

## PART C. OFFENDER CHARACTERISTICS

30. The following information was provided by the defendant. As of this writing, the probation officer has been unable to contact the defendant's mother.

### Personal and Family Data

31. Juan Edward Castillo advised he was born in San Antonio on ⬛⬛⬛⬛⬛⬛ Elias Mojica Castillo and June Ridgeway Castillo. He is the youngest of two children born to this union.

9

The defendant's sister, Manuelita Kirby, age 29, resides in Whitman, Arizona and the defendant has little contact with her.

32.     Mr. Castillo noted he had very little contact with his father for the first 13 years of the defendant's life. The defendant and his mother lived in Arizona, California, and Ohio before moving back to San Antonio in 1994. The defendant and his mother moved back in with his father and his parents continue to reside together, although not as husband and wife. The defendant's father, age 62, has a severe case of emphysema and is disabled. He is cared for by the defendant's mother, age 58, who is a homemaker. The defendant's mother also has health problems including diabetes, carpal tunnel syndrome, and recent knee surgery.

33.     The defendant indicated he married Priscilla Vera Castillo in Edinburg, Texas on March 15, 2002. They have one child, Julian Rene Castillo, now age 2, and she has a son, Jacob, age 7, who had been residing with her since February 2002. Ms. Castillo is currently incarcerated at the Plano State Jail facility in Dayton, Texas on the forgery and burglary charges alluded to in the defendant's arrest history. Since both parents are incarcerated, their son is living with the defendant's mother-in-law, Irina Guerrero. According to the defendant, Ms. Castillo does not have a substance abuse history or any mental or emotional problems.

34.     The defendant was involved in a three-year live-in relationship with Jessica Ramirez. They have one son, Juan E. Castillo, Jr., now age 5. This relationship was very volatile and the defendant was convicted of domestic violence against Ms. Ramirez on a couple of occasions. The defendant had not seen his son for two years until December 2, 2003 at which time they visited shortly before the defendant's arrest on the murder charge.

**Physical Condition**

35.     The defendant is 6'0" tall and weighs 165 pounds. He has brown hair and eyes. He has numerous tattoos including the San Antonio skyline on his right wrist; "Priscilla" and two children's faces on his right upper arm; an electric chair, "50", and "Jacob" on his left arm;

10

and "Hustler" and a Chinese symbol, and "03-20-02" on his stomach. Other tattoos are "Orejon" and "714294" on his right leg and "JEC" on his left leg. Mr. Castillo also has a scar on his left arm where he had a tattoo burned off. The defendant noted he is in good physical health.

### Mental and Emotional Health

36.   The probation officer has no information indicating the defendant has ever received treatment for mental or emotional problems. The defendant was required to participate in aggression counseling as a condition of probation, but he never complied. The defendant admitted he has been in fights since he was a youth. He acknowledges he has an aggressive nature, but insisted he only reacts after someone else starts a fight. Mr. Castillo has numerous arrests and/or convictions for violence where firearms were usually involved. He explained he had guns for protection since, in his neighborhood, nine out of ten persons carry a gun.

### Substance Abuse

37.   The defendant related he consumed alcohol on only five occasions in his life, the first being at age 16 and his last drink on December 2, 1999. He also tried marijuana on one occasion. He admitted he sold drugs as a juvenile, but did not use them.

### Education and Vocational Skills

38.   The defendant reported he withdrew from Kingwood Elementary School in Kingwood, Arizona, in the seventh grade. He advised he took General Equivalency Diploma (GED) classes while incarcerated, but does not have a GED.

11

## Employment Record

39. The defendant has been unemployed since approximately March 2001. He is currently incarcerated.

40. According to employment records, the defendant was last employed from October 12, 2000 until March 22, 2001 as a general utility worker with Aramark Corporation in San Antonio earning $6.50 an hour. The manager with B&R Building Maintenance Inc. verified the defendant was employed as a custodian from September 28, 2000 until October 11, 2000 earning $5.35 an hour. The defendant left employment to work for Aramark. According to the defendant, he was also employed for a month in 1998 with Weiners and two months in 1998 for Tito's Restaurant. A Social Security earnings statement reflects no earnings for 1992 through 1997. It verified employment with Titos and Wieners in 1998 for a total of $749 in earnings for the year of 1998. Records also reflect a total of $566 in earnings with Grady's BBQ in 1999, a total yearly earning of $2,828 in 2000 with Aramark, Texas Staffing Service, and B&R Building Maintenance, and a total yearly earning of $2,325 in 2001 with Aramark.

## Financial Condition: Ability to Pay

41. The defendant prepared a financial statement in which he reported his only assets was a 1985 Montecarlo which was inoperable and which he gave to Carlos Castillo. He noted his only liability was an AT&T phone bill which he never paid. According to a Trans Union credit report, he has a total of $261 in debt which has been placed for collection. These included debts to Dr. F. Garris, Southwestern Bell, and Petes Paging. The defendant's counsel has been appointed by the Court.

42. Based upon the defendant's financial profile, it appears he does not have sufficient assets to pay a fine within the guideline range in a lump sum. The Federal Bureau of Prisons has a voluntary Inmate Financial Responsibility Program and, if employed while incarcerated, the

# Exhibit 36

# Vincent D. Callahan
## Attorney
### Laurel Heights Station

San Antonio TX

March 7, 2005

Juan E. Castillo
Bexar County A.D.C. CD-16

San Antonio TX

     RE:   *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
            186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

     I received your letter postmarked 2/28/05. I will respect your directive and not call you mother as a witness in your punishment phase, if any.

     You would have to testify as to the lies in the Federal Pre-Sentence Investigation Report; I have decided not to attempt to allow the jury to review this report.

     I expect to soon receive Dr. Jack Ferrell's mental health evaluation which I will send to you. Investigator Tommy Caldwell's main function was to find your alibi witness, Carlos Castillo. I have located him and written letters, and will continue to do so but he has not yet responded. This is a very bad sign.

     When I find out which of the two alleged co-defendants will testify against you I will immediately let you know. To date the State has not yet reached any plea bargain agreement with either of the two co-defendants.

     Regarding the photograph that you sent to me of a car fitting the description of one owned by co-defendant Francisco Gonzales' sister, Lucinda Gonzales, I will soon decide whether or not to tender same to the prosecutor. What greatly concerns me regarding this car is your association, if any, with it. Also, your association with co-defendant, Francisco Gonzales. Where and how did you obtain this photo? I will stay in touch.

Juan Castillo
March 7, 2005

Page 2

Sincerely,

Vincent D. Callahan

VDC/ar

Cc:  Bill Harris, Esq.

# Exhibit 37

# Vincent D. Callahan
## Attorney
### Laurel Heights Station



San Antonio TX

May 20, 2005

Juan E. Castillo
Bexar County A.D.C. CD-16

San Antonio TX

     RE:   *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
           186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

     I acknowledge receiving your attempted collect phone call.

     You have earlier indicated that you do not desire your mother to testify at either phase of your jury trial, I think it would be wise to present her testimony during the punishment phase, if any, so that the jury can see that you are a loved person who had some family trouble while you were a young person. Without her testimony the jury will no doubt speculate that you have grown beyond even a mother's love; this would make a very bad impression on the jury.

     I will soon file a requested jury charge on the lesser included offense of felony murder in an effort to assist the jury to not find guilt for capital murder. I will stay in touch.

Sincerely,


Vincent D. Callahan

VDC/ar
CC:  Bill Harris, Esq.

# Exhibit 38

# Vincent D. Callahan
## Attorney
### Laurel Heights Station



San Antonio TX

June 10, 2005

June Castillo

San Antonio TX

RE:   *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
        186th Judicial District Court, Bexar County, Texas

Dear Mrs. Castillo:

Your son's trial begins on 8/23/05 in the 186th Judicial District Court, 300 Dolorosa, San Antonio, Texas 78205.  The State persists in its intention to seek the death penalty.  I would like to present to the jury during the punishment phase, if any, of the trial concerning your son's upbringing and character.  I know that this will be very difficult for you to do; in fact your son has asked me not to involve you in his case to save you any shame and embarrassment.

You can expect to testify perhaps on 8/26/06.  I will stay in touch.

Sincerely,


Vincent D. Callahan

VDC/ar

Cc:   Bill Harris



Vincent D. Callahan
Attorney
San Antonio TX

_AMK_

temporarily not in
Service
disconnected

June Castillo
San Antonio TX

# Exhibit 39

# Vincent D. Callahan

## Attorney

Laurel Heights Station

San Antonio, TX ▓▓▓▓

July 29, 2005

Mrs. Litta Kirby

▓▓▓▓▓▓▓▓▓▓

Wittmann, AZ ▓▓▓

RE:   *State v. Juan Castillo*, No. No. 2004-CR-1461-A
186th Judicial District Court, Bexar County, Texas

Dear Mrs. Kirby:

I am the court appointed attorney for your younger brother, Juan Castillo, whose capital murder trial wherein they are seeking the death penalty begins 8/23/05. I have been unsuccessful in my attempts to secure at his trial the presence of his mother who would be able to tell the jury at the punishment phase, if any, about the background and character of her son.

It is important that someone from Mr. Castillo's family who knows about his past come to trial and give said testimony to the jury. Please consider coming to San Antonio to testify on Mr. Castillo's behalf. If you so desire you should be ready to testify the morning of Friday, 8/26/05 at 9:00 a.m. If you cannot afford the cost of travel and motel, I will ask that the trial court reimburse you for said costs based on original receipts.

Mr. Castillo is very reluctant to involve any of his family members in his criminal proceeding but I think that someone in his family needs to testify on his behalf. I await your prompt reply.

Sincerely,

*Vincent D. Callahan/ar*

Vincent D. Callahan
VDC/ar
Cc:   Juan Castillo
Bill Harris

# Exhibit 40

It says $100.00 not $1,200.00.

ask ya father to
testify that he,
basically abandoned
you as a youth so
that you grew up without
a father.

My dad didn't abandon me my mom
basically took me & my sister
—Well, then that point
being you had no father

Sir, if some one was wearing gloves or a
long sleeve shirt would the G.S.R. show
up? No
Is this witness going to be the last one?

# Exhibit 41

# *OPENING STATEMENT— DRAFTED BY HABEAS ATTORNEY*

## Introduction

- May please the court
- ID self & 2d Chair
- Proud to represent Juan Castillo

## Hit Hard & Fast: ID Killers

## Defendant NG

- This is the case of the Lover's Lane Case.
- Planned and executed by Frank Gonzales & his wife and Debra Espinoza—all long time drug addicts.
- Juan Castillo had no involvement in this case & his innocent.

## Factual Scenario:

- Frank Gonzales, his wife Teresa Quintero, & neighborhood hooker Debra Espinoza have been drug addicts for years & years.
- They commit crime to feed their addiction.
- Dec. 3, 2003—Debra suggested to Frank that they rob Tommy Garcia, Jr.—known as JR. She had had sex w/ the 19 Y/O DJ.
- She phoned a friend Rob Jimenez, who was w/ JR.
- Lured JR to pick her up w/ promise of sex.
- She had JR her to a location locally known as a lover's lane.

- Teresa let out Frank near corner, and he comes up on passenger side while Teresa is giving JR oral sex in that seat.
- Frank has a gun & smashes out the raised window by the sexual partners.
- When JR seeks to escape, Frank G. guns down JR.
- Neighbor reports the shooting immediately and police arrive within minutes.
- Debra runs to a nearby house.
  → Does not call 9-11 or police.
  → Calls the person, Rob Jimenez, whom she called to set up JR.
- Teresa Quintero speeds off and leaves her husband Frank stranded.
- Frank G. *flees, discards his gun, gloves, and ski mask.*
  → His gun & gloves are not recovered.
- 5 police cars race to the scene, and a lead patrol car orders the officer behind him to stop a fleeing suspect.
- That suspect: Frank G.
- Frank Gonzales flees from officer and is captured.
- Claims *he* had just been robbed & officer should let him go to chase all these guys.
- Police arrest both Frank G. & Debra Espinoza. Teresa Quintero makes good her escape.

1

### *Magistrate's Office*
- Define Magistrate's Office.
- There, Frank G. sees Debra thru glass—signals by hand gestures: zip your life. (Demonstrate)
- She signals back that she will.
- Debra gives a statement and says it was Frank.
- Frank learns of this and screams to officers, "that f--ing b-, it was that whore's idea to do it"?
- In her initial statement to police, Debra never mentions Juan Castillo as being involved.
  - Hard to do so, as he was not involved.
  - Police set up roving quadrant—Juan Castillo was no where in the area.

### *Quote Abe Lincoln on Lies*
- "No man has a long enough memory to be a successful liar."
- Certainly true here.
- Debra Espinoza is *out on bond* and is *communicating with Frank's family on how to save gunman Frank Gonzalez.*
- *You will hear many contradictions made under oath.*
  - →Frank will contradict himself and Debra.
  - →Debra will contradict herself and Frank.
  - →The physical evidence will contradict both of them.
- *Every time you hear a contradiction or see the physical evidence contradict testimony, just say to yourself→this drug addict & career criminal cannot*

*be believed*—It's reasonable doubt!

### *Evidence Favoring Juan*
- Their lies will not impress you.
- You should be impressed, however, by the total lack of physical evidence against Juan:
  - →CSI never ties the shooting to Juan→There are no ballistic tests or gunshot residue tests on Juan.
  - →CSI finds fingerprints, but the prints do not belong to Juan.
  - →Despite the massive dragnet that night, Juan is not at the scene. You will find no footprints tying Juan to the crime scene.

### *Empathy for Family of JR*
- Our hearts go to JR's kin.
- They remember JR with:
  - →Words that weep.
  - →Tears that speak.
- This is not a time to let emotions rule.

### *Serpent Tongues*
- Do not let emotions guide you.
- Do not let lies sway you.
- Do realize that career criminals slither out of the privies to lie like a serpent to save their own skins.
  - →Jail Snitches lie.
  - →Drug addict Frank Gonzales and his family lie.
  - →Neighborhood hooker & drug addict Debra Espinoza lie.

### *Reasonable Doubt Closing*
- Juan C not involved in Lover's Lane Case.
- RD→Not guilty.

2

# Exhibit 42

### AFFIDAVIT OF MICHAEL C. GROSS
### REGARDING STANDARDS OF PERFORMANCE
### IN TEXAS DEATH PENALTY CASES

I, Michael C. Gross, am over age 21, have personal knowledge of the matters stated herein, and do not have a felony conviction. I make the following statement under oath.

I am a 47-year-old attorney who specializes in criminal defense law in San Antonio, Texas. I am familiar with the standards of performance expected of criminal defense attorneys in a death penalty capital murder case in San Antonio, Texas and Texas itself.

I was graduated from Trinity University with a bachelor of arts degree in 1984 and from St. Mary's University School of Law with a *juris doctor* degree in 1987. I have been admitted to practice before the Texas Supreme Court and the Texas Court of Criminal Appeals, the Supreme Court of the United States, the U.S. Court of Appeals for the Fifth and Tenth Circuits, the U.S. Court of Appeals for the Armed Forces, and the U.S. District Courts for the Western, Eastern, Northern, and Southern Districts of Texas. I am board certified in criminal law by the Texas Board of Legal Specialization and I am certified as a Criminal Trial Advocate by the National Board of Trial Advocacy.

My practice is devoted exclusively to criminal law. I have represented numerous death penalty capital murder clients at the trial, appeal, state writ, and federal writ level. In my practice, I have defended death penalty clients at the trial level eight times, on state appeals 10+ times, at the state writ level 10+ times, at the federal writ level 10+ times, and at the U.S. Supreme Court 5+ times. I have had dismissals and acquittals and relief at the habeas level in death penalty capital murder cases. I was counsel of record at the state appeal, state writ, federal writ district court, and federal writ at the U.S. Court of Appeals level in the recognized death penalty case of *Panetti v. Quarterman*, for which the U.S. Supreme Court finally granted relief. I also have litigated and appealed numerous non-death penalty murder cases.

As a result of this background, I am aware of the minimum standards expected of criminal defense attorneys in a death penalty capital murder case in San Antonio and Texas. These standards exist today and they existed in 2005.

- ***Initial Contact***. Capital defense counsel has a duty to make personal contact with the capital client within 24 hours of counsel's entry into the case. Personal contact means face-to-face contact.

- ***Continuing Personal Contact***. Capital defense counsel has duty to engage in a continuing interactive personal dialogue with all matters that might reasonably be

expected to have a material impact on the case, including but not limited to the following items:

● The progress and prospects for the factual investigation and discovery in the case and what assistance the client might provide to it;

● Current or potential legal issues;

● Development of a defense theory;

● Presentation of the defense case;

● Disposition of the case;

● Litigation deadlines and the projected schedule of case-related events;

● Relevant aspect of the client's relationship with correctional, parole, or other government agents, including but not limited to medical providers and state psychiatrists.

● Development of cross-examination of prosecution witnesses;

● Strategy of the case;

● Development of matters in extenuation and mitigation;

● Resolution of actual or perceived conflicts or dissatisfactions between client and counsel;

● Addressing any deterioration of the capital client's mental condition; and

● Advising the client of the client's legal rights and preparing the client for testifying if the trial if the client indicates he wants to testify or is indecisive in making a decision to testify.

→Capital trial counsel is **not** providing effective assistance of counsel if he has only a single visit with his death penalty client the week of counsel's appointment and then fails personally to visit the client in jail until after the capital murder case is over almost 20 months later.

● _**Investigation**_. Capital defense counsel has a duty to conduct a proper investigation in defending a death penalty client, including but not limited to the following matters:

● Counsel should visit the crime scene at approximately the same

time that the crime occurred. Counsel should note and record locations of relevant events lighting conditions, and physical layouts.

● Counsel or his investigator should include extensive interviews with the client to determine background information on the case, any potential defenses, the identity of any witnesses available for guilty – innocence, or on punishment; the names and addresses of all available family members; medical history, educational history, criminal history (including the specific facts of all past involvement in criminal activity or criminal convictions).

→ Counsel should provide such reports or statements or their substantially verbatim equivalent to the capital client, although personal identifying information on witnesses such as dates of birth, social security numbers, addresses and phone numbers should be redacted out.

→Counsel has a duty to investigate family matters and mitigation matters even if the death penalty client or his family disapproves of such matters. The defense attorney makes these decisions—not the death penalty client or his family.

● Informal discovery requests should be made to law enforcement or the district attorney for witness statements, police reports, witness lists, physical evidence, names of co-defendants (and any deals made with witnesses to testify); search and arrest documents, copies of written or oral or video-recorded statements of the defendant.

● Counsel should interview family members and other relevant witnesses to the defendant's mental health condition.

→If counsel detects that the capital client is deteriorating, counsel has a duty to address this matter or bring it to the attention of a court-appointed defense mental health expert or detention facility medical personnel for a successful resolution.

● Counsel has a duty to review the client's entire criminal history, including obtaining copies of prior conviction records, arrests, court transcripts, juvenile records—including psychological testing, if any,

● Counsel has a duty to plan and to execute a trial strategy before *voir dire* begins. This strategy includes discovery requests, pretrial motion practice, jury selection, cross-examination techniques of State witnesses, probably legal issues arising during trial, presentation of the defense case, possible rebuttal issues, jury charge issues, final argument strategy, sentencing case strategy, and sentencing argument.

→Capital counsel is **not** providing effective assistance of counsel if he delays preparation of cross-examination until after *voir dire* is completed. Capital counsel is **not** providing effective assistance of counsel if he fails to prepare cross-examination for any witness subpoenaed by the prosecution.

- Counsel owes a duty to particularly investigate and review the client's possible mental retardation under *Atkins v. Virginia*, 536 U.S. 304 (2002).

- Counsel owes a duty to particularly investigate and confirm the client's age as over 17 years in light of *Roper v. Simmons*, 534 U.S. 551 (2005).

- Counsel owes a duty not to ask questions whose answer will enhance, promote, or bolster the credibility of prosecution witnesses in general and accomplice witnesses in particular. Counsel owes a duty to control law enforcement personnel so that they do not bolster the credibility of prosecution witnesses or the prosecutions case.

- Counsel has a duty to investigate for the punishment phase of the trial, especially for the following aspects:

    - Development of character witnesses and family background evidence, and, where applicable, records and witnesses from additional sources, including military, school, hospital, past employment sources, to corroborate mitigating evidence theories;

    - Development of expert witnesses on mental health issues, if any;

    - Development of rebuttal witnesses or vigorous cross-examination of witness for State's extraneous offenses, if any;

        - Development of the defendant's testimony, if any.

        - Planning of cross-examination of State witnesses;

        - Preparation for jury charge issues; and

        - Preparation of final argument.

- Counsel at every stage have an obligation to conduct a full examination of the defense to the client at all prior phases of the case. The obligation involves at a minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

- Counsel at every stage have an obligation to satisfy themselves that the official record of the proceedings is complete and to supplement it as appropriate.

- Counsel has a duty to file notices under Texas Rule of Evidence 404(b) and to seek the prosecution's witness list.

### *Trial Conduct*

- Capital counsel owes a duty to develop a cogent trial strategy from opening statement to final argument.

→The opening statement should not be contradicted by the final argument.

● Capital counsel owes a duty to subpoena defense counsel to insure that they will show up and to insure that he has laid the requisites for a writ of attachment should the witness fail to appear.

● When capital counsel determines that key evidence should be admitted, such as educational records, information from an earlier presentencing investigation report, or psychiatric evidence, capital counsel owes a duty to introduce such evidence, particularly when counsel advises the capital defendant he will do so.

● Counsel owes a duty not to file motions that are not meritorious.

● Counsel owes a duty in a death penalty case to have knowledge of the law of capital cases and the necessary litigation skills to defend a capital murder case. Capital counsel owes a duty to familiarize himself with the facts of the case and the witnesses in the case.

● Counsel owes a duty to prepare his own defense witnesses for trial and to have the skill and judgment to determine if the witness will provide a material benefit to the defendant or hurt the credibility of the defendant or defense attorney in the eyes of jurors.

● Counsel owes a duty to conduct *voir dire* so as to eliminate undesirable jurors or to educate those jurors who do not grasp capital sentencing law.

● Counsel owes a duty to object to sleeping jurors, to move for a mistrial, and to preserve the record when jurors nap.

● Counsel should not concede guilt in final argument based on a misunderstanding of the law involved in the case.

● When a capital defendant expresses a desire to defend himself, capital counsel owes a duty to met personally with the client to resolve these desires. If the client persists in his desire for self-representation, counsel owes a duty to bring the client's desires to the attention of the court for *Faretta* warnings and resolution. If counsel perceives any fact that suggests that the client lacks capacity or competency to make such a decision, including but not limited to depression, counsel should bring that matter to the attention of the court.

● When conflicts with trust have arisen pre-trial or during trial, or both, defense counsel ordinarily should not be appeals counsel in the same case. When there is evidence to suspect that ineffectiveness of counsel is an issue, defense counsel in a capital case owes a duty not to be appeals counsel in the same case.

Further affiant sayeth not.

MICHAEL   C.   GROSS

STATE OF TEXAS

COUNTY OF BEXAR

SUBSCRIBED AND SWORN TO before me by **Michael C. Gross** on this _16ᵗʰ_ day of October, 2009.

NOTARY PUBLIC
State of Texas

JOHN M. ECONOMIDY
Notary Public,
State of Texas
Comm. Exp. 04-24-12

# Exhibit 43

My I.D. was found at Carlos.
It was a Duplex. ████████

Every day of the trial Ms. Cedillo is always falling asleep. I think an alternate should be stepping in.

Why didn't she say that when she took the stand.

D.E. should be called back to the stand so she can dig a deeper hole.

He's lying about what he said about me.

I hope Mr. Cedillo dont fall asleep this morning

May 21 is when I got moved back to CD in #16 cell.

Where is all the victim's family?

What is the argument on the cuts on my hand?

I still had blood on my hand when I got arrested cause I cut my hand the day I got locked up.

I only asked Mr. Perdigone Every thing I asked him, I asked him because Mr. Callahan told me to ask him

I never told any one that F.M.G "snitched" on me because I'm not guilty. F.M.G is busting me.

& how am I going to say that I got a cell phone if F.M.G stated himself that the had the comp's cell phone.

Was there any phone calls made on
the campus phone?
It aint me!

Then fucken telling you I aint do this
shit.

# Exhibit 44

# Vincent D. Callahan
## Attorney
### Laurel Heights Station

███████████

San Antonio TX████████████

████████████████████████

February 18, 2005

Juan E. Castillo ███████████
Bexar County A.D.C. CD-16
████████████████
San Antonio TX███████████

     RE:  *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
           186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

     I received your letter postmarked 2/16/05.  I understand the depression that you are presently experiencing, but you must not give in to negativity as it would hurt your testimony before the jury.

     I gather from your letter that you do not wish me to attempt to stipulate with the prosecutor to the admissibility of your federal pre sentence investigation report. I will not therefore make this attempt.  The information about your troubled and dysfunctional upbringing will have to be presented either through your mother or yourself.

     I have not yet received a response from Carlos Castillo.  I am sending him another letter asking for his assistance in this case a copy of which is enclosed.

     Your attorneys do care about your life and we will use our best wits to help you avoid a capital murder conviction and death sentence.  A lengthy delay in your jury trial works to your advantage; recall that you could not be at liberty during the time that you have been at the Bexar County Jail because considering your Federal conviction.  I will stay in touch.

Juan E. Castillo
February 18, 2005

Page 2

Sincerely,

Vincent D. Callahan

VDC/ar

Cc: Bill Harris, Esq.

# Exhibit 45

# Vincent D. Callahan
## Attorney
### Laurel Heights Station



April 8, 2005

Juan E. Castill███████████
Bexar County A.D.C. CD-16
████████████████
San Antonio TX████████

RE:   *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
      186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

I received your letters postmarked 4/5 & 4/6/05. Please tell me whether or not you will testify and present your alibi defense at your presently unscheduled upcoming jury trial; the law requires that a written notice of alibi be timely presented to the District Court.

As of 4/4/05 the State has not reached any plea bargain agreements with either of the co-defendants; if and when this happens I will immediately let you know.

Out of court statements by either co-defendant are not admissible at your trial unless said co-defendant appears to testify at your trial against you.

It is likely that a second DNA test will take slightly shorter than the first one. When I receive said test results I will let you know.

I acknowledge receiving four additional photographs of that car. I will stay in touch.

Sincerely,


Vincent D. Callahan
VDC/ar
CC:   Bill Harris, Esq.

# Exhibit 46



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-74,593

---

### KEVIN WATTS, Appellant

v.

### THE STATE OF TEXAS

---

### APPEAL FROM
### BEXAR COUNTY

---

*PER CURIAM.*

On February 13, 2003, the appellant was convicted of capital murder,[1] an offense that occurred on March 1, 2002. Pursuant to the jury's answers to the special issues set forth in Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] The appellant raises three points of error. We affirm.

---

[1] *See* TEX. PENAL CODE § 19.03(a)(7).

[2] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *See id.,* § 2(h).

The first point of error in the appellant's brief complains that "the trial court erred (abuse of discretion standard) when during the punishment phase it admitted evidence of [his] future membership in a black racist prison gang against [him] in violation of *Dawson v. Delaware,* 503 U.S. 159 . . . (1992) (constitutional error to admit evidence of defendant's membership in white racist prison gang where that evidence was not relevant to any issue being decided at the punishment phase)." The appellant complains that during punishment, "the State was allowed over objection to show the jury a hand written letter from [him] written from the Bexar County Adult Detention Center while [he] was awaiting trial." He also complains that, in its evidence and its jury arguments, the State attempted to unfairly prejudice the white jury with his past, present, and future membership in racist black gangs. Specifically, he claims that the trial court improperly allowed Sergeant Ricardo Vijil, Sergeant Mark Gibson, Sonia Watts, and Tonya Prince to testify as to his gang membership, improperly allowed the admission of a letter he wrote while incarcerated, and improperly allowed the prosecutor to refer to his gang membership during the punishment phase of trial.

"As a prerequisite to presenting a complaint for appellate review, the record must show that (1) the complaint was made to the trial court ...."[1] The appellant has not satisfied this prerequisite.

During the punishment phase, the State introduced Exhibit 105-A, a letter written by the appellant while in jail describing how he wanted to become a member of the Black Gorilla Family prison gang. The appellant objected to the admission of the letter on the grounds that the letter had been obtained in violation of county-jail regulations and state and federal laws. The

---

[1] TEX. R. APP. P. 33.1 (a).

appellant never objected to the letter on *Dawson* or First Amendment grounds or even mentioned gang membership in his objection. Similarly, when the State questioned Sergeant Vijil about whether the appellant admitted that he was a member of a gang and Vijil answered affirmatively, the appellant objected on hearsay grounds. The appellant never objected on *Dawson* or First Amendment grounds or even mentioned gang membership in his objection. The appellant did not preserve a constitutional claim with respect to the introduction of the letter into evidence or Vijil's testimony because his objections at trial do not comport with the claim he now raises on appeal.

The appellant also complains about testimony by Sergeant Gibson. However, it was the appellant who elicited testimony from Gibson about gang affiliation; when Gibson testified about gangs, the appellant did not object. In regard to Watts's and Prince's testimony about gangs, the appellant also made no objection. Similarly, the appellant made no objection to the State's reference to his gang membership during its closing punishment arguments. Because the appellant failed to object at trial, he has not preserved error for our review. Point of error one is overruled.

In his second point of error, the appellant argues that his "sentence of death is grossly proportionate [*sic*] to the crimes committed in violation of the Eighth Amendment [to the] United States Constitution (cruel and unusual—evolving standards of decency—proportionality)." He asks this Court "to revisit [our] holdings in the light of legally evolving standards of decency" and conduct a proportionality review. We have previously held that this Court does not conduct proportionality reviews in this context. *Ladd v. State*, 3 S.W.3d 547, 574 (Tex. Cr. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). Point of error two is overruled.

Watts- 4

In point of error three, the appellant complains that "the death penalty sentence violates the Eighth Amendment [to the] United States Constitution (cruel and unusual)." We have previously rejected this argument. *Brooks v. State*, 990 S.W.2d 278, 288 (Tex. Cr. App.), *cert. denied*, 528 U.S. 956 (1999). Point of error three is overruled.

We affirm the judgment of the trial court.

En banc.
Delivered December 15, 2004.
Do Not Publish.

# Exhibit 47

75,246

NO. AP-~~74,593~~

## IN THE COURT OF

## CRIMINAL APPEALS OF TEXAS

Juan Edward Castillo
~~KEVIN WATTS,~~

### Appellant

VS.

