# Exhibit E



**NO. 2004-CR-1461A-W1**

| EX PARTE | § | IN THE DISTRICT COURT |
|----------|---|----------------------|
| JUAN CASTILLO | § | 186TH JUDICIAL DISTRICT |
| Applicant | § | BEXAR COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Applicant, Juan Castillo, through his court-appointed attorney, John Economidy, has filed an application for post-conviction writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure, collaterally attacking his conviction and sentence of death in Cause No. 2004-CR-1461A. TEX. CODE CRIM. PROC. art. 11.071 (West 2011).

## HISTORY OF THE CASE

On or about August 30, 2005, Applicant was found guilty by a jury of the offense of capital murder. Based on the jury's answers to the special issues in the punishment phase, a sentence of death was imposed. On March 23, 2005, the Court of Criminal Appeals issued a unanimous opinion affirming Applicant's conviction and sentence. *Juan Castillo v. The State of Texas*, 221 S.W.3d 689 (Tex. Crim. App. 2007). Applicant filed his Article 11.071 habeas application on November 13, 2009. The Criminal District Attorney of Bexar County, Texas filed its response to Applicant's petition for writ of habeas corpus, denying each of the allegations made by the Applicant and demanding strict proof of the same.

This Court held a hearing on Applicant's petition for habeas relief on January 20-21, 2011 and February 1, 2011. At the hearing, the Court considered the pleadings and evidence submitted by the parties, live testimony by witnesses, the complete record of this case at trial and on appeal, as well as the arguments of counsel for Applicant and for the State. The Court now makes the following findings of fact, conclusions of law and recommendations:

1



In the opinion on direct appeal, the Court of Criminal Appeals set out the substantive testimony of Applicant's trial. *Castillo v. State*, 221 S.W.3d 689 (Tex. Crim. App. 2007). The high court's summary of the facts is as follows:

> Francisco Gonzales and Debra Espinosa were accomplice witnesses for the State. Both testified that they, appellant, and Teresa Quintana planned to rob the victim, Tommy Garcia, Jr. Pursuant to the plan, Espinosa called Garcia and made arrangements for him to pick her up and drive to Clamp Street, a secluded area, for sex. As Garcia and Espinosa were parked on Clamp Street, appellant and Gonzales came up behind the car, appellant smashed one of the windows with the butt of his gun, opened the car doors and demanded that Garcia hand over his money. Appellant had a loaded gun, and Gonzales had a gun as well, but it was "just for show" because it did not work. Gonzales and Espinosa both testified that appellant shot Garcia numerous times as he attempted to run.

*Castillo*, 221 S.W.3d at 691-692. The Court of Criminal Appeals also summarized the key non-accomplice testimony in its opinion:

> Several people testified that they saw Garcia wearing his gold medallion necklace on the night of the offense. The necklace was described as a "spinner" medallion on a thick gold chain. Jessica Cantu testified that she saw appellant wearing the necklace on the afternoon after the killing. She told appellant the necklace looked familiar. When Cantu saw appellant a little while later, he was no longer wearing the necklace. Cantu told Garcia's mother that she had seen appellant wearing Garcia's necklace.
>
> Frank Russell and Robert Jimenez both testified that they were at Jimenez's house with Garcia in the late night and early morning hours of December 2 and 3, 2003, when Garcia received a phone call from Espinosa. Garcia agreed to meet Espinosa and offered to give Russell a ride home on the way. Jimenez testified that ten or fifteen minutes after Garcia and Russell left, he received a phone call from Espinosa who was crying hysterically and told him that someone had shot Garcia. Jimenez drove to Russell's and the two of them went to Clamp Street where Espinosa said the shooting had occurred. When they arrived, they saw Garcia's car with the doors open and Garcia lying face-down in the street. He appeared dead. They told police what they knew about Garcia's plans to meet Espinosa.
>
> Gerardo Gutierrez testified that in March 2003, he was an inmate in the same area of the Bexar County Jail as appellant. Appellant told Gutierrez that he and two friends, Frank and Bita, planned to rob a person, but "it turned out wrong" when the victim took off running … appellant shot him numerous times. Appellant told Gutierrez that the female accomplice, Bita, was the one who had turned him in. He also said they would have a hard time convicting him because they did not have the weapon.

Lucinda Gonzales testified that she was the younger sister of Francisco ("Frank") Gonzales, one of the accomplice witnesses. At the time of the murder, Lucinda was living in the same house with Gonzales and his girlfriend Teresa ("Bita") Quintana, among others. Lucinda testified that on the night of the offense, appellant called numerous times looking for Gonzales, and eventually came over with his girlfriend, Debra Espinosa. Appellant and Gonzales asked to borrow Lucinda's car, and she finally agreed to let Teresa drive it. Appellant, Gonzales, and Teresa left in Lucinda's car around 9:30 p.m. that evening. Espinosa left earlier in her own car. Teresa returned around 2:30 a.m., and she told Lucinda that Gonzales had been arrested on a child-support warrant. The following day, Lucinda saw a news report about Garcia's murder. A couple of days later, Gonzales was charged with Garcia's murder and arrested. Later that day, Lucinda covertly listened in on a phone conversation between Teresa and appellant. Lucinda described the exchange: "I heard Teresa say that, you know, what was going to happen to Frank [Gonzales]. And [appellant] said nothing, because he didn't do it, I did it, but they ain't going to know it because they ain't got any evidence. . . . He said that he - after the shooting, that he had ran through an open field and he discarded the - he had a mask, gloves, and the gun, and that he threw everything in the open field." Lucinda called the police and reported what she had heard. A few days later, Lucinda confronted appellant and called him a murderer. Appellant made a threatening gesture toward her and told her that Gonzales was going to stay locked up.

Bryan Anthony Brown testified that at the time of the offense he was fifteen and living in the same house with his aunt Lucinda, his uncle Frank Gonzales and Frank's girlfriend Teresa, and others. On the night of the offense, appellant and his girlfriend came over. Appellant had a gun and a bullet-proof vest. Appellant, his girlfriend, Gonzales, and Teresa all left in Lucinda's car. Brown found out the next day that Gonzales had been arrested. A couple of days later, Brown was riding in a car with appellant and Teresa when appellant said that he had to get out of town, that he had shot someone a bunch of times, and that he had hidden the gun and vest in a field.

*Castillo*, 221 S.W.3d at 692-693.

Applicant has detailed four claims for relief in his habeas petition, including a multi-faceted assertion of ineffective assistance by his trial counsel, in support of his contention that he has been illegally confined. None of these claims warrant the granting of habeas relief and this Court recommends that habeas relief be denied. The reasons why will be detailed herein.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON APPLICANT'S CLAIM I
(Applicant's pleadings, pages 2-93)

In Claim I, Applicant contends "trial defense counsel rendered ineffective assistance of counsel." (App. Pet. 27)[1] He claims he was deprived of effective assistance of trial counsel, in violation of the Sixth Amendment to the United States Constitution and Art. I § 10 of the Texas Constitution and Tex. Code Crim. Proc. Art. 1.05. This Court has identified in Applicant's petition sixteen (16) alleged deficiencies on the part of his trial counsel. This Court finds that the Applicant fails to establish, with regard to each of these alleged deficiencies, that he is entitled to relief.

To avoid confusion, this Court will first set out the applicable standard of review for ineffective assistance of counsel claims. The Court will then address Applicant's allegations of deficient performance individually.

<u>STANDARD OF REVIEW</u>

A defendant has a Sixth Amendment right to effective assistance of counsel. U.S. CONST. amend. VI. To obtain habeas corpus relief for ineffective assistance of counsel under *Strickland v. Washington*, an Applicant must show that (1) counsel's representation fell below an objective standard of reasonableness (i.e., was deficient), and (2) there is a reasonable probability the result of the proceedings would have been different in the absence of counsel's errors (i.e., the deficient performance prejudiced him). *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Ex parte Chandler*, 182 S.W.3d 350 (Tex. Crim. App. 2005). The applicant bears the burden of proof on these issues. Failure to meet either prong defeats the applicant's claim for habeas relief. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011), *cert. denied*, __ U.S. __, 131 S. Ct. 2073 (2011); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002).

---

[1] Citation to the record from the writ hearing on the applicant's habeas petition will be as follows: (__RRWH__). The defense's exhibits are contained in volume 7 of the reporter's record and the state's exhibits are in volume 6. The state will cite to the exhibits directly as (DX_) and (SX_). Citation to the Applicant's habeas petition will be as follows: (App. Pet.__). Citations to the record from the trial will be as follows: clerk's record (CR__) and reporter's record (__RR __).

The first prong requires that the applicant show that his trial attorney's performance was deficient, meaning it "fell below an objective standard of reasonableness . . . under prevailing professional norms and according to the necessity of the case. *Strickland*, 466 U.S. at 687-88; *Ex parte Morrow*, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (en banc). Because there "are countless ways to provide effective assistance in any given case," a reviewing court must be highly deferential and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation marks omitted); *Gosch v. State*, 829 S.W.2d 775 (Tex. Crim. App. 1991), *cert. denied*, 509 U.S. 922 (1993); *Bone v. State*, 77 S.W.3d at 833.

To prove the second prong, the applicant must demonstrate that he was prejudiced by his attorney's performance. *Strickland*, 466 U.S. at 686-689; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). That is, taking into account the totality of the evidence before the judge or jury, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 696. Thus, the applicant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." *Strickland*, 466 U.S. at 687. It is not sufficient for the applicant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the applicant must show that "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695; *Dewberry v. State*, 4 S.W.3d 735, 757 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000); *Ex parte Chandler*, 182 S.W.3d at 353. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Allegations of ineffectiveness must be based on the record, and the presumption of a sound trial strategy cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Busby v. State*, 990 S.W.2d 263, 269 (Tex. Crim. App. 1999). The reviewing court must look to the totality of the representation, and its decision must be based on the facts of the particular case, viewed at the time of counsel's conduct so as to eliminate hindsight bias. *Strickland*, 466 U.S. at 690. In all cases, the "ultimate focus of inquiry must be on the fundamental fairness of the proceeding." *Id.* at 696.

Unless the applicant makes both showings (deficient performance and prejudice), it cannot be said that the conviction or death sentence resulted from a breakdown in the adversarial process which rendered the result unreliable. *Strickland*, 466 U.S. at 689 ("the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.").

The *Cronic* standard

There is a narrow exception to *Strickland*'s requirement that the defendant must show prejudice to the defense arising out of counsel's deficient performance. In *United States v. Cronic*, 466 U.S. 648 (1984) which was decided on the same day as *Strickland*, the Supreme Court identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular effect in a particular case is unjustified." *Cronic*, 446 U.S. at 658-59. First, and "most obvious" as the complete denial of counsel." *Id.* at 659. The Supreme Court held a trial would be presumptively unfair where the accused is denied the presence of counsel at a "critical stage." *Id.* at 659, 662. Second, the Court determined that a similar presumption was warranted if "counsel entirely fails

to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659.  Finally, the Court said that in cases like *Powell v. Alabama*, 287 U.S. 45 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected.  *Cronic*, 446 U.S. at 659-662. *Bell v. Cone*, 535 U.S. 685 (2002).

Applicant argues that his claims fit within the first and second exception identified in *Cronic* in that he was completely denied trial counsel during a "critical stage" and that his trial counsel failed to subject the prosecution's case to "meaningful adversarial testing." (App. Pet. 90-93)  Alternatively, the Applicant claims he is entitled to relief under *Strickland* because the record demonstrates that his trial counsels' performance was deficient and he was prejudiced by counsels' unprofessional errors. (App. Pet. 90-93)  The court will now discuss the Applicant's individual claims and explain why he is neither entitled to relief under *Strickland* nor *Cronic*.

### 1.  FAILURE TO ADEQUATELY COMMUNICATE WITH APPLICANT

In his first allegation of deficient conduct, Applicant claims his trial counsel failed to adequately communicate with him.  Applicant claims that his counsel "abandoned" him by failing to visit him more than once in jail prior to trial. (App. Pet. 30-35)  For the reasons explained more fully below, this contention is without merit.

Applicant argues that the failure of trial counsel to spend more "face-to-face" time with him in jail amounts to abandonment by his counsel or ineffective assistance. (App. Pet. 35) However, the amount of face time trial counsel spends with his client, whether the defendant is on bond or in jail awaiting trial, does not translate into ineffective assistance under *Strickland* or abandonment under *Cronic*.  Rather, the overriding issue is one of "adequate communication" between trial counsel and the defendant.

7

To prove ineffective assistance of counsel based on inadequate communication, the applicant must prove that the lack of communication changed the outcome of the trial or resulted in trial counsel's failure to subject the prosecution's case to "meaningful adversarial testing." *Strickland*, 466 U.S. at 692 (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269 (U.S. 1942)); *Cronic*, 466 U.S. at 658-659.

Applicant fails to meet his burden in this regard. Applicant's claims that his trial counsel failed to adequately communicate with him are factually inaccurate. During the writ hearing on his habeas application, Applicant called his two trial lawyers as witnesses. He called no other witnesses. The Court finds the testimony of Mr. Callahan and Mr. Harris in the writ hearing to be credible and persuasive. (4 RRWH 63-73, 78-90, 109)

Attorney Vincent "Denny" Callahan was appointed to represent applicant in this case in December of 2003. (CR 2) And, attorney John William "Bill" Harris Jr. was appointed as co-counsel in February of 2004. (CR 6)

Mr. Callahan is licensed to practice law in Texas. (4 RR 83) He attends conferences to keep up with the law concerning criminal cases and capital murder. (4 RR 88) He has represented approximately 40-50 persons charged with capital murder and facing the death penalty. (3 RRWH 63-65) Of these, 30-40 resulted in pleas and 10 resulted in jury trials. *Id.* He has also served as appellate counsel for approximately 6 persons convicted of capital murder and sentenced to death. Of these, he had 1 person's conviction and death sentence overturned. (4 RR 85) Mr. Harris is also licensed to practice law in Texas. (3 RR 63) He attends conferences on criminal law. (3 RR 65) Although this was Mr. Harris' first defense of a death-penalty case, he has tried 20 death penalty cases as a prosecutor, with substantial first-chair experience. (3 RR 66, 69-73)

8

Mr. Callahan visited the Applicant in the jail immediately upon his appointment to represent him. (4 RRWH 99-105) He took with him his nearly twenty-five (25) years of experience as a criminal defense lawyer. (4 RRWH 78-88) In speaking with Applicant, Mr. Callahan understood what it was going to take to communicate with Applicant effectively and efficiently so that Mr. Callahan could represent him to the best of his abilities, which meant most importantly – not being sentenced to death. (4 RRWH 100-106) Mr. Callahan did not abandon Applicant in any way. He engaged the Applicant in a way that forced him to operate on a level that was going to permit Mr. Callahan to be effective on his behalf. He forced Applicant to respond in writing to pertinent relevant questions that allowed Mr. Callahan to build a defense case and afforded Applicant effective representation.