## THE STATE OF TEXAS,

### Appellee

---

APPEALED FROM THE 186TH ~~226TH~~ JUDICIAL DISTRICT COURT

OF BEXAR COUNTY, TEXAS

2004-CR-1461A

CAUSE NO. ~~2002-CR-3470~~

Maria Teresa Herr

JUDGE ~~SID HARLE~~, PRESIDING

---

### BRIEF FOR THE APPELLANT

---

**VINCENT D CALLAHAN**

████████████████

San Antonio, TX ████████

Telephone and Fax: ████

State Bar No. ████

**Court Appointed Attorney for Appellant**

No. AP-74,593

*Form.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. 2

TABLE OF AUTHORITIES ........................................................... 4

NAME OF PARTIES ...................................................................... 6

STATEMENT OF THE NATURE OF THE CASE ........................... 7

STATEMENT OF POINT OF ERROR ONE ................................... 9

POINT OF ERROR ONE ................................................................10

THE TRIAL COURT ERRED (ABUSE OF DISCRETION STANDARD)
WHEN DURING THE PUNISHMENT PHASE IT ADMITTED EVIDENCE
OF APPELLANT'S FUTURE MEMBERSHIP IN A BLACK RACIST
PRISON GANG AGAINST THE APPELLANT IN VIOLATION OF
DAWSON V. DELAWARE, 503 U.S. 159, 112 S. CT. 1093, 1098-1099, 117 L.
ED. 2D 309 (1992) (CONSTITUTIONAL ERROR TO ADMIT EVIDENCE OF
DEFENDANT'S MEMBERSHIP IN WHITE RACIST PRISON GANG
WHERE THAT EVIDENCE WAS NOT RELEVANT TO ANY ISSUE BEING
DECIDED AT THE PUNISHMENT PHASE)....................................10

  i.    Statement of Facts: .........................................................10
  ii.   Argument and Authorities: ..............................................11

STATEMENT OF POINT OF ERROR TWO ....................................13

POINT OF ERROR TWO ................................................................14

APPELLANT'S SENTENCE OF DEATH IS GROSSLY PROPORTIONATE
TO THE CRIMES COMMITTED IN VIOLATION OF THE EIGHTH
AMENDMENT, UNITED STATES CONSTITUTION (CRUEL AND
UNUSUAL – EVOLVING STANDARDS OF DECENCY –
PROPORTIONALITY)....................................................................14

  i.    Statement of Facts: .........................................................14
  ii.   Argument and Authorities: ..............................................14

STATEMENT OF POINT OF ERROR THREE...................................19

POINT OF ERROR THREE...............................................................20

THE DEATH PENALTY SENTENCE VIOLATES THE EIGHTH
AMENDMENT, UNITED STATES CONSTITUTION (CRUEL AND
UNUSUAL). ..................................................................................20

*Use*

i.   Statement of Facts: ............................................................................20

ii.   Argument and Authorities: ...........................................................20

PRAYER .................................................................................................22

CERTIFICATE OF SERVICE.................................................................22

No. AP-74,593

# TABLE OF AUTHORITIES  FORM

## CASES

Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 2247, 153 L. Ed. 2d 335 (2002) ...........................................................................................15, 20

Boyle v. State, 820 S.W. 2d 122, 137 (Tex. Crim. App. 1989)..............................21

Cannon v. Texas, 106 S. Ct. 897 (1986)..................................................................20

Cantu v. State, 939 S.W. 2d 627, 648 (Tex. Crim. App. 1997)..............................14

Come v. State, 82 S.W. 3d 486, 491-492 (Tex. App. Austin 2002) ........................12

Dawson v. Delaware, 503 U.S. 159, 112 S. Ct. 1093, 1098-1099, 117 L. Ed. 2d 309 (1992) .................................................................................7, 9, 10, 11

Gregg v. Georgia, 96 S. Ct. 2909, 2950, 2975 (1976) ...........................................20

James v. State, 772 S.W. 2d 84, 101 (Tex. Crim. App. 1989) ...............................20

Johnson v. State, 691 S.W. 2d 619, 624 (Tex. Crim. App. 1984) ..........................14

Krumboltz v. State, 945 S.W. 2d 176, 177 (Tex. App. San Antonio 1997).............15

Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989)........20

Starkes v. Bowels, 682 F. Supp. 891, 893 (N.D. Tex. 1988) ..................................15

U.S. v. Lemons, 941 F. 2d 309, 319-320 (5th Cir. 1991).......................................16

United States v. Tampico, 297 F 3d 396, 402-403 (5th Cir. 2002) ........................12

Wade v. State, 208 S.W. 2d 101, Tex Crim. App. 1948) ........................................12

## RULES

Art. 37.071, Tex. Code of Crim. Proc. ...................................................................14

## TREATISES

4

.

No. AP-74,593

*FoRM*

Jeffersoniana..................................................................................................21

## CONSTITUTIONAL PROVISIONS

Eighth Amendment, United States Constitution.............8, 13, 14, 15, 16, 18, 19, 20

Fourteenth Amendments........................................................................20

5

## NAME OF PARTIES

who requested the not life at the next punishment phase

Indigent and incarcerated, ~~Kevin Watts~~ *Juan Edward Castillo* is the Appellant. Appellant was represented by ~~Gus Wilcox~~ *Vincent D. Callahan*, Esq. and ~~Tina Tussay-Cooper,~~ *Bill Harris* Esq. at ~~jury trial,~~ and

on appeal by Vincent D. Callahan, Esq.  The State of Texas is the Appellee and

was represented at trial by Assistant District Attorneys, ~~William Pennington~~ *David Lunan* and *Michael Anthony Reyes* ~~Rose Zebell.~~  Appellee has not yet designated counsel on appeal.

The guilt-innocence phase.

# STATEMENT OF THE NATURE OF THE CASE

Appellant was charged by ~~two paragraph~~ Bill of Indictment with capital murder ~~(double homicide and~~ homicide during robbery) *as a repeater* to have occurred on ~~March~~ *Dec.* ~~1, 2002.~~ *3, 2003.* The indictment was filed on ~~May 21, 2002~~ *Feb. 24, 2004* (~~Trans. Vol. 1, p. 141~~) *C.R. pgs. 4-5*.

Jury selection occurred from ~~January 10, 2003~~ *July 5, 2005* to ~~January 31, 2003~~ *Aug. 12, 2005*. On ~~February 10, 2003~~ *Aug. 22, 2005* Appellant entered a plea of not guilty before the jury (C.R. ~~Vol. 1, pgs. 382-383~~) *p. 169*. On ~~February 13, 2003~~ *Aug. 30, 2005*, the jury returned a verdict of guilty as charged (C.R. ~~Vol. 2, p. 383~~ *169*). On ~~February 19, 2003~~ *Sept. 1, 2005*, the jury answered probable future danger special issue number one 'yes', and any mitigation special issue number two 'no' (C.R. ~~Vol. 2, p. 383~~ *pgs. 147-148 169*). The court sentenced the Appellant to death on ~~February 19, 2003~~ *Sept. 1, 2005* (~~C.R. Vol. 2, p. 383~~ *RR. Vol. 22, p. 27*).

Judgment of capital murder, as charged in the indictment, imposing the death penalty was signed and entered ~~February 24, 2003~~ *Sept. 9, 2005* (C.R. ~~Vol. 2, pgs. 112-113~~ *157-158*).

On appeal Appellant presents three points of error of:

*(Form)*

1. The trial court erred (abuse of discretion standard) when during the punishment phase it admitted evidence of Appellant's future membership in a black racist prison gang against the Appellant in violation of <u>Dawson v. Delaware</u>, 503 U.S. 159, 112 S. Ct. 1093, 1098-1099, 117 L. Ed. 2d 309 (1992) (constitutional error to admit evidence of defendant's membership in white racist prison gang where that evidence was not relevant to any issue being decided at the punishment phase).

No. AP-74,593

2. Appellant's sentence of death is grossly disproportionate to the crimes committed in violation of the Eighth Amendment, United States Constitution (cruel and unusual – evolving standards of decency – proportionality).

3. The death penalty sentence violates the Eighth Amendment, United States Constitution (cruel and unusual).

8

No. AP-74,593

## POINT OF ERROR THREE

THE DEATH PENALTY SENTENCE VIOLATES THE EIGHTH
AMENDMENT, UNITED STATES CONSTITUTION (CRUEL
AND UNUSUAL).

i.      Statement of Facts:

Appellant raises this issue for the first time on appeal.

ii.     Argument and Authorities:

Appellant acknowledges that his position is in the minority. See: dissenting

Justices Brennan and Marshall, Cannon v. Texas, 106 S. Ct. 897 (1986).

"Adhering to our views that the death penalty is in all circumstances cruel and

unusual punishment prohibited by the Eighth and Fourteenth Amendments. Gregg

v. Georgia, 96 S. Ct. 2909, 2950, 2975 (1976), we would grant certiorari and

vacate the death sentences in these cases."

The law contains an evolving standard of decency. Even dissenting

Honorable Rhenquist so acknowledges. Penry v. Lynaugh, 492 U.S. 302, 109 S.

Ct. 2934, 106 L. Ed. 2d 256 (1989); and Atkins v. Virginia, 536 U.S. 304, 122 S.

Ct. 2242, 2247, 153 L. Ed 2d 335 (2002); Appellant did not waive his right to

legal evolution and thereby to assert a constitutional violation by failing to object

at trial where at the time of trial the right had not been recognized. James v. State,

772 S.W. 2d 84, 101 (Tex. Crim. App. 1989).

20

Case 5:12-cv-00924-XR   Document 16   Filed 06/28/13   Page 67 of 230

No. AP-74,593

"I shall ask for abolition of the punishment of death until I have the infallibility of human judgment demonstrated to me" Thomas Jefferson. Jeffersoniana.

Appellant acknowledges that this Court "is always hesitant to reverse a conviction for capital murder ..." Boyle v. State, 820 S.W. 2d 122, 137 (Tex. Crim. App. 1989). But such a judicial attitude is contrary to the spirit of the law which calls for evolving standards of decency.

The sentence should be reformed to life imprisonment.

Statement of point of E. Four

# Exhibit 48

No. AP-74,593

## STATEMENT OF POINT OF ERROR ONE   *Form*

The trial court erred (abuse of discretion standard) when during the

punishment phase it admitted evidence of Appellant's future membership in a

black racist prison gang against the Appellant in violation of <u>Dawson v. Delaware,</u>

503 U.S. 159, 112 S. Ct. 1093, 1098-1099, 117 L. Ed. 2d 309 (1992)

(constitutional error to admit evidence of defendant's membership in white racist

prison gang where that evidence was not relevant to any issue being decided at the

punishment phase).

9

POINT OF ERROR FOUR

The Evidence Is (at the Guilt-Innocence Phase) Legally Insufficient To Support The Conviction in violation of Art 38.14, Tex. Code Crim. Proc., and Burks v. State, 876 S.W.2d 877; Edwards v. State, 876 S.W.2d 877; 887 (Tex Crim App. 1994), cert den. 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995) (Reversal and rendering required where incriminating independent of the accomplice witness evidence, does not tend to connect the defendant to the offense).

1. <u>Statement of Facts</u>

In pertinent part, The record of the guilt-innocence phase; reveals that Francisco Gonzales (R.R., vol. 16, pgs 83-157) and Debra Espinosa (vol. 17, pgs 28-96), both accomplice witnesses as a matter of law (C.R., pgs 129-130), directly inculpated Appellant in the capital murder of the complainant

/

However, the record fails to reveal any direct forensic or physical evidence of an incriminating character which tends to connect the appellant with the (robbery-murder) commission of the capital murder, for which he was convicted. In fact, the comp autopsy report (State's Exh. no. 145) reveals, regarding the proof of no robbery, that the complainant still possessed a wrist watch, a yellow metal bracelet, a yellow metal ring Texas shaped ring, a stud type earing, a plastic money clip with $124.00, a bag of marijuana and cigarette paper, $450.00 in paper money, and a black wallet with a Texas driver's license and social security card in the complainant's name along with miscellaneous papers and a photograph.

2

First outcry witness, John Medlick (R.R. Vol. 15, pgs 40-66), again regarding proof of no robbery, testified that he saw the a gold necklace still on the neck of the deceased complainant. (Vol. 15, p. 60, lines 8-12 ["... The only thing I remember seeing was he had a gold chain around his neck."] and p. 65, line 4).

To corroborate the accomplices' testimony regarding the robbery, the state offered the testimony of Jessica Cantu (R.R., Vol. 17, pgs. 108-122; Vol. 18, pgs. 8-14) that she had seen the appellant after the murder wearing a gold necklace similiar to the one owned by the complainant, and on cross examination she testified that the gold necklace with crucifix (Def's Exh's

3

Nos 4 and 5) was the necklace of
which she was speaking. It is
noteworthy that accomplice witness
Debra Espinosa had earlier testified
that while she was performing oral
sex on the soon to be deceased complainant,
he was wearing, "... a gold necklace,
kind of like a spinner necklace, like a
medallion..." (Vol. 17, p. 39, lines 11-16);
in short, a different necklace. INSERT A

To corroborate the accomplices (Vol. 13, pp. 7-78);
testimony regarding the murder, the
state offered the inculpating testimonies of Gerardo Gutierrez
Gonzales (B.R. Vol. 16, pgs. 169-197), younger sister
of accomplice witness, Francisco Gonzales,
and Bryon A. Brown (B.R. Vol. 17, pgs.
86-108), nephew of accomplice witness,
Francisco Gonzales. The latter two both testified in

4

INSERT 7L

The complainant's step mother, Mary Lou Lopez Garcia, (R.R. Vol. 15, pgs. 26-39; and Vol. 28, pgs 21-24), Testified (described) that her sons gold necklace as, "...it was a necklace spinning, like a spinning wheel of a necklace. Like a spinner... Like on a car rim that you might see spinning... the size of a silver dollar..." (Vol. 15, p. 29, lines 10-25; and p. 30, lines 1-10). Not a crucifix!

conven

in support of Francisco Gonzales' plea

agreement (they overheard the Appellant admitting

to shooting the complainant to a Third

accomplice as non-testifying accomplice

as a matter of law, Theresa Quintero,

that he shot the complainant somebody

the complainant or somebody. (R.R. Vol.

16, p. 184, lines 1-25; p. 185, lines 1-7;

p. 191, lines 10-22 [Lucinda Gonzales agrees to

lie about Theresa Quintero's involvement];

Vol. 17, p. 97, lines 8-25; p. 98, lines 1-2;

and p. 106, lines 2-9 [Bryon Brown states,

"...that Appellant admitted shooting somebody

"a lot of times"]). Lucinda Gonzales admitted

being furious that her brother, Francisco

Gonzales, was merely arrested for a murder

(R.R., Vol. 16, p. 184, lines 15-21); and that

she came forward, after moving in December,

5

administrator of Mrs. Tussie's estate. This should have resulted in a distribution to each of Mrs. Tussie's heirs of approximately $30,000.00, according to Patricia Strader, an investigator with the white collar crimes section of the District Attorney's office; however, each heir other than Butler received only about $5,000.00. From September 2001 until December 2001, Butler spent approximately $154,000.00 on furniture, a vehicle, and other items. Ultimately, Butler was indicted for theft and misapplication of fiduciary funds of an aggregate amount of $100,000.00 or more but less than $200,000.00. A jury found her guilty of the lesser included offense of misapplication by a fiduciary of property valued at $20,000.00 or more but less than $100,000.00.

## DISCUSSION

1.      In her first point of error, Butler argues the trial court erred in failing to instruct the jury that she "was a beneficiary, an owner of property, had title to property and right to the possession of the property as the seventh heir." However, Butler was not entitled to this instruction since, as she recognizes in her brief, the court's charge already instructed the jury that "no person may be convicted of theft or misapplication of property which is their own property." *Cf. Gonzalez v. State*, 954 S.W.2d 98, 103 (Tex. App.–San Antonio 1997, no pet.) (noting that fiduciary receives money in a fiduciary capacity "'when the business which he transacts, or the money or property which he handles, is *not his or for his own benefit*, but for the benefit of another person as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part'") (quoting BLACK'S LAW DICTIONARY 625 (6th ed.1990)) (emphasis added). ☐

2.      In her second point of error, Butler argues the State violated *Brady v. Maryland* ☐ by withholding the reporter's record of a hearing in the probate court, which Butler argues would establish that the probate court judge testified falsely. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

**BACK OF PRIOR PAGE**

2003, in May, 2005, when the plea bargain agreement offer to avoid the death penalty was made to Francisco Gonzales. (R.R., Vol. 16, p. 292, 16-25; and p. 193, lines 17-25; Vol. 18, p. 101, lines 1-25, p. 102, lines 1-25, and p. 105, lines 1-25, & p. 106, lines 1-17 and p. 106, lines 1-12)

It is noteworthy that Bryan A. Brown did not tell the police about Appellant's admission against interest (R.R., Vol. 17, p. 106, lines 2-9). Nor did Lucinda Gonzales. (R.R., Vol. 18, p. 79, lines 21-25; and p. 80, line 1 [Lucinda Gonzales had telephoned police before Dec. 8, 2003, to give information only about the location of a discarded gun by Francisco Gonzales; p. 96, lines 23-25; Case agent, Timm Detective Timm Angell (Vol. 18, pp. 62-108) testified that he was not able to locate or speak with Bryan A. Brown (Vol. 18, p. 88, lines 15-19). or Lucinda Gonzales for seventeen months after the offense

INSERT C

6

INSERT C

Francisco Gonzales testified that Lucinda Gonzales and Bryan A. Brown came forward to back him up, "... because they came on their own to try and help me." (Vol. 16, p. 134, lines 1-16).

Self confessed Ex-inmate Gerardo Gutierrez while incarcerated with the appellant, testified that, the Appellant admitted (complainant was shot seventimes) shooting somebody four times, during a robbe botched robbery. (R.R. Vol. 17, p. 10, lines 1-25). On cross examination Gerardo Gutierrez admitted lying when he had earlier admitted to being the North Side Killer in response to Francisco Gonzales calling himself the South Side Killer. (Vol. 17, p. 20, lines 24-25; p. 21, lines 1-25; Def's Exh. No's 22 and 23. He also admitted to earlier having a lady friend, Stephanie, who is a niece of Francisco Gonzales. (Vol. 17, p. 22, lines 8-22).

Appellant offered the testimony of inmate Ralph Edward Pedrigone (R.R. Vol. 20, pgs. 7—20) who testified that while he was an inmate with accomplice witness, Francisco Gonzales, who admitted killing the complainant, immediately after

7.

The television news about the complainants's homicide. (Vol. 20, p. 5, lines 1-14); he also testified that Francisco Gonzales had recently asked him the witness Pedrigone not to testify (Vol. 20, p. 5, lines 15-25).

Appellant gave no pre-trial statement; nor did he testify.

ii. Argument And Authorities

INSERT B

8

NO. 04-01-00500-CR

Nighttime across the street eyewitness, Quirina Martinez (R.R. Vol. 4, pgs. 59-96), saw a fight involving three unknown men (one had a beard and had been at the house before) and a female bystander. (R.R. Vol. 4, p. 63, lines 23-25; p. 64, lines 1-20; p. 65, lines 1-21; and p. 66, lines 4-25 [witness states that she observed one of the men leave after the fight]; and p. 70, lines 3-22). She testified further that after she then saw Daniel Chavez and John Peña arrive (R.R. Vol. 4, p. 69, lines 2-4). She stated that then Daniel Chavez and John Peña and the two other men, one of whom had a beard, and who likely opened the trunk of the white car, drove away (R.R. Vol. 4, p. 72, lines 1-23; p. 73, lines 1-25; p. 74, lines 1-25; p. 75, lines 1-17 [States Exhibit No. 16, the white car belonged to the Appellant's mother (R.R. Vol. 6, p. 50, lines 1-4)]. She then testified that she later observed the same two unknown men burning something that looked like clothes in a barrel (R.R. Vol. 4, p. 77, lines 14-25; p. 78, lines 1-25; and p. 1-17). On cross examination, Quirina Martinez could not identify the Appellant as one of the above unknown men, but did identify the man with the beard as looking like Ruben Ruiz (R.R. Vol. 4, p. 88, lines 15-25; p. 89, lines 1-25; and p. 90, lines 2-5 [witness did not observe Appellant do anything to any individual at 523 Grosvenor]).

The Appellant did not testify. However, his admitted written statement to Detective Ernest A. Tavitas on September 14, 1999 only admits to once hand pushing the complainant and to once striking him in the nose with his hand (R.R. Vol. 5, pgs. 106-113). Appellant's statement does not corroborate the testimonies of Daniel Chavez and John Peña.

*INSERT B, 1*

ii.      Argument and Authorities:

The standard for reviewing the legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the offense charged. _Jackson v._

Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); Villalon v. State. 791 S.W. 2d 130, 132 (Tex. Crim. App. 1990); Skillern v. State, 890 S.W. 2d 849, 879 (Tex. App. – Austin 1994, pet. ref'd). The standard of review is the same in both direct and circumstantial evidence cases. Herndon v. State, 787 S.W. 2d 408, 409 (Tex. Crim. App. 1990). In our review of the legal sufficiency of the evidence, we must consider all the evidence that the jury was permitted, properly or improperly, to consider. Johnson v. State, 871 S.W. 2d 183, 186 (Tex. Crim. App. 1993) cert. denied 511 U.S. 1046, 114 S. Ct. 1579, 128 L. Ed. 2d 222 (1994). Moreover, the sufficiency of the evidence should be measured by the elements of the offense as defined by the "hypothetically correct jury charge for the case." Malik v. State, 953 S.W. 2d 234, 240 (Tex. Crim. App. 1997).

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann. Art 38.14 (Vernon 1979).

It is clear from the statute that the testimony of an accomplice witness alone cannot furnish the basis for a conviction and a conviction so based must be reversed. Paulus v. State, 633 S.W. 2d 827, 843 (Tex. Crim. App. 1981). And this is true no mater how compete a case against the defendant may have been made by the accomplice witness testimony, and no matter how much credit the jury might have given to such testimony. Id. Walker v. State, 615 S.W. 2d 728, 731 (Tex. Crim. App. 1981).

An accomplice witness has been described as a discredited witness. See Munoz v. State, 853 S.W. 2d 558, 559 (Tex. Crim. App. 1993). It has been said that the testimony of an

NO. 04-01-00500-CR

accomplice witness must be viewed with caution and carefully scrutinized not only because of any interest such witness might have, but because his or her testimony is evidence from a corrupt source. Paulus, 633 S.W. 2d at 843.

The purpose of the accomplice witness rule is to ensure that the jury does not consider accomplice witness evidence unless the jury finds both that the accomplice witness is telling the truth and that other evidence corroborates the accomplice witness. *See* Tran v. State, 870 S.W. 2d 654, 658 (Tex. App. – Houston [1ˢᵗ Dist.] 1994, pet. ref'd). The accomplice witness rule is a legislative creation, not required by common law or as a matter of federal constitutional law. Thompson v. State, 691 S.W. 2d 627, 631 (Tex. Crim. App. 1984), *cert. denied*, 474 U.S. 865, 106 S. Ct. 184, 88 L. Ed. 2d 153 (1985).

In Edwards v. State, 427 S.W. 2d 629, 632 (Tex. Crim. App. 1968), the court wrote:

> The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise it is not.

*See also* Burke v. State, 876 S.W. 2d 877, 887 (Tex. Crim. App. 1994), *cert. denied*, 513 U.S. 1114, 115 S. Ct. 909, 130 L. Ed. 2d 791 (1995); Munoz, 853 S.W. 2d at 559; Reed v. State, 744 S.W. 2d 112, 125 (Tex. Crim. App. 1988) McDuff v. State, 943 S.W. 2d 517, 521 (Tex. App. – Austin 1997, pet. ref'd).

12

NO. 04-01-00500-CR

In applying the test of the sufficiency of the corroboration each case must be considered on its own facts and circumstances. Reed, 744 S.W. 2d at 126, and all facts may be looked to as furnishing the corroboration. Washburn v. State, 167 Tex. Crim. 125, 318 S.W. 2d 627, 634 (1958), cert. denied, 359 U.S. 965, 79 S. Ct. 876, 3 L. Ed. 2d 824 (1959). The corroborative evidence may be circumstantial or direct. Gosch v. State, 829 S.W. 2d 775, 777 (Tex. Crim. App. 1991). Cert. denied, 509 U.S. 922, 113 S. Ct. 3035, 125 L. Ed. 2d 722 (1993); Paulus, 633 S.W. 2d at 843. Corroborative evidence need not establish the defendant's guilt of the charged offense nor directly link the accused to the offense, but is sufficient if it "tends" to connect the defendant to the offense. Cox v. State, 830 S.W. 2d 609, 611 (Tex. Crim. App. 1992); Granger v. State, 683 S.W. 2d 387, 392 (Tex. Crim. App. 1984), cert. denied, 472 U.S. 1012, 106 S. Ct. 2713, 86 L. Ed. 2d 728 (1985). Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of the accomplice witness testimony. Reed, 744 S.W. 2d at 126.

When, however, as in this case the non-accomplice witness' evidence does no more than point the finger of suspicion towards an accused it is insufficient to corroborate as required by Art. 38.14. Paulus, 633 S.W. 2d at 844. Although an accomplice witness may state any number of facts that are corroborated by evidence of non-accomplice witnesses, still if the facts thus corroborated do not tend to connect the accused with the crime, corroboration on that basis would not meet the requirements of Article 38.14. Id. If the non-accomplice witness evidence fails to connect the accused to the offense, the evidence is insufficient to support the conviction. Munoz, 853 S.W. 2d at 560.

*Francisco Gonzales* *Debra Espinosa*

Daniel Chavez and John Peña, the accomplice witnesses as a matter of law, made out a complete case against appellant. Without the requirements of Article 38.14, there would be no

13

No. 04-01-00300-CR

*B, S*

question as to the sufficiency of the evidence to support the conviction. Applying the legislatively created accomplice witness rule as this court is required to do, the test of sufficiency of corroboration as discussed in Edwards, this court must look to the non-accomplice witnesses' testimony. The critical question is whether that evidence tends to connect appellant to the commission of the crimes charged. Here it does not.

The State introduced ~~appellant's extrajudicial statement. Such statement, if it tends to connect the accused to the commission of the offense, may in a proper case itself corroborate the accomplice witness's testimony. See DeBlanc v. State, 799 S.W.2d 701, 718 (Tex. Crim. App. 1990). Appellant's statement only admitted assault and lack of malevolent intent. The statement alone does not tend to connect appellant with the offense of murder.~~ Of course, a number of the facts stated by the accomplices were corroborated, still these corroborated facts do not tend to connect appellant with the crime, and corroboration on that basis does not meet the requirements of Article 38.14.

Appellant's conviction should be reversed and rendered. ~~Fernandez v. State, 989 S.W.2d 781, 786 (Tex. App. – San Antonio 1998).~~ *See: Burks v. State, 876 S.W.2d 877, 887 (Tex. Crim App. 1994), cert. den. 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995)*

14

; In Ibanez v. State, 779 S.W.2d 804, (Tex. Crim App 1986) The court ruled that the state must prove a nexus between the murder and the theft, i.e., That the murder occurred in order to facilitate the taking of the property. In the case at bar, outside the testimony of the two accomplice witnesses, there is no proof of the nexus between the murder and the theft. Like ~~Heather~~ Lucinda Gonzales, Bryan A. Brown, and Gerardo Gutierrez never testified about ~~a nexus between~~ the murder occurring in order to facilitate the taking of complainant's gold & ~~pimer~~ necklace. Jessica Cantu ~~identified~~ described

9

the necklace worn by the appellant after the offense as a gold chain with a crucifix, not a diamond studded spinner the size of a silver dollar. Additionally, John Medlick testified that he saw a gold In Garrett v. State, 851 S.W.2d 853, 856 (Tex. Crim App. 1993), the court ruled that evidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder. Here, indep there is no indep evidence, independent of the accomplices' testimony, showing that the mens rea of the necklace theft accompanying the murder. Restate back

necklace on the alleged complainant's neck.

10

Regarding the only uncorroborated proof of Appellant's mens rea, accomplice witness, Francisco bonzales, opined that he and Appellant "freaked out" when they observed Appellant's sometimes lover, Debra Espinosa, engaging in oral sex with the complainant. (R.R., Vol. 16, p. 110, lines 2-7; and p. 113, lines 4-9 [shooting the complainant was a surprise to him and not part of the robbery plan]). Debra Espinosa admitted to being Appellant's lover, and also to being surprised by the shooting (Vol. 17, p. 38, lines 2-12; p. 41, lines 1-21, and p. 76, lines 21-22).

Regarding the only uncorroborated proof of the underlying felony of robbery, accomplice witness, Debra Espinosa, testified that Francisco bonzales grabbed the chain

11

off of the complainants necklace (Vol.

17, p. 76, lines 4-7). Not the

Appellant.

In Williams v. State, 937

S.W.2d 479, 483 (Tex. Crim. App.

1996) the court ruled that in a capital

murder prosecution for murder during

the course of robbery, the State must

prove that the defendant formed the

intent to rob prior to or concurrent

with the murder. Here there is

insufficient evidence to establish murder during

the course of robbery albeit, It is also

reasonable to infer that Appellant had

no intent to rob where the complainants

man paper money and jewelry, including

the necklace according to John Medlick,

12

was not taken by the Appellant.

This Court should rule that,
"... Although the evidence although a number of facts stated by the accomplices were corroborated, still these facts corroborated facts do not tend to connect Appellant with the crime of capital murder (murder-robbery), and corroboration on that basis does not meet the requirements of Art. 38.14. This case should be reversed and rendered for legally insufficient evidence.

13

# Exhibit 49

NO. AP 75,246

IN THE COURT OF

CRIMINAL APPEALS OF TEXAS

---

JUAN EDWARD CASTILLO,
                    **Appellant**

VS.

THE STATE OF TEXAS,
                    **Appellee**

---

APPEALED FROM THE 186TH JUDICIAL DISTRICT COURT

OF BEXAR COUNTY, TEXAS

CAUSE NO. 2004-CR-1461A

JUDGE MARIA TERESA HERR PRESIDING

---

BRIEF FOR THE APPELLANT

---

VINCENT D CALLAHAN
Laurel Heights Station
██████████████████
San Antonio, T██████████
Telephone/Fax██████████
State Bar N██████████
Court Appointed Attorney for Appellant

NO. AP 75,246

IN THE COURT OF

CRIMINAL APPEALS OF TEXAS

JUAN EDWARD CASTILLO,

Appellant

VS.