Mr. Callahan and Applicant communicated extensively through written correspondence. (4 RRWH 85-86; 5 RRWH 21-75; SX 7 – SX 49A, SX 51-SX 68) At least fifty nine (59) letters passed between Applicant and Mr. Callahan prior to jury selection. (SX 7 – SX 49A, SX 51-SX 69) Not only are the letters dated, but they often reference proceeding letters to which either party is responding. When read from the beginning of Mr. Callahan's representation until the beginning of jury selection, the letters memorialize Mr. Callahan's extensive work in preparing to defend Applicant, his commitment to updating the Applicant on the status of his case, his direct responses to Applicant's questions and his explanation of relevant law whenever appropriate. In other words, Mr. Callahan engaged in continuing dialogue with Applicant on all matters that had a material impact on the case. When the letters are examined and broken down, they demonstrate that trial counsel did not completely abandon Applicant as alleged, and they definitively demonstrate that he was not denied counsel at a critical stage. (4 RRWH 85-86; 5 RRWH 21-75; SX 7 – SX 49A, SX 51-SX 68)

The letters between Mr. Callahan and Applicant address a myriad of matters including, but not limited to:

- Callahan's meetings with the intake prosecutor in charge of indicting Applicant's case (SX 7 - dated 12/9/2003; SX 8 - dated 1/9/2004);

- status of Applicant's file/case and discovery matters (SX 8 - dated 1/9/2004; SX 9 - dated 2/02/2004; SX 10 - dated 2/20/2004; SX 12 - dated 2/27/2004; SX 22 - dated 6/2/2004);

- reminding Applicant not to discuss the case with anyone (DX 1L, dated 12/11/2003; SX 7, dated 12/9/03);

- reminding Applicant to keep up good conduct in jail so State cannot use misconduct in trial (SX 10 - dated 2/20/2004; SX 21 - dated 5/26/2004; SX 39 - dated 12/3/2004);

- informing Applicant of court setting's in his case (SX 15 - dated 3/4/2004; SX 38 - dated 11/21/2004; SX 41 - dated 12/17/2004; SX 43 - dated 1/7/2005; SX 44 - dated 1/17/2005; SX 45 - dated 1/31/2005; SX 56 - dated 4/5/2005; SX 57 - dated 4/8/2005);

- informing Applicant approximately when the case will be presented to the grand jury (SX 8 - dated 1/9/2004);

- matters relating to Applicant's desire to have bond reduced (SX 11 - dated 2/24/2004; SX 14 - dated 3/3/2004); SX 21 - dated 5/26/2004; SX 22 - dated 6/2/2004; SX 30 - dated 8/2/2004; SX 31 - dated 8/13/2004; SX 32 - dated 8/22/2004; SX 35 - dated 10/18/2004; SX 38 - dated 11/21/2004; SX 39 - dated 12/3/2004; SX 45 - dated 1/31/2005);

- status of the co-defendants' cases (SX 8 - dated 1/9/2004; SX 10 - dated 2/20/2004; SX 43 - dated 1/7/2005; SX 46 - dated 2/11/2005; SX 51 - dated 3/7/2005; SX 53 - dated 3/11/2005; SX 54 - dated 3/30/2005; SX 55 - dated 4/1/2005; SX 57 - dated 4/8/2005; SX 58 - dated 4/22/2005; SX 60- dated 4/30/2005; SX 61 - dated 5/2/2005; SX 63 - dated 5/6/2005);

- requests for a detailed accounting of Applicant's activities the day before, the day of, and the day after the murder of the victim (Tommy Garcia Jr.) and ongoing discussions regarding the accounting (SX 11 - dated 2/24/2004; SX 12 - dated 2/27/2004; SX 13 - dated 2/28/2004); SX 14 - dated 3/3/2004; SX 18 - dated 4/16/2004; SX 19 - dated 4/20/2004;

- discussions regarding relevant legal issues (accomplice witness testimony, corroboration, admissible evidence, etc.) (SX 14 - dated 3/3/2004; SX 36 - dated

00621212 VOL 1146 PG 2401



10/22/2004; SX 39 - dated 12/3/2004; SX 53 - dated 3/11/2005; SX 57 - dated 4/8/2005; SX 58 - dated 4/22/2005; SX 63 - dated 5/6/2005);

- discussions regarding defenses (SX 41 - dated 12/17/2004; SX 53 - dated 3/11/2005; SX 62 - dated 5/3/2005);

- whether Applicant had any witnesses that would alibi him as he alluded to during first meeting – if so, their name and addresses (SX 16 - dated 3/12/2004; SX 17 - dated 4/15/2004);

- investigator to assist in locating alibi witness identified by Applicant, Carlos Castillo (SX 20 - dated 4/23/2004; SX 27 - dated 6/21/2004; SX 38 - dated 11/21/2004; SX 49 - dated 2/28/2005; SX 51 - dated 3/7/2005; SX 52 - dated 3/8/2005; SX 57 - dated 4/8/2005);

- discussions regarding Applicant's pending federal case and subsequent sentencing (SX 16 - dated 3/12/2004; SX 17 - dated 4/15/2004; SX 21 - dated 5/26/2004);

- discovery matters (SX 25 - dated 6/14/2004; SX 26 - dated 6/16/2004; SX 36 - dated 10/22/2004; SX 40 - dated 12/9/2004; SX 42 - dated 12/27/2004; SX 49 - dated 2/28/2005; SX 52 - dated 3/8/2005; SX 53 - dated 3/11/2005; SX 56 - dated 4/5/2005; SX 57 - dated 4/8/2005; SX 60- dated 4/30/2005; SX 62 - dated 5/3/2005; SX 63 - dated 5/6/2005);

- attempts to discover why co-defendants (Applicant's girlfriend, Debra Espinoza, and his good friend, Frank Gonzales) would identify Applicant as the shooter (SX 51 - dated 3/7/2005; SX 52 - dated 3/8/2005);

- numerous attempts to locate Applicant's purported alibi witness, Carlos Castillo (SX 45 - dated 1/31/2005; SX 46 - dated 2/11/2005; SX 48 - dated 2/18/2005; SX 54 - dated 3/30/2005; SX 56 - dated 4/5/2005);

- relevant pre-trial and trial motions (SX 8 - dated 1/9/04; SX 13 - dated 2/28/2004; SX 13 - dated 2/28/2004; SX 53 - dated 3/11/2005; SX 65 - dated 5/20/2005; SX 66 - dated 7/5/2005; SX 67 - dated 7/8/2005)

- counsel's written request for appointment of a mental health expert to examine Applicant, discussions regarding the expert's role, stressing importance of possible testimony and need for Applicant's full cooperation but no discussing facts relating to charge (SX 8 - dated 1/9/04; SX 13 - dated 2/28/2004; SX 13 - dated 2/28/2004; SX 16 - dated 3/12/2004; SX 17 - dated 4/15/2004; SX 38 - dated 11/21/2004; SX 45 - dated 1/31/2005; SX 51 - dated 3/7/2005; SX 54 - dated 3/30/2005; SX 55 - dated 4/1/2005; SX 56 - dated 4/5/2005);

- counsel's on-going discussions with the lead prosecutor, David Lunan (SX 24 - dated 6/11/2004; SX 26 - dated 6/16/2004; SX 34 - dated 9/24/2004; SX 36 -

002112 VOL 1146 PG 2402



dated 10/22/2004; SX 58 - dated 4/22/2005; SX 61 - dated 5/2/2005; SX 63 - dated 5/6/2005);

- updates and discussions regarding forensic testing (SX 14 - dated 3/3/2004; SX 17 - dated 4/15/2004; SX 18 - dated 4/16/2004; SX 21 - dated 5/26/2004; SX 22 - dated 6/2/2004; SX 23 - dated 6/5/2004; SX 24 - dated 6/11/2004; SX 26 - dated 6/16/2004; SX 28 - dated 6/24/2004; SX 28 - dated 6/24/2004; SX 31 - dated 8/13/2004; SX 33 - dated 8/27/2004; SX 35 - dated 10/18/2004; SX 40 - dated 12/9/2004; SX 41 - dated 12/17/2004; SX 55 - dated 4/1/2005; SX 56 - dated 4/5/2005; SX 57 - dated 4/8/2005);

- Applicant's rights regarding representation whether by appointed counsel or self representation, but no hybrid representation and no right to select counsel to be appointed (SX 43 - dated 1/7/2005; SX 45 - dated 1/31/2005; SX 64 - dated 5/13/2005);

- counsels' investigations into possible defensive matters presented by Applicant (including, but not limited to, alleged statements against penal interest made by co-defendant Gonzales to another inmate (SX 21 - dated 5/26/2004; SX 22 - dated 6/2/2004; SX 23 - dated 6/5/2004; SX 24 - dated 6/11/2004; SX 25 - dated 6/14/2004; SX 26 - dated 6/16/2004; SX 27 - dated 6/21/2004; SX 28 - dated 6/24/2004; SX 60- dated 4/30/2005; alleged written materials and writing on vent of jail cell by co-defendant Gonzales' referring to self as "South Side Killer, Poncho Loco"(SX 23 - dated 6/5/2004; SX 25 - dated 6/14/2004; SX 30 - dated 8/2/2004; SX 32 - dated 8/22/2004; alleged photos of car used in offense (SX 27 - dated 6/21/2004; SX 49 - dated 2/28/2005; SX 51 - dated 3/7/2005; SX 54 - dated 3/30/2005; SX 57 - dated 4/8/2005; ; SX 58 - dated 4/22/2005);

- discussions regarding punishment phase including mitigation special issue (SX 45 - dated 1/31/2005; SX 47a - dated 2/14/2005; SX 48 - dated 2/18/2005; SX 49 - dated 2/28/2005; SX 51 - dated 3/7/2005; SX 64 - dated 5/13/2005; SX 64 - dated 5/13/2005);

- the fact that Applicant's purported alibi witness was located and denies alibi claim (SX 55 - dated 4/1/2005);

- discussions with Applicant's defense counsel (Celeste Ramirez) in federal case and Mr. Callahan's concern that Applicant's statements to police in federal case and in federal PSI that reason Applicant possessed weapons and bullet proof vest was because he "robs drug dealers" due to evidence in instant case suggesting victim sold drugs (SX 46 - dated 2/11/2005; SX 47a - dated 2/14/2005);

- counsel's concern that Applicant's purported alibi witness also tried to alibi Applicant in his federal case (SX 46 - dated 2/11/2005);

- counsel's concern in calling purported alibi witness even if located because State

062112 VOL 1146 PG 2403



has tape recorded conversation of call made by accomplice witness Debra Espinoza from jail to alibi hours after murder; during conversation alibi tells Espinoza to keep quite (SX 45 - dated 1/31/2005);

- numerous requests by counsel to allow him to speak with Applicant's family and stressing importance of having them testify (particularly mother) in punishment phase, should there be one (SX 48 - dated 2/18/2005; SX 49 - dated 2/28/2005; SX 51 - dated 3/7/2005; SX 64 - dated 5/13/2005; SX 65 - dated 5/20/2005; SX 67 - dated 7/8/2005; SX 68 - dated 7/11/2005);

- notification of two last minute witnesses who claim Applicant made inculpatory statements regarding the victim's murder (SX 66 - dated 7/05/2005);

- counsel relay's plea offers from state or counsel inquires as to whether Applicant wants counsel to discuss possible plea agreement with state (SX 16 - dated 3/12/2004; SX 34 - dated 9/24/2004; SX 35 - dated 10/18/2004; SX 61 - dated 5/2/2005; SX 62 - dated 5/3/2005);

- counsel encouraging Applicant to keep his spirits up, despite developments that weigh against him in his case (SX 48 - dated 2/18/2005; SX 49 - dated 2/28/2005; SX 64 - dated 5/13/2005);

- discussions regarding Applicant testifying at trial, including the possible benefits and detriments (SX 51 - dated 3/7/2005; SX 57 - dated 4/8/2005; SX 57 - dated 4/8/2005; SX 58 - dated 4/22/2005);

(4 RRWH 92-124; 5 RRWH 13-100)

In addition to this ongoing communication, trial counsel provided Applicant with copies of discovery notes, witness statements and forensic reports. (5 RRWH 24, 27, 71; SX 13 (letter from Callahan to Applicant reflecting copy of indictment enclosed); SX 14 (letter from Applicant to Callahan reflect receipt of indictment); SX 16 (letter from Callahan to Applicant reflecting copy of discovery notes of state's file and motion requesting mental health evaluation enclosed); SX 25 (letter from Applicant to Callahan acknowledging receipt of discovery notes in letter to counsel); SX 34 (letter from Callahan to Applicant reflecting copy of DNA report from ski mask showing inconclusive as to Applicant's DNA enclosed); SX 42 (letter from Applicant to Callahan referencing discovery notes in letter from Callahan); SX 49 (same); SX 55 (letter

0621-2 VOL 1446 PG 2404

13

from Callahan to Applicant reflecting copy of Dr. Ferrell's reports enclosed); SX 56 (letter from Applicant to Callahan acknowledging receipt of Dr. Ferrell's reports and indicating that he already knew he "he wasn't insane or retarded"); SX 66 (letter from Applicant to Callahan acknowledging that Harris gave him copies of the statements from the state's new witnesses, Brian Brown and Lucinda Gonzales).

Mr. Callahan personally visited Applicant at least one time in jail (4 RRWH 99-101), and Mr. Harris visited Applicant at least twice in jail. (3 RRWH 981-985) Mr. Harris' first visit occurred once the State announced its intention to seek the death penalty against Applicant. (SX 36; SX 45) In addition to the face-to-face communications at the jail, Applicant and his defense counsel communicated with each other at court settings and hearings. (3 RRWH 118-120; 5 RRWH 30, 64, 78) (testimony regarding Applicant's court settings on January 6, 2004, March 29, 2004, February 7, 2005, and July 5, 2005); *see also* (DX 1F, 1G) (fee vouchers reflecting Mr. Callahan's presence at court settings); (DX 1A) (fee voucher reflecting the settings attended by Mr. Harris). Also, the Applicant and his two experienced criminal trial attorneys spent nine days together during individual jury selection and discussed the case. (3 RRWH 120-121; 5 RRWH 83-84) (volumes 3-14 of reporter's record relate to jury selection).

As for Applicant's contention that Mr. Callahan should have communicated more with him about Dr. Ferrell's report, his claim is not supported by the record. (App. Pet. 35) Applicant did not testify. Instead, the Applicant attempts to prove this claim through the letter in which his defense counsel, Mr. Callahan, sent him copies of Dr. Ferrell's reports. Applicant claims because there is no discussion regarding the contents and significance of Dr. Ferrell's report, counsel failed to adequately address the matter with him. Interestingly enough, although the Applicant asserted his right to represent himself during the sentencing phase, Mr. Callahan

continued to encourage the Applicant to call witnesses and explain why their testimony was important, including Dr. Ferrell. (DX 2E)

Applicant asserts that, because neither Mr. Callahan nor Mr. Harris took steps to address Applicant's depression over his outlook on sentencing, this "led to the defendant to having zero confidence in his attorneys and seeking to represent himself." (App. Pet: 35) The Court finds from trial counsels' testimony at the writ hearing that neither Mr. Callahan nor Mr. Harris believed that Applicant was experiencing the kind of depression that might have caused him to be actually disabled or to require medical or psychological assistance. (3 RRWH 123-125; 5 RRWH 67; SX 48)

In fact, shortly before the beginning of jury selection, Applicant sent Mr. Callahan a letter expressing his appreciation of Mr. Callahan's work in his case and how he "stood up" for him during the hearing on the pre-trial motion. (2 RRWH 3-8; CR 29-45; SX 66) The hearing was regarding a pre-trial motion filed by Mr. Callahan attempting to exclude the accomplice witness testimony of Gonzales. (5 RRWH 78) In his letter to Mr. Callahan dated July 5, 2005, Applicant apologizes for doubting him. (5 RRWH 78; SX 66) Applicant acknowledges that he was a difficult client, but indicated he was changing his attitude. *Id.* He also affirms his faith in having Mr. Callahan and Mr. Harris representing him. *Id.*

At the writ hearing, trial counsel indicated that Applicant actively participated in the jury selection process. They would exchange notes on various matter, including Dr. Ferrell's proposed testimony. (4 RRWH 65) In one note, Applicant told Mr. Callahan, "I know I put in those motions to dismiss counsel and I apologize for that cause since we've started picking [the] jury I like how you've handled it and that you speak up. I like someone who speaks their mind." (5 RRWH 92-95; SX 103, pg 14) In fact, after the conclusion of his trial Applicant sent Mr.