THE STATE OF TEXAS,

Appellee

APPEALED FROM THE 186TH JUDICIAL DISTRICT COURT

OF BEXAR COUNTY, TEXAS

CAUSE NO. 2004-CR-1461A

JUDGE MARIA TERESA HERR PRESIDING

## BRIEF FOR THE APPELLANT

VINCENT D CALLAHAN
Laurel Heights Station
~~[redacted]~~
San Antonio, TX ~~[redacted]~~
Telephone/Fax: ~~[redacted]~~
State Bar No. ~~[redacted]~~
Court Appointed Attorney for Appellant

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................... 2

LIST OF AUTHORITIES ......................................................... 4

NAME OF PARTIES ............................................................. 7

STATEMENT OF THE NATURE OF THE CASE ......................... 8

STATEMENT OF POINT OF ERROR ONE ................................ 10

POINT OF ERROR ONE ...................................................... 11

THE EVIDENCE AT THE GUILT-INNOCENCE PHASE IS LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION IN VIOLATION OF ARTICLE 38.14, TEX. CODE CRIM. PROC. AND BURKE V. STATE, 876 S.W. 2D 877. 998 (TEX. CRIM. APP. 1994), CERT. DEN. 513 U.S. 1114, 115 S. CT. 909, 130 L. ED 2D 791 (1995) (REVERSAL AND RENDERING REQUIRED WHERE INDEPENDENT OF THE ACCOMPLICE WITNESS THE EVIDENCE DOES NOT TEND TO CONNECT THE DEFENDANT TO THE OFFENSE).

   i.  Statement of Facts: ................................................. 11

   ii.  Argument and Authorities: ....................................... 15

STATEMENT OF POINT OF ERROR TWO ................................ 22

POINT OF ERROR TWO ...................................................... 23

THE EVIDENCE AT THE GUILT-INNOCENCE PHASE IS FACTUALLY INSUFFICIENT IN VIOLATION OF ZUNIGA V. STATE, 144 S.W. 3D 477, 481-485 (TEX. CRIM. APP. 2004) (A VERDICT WILL BE SET ASIDE ONLY IF THE EVIDENCE SUPPORTING THE VERDICT IS SO WEAK AS TO RENDER THE VERDICT CLEARLY WRONG AND MANIFESTLY UNJUST). ...........................................................

   i.  Statement of Facts: ................................................. 23

   ii.  Argument and Authories: ......................................... 23

STATEMENT OF POINT OF ERROR THREE ............................. 27

POINT OF ERROR THREE .................................................... 28

THE DEATH PENALTY SENTENCE VIOLATES THE EIGHTH AMENDMENT, UNITED STATES CONSTITUTION (CRUEL AND UNUSUAL). ...................................................................... 28

   i.  Statement of Facts: ................................................. 28

ii.   Argument and Authorities: ........................................................28

STATEMENT OF POINT OF ERROR FOUR......................................................30

POINT OF ERROR FOUR.................................................................................31

THE TRIAL COURT ERRED (ABUSE OF DISCRETION STANDARD)
WHEN IT OVERRULED APPELLANT'S WRITTEN PRE-TRIAL MOTION
OBJECTING TO THE ADMISSIBILITY OF THE TWO ACCOMPLICE
WITNESSES AS BEING VIOLATIVE OF RULE 3.04(B), TEXAS STATE
BAR RULES OF PROFESSIONAL CONDUCT; AND 18 U.S.C. §
201(B)(1)(A) AND § 201(B)(3). ......................................................31

i.   Statement of Facts: ..........................................................31

ii.   Argument and Authorities: ................................................31

PRAYER ........................................................................................35

CERTIFICATE OF SERVICE...........................................................35

# LIST OF AUTHORITIES

## CASES

Boyle v. State, 820 S.W. 2d 122, 137 (Tex. Crim. App. 1989)..............................29

Burke v. State, 876 S.W. 2d 877, 998 (Tex. Crim. App. 1994), cert. den. 513 U.S.
    1114, 115 S. Ct. 909, 130 L. Ed 2d 791 (1995) ............................ 8, 10, 11, 17, 19

Cannon v. Texas, 106 S. Ct. 897 (1986)................................................................28

Cox v. State, 830 S.W. 2d 609, 611 (Tex. Crim. App. 1992)...................................18

Edwards v. State, 427 S.W. 2d 629, 632 (Tex. Crim. App. 1968) ...................17, 19

Elbaor v. Smith, 845 S.W. 2d 240, 247 n. 14 (Tex. 1992) ......................................32

Garrett v. State, 851 S.W. 2d 853, 856 (Tex. Crim. App. 1993)............................20

Gosch v. State, 829 S.W. 2d 775, 777 (Tex. Crim. App. 1991). *Cert. denied*, 509
    U.S. 922, 113 S. Ct. 3035, 125 L. Ed. 2d 722 (1993) .........................................18

Granger v. State, 683 S.W. 2d 387, 392 (Tex. Crim. App. 1984), *cert. denied*, 472
    U.S. 1012, 106 S. Ct. 2713, 86 L. Ed. 2d 728 (1985) .........................................18

Gregg v. Georgia, 96 S. Ct. 2909, 2950, 2975 (1976)...........................................28

Herndon v. State, 787 S.W. 2d 408, 409 (Tex. Crim. App. 1990) .........................15

Ibanez v. State, 749 S.W. 2d 804, 807 (Tex. Crim. App. 1986)............................20

Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). 15

James v. State, 772 S.W. 2d 84, 101 (Tex. Crim. App. 1989)................................28

Johnson v. State, 871 S.W. 2d 183, 186 (Tex. Crim. App. 1993) *cert. denied* 511
    U.S. 1046, 114 S. Ct. 1579, 128 L. Ed. 2d 222 (1994) ......................................15

Malik v. State, 953 S.W. 2d 234, 240 (Tex. Crim. App. 1997)..............................16

McDuff v. State, 943 S.W. 2d 517, 521 (Tex. App. – Austin 1997, pet. ref'd) .....18

Munoz v. State, 853 S.W. 2d 558, 559 (Tex. Crim. App. 1993)...............16, 17, 19

Olmstead v. United States, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed 944 (1928)
    (J. Brandeis, dissenting)..................................................................................34

Paulus v. State, 633 S.W. 2d 827, 843 (Tex. Crim. App. 1981)......................16, 18

Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) ....... 28

Reed v. State, 744 S.W. 2d 112, 125 (Tex. Crim. App. 1988) ................................. 18

Simmons v. Roper, _____ U.S. _____, 125 S. Ct. 1183, 1190, _____ L. Ed 2d _____ (2005) .................................................................................................. 28

Skillern v. State, 890 S.W. 2d 849, 879 (Tex. App. – Austin 1994, pet. ref'd) ...... 15

Thompson v. State, 691 S.W. 2d 627, 631 (Tex. Crim. App. 1984), *cert. denied*, 474 U.S. 865, 106 S. Ct. 184, 88 L. Ed. 2d 153 (1985). ...................................... 17

Tran v. State, 870 S.W. 2d 654, 658 (Tex. App. – Houston [1st Dist.] 1994, pet. ref'd) ...................................................................................................................... 17

United States v. Orr, 136 Fed. Appx. 632, 637 (5th Cir. 2005) ............................. 33

United States v. Singleton, 144 F. 3d 1343, 1343 (10th Cir. 1998) ........................ 33

Villalon v. State, 791 S.W. 2d 130, 132 (Tex. Crim. App. 1990) .......................... 15

Walker v. State, 615 S.W. 2d 728, 731 (Tex. Crim. App. 1981). ........................... 16

Washburn v. State, 167 Tex. Crim. 125, 318 S.W. 2d 627, 634 (1958), *cert. denied*, 359 U.S. 965, 79 S. Ct. 876, 3 L. Ed. 2d 824 (1959) .......................................... 18

Williams v. State, 937 S.W. 2d 479, 483 (Tex. Crim App. 1996) .......................... 21

Zuniga v. State, 144 S.W. 3d 477, 481-485 (Tex. Crim. App. 2004) ..... 8, 22, 23, 26

## STATUTES

Article 38.14, Tex. Code Crim. Proc. .................................................. 8, 10, 11, 21

## OTHER AUTHORITIES

Jeffersoniana .......................................................................................................... 29

Professional Responsibility Guide to Texas Disciplinary Rules 3.01 through 4.04, Barbara Hanson Nellermore and Fidel Rodriguez, Jr., 28 St. Mary's L.J. 443, 463-468 (1997). ................................................................................................... 32

## RULES

18 U.S.C. § 201(b)(1)(A) and § 201(b)(3).............................................. 9, 30, 31, 33

Rule 3.04(b), Texas State Bar Rules of Professional Conduct......... 9, 30, 31, 32, 33

## CONSTITUTIONAL PROVISIONS

Eighth Amendment, United States Constitution........................................... 9, 27, 28

Fourteenth Amendment............................................................................... 28

## NAME OF PARTIES

Indigent and incarcerated Juan Edward Castillo is the Appellant who represented himself at the punishment phase. Appellant was represented by Vincent D. Callahan, Esq. and Bill Harris, Esq. at the guilt-innocence phase and on appeal by Vincent D. Callahan, Esq. The State of Texas is the Appellee and was represented at the trial by Assistant District Attorneys David Lunan and Michael Anthony Reyes. Appellee has not yet designated counsel on appeal.

## STATEMENT OF THE NATURE OF THE CASE

Appellant was charged by Bill of Indictment with capital murder (homicide during robbery) as a repeater to have occurred on December 3, 2003. The indictment was filed on February 24, 2004 (C.R. pgs. 4-5).

Jury selection occurred from July 5, 2005 to August 12, 2005. On August 23, 2005 Appellant entered a plea of not guilty before the jury (C.R. p. 169). On August 30, 2005 the jury returned a verdict of guilty as charged (C.R. p. 137). On September 1, 2005, the jury answered probable future danger special issue number one 'yes', and any mitigation special issue number two 'no' (C.R. pgs. 147-148). The court sentenced the Appellant to death on September 1, 2005 (R.R. Vol. 22, p. 27).

Judgment of capital murder as charged in the indictment, imposing the death penalty was signed and entered September 9, 2005 (C.R. pgs. 157-158).

On appeal Appellant presents four points of error of:

1. The evidence at the guilt-innocence phase is legally insufficient to support a conviction in violation of Article 38.14, Tex. Code Crim. Proc. and Burke v. State, 876 S.W. 2d 877. 998 (Tex. Crim. App. 1994), cert. den. 513 U.S. 1114, 115 S. Ct. 909, 130 L. Ed 2d 791 (1995) (Reversal and rendering required where independent of the accomplice witness the evidence does not tend to connect the defendant to the offense).

2. The evidence at the guilt-innocence phase is factually insufficient in violation of Zuniga v. State, 144 S.W. 3d 477, 481-485 (Tex. Crim. App. 2004) (A verdict will be set aside only if the evidence supporting

the verdict is so weak as to render the verdict clearly wrong and manifestly unjust).

3. The death penalty sentence violates the Eighth Amendment, United States Constitution (cruel and unusual).

4. The trial court erred (abuse of discretion standard) when it overruled Appellant's written pre-trial motion objecting to the admissibility of the two accomplice witnesses as being in violation of Rule 3.04(b), Texas State Bar Rules of Professional Conduct; and 18 U.S.C. § 201(b)(1)(A) and § 201(b)(3).

# STATEMENT OF POINT OF ERROR ONE

Whether the evidence at the guilt-innocence phase is legally insufficient to support a conviction in violation of Article 38.14, Tex. Code Crim. Proc. and Burke v. State, 876 S.W. 2d 877. 998 (Tex. Crim. App. 1994), cert. den. 513 U.S. 1114, 115 S. Ct. 909, 130 L. Ed 2d 791 (1995) (Reversal and rendering required where independent of the accomplice witness the evidence does not tend to connect the defendant to the offense).

10

## POINT OF ERROR ONE

THE EVIDENCE AT THE GUILT-INNOCENCE PHASE IS LEGALLY INSUFFICIENT TO SUPPORT A CONVICTION IN VIOLATION OF ARTICLE 38.14, TEX. CODE CRIM. PROC. AND BURKE V. STATE, 876 S.W. 2D 877, 998 (TEX. CRIM. APP. 1994), CERT. DEN. 513 U.S. 1114, 115 S. CT. 909, 130 L. ED 2D 791 (1995) (REVERSAL AND RENDERING REQUIRED WHERE INDEPENDENT OF THE ACCOMPLICE WITNESS THE EVIDENCE DOES NOT TEND TO CONNECT THE DEFENDANT TO THE OFFENSE).

i.    Statement of Facts:

In pertinent part, the record of the guilt innocence phase reveals that Francisco Gonzales (R.R. Vol. 16, pgs. 83-157) and Debra Espinosa (Vol. 17, pgs. 28-86), both accomplice witnesses as a matter of law (C.R. pgs. 129-130), directly inculpated Appellant in the capital murder (robbery-murder) of the complainant.

However, the record fails to reveal any direct forensic or physical evidence of an incriminating character which tends to connect the Appellant with the commission of the capital murder (robbery-murder) for which he was convicted.

The autopsy report (State's Exh,. No. 145) reveals, regarding proof of no robbery, that the deceased complainant still possessed a wrist watch, a yellow metal bracelet, a yellow metal Texas shaped ring a stud type earring a plastic money clip with $124.00, a bag of marijuana and cigarette paper, $450.00 in paper money, and a black wallet with a Texas driver's license and social security card in the complainant's name along with miscellaneous papers and photograph.

First outcry witness, John Medlick (R.R. Vol. 15, pgs. 40-66), again regarding proof of no robbery, testified that he saw a gold necklace still on the neck of the deceased complainant.  (Vol. 15, p. 60, lines 8-12 ["... The only thing I remember seeing was he had a gold chain around his neck."]; and p. 65, line 4).

To corroborate the accomplices' testimony regarding the robbery, the State offered the testimony of Jessica Cantu (R.R. Vol. 17, pgs. 108-122; Vol. 18, pgs. 8-14) that after the murder she had seen the Appellant wearing a gold necklace similar to the one owned by the complainant; and on cross examination she testified that the gold necklace with crucifix (Def.'s Exh's Nos. 4 and 5) was the necklace of which she was speaking.  It is noteworthy that accomplice witness Debra Espinoza had earlier testified that while she was performing oral sex on the soon to be deceased complainant, he was wearing, "... a gold necklace, kind of like a spinner necklace, like a medallion ..." (Vol. 17, p. 39, lines 11-16); in short, a different necklace.

The complainant's step-mother, Mary Lou Lopez Garcia (R.R. Vol. 15, pgs. 26-39; and Vol. 20, pgs. 21-24), described her son's gold necklace as, "... it was a necklace spinning, like a spinning wheel of a necklace.  Like a spinner ... Like on a car rim that you might see spinning ... the size of a silver dollar ..." (Vol. 15, p. 29, lines 10-25; and p. 30, lines 1-10).  Not a crucifix!

12

To corroborate the accomplices' testimony regarding the murder, the State

offered the inculpating testimonies of Gerardo Gutierrez (R.R. Vol. 17, pgs. 3-28),

Lucinda Gonzales (R.R. Vol. 16, pgs. 169-197), younger sister of accomplice

witness, Francisco Gonzales, and Bryan A. Brown (R.R. Vol. 17, pgs. 86-108),

nephew of accomplice witness, Francisco Gonzales. The latter two both testified

in convenient support of Francisco Gonzales plea agreement that they overheard

the Appellant admitting to a third non-testifying accomplice as a matter of law,

Theresa Quintero, that he shot the complainant or somebody (R.R. Vol. 16, p. 184,

lines 1-25; p. 185, lines 1-7; p. 191, lines 10-22 [Lucinda Gonzales agrees to lie

about Theresa Quintero's involvement]; Vol. 17, p. 97, lines 8-25; p. 98, lines 1-2;

and p. 106, lines 2-9 [Bryan Brown states that Appellant admitted shooting

somebody "a lot of times"]). Lucinda Gonzales admitted being furious that her

brother, Francisco Gonzales, was falsely arrested for murder (R.R. Vol. 16, p. 184,

lines 15-21); and that she came forward, after moving in December 2003, in May

2005, when the plea bargain agreement offer to avoid the death penalty was first

made to Francisco Gonzales (R.R. Vol. 16, p. 192, lines 16-25; and p. 195, lines

17-25; Vol. 18, p. 101, lines 1-25; p. 102, lines 1-3).

It is noteworthy that Bryan A. Brown did not tell the police about

Appellant's admission against interest (R.R. Vol. 17, p. 106, lines 2-9). Nor did

Lucinda Gonzales (R.R. Vol. 18, p. 79, lines 21-25; and p. 80, line 1 [Lucinda

Gonzales had telephoned police before December 8, 2003, to give information only about the location of a gun discarded by Francisco Gonzales; p. 86, lines 23-25; and p. 96, lines 1-23; p. 105, lines 1-25; and p. 106, lines 1-17). Detective Timm Angell (Vol. 18, pgs. 62-108) testified that he was not able to locate or speak with Bryan A. Brown or Lucinda Gonzales for seventeen months after the offense (R.R. Vol. 18, p. 88, lines 15-19).

Francisco Gonzales testified that Lucinda Gonzales and Bryan A. Brown came forward to back him up, "... because they came on their own to try and help me." (R.R. Vol. 16, p. 134, lines 1-16).

Self confessed altruist Ex-Inmate Gerardo Gutierrez testified that while incarcerated with the Appellant, Appellant admitted shooting somebody four times (complainant was shot seven times) during a botched robbery (R.R. Vol. 17, p. 10, lines 1-25). On cross examination Gerardo Gutierrez admitted lying when he had earlier admitted to being the North Side Killer in response to Francisco Gonzales calling himself the South Side Killer (R.R. Vol. 17, p. 20, lines 24-25; p. 21, lines 1-25; Def.'s Exh. Nos. 2 and 3). He also admitted to earlier having a lady friend, Stephanie who is a niece of accomplice Francisco Gonzales (R.R. Vol. 17, p. 22, lines 8-22).

Appellant offered the testimony of inmate Ralph Edward Pedrigone (R.R. Vol. 20, pgs. 4-20) who testified that he was an inmate with accomplice witness,

14

Francisco Gonzales, who admitted killing the complainant immediately after the television aired the news about the complainant's homicide (R.R. Vol. 20, p. 5, lines 1-14); he also testified that Francisco Gonzales had recently asked witness Pedrigone not to testify (R.R. Vol. 20, p. 5, lines 15-25).

Appellant gave no pre-trial statement; nor did he testify.

<u>ii.</u>    <u>Argument</u> and <u>Authorities</u>:

The standard for reviewing the legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the offense charged.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); <u>Villalon v. State</u>, 791 S.W. 2d 130, 132 (Tex. Crim. App. 1990); <u>Skillern v. State</u>, 890 S.W. 2d 849, 879 (Tex. App. – Austin 1994, pet. ref'd).  The standard of review is the same in both direct and circumstantial evidence cases.  <u>Herndon v. State</u>, 787 S.W. 2d 408, 409 (Tex. Crim. App. 1990). In our review of the legal sufficiency of the evidence, we must consider all the evidence that the jury was permitted, properly or improperly, to consider.  <u>Johnson v. State</u>, 871 S.W. 2d 183, 186 (Tex. Crim. App. 1993) *cert. denied* 511 U.S. 1046, 114 S. Ct. 1579, 128 L. Ed. 2d 222 (1994).  Moreover, the sufficiency of the evidence should be measured by the elements of the offense as defined by the

"hypothetically correct jury charge for the case." <u>Malik v. State</u>, 953 S.W. 2d 234, 240 (Tex. Crim. App. 1997).

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann. Art 38.14 (Vernon 1979).

It is clear from the statute that the testimony of an accomplice witness alone cannot furnish the basis for a conviction and a conviction so based must be reversed. <u>Paulus v. State</u>, 633 S.W. 2d 827, 843 (Tex. Crim. App. 1981). And this is true no mater how compete a case against the defendant may have been made by the accomplice witness testimony, and no matter how much credit the jury might have given to such testimony. *Id.* <u>Walker v. State</u>, 615 S.W. 2d 728, 731 (Tex. Crim. App. 1981).

An accomplice witness has been described as a discredited witness. *See* <u>Munoz v. State</u>, 853 S.W. 2d 558, 559 (Tex. Crim. App. 1993). It has been said that the testimony of an accomplice witness must be viewed with caution and carefully scrutinized not only because of any interest such witness might have, but because his or her testimony is evidence from a corrupt source. <u>Paulus</u>, 633 S.W. 2d at 843.

The purpose of the accomplice witness rule is to ensure that the jury does not consider accomplice witness evidence unless the jury finds both that the accomplice witness is telling the truth and that other evidence corroborates the accomplice witness. *See* Tran v. State, 870 S.W. 2d 654, 658 (Tex. App. – Houston [1st Dist.] 1994, pet. ref'd). The accomplice witness rule is a legislative creation, not required by common law or as a matter of federal constitutional law. Thompson v. State, 691 S.W. 2d 627, 631 (Tex. Crim. App. 1984), *cert. denied,* 474 U.S. 865, 106 S. Ct. 184, 88 L. Ed. 2d 153 (1985).

In Edwards v. State, 427 S.W. 2d 629, 632 (Tex. Crim. App. 1968), the court wrote:

> The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witness and then to examine the other witnesses with the view to ascertain if there be inculpatory evidence, that is evidence of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient; otherwise it is not.

*See also* Burke v. State, 876 S.W. 2d 877, 887 (Tex. Crim. App. 1994), *cert. denied,* 513 U.S. 1114, 115 S. Ct. 909, 130 L. Ed. 2d 791 (1995); Munoz, 853

S.W. 2d at 559; Reed v. State, 744 S.W. 2d 112, 125 (Tex. Crim. App. 1988)

McDuff v. State, 943 S.W. 2d 517, 521 (Tex. App. – Austin 1997, pet. ref'd).

In applying the test of the sufficiency of the corroboration each case must be considered on its own facts and circumstances. Reed, 744 S.W. 2d at 126, and all facts may be looked to as furnishing the corroboration. Washburn v. State, 167 Tex. Crim. 125, 318 S.W. 2d 627, 634 (1958), cert. denied, 359 U.S. 965, 79 S. Ct. 876, 3 L. Ed. 2d 824 (1959). The corroborative evidence may be circumstantial or direct. Gosch v. State, 829 S.W. 2d 775, 777 (Tex. Crim. App. 1991). Cert. denied, 509 U.S. 922, 113 S. Ct. 3035, 125 L. Ed. 2d 722 (1993); Paulus, 633 S.W. 2d at 843. Corroborative evidence need not establish the defendant's guilt of the charged offense nor directly link the accused to the offense, but is sufficient if it "tends" to connect the defendant to the offense. Cox v. State, 830 S.W. 2d 609, 611 (Tex. Crim. App. 1992); Granger v. State, 683 S.W. 2d 387, 392 (Tex. Crim. App. 1984), cert. denied, 472 U.S. 1012, 106 S. Ct. 2713, 86 L. Ed. 2d 728 (1985). Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of the accomplice witness testimony. Reed, 744 S.W. 2d at 126.

When, however, as in this case the non-accomplice witness' evidence does no more than point the finger of suspicion towards an accused it is insufficient to corroborate as required by Art. 38.14. Paulus, 633 S.W. 2d at 844. Although an accomplice witness may state any number of facts that are corroborated by

18

evidence of non-accomplice witnesses, still if the facts thus corroborated do not tend to connect the accused with the crime, corroboration on that basis would not meet the requirements of Article 38.14. *Id.* If the non-accomplice witness evidence fails to connect the accused to the offense, the evidence is insufficient to support the conviction. <u>Munoz</u>, 853 S.W. 2d at 560.

Francisco Gonzales and Debra Espinoza, the accomplice witnesses as a matter of law, made out a complete case against appellant. Without the requirements of Article 38.14, there would be no question as to the sufficiency of the evidence to support the conviction. Applying the legislatively created accomplice witness rule as this court is required to do, the test of sufficiency of corroboration as discussed in <u>Edwards</u>, this court must look to the non-accomplice witnesses' testimony. The critical question is whether that evidence tends to connect appellant to the commission of the crimes charged. Here it does not.

Of course, a number of the facts stated by the accomplices were corroborated, still these corroborated facts do not tend to connect appellant with the crime, and corroboration on that basis does not meet the requirements of Article 38.14.

Appellant's conviction should be reversed and rendered. See: <u>Burke v. State</u>, 876 S.W. 2d 877, 887 (Tex. Crim. App. 1994), cert. den. 513 U.S. 1114, 115 S. Ct. 909, 130 2 Ed 2d 791 (1995).

19

In Ibanez v. State, 749 S.W. 2d 804, 807 (Tex. Crim. App. 1986) the court ruled that the State must prove a nexus between the murder and the theft, i.e., that the murder occurred in order to facilitate the taking of the property. In the case at bar, outside the testimony of the two accomplice witnesses, there is no proof of the nexus between the murder and the theft. Lucinda Gonzales, Bryan A. Brown, and Gerardo Gutierrez never testified about the murder occurring in order to facilitate the taking of complainant's gold spinner necklace. Jessica Cantu described the necklace worn by the Appellant after the offense as a gold chain with a crucifix, not a diamond studded spinner the size of silver dollar. Additionally, John Medlick testified that he saw a gold necklace on the deceased complainant's neck.

In Garrett v. State, 851 S.W. 2d 853, 856 (Tex. Crim. App. 1993), the court ruled that evidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder. Here, there is no evidence, independent of the accomplices' testimony, showing that the mens rea of the necklace theft accompanying the murder.

Regarding the only uncorroborated proof of Appellant's mens rea, accomplice witness, Francisco Gonzales, opined that he and Appellant "freaked out" when they observed Appellant's sometimes lover, Debra Espinosa engaging in oral sex with the complainant (R.R. Vol. 16, p. 110, lines 2-7; and p. 113, lines

20

4-9 [shooting the complainant was a surprise to him and not part of the robbery plan]). Debra Espinoza admitted to being Appellant's Lover, and also to being surprised by the shooting (Vol. 17, p. 38, lines 2-12; p. 41, lines 1-21; and p. 76, lines 21-22).

Regarding the only uncorroborated proof of the underlying felony of robbery, accomplice witness, Debra Espinoza, testified that Francisco Gonzales grabbed the chain off the complainant's neck (R.R. Vol. 17, p. 76, lines 4-7). Not the Appellant.

In Williams v. State, 937 S.W. 2d 479, 483 (Tex. Crim App. 1996) the court ruled that in a capital murder prosecution for murder during the course of robbery, the State must prove that the defendant formed the intent to rob prior to or concurrent with the murder. Here there is insufficient evidence to establish murder during the course of robbery. It is also reasonable to infer that Appellant had no intent to rob where the complainant's paper money and jewelry, including the necklace according to John Medlick, was not taken by Appellant.

This Court should rule that, although a number of facts stated by the accomplices were corroborated, still these corroborated facts do not tend to connect Appellant with the crime of capital murder (murder-robbery), and corroboration on that basis does not meet the requirements of Art. 38.14. This case should be reversed and rendered for legally insufficient evidence.

21

## STATEMENT OF POINT OF ERROR TWO

Whether the evidence at the guilt-innocence phase is factually insufficient in violation of <u>Zuniga v. State,</u> 144 S.W. 3d 477, 481-485 (Tex. Crim. App. 2004) (A verdict will be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong and manifestly unjust).

## POINT OF ERROR TWO

<u>THE EVIDENCE AT THE GUILT-INNOCENCE PHASE IS FACTUALLY INSUFFICIENT IN VIOLATION OF ZUNIGA V. STATE, 144 S.W. 3D 477, 481-485 (TEX. CRIM. APP. 2004) (A VERDICT WILL BE SET ASIDE ONLY IF THE EVIDENCE SUPPORTING THE VERDICT IS SO WEAK AS TO RENDER THE VERDICT CLEARLY WRONG AND MANIFESTLY UNJUST).</u>

<u>i.</u>    <u>Statement of Facts:</u>

Appellant here adopts the Statement of Facts in Point of Error One for the sake of brevity.

<u>ii.</u>    <u>Argument and Authories:</u>

Appellant here adopts the Argument and Authorities in Point of Error One for the sake of brevity.

A verdict will be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong and manifestly unjust. A clearly wrong and manifestly unjust verdict occurs where the jury's finding shocks the conscience or clearly demonstrates bias. <u>Zuniga v. State</u>, 144 S.W. 3d 477, 481 (Tex. Crim. App. 2004).

This case should be reversed and remanded where proof of the underlying felony of robbery is clearly wrong and manifestly unjust. To corroborate the two accomplice witnesses, the State in its case in chief presented the testimony of John Medlick who twice told the jury that he saw a gold necklace on the neck of the

deceased complainant (R.R. Vol. 15, p. 60, lines 8-12; and p. 65, line 4).  This shows that Appellant did not commit the underlying felony of robbery and is evidence contrary to the verdict.

The autopsy report (State's Exhibit No. 145) lists $574.00 paper money, plus five separate pieces of jewelry, plus a baggie of marijuana found on the deceased complainant suggesting that no property was intended to or was taken from the complainant contrary to the assertions of the two testifying accomplice witnesses that a mere robbery had been planned with Appellant to take the complainant's money and dope (R.R. Vol. 16, p. 89, lines 1-9; and Vol. 17, p. 35, lines 1-13).

Complainant's necklace worn by him the night he was murdered was described by his step-mother, Mary Lou Garcia, as "... it was a necklace spinning, like a spinning wheel of a necklace ... like a spinner ... like on a car rim that you might see spinning ... the size of a silver dollar ..." (Vol. 15, p. 29, lines 10-25; and p. 30, lines 1-10).  The State offered the testimony of Jessica Cantu to show Appellant in recent unexplained possession of complainant's gold necklace with spinner and thus demonstrate a nexus between the murder and the robbery; but she testified that Appellant was after the offense wearing a gold chain with a crucifix (Vol. 18, p. 8, lines 19-25; p. 9, lines 1-24; and Defendant's Exh. Nos. 4-5).  The prosecutor attempted to rehabilitate his witness and elicited as "I don't think so" in response to his question whether the complainant was seen one unspecified time

24

earlier by her wearing a crucifix (Vol. 18, p. 10, lines 5-25; and p. 11, lines 1-25). But in this rehabilitative effort the witness testified that she once saw the complainant wearing a medallion with glimmering diamonds – not a spinner! (Vol. 18, p. 11, lines 23-25; and p. 12, line 1).

To corroborate the accomplices' proof of murder by the Appellant the State offered the clearly unfairly biased, late in forthcoming, last hour rescuing, highly suspicious testimonies of two family members, and a former boyfriend of another family member, related to accomplice witness Francisco Gonzales. Lucinda Gonzales and Bryan A. Brown went into hiding before December 8, 2003, never having reported to the police Appellant's alleged separately overheard, confession of only murder to a third non-testifying accomplice witness, Theresa Quintero; they conveniently surfaced seventeen months later in May 2005, in dubious support of Francisco Gonzales' plea bargain agreement helping him to escape the death penalty. Gerardo Gutierrez, ex-boyfriend of Francisco Gonzales' niece, surfaces during Appellant's trial out of pangs of conscience, and testifies that he was once an inmate with Appellant who admitted a four shot unspecified murder during a botched unspecified robbery (Vol. 17, p. 10, lines 3-11; and p. 15, lines 4-7). He also admitted, however, identifying himself falsely as 'North Side Killer' (Vol. 17, p. 20, lines 24-25; p. 21, lines 1-6; Defendant's Exhibits Nos. 2 and 3).

25

As further evidence contrary to the verdict, inmate Ralph Edward Pedrigone testified that he was once an inmate with accomplice witness Francisco Gonzales who admitted killing the complainant himself (Vol. 20, p. 5, lines 1-14).

This case should be reversed and remanded for factually insufficient evidence of both the murder, and the underlying offense of robbery. The jury's verdict of guilty of capital murder (murder-robbery) should shock the conscience for want of moral certitude; it also clearly demonstrates bias. See: <u>Zuniga v. State</u>, 144 S.W. 3d 477, 481 (Tex. Crim. App. 2004).

# STATEMENT OF POINT OF ERROR THREE

Whether the death penalty sentence violates the Eighth Amendment, United States Constitution (cruel and unusual).

## POINT OF ERROR THREE

### THE DEATH PENALTY SENTENCE VIOLATES THE EIGHTH AMENDMENT, UNITED STATES CONSTITUTION (CRUEL AND UNUSUAL).

i.     Statement of Facts:

Appellant raises this issue for the first time on appeal.

ii.    Argument and Authorities:

Appellant acknowledges that his position is in the minority.  See: dissenting Justices Brennan and Marshall, Cannon v. Texas, 106 S. Ct. 897 (1986). "Adhering to our views that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. Gregg v. Georgia, 96 S. Ct. 2909, 2950, 2975 (1976), we would grant certiorari and vacate the death sentences in these cases."

The law contains an evolving standard of decency.  Even dissenting Honorable Rhenquist so acknowledges. Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) see also: Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242, 2247, 153 L. Ed 2d 335 (2002) and Simmons v. Roper, _____ U.S. _____, 125 S. Ct. 1183, 1190, _____ L. Ed 2d_____ (2005).  Appellant did not waive his right to legal evolution and thereby to assert a constitutional violation by failing to object at trial where at the time of trial the right had not been recognized. James v. State, 772 S.W. 2d 84, 101 (Tex. Crim. App. 1989).

28

"I shall ask for abolition of the punishment of death until I have the infallibility of human judgment demonstrated to me" Thomas Jefferson. Jeffersoniana.

Appellant acknowledges that this Court "is always hesitant to reverse a conviction for capital murder ..." <u>Boyle v. State</u>, 820 S.W. 2d 122, 137 (Tex. Crim. App. 1989). But such a judicial attitude is contrary to the spirit of the law which calls for evolving standards of decency.

The sentence should be reformed to life imprisonment.

## STATEMENT OF POINT OF ERROR FOUR

Whether the trial court erred (abuse of discretion standard) when it overruled Appellant's written pre-trial motion objecting to the admissibility of the two accomplice witnesses as being violative of Rule 3.04(b), Texas State Bar Rules of Professional Conduct; and 18 U.S.C. § 201(b)(1)(A) and § 201(b)(3).

## **POINT OF ERROR FOUR**

THE TRIAL COURT ERRED (ABUSE OF DISCRETION
STANDARD) WHEN IT OVERRULED APPELLANT'S WRITTEN
PRE-TRIAL MOTION OBJECTING TO THE ADMISSIBILITY OF
THE TWO ACCOMPLICE WITNESSES AS BEING VIOLATIVE
OF RULE 3.04(B), TEXAS STATE BAR RULES OF
PROFESSIONAL CONDUCT; AND 18 U.S.C. § 201(B)(1)(A) AND
§ 201(B)(3).

i.    Statement of Facts:

The trial court denied Appellant's written pre-trial motion objecting to the

admissibility of the two accomplice witnesses (Francisco Gonzales and Debra

Espinosa) as being violative of Rule 3.04, Texas State Bar Rules of Professional

Conduct; and 18 U.S.C. § 201(b)(1)(A) and § 201(b)(3) (C.R. Vol. 1, pgs. 29-45;

R.R. Vol. 2, pgs. 3-7; and Vol. 17, p. 27, lines 20-24).