Callahan a letter stating, "I like to tell you that even though I represented myself during the punishment phase I appreciated you and Mr. Harris staying there with me till the end." (SX 70)

Applicant failed to call witnesses or present any other evidence substantiating his claim that counsel abandoned him at any stage (let alone a "critical stage"), that his trial counsel entirely failed to subject the prosecution's case to "meaningful adversarial testing", or provided ineffective assistance by failing to attend more face-to-face meetings with him. *Cronic*, 466 U.S. at 659; *Strickland* 466 U.S. 687-89; *see also Burdine v. Johnson*, 262 F.3d 336, 345 (5th Cir. 2001) (en banc) (distinguishing between the total lack of counsel and ineffective assistance of counsel; noting that prejudice is presumed "when, during a critical stage of a trial, counsel is either (1) totally absent, or (2) present but prevented from providing effective assistance"); *Gochicoa v. Johnson*, 238 F.3d 278, 284-85 (5th Cir. 2000) (stating that prejudice is presumed under *Cronic*'s constructive denial of counsel prong "only when the defendant demonstrates that counsel was not merely incompetent but inert, distinguishing shoddy representation from no representation at all"); *Bell v. Cone*, 535 U.S. 685, 696-97 (2002) (observing that, under *Cronic*, an attorney's failure to test the prosecutor's case must be "complete"; only when trial counsel "entirely fails to subject the prosecution's case to adversarial testing" does presumption of prejudice apply because failure to do so amounts to a denial of Sixth Amendment rights "that makes the adversary process itself presumptively unreliable") (quoting *Cronic*, 466 U.S. at 658-659); *Ex parte McFarland*, 163 S.W.3d 743, 752-754 (Tex. Crim. App. 2005) (emphasizing that under *Strickland* it is the applicant's burden of proving his counsel's conduct was "objectively deficient" and must overcome the "strong presumption that counsel's performance fell within the wide range of reasonable professional assistance"). More importantly, this Court finds that Applicant fails to demonstrate how such hypothetical communications, had they occurred, would

0621432 VOL 1146 PG 2407

have had any material impact on the trial strategy or would have otherwise affected the outcome of the case. *Strickland*, 466 U.S. 694.

The Court finds that the numerous communications between trial counsel and Applicant, both in person and in written correspondence, kept Applicant reasonably informed about the status of matters relating to his case and promptly complied with Applicant's reasonable requests for information. Trial counsel reasonably explained important matters to Applicant to the extent reasonably necessary to permit Applicant to make informed decisions regarding the case. This Court concludes that Applicant's claim that his defense counsel was ineffective is without merit.

## 2. FAILURE TO INTERVIEW PROSECUTION WITNESS

In his second allegation of deficient conduct, Applicant claims counsel's failure to interview the state's witnesses damaged his defense. (App. Pet. 35-38) For the reasons explained more fully below, this contention is without merit.

In order to obtain relief on a claim that trial counsel failed to adequately investigate a charge, hence denying the accused his Sixth Amendment right to effective assistance of counsel, Applicant must demonstrate that facts pertinent to the issue were not investigated and that the failure to investigate harmed Applicant. *Rompilla v. Beard*, 545 U.S. 374 (U.S. 2005); *Ex parte McFarland*, 163 S.W.3d 743 (Tex. Crim. App. 2005); *Dewberry v. State*, 4 S.W.3d 735 (Tex. Crim. App. 1999). Applicant herein has failed on both counts. He has failed to demonstrate that Mr. Callahan and Mr. Harris conducted an inadequate investigation. Furthermore, Applicant has not demonstrated how a more comprehensive investigation would have benefited him. Applicant's pleading does not delineate, with any degree of specify, what he considers to constitute an ineffective investigation on the part of trial counsel aside from not interviewing the

prosecution's witness. However, Applicant does not demonstrate how he was prejudiced by trial counsels' failure to interview the prosecution's witnesses.

Mr. Callahan and Mr. Harris conducted discovery of the state's file and took notes regarding the information contained therein. (3 RRWH 74-92; 4 RRWH 42-51; SX 16; SX 42; DX 1A, 1F, 1H) They viewed the physical evidence collected by the police. (4 RRWH 39-40) Trial counsel was aware of the matters to which the prosecution witnesses would testify and were not surprised by testimony of any the prosecution witnesses they did not personally interview. (3 RR 145)

Applicant informed trial counsel that he did not murder Tommy Garcia Jr. He insisted he had an alibi. (4 RR 105-106) He told Mr. Callahan, "Don't worry about it. I'll find somebody [to alibi]. I'll take care of it." (4 RRWH 105) Consequently, trial counsel focused their attention on interviewing witnesses significant to the Applicant's purported alibi defense. There was no physical evidence or forensic testing inculpating the Applicant. (4 RRWH 40-41) The key witnesses against him were the two accomplice witnesses, Debra Espinoza and Frank Gonzales.

Mr. Callahan made extensive attempts to locate the possible alibi witness, namely Carlos Castillo, based on information supplied by the Applicant. (5 RRWH 42-44) Mr. Callahan had an investigator appointed to assist in locating the witness. (5 RRWH 32) Although the defense was unable to locate the potential alibi witness, the state subsequently provided an address for Carlos Castillo and Mr. Callahan interviewed him. (5 RRWH 42-44) Mr. Castillo was unable to corroborate the Applicant's proffered alibi. (5 RRWH 43)

Mr. Callahan interviewed Celeste Ramirez, Applicant's federal criminal defense attorney. (5 RRWH 65-66) He investigated Ralph Pedigrone, who happened to be the defense's sole

witness. (5 RRWH 82-83, 114-115; DX 1F, 1H; 20 RR 4) Because Mr. Pedigrone was incarcerated in a different jail, Mr. Callahan had to request that the court's coordinator make arrangements to have him transferred to the Bexar County jail. (5 RRWH 82-83; 15 RR 4) Once transferred, Mr. Callahan interviewed Mr. Pedigrone. *Id.* According to Mr. Pedigrone accomplice Gonzales made statements in jail inclulpating himself in the murder.

Mr. Callahan also made significant efforts to locate Applicant's family, whom he believed could provide mitigating evidence during the sentencing phase, if necessary. (5 RRWH 40-41; 67, 69, 74-75, 80-82; SX 48, 51, 63, 66, 67; DX 1F, 1H) Based on the information known to Mr. Callahan, he diligently made reasonable attempts to interview the material witnesses.

Applicant's contention that Mr. Callahan was ineffective for failing to interview the state's witnesses is not supported by record evidence. Applicant did not call any of the non-interviewed witnesses to testify during the hearing on Applicant habeas application. Absent such evidence, Applicant wholly failed to show how a pre-trial interview of any non-interviewed witnesses would have benefitted Applicant at trial. There is no evidence regarding how the failure to interview these witnesses harmed Applicant. Applicant fails to establish that any of the non-interviewed witnesses provided false testimony at trial or could have provided any testimony that would have exculpated the Applicant.

Furthermore, the two significant witnesses, Debra Espinosa and Fernando Gonzalez, who testified against Applicant, were accomplices as a matter of law, as they were charged with the same capital murder offense. Mr. Callahan spoke with the attorneys for the accomplice witnesses and requested an opportunity to interview the witnesses. (5 RRWH 39-40) The accomplices, through their attorneys, declined to submit to an interview by Mr. Callahan. *Id.*

Given the pending criminal charges, neither accomplice was willing to voluntarily cooperate with Mr. Callahan. Nothing changed when Gonzales and Espinoza entered into plea agreements with the state and agreed to testify against Applicant.

With respect to the non-interviewed witnesses called by the state, Mr. Callahan and Mr. Harris adequately cross-examined the witnesses at trial. To the extent that Applicant suggests Mr. Callahan's cross-examination of accomplice witness Debra Espinoza was ineffective, he testified at the writ hearing that his method of cross-examining her was based on trial strategy. (5 RRWH 90) He explained his strategy was to intentionally misstate what Espinoza testified to on direct examination with a view to confuse her in front of the jury and thus have her lose credibility in the eyes of the jury. *Id.* Mr. Callahan admitted his strategy failed. However, his admission that this trial tactic failed to work on Espinoza does not render his trial strategy unreasonable.

Trial counsel's trial strategy in the instant case was sound. An attorney can avoid activities that appear "distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 130, S.Ct. 13 (2009)*(per curiam)*. Counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 644 (2011) (citing *Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *Wiggins v. Smith*, 539 U.S. 510, 525 (2003)). *Strickland* permits counsel to "make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Applicant fails to meet his burden of proof as to either prong of *Strickland*. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 3. FAILURE TO TIMELY BEGIN TRIAL PREPARATION

In his third allegation of deficient conduct, Applicant faults his trial counsel for when he began preparing for trial, for how he prepared for trial, the extent to which he prepared for trial and his trial performance. (App. Pet. 39-46) For the reasons explained more fully below, this contention is without merit.

While criticizing trial counsel's preparation methods and trial performance, Applicant fails to meet his burden under either prong of *Strickland*. Applicant relies on how his habeas counsel would have prepared and what questions his habeas counsel would have asked on cross had he been the attorney appointed to represent him at trial.

Applicant fails to point to any credible evidence relevant showing he was prejudiced by what Applicant claims to be deficient performance. Mr. Callahan is an attorney who, at the time of trial, had been practicing exclusively criminal law for more than twenty-five (25) years. (4 RRWH 83) Mr. Harris, is a former prosecutor of twenty-nine (29) years, and has been in private practice as a criminal defense attorney since 1998. (3 RRWH 63-65) Both attorneys have extensive capital litigation experience, including with cases in which the state sought the death penalty. (3 RRWH 64; 4 RRWH 83-88).

Although both attorneys acknowledge that their notes specifically used for trial were not reduced to written form until shortly before trial, both attorneys testified that they started preparing for trial once they were appointed to represent Applicant. (3 RRWH 93-96; 4 RRWH 59-60; 5 RRWH 85) Mr. Callahan and Mr. Harris routinely discussed developments in the case and strategies leading up to the trial. They worked individually and collectively to prepare for trial.

The fee vouchers tendered by the attorneys support the testimony of Mr. Callahan and Mr. Harris, who both testified that the fee vouchers did not contain all of the work performed by

them. It cannot be said that that trial counsel's method for preparing for trial was deficient as anticipated by the Sixth Amendment. All attorneys pursue different methods of practice. The court finds both attorneys were adequately prepared for the trial. Applicant fails to meet his burden of proof as to either prong of the *Strickland*. He fails to prove that Mr. Callahan's performance fell below an objective standard of reasonableness or that the alleged deficient performance prejudiced his trial. Therefore, the court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 4. FAILURE TO PREPARE FOR SENTENCING AND MITIGATION

In his fourth allegation of deficient conduct, the Applicant claims that his trial counsel failed to adequately prepare for sentencing and mitigation. (App. Pet. 46-49) For the reasons explained more fully below, this contention is without merit.

Mr. Callahan testified that he gave greater focus to sentencing and mitigation in light of the state's evidence of Applicant's guilt. He also gave greater focus to this area based on his initial meeting with Applicant at jail when he was appointed to represent him. Because trial counsel was not aware, at the time of trial, that Applicant suffered an abusive childhood, the issue is not whether he was ineffective for failing to present evidence of abuse, but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence.

During the habeas hearing, Mr. Callahan explained that when he met Applicant for the first time at the jail his attitude was "humdrum", "nonchalant," like nothing unusual had occurred to his life. (4 RRWH 103-104; 5 RRWH 17-18) He described Applicant as a "bit cavalier" and "not alarmed at the gravity of the charge." (4 RRWH 103) They went over a newspaper article that Mr. Callahan brought with him since the State's file was not ready when he spoke with the intake prosecutor. (4 RRWH 104) Applicant was aware that the codefendants were identifying

him as the shooter.

During the meeting, Mr. Callahan discussed the kind of defenses available for this type of charge. (4 RRWH 105) He also indicated that he needed to know from Applicant his thoughts regarding why the co-defendants would say things against him or "why the police would pull him in on it." Id. Applicant's response to Mr. Callahan was "I'll find somebody. Don't worry about it." (5 RRWH 18) According to Mr. Callahan, Applicant's response was a "red flag" because "in facing the grave charges of capital murder where you're looking at potential death penalty, if you really are innocent, you would know where you were at the time of the allegation." (4 RRWH 105-106) Applicant did not provide him with the name or names of potential alibi witnesses at the jail. Mr. Callahan asked Applicant to prepare a detailed outline regarding where he was at the day before, the day of, and the day after the murder, so that counsel could use it to prepare a defense. (4 RRWH 106; 5 RRWH 21)

Mr. Callahan's concern about Applicant's input intensified as he wrote him several times about the need for a time line. (4 RRWH 106; 5 RRWH 21, 23-25, 28, 31; SX 12, SX 13, SX 15, SX 18) According to Mr. Callahan, the timeline was critical because he needed it so he could begin developing Applicant's alibi defense, if it existed. (5 RRWH 21) When Applicant provided the first time line it was nonspecific and suggests he was with Carlos Castillo or someone else. (5 RRWH 21-23; SX 11) Mr. Callahan reiterated the need for a specific time line and explained that the offense date was December 3, 2003. Callahan reiterated the need to have an hour by hour accounting of what he did on that date (which was a Wednesday). He also asked that Applicant do the same for December 2, 2005 and December 4, 2005. (5 RRWH 23-24; SX 12) He responded in a subsequent letter that he was trying to think about what he did during that time (5 RRWH 25-26; SX 14); that he was trying to get in touch with people he was around

during that time to help him remember but explained it was hard because they have moved – identifies Carlos Castillo and mother-in-law (5 RRWH; 30 SX 17); explained that on December 3, 2003 he woke up at Carlos Castillo's house, was with his mom, and that later that night he went to his mother-in-laws house for her birthday. (5 RRWH 31; SX 19)

Before the alleged alibi witness was located, the State informed Mr. Callahan of a tape recorded conversation between Applicant's purported alibi witness and codefendant Espinoza. Espinoza called Carlos Castillo from the Bexar County Jail on the day of the murder, after she was arrested. Castillo admonished her 2 or 3 times to be still and not give out names. (5 RRWH 63; SX 45) Mr. Callahan explained the tape "sounded fishy" particularly in light of the fact that Castillo and Applicant were friends and in light of Castillo's attempt to alibi Applicant in his federal case. *Id.* When Carlos Castillo was eventually located he stated that he did not know what Mr. Callahan was talking about in terms of being an alibi for Applicant in the case. (5 RRWH 43)

Mr. Callahan believed it was important to establish mitigating factors for Applicant, such as the fact that Applicant's father had abandoned him when he was a child, through the testimony of family members. (5 RR 40-41, 67-69, 74-75, 80; SX 48, SX 49, SX 51, SX 64 SX 65, SX 67) Applicant, however, denied his father abandoning him and instructed Mr. Callahan that he did not want his family involved in the trial. (5 RRWH 40; SX 49; SX 68) Despite such instruction, Mr. Callahan tried to contact Applicant's mother, sister, and father. (5 RRWH 41) He sent letters to the family members but they proved unsuccessful. (5 RRWH 41; SX 68, DX 1F, 1H) The record establishes that Mr. Callahan explained the importance of this mitigating evidence to the Applicant. Despite such efforts by Mr. Callahan, the Applicant was generally unwilling to cooperate in the enlistment of his family members to testify on his behalf at trial.