The record reveals that both above accomplice witnesses entered into

a lenient plea bargain agreement with the State whereby they received

contingent 40 year sentence, instead of the death penalty, in exchange for

their trial testimony against Appellant (R.R. Vol. 16, p. 132, lines 5-24; and

Vol. 17, p. 68, lines 16-25; and p. 69, lines 1-19).

ii.    Argument and Authorities:

Rule 3.04(b), Texas State Bar Rules of Professional Conduct, FAIRNESS

IN ADJUDICATORY PROCEEDINGS, states "A lawyer shall not ... pay ... or

acquiesce in the offer or payment of compensation to a witness ... contingent upon

31

the content of the testimony of the witness ...". The record plainly reveals that this State Bar Rule was violated. Had said Rule not been violated, the State would not have been able to obtain a death sentence against Appellant.

In the context of a capital murder conviction, this is likely a case of first impression. See: Professional Responsibility Guide to Texas Disciplinary Rules 3.01 through 4.04, Barbara Hanson Nellermore and Fidel Rodriguez, Jr., 28 St. Mary's L.J. 443, 463-468 (1997).

"In a nutshell, an attorney violates Rule 3.04 if the attorney: ... (3) unlawfully pays a witness for his testimony [Elbaor v. Smith, 845 S.W. 2d 240, 247 n. 14 (Tex. 1992) (discussing Rule 3.04's prohibition against paying witness contingent upon content of testimony in context of Mary Carter agreements and asserting that Rule mandates that an attorney has an ethical duty to refrain from making a settlement contingent, IN ANY WAY, on the testimony of a witness who was also a settling party] ...". Professional Responsibility etc. *Ibid.* 28 St. Mary's L.J. 443, 465 (1997).

The opinion of the Texas Commission on Professional Ethics, Op. 510, 58 Tex. B.J. 1058, 1058 (1995) stated that Rule 3.04(b) prohibits a lawyer from paying a witness to testify contingent upon the content of his testimony. See: Professional Responsibility, etc. *Ibid.* 28 St. Mary's L.J. 443, 467 (1997).

32

Regarding a violation of 18 U.S.C. § 201(b)(1)(A) and § 201(b)(3) (federal anti-bribery statute), Appellant cites as supportive United States v. Singleton, 144 F. 3d 1343, 1343-1348 (10th Cir. 1998) [panel rules that grants of leniency are things of value, and fall within the prohibitions of the federal anti-bribery statute 18 U.S.C. § 201], opinion vacated by court en banc 165 F. 3d 1297; but see: United States v. Orr, 136 Fed. Appx. 632, 637 (5th Cir. 2005) [A favorable plea agreement in exchange for truthful testimony does not violate 18 U.S.C. § 201 ... and § 201 is not violated where prosecutor's compensate informants for their cooperation].

Appellant respectfully requests this Honorable Court to revisit this issue and rule that this case should be reversed and remanded where it rests on violations of 18 U.S.C. § 201(b)(1)(A) and § 201(b)(3). (For text of 18 U.S.C. § 201, see C.R. pgs. 34-35).

The accomplice witnesses' punishment of 40 years incarceration was clearly contingent upon the content of their testimony in violation of Rule 3.04(b), Texas State Bar Rules of Professional Conduct. Francisco Gonzales and Debra Espinosa were unethically promised 40 years incarceration contingent upon the content of their testimony.

This case should be reversed and remanded. "Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the

33

administration of the criminal law the end justifies the means – to declare that the Government may commit crimes in order to secure the conviction of a private criminal – would bring terrible retribution.  Against that pernicious doctrine this Court should resolutely set its face." Olmstead v. United States, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed 944 (1928) (J. Brandeis, dissenting).

## PRAYER

WHEREFORE PREMISES CONSIDERED, Appellant respectfully prays that the Judgment in Cause No. 2004-CR-1461A be reversed and remanded, or be reformed to life, or be reversed and rendered.

Respectfully Submitted:

VINCENT D. CALLAHAN
Laurel Heights Station

San Antonio, Texas ████████████
Telephone/Fax: ████████████
State Bar No ████████████

Court Appointed Attorney for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Appellant's Brief has been mailed or hand delivered to the Appellate Section of the Office of the District Attorney, Bexar County Justice Center, ████████████ on this the 19th day of June, 2006.

VINCENT D. CALLAHAN

35

# Exhibit 50

ATTORNEY'S FEES EXPENSE CLAIM FORM - DISTRICT COURT, BEXAR COUNTY REV'D 10/03

**PERSONAL INFORMATION**

1. NAME AND MAILING ADDRESS (Number)     (Street)     (Suite)     (City)     (State)     (Zip)

2. SOCIAL SECURITY NUMBER

6. PERSON REPRESENTED AND SID

3. DISTRICT COURT

7. STATE BAR NUMBER

8. OFFENSE(S) CHARGED:

9. OFFENSE DATE:

10. PROCEEDING AND DISPOSITION (DESCRIBE BRIEFLY):

**CLAIM FOR SERVICES AND EXPENSES**

11. Payment Category
☐ Capital     ☐ Second Degree     ☐ 11.071 DP Writ
☐ First Degree     ☐ Third Degree, SJF

12. Type Person Represented
☐ Adult Defendant     ☐ Appellee     ☐ Appellant

| IN COURT APPEARANCE | NUMBER OF HOURS | HOURLY RATE/FLAT FEE | AMOUNT |
|---|---|---|---|
| Court Appearance (Trial, Routine Appearances) | | $75 | |
| Preliminary Hearing, (Pre Trial Hearing, MTR/P - Testimony taken) | | Capital 1st chair - $125, 2nd chair - $115 | 1° - $100, 2° - $85, 3° SJF - $75 |
| Trial | | Capital VD 1° - $100 Trial - $150, 2° - $90 - $140 | 1° - $125, 2° - $100, 3° SJF - $75 |
| Flat Fees for Pleas | n/a | Capital 1° - $3500, 2° - $2500, 1° - $300 | 1° - $750, 2° - $500, 3° SJF - $400, 3° SJF - $175 |
| Flat Fees for MTR's | n/a | 2° - $225 | HOURLY RATE |
| **OUT OF COURT SERVICES** | NUMBER OF HOURS | HOURLY RATE | AMOUNT |
| Initial Jail Visit (one time only payment) | n/a | $100 (FLAT FEE) | |
| Not to exceed Capital - 100 hrs | | Capital - $80, 1° - $75 | 2° - $60, 3°, SJF - $50 |
| Other felonies - 30 hrs Without prior court approval | | | |
| **OTHER** | | | |
| Appeals and PDRs Not to exceed Capital - $15,000 1st (semi - $15,000 / felonies - $6,500 | | Capital j/c - $150 hr j/c - $200 hr | Other felonies o/c - $125 hr j/c - $150 hr |

Capital - $1500.00
1° - $750     2° - $500     3° SJF - $300

| | | | |
|---|---|---|---|
| | 100.50 | | 15,000.00 |

Investigator fees.  Attach a copy of order approving appointment.  Need prior approval to exceed the following maximums:

TOTAL $ 15,000.00

**[CERTIFICATION]**

I, _____ Attorney at Law, swear that having been duly appointed, I personally represented the above-named defendant and that the foregoing facts are true and correct.

Attorney Signature

Clerk/Coordinator of the Court

SWORN AND SUBSCRIBED before me, this the _____ day of _____, 20___

APPROVED in the total amount of $ 15000.00 .  Comments: _____ FORWARD TO AUDITORS OFFICE THIS

DATE     JUN 26 2006

Attachment Seven(sep)

Judge Presiding

* In the event of a dispute this voucher may be submitted to a peer review committee for resolution.

STATE OF TEXAS                          186ᵗʰ DISTRICT COURT

COUNTY OF BEXAR

## APPOINTMENT OF ATTORNEY

The court in accordance with Article 26.04 Code of Criminal Procedure, as amended hereby appoints: Vincent D. Callahan

attorney, to represent Juan Castillo , defendant, in

cause number(s) MC 927854

Such representation to continue until charges are dismissed, the defendant is acquitted, appeals are exhausted, or until relieved by the court or replaced by other counsel.

Performance of duties under this order of appointment will result in submission of your claim for payment by submitting a payment voucher for court approval.

Notified of appointment on the 11th day of Dec , 2003.

Signed this 11th day of Dec , 2003.

_____
Judge

**OUT OF COURT HOURLY WORKSHEET**

**ATTORNEY NAME** Vincent D. Callahan

**CAUSE NO.** 2004-CR-142175

| Date | Brief Description of Service | Interview and Conferences | Obtaining and Reviewing Records | Legal Research and Brief Writing | Investigate and Other Work |
|---|---|---|---|---|---|
| 9-8-05 | jail visit | 1.0 | | | |
| 9-19-05 | letters to r/ franc/client | .50 | | | |
| 10-21-05 | letter to client | .25 | | | |
| 12-9-05 | " | .25 | | | |
| 12-30-05 | " | .25 | | | |
| 1-18-06 | " | .25 | | | |
| 3-9-06 | " | .25 | | | |
| 3-14-06 | Rev. R.O.R | | 3.0 | | |
| 3-15-06 | " | | 3.0 | | |
| 3-16-06 | " | | 3.0 | | |
| 3-20-06 | " | | 3.0 | | |
| 3-21-06 | " | | 3.0 | | |
| 3-27-06 | " | | 3.0 | | |
| 3-22-06 | " | | 4.0 | | |
| 3-24-06 | " | | 3.0 | | |
| 3-27-06 | " | | 3.0 | | |
| 3-28-06 | " | | 3.0 | | |
| 3-29-06 | " | | 3.0 | | |
| 3-31-06 | " | | 3.0 | | |
| | | 2.75 | 46.0 | | |

Note: Voucher should be itemized on 1/4 of an hour basis.

**PAGE TOTAL HOURS** 38.75

**GRAND TOTAL HOURS** _____

**OUT OF COURT HOURLY WORKSHEET**

**ATTORNEY NAME** Vincent W. Belardi

**CAUSE NO.** 2007-CR-146-78

| Date | Brief Description of Services | Interviews and Conferences | Obtaining and Reviewing Records | Legal Research and Brief Writing | Investigative and Other Work |
|---|---|---|---|---|---|
| 4-3-06 | Draft Apps Brief | | | 3.0 | |
| 4-4-06 | " | | | 2.0 | |
| 4-5-06 | " | | | 3.0 | |
| 4-6-06 | " | | | 4.0 | |
| 4-7-06 | Draft + File 1st Mot. To Extend | | | | .50 |
| 4-7-06 | Draft Apps Brief | | | 3.0 | |
| 4-10-06 | " | | | 3.0 | |
| 4-11-06 | " | | | 2.0 | |
| 4-12-06 | " | | | 2.0 | |
| 4-14-06 | Letter to Client | .25 | | | |
| 4-18-06 | Draft Apps Brief | | | 3.0 | |
| 4-19-06 | " | | | 2.0 | |
| 4-20-06 | " | | | 2.0 | |
| 4-21-06 | " | | | 3.0 | |
| 4-24-06 | Tel. conf. A. Acosta | .25 | | | |
| | Tex. Crim. Opp. | | | 3.0 | |
| 4-21-06 | Draft Apps Brief | .25 | | | |
| 5-18-06 | Tel. Comp. W Dora Per... | .25 | | | |
| | | .75 | | 39.0 | .50 |

**PAGE TOTAL HOURS** 48.25

**GRAND TOTAL HOURS** 100.5

Note: Voucher should be itemized on 1/4 of an hour basis.

**OUT OF COURT HOURLY WORKSHEET**

**ATTORNEY NAME**

**CAUSE NO.**

_Vincent D. Palladino_
_2004-CR-14A21-9_

| Date | Brief Description of Services | Interviews and Conferences | Obtaining and Reviewing Records | Legal Research and Brief Writing | Investigative and Other Work |
|---|---|---|---|---|---|
| 5-19-06 | Letter to Client | .25 | | | |
| 6-2-06 | Draft Depps Brief | | | 3.0 | |
| 6-5-06 | " | | | 1.5 | |
| 6-6-06 | " | | | 2.5 | |
| 6-7-06 | " | | | 2.0 | |
| 6-8-06 | " | | | 2.0 | |
| 6-9-06 | Letter to client | .25 | | | |
| 12-16-04 | Letters to & from client + mother | .50 | | | |
| 12-16-04 | Draft & File Depps Brief | | | 4.0 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

PAGE TOTAL HOURS  Interviews 1.0  Legal Research 28.0

GRAND TOTAL HOURS  21.0

Note: Voucher should be itemized on 1/4 of an hour basis.

# Exhibit 51



SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
TOM PRICE
PAUL WOMACK
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
CHARLES R. HOLCOMB
CATHY COCHRAN
JUDGES

COURT OF CRIMINAL APPEALS

CAPITOL STATION
AUSTIN, TEXAS

LOUISE PEARSON
CLERK



EDWARD J. MARTY
GENERAL COUNSEL

June 27, 2006

Vincent D. Callahan


RE:   Juan Edward Castillo
      Case No. AP-75,246
      Trial Court No. 2004-CR-1461A

Dear Counselor:

The Court has this day received and filed the Appellant's Brief in the above referenced cause.

The brief does not comply with Rule 71.3, Texas Rules of Appellate Procedure. Please advise this Court, within 15 days of the date of this letter, if oral argument is desired or waived. If oral argument is desired, please advise this Court, specifically, why oral argument would be helpful.

Please call if you have any questions.

Very truly yours,

Abel Acosta
Chief Deputy Clerk



UNITED STATES POSTAGE

$ 00.30⁸

PITNEY BOWES

02 1A
000461 5122        JUN 29 2006
MAILED FROM ZIPCODE 78701.

PRESORTED
FIRST CLASS

RR RETURN SERVICE REQUESTED RR

AUSTIN, TEXAS

Vincent D. Callahan

# Exhibit 52



### STATE BAR of TEXAS

# GUIDELINES AND STANDARDS
## *for*
# TEXAS CAPITAL COUNSEL



*Standing Committee on Legal Services to the Poor in Criminal Matters*
*Adopted by the State Bar Board of Directors*
*April 21, 2006*

# INTRODUCTION

On April 21, 2006, the Board of Directors of the State Bar of Texas adopted the *Guidelines and Standards for Texas Capital Counsel ("Guidelines")*, which articulate the statewide standard of practice for the defense of capital cases. Recognizing the need for a clear outline of defense attorney performance standards in capital cases, the State Bar of Texas Standing Committee on Legal Services to the Poor in Criminal Matters ("Committee") designed the *Guidelines* to be a Texas specific version of the American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.*

Through its research in this area, the Committee, which includes defense attorneys, judges, prosecutors and public members, determined that a comprehensive tool to guide counsel representing defendants in these cases would benefit not only defendants, but also the legal profession and the justice system as a whole. The Committee appreciates the support of the State Bar of Texas Board of Directors in adopting the *Guidelines and Standards for Texas Capital Counsel,* and is confident that the *Guidelines* will elevate the quality of representation of indigent people, and all people, in capital cases in Texas.

# TABLE OF CONTENTS

**GUIDELINE**                                                                                            **PAGE**

GUIDELINE 1.1        OBJECTIVE AND SCOPE OF GUIDELINES ..................................................4

GUIDELINE 2.1        ADOPTION AND IMPLEMENTATION OF A PLAN TO PROVIDE HIGH QUALITY LEGAL
                     REPRESENTATION IN DEATH PENALTY CASES ......................................4

GUIDELINE 3.1        THE DEFENSE TEAM AND SUPPORTING SERVICES .....................................4

GUIDELINE 4.1        QUALIFICATIONS OF DEFENSE COUNSEL ...........................................5

GUIDELINE 5.1        WORKLOAD ......................................................................5

GUIDELINE 6.1        MONITORING; REMOVAL ...........................................................6

GUIDELINE 7.1        TRAINING .......................................................................6

GUIDELINE 8.1        FUNDING AND COMPENSATION .....................................................7

GUIDELINE 9.1        ESTABLISHMENT OF PERFORMANCE STANDARDS .....................................8

GUIDELINE 9.2        APPLICABILITY OF PERFORMANCE STANDARDS .....................................8

GUIDELINE 9.3        OBLIGATIONS OF COUNSEL RESPECTING WORKLOAD ...............................8

GUIDELINE 10.1       THE DEFENSE TEAM ..............................................................8

GUIDELINE 10.2       RELATIONSHIP WITH THE CLIENT .................................................9

GUIDELINE 10.3       ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL .......10

GUIDELINE 11.1       TRIAL INVESTIGATION ..........................................................10

GUIDELINE 11.2       THE DUTY TO ASSERT LEGAL CLAIMS .............................................12

GUIDELINE 11.3       THE DUTY TO SEEK AN AGREED-UPON DISPOSITION ..............................13

GUIDELINE 11.4       ENTRY OF A PLEA OF GUILTY ...................................................14

GUIDELINE 11.5       TRIAL PREPARATION OVERALL ...................................................15

GUIDELINE 11.6       VOIR DIRE AND JURY SELECTION ...............................................15

GUIDELINE 11.7       THE DEFENSE CASE CONCERNING PENALTY ......................................15

GUIDELINE 11.8       THE DUTY TO FACILITATE THE WORK OF SUCCESSOR COUNSEL ..................17

GUIDELINE 12.1       DUTIES OF TRIAL COUNSEL AFTER CONVICTION ..............................17

GUIDELINE 12.2       DUTIES OF POST-TRIAL COUNSEL .............................................18

GUIDELINE 12.2(A)    DUTIES OF DIRECT APPEAL COUNSEL ..........................................18

GUIDELINE 12.2(B)    DUTIES OF HABEAS CORPUS COUNSEL ........................................19

GUIDELINE 12.2(C)    DUTIES OF CLEMENCY COUNSEL ..............................................24

# TEXAS CAPITAL COUNSEL GUIDELINES

**GUIDELINE 1.1**        **OBJECTIVE AND SCOPE OF GUIDELINES**

A.  The objective of these Guidelines is to set forth a state-wide standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any State of Texas jurisdiction.

B.  These Guidelines apply from the moment the client is taken into custody and extend to all stages of every case in which the State of Texas may be entitled to seek the death penalty, including initial and ongoing investigation, pretrial proceedings, trial, post-conviction review, clemency proceedings and any connected litigation.

**GUIDELINE 2.1**        **ADOPTION AND IMPLEMENTATION OF A PLAN TO PROVIDE HIGH QUALITY LEGAL REPRESEN-TATION IN DEATH PENALTY CASES**

A.  Each jurisdiction should adopt and implement a plan formalizing the means by which high quality legal representation in death penalty cases is to be provided in accordance with these Guidelines (the "Legal Representation Plan").

B.  The Legal Representation Plan should set forth how the jurisdiction will conform to each of these Guidelines.

C.  All elements of the Legal Representation Plan should be structured to ensure that counsel defending death penalty cases are able to do so free from political influence and under conditions that enable them to provide zealous advocacy in accordance with professional standards.

**GUIDELINE 3.1**        **THE DEFENSE TEAM AND SUPPORTING SERVICES**

A.  The Legal Representation Plan should provide for assembly of a defense team that will provide high quality legal representation.

  1.  The defense team should consist of no fewer than two attorneys qualified in accordance with GUIDELINE 4.1, an investigator, and a mitigation specialist.

  2.  The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

B.  The Legal Representation Plan should provide for counsel to receive the assistance of all expert, investigative, and other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceedings. The Plan should specifically ensure provision of such services to private attorneys whose clients are financially unable to afford them.

  1.  Counsel should have the right to have such services provided by persons independent of the government.

  2.  Counsel should have the right to protect the confidentiality of communications with the persons providing such services to the same extent as would counsel paying such persons from private funds.

**GUIDELINE 4.1**      **QUALIFICATIONS OF DEFENSE COUNSEL**

A.   Qualification standards for defense counsel in capital cases should be developed and published. These standards should be construed and applied in such a way as to further the overriding goal of providing each client with high quality legal representation.

B.   In formulating qualification standards, the following principles should insure:

   1.   That every attorney representing a capital defendant has:

       a.   obtained a license or permission to practice in the jurisdiction;

       b.   demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases; and satisfied the training requirements set forth in GUIDELINE 7.1.

   2.   That the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

       a.   substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

       b.   skill in the management and conduct of complex negotiations and litigation;

       c.   skill in legal research, analysis, and the drafting of litigation documents;

       d.   skill in oral advocacy;

       e.   skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including finger-prints, ballistics, forensic pathology, and DNA evidence;

       f.   skill in the investigation, preparation, and presentation of mitigating evidence;

       g.   skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements; and,

       h.   skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

**GUIDELINE 5.1**      **WORKLOAD**

A.   Effectual mechanisms should be implemented to ensure that the workload of attorneys representing defendants in death penalty cases is maintained at a level that enables counsel to provide each client with high quality legal representation in accordance with these Guidelines.

5

**GUIDELINE 6.1**        **MONITORING; REMOVAL**

A.  The performance of all defense counsel should be monitored to ensure that the client is receiving high quality legal representation. Where there is evidence that an attorney is not providing high quality legal representation, appropriate action should be taken to protect the interests of the attorney's current and potential clients.

B.  A regular procedure for investigating and resolving any complaints made by judges, clients, attorneys, or others should be established and publicized, should defense counsel fail to provide high quality representation.

C.  The rosters of attorneys who have been certified to accept appointments in capital cases should be periodically reviewed to ensure that those attorneys remain capable of providing high quality legal representation. Where there is evidence that an attorney has failed to provide high quality legal representation, the attorney should not receive additional appointments and should be removed from the roster. Where there is evidence that a systemic defect in a defender office has caused the office to fail to provide high quality legal representation, the office should not receive additional appointments.

D.  Before taking final action making an attorney or a defender office ineligible to receive additional appointments, written notice should be given that such action is being contemplated, and give the attorney or defender office opportunity to respond in writing.

E.  An attorney or defender office sanctioned pursuant to this Guideline should be restored to the roster only in exceptional circumstances.

F.  This Guideline should be implemented consistently with GUIDELINE 2.1, so that an attorney's zealous representation of a client cannot be cause for the imposition of sanctions pursuant to this guideline.


**GUIDELINE 7.1**        **TRAINING**

A.  The Legal Representation Plan should provide funds for the effective training, professional development, and continuing education of all members of the defense team.

B.  Attorneys seeking to qualify to receive appointments should be required to satisfactorily complete a comprehensive training program in the defense of capital cases. Such a program should include, but not be limited to, presentations and training in the following areas:

   1.  relevant state, federal, and international law;

   2.  pleading and motion practice;

   3.  pretrial investigation, preparation, and theory development regarding guilt/innocence and penalty;

   4.  jury selection;

   5.  trial preparation and presentation, including the use of experts;

   6.  ethical considerations particular to capital defense representation;

   7.  preservation of the record and of issues for post-conviction review;

   8.  counsel's relationship with the client and his/her family;

9.   post-conviction litigation in state and federal courts;

10.   the presentation and rebuttal of scientific evidence, and developments in mental health fields and other relevant areas of forensic and biological science;

11.   the unique issues relating to the defense of those charged with committing capital offenses when under the age of 18.

C.   Attorneys seeking to remain on the roster or appointment roster should be required to attend and successfully complete, at least once every two years, a specialized training program that focuses on the defense of death penalty cases.

D.   All non-attorneys wishing to be eligible to participate on defense teams should receive continuing professional education appropriate to their areas of expertise.

## GUIDELINE 8.1    FUNDING AND COMPENSATION

A.   The Legal Representation Plan must ensure funding for the full cost of high quality legal representation, as defined by these Guidelines, by the defense team and outside experts selected by counsel.

B.   Counsel in death penalty cases should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the extraordinary responsibilities inherent in death penalty representation.

   1.   Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.

   2.   Attorneys employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale of the prosecutor's office in the jurisdiction.

   3.   Appointed counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with the prevailing rates for similar services performed by retained counsel in the jurisdiction, with no distinction between rates for services performed in or out of court. Periodic billing and payment should be available.

C.   Non-attorney members of the defense team should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the specialized skills needed by those who assist counsel with the litigation of death penalty cases, such as:

   1.   Investigators employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale of the prosecutor's office in the jurisdiction.

   2.   Mitigation specialists and experts employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale for comparable expert services in the private sector.

   3.   Members of the defense team assisting private counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with prevailing rates paid by retained counsel in the jurisdiction for similar services, with no distinction between rates for services performed in or out of court. Periodic billing and payment should be available.

   4.   Additional compensation should be provided in unusually protracted or extraordinary cases.

   5.   Counsel and members of the defense team should be fully reimbursed for reasonable incidental expenses.

7

**GUIDELINE 9.1      ESTABLISHMENT OF PERFORMANCE STANDARDS**

A.  The standards of performance should be formulated so as to insure that all counsel provide high quality legal representation in capital cases in accordance with these Guidelines. The standards of performance should include, but not be limited to, the specific standards set out in these Guidelines.


**GUIDELINE 9.2      APPLICABILITY OF PERFORMANCE STANDARDS**

A.  Counsel should provide high quality legal representation in accordance with these Guidelines for so long as the jurisdiction is legally entitled to seek the death penalty.


**GUIDELINE 9.3      OBLIGATIONS OF COUNSEL RESPECTING WORKLOAD**

A.  Counsel representing clients in death penalty cases should limit their caseloads to the level needed to provide each client with high quality legal representation in accordance with these Guidelines.

B.  Counsel representing the death penalty clients must, due to the severity of nature of the case and the necessity for time-consuming research and preparation, give priority to death penalty clients over their other caseload.

C.  In the event that counsel's caseload becomes overextended after acceptance of a death penalty case, so that reasonable time is not available to properly complete the tasks necessary for providing maximum quality representation, counsel should notify the court and request additional legal assistance, or seek to withdraw, or take steps to reduce other caseload matters which conflict with his death penalty representation.


**GUIDELINE 10.1      THE DEFENSE TEAM**

A.  After the appearance of Lead counsel, either by court appointment or being retained to represent the defendant, lead counsel bears overall responsibility for the performance of the defense team, and should allocate, direct, and supervise its work in accordance with these Guidelines and professional standards.

   1.  Subject to the foregoing, lead counsel may delegate to other members of the defense team duties imposed by these Guidelines, unless:

   2.  The Guideline specifically imposes the duty on "lead counsel," or The Guideline specifically imposes the duty on "all counsel" or "all members of the defense team."

B.  As soon as possible after designation, lead counsel should assemble a defense team by:

   1.  Requesting the court to appoint associate counsel to assist lead counsel with the responsibilities of representation. Lead counsel should consult with available potential associate counsel to insure their qualifications, desire and availability to properly assist in the representation.

   2.  Lead counsel, in consultation with associate counsel, should make application to the Court for financial assistance for securing the following additional services for the defense team:

      a.  A private investigator to conduct factual investigations of the case on guilt — innocence and punishment issues;

8

b. A qualified "mitigation expert" should be enlisted, if the existing defense team does not have the present expertise in obtaining and evaluating such mitigation evidence, pursuant to the standards set out in *Wiggins v. Smith*, 539 U.S. 510 (2003).

c. A mental health associate, qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments, should be enlisted to determine the client's mental health history for the purposes of pursuing issues of mental retardation, competency to stand trial, insanity at the time of the offense and other mitigating mental health problems for punishment consideration. In the event that the mental health associate determines the possibility of legitimate mental health issues, lead counsel should then make application to the Court that the appropriate experts be appointed by the Court for making expert of valuations of the defendant's condition, and

d. any other members needed to provide high quality legal representation.

C. Counsel at all stages should demand on behalf of the client all resources necessary to provide high quality legal representation. If such resources are denied, counsel should make an adequate record to preserve the issue for further review.

D. Counsel should recognize that under Texas law, application to the Court for financial assistance for experts with regard to some of the above issues may be requested in an *ex parte* proceeding, under seal, to preserve the attorney-client privileged information. Counsel should be prepared to submit *ex parte* requests for funding, accompanied by the appropriate affidavits, showing the need for the financial assistance sought, and be prepared to make a record to the court in-chambers of the necessity for such financial assistance. Counsel should also be aware that due to the constraints of the budgets of most counties, while a court may deny an initial request for funds, that subsequent, follow-up requests should be submitted to the court, based upon the exigencies of the case. See Article 26.052 f), V.A.C.C.P.

## GUIDELINE 10.2     RELATIONSHIP WITH THE CLIENT

A. Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

1. Barring exceptional circumstances, the client should be contacted within 24 hours of initial counsel's entry into the case, with full and complete interviews of the client to be conducted as soon as practically possible.

2. Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

B. Counsel at all stages of the case should re-advise the client and the government regarding these matters as appropriate.

C. Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as:

1. the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

2. current or potential legal issues;

3. the development of a defense theory;

4. presentation of the defense case;

5.  potential agreed-upon dispositions of the case;

6.  litigation deadlines and the projected schedule of case-related events; and

7.  relevant aspects of the client's relationship with correctional, parole or other governmental agents (e.g., prison medical providers or state psychiatrists).

## GUIDELINE 10.3    ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL

A.  Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B.  Counsel representing a foreign national should:

1.  Immediately determine if the client's ability to communicate with counsel, in English, is sufficient to allow counsel and the client to adequately communicate. Counsel must recognize that some foreign nationals speak in dialects of which counsel may be unfamiliar, resulting in unintended miscommunication.

2.  If there are any language conflicts, counsel should immediately request the court to appoint an appropriate interpreter to assist the defense in all stages of the proceeding, or counsel may request permission to withdraw due to language problems. It is highly recommended that both lead and associate counsel have adequate communication with the defendant, rather than just one of counsel.

3.  Immediately advise the client of his or her right to communicate with the relevant consular office; and

4.  Obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest. Counsel who is unable to obtain consent should exercise his or her best professional judgment under the circumstances.

## GUIDELINE 11.1    TRIAL INVESTIGATION

A.  Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.

1.  The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

2.  The investigation for the guilt — innocence phase of the trial should generally encompass the following aspects:

a.  Extensive interviews with the client to determine: the background information in the case; any potential defenses; the identity of any witnesses available for guilt — innocence, or on punishment; the names and addresses of all available family members; medical history; educational history; criminal history, etc.;

b.  Informal discovery requests (before indictment if possible) should be immediately made to law enforcement and the district attorney for witness statements, police reports, witness lists, physical evidence, names of co-defendants (and any deals made with witnesses to testify); search and arrest warrant documents, copies of written or oral statements of the defendant, and any other information immediately available to permit commencement of

10

the defense investigation. After indictment, formal discovery motions should be immediately submitted to the Court for resolution and ruling.

c. Interviewing as soon as practically possible any potential witnesses relevant to the issues of guilt innocence, properly preserving such witness information by written statement, affidavit or audio/video recording.

d. Reviewing the scene of the crime, recording exact locations of relevant events, lighting conditions, physical layout, etc.

e. Interviewing family members and other relevant witnesses to the defendant's mental health condition

f. Conducting review of client's entire criminal history, including obtaining copies of prior conviction records, arrests, etc.

g. Research and preparation of pretrial strategy for suppression motions, motions to quash, discovery requests, both formal and informal, etc.

h. Plan trial strategy, including discovery requests, pretrial motion practice, jury selection, cross examination techniques of State witnesses, probable legal issues arising during trial, presentation of defense case (including defendant's possible testimony), possible rebuttal issues, jury charge issues, final argument strategy.

i. Conducting a review of the client's possible mental retardation, in view of the decision of *Atkins v. Virginia*, 536 U.S. 304 (2002). Counsel are advised that the issue of mental retardation may not easily be determined from the attorneys' interviews with the client. The client will generally attempt to "mask" such condition. Special expertise in recognizing actual mental retardation is required. Counsel are advised to pursue pretrial hearings to challenge any attempt by the State to seek death, if there is credible evidence of mental retardation, until such time as the Texas Legislature sets a statutory procedure, or the United States Supreme Court determines that pretrial hearings are not constitutionally required on the mental retardation issue.

j. In view of the decision of *Roper v. Simmons*, 543 U.S. 551 (2005), especially in cases involving aliens, where the client's date of birth may be difficult to document, a special investigation may be required to ascertain the true "age" of the defendant to ensure that he is "death eligible" and if not, ensure that the prosecution is aware of such evidence. Counsel are advised that it may be necessary to pursue special pretrial hearings to challenge any attempt by the State to seek death, if there is credible evidence that the client is under 18 years of age, or if there is no credible evidence to show his exact birthdate, as it would appear that the State has the burden to prove an accurate date of birth before death is sought.