Faced with the lack of any family members who were willing to testify at trial on Applicant's behalf, Mr. Callahan decided to try to introduce any relevant evidence in whatever manner he could. (5 RRWH 40) He obtained an agreement from the lead prosecutor, David Lunan, to stipulate to the admission of Applicant's educational records at trial. There was also a potential stipulation to the family history as set forth in the presentencing investigative report in Applicant's federal case. (5 RR RRWH 35, 38)

On March 5, 2004, Mr. Callahan filed a motion requesting that the court appoint a mental health expert to assist with the defense. (CR 9; SX 105) Mr. Callahan sought the testimony of an expert witness to testify about the lack of future dangerousness and other potential mitigating factors. (5 RRWH 56-59; SX 109, SX 110, SX 111) The court approved the retention of Dr. Ferrell. (CR 11) Dr. Ferrell was prepared to testify that Applicant would not be a future danger to society. (5 RRWH 57) He was also prepared to testify to any potentially mitigating evidence that he learned as a result of obtaining Applicant's personal background during his examination of Applicant. (5 RRWH 57; SX 106, SX 107, SX 108)

This Court finds that Mr. Callahan made reasonable efforts to prepare for the punishment phase. Mr. Callahan retained an expert witness who was ready and willing to testify about Applicant's lack of future dangerousness and other mitigating factors such as his limited educations, fragmented family structure, and other childhood problems. Additionally, Mr. Callahan obtained stipulations from the state concerning Applicant's limited education and family history.

Applicant did not proffer any evidence to show that Mr. Callahan's efforts were inadequate or counter-productive. The court notes that Applicant was not called to testify at the writ hearing about any potential mitigation evidence that might have been proffered at his trial.

Nor did Applicant call any of his family members to testify at the writ hearing. As such, the court is without any evidence from which it could conclude that Mr. Callahan's actions were deficient, let alone resulted in prejudice to the Applicant. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

## 5. FAILURE TO USE FORENSIC PSYCHOLOGIST

In his fifth allegation of deficient conduct, Applicant claims counsel failed to adequately prepare prior to trial calling Dr. Ferrell to testify as a defense expert in the punishment phase. He also contends counsel was deficient for not calling Dr. Ferrell as a witness in the sentencing phase of Applicant's trial. (App. Pet. 49-54) For the reasons explained more fully below, this contention is without merit.

Applicant elected to represent himself during the sentencing phase and it was Applicant who elected not to call the forensic psychologist. (21 RR 3-7; 5 RRWH 59) Applicant was aware of the matters of which Dr. Ferrell would testify. Dr. Ferrell was on stand-by and ready and willing to testify on Applicant's behalf. (3 RRWH 127; 5 RR 59) To prepared Dr. Ferrell for cross by the state, Mr. Callahan provided him with a copy of Applicant's federal PSI, the state's 404(b) notice, and informed him of an incident at the jail in which Applicant was alleged to have assaulted another inmate while the inmate was sleeping. (5 RR 56-59; SX 109, SX 110, SX 111)

It is without question that Applicant is the person who made the determination not call Dr. Ferrell to testify. Had Mr. Callahan been allowed to represent Applicant during the sentencing phase, he would have called Dr. Ferrell to rebut the state's evidence of future dangerousness and to offer mitigating evidence.

Applicant did not testify at the writ hearing and therefore failed to offer any explanation

for his decision to not call Dr. Ferrell. The trial court is unable to reconcile Applicant's writ application with the evidence adduced by Applicant at the hearing. There is simply no evidence to support his contention. Therefore, this Court concludes that Applicant's claim that counsel was ineffective is without merit.

### 6. FAILURE TO INTRODUCE STIPULATED MITIGATION EVIDENCE

In his sixth allegation of deficient conduct, Applicant claims that his trial counsel was ineffective during the sentencing phase of trial because he failed to introduce stipulated mitigation evidence, namely his school records. (App. Pet. 54-59) For the reasons explained more fully below, this contention is without merit.

Applicant elected to represent himself during the sentencing phase and it was the Applicant who elected not to file the stipulated evidence. Mr. Callahan had already obtained an agreement from the state to stipulate to the admission of Applicant's educational records and his family history as set forth in the presentencing investigative report in the Applicant's federal case. It was solely Applicant who elected not to introduce these records at sentencing. Applicant did not testify at the writ hearing and therefore failed to offer any explanation for his decision. As a consequence, Applicant has failed to establish that he is entitled to relief. This Court concludes that Applicant's claim that counsel was ineffective is without merit.

### 7. FAILURE TO INTERVIEW AND USE APPLICANT'S FAMILY IN SENTENCING

In his seventh allegation of deficient conduct, Applicant claims his trial counsel was ineffective for failing to interview Applicant's family. He also argues his counsel's performance was deficient because he failed to call Applicant's family to testify in the sentencing phase of trial. (App. Pet. 59-63) For the reasons explained more fully below, this contention is without merit.

Despite Mr. Callahan explaining to Applicant on numerous occasions the importance of having his family at his trial, he refused Mr. Callahan's repeated requests to speak to Applicant's family. Despite Applicant's lack of cooperation, Mr. Callahan attempted to locate and interview his family. Mr. Callahan sent a letter to Applicant's sister in Arizona and his father requesting assistance. The letters were unsuccessful. Applicant's mother could not be located. The record establishes that Mr. Callahan explained the importance of this mitigating evidence to Applicant. Despite such efforts by Mr. Callahan, Applicant was generally unwilling to enlist the assistance of his family members.

Mr. Callahan was able to obtain an agreement from the state to stipulate to Applicant's family history as set forth in the presentencing investigative report in his federal case. Since Applicant represented himself in the sentencing phase, Mr. Callahan encouraged Applicant to admit that evidence. However, Applicant failed to do so. Applicant did not testify at the writ hearing regarding why he chose not to introduce the stipulated evidence. In the absence of such evidence, Applicant cannot meet his burden of proof under either prong of the *Strickland*. Therefore, this Court concludes that Applicant's claim that counsel was ineffective is without merit.

## 8. FRIVOLOUS DIVERSION OF EFFORTS INTO NON-MERITORIOUS MOTIONS AND FAILURE TO FILE NEEDED MOTIONS AND NOTICES

In his eighth allegation of deficient conduct, Applicant claims that his counsel's pleading practice in his case was ineffective. Specifically, he insists that the pre-trial motion to suppress the testimony of the accomplices was a waste of time counsel's time because, in his habeas counsel's opinion, the motion was frivolous. He contends that his counsel was ineffective for failing to file a written pre-trial motion requesting notice of punishment evidence under TEX. R. EVID. 404(b), 609(f), and TEX. CODE CRIM. P. art. 37.07. Applicant alleges the same regarding

*Brady* material. (App. Pet. 63-67)    For the reasons explained more fully below, this contention is without merit.

At the hearing on Applicant's habeas petition, habeas counsel only questioned Mr. Callahan regarding his reasons for not filing a written 404(b) motion. However, such motions do not need to be in writing and an oral request is sufficient. Mr. Callahan made the oral request for 404(b) information and was provided responsive information by the state. (5 RRWH 42-43) Mr. Callahan testified that he was prepared for trial. Applicant fails to show any harm by utilizing an oral motion instead of a written pleading. Further, Applicant did not adduce any evidence that the pleadings actually filed, or not filed, by Mr. Callahan fell below an objective standard of reasonableness. He also failed to adduce any evidence that even if counsel's conduct amounted to error that the error had some conceivable effect on the outcome of the proceeding let alone one so serious as to deprive the defendant of a fair trial.

Even if the court were to accept Applicant's contention that Mr. Callahan's accomplice-witness motion to exclude Gonzales' testimony was frivolous, no harm has been shown. Applicant fails to meet his burden of proof as to either prong of *Strickland*. This Court concludes that Applicant's claim that counsel was ineffective is without merit.

### 9. LACKING KNOWLEDGE AND SKILLS IN CAPITAL CASE

In his ninth allegation of deficient conduct, Applicant claims his counsel was ineffective at trial because he lacked knowledge and skills to defend him in his capital murder case. (App. Pet. 67-71) For the reasons explained more fully below, this contention is without merit.

As stated previously, Mr. Callahan is an attorney who, at the time of trial, had been practicing exclusively criminal law for more than twenty-five (25) years. (4 RRWH 78-88) Mr. Harris is a former prosecutor of twenty-nine (29) years and been in private practice as a criminal

defense attorney since 1998. (3 RRWH 63-65) Both attorneys have extensive experience defending individuals in capital cases in which the state sought the death penalty. *Id*. At the time of Applicant's trial, Mr. Callahan had handled between 40-50 death penalty cases. *Id*. Of these, 30-40 resulted in pleas and 10 resulted in jury trials. *Id*. He had handled 6 death-penalty appeals and had won 1 of these appeals. Although this was Mr. Harris' first defense of a death-penalty case, he had tried 20 death penalty cases as a prosecutor, with substantial first-chair experience. Both attorneys have represented hundreds of criminal cases throughout their careers. *Id*.

This Court finds that both attorneys possessed substantial knowledge of criminal law and procedures and had adequate skills to represent Applicant in this capital murder litigation. The court concludes that Applicant's claim that his counsel was ineffective due to inadequate legal knowledge and skills in capital litigation is without merit.

### 10. OPENING STATEMENT FOR THE DEFENSE

In his tenth allegation of deficient conduct, Applicant claims his trial counsel's opening statement in the guilt/innocence phase of trial demonstrates a lack of trial strategy, in that it was not cogent with their closing argument. (App. Pet. 71-74) For the reasons explained more fully below, this contention is without merit.

The defense's opening statement and closing arguments were not inconsistent with each other. (15 RR 23-24; 20 RR 67-77) In opening statements, Mr. Harris contended that the evidence was not going to prove that Applicant committed capital murder. (15 RR 23-24) In closing, Mr. Callahan detailed why the evidence failed to prove Applicant was guilty of capital murder. (20 RR 67-76) Recognizing the possibility that the jury could disagree and find Applicant guilty of capital murder and thus death-eligible, Mr. Callahan argued in the alternative.

He argued that if the jury disagreed that Applicant was not guilty based on the evidence presented by the state and believed Applicant was guilty, the jury should only find Applicant guilty of regular murder as provided for in the jury charge. (20 RR 76-77) (CR 128)

At the writ hearing, Mr. Callahan addressed the strategy of his closing argument. (5 RR 76-77) Recognizing the possibility that the jury might not agree with the defense's position that Applicant was not guilty, Mr. Callahan decided to argue that if the jury believed he was guilty it should be of the lesser offense of murder. If the jury were to find Applicant guilty of regular murder, Applicant would no longer be death eligible, but only subject to first degree punishment. (5 RR 76-77) Counsel's trial strategy was both reasonable and sound particularly in light of the evidence and potential punishment.

Applicant fails to meet his burden of proof under either prong of *Strickland*. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

11. FAILING TO INVESTIGATE AND BOLSTERING THE PROSECUTION'S CASE

In his eleventh allegation of deficient conduct, Applicant contends his trial counsel's performance in cross-examining six state's witness was ineffective in that it was "flaccid and impotent." (App. Pet. 79) He argues that counsel's deficient performance bolstered the state's case. (App. Pet. 74-80) For the reasons explained more fully below, this contention is without merit.

When Mr. Callahan cross-examined the state witnesses he inquired as to the witness's opinion regarding the truthfulness of other state witnesses. While a risky strategy, it proved to have some success. For instance, when crossing Frank Russell about the truthfulness of accomplice witness Debra Espinosa, Mr. Russell stated, "I don't trust her ..." In fact, Mr. Russell testified that because he did not trust her, when the victim said he was going to meet up

with Ms. Espinosa, he told the victim "not to go" with her …[but] he didn't listen to me." (15 RR 188-90)  When questioning the state's witness Robert Jimenez, Mr. Callahan asked him if Frank Russell was a truthful person and Jimenez said "yes." (24 RR 51)

At the hearing on Applicant's petition, Mr. Callahan was only asked about his cross-examination of accomplice witness Debra Espinoza.  Mr. Callahan explained that he employed a trial strategy that he hoped would cause Espinosa to become confused and impeach her credibility. (5 RRWH 90)  His strategy was to make a mistake in his questioning of her in hopes that the witness would be confused and, when answering, would make a statement that would help the defense.  While the strategy was not successful, this Court cannot say it was a mistake to employ the trial tactic.  Applicant asserts "a prepared cross-examination … would have won the day." (App. Pet. 79)  However, Applicant provides no evidence showing this to be true.  In fact, the jury's note demonstrates the jury was considering points made by the defense. (CR 121) ("Would like the results of the CSI report on the blood evidence from the console of the Honda. Exhibit 90.")  Absent more, how habeas counsel would have utilized a scripted cross-examination crafted from a trial record is exactly what *Strickland* states ineffective assistance claims are not supposed to be based on. *Strickland*, 466 U.S. at 689-90 (observing that it is "all too tempting" to second-guess counsel's assistance after conviction or adverse sentence."  The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms").

Review of trial counsel's performance is "highly deferential" and the reviewing court shall look at the totality of the representation rather than to individual, alleged errors. *Strickland*, 466 U.S. at 689; *Thompson*, 9 S.W.3d at 813.  In this case, Applicant fails to overcome the strong presumption that Mr. Callahan's actions fell within the wide range of reasonable and

professional assistance." *Bone*, 77 S.W.3d at 833; *Jackson v. State*, 877 S.W.2d 768, 770-01 (Tex. Crim. App. 1994). Applicant fails to meet his burden of proof under either prong of *Strickland*. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 12. CONCESION OF GUILT IN FINAL ARGUMENT DUE TO MISUNDERSTANDING OF LAW

In his twelfth allegation of deficient conduct, Applicant claims that his trial counsel's closing argument was ineffective because he conceded guilt in closing argument. (App. Pet. 80-83) He asserts that conceding guilt "was based on stupidity. Stupidity is no strategy." (App. Pet. 83) For the reasons explained more fully below, this contention is without merit.

The record demonstrates Mr. Callahan did not concede Applicant committed capital murder, or his guilt as to any offense for that matter, in his closing argument. (20 RR 67-77) He did, however, argue in the alternative. In closing argument, Mr. Callahan insisted that Applicant was not guilty based on the evidence presented by the State. After addressing the reasons why the jury should find Applicant not guilty, he argued in the alternative. Specifically, that if the jury believed he was guilty based on the only direct evidence presented by the state (the accomplice witness testimony) then the jury should find Applicant guilty of murder only, not capital murder. (20 RR 76-77) At one point in his closing Mr. Callahan misspoke, but the context of his statement demonstrates without a doubt that he was advocating for the jury to find Applicant "not guilty." (20 RR 68) Mr. Callahan summed up his argument by stating, "So I'm asking you first to vote not guilty in the case in general … But if you decided as fact finders … [that you believe the accomplices' testimony then] this was a murder." (20 RR 77) The jury charge included the lesser offense of murder. (CR 28)

At the writ hearing, Mr. Callahan testified regarding his strategy in closing argument.