3. The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

a. Discovery — all efforts should be made to determine, well in advance of trial, the evidence the State intends to use during the punishment phase of the trial, extraneous offenses, prior criminal convictions, and expert witnesses.

b. The investigation for the punishment phase of the trial should generally encompass the following aspects:

(i.) Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate mitigating evidence theory;

(ii.) Development of expert witnesses on mental health issues, if any;

(iii.) Development of rebuttal witnesses for State's extraneous offenses, if any;

11

    (iv.)   Development of the defendant's testimony, if necessary;

    (v.)   Planning of cross examination of State witnesses;

    (vi.)   Preparation for jury charge issues; or,

    (vii.)   Preparation of final argument.

B.   Counsel at every stage have an obligation to conduct a full examination of the defense provided to the client at all prior phases of the case. This obligation includes at minimum interviewing prior counsel and members of the defense team and examining the files of prior counsel.

C.   Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.

## GUIDELINE 11.2     THE DUTY TO ASSERT LEGAL CLAIMS

A.   Counsel at every stage of the case, exercising professional judgment in accordance with these Guidelines, should:

   1.   Consider all legal claims potentially available; and

   2.   Thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted; and

   3.   Evaluate each potential claim in light of:

      a.   The unique characteristics of death penalty law and practice;

      b.   The near certainty that all available avenues of post-conviction relief will be pursued in the event of conviction and imposition of a death sentence;

      c.   The importance of protecting the client's rights against later contentions by the government that the claim has been waived, defaulted, not exhausted, or otherwise forfeited; and,

      d.   Any other professionally appropriate costs and benefits to the assertion of the claim.

B.   Counsel who decide to assert a particular legal claim should:

   1.   Present the claim as forcefully as possible, tailoring the presentation to the particular facts and circumstances in the client's case and the applicable law; and

   2.   Ensure that a full record is made of all legal proceedings in connection with the claim.

C.   Counsel at all stages of the case should keep under consideration the possible advantages to the client of:

   1.   Asserting legal claims whose basis has only recently become known or available to counsel; and

   2.   Supplementing claims previously made with additional factual or legal information.

**GUIDELINE 11.3**      **THE DUTY TO SEEK AN AGREED-UPON DISPOSITION**

A. Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.

B. Counsel at every stage of the case should explore with the client the possibility and desirability of reaching an agreed-upon disposition. In so doing, counsel should fully explain the rights that would be waived, the possible collateral consequences, and the legal, factual, and contextual considerations that bear upon the decision. Specifically, counsel should know and fully explain to the client:

1. The maximum penalty that may be imposed for the charged offense(s) and any possible lesser included or alternative offenses;

2. Any collateral consequences of potential penalties less than death, such as forfeiture of assets, deportation, civil liabilities, and the use of the disposition adversely to the client in penalty phase proceedings of other prosecutions of him as well as any direct consequences of potential penalties less than death, such as the possibility and likelihood of parole, place of confinement and good-time credits;

3. The general range of sentences for similar offenses committed by defendants with similar backgrounds;

4. The governing legal regime, including but not limited to whatever choices the client may have as to the fact finder and/or sentences;

5. The types of pleas that may be agreed to, such as a plea of guilty, a conditional plea of guilty, or a plea of nolo contendere or other plea which does not require the client to personally acknowledge guilt, along with the advantages and disadvantages of each;

6. Whether any agreement negotiated can be made binding on the court, on penal/parole authorities, and any others who may be involved;

7. The practices, policies and concerns of the particular jurisdiction, the judge and prosecuting authority, the family of the victim and any other persons or entities which may affect the content and likely results of plea negotiations;

8. Concessions that the client might offer, such as:

    a. An agreement to waive trial by jury and to plead guilty to particular charges;

    b. An agreement regarding future custodial status, such as one to be confined in a more onerous category of institution than would otherwise be the case;

    c. An agreement to forego in whole or part legal remedies such as appeals, or for post-conviction relief, and/or parole or clemency applications;

    d. An agreement to provide the prosecution with assistance in investigating or prosecuting the present case or other alleged criminal activity;

    e. An agreement to engage in or refrain from any particular conduct, as appropriate to the case;

    f. An agreement with the victim's family, which may include matters such as: a meeting between the victim's family and the client, a promise not to publicize or profit from the offense, the issuance or delivery of a public statement of remorse by the client, or restitution;

13

    g.   Agreements such as those described in Subsection (8) (a)-(f) respecting actual or potential charges in another jurisdiction;

9.   Benefits the client might obtain from a negotiated settlement, including:

    a.   A guarantee that the death penalty will not be imposed;

    b.   An agreement that the defendant will receive a specific sentence;

    c.   An agreement that the prosecutor will not advocate a certain sentence, will not present certain information to the court, or will engage in or refrain from engaging in other actions with regard to sentencing;

    d.   An agreement that one or more of multiple charges will be reduced or dismissed;

    e.   An agreement that the client will not be subject to further investigation or prosecution for uncharged alleged or suspected criminal conduct;

    f.   An agreement that the client may enter a conditional plea to preserve the right to further contest certain legal issues;

    g.   An agreement that the court or prosecutor will make specific recommendations to correctional or parole authorities regarding the terms of the client's confinement;

    h.   Agreements such as those described in Subsection (9) (a)-(g) respecting actual or potential charges in another jurisdiction.

C.   Counsel should keep the client fully informed of any negotiations for a disposition, convey to the client any offers made by the prosecution, and discuss with the client possible negotiation strategies.

D.   Counsel should inform the client of any tentative negotiated agreement reached with the prosecution, and explain to the client the full content of the agreement along with the advantages, disadvantages and potential consequences of the agreement.

E.   If a negotiated disposition would be in the best interest of the client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.

F.   Counsel should not accept any agreed-upon disposition without the client's express authorization.

G.   The existence of ongoing negotiations with the prosecution does not in any way diminish the obligations of defense counsel respecting litigation.

## GUIDELINE 11.4    ENTRY OF A PLEA OF GUILTY

A.   The informed decision whether to enter a plea of guilty lies with the client. In the event the client determines to enter a plea of guilty:

    1.   Prior to the entry of the plea, counsel should:

        a.   Make certain that the client understands the rights to be waived by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent.

b. Ensure that the client understands the conditions and limits of the plea agreement and the maximum punishment, sanctions, and other consequences to which he or she will be exposed by entering the plea.

c. Explain to the client the nature of the plea hearing and prepare the client for the role he or she will play in the hearing,

d. including answering questions in court and providing a statement concerning the offense.

e. Ensure that the client is mentally competent and psychologically capable of making a decision to enter a plea of guilty.

2. During entry of the plea, counsel should make sure that the full content and conditions of any agreements with the government are placed on the record.

## GUIDELINE 11.5      TRIAL PREPARATION OVERALL

A. As the investigations mandated by GUIDELINE 11.1 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies.

## GUIDELINE 11.6      VOIR DIRE AND JURY SELECTION

A. Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

B. Counsel should be familiar with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding "death qualification" concerning any potential juror's belief about the death penalty. Counsel should be familiar with techniques: (1) for exposing those prospective jurors who would automatically impose the death penalty following a murder conviction or finding that the defendant is death-eligible, regardless of the individual circumstances of the case; (2) for uncovering those prospective jurors who are unable to give meaningful consideration to mitigating evidence; and (3) for rehabilitating potential jurors whose initial indications of opposition to the death penalty make them possibly excludable.

C. Counsel should consider seeking expert assistance in the jury selection process.

## GUIDELINE 11.7      THE DEFENSE CASE CONCERNING PENALTY

A. As set out in GUIDELINE 11.1, counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation.

B. Trial counsel should discuss with the client early in the case the sentencing alternatives available, and the relationship between the strategy for the sentencing phase and for the guilt/innocence phase.

C. Prior to the sentencing phase, trial counsel should discuss with the client the specific sentencing phase procedures and advise the client of steps being taken in preparation for sentencing.

15

D. Counsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing body, means by which the mitigation presentation might be strengthened, and the strategy for meeting the prosecution's case in aggravation.

E. Counsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing body.

F. In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:

1. Witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutors, would present positive aspects of the client's life, or would otherwise support a sentence less than death:

2. Expert and lay witnesses along with supporting documentation (e.g., school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs, or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;

3. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served;

4. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones;

5. Demonstrative evidence, such as photos, videos, and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts, and letters of praise or reference.

G. In determining what presentation to make concerning penalty, counsel should consider whether any portion of the defense case will open the door to the prosecution's presentation of otherwise inadmissible aggravating evidence. Counsel should pursue all appropriate means (e.g., *motions in limine*) to ensure that the defense case concerning penalty is constricted as little as possible by this consideration, and should make a full record in order to support any subsequent challenges.

H. Trial counsel should determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof. If the jurisdiction has rules regarding notification of these factors, counsel at all stages of the case should object to any non-compliance, and if such rules are inadequate, counsel at all stages of the case should challenge the adequacy of the rules.

I. Counsel at all stages of the case should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible.

J. If the prosecution is granted leave at any stage of the case to have the client interviewed by witnesses associated with the government, defense counsel should carefully consider:

1. What legal challenges may appropriately be made to the interview or the conditions surrounding it;

2. The legal and strategic issues implicated by the client's co-operation or non-cooperation;

3. Ensure that the client understands the significance of any statements made during such and interview; and,

4. Attend the interview.

K. Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions. Post-conviction counsel should pursue these issues through factual investigation and legal argument.

L. Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client.

## GUIDELINE 11.8    DUTY TO FACILITATE WORK OF SUCCESSOR COUNSEL

A. In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to safeguard the interests of the client and should cooperate fully with successor counsel. This duty includes, but is not limited to:

1. Maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation;

2. Providing the client's files, as well as information regarding all aspects of the representation, to successor counsel;

3. Sharing potential further areas of legal and factual research with successor counsel; and cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

## GUIDELINE 12.1    DUTIES OF TRIAL COUNSEL AFTER CONVICTION

A. Trial counsel should be familiar with all state and federal post-conviction options available to the client. Trial counsel should discuss with the client the post-conviction procedures that will or may follow imposition of the death sentence.

B. Trial counsel should take whatever action(s), such as filing of a motion for a new trial, will maximize the client's ability to obtain post-conviction relief.

C. Trial counsel should not cease acting on the client's behalf until successor counsel has entered the case or trial counsel's representation has been formally terminated.

D. Trial counsel should consider carefully whether they should accept appointment for the appeal of the case. While Texas law does permit trial counsel to be appointed for appeal upon a showing of "good cause", see Article 26.052 (k), V.A.C.C.P., the availability of some habeas issues may be negatively impacted by counsel's representation at both phases, resulting in claims conceivably being procedurally defaulted or waived. In the event that counsel and the appellant strongly desire that one of the trial counsel act as counsel on appeal, it is recommended that another independent counsel also be appointed as lead appellate counsel to prevent any conflicts.

E. Trial counsel should take all appropriate action to ensure that the client obtains successor counsel as soon as possible.

F. Trial counsel should cooperate with successor direct appeal, habeas and clemency counsel in providing relevant information to successor counsel, including trial counsel's prior representation files upon the client's consent, in order to maintain continuity of representation, and to assist future counsel in presentation of issues relevant to subsequent litigation efforts.

**GUIDELINE 12.2**     <u>**DUTIES OF POST-TRIAL COUNSEL**</u>

**GUIDELINE 12.2(A)**     <u>**DUTIES OF DIRECT APPEAL COUNSEL**</u>

1.  Counsel should, upon being contacted by the court or client concerning representation in a capital appeal, immediately consult with the court and/or the clerk of the court to ascertain relevant information concerning relevant filing deadlines, in order to ensure that counsel's acceptance of the case permits counsel the maximum opportunity for proper representation.

2.  Counsel should immediately contact trial counsel to obtain background information on the client, the nature of the issues presented and the possibility of filing a motion for new trial with regard to any issues that need to be raised in such proceeding.

3.  Counsel should, upon acceptance of appellate representation, immediately inform the court and the prosecution of his representation by filing the appropriate designation of counsel with the court, along with the proper designation of the Clerk's Record and Court Reporter's Record as mandated by the Texas Rules of Appellate Procedure.

4.  Counsel should immediately request the trial court to appoint habeas corpus counsel, under Article 11.071, Code of Criminal Procedure, to represent the client in the parallel capital habeas proceedings. It is recommended that counsel on appeal contact qualified attorneys, certified by the Texas Court of Criminal Appeals for habeas representation, to determine their availability for representation and their desire to assist counsel in the particular case.

5.  Counsel should consult and cooperate with habeas corpus counsel in order to maximize proper presentation of the respective appellate issues and habeas corpus issues to secure the best possible post-conviction review for the client.

6.  Counsel should be cognizant of decisions with regard to capital murder issues from the United States Supreme Court, Fifth Circuit Court of Appeals, and from across the country, maintaining current research capabilities, including law library facilities, online legal resources, and all other resources for presentation of all available issues to the Court.

7.  Counsel must recognize that errors are often committed by the clerk in preparation of the clerk's transcript, and by the court reporter in compiling the reporter's transcript, therefore counsel must ensure that the record is true, correct and complete in all respects. If errors or omissions are found, objections to the record must be immediately filed with the trial or appellate courts, to obtain corrections or hearings to insure reliability of the record.

8.  Counsel should fully review the appellate record for all reviewable errors, preparing a well researched and drafted appellate brief which conforms with Court of Criminal Appeals rules and policies, ensuring that the brief is filed in a timely manner, timely notifying the Court of Criminal Appeals of his desire to present oral argument in the case, if appropriate.

9.  Counsel should be prepared to prepare and file a Reply Brief in opposition to any brief filed by the District Attorney's Office within a timely manner.

10. Should counsel desire to present oral argument to the Court of Criminal Appeals, counsel should be familiar with the rules and policies of the Court concerning arguments, and ensure that his argument presented is geared to issues that are worthy of presentation under current standards, and not wasteful of the Court's time.

11. Counsel should be prepared to file a Motion for Rehearing with the Court of Criminal Appeals should the conviction be affirmed, or conversely, be prepared to defend against the State's Motion for Rehearing, should the Court of Criminal Appeals reverse the conviction on original submission.

12. Counsel should be prepared to research, prepare and file a Petition for Writ Of Certiorari in the United States Supreme Court should the conviction be affirmed, or ensure that counsel is obtained or appointed to seek certiorari to review, should original appellate counsel not be prepared to proceed with such representation.

13. Should appellate relief be denied by the Court of Criminal Appeals and/or United States Supreme Court, counsel on appeal should consult with habeas counsel to ensure that federal habeas corpus counsel is assigned for future representation of the client.

## GUIDELINE 12.2(B)    DUTIES OF HABEAS CORPUS COUNSEL

1. General Responsibilities

    a. Habeas corpus counsel must understand that the state habeas corpus proceeding is not a second direct appeal. Direct appeal-like, record-based claims are not cognizable in state habeas corpus and can be fatal to the capital client. Counsel should not accept an appointment if he or she is not prepared to undertake the comprehensive extra-record investigation that habeas corpus demands.

    b. Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case.

    c. Habeas corpus counsel must treat the habeas corpus stage as both the first and last meaningful opportunity to present new evidence to challenge the capital client's conviction and sentence. Therefore, counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place, including — but not limited to – claims involving police and prosecutorial misconduct, faulty eyewitness evidence, unreliable jailhouse informant testimony, coerced confessions, dubious or flawed forensic scientific methods, ineffective assistance of trial and appellate counsel, and juror misconduct.

    d. Because state habeas corpus is the first opportunity for a capital client to raise challenges to the effectiveness of trial or direct appeal counsel, state habeas corpus counsel should not accept the appointment if he or she represented the client at the capital murder trial or on direct appeal of the capital conviction and death sentence.

    e. Habeas corpus counsel should assume that any meritorious issue not contained in the first state application for writ of habeas corpus will be waived or procedurally defaulted in subsequent federal habeas corpus litigation, or barred by strict rules governing successive state habeas corpus applications. State habeas corpus counsel's lack of diligence, mistakes, missteps, and omissions will be attributed to the capital client and will follow the client throughout all remaining proceedings in state and federal court.

    f. Habeas corpus counsel must master the set of procedural rules and statutes that may restrict the capital client's opportunity for federal habeas corpus review, including the federal statute of limitations found in the Antiterrorism and Effective Death Penalty Act. State habeas corpus counsel's failure to understand AEDPA's implications may result in the unwitting forfeiture of a capital client's right to federal habeas corpus review.

    g. Attorneys seeking to qualify to receive state habeas corpus appointments should be required to satisfactorily complete a comprehensive training program. At least once every two years, attorneys seeking to remain on the state habeas corpus appointment roster should be required to successfully complete a specialized training program that focuses on the representation of death row inmates in state and federal post-conviction proceedings.

2.  Client Communication

    a.  Without exception, habeas corpus counsel has a duty to meet the capital client face-to-face as soon as possible after appointment. Counsel, or some member of the defense team, should make every effort to establish a relationship of trust with the client. It is also essential for counsel or some member of the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

    b.  Habeas corpus counsel has a duty to keep the capital client informed of case developments, the progress of the investigation, potential legal issues, and litigation deadlines. Although some strategic decisions require the client's knowledge and agreement, others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

    c.  It is a dereliction of habeas corpus counsel's duty to simply acquiesce to a capital client's insistence that he or she wishes to be executed, or wants to challenge only the conviction but not the sentence. Counsel must try to identify the source of the client's feelings about these matters. Counsel should consult lawyers, clergy, mental health professionals, the client's family or others who have worked with similarly situated death row inmates.

    d.  Habeas corpus counsel should be familiar enough with the capital client's mental condition to make a reasoned decision – fully documented, for the benefit of actors at later stages of the case –whether to assert the position that the client is not competent to waive further proceedings.

    e.  Habeas corpus counsel should make appropriate efforts to determine whether any foreign country might consider the capital client to be one of its nationals. Unless predecessor counsel has already done so, counsel representing a foreign national should immediately advise the client of his or her right to communicate with the relevant consular office; and obtain the consent of the client to contact the consular office. After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's conviction and sentence.

3.  The Duty to Investigate

    a.  Because habeas corpus counsel must review what are, in essence, two different trials, providing quality representation in capital cases requires counsel to conduct a thorough and independent investigation of both the conviction and sentence. Habeas corpus counsel must promptly obtain the investigative resources necessary to examine both phases, including the assistance of a fact investigator and a mitigation specialist, as well as any appropriate experts.

    b.  Habeas corpus counsel must obtain and read the entire record of the trial, including all transcripts and motions. Counsel has an obligation to independently verify that the official record of all prior proceedings is complete, and to supplement it if necessary. Counsel must also inspect the evidence and obtain the files of trial and appellate counsel, scrutinizing them for what is missing as well as what is present. Counsel should interview prior counsel and members of the defense team.

    c.  Because the mental vulnerabilities of many death row inmates increase the possibilities for error, habeas corpus counsel must take seriously the possibility of the capital client's innocence, carefully analyze the quality of the prosecution's case in aggravation, and investigate all possible defenses and potentially mitigating evidence.

    d.  In short, habeas corpus counsel has a duty to make an independent examination of all of the available evidence – both that which the jury heard and that which it did not – to determine whether the jurors made a fully informed resolution of the issues at both guilt and punishment.

4. The Guilt-Innocence Phase Investigation

    a.   Habeas corpus counsel should conduct a guilt-innocence phase investigation regardless of any admission or statement by the capital client about the facts of the crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be examined. Instead, counsel must independently investigate the circumstances of the crime and all evidence inculpating the client. Counsel should not assume the accuracy of the evidence admitted at trial.

    b.   Informal discovery requests should be made to law enforcement and the district attorney for additional documentation not contained within the district clerk's file, such as: witness statements; police reports; physical evidence; search and arrest warrant documents; and any other information immediately available to permit commencement of the habeas investigation.

    c.   Should the State not maintain a complete open file policy, formal discovery motions should be pursued to the Court for resolution and ruling. Counsel should further be aware that requests may be made for disclosure of District Attorney files through the Texas Attorney General's Open Records Division.

    d.   The assistance of a fact investigator with specialized training is indispensable to discovering and developing the facts that must be unearthed in habeas corpus proceedings.

    e.   Habeas corpus counsel's obligation to reinvestigate the case will require counsel to interview most, if not all, of the critical witnesses for the prosecution and investigate their backgrounds. Counsel must determine if a witness's testimony bears scrutiny or whether motives for fabrication or bias were left uncovered at the time of trial.

    f.   Habeas corpus counsel must also assess all of the non-testimonial evidence and consider whether to perform independent forensic testing, either because some technology, such as DNA testing, was unavailable at the time of trial, or because trial counsel failed to ensure that the necessary testing took place.

    g.   Habeas corpus counsel should seek out and interview potential witnesses who might challenge the prosecution's version of events, including eyewitnesses or other witnesses having purported knowledge of events surrounding the offense; potential alibi witnesses; witnesses familiar with aspects of the capital client's life history that might affect the likelihood that the client committed the offense or the degree of culpability for the offense.

    h.   Habeas corpus counsel must attempt to obtain evidence and information in the possession of the prosecution or law enforcement authorities, including police reports, autopsy reports, photos, video or audio tape recordings, and crime scene and crime lab reports, together with the raw data forming the basis of any reports or conclusions, and any other physical evidence. Counsel should pursue such evidence and information through public information act requests to the appropriate government agencies, or through informal and formal discovery.

    i.   Habeas corpus counsel has a duty to conduct additional investigation to determine whether racial discrimination tainted the imposition of the death penalty or the composition of the jury. Counsel should investigate whether minorities or women were underrepresented on the jury lists from which grand and petit juries were drawn.

    j.   Habeas corpus counsel should maintain copies of media reports about the case to determine the effects of pretrial publicity, as well as to review the public statements of potential witnesses and other trial participants.

5. The Mitigation Investigation

    a.   Habeas corpus counsel must conduct a mitigation investigation regardless of the expressed desires of the capital client. Counsel may not conclude that a mitigation investigation would be futile, because counsel cannot responsibly advise

a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation.

b.   Habeas corpus counsel should not rely on his or her own observations of the capital client's mental status as sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. For that reason, at least one member of the defense team should be qualified to screen for mental or psychological disorders or defects and recommend further investigation of the client if necessary.

c.   Habeas corpus counsel should retain an independent mitigation specialist as a member of the defense team as soon as possible after appointment. The mitigation specialist should have the ability to: (i.) compile a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation, interviews, and collection of documents; (ii.) analyze the significance of the information in terms of impact on development, including effect on personality and behavior; (iii.) find mitigating themes in the client's life history; (iv.) identify the need for assistance from mental health experts; (v.) assist in locating appropriate experts; (vi.) provide social history information to experts to enable them to conduct competent and reliable evaluations; and (vii.) work with the defense team and experts to develop a comprehensive and cohesive case in mitigation that could have been presented at trial.

d.   Habeas corpus counsel's mitigation investigation should include a review of the capital client's (i.) medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); (ii.) family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); (iii.) educational history (including achievement, performance, behavior, and activities) and special educational needs (including cognitive limitations and learning disabilities); (iv.) military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services); (v.) employment and training history (including skills and performance, and barriers to employability); and (vi.) prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

e.   Note: Counsel should be advised that, in obtaining a prisoner's records from the Texas Department of Corrections, Institutional Division, some records can be found at the main Classification Division of the TDC in Huntsville, but also, other records are separately maintained at the Polunsky Unit, the Death Row facility, therefore any investigation or subpoena of records needs to be directed at both locations.

f.   Habeas corpus counsel should locate and interview the capital client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others.

g.   Habeas corpus counsel should obtain releases for securing confidential records relating to all potentially relevant information about the capital client, his or her siblings and parents, and other family members, including but not limited to school records, social service and welfare records, juvenile dependency or family court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, and death records, alcohol and drug abuse assessment or treatment records, and INS records.

h. Habeas corpus counsel must also investigate prior convictions and unadjudicated offenses that the prosecution presented as aggravating circumstances, or that otherwise came into evidence. If a prior conviction is legally flawed, counsel should seek to have it set aside. Counsel may also find extenuating circumstances that can be offered to lessen the weight of a prior conviction or unadjudicated offense.

6. Making a Record

a. Habeas corpus counsel must demand on behalf of the capital client all resources necessary to provide high quality legal representation, to conduct a thorough investigation of both the conviction and sentence, to procure documentary evidence, and to retain experts. Because counsel should not have to disclose privileged communications or strategy to the prosecution in order to secure these resources, counsel must insist upon making such requests *ex parte* and *in camera*. If resources are denied, counsel should make an adequate record to preserve the issue for further review.

b. Habeas corpus counsel must ensure that there is a complete record for every issue raised, including objections, motions, statements of grounds, oral and written arguments of both sides, discussions among counsel and the court, evidence proffered and received, rulings of the court, reasons given by the court for its rulings, and any agreements reached between the parties. If a court refuses to allow a proceeding to be recorded, counsel should state the objection to the court's refusal and, at the first available opportunity, make a record of what transpired in the unrecorded proceeding.

c. Habeas corpus counsel must file a written request for an evidentiary hearing on all disputed factual issues and provide the trial court with an in-depth explanation of why a hearing is necessary.

7. Presenting Legal Claims

a. Habeas corpus counsel must evaluate each potential claim in light of the near certainty that any claim not presented in the first state application for writ of habeas corpus will be waived or otherwise defeated by defenses such as procedural default or failure to exhaust. For this reason, counsel must be especially sensitive to the need to preserve all potential issues for later review by including them in the first state application for writ of habeas corpus.

b. Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim before deciding not to include it in the first state application for writ of habeas corpus.

c. Habeas corpus counsel has a duty to preserve issues calling for a change in existing precedent. Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices and long-standing precedent.

d. Habeas counsel should attach all available proof to the application (affidavits, documentary evidence, etc.) even though doing so is not technically required by state law. Failing to attach proof in state court will likely waive the client's ability to present it in federal court. When proof is unavailable, habeas counsel should plead all factual allegations with the greatest possible specificity.

e. Habeas corpus counsel should consider the possible advantages to the capital client of asserting legal claims whose basis has only recently become known or available to counsel. Counsel should supplement claims previously made with additional factual or legal information that comes to counsel's attention, even if it occurs after the first state application for writ of habeas corpus has been filed.

23

8. Negotiating a Settlement

   a. Habeas corpus counsel has an obligation to take all steps that may be appropriate in the exercise of professional judgment to achieve an agreed-upon disposition of the case. If a negotiated disposition would be in the best interest of the capital client, initial refusals by the prosecutor to negotiate should not prevent counsel from making further efforts to negotiate. Similarly, a client's initial opposition should not prevent counsel from engaging in an ongoing effort to persuade the client to accept an offer of resolution that is in the client's best interest.

   b. Habeas corpus counsel should consider making overtures to members of the victim's family—possibly through an intermediary, such as a clergy member, victim liaison, or representative of an organization such as Murder Victim's Families for Reconciliation—to ascertain their current feelings about the death penalty and the possibility of settling the case.

9. Facilitating Federal habeas Corpus Review

   a. State habeas corpus counsel must file a motion for appointment of federal habeas counsel in federal district court immediately after the conclusion of state habeas corpus proceedings, as required by Section 2 of Article 11.071. Any delay in filing this motion may deprive the capital client of the right to federal review.

   b. If state habeas corpus counsel does not intend to continue representing the capital client in federal habeas corpus proceedings, state habeas corpus counsel must not cease acting on the capital client's behalf until the federal district court has formally appointed new counsel. State habeas corpus counsel's duty includes monitoring the case in federal district court and, if necessary, urging the federal district court to appoint federal habeas corpus counsel as soon as possible after the termination of state habeas corpus proceedings.

   c. Even after state habeas corpus counsel has been formally replaced, he or she owes a continuing duty of complete fidelity to the capital client. State habeas corpus counsel has a responsibility to cooperate with successor counsel in evaluating state habeas corpus counsel's representation of the client.

   d. State habeas corpus counsel's continuing duty to safeguard the interests of the capital client and cooperate fully with successor counsel includes, but is not limited to, maintaining the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation; providing the client's files, as well as information regarding all aspects of the representation, to successor counsel; sharing potential further areas of legal and factual research with successor counsel; and cooperating with such professionally appropriate legal strategies as may be chosen by successor counsel.

## GUIDELINE 12.2(C)   DUTIES OF CLEMENCY COUNSEL

1. Clemency counsel should be familiar with the procedures for, and permissible substantive content of, a request for clemency. Clemency counsel should timely contact the Texas Board of Pardons and Paroles to determine the current and present rules and regulations for seeking clemency in death penalty cases. Counsel are advised that these rules and regulations change on a regular basis, thus this immediate contact is absolutely necessary to ensure preparation and filing of proper documents that will be considered by the Board.

2. Clemency counsel should conduct an investigation in accordance with GUIDELINE 12.2.

3. Clemency counsel should ensure that clemency is sought in as timely and persuasive a manner as possible, tailoring the presentation to the characteristics of the particular client, case and jurisdiction.

4. Clemency counsel should ensure that the process governing consideration of the client's application is substantively and procedurally just, and, if it is not, should seek appropriate redress.

# Exhibit 53

# American Bar Association

# Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases

**Revised Edition**
**February 2003**

Copyrighted by the American Bar Association

# TABLE OF CONTENTS

**GUIDELINE 1.1 – OBJECTIVE AND SCOPE OF GUIDELINES** ....................................... **1**

**GUIDELINE 2.1 – ADOPTION AND IMPLEMENTATION OF A PLAN TO PROVIDE HIGH QUALITY LEGAL REPRESENTATION IN DEATH PENALTY CASES** ............ **18**

**GUIDELINE 3.1 – DESIGNATION OF A RESPONSIBLE AGENCY** ............................ **22**

**GUIDELINE 4.1 – THE DEFENSE TEAM AND SUPPORTING SERVICES** ................. **28**

**GUIDELINE 5.1 – QUALIFICATIONS OF DEFENSE COUNSEL** ................................. **35**

**GUIDELINE 6.1 – WORKLOAD** ........................................................................ **38**

**GUIDELINE 7.1 – MONITORING; REMOVAL** .................................................... **42**

**GUIDELINE 8.1 – TRAINING** ......................................................................... **46**

**GUIDELINE 9.1 – FUNDING AND COMPENSATION** .......................................... **50**

**GUIDELINE 10.1 – ESTABLISHMENT OF PERFORMANCE STANDARDS** .............. **56**

**GUIDELINE 10.2 – APPLICABILITY OF PERFORMANCE STANDARDS** .................. **59**

**GUIDELINE 10.3 – OBLIGATIONS OF COUNSEL RESPECTING WORKLOAD** ....... **62**

**GUIDELINE 10.4 – THE DEFENSE TEAM** ........................................................ **64**

**GUIDELINE 10.5 – RELATIONSHIP WITH THE CLIENT** ..................................... **69**

**GUIDELINE 10.6 – ADDITIONAL OBLIGATIONS OF COUNSEL REPRESENTING A FOREIGN NATIONAL** ................................................................................... **74**

**GUIDELINE 10.7 – INVESTIGATION** ............................................................... **77**

**GUIDELINE 10.8 – THE DUTY TO ASSERT LEGAL CLAIMS** ............................. **88**

**GUIDELINE 10.9.1 – THE DUTY TO SEEK AN AGREED-UPON DISPOSITION** ........ **93**

**GUIDELINE 10.9.2 – ENTRY OF A PLEA OF GUILTY** ....................................... **99**

**GUIDELINE 10.10.1 – TRIAL PREPARATION OVERALL** .................................. **101**

**GUIDELINE 10.10.2 – VOIR DIRE AND JURY SELECTION** ................................ **102**

**GUIDELINE 10.11 – THE DEFENSE CASE CONCERNING PENALTY** ...................... **106**

## GUIDELINE 5.1 – QUALIFICATIONS OF DEFENSE COUNSEL

A.    The Responsible Agency should develop and publish qualification standards for defense counsel in capital cases. These standards should be construed and applied in such a way as to further the overriding goal of providing each client with high quality legal representation.