(5 RR 76-77)  Recognizing the possibility that the jury might not agree with the defense's position that Applicant was not guilty, to argue that _if_ the jury believed he was guilty it should be of the lesser offense of murder.  If the jury were to find Applicant guilty of regular murder, Applicant would no longer be death eligible.  (5 RR 76-77)  This Court finds counsel's strategy both reasonable and sound.  Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 13. SLEEPING JUROR

In his thirteenth allegation of deficient conduct, Applicant's claims that his trial counsel failed to object to sleeping jurors. (App. Pet. 83-85)  For the reasons explained more fully below, this contention is without merit.

Although Mr. Callahan's notes reflects that some jurors may have slept during portions of the trial, there is no evidence concerning when the jurors slept, if at all, or during which portions of the trial.  Mr. Callahan cannot recall if the jurors were sleeping or simply not paying attention.  Neither the state, nor the defense, objected to sleeping jurors during the trial and the record is silent as to whether any juror was actually sleeping during any portion of testimony.  Also, this Court does not recall any jurors sleeping during the trial.

Mr. Callahan testified that his notes reflected that a juror was sleeping or nodding during the state's case in the punishment phase.  During this phase, Mr. Callahan was stand-by counsel.  He kept notes in the event he was called to represent Applicant.  Generally, defense counsel is not concerned if the jury is not paying attention to the state's case.  This Court notes that Applicant did not call any of the jurors to testify at the writ hearing.  The record is insufficient to establish the possibility that any juror slept during the defendant cross-examination of the state's witnesses or during the defense's case in chief.  There is no evidence that, if true, the alleged

sleeping juror negatively affected the defensive theory of the case. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 14. FAILURE TO TIMELY INTERVIEW SOLE DEFENSE WITNESS

In his fourteenth allegation of deficient conduct, Applicant claims his trial counsel failed adequately prepare the sole defense witness, Ralph Pedigrone, because he met with him for the first time on the third day of trial. (App. Pet. 85-87) Applicant insists that if counsel had adequately prepared Mr. Pedigrone for trial he would have realized that his testimony would be of little value or alternatively prepare him for cross-examination. For the reasons explained more fully below, this contention is without merit.

Mr. Pedigrone was confined in Kleberg county. (15 RR 4) Mr. Callahan had to request the court issue a bench warrant. (5 RRWH 82-83; 15 RR 24) He had tried to obtain the transfer for some time prior to trial. Before the start of trial, Mr. Callahan brought to this Court's attention that Mr. Pedigrone had not arrived at the Bexar County jail and requested that the record reflect his due diligence in obtaining the witness for trial. (15 RR 4) According to the court coordinator, the lieutenant with whom she had worked out Mr. Pedigrone's transport to Bexar County was out for the week. The certainty as to when, or if, Mr. Pedigrone would arrive was unclear. (15 RR 4) The State indicated that "this has been an ongoing thing that Mr. Callahan has been asking about." (15 RR 4)

Mr. Pedigrone arrived on August 25, 2005 and Mr. Callahan arranged an interview at the county jail after the trial concluded for the day. (5 RRWH 81-82) Applicant contends that more should have been done to make Mr. Pedigrone "trial ready." However, Applicant fails to establish any lack of diligence on the part of Mr. Callahan for the transfer of Mr. Pedigrone. Applicant did not call Mr. Pedigrone as a witness at the writ hearing and therefore, no record has

been made to controvert the fact that Mr. Callahan prepared the witness for trial. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 15. INEFFECTIVE REPRESNTATION ON *FERRETTA* ISSUE

In his fifteenth allegation of deficient conduct, Applicant claims that Mr. Callahan should have informed the trial court that Applicant was dissatisfied with his representation. (App. Pet. 87-89) He also claims that Mr. Callahan should have informed the trial court that Applicant was depressed at the time the request was made. For the reasons explained more fully below, this contention is without merit.

Long before trial, Applicant had notified the trial court in writing that he was dissatisfied with Mr. Callahan's representation and wanted a new attorney. Applicant was informed that he did not have the right to select his court appointed attorney. Applicant was also informed prior to trial that he had the right to represent himself. He did not assert his right to self-representation prior to trial. The first time that Applicant asserted his right to self-representation was between the guilt/innocence and punishment phases.

While Applicant contends that Mr. Callahan should have informed the trial court that the Applicant was depressed when he made his request to represent himself in the punishment phase, there is no evidence of that Applicant suffered from clinical diagnosis of depression. Mr. Callahan and Mr. Harris both testified that Applicant was alert and coherent during the guilt/innocence phase of the trial, that Applicant was writing notes to counsel during trial, that Applicant was able to assist counsel during the trial and that he understood the nature of the proceeding. Applicant appeared to be of sound mind when he made his request to represent himself for the punishment phase of the trial. Neither attorney was concerned about Applicant's mental health. Applicant did not present any evidence at the writ hearing that his depressive

state of mind impaired his reasoning or thought process. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

### 16. CUMULATIVE EFFECT OF TRIAL COUNSEL'S ERRORS

In his sixteenth allegation, Applicant claims that all of his counsel's errors constructively denied him counsel during his trial. (App. Pet. 92-93) He contends that his trial counsel's cumulative deficient performance deprived him of a fair trial during the guilt/innocence phase and sentencing phase. For the reasons explained more fully below, this contention is without merit.

To determine whether counsel has provided effective assistance, courts must consider the totality of the representation and the particular circumstances of each case. The reviewing court should not restrict its analysis to an evaluation of isolated acts or omissions of counsel. After evaluating all of Applicant's allegations of deficient conduct, this Court finds that Applicant was not denied effective assistance of counsel and his trial counsels' performance did not fall below an objective standard of reasonableness. This Court also finds that Applicant fails to show the result of his trial would have been different but for the alleged errors committed by his trial counsel. Therefore, this Court finds that Applicant's claims of ineffective assistance of trial counsel are without merit.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### ON APPLICANT'S CLAIM IV
(Applicant's pleadings, pages 114-117)

In his claim IV for relief, Applicant contends that he was deprived of effective assistance of trial counsel, in violation of the Sixth Amendment to the United States Constitution in jury selection. (App. Pet. 114-117) For the reasons explained more fully below, this contention is without merit.

Applicant contends trial counsel was ineffective in accepting two venire persons, Doris Cedillo and Arthur Carter, both of whom sat on the jury.

*Doris Cedillo*

Applicant claims trial counsel should have accepted the state's offer to agree to a challenge for cause against Doris Cedillo. (App. Pet. 117) Prior to starting individual voir dire of Ms. Cedillo, the trial court apologized for keeping her waiting because "[a]pparently there was a mix-up at the jail or something, so we're a little bit behind schedule." (5 RR 3, 35) The parties proceeded to question Ms. Cedillo. (5 RR 33-34) After the conclusion of voir dire, Ms. Cedillo left the room. Prosecutor Lunan indicated that because Ms. Cedillo was present when the trial court mentioned the delay was due to a mix-up at jail, if the defense wished to raise a challenge for cause he would not object. (5 RR 35) Mr. Callahan indicated he had no objection to the remark and agreed to accept her.

Applicant insists that Mr. Callahan's decision not to raise a challenge for cause to Cedillo, where she was "tainted" and the State agreed to the challenge, constituted deficient performance because there was no possibility that his decision could have been based on legitimate trial strategy. (App. Pet. 117) Applicant cites no authority for his assertion that "no sound strategy" exists under these circumstances. Applicant's argument is based purely on his own opinion. There are a number of reasons why Mr. Callahan may have found Ms. Cedillo to be agreeable and desire her to be on the jury.

The record demonstrates that Ms. Cedillo did not have strong feelings about the death penalty. When pressed by the state regarding whether she could participate in a process whereby her vote could result in execution, she was reluctant in her responses. (5 RR 21-25) In fact, Mr. Callahan's reasons for choosing not to agree to a challenge, whatever they may have been, could

explain why the State was so eager to offer to agree to a defense challenge. An innocuous reference to "a mix-up at the jail" prior to Ms. Cedillo's questioning does not establish that she is forever "tainted" as Applicant claims. Also, Ms. Cedillo's responses during voir dire fail to demonstrate any impartiality or prejudice towards Applicant.

Nevertheless, the record is silent as to Mr. Callahan's strategy for not challenging Ms. Cedillo. A *Strickland* claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Goodspeed v. State*, 187 S.W.3d 390 (Tex. Crim. App. 2005). Applicant has not satisfied his burden of proving that trial counsel's performance was deficient

### Arthur Carter

Applicant claims his trial counsel should have struck Mr. Carter because he understood the future dangerousness special issue to only require him to make a finding of "possibility" rather than "probability." (App. Pet. 115-116) Applicant contends that no one corrected this misconception of the first special issue. The record demonstrates Applicant's claim is factually inaccurate.

While it is true that in response to Mr. Lunan's explanation that the state must prove to him that there is a "probability" that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, Mr. Carter stated, "Possiblity, yes." (5 RR 121-122) Mr. Lunan immediately corrected Mr. Carter by explaining that "probability is probably more than a possibility but certainly less than a certainly, would you agree? So is there a probability that the defendant would, not necessarily will, but would commit criminal acts of violence." (5 RR 122) Mr. Lunan continued to explain the purpose of the future dangerousness special issue and the burden of proof is on the State to prove beyond a reasonable doubt that the

0821-12 VOL 1146 PG 2240

answer to the future dangerousness question is yes. (5 RR 122-124) There is no evidence to suggest that trial counsel was not exercising reasonable trial strategy. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON APPLICANT'S CLAIM II
(Applicant's pleadings, pages 94-108)

In his Claim II, Applicant contends the trial court "violated the defendant's rights to self representation and then abused her discretion in having Applicant defend himself during sentencing." (App. Pet: 94) He claims he was denied his rights of self-representation, in violation of the Sixth Amendment to the United States Constitution, and of due process under the Fifth and Fourteenth Amendments to the United States Constitution. (App. Pet. 94) For the reasons explained more fully below, this contention is without merit.

Applicant first argues that the district judge erred by failing to make a pre-trial *Faretta* inquiry after Applicant wrote her a letter, dated January 16, 2005, asking to dismiss his attorney because he had "only *seen* him twice in the past 13 months." (App. Pet. 94) (emphasis added) The letter, written about six months before the trial commenced in this case, did state that Applicant "was under the impression that [he] could fire a court appointed attorney if [he] felt that they weren't helping [him]." *Id.* But the letter never directly, clearly, or unequivocally, indicated any desire on the part of Applicant to represent himself at trial.

Applicant also points to a second letter written by him to the trial court, on June 2, 2005, asking that his trial counsel be dismissed. (App. Pet. 96). Like the letter dated January 16, 2005, this letter was also written before the commencement of trial in this case.[2] In the letter, Applicant clearly asks that the court "grant [his] second motion to dismiss appointed counsel."

[2] The record reflects that general *voir dire* was commenced in this case on July 15, 2005. Thus, it was received by the court within a month of the date when trial was scheduled to begin.

But, according to the quote from the letter included in Applicant's habeas application, the Applicant also stated the following: "*All I want is* a fair trial *someone who will fight for me*." (App. Pet. 96) (all emphasis added). This letter, like the letter sent by the Applicant to the court on January 16, 2005, did not clearly or unequivocally invoke the right to self-representation. In fact, it directly indicates a desire for the help of "someone who will fight for me."

Of significance, is a letter the Applicant sent Mr. Callahan dated July 5, 2005 (after both of the letters referenced by habeas counsel above). The letter reflects Applicant changed his opinion regarding Mr. Callahan and Mr. Harris. On July 5, 2005, the trial court held a hearing on the "Defendant's Motion for Order on Admissibility of Testimony of Co-Defendant F. Gonzalez" filed by Mr. Callahan. (CR 29-45; 2 RR 3) In the letter, the Applicant expresses his gratitude for Mr. Callahan filing the motion even though the trial court denied it. (SX 66) (5 RRWH 78) He also expresses his appreciation for speaking out against what the prosecutor said at the hearing. He stated the following, "Sir, I'd like to take this time to apologize to you for doubting you. I will have faith in you & Mr. Harris to represent me to the best of your ability. I know I haven't been an easy client to represent but I will have a different attitude from here on out." *Id.*

It is true that the Sixth Amendment includes right to self-representation. U.S. Const. VI; *Faretta v. California*, 422 U.S. 806, 818-820 (1975). Our courts have explained, however, that a waiver of the right to counsel will not be "lightly inferred." *Geeslin v. State*, 600 S.W.2d 309, 313 (Tex. Crim. App. [Panel Op.] 1980). In fact, it is well settled that, "the right to self-representation does not attach until it has been clearly and unequivocally asserted." *Williams v. State*, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008), *quoting from Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986).

In this case, neither the letter dated January 16, 2005, nor the letter dated June 2, 2005, constituted a clear or unequivocal invocation of the right to self representation. Neither letter put the trial court on notice that Applicant wanted to represent himself in the guilt/innocence phase of the trial of this case. This is further supported by Applicant's letter to Mr. Callahan dated July 5, 2005. (SX 66)(5 RRWH 78)  Therefore, the trial court had no duty to make a pre-trial inquiry under *Faretta* or to permit Applicant to represent himself because of the statements made in the two letters he points to in his application.

In an interesting turn about, Applicant next contends that the trial court erred by actually permitting him to represent himself at the punishment phase of his trial. Applicant contends that the trial court should have denied his request to represent himself during the punishment phase of trial. He suggests that the trial court did not understand its own authority to deny him the right to self-representation during the punishment phase of trial.