B.    In formulating qualification standards, the Responsible Agency should insure:

    1.    That every attorney representing a capital defendant has:

        a.    obtained a license or permission to practice in the jurisdiction;

        b.    demonstrated a commitment to providing zealous advocacy and high quality legal representation in the defense of capital cases; and

        c.    satisfied the training requirements set forth in Guideline 8.1.

    2.    That the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation. Accordingly, the qualification standards should insure that the pool includes sufficient numbers of attorneys who have demonstrated:

        a.    substantial knowledge and understanding of the relevant state, federal and international law, both procedural and substantive, governing capital cases;

        b.    skill in the management and conduct of complex negotiations and litigation;

        c.    skill in legal research, analysis, and the drafting of litigation documents;

        d.    skill in oral advocacy;

        e.    skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence;

        f.    skill in the investigation, preparation, and presentation of evidence bearing upon mental status;

        g.    skill in the investigation, preparation, and presentation of mitigating evidence; and

        h.    skill in the elements of trial advocacy, such as jury selection, cross-examination of witnesses, and opening and closing statements.

### *History of Guideline*

This Guideline has been substantially reorganized for this edition. In the original edition, it emphasized quantitative measures of attorney experience – such as years of litigation experience and number of jury trials – as the basis for qualifying counsel to undertake representation in death penalty cases. In this revised edition, the inquiry focuses on counsel's ability to provide high quality legal representation.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: PROVIDING DEFENSE SERVICES Standard 5-2.2 (3d ed. 1992) ("Eligibility to Serve").

NAT'L ADVISORY COMM'N ON CRIMINAL JUSTICE STANDARDS & GOALS, REPORT OF THE TASK FORCE ON THE COURTS Standard 13.15 (1973) ("Providing Assigned Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 1.2 (1997) ("Education, Training, and Experience of Defense Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR NEGOTIATING AND AWARDING GOVERNMENTAL CONTRACTS FOR CRIMINAL DEFENSE SERVICES, Guideline II.3 (1984) ("Duties").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 2.9 (1989) ("Standards for Performance of Counsel").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1(b) (1989) ("Establishment and General Operation of Assigned Counsel Roster").

NAT'L LEGAL AID & DEFENDER ASS'N, STANDARDS FOR THE ADMINISTRATION OF ASSIGNED COUNSEL SYSTEMS Standard 4.1.1 (1989) ("Qualifications of Attorneys").

NAT'L LEGAL AID & DEFENDER ASS'N, GUIDELINES FOR LEGAL DEFENSE SYSTEMS IN THE UNITED STATES, Guideline 2.15 (1976) ("Establishing the Assigned Counsel Panel").

### *Commentary*

Under Guideline 3.1, it is the duty of the Responsible Agency to provide capital defendants with attorneys who will give them high quality legal representation. This Guideline amplifies that duty. It is designed to be outcome-focused and to leave the Responsible Agency maximum flexibility. The Guideline sets forth the necessary qualifications for all attorneys (Subsection B (1)), and also requires that "the pool of defense attorneys as a whole is such that each capital defendant within the jurisdiction receives high quality legal representation." (Subsection B (2)). The qualification standards set by the Responsible Agency must be such as to bring about this result.

This functional approach is new to this edition.

As described in the Commentary to Guideline 1.1, the abilities that death penalty defense counsel must possess in order to provide high quality legal representation differ from those required in any other area of law. Accordingly, quantitative measures of experience are not a sufficient basis to determine an attorney's qualifications for the task. An attorney with substantial prior experience in the representation of death penalty cases, but whose past performance does not represent the level of proficiency or commitment necessary for the adequate representation of a client in a capital case, should not be placed on the appointment roster.[107]

There are also attorneys who do not possess substantial prior experience yet who will provide high quality legal representation in death penalty cases.[108] Such attorneys may have specialized training and experience in the field (*e.g.*, as law professors), may previously have been prosecutors, or may have had substantial experience in civil practice.[109] These attorneys should receive appointments if the Responsible Agency is satisfied that the client will be provided with high quality legal representation by the defense team as a whole.

In order to make maximum use of the available resources in the legal community overall, the Responsible Agency needs to devise qualification standards that build upon the contribution that each lawyer can make to the defense team, while ensuring that the team is of such a size and aggregate level of experience as to be able to function effectively.

---

[107]   *See* Bright, *supra* note 28, at 1871 n.209 ("Standards for the appointment of counsel, which are defined in terms of number of years in practice and number of trials, do very little to improve the quality of representation since many of the worst lawyers are those who have long taken criminal appointments and would meet the qualifications").

[108]   Because, as the second sentence of Subsection A emphasizes, the overriding goal is to provide high quality legal representation to the client in the individual case, it may also be appropriate for the appointing authority to certify an attorney for a limited purpose, *e.g.*, to represent a particular client with whom he or she has a special relationship.

[109]   Superior post-conviction death penalty defense representation has often been provided by members of the private bar who did not have prior experience in the field but who did have a commitment to excellence. *See, e.g.*, Kelly Choi, *Against All Odds*, THE AMERICAN LAWYER, Dec. 2000, at 98; *Death-Row Rescue by Minnesota Life-Saving Lawyers*, STAR TRIBUNE, Jan. 5, 2001, at 18A.

## GUIDELINE 10.5 – RELATIONSHIP WITH THE CLIENT

**A.**   Counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client.

**B.**   **1.**   Barring exceptional circumstances, an interview of the client should be conducted within 24 hours of initial counsel's entry into the case.

   **2.**   Promptly upon entry into the case, initial counsel should communicate in an appropriate manner with both the client and the government regarding the protection of the client's rights against self-incrimination, to the effective assistance of counsel, and to preservation of the attorney-client privilege and similar safeguards.

   **3.**   Counsel at all stages of the case should re-advise the client and the government regarding these matters as appropriate.

**C.**   Counsel at all stages of the case should engage in a continuing interactive dialogue with the client concerning all matters that might reasonably be expected to have a material impact on the case, such as: 

   **1.**   the progress of and prospects for the factual investigation, and what assistance the client might provide to it;

   **2.**   current or potential legal issues;

   **3.**   the development of a defense theory;

   **4.**   presentation of the defense case;

   **5.**   potential agreed-upon dispositions of the case;

   **6.**   litigation deadlines and the projected schedule of case-related events; and

   **7.**   relevant aspects of the client's relationship with correctional, parole, or other governmental agents (*e.g.*, prison medical providers or state psychiatrists).

### *History of Guideline*

   This Guideline collects, and slightly expands upon, material that was found in Guidelines 11.4.2, 11.6.1, and 11.8.3 of the original edition.  The major revisions make this standard apply to *all* stages of a capital case and note expressly counsel's obligation to discuss potential dispositions of the case with the client.

### *Related Standards*

ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-3.1 ("Establishment of Relationship"), Standard 4-3.2 ("Interviewing the Client"), Standard 4-3.8 ("Duty to Keep Client Informed"), and Standard 4-5.2 ("Control and Direction of the Case"), *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993).

NAT'L LEGAL AID & DEFENDER ASS'N, PERFORMANCE GUIDELINES FOR CRIMINAL DEFENSE REPRESENTATION, Guideline 1.3(c) ("General Duties of Defense Counsel"), Guideline 2.2 ("Initial Interview") (1997).

NAT'L LEGAL AID AND DEFENDER ASS'N, THE 10 PRINCIPLES OF A PUBLIC DEFENSE DELIVERY SYSTEM, Principle 3 (2000) ("Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel").

### *Commentary*

#### The Problem

Immediate contact with the client is necessary not only to gain information needed to secure evidence and crucial witnesses, but also to try to prevent uncounseled confessions or admissions and to begin to establish a relationship of trust with the client.

Anyone who has just been arrested and charged with capital murder is likely to be in a state of extreme anxiety. Many capital defendants are, in addition, severely impaired in ways that make effective communication difficult: they may have mental illnesses or personality disorders that make them highly distrustful or impair their reasoning and perception of reality; they may be mentally retarded or have other cognitive impairments that affect their judgment and understanding; they may be depressed and even suicidal; or they may be in complete denial in the face of overwhelming evidence. In fact, the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that "[i]t must be assumed that the client is emotionally and intellectually impaired."[176] There will also often be significant cultural and/or language barriers between the client and his lawyers. In many cases, a mitigation specialist, social worker or other mental health expert can help identify and overcome these barriers, and assist counsel in establishing a rapport with the client.

#### Counsel's Duty

---

[176]     *See* Rick Kammen & Lee Norton, *Plea Agreements: Working with Capital Defendants*, THE ADVOCATE, Mar. 2000, at 31, *available at* http://www.dpa.state.ky.us/library/advocate/mar00/plea.html; *see also* Lewis, *supra* note 91, at 840 (finding 40% of death row inmates to be chronically psychotic); Dorothy O. Lewis et al., *Neuropsychiatric, psychoeducational, and family characteristics of 14 juveniles condemned to death in the United States*, 145 AM. J. PSYCHIATRY 584, 585 (1988) (finding 50% of death sentenced juveniles in survey suffered from psychosis and all were severely abused as children).

Although ongoing communication by non-attorney members of the defense team is important, it does not discharge the obligation of counsel at every stage of the case to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters. Some decisions require the client's knowledge and agreement;[177] others, which may be made by counsel, should nonetheless be fully discussed with the client beforehand.

Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense, as discussed in the text accompanying notes 101-04 *supra*, and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.[178] Client contact must be ongoing. An occasional hurried interview with the client will not reveal to counsel all the facts needed to prepare for trial, appeal, post-conviction review, or clemency. Similarly, a client will not – with good reason – trust a lawyer who visits only a few times before trial, does not send or reply to correspondence in a timely manner, or refuses to take telephone calls. It is also essential for the defense team to develop a relationship of trust with the client's family or others on whom the client relies for support and advice.

Often, so-called "difficult" clients are the consequence of bad lawyering – either in the past or present.[179] Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation.[180]

---

[177]   *See, e.g.,* Nixon v. Singletary, 758 So. 2d 618 (Fla. 2000) (ineffective assistance for counsel to fail to obtain client's explicit prior consent to strategy of conceding guilt to jury in opening statement in effort to preserve credibility for sentencing), *cert. denied*, 531 U.S. 980 (2000).

[178]   *See* ABA STANDARDS FOR CRIMINAL JUSTICE: DEFENSE FUNCTION Standard 4-5.2 & cmt., *in* ABA STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION (3d ed. 1993). *See also* Kevin M. Doyle, *Heart of the Deal: Ten Suggestions for Plea Bargaining*, THE CHAMPION, Nov. 1999, at 68 (counsel should not expect client to accept plea bargain unless opinion is founded on experience and leg work investigating the case); White, *supra* note 2, at 371, 374 (thorough investigation and relationship of trust key to persuading client to accept appropriate plea offer).

[179]   *See* White, *supra* note 2, at 338 ("Often, capital defendants have had bad prior experiences with appointed attorneys, leading them to view such attorneys as 'part of the system' rather than advocates who will represent their interests. Appointed capital defense attorneys sometimes exacerbate this perception by harshly criticizing their clients' conduct or making it clear that they are reluctant to represent them. A capital defendant who experiences, or previously has experienced, these kinds of judgments understandably will be reluctant to trust his attorney.").

[180]   A lawyer can frequently earn a client's trust by assisting him with problems he encounters in prison or otherwise demonstrating concern for the client's well being and a willingness to advocate for him. *See id.*; Lee Norton, *Mitigation Investigation, in* FLORIDA PUBLIC DEFENDER ASS'N, DEFENDING A CAPITAL CASE IN FLORIDA 25 (2001). Accordingly, such advocacy is an

Overcoming barriers to communication and establishing a rapport with the client are critical to effective representation. Even apart from the need to obtain vital information,[181] the lawyer must understand the client and his life history.[182] To communicate effectively on the client's behalf in negotiating a plea, addressing a jury, arguing to a post-conviction court, or urging clemency, counsel must be able to humanize the defendant. That cannot be done unless the lawyer knows the inmate well enough to be able to convey a sense of truly caring what happens to him.[183]

Counsel's Duties Respecting Uncooperative Clients

Some clients will initially insist that they want to be executed – as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision.[184] Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison. A client who insists on his innocence should be reminded that a waiver of mitigation will not persuade an appellate court of his innocence, and securing a life sentence may bar the state from seeking death in the event of a new trial.[185]

---

appropriate part of the role of defense counsel in a capital case. Indeed, a lawyer who displays a greater concern with habeas corpus doctrine than with recovering the radio that prison authorities have confiscated from the client is unlikely to develop the sort of a relationship that will lead to a satisfactory legal outcome.

[181] One important example is the fact that the client is mentally retarded – a fact that the client may conceal with great skill, *see, e.g.,* James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants,* 53 GEO. WASH. L. REV. 414, 484-86 (1985), but one which counsel absolutely must know. *See* Atkins v. Virginia, 122 S. Ct. 2242, 2252 (2002) (holding that mentally retarded defendants may not constitutionally be executed).

[182] *See* Goodpaster, *supra* note 2, at 321.

[183] *See* Norton, *supra* note 180, at 5; White, *supra* note 2, at 374-75 (jury will be less likely to empathize with defendant if it does "not perceive a bond between the defendant and his attorney").

[184] *See infra* Guideline 10.7(A) and accompanying Commentary; Kammen & Norton, *supra* note 176, at 32.

[185] *See* Bullington v. Missouri, 451 U.S. 430 (1981); *see also* Sattazahn v. Pennsylvania, 123 S.Ct. 732 (2003).

Counsel in any event should be familiar enough with the client's mental condition to make a reasoned decision – fully documented, for the benefit of actors at later stages of the case – whether to assert the position that the client is not competent to waive further proceedings.[186]

## The Temporal Scope of Counsel's Duties

The obligations imposed on counsel by this Guideline apply to all stages of the case. Thus, post-conviction counsel, from direct appeal through clemency, must not only consult with the client but also monitor the client's personal condition for potential legal consequences.[187] For example, actions by prison authorities (*e.g.*, solitary confinement, administration of psychotropic medications) may impede the ability to present the client as a witness at a hearing,[188] and changes in the client's mental state (*e.g.*, as a result of the breakup of a close relationship or a worsening physical condition) may bear upon his capacity to assist counsel and, ultimately, to be executed.[189] In any event, as already discussed, maintaining an ongoing relationship with the client minimizes the possibility that he will engage in counter-productive behavior (*e.g.*, attempt to drop appeals, act out before a judge, confess to the media). Thus, the failure to maintain such a relationship is professionally irresponsible.[190]

---

[186]   *See generally* Godinez v. Moran, 509 U.S. 389, 399-402 (1993) (setting forth minimum competency standard that the Constitution requires).

[187]   *See infra* text accompanying note 338.

[188]   *See* Riggins v. Nevada, 504 U.S. 127 (1992) (defendant was constitutionally entitled to have administration of anti-psychotic drugs cease before trial).

[189]   *See infra* text accompanying note 339.

[190]   *See* ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.4(a) (2002) ("A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.").

73

# Exhibit 54

57726

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT COURTS |
| | § | |
| AND | § | 144th, 175th, 186th, 187th, 226th, |
| | § | 227th, 290th, 379th, 399th |
| | § | |
| COUNTY OF BEXAR | § | HANDLING CRIMINAL CASES |

## SIXTH JOINT ORDER AMENDING FEE SCHEDULE

In accordance with Article 26.05, Sections (b), (c), and (d) of the Code of Criminal Procedure of the State of Texas, the undersigned, being the district court judges designated by the legislature to give priority to criminal cases in Bexar County, Texas, now adopt the following amendments to the Fee Schedule that was effective January 1, 2002, signed, ordered, and entered the 19th day of November, 2001, and amended January 10, 2002, January 31, 2002, April 3, 2002, July 12, 2002, and August 14, 2003.

We hereby revise and clarify the following provisions of the Fee Schedule:

In the box for Out-of-Court time under Capitals, the words "Need prior approval to exceed 100 hours on capitals" have been replaced with the words "See Guideline #17".

At the bottom of the Fee Schedule page, the words "Need prior approval to exceed" have been removed.

After the words "See the attached Guidelines for the Fee Schedule for more information," the following words have been added: "including Guideline #16 regarding expert and investigative expenses."

Additionally, we hereby add number 17. to the Guidelines for the Fee Schedule, to read as follows:

17.    On a capital murder case, if an attorney anticipates exceeding 100 hours of out-of-court time, he/she must notify the court when they have reached 100 hours and provide the court with an up-to-date itemization form for the time already spent. On presentation of a claim for payment, the court shall order payment of counsel for all out-of-court time, if the time spent was reasonably necessary and reasonably incurred. Unreasonable claims will not be approved.

57726

It is ORDERED that this Joint Order be spread upon the minutes of the respective courts, filed for a record in the offices of the District Clerk of Bexar County, and a copy sent to the Commissioner's Court of Bexar County.

SIGNED, ORDERED and ENTERED the ____12th____ day of December, 2003.

_____
MARK R. LUITJEN
JUDGE
144TH JUDICIAL DISTRICT

_____
TESSA HERR
JUDGE
186TH JUDICIAL DISTRICT

_____
SID L. HARLE
JUDGE
226th JUDICIAL DISTRICT

_____
SHARON MACRAE
JUDGE
290TH JUDICIAL DISTRICT

_____
JUANITA A. VÁSQUEZ-GARDNER
JUDGE
399TH JUDICIAL DISTRICT

_____
MARY ROMAN
JUDGE
175TH JUDICIAL DISTRICT

_____
RAYMOND ANGELINI
JUDGE
187TH JUDICIAL DISTRICT

_____
PHILIP A KAZEN JR.
JUDGE
227TH JUDICIAL DISTRICT

_____
BERT RICHARDSON
JUDGE
379TH JUDICIAL DISTRICT

Fee Schedule

**57726**

\* Vouchers should be itemized on 1/4 of an hour basis.

|  | SJF, 3° | 2° | 1° | Capital |
|---|---|---|---|---|
| Initial Jail Visit | 100 | 100 | 100 | 100 |
| Court Appearance (Hourly Rate) | 75 | 75 | 75 | 75 |
| Evid. Hearing & MTR's (Hourly Rate) | 75 | 85 | 100 | 1st Chair 125<br>2nd Chair 115 |
| Trial (Hourly Rate) | 75 | 100 | 125 | 1st Chair Voir Dire 100<br>2nd Chair 90<br>1st Chair Trial 150<br>2nd Chair 140 |
| Out-of-Court-time (Hourly Rate)<br><br>\*Need prior approval to exceed 30 hours on regular felonies | 50 | 60 | 75 | 80<br><br>\*See Guideline #17 |
| Flat Fee for Pleas | 400 | 500 | 750 | 1st Chair 3500<br>2nd Chair 2500 |
| Flat Fee for MTR's | 175 | 225 | 300 | N/A |

**Multiple Cases:**   <u>Pleas and MTRs</u> : Full amount for highest degree except capital murder then 1/4 of whatever flat fee rate applies to each additional case.

**Multiple Counts:**   <u>Pleas only</u>: Full amount for highest degree except capital murder then 1/4 of whatever flat fee rate applies to each additional count.

**Appeals and P.D.R.'s:**

Regular Felonies:
- out of court   $125/hour
- in court   $150/hour
- \*cap of   $6500

Death Penalty Capitals:
- out of court   $150/hour
- in court   $200/hour
- \*cap of   $15,000

**Investigator Fees:**

- SJF, 3° Up to $300
- 2°   Up to $500
- 1°   Up to $750
- Capital Up to $1500

See the attached Guidelines for the Fee Schedule for more information, including Guideline #16 regarding expert and investigative expenses.

57726

## GUIDELINES FOR THE FEE SCHEDULE

1.  No claim will be paid unless properly submitted within one year of the final disposition.

2.  All dismissals will be paid on an hourly basis only.

3.  When it becomes necessary for the Court to appoint an attorney to advise and counsel a witness whose own testimony might subject that witness to potential criminal liability, counsel will be entitled to compensation at the hourly rate which would be payable if counsel had been appointed to represent the defendant in the case on trial.

4.  Attorneys handling waiver pleas will be paid as if the case had been indicted.

5.  According to Article 26.05(c) of the Code of Criminal Procedure, this fee schedule takes into consideration reasonable and necessary overhead costs.

6.  Requests for prior approval to exceed the maximum stated out-of-court hours and/or the maximum stated investigator fees must be filed in the appropriate court and set out the need to exceed the maximum and a justification of the cost. Extraordinary circumstances must be presented in order to obtain Court approval.

7.  If an attorney chooses to be paid a flat fee for a plea, an additional $100 may be paid for the initial jail visit, if in person.

8.  An itemization sheet must be attached showing detailed hours worked if the attorney is being paid on an hourly basis.

9.  If the County Auditor's Office detects simple mathematical errors in a pay voucher, it will compute the voucher and pay it out based on the auditor's office calculations.

10. Please attach a copy of your brief to your voucher for payment on an appeal.

11. This fee schedule takes effect January 1, 2002, for all offenses committed on or after that date. For offenses committed prior to January 1, 2002, the previous fee schedule will apply.

12. After January 1, 2002, there will be no more automated payments. A voucher must be submitted for payment on any case.

13. MTRs will be paid based on the date the MTR is filed. MTRs filed on or before December 31, 2001, will be paid under the old fee schedule. MTRs filed January 1, 2002 or after, will be paid under the new fee schedule. If an attorney chooses to be paid a flat fee for an MTR, no additional compensation will be payable.

14. Appeals will be paid based on the date of sentence. If the sentencing date is on or before December 31, 2001, the appeal will be paid under the old fee schedule. If the sentencing date is January 1, 2002 or after, the appeal will be paid under the new fee schedule.

15. A voucher combining hourly itemizations and flat fees on multiple cases/multiple counts will

57726

57726

not be approved.  An attorney must submit a voucher based on flat fees alone, or hourly itemizations alone, and no combination of the two is acceptable.

16.      Appointed counsel may incur investigative or expert expenses without prior approval of the court.  On presentation of a claim for reimbursement, the court shall order reimbursement of counsel for the expenses, if the expenses are reasonably necessary and reasonably incurred.  Unreasonable expenses will not be approved.  When possible, prior court approval should be obtained before incurring expenses for investigation and for mental health and other experts.

17.      On a capital murder case, if an attorney anticipates exceeding 100 hours of out-of-court time, he/she must notify the court when they have reached 100 hours and provide the court with an up-to-date itemization form for the time already spent.   On presentation of a claim for payment, the court shall order payment of counsel for all out-of-court time, if the time spent was reasonably necessary and reasonably incurred.   Unreasonable claims will not be approved.

# Exhibit 55



CAUSE NO. 2004 -CR- 1461-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 186th JUDICIAL DISTRICT |
| | § | |
| Francisco Gonzales | § | BEXAR COUNTY, TEXAS |

## WAIVER, CONSENT TO STIPULATION
## OF TESTIMONY AND STIPULATIONS

The Defendant in this cause, being sworn and having read the indictment or had it read to him, advises the Court that he fully understands the charge which is pending against him, and Counsel for the Defendant has explained the Federal and State Constitutional and legal rights possessed by a criminal defendant, including the procedural rights and safeguards afforded by the laws of the State of Texas.

In particular, Counsel has explained and the Defendant understands the privilege against self-incrimination, the confrontation and cross-examination of the witness.

Understanding all these rights, the Defendant knowingly and voluntarily agrees to waive each such right and consents to waive the appearance, confrontation and cross-examination of witnesses against the Defendant; further, the Defendant and his Counsel agree with the Attorney for the State to the introduction of evidence on behalf of the State by affidavits, written statements of witnesses, police reports, laboratory reports and any other documentary evidence which is attached, marked Exhibit Nos. S×1 inclusive, all of which are by this reference made a part of this document. The Defendant, his Counsel and the State's Attorney agree that this evidence is true and correct, that the Defendant is the person referred to by the witness in the attached documents, that if the witnesses testified they would identify the Defendant as the person of whom they speak, and that this document and its attachments may be considered as a part of the Statement of Facts in this case.

s×1

I, _Francisco Gonzales_, do hereby judicially confess and admit, that I intentionally and knowingly, in Bexar County, Texas on _or about the_ ~~,20~~ _3rd day of December, 2003 I did then and there, acting as a party to Juan Castillo, Debra Espinosa and Teresa Quintero, cause the death of Tommy Garcia, by shooting Tommy Garcia with a deadly weapon, namely: a firearm;_ ~~and the~~

The Defendant and his Counsel further agree with the State's Attorney that the Defendant is the person named in the indictment ~~in Count~~ _____ ~~of the indictment~~, that all of the acts alleged therein occurred in Bexar County, Texas, and that the allegations are true and correct.

_____
DEFENDANT

_____
ATTORNEY FOR DEFENDANT

_____
ASST. CRIMINAL DISTRICT ATTORNEY

_Francisco Gonzales_____, known to me to be the Defendant in the above styled and numbered cause, who, being by me duly sworn, acknowledged that he read or had read to him the foregoing waiver, consent to stipulation of testimony and stipulations, that he fully understands the document, that the recitations of fact in the document are true and correct, that the signature which follows is the Defendant's signature, and that the signature was voluntarily given.

## OATH

I hereby solemnly swear or affirm that I shall tell the truth the whole truth and nothing but the truth in response to all questions propounded to me by the court or attorneys representing the state and defense during proceedings in this cause, so help me God.

DEFENDANT

SWORN TO BEFORE ME THIS _____ DAY OF ___ MAY - 3 2005 _____ 20___.

MARGARET G. MONTEMAYOR
CLERK OF THE DISTRICT COURTS
OF BEXAR COUNTY

BY _____
DEPUTY DISTRICT CLERK

3

## CERTIFICATE OF DEFENSE COUNSEL

I am a duly licensed member of the State Bar of Texas. I certify that I have fully explained the rights secured to a Defendant by the Federal and State Constitutions, including the right to be free from self-incrimination, the right to compulsory process, and the rights of confrontation and cross-examination of witnesses. Further, I have discussed the procedural rights and safeguards afforded a criminal defendant by the laws of the State of Texas. Additionally, I have read this Waiver, Consent to Stipulation of Testimony and Stipulations and the attached exhibits and gone over them carefully with the Defendant. It appears to me that the Defendant fully understands these rights and has intelligently and voluntarily waived these rights and entered into these agreements after due deliberation, and so his waivers and agreements are entered into with my advice and consent.

_____
ATTORNEY FOR DEFENDANT

## APPROVAL OF TRIAL JUDGE

The Defendant having signed the Waiver, Consent to Stipulation of Testimony and Stipulations in open Court and under oath, the Court questioned both the Defendant and his Counsel and thereby became satisfied that the Defendant understands the rights which have been waived and therefore can be truly said to have voluntarily relinquished known rights. The Waiver, Consent to Stipulation of Testimony and Stipulations are approved and ORDERED filed in the papers of the cause.

Signed this _____ day of _____ MAY - 3 2005 _____ 20 _____.

_____
JUDGE PRESIDING

4

SUPPLEMENTARY REPORT

3. OFFENSE CLASSIFICATION

PAGE __1__ OF __6__

**CAPITAL MURDER**

4. ASSIGNMENT NO: 03/810893

5. OFFENSE NO:

6. DATE REPORTED: 12/03/03

ROUTING HOMICIDE FILE

**SAN ANTONIO POLICE DEPARTMENT**

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| Garcia, Tommy Jr. | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date and Time of this Report |
|---|---|---|---|
| | 6270 | 12/03/03/0200 | 12/03/03/1030 |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc.

**Complainant**      Garcia, Tommy Jr. H/M ▇▇▇▇ of ▇▇▇▇▇ phone ▇▇▇▇ No arrest record. Complainant received numerous gunshot wounds, including at least one to the mid front torso, at least two to the back and at least two to the head. He was pronounced at the scene by E.M.T. R. Simon 713 at 02:26 hours. The complainant was wearing two white T-shirts; red boxer shorts and denim painters pants. He was wearing white Reebok tennis shoes. There was a silver and gold colored watch on his left wrist and a gold colored nugget bracelet style on his right wrist. A small gold colored earring was in his left ear. He was clutching a handful of leaves in his right hand. His wallet with a money clip containing $450.00 was found in his left rear pocket. An additional $124.00 was found in his left front pocket.

**Next of Kin**      Garcia, Tommy H/M ▇▇▇ of ▇▇▇▇▇▇, phone ▇▇▇▇ Father of Complainant. Notified by this Detective and Officer V. Gonzalez 1136 at 0503 hours.

**Suspects**      Unknown H/M's wearing masks.

**Complainant's Veh.**      Black 1994 Chevy Camaro bearing Texas plates K44RHN. Passenger window was shattered and possibly shot out. Taken to Evidence stall at Ninth Street Pound for processing.

**Weapon**      Unknown make/model .9 MM caliber semi-automatic handgun.

**Witness{1}**      Espinosa, Debra H/F ▇▇▇▇ of ▇▇▇▇▇▇ phone ▇▇▇▇ Statement taken by Detective L. Spiess 2147. This witness stated she and the C are "fucking friends" who meet for occasional sex. She stated she was on top of C. in the passenger seat of his car when two males wearing masks began firing guns through both car windows. After the passenger window was shattered she was pulled from the car and ordered to the ground. One of the Actors put his foot on her back holding her down. She heard several shots and then the Actors left. Espinosa ran to ▇▇▇▇▇ and asked them to call the police. Because she had outstanding arrest warrants she then ran to her sister's house at ▇▇▇▇▇▇ Her sister and brother in law drove Espinosa home where the police found her. Espinosa stated she has no idea who the Actors were. After giving her statement she was booked for the warrants.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( ) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OR OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( X ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| DET. E. GIDDINGS 2081 — *Edward R. Giddings 2021* | SGT. L. DE HAVEN 3027 | | HOMICIDE |

SAN ANTONIO POLICE DEPARTMENT

TYPE ONLY

SUPPLEMENTARY REPORT

SAPD Form 3-L  Rev. (9-90)

SUPPLEMENTARY REPORT                    3. OFFENSE CLASSIFICATION

PAGE _2_ OF _6_                **CAPITAL**          4. ASSIGNMENT NO:  03/810893
                               **MURDER**          5. OFFENSE NO:
ROUTING  HOMICIDE                                  6. DATE REPORTED:  12/03/03
FILE

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| Garcia, Tommy Jr. | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date and Time of this Report |
|---|---|---|---|
| | 6270 | 12/03/03/0200 | 12/03/03/1030 |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

Witness{2}      Robles, Dina H/F/     of       , phone     Sister of Espinosa. Statement taken by Detective H. Bellamy 2352. Stated she was awakened by Espinosa yelling "JR" was shot. Robles and her husband drove Espinosa to E. Villaret where the police were waiting.

Witness{3}      Robles, David H/M     of       phone    . Brother-in-law of Espinosa. Statement taken by Detective L. Spiess 2147. His statement mirrors that of his wife, Dina Robles.

Witness{4}      Gruber, George W/M    of    , phone    . Statement taken by Detective H. Bellamy 2352. Gruber stated he was asleep and heard loud gunshots. He called 911 and was interrupted by Espinosa who was screaming hysterically. Espinosa called someone and told them "they robbed and killed him." Gruber then went outside and saw the Complainant lying on the street. He saw Russell and Jimenez drive up but mistakenly believed they arrived in the Complainant's rather than Jimenez'. He did not hear any cars driving away after the gunshots.