Applicant points to an incident that occurred before argument on guilt/innocence, but after both sides had rested and closed, where Applicant sought to absent himself from the courtroom for the remainder of the proceedings. (App. Pet. 96-97)  Applicant does not indicate how this Court should interpret the incident in relation to his ultimate decision to represent himself.  It is clear, however, but not addressed by Applicant in his application, that after some legal wrestling over the possibility that Applicant might become disruptive if he were required to remain in the court room during the remainder of the proceedings, and after a few recesses at which it appears that some research was conducted, Applicant changed his mind; and this potential issue became a "non-issue" for the court.  (20 RR 26-28)  Applicant also does not discuss the fact that, the charge was then discussed, the parties argued their respective

06-2-4-4-2 VOL 1146 PG 2443

guilt/innocence cases, and the jury deliberated and found Applicant guilty of capital murder. (20 RR 28-95)

Applicant next points out that, the following morning (after Applicant was found guilty by the jury), Applicant's trial counsel informed the court that Applicant wanted to represent himself. (App. Pet: 97) At that point, the trial court conducted a thorough *Faretta* inquiry. (21 RR 3-7)

Upon inquiry by the trial court, Applicant confirmed clearly and unequivocally that, in fact, he did desire to represent himself for the remainder of the proceedings. (21 RR 3) The court told him that in the court's opinion it was "not a good idea," that he was "on trial for capital murder for which he could receive the death penalty," that "[t]he only issues left [were] whether [he was] going to get a life sentence or a death penalty," and that "it doesn't get any more critical than that." (21 RR 3) The trial court asked if he had ever represented himself, and he stated that he had not. (21 RR 3-4) The trial court asked if he clearly understood what was at risk in the case, and Applicant stated that he did. (21 RR 4) The trial court asked if he understood that at the end of the punishment phase the jury could sentence him to death, and he stated that he did. (21 RR 4) The trial court asked if he understood that if he decided to represent himself he would be "on [his] own," "with no help from anyone," and Applicant responded, "Yes, ma'am." (21 RR 4) Applicant confirmed that he was not expecting the trial court to jump in and tell him how to proceed. (21 RR 4) Applicant told the court that he was "[n]ot really" familiar with the Rules of Evidence, but he indicated that he intended to "handle the cross-examination" of witnesses on his own. (21 RR 4-5) He confirmed that he intended to do that despite his lack of knowledge of the Rules of Evidence and of what is admissible and what is not admissible. (21 RR 5) He confirmed that he understood that the Rules of Evidence

062112 VOL 1146 PG 2434

are what attorneys use to know "what kind of evidence can get in," and he confirmed that he wanted to "do this on [his] own without any knowledge of the Rules of Evidence" or any understanding of "what can come into evidence and what cannot." (21 RR 5)  The court advised him that in the court's opinion a trained lawyer would defend him and represent him far better than he could ever do for himself, and he confirmed that he understood that. (21 RR 5)  The court explained to him that it was "unwise of [him] to try to represent [him]self," that he was "not familiar with the law," that he was "not familiar with court procedure," that he was "not familiar with the Rules of Evidence," and the court "strongly urged [him] not to represent [him]self." (21 RR 5)  The court strongly urged him not to represent himself and indicates that it would be in his best interest to be represented by counsel and let them handle the punishment phase of the trial; Also, the court advised him that he would be far better off proceeding that way than he would be representing himself, and Applicant stated that he understood.  (21 RR 5)  Applicant confirmed that, in light of the penalty that he might suffer, and in light of all the difficulties that the court explained to him with regard to him representing himself, he still wished to give up his right to be represented by a lawyer and represent himself. (21 RR 6)  Applicant confirmed that his decision to represent himself was "entirely voluntary," and that "emotionally, mentally, [and] psychologically, he was in an appropriate place at that point to represent himself." (21 RR 6)   And finally, the court explained the following:

> In spite of my advice to you, you certainly have the right to represent yourself.  I cannot deny that to you.  There's nothing that you have said thus far that would justify my not allowing you to do that.  So I'm going to find that you are knowingly and voluntarily waiving your right to counsel, and I'm going to permit you to represent yourself.  I am, however, going to ask that the attorneys be present in an advisory capacity so that if you need advice during the course of the punishment phase of this trial, they will be there for you.
> Furthermore, if you should change your mind and decide that you want them to represent you, you just need to come up here and tell me that.  Do you understand?

0621112 VOL 1146 PG 2435

(21 RR 6-7) Applicant stated that he understood. (21 RR 7)

Applicant points to a letter written to him by his trial counsel on February 18, 2005, wherein trial counsel recognizes that Applicant was experiencing some depression. (App. Pet. 95) In the letter, trial counsel states that he "understands the depression that [Applicant was] presently experiencing," and encourages him that he "must not give in to negativity as it would hurt your testimony before the jury." *Id.* (letter also marked as SX 48; 5 RRWH 67) Applicant then complains that his counsel did not "take action to resolve [Applicant's] depression." *Id.* Applicant argues that this is another indication that trial counsel "totally abandoned his client." *Id.*

To the contrary, however, this letter shows encouragement by trial counsel in Applicant's time of distress. (SX 48; 5 RRWH 67) Trial counsel urges Applicant to "not give in to negativity." Also the court finds from the testimony of trial counsel at the hearing on this writ application that trial counsel never believed that Applicant was experiencing the kind of depression that might have caused him to be actually disabled or to require medical or psychological assistance. (SX 48; 5 RRWH 67) The court also finds that trial counsel did not abandon the Applicant. To the contrary, trial counsel was very responsive to the Applicant and communicated with him regularly and with clarity concerning the progress of preparations for trial. (SX 7, 8, 9, 10, 12, 13, 15, 16, 18, 23, 22, 24, 26, 28, 29, 31, 33, 34, 36, 37, 39, 41, 43, 44, 45, 46, 48, 51, 53, 55, 57, 59, 61, 63, 64, 65, 67) Consequently, this Court finds no reason to believe that the "depression" described by trial counsel's letter influenced Applicant's ultimate decision to represent himself at the punishment phase of trial.

Applicant also points to the trial court's concluding remarks during the *Faretta* inquiry, where the trial court – speaking of the defendant's right to self-representation - stated that "I

cannot deny that to you," and suggests that the statement is a misstatement of the law, and presumptively an indication that the trial court did not understand the law. (App. Pet. 100).

Applicant points to cases that have held that a request for self-representation made after the commencement of trial is untimely. (App. Pet. 100-101, n.24; 103)

Those cases cited by Applicant are not controlling authority on this court. They are also distinguishable from this case because they involved requests for self-representation in the guilt/innocence phase of trial after that phase of trial had already commenced with the defendant represented by counsel. *See U.S. v. Majors*, 328 F.3d 791 (5th Cir. 2003) (request made on second day of trial); *Brown v. Wainwright*, 665 F.2d 607 (5th Cir. 1982) (request made on third day of trial); *U.S. v. Lawrence*, 605 F.2d 1321 (9th Cir. 1979) (request made after voir dire but before the jury was sworn); *U.S. v. Dunlap*, 577 F.2d 867 (4th Cir. 1978) (defendant requested the right to personally make his own closing argument). The request for self-representation in this case came after the completion of the guilt innocence phase of trial, and before the commencement of the punishment phase of trial.

Unlike the attempted dismissal of counsel and switch to self-representation in the middle of trial addressed in the cases cited by Applicant, because the request for self-representation was made in this case after the completion of the guilt/innocence phase of trial and before the punishment phase commenced, the request in this case was likely to cause minimal disruption to the proceedings, minimal delay, and minimal – if any – confusion to the jury. As the Fourth Circuit Court of Appeals pointed out in *Dunlap*, "[i]n justifying the need to timely raise the right of self-representation, the courts recognized, among other things, the need to minimize disruptions, to avoid inconvenience and delay, to maintain continuity, and to avoid confusing the jury." *Dunlap*, 577 F.2d at 868. Here, because the request for self-representation came at a point

0621112 VOL 1146 PG 2447

after the completion of the guilt/innocence phase and before the punishment phase, the disruption, inconvenience, and delay caused by the Applicant's request were minimal. Also, while the continuity of representation changed from guilt/innocence to punishment, the jury was not likely to be confused by the change in representation between phases of trial.

Finally, the cases cited by Applicant involve cases where defendants were complaining on direct appeal about a trial court's denial of their right to self-representation. This case is different in that the trial court actually granted Applicant the right to self-representation. Thus, in the context of this case, the cases cited by Applicant are of no moment. The cases cited by Applicant involve only an approval by the appellate courts of the exercise of discretion by the trial courts to deny self-representation. The cases cited by Applicant do not suggest that the trial courts in those cases would have, or even could have, erred if they had granted the right of self-representation to the defendant's involved. This case is one in which the trial court granted the right of self representation to the defendant. Applicant has not cited any authorities suggesting that a trial court errs to grant a defendant the right to self-representation, when freely and voluntarily requested, merely because it happens after trial has commenced. Therefore, this Court is not persuaded by the cases cited by Applicant.

A defendant's choice of self representation need not be "wise" and, may ultimately be "to his own detriment." *Hathorn v. State*, 848 S.W.2d 101, 123 (Tex. Crim. App. 1991). But it cannot be arbitrarily denied. In this case, the request for self-representation was made at a time when it caused minimal disruption, minimal delay, and when it had little if any chance of confusing the jury. The defendant has not shown that his request for self representation was involuntary, or the product of untreated clinical depression, or that it was coerced, or that it was caused by anything other than the free, voluntary, and informed choice of a properly admonished

00821-12 VOL 1-146 PG 2338

defendant.  He has not shown that the trial court erred at all by granting him the right to self-representation.

Applicant employs a considerable amount of hyperbole in his efforts to suggest that defense counsel and the trial court let him down by failing to ensure that he received quality representation during his trial. (App. Pet: 95)("Callahan has *totally* abandoned his client.") (emphasis added); (App. Pet: 97)(neither defense attorney notes in his fee voucher that he saw [the Applicant] at the jail that night to *assuage* [his] concerns) (emphasis added); (App. Pet: 104) (Castillo *repeatedly screamed to the trial judge* through letters and motions) (Defense counsel . . . *sadly failed to respond* to the communications from Castillo) (emphasis added); (App. Pet: 105) (Callahan took no action to meet with the client *to resolve his disillusion and to counter the depressive moment.* *** Instead both counsel and the court let *this cankerous sore fester*) (It was only after defense counsel's *disastrous performance*) (emphasis added); (App. Pet: 105) (the trial judge *clearly misunderstood the law*) (emphasis added).  But this Court is not persuaded by his dramatic use of language.

Applicant also contends that "neither defense counsel prepared for cross-examination of prosecution witnesses in sentencing or for a mitigation case." (App. Pet: 102).  This Court finds his claim to be completely unsupported by credible evidence.  Instead, the credible record evidence suggests that trial counsel did prepare both for the guilt/innocence phase and for the punishment phases of trial, that trial counsel ably represented Applicant during the guilt/innocence phase of trial, that trial counsel was prepared to represent the defendant at the punishment phase of trial, and that trial counsel remained in the court room after he was dismissed and actually tried to assist Applicant by offering advice and by encouraging him to call witnesses while Applicant represented himself in the punishment phase of trial.

Applicant has not shown that the trial court erred by not conducting a *Faretta* inquiry before trial. He has also not shown that the trial court erred by permitting him to represent himself in the punishment phase of trial. Finally, he has not shown that the result of any of the proceedings would have been different if the trial court had acted differently. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON APPLICANT'S CLAIM III
(Applicant's pleadings, pages 107-114)

In claim III for relief, Applicant contends that he was deprived of effective assistance of appellate counsel on the motion for new trial and on appeal, in violation of the Sixth Amendment to the United States Constitution. For the reasons explained more fully below, this contention is without merit.

Applicant claims he was deprived of effective assistance in his motion for new trial and on appeal because Mr. Callahan did not advance an ineffective assistance of trial counsel claim. (App. Pet. 107-117) Applicant insists that because Mr. Callahan was aware that he wanted to pursue an ineffective assistance of counsel claim, he should have removed himself due to the conflict. (App. Pet. 107-117)

The record demonstrates that Mr. Callahan informed Applicant that his writ attorney, Suzanne Kramer, would raise a claim of ineffective assistance of counsel in his habeas application. (SX 88, 92)

Suzanne Kramer was subsequently replaced as Applicant's writ attorney. Mr. Economidy was appointed to represent Applicant. Sixteen separate claims of ineffective assistance of counsel are advanced in Applicant's petition for habeas corpus relief. Aside from ineffective assistance, Applicant does not assert that any other grounds should have been raised

0621112 VOL 1146 PG 2440

either in his motion for new trial or in his direct appeal.

To prove ineffective assistance of appellate counsel, Applicant must show that: (1) counsel's performance was deficient; and (2) there is a reasonable probability he "would have prevailed on appeal" but for counsel's deficient performance. *Ex parte Santana*, 227 S.W.3d 700, 704-05 (Tex. Crim. App. 2007). This Court finds Applicant fails to meet this standard. Therefore, this Court concludes that Applicant's claim that his counsel was ineffective is without merit.

## ORDER

The court recommends that Applicant's writ of habeas corpus, with all requested relief therein, be DENIED. The clerk of the court is ordered to prepare the record in this cause and transmit the same to the Court of Criminal Appeals, in Austin, Texas. The clerk is further ordered to send a copy of these Findings of Fact and Conclusions of Law and this order to Applicant, his attorney and counsel for the State.

SIGNED AND ENTERED on this the ___3___ Day of ___April___, 2012.

JUDGE Maria Teresa "Tessa" Herr
186th District Court
Bexar County, Texas

## CERTIFICATE OF SERVICE

I, Crystal Chandler, Assistant Criminal District Attorney, hereby certify that a true copy of the foregoing State's First Amended Proposed Findings of Fact and Conclusions of Law were mailed to John Economidy, Attorney for Applicant, 111 Soledad, St. Suite 348, San Antonio, Texas 78205, on this the 12th day of January, 2012.



CRYSTAL CHANDLER
Assistant Criminal District Attorney

# Exhibit F

## SWORN DECLARATION

**STATE OF TEXAS** §
                     §
**COUNTY OF** _Anderson_ §

My name is Gerardo Gutierrez. I am over the age of eighteen and competent to make this sworn declaration.

I am giving this sworn declaration regarding State v. Juan Castillo, Cause No. 2004-CR-1461A, in the 186th Judicial District Court, Bexar County, Texas. I testified for the State in this cause during the guilt-innocence phase of the trial. Today I reviewed my entire testimony in this cause. After reviewing my testimony, I have the following to state.

I TESTIFIED IN THIS TRIAL ON 8-35-05. AT PAGES 9-10 OF MY TESTIMONY, I DESCRIBED WHAT JUAN CASTILLO SUPPOSEDLY TOLD ME ABOUT THE CAPITAL MURDER. SPECIFICALLY AT LINES 5-10 ON PAGE 10 OF MY TESTIMONY WHICH IS ATTACHED TO THIS DECLARATION. JUAN CASTILLO NEVER TOLD ME THIS INFORMATION ABOUT THIS CAPITAL MURDER CASE. THIS TESTIMONY WAS UNTRUE ABOUT JUAN CASTILLO. I MADE UP THIS TESTIMONY TO TRY TO HELP MYSELF. THIS MONTH, JUNE 2013, IS THE FIRST TIME, EVER THAT I DECIDED TO REVEAL THIS INFORMATION.

I, Gerardo Gutierrez, TDC # 1602828, being presently incarcerated in the Texas Department of Criminal Justice at the Coffield Unit, Tennessee Colony, Texas, declare under penalty of perjury that the foregoing is true and correct.

Executed on the 26 day of June 2013.