Witness{5}      Medlick, John W/M    of     phone     Statement taken by Detective J. Menefee 2177. Medlick stated he was awakened by gunshots. His roommate Gruber was calling 911 while Medlick dressed. The front door to the house does not lock and Medlick was startled by the sudden appearance of Espinosa in their house. Espinosa was screaming about someone being shot. Gruber allowed her to use the phone and Medlick heard her tell someone about the shooting, she also mentioned a robbery and then said she could not stay because she had warrants. Medlick went outside and saw the Complainant's Camaro parked on the west side of the street and saw Russell and Jimenez drive up in Jimenez' car and watched as they stayed until the police arrived. Medlick did not hear any car leaving after the shooting.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( ) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OR OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( X ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| DET. E. GIDDINGS 2081 | SGT. L. DE HAVEN 3027 | | HOMICIDE |
| _Edward R. Giddings 2081_ | | | |

| SAN ANTONIO POLICE DEPARTMENT | TYPE ONLY | SUPPLEMENTARY REPORT SAPD Form 3-L Rev. (9-90) |
|---|---|---|

SUPPLEMENTARY REPORT

3. OFFENSE CLASSIFICATION

PAGE _3_ OF _6_

CAPITAL
MURDER

4. ASSIGNMENT NO: 03/810893

5. OFFENSE NO:

6. DATE REPORTED: 12/03/03

ROUTING HOMICIDE
FILE

SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| Garcia, Tommy Jr. | ████████ | ████████ |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date and Time of this Report |
|---|---|---|---|
| ████████ | 6270 | 12/03/03/0200 | 12/03/03/1030 |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

**Witness{6}**   Jimenez, Robert H/M ████████ of ████████, phone ████████. Statement taken by Detective R. Jones 2094. This complainant stated he was with the Complainant and Russell at his house earlier in the night. They were playing video games when he was paged by Espinosa at 01:19. He went to his bedroom and was told Espinosa had also paged the Complainant. The Complainant and Russell played another video game before leaving. Fifteen minutes later Espinosa called Jimenez and told him the Complainant had been shot. Jimenez picked up Russell and the drove to the scene. Jimenez made the positive identification of the Complainant.

**Witness{7}**   Russell, Frank H/M ████████ o ████████, phone ████████ Statement taken by Detective R. Jones 2094. This witness was with the Complainant and Jimenez at Jimenez' house earlier in the evening. Espinosa called the Complainant on his cell phone and asked him to pick her up. Russell describes Espinosa as "some girl who lives in the neighborhood who messes around with everyone." The Complainant left and gave Russell a ride home before he left to pick up Espinosa. Russell stated he had just lay down when Jimenez called him saying the Complainant had been shot. Jimenez picked up Russell and the pair drove to the Clamp location.

**Scene**   Weather warm/dry. Lighting conditions poor. Shooting occurred in the ████████ Clamp, which is between Villaret and Buchanan. Clamp runs north-south. The Complainant's 1994 black Chevy Camaro was parked on the west side of the street about mid-block. Both doors were open and both seats were in the full reclining position. The keys were not in the ignition. The passenger window was shattered and there was glass on the passenger seat. A single drop of blood was apparent on the passenger armrest. A spent 9MM shell casing was found outside the passenger door in the leaves. Another spent 9MM shell casing was found near the left rear quarter of the Camaro. A trail of 9MM shell casings led across the street to the east side of Clamp where the Complainant expired. When I arrived he was lying on his back. Officers advised me EMS had turned him over. The area is very dark as the block is long and streetlights are only at the corners. Few houses are in the ████████ with vacant lots comprising most of the street.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( ) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OR OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( X ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| DET. E. GIDDINGS 2081 | SGT. L. DE HAVEN 3027 | | HOMICIDE |
| Edward R. Giddings 2081 | | | |

SAN ANTONIO
POLICE DEPARTMENT

TYPE ONLY

SUPPLEMENTARY REPORT

SAPD Form 3-L Rev. (9-90)

SUPPLEMENTARY REPORT

3. OFFENSE CLASSIFICATION

PAGE __4__ OF __6__

**CAPITAL MURDER**

4. **ASSIGNMENT NO:** 03/810893
5. **OFFENSE NO:**
6. **DATE REPORTED:** 12/03/03

ROUTING __HOMICIDE__ FILE

SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| Garcia, Tommy Jr. | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date and Time of this Report |
|---|---|---|---|
| | 6270 | 12/03/03/0200 | 12/03/03/1030 |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

Evidence

Videotape of crime scene.

35 mm photographs of crime scene

Blood samples

Fingerprints

Eight shell casings caliber 9MM

Complainant's vehicle

Witness statements

Officers reports

Officers

Sgt. R. Maxwell 3190 Patrol Supervisor

Sgt. R. Lopez 3261 Evidence Supervisor

Sgt. L. De Haven 3203 Night CID Supervisor

Det. M. Podwika 2412 Evidence Detective

E.T. L. Tijerina 9427 Evidence Technician

Det. L. Spiess 2147 Night CID/Statements

Det. H. Bellamy 2352 Night Cid/Statements

Det. R. Jones 2094 Night CID/Statements

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( ) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OR OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( X ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| DET. E. GIDDINGS 2081 *Edward R Giddings 2081* | SGT. L. DE HAVEN 3027 | | HOMICIDE |

SAN ANTONIO POLICE DEPARTMENT

**TYPE ONLY**

SUPPLEMENTARY REPORT

SAPD Form 3-L  Rev. (9-90)

**SUPPLEMENTARY REPORT**

3. OFFENSE CLASSIFICATION

PAGE _5_ OF _6_

**CAPITAL**
**MURDER**

4. ASSIGNMENT NO: 03/810893

5. OFFENSE NO:

6. DATE REPORTED: 12/03/03

ROUTING HOMICIDE
FILE

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| Garcia, Tommy Jr. | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date and Time of this Report |
|---|---|---|---|
| | 6270 | 12/03/03/0200 | 12/03/03/1030 |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

Det. J. Menefee 2177 Night CID/Statements

Det. E. Giddings 2081 Night CID/Report

Off. V. Gonzalez 1136 Report Responsibility

Off. D. Higginbotham 0786 Cover Officer

Off. J. Bonilla 0070 Cover Officer

Off. D. Soto Cover Officer

Off. J. Garza 0475 Cover Officer

Off. D. Tritley 0563 Cover Officer

Off. R. Wilson 0774 Cover Officer

Off. P. Holder 1108 Cover Officer

Off. J. Sabo 1050 Cover Officer

M.E. E. Rosenauer 117 Medical Examiner Investigator

Details

Officers received a call to ▅▅▅▅▅ for a shooting. Upon arrival they contacted Gruber, Medlick, Russell and Jimenez. The Complainant was lying face down in the street but was turned over by EMS. Officers learned of Espinosa's involvement from the other Witnesses and Officer Higginbotham drove to Espinosa's house and was there when she arrived with her sister and brother-in-law. He returned her to the scene and had the sister and brother-in-law follow him. The officers called for Night CID. I responded and made the scene.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( ) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OR OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( X ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| DET. E. GIDDINGS 2081 *Edward R. Giddings 2081* | SGT. L. DE HAVEN 3027 | | HOMICIDE |

SAN ANTONIO
POLICE DEPARTMENT

TYPE ONLY

SUPPLEMENTARY REPORT
SAPD Form 3-L Rev. (9-90)

**SUPPLEMENTARY REPORT**

3. OFFENSE CLASSIFICATION

PAGE __6__ OF __6__

**CAPITAL MURDER**

4. ASSIGNMENT NO: 03/810893

5. OFFENSE NO:

6. DATE REPORTED: 12/03/03

ROUTING __HOMICIDE__ FILE

**SAN ANTONIO POLICE DEPARTMENT**

| Last name of Complainant,First,Middle Initial | Address of Complainant | | Phone Number |
|---|---|---|---|
| Garcia, Tommy Jr. | | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date and Time of this Report |
|---|---|---|---|
| | 6270 | 12/03/03/0200 | 12/03/03/1030 |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

At the scene I spoke with Espinosa, Jimenez and the Robles' briefly before they were returned to Night CID for statements. Jimenez voiced the opinion Espinosa may have "set up" the Complainant. Espinosa stated she has sex with the Complainant occasionally even though she knows him only as "JR" and does not know his address. She stated she abandoned the Complainant after the shooting because she has active warrants. The Robles professed no knowledge of the shooting saying they were merely awakened by Espinosa who came crying and asking for a ride. I stayed at the scene with Evidence until the Medical Examiner Investigator finished her preliminary investigation. Officer Gonzalez and I then made the notification to the next of kin at 0503 hours at his home, ████████ The father stated his son left the house at approximately 22:30 hours to visit a friend, Elijah Troy Cunningham {W/M██████ of ████████ Mr. Garcia stated his son was unemployed.

It appears the Complainant was shot while he was in the passenger seat of his Camaro. He then fled in a northeasterly direction while being pursued by his assailants. He was shot as he ran. One shot hitting him possibly in or next to the spine and had three to four more shots fired into him as he lie face down on the east side of Clamp. Although Espinosa states she was "on top" of the Complainant when the first shot was fired I did not notice any fragments of glass on her clothing or in her hair. Nor did I see a footprint or shoe print on the back of her jacket. She was booked after giving her statement. The Complainant had $450.00 in a money clip in his left rear pants pocket and another $124.00 in his left front pants pocket.

The crime scene is dark and fairly secluded and is used for clandestine trysts by teenagers in the neighborhood.

Statements and reports were forwarded to Homicide for follow up.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( ) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OR OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( X ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| DET. E. GIDDINGS 2081 | SGT. L. DE HAVEN 3027 | | HOMICIDE |
| Edward R. Giddings 2081 | | | |

SAN ANTONIO POLICE DEPARTMENT

**TYPE ONLY**

**SUPPLEMENTARY REPORT**
SAPD Form 3-L Rev. (9-90)

**STATE OF TEXAS §**
**COUNTY OF BEXAR §**

Case Number: 03-810893

VOLUNTARY STATEMENT OF :

I, ___Francisco Gonzales___ , after first being duly warned by Det. T. Angell #2395 at 1910 hrs , at [redacted] on 12-06-03 that 1) I have the right to remain silent and not make any statement at all, and any statement I do make may be used against me at my trial; 2) Any statement I make may be used as evidence against me in Court; 3) I have the right to have a lawyer present to advise me prior to and during any questioning; 4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; 5) I have the right to terminate the interview at any time; and I understand that the above rights are continuing rights and may be urged by me at any stage of the proceedings, and I hereby prior to and during the making of this statement, knowingly, intelligently, and voluntarily waive the above rights and give to the said, Det T. Angell #2395, the person to whom this statement is being given, the following statement:

My name is Francisco Gonzales; I am 34 years old. I was born on [redacted] in San Antonio, TX. I am at the Homicide Office of the San Antonio Police Department to talk to you about a robbery that I was involved in last Wednesday morning. You have read me my rights and I have agreed to talk to you without an attorney present. You have not promised me anything in return for giving this statement.

I know a guy I call Juanito, who lives on the southside. I have known him about three years. His last name is Castillo, and his first name is Juan. He is about 26 or 27 years old. He's about 5'11 or 6' feet tall. He weighs about 150 or so. He drives a lowrider Cutlass that is gray in color. He is seeing a girl named Debbie, who I have met a couple times before. I don't know Debbie's last name and I don't know where she lives. About 10:30 last Tuesday night Juanito called my house and said he needed to talk to me. He asked if he could come by and I told him to come on. He got there about 11:00 or 11:15. When he got there he was with that girl Debbie. He said that Debbie was going to set up this dude that had some money. He said that the dude had money, and we would all get some. I told him that I had things to do. He said that it wouldn't take that long. I said 'Fuck it, lets go." I told him that whatever happened, I didn't want anybody to get hurt. Juanito had told me he had a gun I didn't want anybody to get hurt because I didn't want any serious problems. I saw the gun and it looked like it was a black automatic, that is all I know about it. We left in Juanito's car with him driving. While we were in the car, Juan gave me a ski mask to wear, and he had one also. They were both black, but the one he gave me had bigger holes for the eyes. The one he was wearing had smaller holes where the eyes went. We went to Debbie's house somewhere on the southside and waited outside while she went in and got a phone. She called this dude who she said had money because he deals dope and sells CD's. She said he drove a black Camaro, but she didn't tell me his name. It was just me, Juan and this chick named Debbie that knew about this. She said she was going to take the guy to some street, and get high with him. Juanito and I were supposed to come up and rob the guy. We walked away and waited by the corner. I saw a car pull up in a front of Debbie's house. After the car drove off, Juanito and I waited for about fifteen minutes then walked down this street that had signs in the middle of it. We saw the Camero parked on the side of the street. We walked up to the passenger side of the car. I saw inside the car and it looked like this chick Debbie was on the floor giving this guy head or something. Juanito broke out the passenger side window of the car with the butt of the gun and the glass flew all over. I did not have a gun with me. All I remember saying is "get off the car" as I opened the passenger side door. They both got out of the car without any problems. The guy's pants were down. After they got out of the car, I moved around the other

to Debbie.

WITNESS: _[signature]_   SIGNATURE: _[signature]_ Francisco Gonzales

WITNESS: _[signature]_

SAPD Form #66-13(01-95)

**STATE OF TEXAS** §
**COUNTY OF BEXAR** §

Case Number: 03-810893

VOLUNTARY STATEMENT OF :

I, ___Francisco Gonzales_____, after first being duly warned by Det. T. Angell #2395 at 1910 hrs , at ▮▮▮▮▮▮▮▮▮ on 12-06-03  that 1) I have the right to remain silent and not make any statement at all, and any statement I do make may be used against me at my trial; 2) Any statement I make may be used as evidence against me in Court; 3) I have the right to have a lawyer present to advise me prior to and during any questioning; 4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; 5) I have the right to terminate the interview at any time; and I understand that the above rights are continuing rights and may be urged by me at any stage of the proceedings, and I hereby prior to and during the making of this statement, knowingly, intelligently, and voluntarily waive the above rights and give to the said, Det T. Angell #2395, the person to whom this statement is being given, the following statement:

side of the car. I don't remember Juanito saying anything, but I remember him trying to search the guy's pockets. Then for some reason the guy broke and ran. As soon as the guy broke and ran, I heard two gunshots. As soon as I heard the gunshots, I took off. I didn't see Juan shoot the guy, but he was the only one I saw with a gun. I know that I didn't have a gun, and I never saw Debbie with a gun. I ran towards the flea market and turned left. As I was running along the fence that borders the back of the flea market, I threw the ski mask I had been wearing over the fence of the flea market. I slowed down and walked all the way to Pleasanton Road. I took a left and went towards town. I was going home. I guess I was going to walk all the way home. As I was walking up Pleasanton Road a police officer stopped me and wanted to see what I had in my pockets. When the policeman stopped me I ran because I had warrants for my arrest. I ran for a little way then I stopped because I have a torn ACL. I got on the ground and just gave up. Then I was taken downtown and they swabbed my hand. Then I was booked for my warrants.

Today, the detectives came to the jail and said they needed to talk to me about this case. I decided to tell the truth because I know that I didn't shoot anybody, I didn't have a gun with me, and I never touched the gun that Juanito used to shoot that guy. I am sorry that this happened, I am sorry for the guy who got killed and sorry for his family. If I would have been closer I might have been able to stop Juanito from shooting the victim. I was mad when he did that because it didn't have to happen that way.

You showed me what he called a photo lineup. There were six pictures of men on the page and I told you that the picture in the middle of the top row is the man I know as Juanito. You asked me to circle the picture and put my initials in the circle, which I did. You told me that his name id Juan Castillo and that his date of birth is ▮▮▮▮▮▮▮

I can read, but there are some words I don't read. You typed this statement and printed out a copy for me to read. I read the statement out loud. This statement is true and correct.

This is the end of my two-page statement.

WITNESS: _____      SIGNATURE: _____

WITNESS: _____

SAPD Form #66-13(01-95)

Before you are asked any questions, it is my duty as a police officer to advise you of your rights and to warn you of the consequences of waiving these rights.

1. You have the right to remain silent.

2. You do not have to make any statement oral or written, to anyone.

3. Any statement that you make will be used in evidence against you in a court of law, or at your trial.

4. You have a right to have a lawyer present to advise you before and during any questioning by police officers or attorneys representing the state.

5. You may have your own lawyer present, or if you are unable to employ a lawyer, the court will appoint a lawyer for you free of charge, now, or at any other time.

6. If you decide to talk with anyone, you can, and you can stop talking to them at any time you want.

7. The above rights are continuing rights which can be urged by you at any stage of the proceedings.

DO YOU UNDERSTAND THESE RIGHTS?

SAPD Form 66-E (Jul 99)

**STATE OF TEXAS** §
**COUNTY OF BEXAR** §

Case Number: __03-810893__
Date and Time: __12-07-03 @ 4:03 PM__
Taken by : __Det. Timm Angell #2395__

Page   1   of   2

            BEFORE ME, the undersigned authority in and for the State and County aforesaid, on this day personally appeared **Debra Espinosa** who being by me duly sworn upon his/her oath deposes and says:

My name is Debra Espinosa. I am here today at the Homicide Office to talk to you about the murder that happened on Clamp. This is the second statement I have given you about this case. Everything I said in the first statement I gave you was true, except the part about me not knowing who the guy who did the shooting was. I didn't want to tell you the name of this person because that would mean that I would have to testify against him in court and I was afraid. This guy is named Juan Castillo, and he is 22 years old. I don't know his address, but I know he lives someplace on Southcross. Juan has a fetish for guns and I am afraid that if he finds out that I gave his name to the police he would kill me. I met Juan this past Halloween. He was taking his son trick or treating in our neighborhood. We became friends. I have never been to his house, we would usually get together at one of my friends house. I have seen Juan drive a dark blue four door. I don't know what kind of car it is.

Juan and Frank had been planning to rob somebody for about three days. They were asking me to find somebody who had money and who would be an easy target to rob. We decided to do it on Tuesday. On Tuesday I called JR like I said in my first statement and he agreed to meet with me. Frank and Juan came to my house in a light blue little four door car. Frank's wife was driving the car. I don't know her name but she is about Frank's age. She is real thin and has messed up teeth. We had planned out that I was supposed to get JR to park on Clamp Street, try and get him on the passenger side of the car and I was also supposed to try and make sure that his pants were down. I assumed this was because then JR wouldn't be able to run or fight very well.

When JR picked me up we drove to Clamp Street, and it went the way I said it did in my first statement. We drove there and started to mess around and that's when  both  side windows of the car were broken out and Frank and Juan were doing the robbery. I know that it was Frank and Juan by the sounds of their voice and the way the robbery went down just the way it was planned. Frank pulled me out of the car and threw me on the ground just like I said in my other statement. Then they pulled JR from the car and Juan was telling him to give up the money. JR was telling them he didn't have shit and then Frank hit JR in the face. Then JR tries to hit Frank back and that is when Juan fired the first shot that I think must have hit JR in the face. Then JR took off running and Juan kept on shooting. He didn't stop shooting until the JR was on the ground.  Then I ran to a house and asked for help, just like I said in my original statement. I don't know what happened to Juan or Frank after that. We never talked about what we were going to do after it was over and I have not talked to anybody about this.

Signature _Debra Espinosa_

**Witnessed before me on this** _____7th_____ day of _December_, A.D., 2003.

Detective Tim Angell #2395

STATE OF TEXAS §
COUNTY OF BEXAR §

Case Number: __03-810893__
Date and Time: __12-07-03 @ 4:03 PM__
Taken by : __Det. Timm Angell #2395__

Page  2  of  2

BEFORE ME, the undersigned authority in and for the State and  County aforesaid, on this day personally appeared *Debra Espinosa* who being by me duly sworn upon his/her oath deposes and says:

You asked me if I ever saw the gun that Juan used and I told you that I only saw the gun when he was doing the shooting that night. The gun was black, and that is all that I know about it.

You showed me a photo lineup and I pointed out the picture of Juan Castillo and circled it. I also put my initials inside the circle. You told me that I identified Juan Castillo and that his date of birth is ████████

The reason I didn't tell the whole truth in my first statement is because I am in love with, and afraid of, Juan Castillo. I am in love with him because he has been my inspiration to get off drugs, and I am afraid of him because of his past. But I have decided that I have to tell the truth.

This is the end of my statement.

Signature _____

Witnessed  before me on this ____7th____ day of __December__ A.D., 2003.

_____
Detective Tim Angell #2395

# STATE OF TEXAS §
# COUNTY OF BEXAR §

Case Number: 03-810893

VOLUNTARY STATEMENT OF :

I, ___Debra Lynn Espinosa___ , after first being duly warned by Det. T. Angell #2395 at 1255 hrs , at ▓▓▓▓▓▓ on 12-04-03 that 1) I have the right to remain silent and not make any statement at all, and any statement I do make may be used against me at my trial; 2) Any statement I make may be used as evidence against me in Court; 3) I have the right to have a lawyer present to advise me prior to and during any questioning; 4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; 5) I have the right to terminate the interview at any time; and I understand that the above rights are continuing rights and may be urged by me at any stage of the proceedings, and I hereby prior to and during the making of this statement, knowingly, intelligently, and voluntarily waive the above rights and give to the said, Det T. Angell #2395, the person to whom this statement is being given, the following statement:

My name is Debra Lynn Espinosa, I am here at the Homicide Office talking to Detective Angell about the murder of friend, JR. I understand that I am under arrest, and that as soon as I give this statement I will be taken back to the jail. I have not been promised anything in return for giving this statement. I gave a statement to another detective on the morning that JR was shot but I don't remember his name. That statement was true, and I didn't lie in it but I didn't tell the whole truth. I decided to tell the truth today when Detective Angell came and asked me about it. I feel so bad about JR getting shot. That wasn't supposed to happen.

There is this guy named Frank, who I have known for about a month. He has told me that he robs people and I know that he steals and shoplifts to support his drug habit. He lives with his wife but I don't know where they live. In the month that I have known him I have probably only seen him two or three times. Frank came by my house on Tuesday night. It was between 10:00 PM and 12:00 PM. He asked me if I knew anybody with money. He said that he was going to rob them and that he would give me part of the money. I was supposed to get the guy to take me to Clamp street, park and have sex with them and Frank would come and rob them. As far as I knew, he was going to be alone. We never talked about how this was going to happen. He said he had done this before and I assumed he knew what he was doing. After I agreed to do this, I kinda wanted to back out of it but I was afraid of Frank. I just decided to go ahead, thinking everything would be alright. Frank was wearing black jeans and maybe a gray tee shirt. I called my friend JR. I have known JR for years. I know now that his real name is Tommy Garcia, but at the time, I just knew him as JR. I called him and asked him what he was doing, and he said nothing. I asked him if he wanted to come over. He asked me if it would be "worth" it and I said it would. I told him I would call him back when I got ready. I wanted to change my clothes. I called JR back right after I changed clothes and he was there in about five minutes. Usually when we get together we rent a room. JR said he didn't have enough money for a room so we decided to just do it in his car. When we left my house we drove to JR's Mom's house on Yukon St. JR ran inside and was inside a few minutes. I asked him what he was doing and he said he had to get something. I didn't ask him what he got, I just figured he got a gun. JR sells drugs, that's how he gets his money. He sells weed and coke. I know this because years ago I got some weed from him. He sells to everybody in the neighborhood, and he sometimes carries a gun with him. I didn't see him with a gun that night, but I have heard him talking about having a gun. I just assumed that he got his gun. After we left his mother's house we drove straight to Clamp street. JR parked the car in the middle of the block. There was a street light at each

WITNESS: _Connie Meza_              SIGNATURE: _Debra Espinosa_

WITNESS: _Cynthia Lozano_

SAPD Form #66-13(01-95)

**STATE OF TEXAS §**
**COUNTY OF BEXAR §**

Case Number: 03-810893

VOLUNTARY STATEMENT OF :

I, __Debra Lynn Espinosa_____, after first being duly warned by Det. T. Angell #2395 at 1255 hrs , at
on 12-04-03 that 1) I have the right to remain silent and not make any statement at all, and any statement I do make may be used
against me at my trial; 2) Any statement I make may be used as evidence against me in Court; 3) I have the right to have a lawyer
present to advise me prior to and during any questioning; 4) If I am unable to employ a lawyer, I have the right to have a lawyer
appointed to advise me prior to and during any questioning; 5) I have the right to terminate the interview at any time; and I
understand that the above rights are continuing rights and may be urged by me at any stage of the proceedings, and I hereby prior to
and during the making of this statement, knowingly, intelligently, and voluntarily waive the above rights and give to the said, Det
T. Angell #2395, the person to whom this statement is being given, the following statement:

end of the block, but it was dark in the middle. JR moved to the passenger side of the car. I got on top of him
and pulled his pants down. I started giving him head. I had been doing this for about fifteen minutes when it
happened. The first thing that happened was both side windshields broke. It was so loud that I don't know if
it was a gunshot, or the windows were broke out by something hitting them. Both car doors opened up at the
same time. Then I was pulled out of the car by a guy dressed in dark clothing. the guy who pulled me out said
something like "get on the ground bitch" and pulled me out of the car. I knew it was Frank by the sound of
his voice. That is when I noticed that there was another guy with Frank. He was taller then Frank, and he
was also wearing all black. I didn't get to look at them very long but I noticed that both had stocking caps on
that covered their whole face, the kind with just three holes in the front. Detective Angell asked me if they
were wearing gloves and I said that I didn't remember if they had gloves on or not. By that time I had been
thrown on the ground, and Frank put his foot on my back to hold me down. I don't remember his exact words
but it was like stay on the ground and don't look up. I knew this was frank talking by his voice. They were
both yelling at JR to give them the money. I heard JR saying he didn't have any, then I heard him say "alright
alright."   Then I started hearing gunshots. I know it was gunshots because they were so close. I never saw a
gun, and I don't know if they both had guns or just one of them had a gun. I heard at least five gunshots,
maybe more. Then I heard them running away. There was never any car that took off, I know that they were
on foot. I got up and ran over to JR. I saw that he had been shot and there was smoke coming out of his body.
I asked him where his cell phone was but he couldn't answer me. He was starting to shake real bad. I told
him to hold on, that I was going to get help. I ran to his car but I couldn't find his cell phone. I started
running up and down the street screaming for help. I ran to this house and asked for help. There was a guy
there and he said he was already on the phone with 911. I remember the man telling me to wait for the police.
I told him that I had kids and I was wanted on warrants and I couldn't wait. I left the house and ran back to
JR. I told him that help was on the way and that I had to leave. He didn't respond. I left and ran to my sister-
in-law's husband's parent's house on Buchanan. I started banging on the door and told them that my friend
had been shot. I had them drive me back to the street where it all happened. I knew that I had to go back,
even if it meant that I had to go to jail for the warrants that I have.

My sister Dina drove me back to the scene in her car, it's a maroon two-door sporty car. When I got back I
flagged down an officer and told him what had happened. I was taken to the police station where I gave a
statement to the police about what had happened. I told the detectives what had happened, but I left out the
part about Frank and I making plans to rob somebody. I didn't do this because I was afraid of getting into

WITNESS: _Connie Mayi_                    SIGNATURE: _Debra Espinosa_

WITNESS: _Cynthia Lopino_

SAPD Form #66-13(01-95)

**STATE OF TEXAS** §

**COUNTY OF BEXAR** §

Case Number: 03-810893

VOLUNTARY STATEMENT OF :

I, ___Debra Lynn Espinosa___ , after first being duly warned by <u>Det. T. Angell #2395</u> at <u>1255 hrs</u> , at ▓▓▓▓▓
on <u>12-04-03</u> that 1) I have the right to remain silent and not make any statement at all, and any statement I do make may be used
against me at my trial; 2) Any statement I make may be used as evidence against me in Court; 3) I have the right to have a lawyer
present to advise me prior to and during any questioning; 4) If I am unable to employ a lawyer, I have the right to have a lawyer
appointed to advise me prior to and during any questioning; 5) I have the right to terminate the interview at any time; and I
understand that the above rights are continuing rights and may be urged by me at any stage of the proceedings, and I hereby prior to
and during the making of this statement, knowingly, intelligently, and voluntarily waive the above rights and give to the said, <u>Det.
T. Angell #2395</u>, the person to whom this statement is being given, the following statement:

trouble, I did this because I was afraid of Frank. He had said before that if anything happened or I ever talked
to the police, that he would come back and kill me. So I was thinking that I needed to leave out that part.

After I gave my statement, I was taken to the Magistrates Office and arrested for my warrant. While I was at
the Magistrates Office I saw Frank through the window. He was in a cell with a bunch of other men. As I
was walked past, Frank made a motion putting his hand across his mouth, like I was supposed to zip my lips.
I motioned like I would keep silent and not talk just to get him to stay away from me. Then I was placed into
a holding cell right next to the one Frank was in. I didn't go up to the window but other girls were telling me
that a guy in the next cell wanted to talk to me. I wouldn't walk up to the front and talk to him. When we
went in to see the judge, Frank was in the same group. That's when I learned that he was in jail for not
paying child support.

Since I have been in jail, I have been sick over what happened. I have not been able to eat, and I have not
been sleeping. I decided that I needed to call somebody and tell them what happened. The first two times I
was allowed to use the telephone, I called my Mom, and then my Daughter. After that I wanted to call
somebody and tell them the truth. I was told several times that I couldn't make a phone call for different
reasons. Then this morning Detective Angell came to see me at the jail. I first thought it was my lawyer.
When he told me he was a detective, I was excited, and relieved. He asked me if I knew why he was here and
I immediately told him I did. I told him right away that I had left some things out of my first statement, and I
wanted to tell him the truth. We started to talk at the jail and I tried to tell him everything, but it was hard
because we had to almost yell to talk to each other. Detective Angell said he would come back later and bring
me to the police station to take a second statement.

Detective Angell returned later and took me to the police station. On the way I told him that I had not eaten
since I was arrested because I was so upset. I told him that I was feeling better now. When I got to the police
station, another detective gave me some food from Whataburger.

This is all that I remember about JR getting killed. I know that one of the men was Frank, but I have no idea
who the other man was. I don't know if one or both of them had guns, or which one did the shooting.
Detective Angell showed me what he called a photo lineup with six pictures of men. I told him that the
picture in the bottom row, left corner was the man I know as Frank. Detective Angell asked me to circle his

WITNESS: _Connie Meza_

WITNESS: _Cynthia Lozano_

SIGNATURE: _Debra Espinosa_

SAPD Form #66-13(01-95)

**STATE OF TEXAS** §

**COUNTY OF BEXAR** §

Case Number: 03-810893

VOLUNTARY STATEMENT OF :

I, ___Debra Lynn Espinosa_____, after first being duly warned by <u>Det. T. Angell #2395</u> at <u>1255 hrs</u> , at ▬▬▬▬▬ on <u>12-04-03</u>  that 1) I have the right to remain silent and not make any statement at all, and any statement I do make may be used against me at my trial; 2) Any statement I make may be used as evidence against me in Court; 3) I have the right to have a lawyer present to advise me prior to and during any questioning; 4) If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; 5) I have the right to terminate the interview at any time; and I understand that the above rights are continuing rights and may be urged by me at any stage of the proceedings, and I hereby prior to and during the making of this statement, knowingly, intelligently, and voluntarily waive the above rights and give to the said, <u>Det T. Angell #2395,</u> the person to whom this statement is being given, the following statement:

picture and put my initials and the date inside, which I did. Detective Angell told me his name is Francisco Gonzales, and that he was born on ▬▬▬▬▬



This is the end of my four-page statement. I have told Detective Angell the truth. I have not been promised anything in return for giving this statement. I decided to tell the truth because what happened has been bothering me ever since it happened. The only reason I even agreed to have any part in this is because my little girls birthday is this Friday, and I needed money.

I told Detective Angell what happened and he typed my statement for me. He asked me questions as we went along, then typed the statement out. I have read and signed this statement because it is the truth.

WITNESS: _Connie Mejia_

WITNESS: _Cynthia Lozano_

SIGNATURE: _Debra Espinosa_

SAPD Form #66-13(01-95)



Bexar County
Forensic Science Center

San Antonio, Texas

CAUSE AND MANNER OF DEATH
===============================

Name of Deceased: TOMMY G.. GARCIA, JR.
M.E. Case Number: 2003-2187

Agency: SAPD #03-810893

Date Issued:    12-05-2003
Date of Exam:   12-03-2003
Date Found or
Pronounced:     12-03-2003

Autopsy Performed By:
    Vincent J.M. DiMaio, M.D.