_____
GERARDO GUTIERREZ

Page 1 of 1

1          REPORTER'S RECORD
           VOLUME 17 OF 24 VOLUME(S)
2        TRIAL COURT CAUSE NO. 2004-CR-1461A

3   THE STATE OF TEXAS          *     IN THE DISTRICT COURT
                                *
4   VS.                         *     186TH JUDICIAL DISTRICT
                                *
5   JUAN CASTILLO               *     BEXAR COUNTY, TEXAS

6           ************************************

7                   TRIAL ON THE MERITS

8           ************************************

9        On the 25th day of August, 2005, the following proceedings

10  came on to be heard in the above-entitled and numbered cause

11  before the Honorable Maria Teresa Herr, Judge Presiding, held in

12  the 186th Judicial District Court, San Antonio, Bexar County,

13  Texas:

14       Proceedings reported by Machine Shorthand.

15

16

17

18          Debra A. Doolittle, CSR, RPR
               Official Court Reporter
19                100 Dolorosa
              Bexar County Courthouse
20          San Antonio, Texas  78205

21

22

23

24

25

FILED
DISTRICT CLERK
BEXAR CO. TEXAS
2006 MAR -9  P 4: 48
BY:
DEPUTY

```
1                    A P P E A R A N C E S

2

3    Mr. David Lunan              Mr. Vincent D. Callahan·

4    DISTRICT ATTORNEY'S OFFICE   LAW OFFICES OF VINCENT D. CALLAHAN

5    SBOT NO. 00787933            SBOT NO. 03651700

6    300 Dolorosa                 P.O. Box 12141

7    San Antonio, Texas  78205    San Antonio, Texas  78212

8    Phone: (210) 335-2311        Phone: (210) 737-3404

9    Fax: (210)                   Fax: (210)

10   ATTORNEY FOR THE STATE       ATTORNEY FOR THE DEFENDANT

11        --and--                      --and--

12   Mr. Michael Anthony Reyes    Mr. Bill Harris

13   DISTRICT ATTORNEY'S OFFICE   LAW OFFICES OF BILL HARRIS

14   SBOT NO. 24007906            SBOT NO. 09106000

15   300 Dolorosa                 20475 Highway 46 N, Ste. 180-418

16   San Antonio, Texas  78205    San Antonio, Texas  78070

17   Phone: (210) 335-2311        Phone: (830) 228-4846

18   Fax: (210)                   Fax: (210)

19   ATTORNEY FOR THE STATE       ATTORNEY FOR THE DEFENDANT

20

21

22

23

24

25
```

```
CASTILLO:2004-CR-1461A
                         VOLUME 17
                     TRIAL ON THE MERITS
```

**August 25, 2005**                                          **Page  Vol.**
Caption ....................................     1     17
Appearances ................................     2     17

Trial On The Merits (Cont'd) ...............     3     17

| State Witnesses | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Gutierrez, Gerardo | 3 | 16 | | 17 |
| | 23 | 25 | | 17 |
| | 26 | 27 | | 17 |
| Espinosz, Debra | 28 | 70 | | 17 |
| | 81 | | | 17 |
| Brown, Bryan A. | 86 | 103 | | 17 |
| Cantu, Jessica | 108 | 119 | | 17 |

End of Proceedings .........................   122    17
Court Reporter's Certificate ...............   123    17

### ALPHABETICAL WITNESS INDEX

| State Witnesses | Direct | Cross | Voir Dire | Vol. |
|---|---|---|---|---|
| Brown, Bryan A. | 86 | 103 | | 17 |
| Cantu, Jessica | 108 | 119 | | 17 |
| Espinosz, Debra | 28 | 70 | | 17 |
| | 81 | | | 17 |
| Gutierrez, Gerardo | 3 | 16 | | 17 |
| | 23 | 25 | | 17 |
| | 26 | 27 | | 17 |

### E-X-H-I-B-I-T-S

**Defense's**
| No. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| 2 | Note | 17 | 17 | 17 |
| 3 | Note | 17 | 17 | 17 |

```
 1                    P R O C E E D I N G S
 2              (In the presence of the defendant and Counsel).
 3              THE COURT:  All right.  Are both sides ready?
 4              MR. CALLAHAN:  Ready.
 5              MR. LUNAN:  We're ready.
 6              (Jury enters).
 7              THE COURT:  All right.  Please be seated.  Good
 8  morning.  How is everyone this morning?
 9              THE JURY:  Good morning.
10              THE COURT:  Let's proceed.
11              MR. LUNAN:  State would call Gerardo Gutierrez.
12              (Witness takes the stand).
13              THE COURT:  Would you state your name for the
14  court reporter and jury, please.
15              THE WITNESS:  My name is Gerardo Gutierrez.
16              THE COURT:  All right.  Would you raise your right
17  hand.
18              (Witness sworn by the Court).
19              THE WITNESS:  Yes, I do.
20              THE COURT:  All right.  Thank you.
21                    GERARDO GUTIERREZ,
22  having been first duly sworn, testified as follows:
23                    DIRECT EXAMINATION
24  QUESTIONS BY MR. LUNAN:
25     Q.   Mr. Gutierrez, how are you?
```

| 1 | A. | (No response). |
| 2 | Q. | How are you? |
| 3 | A. | Good. |
| 4 | Q. | There's a microphone kind of in front of you.  If you |

5   can pull it closer to you.  How old are you?

| 6 | A. | Thirty-one. |
| 7 | Q. | And, Mr. Gutierrez, where were you born? |
| 8 | A. | What year? |
| 9 | Q. | Where? |
| 10 | A. | I was born in Laredo, Texas.  Webb County. |
| 11 | Q. | And where were you raised? |
| 12 | A. | I was raised in San Antonio, Texas. |
| 13 | Q. | Went to elementary school, middle school, high school |

14   here?

| 15 | A. | Yes. |
| 16 | Q. | Joined the Marines after high school? |
| 17 | A. | Correct. |
| 18 | Q. | Got in some trouble after that? |
| 19 | A. | That is correct. |
| 20 | Q. | You have been to prison, have you not? |
| 21 | A. | Yes.  Two times. |
| 22 | Q. | When did you get out the last time? |
| 23 | A. | March 31st, 2005. |
| 24 | Q. | So you've been out a number of months now.  Are you |

25   working?

1   A.   Correct.

2   Q.   Let's tell the jury what you went to prison for.  You

3   went to prison for theft of a vehicle under 1992-CR-2975 out of

4   the 226th District Court?

5   A.   That is correct.

6   Q.   And another theft, 250 to 20,000, under 1994-CR-6871?

7   A.   That is correct.

8   Q.   You went to prison for unauthorized use of a vehicle.

9   Actually, two different cases of that.  1995-CR-0480 and

10   1995-CR-4864W; is that true?

11   A.   That is correct.

12   Q.   And you went to prison for a sexual assault in

13   1997-CR-3491?

14   A.   That is correct.

15   Q.   And a theft, 20,000 to 100,000, 1997-CR-2552?

16   A.   That is correct.

17   Q.   A drug case, possession of a controlled substance?

18   A.   Right.

19   Q.   Less than a gram?

20   A.   Correct.

21   Q.   Went to prison for that?

22   A.   Yes.

23   Q.   And an escape case out of this court back in 2003,

24   under 2003-CR-4911, right?

25   A.   Yes, that is correct.

1     Q.    Okay.   And for those crimes you went on two different
2   trips.   Was it one trip for which crimes and another trip for
3   which other crime?

4     A.    For the unauthorized use of a motor vehicles, and for
5   the theft of motor vehicles, and for the sexual assault I did
6   five years, total of six charges.   Six felonies and I did five
7   years for that.   Then my -- I was out my second time in March,
8   2005 -- I mean, 2003, I was out of this courtroom, the 187th, I
9   was given two years for the escape and two years for the drug
10   case.

11     Q.    Okay.   And you were released from that confinement in·
12   March of this year?

13     A.    Correct.

14     Q.    Now, after December 3rd of 2003, where were you living
15   for the next year or so?

16     A.    (No response).

17     Q.    Where were you living and sleeping every day and every
18   night?

19     A.    2000 -- December?

20     Q.    December of 2003 and onward.

21     A.    Actually, it was --

22     Q.    Beginning in September, thereafter.   I'm sorry.   Go
23   ahead and tell me where you were.

24     A.    In March, 2003, that was 2003 when I got locked up.   I
25   was living in --

1    Q.    March of 2003 you were locked up and you remained in
2    the Bexar County Jail --

3    A.    For a total of 18 months.

4    Q.    Okay.  Continuously?

5    A.    Continuously.  While I was going to trial on the escape
6    case.

7    Q.    All right.  In the course of your time spent there in
8    the jail, but sometime after December of 2003, did you make the
9    acquaintance or meet a person that was known to you as Juan?

10    A.    That is correct.

11    Q.    Do you see that Juan here in the courtroom this
12    morning?

13    A.    Yes, I do.

14    Q.    Can you point to him and describe what he's wearing?

15    A.    Yes.  He's wearing a white shirt and he's wearing
16    glasses.

17    Q.    Can you point to him, what direction he is?

18    A.    He's the defendant.

19          MR. LUNAN:  The record will reflect that he's
20    identified the defendant here in open court.

21    Q.    (BY MR. LUNAN)  Did you have a nickname for him?  Or
22    did you call him by Juan or by some other name?

23    A.    Actually, yes, I did have a nickname for him.  But it
24    was more like, you know, a -- because we knew each other.  We --
25    basically we did not know each other, but we got to know each

DEBRA A. DOOLITTLE, CSR, RPR
BEXAR COUNTY COURTHOUSE. ROOM 3.04
(210) 335-2080

1  other in there.  And I actually gave him the nickname of
2  Mr. Six.

3      Q.   And that was referring to what?

4      A.   Mr. Six is the character out at Fiesta Texas.  The
5  little guy who gets out of the bus and starts dancing.  Due to
6  the fact that he looked like him with his glasses.  He had big
7  old glasses.

8      Q.   The glasses that he was issued there were similar to
9  those.  Big, thick, black rimmed glasses?

10     A.   Something like that, correct.

11     Q.   Okay.  And during that time that you spent with him,
12  did you speak with him every few days, or once a week, or how
13  often.

14     A.   You can say we spoke like every day.

15     Q.   Now, you were assigned to a particular cell.  Was he in
16  the same cell as you or --

17     A.   He was not in the same cell, but -- he was not in the
18  same cell.  We were in the same dorm.

19     Q.   How does that work?

20     A.   The dorm system?  I mean, how --

21     Q.   I guess, is the jail divided up by several different
22  units or --

23     A.   Yes.  See, the thing is, the jail system is divided by
24  like -- by the type of risk you are; high risk, low risk, medium
25  risk, whatever.

1     Q.   Maybe depending on what you were charged with?

2     A.   Depending on what you were charged with. Since I was

3 charged with escape, I'm considered a high risk.

4     Q.   Okay. And in this dorm, would inmates from different

5 rooms come together for certain parts of the day in a common

6 area?

7     A.   Correct.

8     Q.   Is that the dorm area?

9     A.   That is the dorm area.

10    Q.   And in that area is there a television --

11    A.   Yes.

12    Q.   -- and benches?

13    A.   Yes, there's televisions, there's benches, there's

14 tables, there's phones.

15    Q.   And when you talk about, then, speaking with the

16 defendant, you would speak to him in the common areas?

17    A.   We would speak in common areas or we would speak

18 through doors, the cell doors and stuff like that.

19    Q.   During this time, did you have an opportunity to talk

20 to this defendant about why he was there, what he was charged

21 with?

22    A.   Yes, I did.

23    Q.   And what did he tell you?

24    A.   He told me that he was in there for -- he was being

25 charged with capital murder. And he described what had

1  happened.  And he described who was there.  He basically gave me
2  like a brief summary of what had happened.

3      Q.    What did he tell you about what happened and what he
4  did?

5      A.    Basically, stated that it was him, a friend -- two
6  friends, Frank and Bita -- Bita -- that actually planned to rob
7  this person.  And it turned out -- it turned out wrong.  And the
8  victim took off running, and that he shot at him a couple of
9  times.  And then when he was crawling, like screaming for help,
10  he walked up closer to him and shot him two more times, close
11  range.

12     Q.    When he told you that, I mean, were you kind of -- did
13  he trust you?

14     A.    Yes, you know, they say to me -- sometimes we discuss
15  our cases in there.  Sometimes we try to beat it, and sometimes,
16  you know, we all try to get together to go against the system.

17     Q.    Need you to kind of pull that up and get closer to that
18  mic.  I'm having a little trouble hearing you.

19     A.    I said sometimes we all try to get together so we can
20  try to beat the system.  Find out ways to get away from it
21  and --

22     Q.    Compare legal theories, that kind of thing?

23     A.    Yeah.  Right.  And one theory that he says is like they
24  were going to have a hard time convicting him because, for one
25  thing, they didn't have the weapon.

1    Q.   Because the State didn't have the weapon?

2    A.   Correct.

3    Q.   Okay.  What did he say about that?

4    A.   That was going to be a hard issue to prove because they

5    did not have the weapon.  And I did mention a previous case

6    about an individual that did not have the weapon, and I says,

7    well, that's a theory, so...

8    Q.   You pointed out to him some cases where you knew people

9    who had gone to prison even though the weapon wasn't actually

10   discovered?

11   A.   Correct.

12   Q.   Did he tell you anything about -- about a snitch?

13   A.   Basically who had told him -- who had -- who had, you

14   know, turned him in and stuff like that.  Yes.  See, what

15   happened was that the female accomplice was the one who

16   basically was the one who told on them.

17   Q.   And the name you remember him using was?

18   A.   For the female?

19   Q.   Yes.

20   A.   Bita.

21   Q.   Bita?

22   A.   Right.

23   Q.   Okay.  When you left the jail, when you went to prison,

24   did you -- I mean, did you ever have any altercation or anything

25   with the defendant?  Did you have anything that created hard

1    feelings?

2         A.   No, I did not.

3         Q.   In fact, when you left to go to prison, did you leave

4    him your shoes, your tennis shoes?

5         A.   Yes.   When I left, I left him my shoes.   It's something

6    that, you know, we do in there.   We leave them to people who --

7                   MR. CALLAHAN:   Can't hear him, Your Honor.

8                   THE COURT:   Yes, can you --

9                   THE WITNESS:   It is something we do while we're in

10   there.   Whether we, you know, we leave -- either you turn around

11   and sell them or you give them away to someone else.

12        Q.   (BY MR. LUNAN)   Okay.   While you were there in the

13   jailhouse community, did you know an inmate by the name of

14   Ralph Pedrigone, Pedrigone, something like --

15        A.   Ralph Pedrigone.

16        Q.   Pedrigone?

17        A.   Yes, he was my cellmate.

18        Q.   For how long a period of time?

19        A.   He was my cellmate for -- I would say for a length of

20   about two-and-a-half, something like that, couple of months.

21   And then, at the same time, I would still talk to him because I

22   was moved from that cell to a different cell, but I stayed in

23   the same dorm.   But, you know, I would still talk to him.   So I

24   was there for -- I did know Mr. Ralph Pedrigone.

25        Q.   Describe him for us.

1    A.   Well, back then, he was an older man.  He had long
2    hair, a beard, glasses.  He was really good with cards, playing
3    cards.

4        Q.   Did he have a close friend there in the unit?

5        A.   We all tried to get close to each other in there.  And
6    I mean, when we'd go -- when we were in the day room, we'd all
7    try to talk to each other.  I know that I would, you know,
8    always see him talking to the defendant, you know.

9        Q.   Ralph Pedrigone and the defendant would often speak
10   with each other?

11       A.   Right.  Because they were like -- he was in 17 and he
12   was in 16.

13       Q.   They were right next door to each other?

14       A.   Correct.

15       Q.   And they spent time together in the common area?

16       A.   Correct.

17       Q.   Play cards together?

18       A.   Yes.

19       Q.   In all those dealings with Pedrigone, did you have an
20   opinion as to whether he always told the truth?

21       A.   I did catch him in a couple of lies.  But, I mean, he
22   would just, you know, blow it off.  And, you know, but it was no
23   major lies.  It was like, you know, he was trying to scam
24   people.  That was his biggest thing.

25       Q.   Scamming people?

1     A.   Yes.

2     Q.  Now, presently you've served your time.  You have

3  nothing pending; is that right?

4     A.   I have nothing pending.  Not one charge, not one case,

5  not probation, no paper, no nothing.

6     Q.   I guess before you had gone to prison, was there a case

7  out of Rhode Island that was still pending out there?

8     A.   That is correct.

9     Q.   A car theft case?

10     A.   A car theft case.

11     Q.   Okay.  And when you got out of prison, they didn't wish

12  to bring you back to Rhode Island?

13     A.   Negative.

14     Q.   How did you happen to come forward?  When is the first

15  time you spoke with us?