Cause of Death:
    MULTIPLE GUNSHOT WOUNDS

Manner of Death:
    HOMICIDE

Vincent J.M. DiMaio, M.D.
CHIEF MEDICAL EXAMINER

Bexar County
Medical Examiner's Office

Date: 12-03-2003
TIME: 1337 HRS

Agency: SAPD
Nbr: 03-810893

INVESTIGATION REPORT
=========================

M.E. Nbr: 2003-2187
Type: BX

Name of Deceased: GARCIA, TOMMY
***Positive I.D.

Age: 19   Race: W   Sex: M
Address: ███████████████
City/St/Zip: SAN ANTONIO, TX
Occupation:

SSN:
Date of Birth: ███████
Phone: ███████████
Driver's License: ███████████

Next of Kin: MARY LOU LOPEZ (MOTHER)
Address: ███████████████
City/St/Zip: SAN ANTONIO, TX
Notified: 12-03-2003  by: DET.GIDDINGS, OFF.GONZALE   of: SAPD
Funeral Home: DELGADO

Phone: ███████████

Place of Death: SC -███████████████
Found Dead:                          by:                   of
Pronounced: 12-03-2003 @0226   by: SIMON #713, ANZ #666   of SAFD EMS
BCME Notified: 12-03-2003 @0300  by: DETECTIVE GIDDINGS   of SAPD

Apparent Death Classification: APPARENT HOMICIDE, MULTIPLE GUNSHOT WOUNDS
Method of Identification: Visual identification, Documentary identificatio

Date of Incident: 12-03-2003   Day: Wed
Time of Incident: EARLY AM   At Work? N
Place of Incident: ███████████
City/State: SAN ANTONIO, TX
County: BEXAR  (USA)

------Officer at scene--------
Name: OFFICER GONZALEZ
Badge: XXX
of: SAPD

---------------------------- CASE SUMMARY --------------------------------
19 YO WM, APPARENT HOMICIDE, THE DECEASED HAD MULTIPLE APPARENT GUNSHOT
WOUNDS
-------------------- MEDICAL HISTORY/PHYSICIANS -------------------------
UNKNOWN MEDICAL HISTORY.
---------------------- SOURCE OF INFORMATION -------------------------
DETECTIVE ED GIDDINGS OF SAPD NIGHT CID AND OFFICER GONZALEZ OF SAPD
---------------------------- CIRCUMSTANCES -------------------------
THE DECEASED AND A FEMALE WERE PARKED IN THE DECEASED'S CAR AT THE ███████
███████████.  THE DECEASED'S CAR WAS A 1994 BLACK, 2-DOOR CHEVROLET
CAMERO.  THE FEMALE TOLD SAPD THAT THE DECEASED WAS SITTING IN THE FRONT
PASSENGER SEAT OF THE CAR.  THE FEMALE WAS ON TOP OF THE DECEASED, AND THE
TWO WERE ENGAGED IN SEXUAL INTERCOURSE.  THE FEMALE REPORTED THAT TWO
MASKED MEN CAME UP TO THE PASSENGER SIDE OF THE CAR AND TOLD HER TO GET OUT
OF THE CAR AND LIE FACE DOWN ON THE GROUND.  ONE OR BOTH MEN STARTED
SHOOTING THE DECEASED, AND THE DECEASED GOT OUT OF THE CAR, RAN BEHIND THE
CAR, AND ATTEMPTED TO RUN AWAY.  ONE OR BOTH MEN CONTINUED SHOOTING AT THE
DECEASED, AND THE DECEASED ENDED UP COLLAPSING AND LANDING FACE DOWN ON THE
STREET.  THE FEMALE TOLD POLICE THAT SHE DID NOT SEE WHICH WAY THE MEN TOOK
OFF.  SHE GOT UP, WENT TO A NEARBY HOUSE AND TOLD THE RESIDENTS THAT THE
DECEASED HAD BEEN SHOT, AND THEN TOOK OFF ACROSS A FIELD AND HEADED TOWARDS
HER SISTER'S HOUSE.  THE NEARBY RESIDENTS REPORTED HEARING GUNSHOTS, BUT
THEY DID NOT HEAR THE SOUND OF A CAR SPEEDING OFF.  SAPD THINKS THE TWO MEN
MAY HAVE APPROACHED THE DECEASED'S CAR ON FOOT.  ALSO, SAPD SUSPECTS THAT
THE FEMALE MAY HAVE BEEN INVOLVED IN THE SET UP OF THE DECEASED'S DEATH.

Bexar County
Medical Examiner's Office

Date: 12-03-2003
TIME: 1337 HRS

Agency: SAPD
Nbr: 03-810893

INVESTIGATION REPORT
========================

M.E. Nbr: 2003-2187
Type: BX

(Continued)

THE FEMALE TOLD SAPD THAT SHE HAD KNOWN THE DECEASED FOR MANY YEARS AND
THAT THE TWO WOULD OCCASIONALLY GET TOGETHER TO HAVE SEXUAL INTERCOURSE.
EMS WAS CALLED TO THE RESIDENCE.  WHEN EMS ARRIVED, THE EMTS FOUND THE
DECEASED LYING FACE DOWN ON THE STREET.  THEY TURNED HIM OVER ONTO HIS BACK
AND LEFT HIM LYING ON HIS BACK.  THEY FOUND THAT THE DECEASED HAD NO VITAL
SIGNS AT 0226 HRS.

------------------------------ OBSERVATIONS ------------------------------
THE SCENE WAS LOCATED AT THE ████████████████████, ON THE SOUTH SIDE OF
TOWN.  THE SCENE WAS LOCATED IN A RESIDENTIAL AREA THAT HAD HOUSES SPACED
APART SPORADICALLY.  SOME OF THE HOUSES WERE SEPARATED BY EMPTY LOTS.  THE
AREA WAS NOT WELL LIT AND WAS SOMEWHAT DESERTED.  MI WAS ABLE TO OBSERVE
THE SCENE WITH THE AID OF PATROL CAR LIGHTS AND FLASHLIGHTS.
THE DECEASED'S CAR WAS PARKED ON THE RIGHT SIDE OF THE STREET.  THE
DRIVER'S SIDE DOOR WAS OPEN, AND THE PASSENGER SIDE DOOR WAS OPEN.  THE
PASSENGER DOOR WINDOW WAS ON THE GROUND IN PIECES BETWEEN AND UNDER THE
OPEN DOOR AND THE CAR.  A SHELL CASING WAS ALSO FOUND ON THE GROUND BETWEEN
THE OPEN DOOR AND THE CAR.  SOME PIECES OF GLASS WERE FOUND ON THE
PASSENGER SEAT, WHICH WAS LEANING BACK AS IF SOMEONE HAD BEEN LYING IN THE
SEAT.
THE DECEASED WAS FOUND LYING FACE UP ON THE STREET BEHIND THE CAR AND ON
THE LEFT SIDE OF THE STREET.  HIS HEAD WAS POINTED AWAY FROM THE CAR, AND
HIS FEET WERE POINTED TOWARDS THE CAR.  HIS LEFT ARM WAS AT HIS SIDE, AND
HIS RIGHT ARM WAS EXTENDED ABOVE HIS HEAD.  THE DECEASED HAD MULTIPLE
APPARENT GUNSHOT WOUNDS TO HIS FACE AND NECK AREA AND TO HIS FRONT SIDE AND
BACK SIDE.  HE WAS WEARING TWO WHITE T-SHIRTS, JEANS, BOXER SHORTS, WHITE
TENNIS SHOES, A BRACELET ON HIS RIGHT WRIST, A WATCH ON HIS LEFT WRIST, AND
AN EARRING IN HIS LEFT EAR.  THE DECEASED'S JEANS WERE UNZIPPED AND PULLED
DOWN UNDER HIS BUTTOCKS AND GROIN AREA.  THE DECEASED'S BOXERS WERE STILL
ON AT HIS WAIST, AND HIS PENIS WAS EXPOSED OUT OF THE FRONT OF THE BOXER
SHORTS.  THE TOP OF THE DECEASED'S T-SHIRT WAS FULL OF BLOOD, AND HIS FACE
WAS COVERED IN BLOOD.  BLOOD WAS ALSO NOTED TO THE BACK OF THE DECEASED'S
T-SHIRT.  THE DECEASED'S HANDS WERE FULL OF BLOOD, AND SOME LEAVES WERE IN
THE DECEASED'S RIGHT HAND.  A LARGE PUDDLE OF BLOOD WAS ON THE GROUND TO
THE RIGHT OF THE DECEASED.  THE DECEASED HAD A WALLET IN HIS LEFT BACK
POCKET THAT CONTAINED $450.00.  $124.00 WAS FOUND IN THE DECEASED'S LEFT
FRONT POCKET.  MI BAGGED THE DECEASED'S HANDS IN BROWN PAPER SACKS PRIOR TO
MOVING THE DECEASED.  THE DECEASED WAS PLACED ON A CLEAN WHITE SHEET IN A
NEW BODY BAG.

Elizabeth A. Rosenauer
Medical Investigator

Body ordered to morgue: 12-03-2003 @0345 hrs    by: ER
Body received @ morgue: 12-03-2003 @0540 hrs
        Transported by: ACMS

BCME at Scene: Arrived: 0345 hrs  Departed: 0435 hrs  Photos?: Y
------Scene Conditions------   -Rigor Mortis-   --Lividity--   -Decomposition-
Temperature:                        Jaw:            Fixed?:          ABSENT

# Exhibit 56

CAUSE NO. 2004 -CR- 1461-B

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 186 th JUDICIAL DISTRICT |
| | § | |
| Francisco Gonzales | § | BEXAR COUNTY, TEXAS |

## COURT'S ADMONISHMENT AND
## DEFENDANT'S WAIVERS AND AFFIDAVIT OF ADMONITIONS

**COURT'S ADMONISHMENTS:**

(lesser included)

Offense: Murder _____ DEGREE F- 1

PENAL CODE SEC. 19.02 _____ (Repeater) (Habitual)
waived

You are admonished that if convicted of a Felony the following applies:

### 1. RANGE OF PUNISHMENT

All time is served in Texas Department of Criminal Justice.

✓ 5 years to 99 years or Life: Possible fine up to $10,000

_____ 2 years to 20 years: Possible fine up to $10,000

_____ 2 years to 10 years: Possible fine up to $10,000 if the offense occurred on or after September 1, 1994

_____ 2 years to 10 years: Possible fine up to $10,000 or up to 1 year in a Community Correction facility (for offenses committed after August 31, 1989 but before September 1, 1994)

_____ 25 years to 99 years or Life

_____ Other _____

### 2. PLEA BARGAINING

A recommendation of the prosecuting attorney as to punishment is not binding on the Court. The Court may accept or reject any plea bargaining agreement made between the State and the Defendant. If the Court rejects the plea agreement, the Defendant shall be permitted to withdraw the plea of guilty/nolo contendere and no statement or other evidence received during such hearing on the plea of guilty/nolo contendere may be admitted against the Defendant on the issue of guilt or punishment in any subsequent criminal proceeding.

If the punishment assessed does not exceed the punishment recommended by the prosecuting attorney (plea bargain), the trial court must give its permission to appeal any matter in the case except for those matters raised by written motion filed prior to trial and ruled upon by the Court. If a plea bargain is followed, this Court will not give permission to appeal.



### 3. TRIAL RIGHTS

You have a right to trial by jury, cross examination of witnesses and the right to remain silent.

### 4. CITIZENSHIP

If you are not a U.S. citizen, a plea of guilty or nolo contendere may result in deportation, exclusion from admission to this country or denial of naturalization under federal law.

### 5. DEFERRED ADJUDICATION

If the Court defers adjudicating your guilt and places you under community supervision, on violation of any condition you may be arrested and detained as provided by law. You are then entitled to a hearing limited to a determination by the Court of whether to proceed with an adjudication of guilt on the original charge. No appeal may be taken from this determination. After adjudication of guilt, all proceedings including the assessment of punishment and your right to appeal continue as if adjudication of guilt had not been deferred. The Court is also able to assess the full range of punishment.

### 6. SEX OFFENDER REGISTRATION PROGRAM

A plea of GUILTY or NOLO CONTENDERE that results in a conviction or placement on deferred adjudication for an offense under Chapter 62 of the Texas Code of Criminal Procedure will require you to register as a sex offender with local law enforcement officials as required by Chapter 62. You will also be required to report regularly and to obtain or maintain a Texas driver's license or certificate of identification identifying you as a sex offender. Violation of the registration and/or reporting requirements will subject you to additional criminal charges.

## DEFENDANT'S WAIVERS AND AFFIDAVIT OF ADMONITIONS:

TO THE HONORABLE JUDGE OF SAID COURT:

I, _Francisco Gonzales_, the Defendant in this cause, having this day appeared in open court with my counsel and having been duly sworn, represent to the Court that I have received a copy of the indictment or information in this cause, that I fully understand its contents; that I know that I am charged with the felony offense of _Murder_, and that I waive formal arraignment and the reading of the charging instrument.

I, the Defendant, hereby enter a plea of GUILTY/~~NOLO CONTENDERE~~ to this charge.

1. I have had my Constitutional and legal rights explained to me by my attorney, and have decided to waive my Constitutional right of trial by jury and enter this plea before the judge. I hereby request the consent and approval of the State's Attorney and of the Court to my waiver of trial by jury. I further represent to the Court as follows:

2. I am mentally competent now and was legally sane at the time that this offense was committed.

2

3. I have not been threatened, coerced or placed in fear by any person to induce me to enter my plea.

4. If I have a plea bargain agreement with the prosecutor, its terms are fully set forth in the attached document. I have received no promise from the prosecutor, my attorney or the Court which are not set forth in that document, and I realize that no one else would be empowered to make me any promises.

5. If I am pleading GUILTY, it is because I am guilty, and for no other reason. If my plea is one of NOLO CONTENDERE, it is because I have considered all aspects of my legal situation and discussed them with my attorney and have determined that the entry of such plea is in my own best interest.

6. If applicable, my attorney has explained to me the requirements and consequences of Chapter 62 of the Texas Code of Criminal Procedure Sex Offender Registration Program.

7. I understand the Courts admonishments as contained in this waiver.

8. I am satisfied with the advice and representation of my attorney in this case.

_____
DEFENDANT

SWORN TO AND SUBSCRIBED ME THIS _____ day of _____ MAY - 3 2005 _____, 20___.

_____
DEPUTY DISTRICT CLERK

I have counseled with the Defendant in this cause and have concluded that the Defendant has a rational, as well as a factual understanding of both the charge(s) pending and this proceeding. I have explained the law regarding all waivers set forth in this document and am satisfied that in each instance the defendant has voluntarily relinquished a known right. I join in the Defendant's waiver of the right of trial by jury. If applicable, I have explained to my client the requirements and consequences of Chapter 62 of the Texas Code of Criminal Procedure Sex Offender Registration Program.

_____
ATTORNEY FOR DEFENDANT

I consent to and approve the jury waiver in this case.

_____
ASST. CRIM. DISTRICT ATTORNEY
00787933

3

I approve the jury waiver and ORDER it filed in the papers of the cause.  It plainly appearing that the Defendant is mentally competent; that his waivers have been entered voluntarily, in full knowledge of his rights; that the admonishment of the Court have been understood by the Defendant; that the Defendant's plea has not been induced by improper persuasion; and that the Defendant persist in his plea, the Defendant's plea is now accepted by the Court and the balance of this document is likewise ORDERED filed among the papers of the cause.

SIGNED and ENTERED this _____ day of ____ MAY - 3 2005 ____, 20 __.

_____
JUDGE PRESIDING

4

CAUSE NO. _2004_ CR _1461-B_

**PLEA BARGAIN**

I, the undersigned Defendant, together with my counsel and counsel for the State, agree that in exchange for the Defendant's agreement to plead guilty or nolo contendere, to allow the State to prove its case by means of written stipulations. The State may make recommendations regarding punishment; however, it is understood by all that even in the event the parties agree to recommend specific conditions and terms of community supervision or deferred adjudication or the length of supervision that such recommendations are not part of the formal plea agreement and are not binding on the Court. All parties understand and agree that the terms, conditions and length of supervision of community supervision or deferred adjudication are to be determined and assessed solely within the Court's discretion. It is further understood and agreed by the parties that in the event the Court assessed terms, conditions and or a length of supervision of community supervision or deferred adjudication different from those agreed to by the parties, that such difference shall not constitute grounds for setting aside the Defendant's plea in this cause. If the court grants deferred adjudication, the State does not recommend any term of years as part of the plea agreement. All parties agree that if deferred adjudication is subsequently revoked, Defendant may be sentenced to any term of years within the range of punishment provided by law for this offense.

It is mutually agreed and recommended by the parties: SEE ATTACHED "TERMS OF PLEA BARGAIN AGREEMENT

_____ Prosecution to proceed only on Count(s) _____ Prosecution for lesser included offense of _____

_____ Defendant agrees that he has been previously convicted of one/two or more felonies for enhancement under 12.42 P.C.

_____ Class A Misdemeanor punishment with State jail Felony Conviction under 12.44 P.C.

_____ Punishment to be assessed at _____ years

_____ Fine $_____

_____ Affirmative Finding of Deadly Weapon or 3G offense, Defendant not eligible for supervision under CCP42.12,Sec.3

_____ There is no application for community supervision/deferred adjudication.

_____ State will make no recommendation of Defendant's deferred adjudication/community supervision application. State reserves right to speak as to factual issues relevant to Defendant's punishment.

_____ State opposes community supervision/deferred adjudication. _____ Concurrent with: _____

_____ State recommends community supervision.

_____ State recommends deferred adjudication.

_____ Causes taken into consideration _____

_____ Restitution to be determined by the Court through the Community Supervision office or $_____

_____ Payable to victim in this cause number only: _____

_____ Payable to victims under: _____

_____ Other: _____

**WAIVER OF APPEAL**

I understand that upon my plea of guilty or nolo contendere, where the punishment does not exceed that recommended by the prosecutor and agreed to by me, my right to appeal will be limited to only: (1) those matters that were raised by written motion filed and ruled on before trial, or (2) other matters on which the trial court gives me permission to appeal. I understand that I have this limited right to appeal. However, as part of my plea bargain agreement in this case, I knowingly and voluntarily waive my right to appeal under (1) and (2) in exchange for the prosecutor's recommendation, provided that the punishment assessed by the court does not exceed our agreement.

_Francisco M Gonzalez_
DEFENDANT

_3 May 2005_
DATE

COUNSEL FOR DEFENDANT
SBOT # 07498400

The above terms constitute our agreement, and there are no agreements not set forth above. The Defendant and Counsel request the Court to follow the plea bargain.

_____
ASSISTANT DISTRICT ATTORNEY
SBN 00787933

ATTORNEY FOR DEFENDANT

_Francisco M Gonzalez_
DEFENDANT

**NOTE:** The parties are not allowed to make binding agreement s regarding the length of community supervision or the terms and conditions of community supervision, which are totally dependent upon the Court's discretion. The following recommendations do not constitute part of the formal plea agreement. However, the (State) (both parties) make the following non-binding recommendations:

_____ Community Supervision be granted for _____ years
_____ Restitution Center
_____ Hours Community Service
_____ Days Electronic Monitoring
_____ No contact with _____

_____ Days in Bexar County Jail or State Jail (circle one)
_____ Substance abuse treatment facility
_____ Days Community Corrections Facility

Other Punishment recommendations: _____

NO. 2004-CR-1461-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| VS. | § | 186TH JUDICIAL DISTRICT |
| FRANCISCO GONZALES | § | BEXAR COUNTY, TEXAS |

## TERMS OF PLEA BARGAIN AGREEMENT

I, FRANCISCO GONZALES, the undersigned defendant, having had the advice of my attorney, Ray Fuchs, agree to the following:

I.  I, FRANCISCO GONZALES, will enter a plea of guilty to the lesser included offense of Murder of Tommy Garcia, pending against me in 2004-CR-1461-B.

II.  I, FRANCISCO GONZALES, will give full, complete, and truthful evidence concerning my knowledge of the Capital Murder of Tommy Garcia on December 3rd 2003, and any and all offenses committed by any person, including but not limited to Juan Castillo, Debra Espinosa, Teresa Quintero, and any other person involved in the murder and robbery of Tommy Garcia on or about December 3rd 2003.

III.  It is specifically agreed that said above-referenced evidence shall include live testimony before any Grand Jury, pretrial, trial, probation hearing, post conviction and retrial proceedings in any Court, State or Federal; and I specifically agree to testify truthfully at the trial(s) of Juan Castillo, Debra Espinosa, Teresa Quintero, and any other participant involved in the robbery and killing of Tommy Garcia, concerning my knowledge of any and all offenses committed by them.

IV.  It is specifically agreed that I will give a full, complete and truthful sworn written voluntary statement to representatives of the District Attorney's Office concerning my knowledge of the offenses referred to in Paragraph II and III above.

V.  It is specifically agreed that I will not engage in any conduct, by words or actions, that compromise my credibility as a witness in any of the above mentioned trials and proceedings in which my testimony is anticipated.

In return and in consideration therefore, both parties, the State of Texas and the defendant, FRANCISCO GONZALES agree that:

I.  The State will waive the death penalty and allow me, FRANCISCO GONZALES, to plead guilty to the lesser-included offense of Murder and receive a sentence of forty (40) years in prison.

II.  The State of Texas, by and through the Bexar County District Attorney's Office, shall be the sole and final arbiter of my, FRANCISCO GONZALES's good faith in the fulfillment in this Agreement.

III.     The sentencing phase in cause number 2004-CR-1461-B shall be postponed until such time as I, FRANCISCO GONZALES, have had the opportunity to comply with my obligations under this Agreement, through the completion of the trial(s) of Juan Castillo, Debra Espinosa, Teresa Quintero, and other persons who participated in the murder and robbery of Tommy Garcia on or about December 3, 2003, referred to in paragraphs II and III above.

IV.     Should I, FRANCISCO GONZALES, fail to fulfill my obligations under this Agreement, as determined by the State, the State shall inform the Court of such failure, and be free to recommend whatever it deems appropriate, including a life sentence, and I understand that I would not be free to withdraw my plea.

V.     In the event that I, FRANCISCO GONZALES, faithfully fulfill my obligations under this Agreement, the State shall inform the Court of the same and proceed with sentencing me to a sentence of 40 years for Murder.

VI.     No further Agreements or Conditions exist.

Signed this _____ 3rd _____ day of _____ May _____, 2005.

_____
David B. Lunan
Assistant Criminal District Attorney

_____
Francisco Gonzales
Defendant

_____
Ray Fuchs
Attorney for Defendant

# Exhibit 57

3-30-05, 10:30 —
186th; Hearing on co-def; F.
Gonzales, m.75.
(missed part; t.act) Sullivan
1/ add direct — Det.
S.A.P.D. 5 yrs; homicide
12 yrs; P.D.

12-6-03; asst'ng Det. Angel;
ct. order to int. F.G. at jail
5:30 p.m. to ~~~~~~~~
P.D.
· jail informed about hearing
that he was arrested
near scene of homicide
Det. Angel (lead invest.) present
O. Espinoza had already given 2
different statements
rts read- 1st thing., 18:02 hrs
F.G. under arrest since 12-3-03.
1st interrog. of F.G.
F.G. volunteers story to Gilette
· ride from house of
· don't know driver
· scored #20 drugs
· he's walking; gets robbed
· then hears shots fired
· hears cops
· cop arrives, he runs (warrants)

, purrender?
, knew nothing of murder on Comp St
, not intox.) understood, not cuffed
, no threats or promises
, Angel walks out
, jail took his clothes
    , glass found on
    , matched car glass
        (fabrication)
, had D.E.'s inculpating of F.G.
, But Angel comes back
, F.G. — "I wasn't there"
, But Angel says he has eyewitness
    to place F.G.
        F.G. says "That fucking
        bitch, — it was her
        idea"

(*) , F.G. says J.C. & he agreed to
    rob victim set up by D.E.
, But Sullivan leaves at 7:00 to get
    whataburgers — back at 7:30
    they eat
, But Angel already typing
    statement of F.G.

(*) , F.G. describes Juanito ___ as having
    been arrested for bulletproof
    vests — describes face

. does to photo array of J. Q.
in spread.

. 3 sec's — ID's Juanito —
. "That's the motherfucker"
. signs photo
. st #4

. written statement produced
. DF read it outloud
. 2 ski masks — F.G. describes
  statement corrected because
  statement had reversed who was
  using which
. 2 civilian witnesses to F.G.'s
  signature  SY #2
. F.G. never invoked it's — was cooperative
. F.G. taken back to jail
. F.G. signs statement at
  approx 8:30 P.M.
. F.G. angry at D.E.
. F.G. no more statements near
  or since

11:35 — Cross, for def.

• F.G. did invoke rt to s/b on
day of arrest
• F.G.'s oral statements — not recorded

11:40 — excused to 1:30 P.M.

1:30 — met
1:50 — DIRECT, Det Timo Angel

SAPD homic. det — 9 yrs.

• assigned day of case
• interviewed D.E.
• took written statement
from her, Thurs. 12-4-03.
• no arrests yet

• visited with F.G. after ct. order
to remove from jail
• F.G. in for outstanding
warrants — not case
• Sat 12-6-03 to SAPD
from jail, 1745 hrs.

• with Det Sullivan
• initially denied, then admitted
presence — F.G.
• Det Sullivan started questioning;
Angel in + out

, no recording at time
. F.G. cooperative & calm
. (same story as Sullivan +
  F.G.'s 1st oral statement)
. then glass fragments by Sullivan
  — def put his head down +
  didn't say anything.
      . F.G. — says "you got
      wrong guy"
. F.G. — "That fucking bitch — it was
         that whore's idea to
         do it"

. he typed statement them for F.G.
  who read very good, except for
  word "borders"

         . correction on who wore
           which ski masks + size
           of hole for eyes.
         . started at 19:10 hrs to
         type  SX#2

         . rts read from statement
           form, top of SX#2

. F.G. asked if he should have
  lawyer; cell phone given F.G.

F.G. — laughs + says he doesn't
read lawyer 'cause he didn't
shoot the (fucker?)

. F.G. not get dog with
cap. murder
. nobody was there
. SX #2 signed at 21:45 hrs.

. F.G. — planned robbery with
D.E. + Jvanito
. F.G. — views photo array; IDs
Jvanito

. statement voluntary

2:19 — cross, Fuchs
. corrected re ski masks —
mistakes not copied, thrown
away.
. no VCR recording.
. F.G. — didn't use phone book.
. F.G. — initially didn't want to give
statement to Det Whitser

2:36 — redirect
. F.G. — not originally a suspect
. F.G. — GSR test taken

2:29 — re-cross
· F.G. — read S×2 outloud

2:30 — excused
    — st. rests / def rests
    — argument

2:36 — ct.
        2 oral st. of F.G.
            voluntary not
            admiss., except
            for impeach.
        1 statement
            voluntary +
            admissible

        1 oral st. of F.G. —
        "hey there's been a
        Shooting"
            (no Crawford
            obj. taken)

# Exhibit 58

# Vincent D. Callahan
## Attorney
### Laurel Heights Station



June 16, 2004

Juan E. Castillo 

San Antonio TX

     RE:   *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
           186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

     I received your letter postmarked 6/15/04. My notes regarding your inquiry state that James Fenimore observes older, 80's model small square car turn around in his driveway and drive off – after shots.

     Because of the limitations expressed in the Texas Rules of Evidence regarding hearsay and persons who would likely invoke their Constitutional privilege against self incrimination, I have disclosed your information about the co-defendant to the prosecutor as some evidence of your actual innocence with a hope that he might dismiss your case.

     Perhaps you should invite Ralph Perdigone to write a letter to the prosecutor of the 186th District Court regarding any arrangements that Mr. Perdigone is interested in.

     I will come to see you to discuss your case after I have received the various test results in your case. If the DNA test results indicate that you cannot be excluded as a source of the tested DNA, I will ask the trial court to appoint a DNA expert to review these test results for errors, if any. I will stay in touch.

Juan E. Castillo                                    Page 2
June 16, 2004


Sincerely,


Vincent D. Callahan

VDC/ar

Cc:

Bill Harris, Esq.

# Exhibit 59

# Vincent D. Callahan
## Attorney
### Laurel Heights Station

San Antonio TX 

March 9, 2006

Juan Castillo TDCJ-ID

Livingston TX

RE: *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

I received your letter postmarked 2/28/06.  I deny that I sold you out at your jury trial.  I deny that I will sell you out on your appeal.

I will obey any orders from the Texas Court of Criminal Appeals regarding my representation of you on appeal.

It is likely that I will raise on your appeal the issue of unfairness of compensating a co-defendant in exchange for adverse testimony.  I will also raise the issue of likely insufficient evidence.  If the record supports your allegation that three jurors slept throughout your trial I will also present on appeal that issue.

On 3/9/06 is the date for your transcript to be filed but I have not yet received notice that they have been filed; I will keep you informed.  I will stay in touch.

Sincerely,

Vincent D. Callahan
VDC/ar

# Exhibit 60

2004 JU461A

To: THE HONORABLE JUDGE MARIA THERESA HERR,                    TUESDAY 4·11·06

                          I'M WRITING THIS LETTER TO ASK THE COURT.
TO ALLOW ME TO REMOVE MR. VINCENT CALLAHAN AS MY DIRECT APPEAL
ATTORNEY & TO PLEASE APPOINT ME AN ATTORNEY FROM THE PUBLIC DEFE-
NDER'S OFFICE. THE REASON FOR THIS REQUEST IS BECAUSE I'D LIKE TO
ARGUE THE ISSUE OF INEFFECTIVE ASSISTANCE OF COUNSEL. IF I HAVE
MR. CALLAHAN REPRESENTING ME HE WON'T FILE THAT ISSUE ON HIMSELF
SINCE HE WAS MY TRIAL ATTORNEY AS WELL. IF THIS AINT POSSIBLE
THEN I'D LIKE TO WAIVE MY APPEAL. IF THE COURT WOULD GRANT ME
THIS REQUEST IT WOULD BE GREATLY APPRECIATED. THANK YOU FOR YOUR
TIME.

4/24/06  Spoke to Judge Angela Moore
         and Mr. Callahan.

Angela said ineffective assistance usually
not meritorious on appeal, but is
raised on Writ. Denny almost completed
w/appeal and Suzanne is raising
ineffective assistake on writ so
we will leave everything as is

                  SINCERELY,
                  Juan Castillo

                     Angela
                     0706



N HOUSTON TX 773

12 APR 2006 PM 5 L



TO: THE HONORABLE JUDGE MARIA THERESA HERR
COURT HOUSE
SAN ANTONIO TX.

78205+3038

LEGAL
MAIL

# Exhibit 61

Vincent D. Callahan
Attorney
Laurel Heights Station



May 8, 2006

Juan Castillo TDCJ-ID

Livingston TX

     RE:  *State of Texas v. Juan E. Castillo*, No. 2004-CR-1461-A
          186th Judicial District Court, Bexar County, Texas

Dear Mr. Castillo:

     I received your letter postmarked 4/29/06. The law prohibits me from disclosing to you any juror's information after the trial is completed; your writ attorney will have access to this information.

     I was informed by the Trial Court of your resent letter requesting a new lawyer on appeal. Your writ attorney will present a claim of ineffective assistance of counsel in her writ application.

     I have requested and received an extension of time to file your Appellant's Brief until 9/11/06. It is likely however that I will complete the brief prior to that date.

     Regarding a motion for discovery I reviewed the State's complete file on three different occasions; regarding a motion for exculpatory evidence on these three separate occasions, I repeated my request to the prosecutor to give to me any exculpating evidence (he continuously revealed the circumstantial nature of his proof against you and was prepared to stipulate at the punishment phase to your educational records).

Juan Castillo
Page 2

May 8, 2006

     I will stay in touch.

Sincerely,

Vincent D. Callahn

VDC/ar

Enclosure