16     A.   I left a message Monday night on the answering machine

17  because I called over here to the DA's office and they referred

18  me to this courthouse -- this courtroom.  And they gave me the

19  number, and I called and I left a message.  No one ended up

20  talking to me until later that night, about 9:30, 10:00 o'clock

21  Tuesday night.

22     Q.   Was that a representative of the DA's office?

23     A.   That is correct.

24     Q.   And did you tell that person what you told us now?

25     A.   Yes, I did.

1    Q.   And were you asked to come here and served with a
2    subpoena to come in and testify today?

3    A.   Yes, I was served my subpoena yesterday.

4    Q.   Why did you come forward?

5    A.   I've taken away so much things from society that I
6    figured it was time to give something back to society.  I've
7    hurt society so bad.  I want to do something that's right.

8    Q.   Have you asked me or anyone in our office to help you
9    in any way at all?

10    A.   In which way?  That you -- to help me?

11    Q.   I don't know.  Is there something you wanted from us?

12    A.   No.

13    Q.   Is there anything you wanted from any of us?

14    A.   No.  Like I said, I don't owe the State nothing, the
15    State doesn't owe me nothing.

16    Q.   Do you feel you were treated fairly by the system?

17    A.   I think I was given -- I was treated more than fairly.

18    Q.   You said that he referred to having committed this
19    crime with a guy named Frank?

20    A.   Yes.

21    Q.   Did you know who he was?  Was he in the unit at some
22    point?

23    A.   Yes, he was in the unit.  Same dorm.  I did meet him at
24    one time.

25    Q.   Never talked to him about the case?

1      A.   No, not really.  I've never talked to him about the
2    case.  We would just talk, but nothing about the case.
3                  MR. LUNAN:  I'll pass the witness.
4                        CROSS-EXAMINATION
5    QUESTIONS BY MR. CALLAHAN:
6      Q.   Mr. Gutierrez, I'm Denny Callahan.  And I represent
7    Mr. Castillo.
8                  MR. CALLAHAN:  May I approach the witness,
9    Your Honor?
10                  THE COURT:  Yes.
11     Q.   (BY MR. CALLAHAN)  I'm going to show you two documents,
12   which I'm going to have marked as Exhibits 2 and 3, and ask if
13   you can identify them.
14                  (Defendant's Exhibits Number 2 and 3 marked).
15     Q.   (BY MR. CALLAHAN)  First I want to show you what's been
16   marked now as Defendant's Exhibit Number 2 and ask if you can
17   identify that.
18     A.   Yes, this is a -- this is a note that I wrote the
19   defendant.
20     Q.   I want to show you what's been marked now as
21   Defendant's Exhibit Number 3 and ask if you can identify that?
22     A.   Yes, that is correct.
23     Q.   What's correct?
24     A.   That those are my -- that is my handwriting and that is
25   me.

1      Q.   When did you write to the defendant State's -- rather,

2  Defendant's Exhibit 2 and 3, if you remember?

3      A.   When I was locked up with him.

4             MR. CALLAHAN:  Tender same to Counsel and ask they

5  be admitted into evidence.

6                (Defendant's Exhibits Number 2 and 3 offered).

7             MR. LUNAN:  Have no objection.

8             THE COURT:  They're admitted.

9                (Defendant's Exhibits Number 2 and 3 admitted).

10            MR. CALLAHAN:  May I publish to the jury,

11  Your Honor?

12            THE COURT:  Yes.

13      Q.   (BY MR. CALLAHAN)  You mentioned to the jury on direct

14  examination that you were not in the same cell as Juan Castillo,

15  but would see him and other inmates in what might be called a

16  day room; is that correct?

17      A.   That is correct.

18      Q.   At the time that you're speaking of in direct

19  examination to the jury, how many people could get into the day

20  room?

21      A.   The dorm is a total of 44 people and half of that would

22  be allowed in the day room.

23      Q.   Do you recall the names, during the time that you're

24  speaking about, Quintan Brown?

25      A.   Brown, Brown, Brown.  Negative.

```
 1        Q.    Raymond Rodriguez?

 2        A.    Cricket, yes.

 3        Q.    Orlando Guerda?  Guerda?

 4        A.    Negative.

 5        Q.    Michael Perry?

 6        A.    Negative.

 7        Q.    Danny Ugarte?

 8        A.    Yes.

 9        Q.    Vincent Martinez?

10        A.    No.

11        Q.    Kevin French?

12        A.    French, yes.

13        Q.    Anthony Mathis?

14        A.    Mathis, yes.

15        Q.    Albert Dominguez?

16        A.    No.

17        Q.    Juan De la Lata?

18        A.    Negative.

19        Q.    Rashawn Wallace?

20        A.    Negative.

21        Q.    These fellows that you do remember were part of that

22   day room experience, correct?

23        A.    Yes.

24        Q.    Do you recall a time in early January of '04 when

25   Juan Castillo was removed from his cell in that unit and
```

1  Francisco Gonzales replaced him or was put into that cell or
2  that unit?

3      A.    That is correct.

4      Q.    Then, in early January '04, in the day room, in front
5  of many people, including the ones that you could identify,
6  Francisco Gonzales, after he saw the television show about -- or
7  rather, the news break about this case, said out loud:  That is
8  the guy I killed.  Do you recall that?

9      A.    No, I don't recall that.

10     Q.    And then after he recognized the damage of his
11  statement, he immediately --

12             MR. LUNAN:  He's already said he didn't recall
13  that.  I would object to it being an improper question.

14             MR. CALLAHAN:  I'm moving on, Your Honor.

15             MR. LUNAN:  He just said and then, right after he
16  recognized the improper -- the statement that he says he never
17  even heard.  He's trying to put in evidence things that are not
18  in evidence.

19             THE COURT:  Well, all right, if you're moving on
20  to a different question, that's fine.  Otherwise, I'll --

21     Q.    (BY MR. CALLAHAN)  Did you then hear Francisco Gonzales
22  say --

23             MR. LUNAN:  I object.

24             THE COURT:  Sustain it.

25     Q.    (BY MR. CALLAHAN)  Did you ever hear Francisco Gonzales

1    talk about this case?

2        A.   I would hear him, but it was briefly.  I would not

3    debate with him the case.

4        Q.   Mr. Gutierrez, he called himself the South Side Killer.

5    And the exhibits show that you called him --

6                    MR. LUNAN:  Object, there's no evidence of that.

7                    THE COURT:  May I see the attorneys at the bench,

8    please.

9                    (At the bench, out of the hearing of the jury).

10                   THE COURT:  I don't have the benefit of the notes.

11   I don't know if that's in there.

12                   MR. LUNAN:  Your Honor, it doesn't say that on any

13   of those notes.  He's continuing to say things that aren't in

14   evidence, pretending to the witness that they are.  It's not in

15   evidence.  He can't -- he's insinuating in the questions that it

16   is and we would object.

17                   MR. CALLAHAN:  By that logic, I could never

18   cross-examine.

19                   THE COURT:  I mean, you can ask questions if

20   there's a good-faith basis or something.

21                   MR. CALLAHAN:  Yes, there is.

22                   THE COURT:  I'll overrule.  I'm going to let him

23   ask that question.

24       Q.   (BY MR. CALLAHAN)  The exhibits that are in the hands

25   of the jury somewhere over there are signed by North Side

1 Killer, yourself. And you were mocking him by signing that.

2 That was a mockery of your -- of Mr. Gonzales' statement where

3 he called himself the South Side Killer, correct?

4   A. That is negative.

5   Q. It was sarcasm on your part, wasn't it?

6   A. It was sarcasm on my part.

7   Q. Well, you haven't killed anybody, have you?

8   A. Negative.

9   Q. You want to give something back to society, so today

10 would be a good time for you to tell us who you have killed.

11   A. I have not killed nobody.

12   Q. Why did you call yourself the North Side Killer then?

13   A. Like I said, it was sarcasm.

14   Q. For what?

15   A. If you noticed that I even wrote to the defendant as

16 Mr. Six. And we used to joke around all day long. Okay. The

17 South Side Killer, that is also what they used to call him.

18   Q. But not Francisco Gonzales, is that what you're telling

19 the jury?

20   A. That is correct. Francisco Gonzales they used to --

21 Pancho. They used to call him Pancho Loco and that is it.

22   Q. And who's El Loco Gerry?

23   A. That is me.

24   Q. Is that your name?

25   A. Gerry is my nickname. El Loco. The reason they call

1   me El Loco is because I also -- I also see -- well, I used to

2   see the psychiatrist in there.

3       Q.   So you're not making fun of Francisco Gonzales, who's

4   called Pancho Loco, by signing --

5       A.   I was making fun of both of them.

6       Q.   -- by signing El Loco Gerry, are you?

7       A.   I was making fun of both of them.

8       Q.   While you were in jail, you had a lady friend who wrote

9   to you named Stephanie; is that correct?

10      A.   Yes, she wrote to me.  Like one or two times, yes, that

11  is correct.

12      Q.   And you-all were boyfriend/girlfriend best you could

13  be, considering she's in the free world and you're in jail,

14  correct?

15      A.   I would not consider boyfriend/girlfriend.

16      Q.   Turns out that Stephanie is Francisco Gonzales' niece;

17  is that correct?

18      A.   Yes, that is correct.

19      Q.   Is she in the courtroom today?

20      A.   I do not see her.

21      Q.   Are you still friends with Stephanie?

22      A.   No, we're not friends anymore.

23      Q.   Was it your or her idea to come forward after you saw

24  this television blurb on Monday?

25      A.   No, I have not talked to her since I left the county

1    jail.

2        Q.    When did you -- when you heard these conversations with

3    Mr. Castillo sometime in January, '04, and here it is August,

4    '05, when did you acquire this attitude change where you decided

5    to give back to society and come forward with this information?

6        A.    Monday, when I first heard about the case.

7        Q.    You recall Mr. Lunan asked you questions on direct

8    examination where you admitted to the jury seven felonies; is

9    that correct?

10       A.    That is correct.

11       Q.    Are you on parole at the moment?

12       A.    No, I am not on parole.  I discharged my sentence.  I

13   was given a two-year state jail sentence for the drug case, and

14   I was given two years for the escape case, to run concurrent

15   with the two years with state jail.  So my discharge date was

16   March 31st, 2005.  I am not on paper.  I'm not on parole.  I'm

17   not on probation.

18       Q.    Well, you have to register as a sex offender, correct?

19       A.    Well, that is correct.  I am registered in the SAPD and

20   I am registered in DPS.

21            MR. CALLAHAN:  Pass the witness.

22                        REDIRECT EXAMINATION

23   QUESTIONS BY MR. LUNAN:

24       Q.    Both of these notes, State's Exhibit -- or Defense

25   Exhibits 2 and 3 are addressed to whom?

1      A.    To Mr. Six and Juan.

2      Q.    And who is that?  The same person?

3      A.    That is the same person.

4      Q.    Both these notes were directed to this person, the

5   defendant.

6      A.    That's correct.

7      Q.    And the mocking of North Side Killer on Defense Exhibit

8   3 was in response to him being the South Side Killer?

9      A.    That is correct.  Because I live on the north side.

10  And I was always -- oh, well, you're from the north side.  Oh,

11  you're from the north side.  Yeah, so what?  South side.  Dirty

12  south.  This and that.  Or west side, you know.  When you're in

13  there, everybody makes fun of you because you're from the

14  different side of town.

15     Q.    That's where the divisions and teams are drawn,

16  correct?

17     A.    Correct.

18     Q.    When you were making that decision to make that phone

19  call on Monday, whether to put yourself in this mix, did you see

20  this attack coming upon you?

21     A.    Yes, I did see this attack coming upon me.  I did

22  see -- I did notice -- One of the reasons I did not go to trial

23  for the sexual assault case was because I have three sisters,

24  some of them are well known in the community.  One of them is

25  part of the Chamber of Commerce.  And I did not want to -- they

1   also know -- their friends, they know me.  And I did not want

2   them to, you know, be ashamed of me.  This is why I took -- I

3   pleaded guilty.  No, I pleaded no content (sic) to it.

4        Q.    And knowing that you would be attacked in this way, you

5   could have kept your mouth shut?

6        A.    Yes, that is true.

7        Q.    Yet you called anyway?

8        A.    Yes, that is true.

9        Q.    And you came down here anyway?

10       A.    That is true.

11       Q.    For what?

12       A.    Like I said -- said before, I felt bad.  I've taken

13   away so many things from society that I just wanted to try to be

14   a good citizen and give something back to them.

15       Q.    Did this man do a terrible thing?

16       A.    Under my eyes, yes, he did.

17                    MR. LUNAN:   Pass the witness.

18                    RECROSS-EXAMINATION

19   QUESTIONS BY MR. CALLAHAN:

20       Q.    So on the first part of Defendant's Exhibits 2 and 3

21   where you signed yourself as North Side Killer is a sarcasm of

22   Juan Garcia (sic) known as South Side Killer.  But the second

23   part of the note where you sign yourself as El Loco Gerry is

24   sarcasm for Francisco Gonzales, is that what you're telling this

25   jury?

1      A.    That is correct.

2                  MR. CALLAHAN:  A moment please, Your Honor.

3                  THE COURT:  Yes.

4                  MR. CALLAHAN:  Nothing further Your Honor.

5                       REDIRECT EXAMINATION

6    QUESTIONS BY MR. LUNAN:

7      Q.    Just one other thing.  You had mentioned that -- was

8    asking you about referring to yourself as El Loco and you had

9    mentioned that you had had some treatment, some mental health

10   treatment?

11     A.    That is correct.

12     Q.    What event precipitated that?  Were you depressed?  Did

13   you lose someone in your life?

14     A.    Yes, I was depressed.  I was taking -- actually, at the

15   current time I was seeing the psychiatrist.  I was taking 150

16   milligrams and actually it was bumped up to 200 milligrams of

17   Zoloft.  Zoloft is an antidepressant, okay.  And I have lost

18   some dear ones in my past.  November 22nd.

19     Q.    Your children, right?

20     A.    Yes.

21     Q.    November 22nd of what year?

22     A.    1997.

23     Q.    And you were getting treatment for that, for the --

24     A.    Correct.

25     Q.    -- the despair and depression that followed?

1        A.    That is correct.

2                    MR. LUNAN:  Pass the witness

3                        RECROSS-EXAMINATION

4    QUESTIONS BY MR. CALLAHAN:

5        Q.    Regarding the testimony that you gave to the jury about

6    pleading no contest to save embarrassment to your more famous

7    family members, are you telling the jury you're not even guilty

8    of that case, though, are you?

9        A.    Yes, I am guilty of that case to a certain extent.

10                    MR. CALLAHAN:  Nothing further.

11                    MR. LUNAN:  No questions.

12                    THE COURT:  Thank you, sir.  You may step down.

13                    MR. LUNAN:  Is he excused?

14                    MR. CALLAHAN:  Yes.

15                    MR. LUNAN:  State would call Debra Espinosa.

16                    MR. CALLAHAN:  May we approach the bench,

17   Your Honor?

18                    THE COURT:  Yes.

19                    (At the bench, out of the hearing of the jury).

20                    MR. CALLAHAN:  Out of an abundance of caution, we

21   object to the testimony of the accomplice as violative of the

22   Texas Rules of Ethics and Federal Bribery Statute as referenced

23   in our pretrial motion and right before the trial started.

24                    THE COURT:  Your objection is noted.

25                    (In open court).

DEBRA A. DOOLITTLE, CSR, RPR
BEXAR COUNTY COURTHOUSE, ROOM 3.04
(210) 335-2080