**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **JUAN EDWARD CASTILLO,** | § | |
| **TDCJ No. 999502,** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| **V.** | § | **CIVIL NO. SA-12-CA-924-XR** |
| | § | |
| **WILLIAM STEPHENS, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Juan Edward Castillo filed this federal habeas corpus action pursuant to 28 U.S.C.

§ 2254 challenging his 2005 Bexar County conviction for capital murder and sentence of death.

For the reasons set forth below, Petitioner is entitled to neither federal habeas corpus relief

nor a Certificate of Appealability from this Court.

**I. Background**

A.     **The Offense**

The Texas Court of Criminal Appeals published an opinion affirming Petitioner's conviction

and summarized the pertinent guilt-innocence phase testimony from Petitioner's capital murder trial.

*See Castillo v. State*, 221 S.W.3d 689, 691-93 (Tex. Crim. App. 2007).

B.     **The Indictment**

A Bexar County grand jury indicted Petitioner on February 24, 2004 in cause no. 2004-CR-

1461 on a single count of capital murder, to wit, intentionally and knowingly causing the death of

Tommy Garcia by shooting Garcia with a deadly weapon in the course of committing and attempting to commit the offense of robbery of Garcia.[1]

## C.    Guilt-Innocence Phase of Trial

The guilt-innocence phase of Petitioner's capital murder trial commenced on August 23, 2005.   The jury heard evidence from prosecution witnesses establishing (1) Debra Espinosa frantically beat on the door of a nearby residence immediately after Garcia was shot until the residents let her in,[2] (2) Espinosa called Garcia's friend Jimenez and police to notify them of the shooting but fled the scene before police arrived,[3] (3) Robert Jimenez and Frank Russell arrived at the scene of Garcia's murder and gave San Antonio police officers information which allowed them to locate Espinosa, whom the police arrested on an outstanding, unrelated, warrant,[4] (4) Frank

---

[1] Transcript of pleadings, motions, and other documents filed in Petitioner's state trial court proceeding (henceforth "Trial Transcript"), Volume 1, at pp. 4-5.  An enhancement paragraph in the indictment alleged Petitioner had previously been convicted in Bexar County cause no. 2000-CR-5489 of deadly conduct -firearm.

[2] Statement of facts from Petitioner's trial (henceforth "S.F. Trial"), Volume 15, testimony of John Medlick, at pp. 40-48, 62-63, 65-66; Volume 15, testimony of George Gruber, at pp. 67-77, 81-83, 86-88; Volume 17, testimony of Debra Espinosa, at pp. 31-46, 78, 82-85.
The two residents of the home at 9710 Clamp Street testified they heard multiple shots and called police prior to Espinosa pounding on their door.  S.F. Trial, Volume 15, testimony of John Medlick, at pp. 42, 44-45; Volume 15, testimony of George Gruber, at pp. 68, 82.
Another resident of the area testified he was also awakened by the shots and phoned police about same and a car with body damage which he saw driving slowly through the area after the shots woke him and which turned around in his driveway.  S.F. Trial, Volume 16, testimony of James Fenimore, at pp. 157, 159-61.

[3] S.F. Trial, Volume 15, testimony of John Medlick, at pp. 45-46; Volume 15, testimony of George Gruber, at pp. 69-70; Volume 15, testimony of Frank Russell, at pp. 171-74, 198; Volume 16, testimony of Robert Jimenez, at pp. 41, 47; Volume 17, testimony of Debra Espinosa, at pp. 43-45, 83.

[4] S.F. Trial, Volume 15, testimony of Victor Gonzales, at pp. 93-96, 98-100, 104, 106, 108; Volume 15, testimony of Frank Russell, at pp. 171-75, 177-78, 188; Volume 15, testimony

Gonzales was arrested on foot a short distance from the location of the fatal shooting on an unrelated

warrant,[5] (5) both Espinosa and Gonzales initially denied any knowledge of the identity of Garcia's

shooter and any involvement in the robbery-murder of Garcia,[6] (6) Espinosa subsequently admitted

her and Gonzales' involvement in what she described as a planned robbery of Garcia, but only later

identified Petitioner as Garcia's murderer,[7] (7) eventually, both Espinosa and Gonzales admitted

their involvement in the planned robbery of Garcia and identified Petitioner as Garcia's fatal

shooter,[8] and (8) Garcia died as a result of seven gunshot wounds, most of which would have been

_____

of Danny Higginbotham, at pp. 205-07, 209-10; Volume 16, testimony of Robert Jimenez, at pp. 38-42, 47-48; Volume 17, testimony of Debra Espinosa, at pp. 46-47, 49, 53, 71-72, 83.

[5] S.F. Trial, Volume 15, testimony of Danny Higginbotham, at pp. 203-05; Volume 15, testimony of Julian Garza, at pp. 212-16; Volume 16, Francisco Gonzales, at pp. 118-30.
A trace evidence expert from the Bexar County Criminal Investigation Laboratory testified swabs taken from Frank Gonzales' hands at the time of Gonzales' arrest were negative for gun shot residue.  S.F. Trial, Volume 16, testimony of Michael Victor Martinez, at pp. 68-71, 75, 81.

[6] S.F. Trial, Volume 16, testimony of Francisco Gonzales, at pp. 129-32, 138; Volume 17, testimony of Debra Espinosa, at pp. 47-49, 58-60, 63-65, 73; Volume 18, testimony of Timm Angell, at pp. 66-73.

[7] S.F. Trial, Volume 17, testimony of Debra Espinosa, at pp. 47-49, 57-61; Volume 18, testimony of Timm Angell, at pp. 68-73.

[8] S.F. Trial, Volume 16, testimony of Francisco Gonzales, at pp. 129-32, 138, 140-41, 147, 149-50, 153-54; Volume 17 testimony of Debra Espinosa, at pp. 66-67; Volume 18 testimony of Timm Angell, at pp. 75, 78-79, 102.
Gonzales testified he negotiated a plea bargain in which he received a forty-year sentence for murder in exchange for Gonzales' truthful testimony at Petitioner's trial.  Volume 16, testimony of Francisco Gonzales, at pp. 132, 134, 154.
Espinosa also testified she changed her mind about protecting Petitioner after she had a conversation with Petitioner a few days after she got out of jail in which Petitioner referred to Espinosa as a "loose end" and stated confidently he did not believe he would be convicted because he had burned the gun, mask, and his gloves and he didn't believe Gonzales would "snitch" on him.  S.F. Trial, Volume 17, testimony of Debra Espinosa, at pp. 60-61, 64-65, 67. Espinosa testified she entered into a plea bargain which allowed her to plead to a reduced charge

fatal individually.[9]   The defense called a single witness at the guilt-innocence phase of trial, a jail house informant who testified he overheard Francisco Gonzales make the statement "That's the guy I killed" after watching a local television news story about Garcia's murder.[10]

On August 30, 2005, the jury returned its verdict, finding Petitioner guilty of capital murder as charged in the indictment.[11]

D.     **Punishment Phase of Trial**

The punishment phase commenced on August 31, 2005, with Petitioner advising the state trial court he wished to represent himself throughout the remainder of trial.[12]   The prosecution presented testimony from the mother of Petitioner's son Juan, Jr. about (a) numerous instances of physical violence Petitioner inflicted upon her, (b) an instance in which Petitioner forced her and Juan, Jr. to accompany him to California and remain there for a month, © an incident in which Petitioner pointed a gun at her sister while her sister was holding Juan, Jr.,[13] and (d) an incident in

---

of aggravated robbery and receive a forty-year sentence in exchange for her giving truthful testimony at Petitioner's trial.  *Id.*, at pp. 68-69.

[9] S.F. Trial, Volume 18, testimony of Vincent DiMaio, at pp. 148-63.

[10] S.F. Trial, Volume 20, testimony of Ralph Edward Pedrigone, at p. 5.  Pedrigone admitted, however, that Gonzales corrected himself almost immediately by saying "I mean they killed."  *Id.*

[11] S.F. Trial, Volume 20, at pp. 94-95; Trial Transcript, Volume 1, at p. 137.

[12] S.F. Trial, Volume 21, at pp. 3-7.  The state trial court asked Petitioner many questions about Petitioner's knowledge of the law and legal expertise and strongly advised Petitioner against self-representation but ultimately granted Petitioner's request.  *Id.*  The state trial court did direct Petitioner's trial counsel to remain in the courtroom and remain available in case Petitioner changed his mind or wished to consult with them.  *Id.*

[13] S.F. Trial, Volume 21, testimony of Jessica Ann Ramirez, at pp. 9-32.

which Petitioner pointed a rifle or large pistol at her and fired a shot through the ceiling.[14]  A South

San Antonio resident testified about an incident in September, 2002 in which Petitioner fired

multiple shots into the vehicle driven by this witness in an unprovoked assault which (a) shattered

the passenger window in the victim's truck, (b) left three bullet holes in the passenger door of the

victim's truck, and (c) struck the windshield of the victim's truck.[15]  A San Antonio Police Officer

testified about an incident in February, 1998 in which he arrested Petitioner and found Petitioner was

carrying a knife, cork screw, a plastic bag containing a white powder, and nineteen small zip lock

baggies which he explained were used on the street to subdivide cocaine.[16]  Debra Espinosa testified

about the many criminal activities in which she and Petitioner jointly engaged or made plans to

engage in before Garcia's robbery-murder, including (a) a planned robbery of a convenience store,

(b) a planned robbery of an IHOP restaurant, (c) a home invasion of a South Side drug dealer's

residence in which Petitioner tied up and stabbed the victims, and (d) an incident in which Petitioner

and Petitioner's friend, Gilbert, beat an old man who had attempted to run off with their money

without furnishing the marijuana he had promised to sell them.[17]  Petitioner's wife testified regarding

(a) her joint arrest with Petitioner and others for attempting to pass a forged, stolen, check and (b)

---

[14] S.F. Trial, Volume 21, testimony of Laura Lynn Ramirez, at pp. 33-39.

[15] S.F. Trial, Volume 21, testimony of Phillip Lopez, at pp. 40-54.  Mr. Lopez testified he did not know Petitioner personally but had, on two previous occasions, been threatened by Petitioner when he attempted to visit women who lived near Petitioner's residence. *Id.*, at pp. 51-52.

[16] S.F. Trial, Volume 21, testimony of Charles Steven Hunt, at pp. 54-60.

[17] S.F. Trial, Volume 21, testimony of Debra Espinosa, at pp. 61-80.  Espinosa testified she and Petitioner did not go through with the convenience store robbery because she got cold feet and Petitioner decided against attempting the IHOP robbery due to the arrival at the restaurant of police personnel. *Id.*, at pp. 64-65, 66-68, 72.

her purchase of guns and a bullet proof vest for Petitioner while Petitioner was on parole.[18]   A San

Antonio Police patrol officer and crime scene investigator testified regarding (a) a traffic stop of

Petitioner on July 20, 2002, (b) Petitioner's arrest on an outstanding warrant, (c) an inventory search

of the vehicle Petitioner was driving, and (d) the subsequent arrest of Petitioner for possession of two

fully loaded semi-automatic handguns, a pair of bullet proof vests, and additional ammunition, all

of which were illegal given Petitioner's status as a convicted felon.[19]   Francisco Gonzales testified

regarding (a) the multiple incidents in which he and Petitioner jointly robbed inebriated bar patrons

(identified by Gonzales as illegal immigrants) as the victims exited a bar late at night, (b) Petitioner's

admission to having shot a drug dealer in the face during a robbery, © Petitioner's admission to

having stabbed someone in a bar, and (d) the fact Petitioner never had a job other than robbing

people.[20]   A records custodian from the Bexar County Adult Detention Center testified regarding

Petitioner's multiple arrests.[21]   Petitioner did not cross-examine any of these witnesses and offered

no evidence or jury argument during the punishment phase of trial.[22]

---

[18] S.F. Trial, Volume 21, testimony of Priscilla Anne Castillo, at pp. 81-100.  Mrs. Castillo also identified a photograph showing Petitioner wearing a bullet proof vest and brandishing a handgun while her young son sat next to Petitioner (State Exhibit no. 176).  *Id,*, at p. 92.

[19] S.F. Trial, Volume 21, testimony of John Corona, at pp. 101-11; Volume 21, testimony of Monica Garza, at pp. 112-39.

[20] S.F. Trial, Volume 21, testimony of Francisco Gonzales, at pp. 149-61.

[21] S.F. Trial, Volume 21, testimony of Manuel Alvarez, at pp. 161-74.  This witness testified booking slips from the BCADC reflected Petitioner's arrests for multiple charges of assault with bodily injury, multiple charges of deadly conduct involving firearms, and federal detainers for possession of a firearm by a convicted felon.  *Id.*

[22] S.F. Trial, Volume 22, at p. 3.

On September 1, 2005, the jury returned its verdict at the punishment phase of Petitioner's capital murder trial, finding (1) beyond a reasonable doubt there was a probability Petitioner would commit acts of violence that would constitute a continuing threat to society and (2) unanimously, taking into consideration all of the evidence, including the circumstances of the offense and the defendant's background, character, and personal moral culpability, there was not a sufficient mitigating circumstance to warrant that a sentence of life imprisonment rather than a death sentence be imposed.[23]   The state trial court imposed the sentence of death.[24]

E.      **Direct Appeal**

Petitioner filed his appeal June 27, 2006, challenging the factual and legal sufficiency of the evidence of guilt, arguing Petitioner's death sentence violated the Eighth Amendment, and arguing the trial court erred in overruling Petitioner's pretrial motion to exclude the testimony of Petitioner's accomplices Debra Espinosa and Francisco Gonzales.   The Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence in a published opinion issued May 2, 2007.   *Castillo v. State*, 221 S.W.3d 689 (Tex. Crim. App. 2007).   Petitioner did not thereafter seek further review of his conviction from the United States Supreme Court through a petition for writ of certiorari.

F.      **State Habeas Corpus Proceeding**

---

[23] Trial Transcript, Volume 1, at pp. 147-49; S.F. Trial, Volume 22, at p. 21.

[24] S.F. Trial, Volume 22, at pp. 26-27.

Petitioner filed his application for state habeas corpus relief on November 13, 2009,[25] urging

therein a number of ineffective assistance complaints against Petitioner's trial and appellate counsel

and arguing the state trial court erred in granting Petitioner's request for self-representation at the

punishment phase of trial and in failing to hold a *Faretta* hearing after Petitioner wrote the trial judge

prior to trial to express dissatisfaction with the performance of his trial counsel.[26]   The state habeas

---

[25] The considerable delay in filing Petitioner's state habeas corpus application resulted from the inability of Petitioner's initial state habeas corpus counsel, attorney Suzanne Kramer, which resulted in the Texas Court of Criminal Appeals (1) issuing multiple Show Cause Orders directed toward attorney Kramer concerning her inability to timely file state habeas corpus application in Petitioner's and other cases and (2) ultimately, replacing attorney Kramer with attorney John Economidy.  Attorney Economidy filed a state habeas corpus application on Petitioner's behalf on November 13, 2009, but successfully moved the Texas Court of Criminal Appeals to accept that state habeas corpus application as timely filed, i.e., as if filed on October 11, 2007.

[26] Petitioner's State Habeas Corpus Application appears at pages 1-140 of the "State Habeas Transcript" (i.e., the collection of pleadings, motions, and other documents filed in Petitioner's state habeas corpus proceeding).  *The page numbers in Petitioner's State Habeas Transcript to which this Court refers are those found in the lower left corner of each page in that document, i.e., the numbers 1 through 770.*

In his first, third, and fourth grounds for relief, Petitioner's state habeas corpus application included arguments that Petitioner's trial counsel rendered ineffective assistance (1) during jury selection by (a) failing to move to disqualify or object to the trial court's comments made in the presence of venire member Doris Cedillo and (b) failing to move to disqualify or strike venire member Arthur Carter [Fourth ground], (2) during trial by (a) failing to meet with Petitioner at the jail with sufficient frequency, (b) failing to interview prosecution witnesses, (c) waiting until the eve of trial to begin trial preparation, (d) failing to adequately investigate and prepare for the sentencing phase of trial, (e) failing to utilize the defense team's forensic psychologist during the sentencing phase of trial, (f) failing to introduce documentary evidence via stipulation during the sentencing phase of trial, (g) failing to interview Petitioner's family and present their testimony at the sentencing phase of trial, (h) filing a frivolous motion challenging the admissibility of Petitioner's accomplices' trial testimony, (i) making a bad opening statement, moving for judicial sentencing and otherwise demonstrating a lack of knowledge of capital sentencing proceedings, (j) failing to investigate the prosecution's case, failing to present evidence regarding the effects of sleep deprivation, and asking questions on cross-examination which bolstered the credibility of prosecution witnesses, (k) conceding Petitioner's guilt during closing arguments at the guilt-innocence phase of trial, (l) failing to object to sleeping jurors, (m) failing to interview the sole defense witness until after trial began, (n) failing to object to

trial court held an extended evidentiary hearings on July 8, 2010, January 20-21, 2011, and February

1, 2011, at the conclusion of which the state habeas trial court found no deficient performance by

Petitioner's trial or appellate counsel.[27]  In an Order issued April 2, 2012, the state habeas trial court

issued its formal findings of fact and conclusions of law and recommended denial of Petitioner's

state habeas corpus application.[28]   The Texas Court of Criminal Appeals adopted the state trial

court's findings and conclusions and denied state habeas corpus relief in an unpublished Order in

which that court separately concluded Petitioner's second claim for relief, i.e., Petitioner's

complaints about the trial court's handling of his request for self-representation, was procedurally

---

Petitioner's assertion of his right to self-representation, and (o) the cumulative effect of the
foregoing acts of deficient performance [First ground], and (3) on appeal by (a) failing to include
an affidavit with Petitioner's motion for new trial, (b) failing to assert the foregoing claims of
ineffective assistance in Petitioner's direct appeal, (c) urging the same Eighth Amendment
argument the Texas Court of Criminal Appeals had rejected in a recent opinion involving another
of the same appellate counsel's clients, Kevin Watts, and (d) operating under a conflict of interest
once it became apparent Petitioner had viable complaints of ineffective assistance by his trial
counsel [Third ground].

[27] Statement of Facts from Petitioner's state habeas corpus evidentiary hearing
(henceforth "S.F. State Habeas Hearing"), Volume 5 of 7, at p. 530/144.  *The verbatim
transcription from the evidentiary hearing held in Petitioner's state habeas corpus proceeding
consists of seven volumes bound in a single binder among the state court records received by this
Court from Respondent.  A set of numbers appears in the lower left corner of those pages which
begins with the first page of the index to the Statement of Facts and continues seriatim
throughout the remaining pages of all seven volumes.  Each separate volume of these records
has a second set of page numbers which appears in the upper right corner of the pages and
begins anew with each new volume.  In an attempt to avoid confusion and assist the reviewing
appellate court and readers of this Memorandum Opinion and Order, this Court will endeavor to
list both of the page numbers for all cited testimony with the first number of numbers
representing the comprehensive number for the entire set of volumes which appears in the lower
left corner of each page and the second number representing the page within each particular
volume which appears in the upper right corner of each page (i.e., "Lower Left/Upper Right").*

[28] State Habeas Transcript, at pp. 719-68.

barred. *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

G.     **Proceedings in this Court**

Petitioner filed his federal habeas corpus petition in this Court on June 28, 2013 (ECF no. 12), reasserting the ineffective assistance complaints he urged in his state habeas corpus proceeding, along with his claim the state trial court erroneously granted his request for self-representation during the punishment phase of trial (and failed to hold a *Faretta* hearing on Petitioner's pretrial expressions of dissatisfaction with his trial counsel) and a wholly new claim that a prosecution witness (Gerardo Gutierrez) committed perjury during Petitioner's trial.

On January 23, 2014, Respondent filed his answer to Petitioner's federal habeas corpus petition (ECF no. 22), arguing (1) the state courts reasonably rejected Petitioner's ineffective assistance claims on the merits because all those claims were either refuted by the uncontradicted testimony of Petitioner's trial counsel during the extended state habeas hearing or because Petitioner failed to allege any facts showing how he was "prejudiced" within the meaning of *Strickland* by the alleged deficiencies in his trial counsels' performance, (2) the state trial court properly granted Petitioner's request for self-representation and failed to make a *Faretta* inquiry prior to trial because Petitioner's requests for appointment of new counsel were withdrawn almost as soon as they were made, and (3) Petitioner's allegation of perjured testimony by a prosecution witness is both unexhausted, and therefore procedurally defaulted, as well as legally meritless because Petitioner alleges no facts showing the prosecution ever knew of any factual inaccuracy in Gutierrez's trial testimony.

## II. <u>AEDPA Standard of Review</u>

Because Petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of Petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. Section 2254(d) (1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court

need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the Petitioner's case. *Brown v. Payton*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of...clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, ___ U.S. ___, ___, 132 S. Ct. 26, 27, 181 L. Ed. 2d 328 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, ___, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___, 2014 WL 4956764, *1 (Oct. 6, 2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. 28 U.S.C. §2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does

13

not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, section 2254(e)(1) provides a Petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the Petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood v. Allen*, 558 U.S. at 300 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

14

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (federal habeas review of a state court's adjudication involves review only of a state court's decision, not the written opinion explaining the decision), *cert. denied*, ___ U.S. ___, 132 S. Ct. 124, 181 L. Ed. 2d 46 (2011); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006) (holding section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 550 U.S. 921 (2007).

### III. Ineffective Assistance by Trial Counsel

A.      **Overview of the Claims**

In his first claim, Petitioner argues his trial counsel rendered ineffective assistance by (1) failing to meet adequately with Petitioner face-to-face at the jail, (2) failing to interview prosecution witnesses, (3) waiting until the eve of trial to engage in trial preparation, (4) failing to investigate Petitioner's background and prepare for the punishment phase of trial, (5) failing to present mitigating evidence through the testimony of the defense team's forensic psychologist at the punishment phase of trial, (6) failing to admit documentary mitigating evidence via stipulation at the punishment phase of trial, (7) failing to interview Petitioner's family members and present them as witnesses at the punishment phase of trial, (8) filing a frivolous motion attacking the admissibility of Petitioner's accomplices' testimony, (9) lacking knowledge and skills in capital litigation, (10) making a "bad" opening statement at the guilt-innocence phase of trial, (11) failing to investigate the

prosecution's case and bolstering the testimony of prosecution witnesses, (12) conceding Petitioner's guilt during closing argument at the guilt-innocence phase of trial, (13) failing to object to sleeping jurors, (14) mishandling the lone defense witness, (15) failing to (a) object to Petitioner's assertion of his right to self-representation as untimely and (b) argue Petitioner was too depressed to be capable of self-representation and failing to present Petitioner's pretrial complaints about the performance of trial counsel to the state trial court as a request for self-representation, (16) accepting venire members Cedillo and Carter as jurors, i.e., failing to challenge either venire member for cause or exercise a peremptory strike against either venire member, and (17) the cumulative effect of the foregoing deficiencies in the performance of Petitioner's trial counsel prejudiced Petitioner.[29]

B.    **Clearly Established Federal Law**

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U.S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, 558 U.S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U.S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984):

---

[29] Petitioner's Petition for Writ of Habeas Corpus, filed June 28, 2013, ECF no. 12 (henceforth "Petition"), at pp. 10-72.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. at 7; *Strickland v. Washington*, 466 U.S. at 688-89. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534; *Strickland v. Washington*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. at 694.

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the Petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U.S. at 27.

In evaluating Petitioner's complaints about the performance of his counsel under the AEDPA, i.e., those complaints which the state courts have addressed on the merits, the issue before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003), *cert. denied*, 540 U.S. 1154 (2004). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.* In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which Petitioner failed to fairly present to the state courts), this Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U.S. at 39 (holding *de novo*

18

review of the allegedly deficient performance of Petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U.S. at 534 (holding the same).

A habeas Petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, 558 U.S. 839 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, 556 U.S. 1240 (2009); *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Strickland v. Washington*, 466 U.S. at 690; *Scheanette v. Quarterman*, 482 F.3d at 820; *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert. denied*, 552 U.S. 948 (2007); *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

C.     **Failure to Meet Sufficiently with Petitioner at the Jail**

1.     **The Complaint**

In his first assertion of ineffective assistance by his trial counsel, Petitioner argues his counsel should have met more frequently with Petitioner at the jail prior to trial and furnished Petitioner with copies of notes counsel made after reviewing the prosecution's file.[30]

2.      **State Court Disposition**

Petitioner included the same basic set of complaints to the state habeas court.[31]   During the evidentiary hearing held in Petitioner's state habeas corpus proceeding, Petitioner's trial counsel (attorneys Vincent D. Callahan and John William Harris, Jr.) testified without contradiction that, while they only visited Petitioner at the jail once or twice, lead defendant counsel Callahan corresponded frequently with Petitioner and they both consulted with Petitioner at the courthouse during pretrial hearings and other proceedings.[32]   The State introduced extensive correspondence

---

[30] Petition, at pp. 10-16.

[31] State Habeas Transcript, at pp. 49-54.

[32] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at pp. 186-87/105-06, 199/118, 201-02/120-21.  Attorney Harris testified (1) he met with Petitioner at the jail, (2) he found Petitioner read better than he expected, (3) he believed Petitioner was intelligent, and (4) Petitioner wrote both him and lead counsel Callahan notes through jury selection and the trial.  *Id.*, at pp. 142/61, 228-30/147-49.

Lead counsel Callahan testified without contradiction (1) he met with Petitioner at the jail December 15, 2003 but not thereafter, (2) the during their initial meeting, Petitioner displayed a flat affect, i.e., Petitioner appeared a bit cavalier about his fate and did not appear concerned about the gravity of the charge against him (which raised a red flag in Callahan's mind), (3) he was unable to elicit any detailed information from Petitioner regarding Petitioner's purported alibi defense during their initial meeting but subsequently did receive some information regarding a possible alibi defense from Petitioner, (4) he corresponded extensively with Petitioner after their first meeting, and (5) he sent Petitioner a copy of Dr. Ferrell's report and explained what testimony Dr. Ferrell was prepared to give for the defense.  S.F. State Habeas Hearing, Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 317-18/64-65, 321/68, 338/85, 352/99, 356-59/103-06, 364-83/111-30.  Callahan also testified without contradiction (1) he corresponded frequently with Petitioner in an attempt to elicit a time line relative to Garcia's murder for Petitioner's whereabouts and a possible alibi, (2) he wrote Petitioner to explain the

between lead defense counsel Callahan and Petitioner covering the entire period from Callahan's appointment up through and even following Petitioner's capital murder trial.[33]  Petitioner did not testify during the state habeas corpus proceeding and did not present any testimony or other evidence showing either (1) Petitioner was unable to communicate any identifiable information or questions to his trial counsel prior to trial or (2) Petitioner's trial counsel failed to communicate any identifiable information to Petitioner prior to trial.  The state habeas trial court found, in pertinent part (1) Petitioner's lead trial counsel (attorney Vincent D. Callahan) visited Petitioner at the jail shortly after attorney Callahan was appointed to represent Petitioner, (2) thereafter attorney Callahan communicated with Petitioner prior to trial through conferences during pretrial hearings and jury selection as well as extensive correspondence which included at least fifty nine letter exchanged between Callahan and Petitioner, (3) the letters memorialize Callahan's extensive work in preparing to defend Petitioner, demonstrate Callahan's commitment to updating Petitioner on the status of the case, show Callahan's direct responses to Petitioner's questions and explanations of relevant law,

---

importance of Petitioner cooperating with defense expert Dr. Ferrell, (3) he wrote Petitioner to answer a question about the indictment posed by Petitioner, (4) he wrote Petitioner to try and convince Petitioner of the importance of obtaining testimony from Petitioner's family but Petitioner did not want to involve his family, particularly his mother, (5) he contacted Petitioner's purported alibi witness, Carlos Castillo, who refused to furnish Petitioner with an alibi, (6) he wrote to Petitioner and explained Petitioner's right to self-representation but also explained Petitioner had no right to hybrid representation, (7) he wrote Petitioner and explained Carlos Castillo would not furnish an alibi and could be impeached and also explained defense counsel had worked out an agreement with the prosecution to admit educational records by stipulation, (8) Petitioner resisted the defense team's efforts to investigate Petitioner's background, and (9) Petitioner communicated extensively with trial counsel during voir dire. S.F. State Habeas Hearing, Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 401-18/15-33, 426-27/40-41, 429/43, 434-35/48-49, 437-38/52-53, 447-49/61-63, 454-58/68-72, 469/83.

[33] The extensive pretrial correspondence between lead defense counsel Callahan and Petitioner appears as State Exhibits 7 through 68 found in S.F. State Habeas Hearing, Volume 6 of 7, at pp. 546-689.

and establish that Callahan engaged in continuing dialogue with Petitioner on all matters of material impact on the case, (4) Petitioner's trial counsel furnished him with copies of discovery notes, witness statements, and forensic reports, (5) despite Petitioner's assertion of his right to self-representation during the punishment phase of trial, Callahan continued to encourage Petitioner to call witnesses and to present evidence, including the testimony of defense expert Dr. Ferrell, (6) at no point prior to or during trial did either Callahan or defense co-counsel Harris believe Petitioner was suffering from the kind of depression which would cause Petitioner to be disabled or to require medical or psychological assistance, (7) shortly before the beginning of jury selection, Petitioner sent Callahan a letter expressing his appreciation for Callahan's work on his case, especially Callahan's urging of a pretrial motion to exclude the testimony of Petitioner's co-defendants, apologizing for doubting Callahan, and expressing his faith in Callahan and Harris, (8) Petitioner actively participated in jury selection and gave his defense counsel a note expressing his appreciation for their work on his behalf, (9) shortly after trial, Petitioner sent Callahan another letter expressing his appreciation to Callahan and Harris for sticking by him despite his decision to represent himself during the punishment phase of trial, and (10) Petitioner's trial counsel kept Petitioner reasonably informed about the status of the case, promptly complied with Petitioner's reasonable requests for information, and reasonably explained important matters to Petitioner to the extent reasonably necessary to permit Petitioner to make informed decisions regarding the case.[34]  The state habeas trial court concluded this aspect of Petitioner's multi-faceted ineffective assistance claim lacked merit.[35]

---

[34] Trial Court Order issued April 3, 2012 found in Transcript of pleadings, motions, and other documents filed in Petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), at pp. 725-35.

[35] State Habeas Transcript, at p. 735.

The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

       3.    **AEDPA Analysis**

     The state trial court's factual findings, expressly adopted by the Texas Court of Criminal Appeals, were fully supported by the evidence presented during Petitioner's state habeas corpus proceeding.  As the state trial court noted, the only testimony presented during Petitioner's state habeas corpus proceeding consisted of that of Petitioner's trial counsel, who explained in rational and reasonable terms (1) the steps they took to communicate prior to trial with Petitioner (who insisted throughout pretrial proceedings he had an alibi - even after his purported alibi witness refused to furnish an alibi, repeatedly communicated his desire that his family not be called upon to furnish any testimony at trial, and ultimately decided not to testify at the guilt-innocence phase of trial), (2) the difficulties they experienced getting information from Petitioner relevant to the case, and (3) the steps they took to investigate Petitioner's alibi defense and gather potential mitigating evidence for possible use at the punishment phase of trial.[36]

---

    [36] During Petitioner's state habeas corpus proceeding, Petitioner's co-counsel at trial, attorney Harris, testified without contradiction in pertinent part that (1) while Petitioner's trial was his first as a defense counsel, he had handled twenty capital cases as a prosecutor, (2) his vouchers submitted to the state trial court did not reflect everything he did on Petitioner's case, (3) he reviewed the prosecution's file independently from attorney Callahan, (4) he was in contact with the defense attorney representing Petitioner's co-defendant Francisco Gonzales, (5) he reviewed the video recording of Debbie Espinosa's police interview, (6) Dr. Ferrell was retained to furnish mitigating evidence at the punishment phase of trial, (7) Petitioner's brother refused to cooperate with defense counsels' efforts to help Petitioner and Petitioner's mother would not respond to inquiries from the defense team, (8) after Petitioner invoked his right to self-representation Harris and Callahan remained in the courtroom and took notes but Petitioner never asked for their assistance at the punishment phase of trial, (9) Petitioner appeared to know

This Court has independently examined the evidence presented to the state habeas trial court and concludes Petitioner's assertions that his defense counsel "abandoned" Petitioner and failed to adequately communicate with Petitioner prior to trial were refuted by the uncontradicted testimony of Petitioner's trial counsel and the voluminous correspondence between Petitioner and lead defense counsel Callahan admitted into evidence during Petitioner's state habeas corpus proceeding. As the state trial court accurately noted, the correspondence between Petitioner and attorney Callahan amply demonstrates Petitioner was able to communicate effectively with his trial counsel and the defense team furnished Petitioner with relevant and material information Petitioner needed to make informed decisions on a wide range of matters, including whether Petitioner should testify at the guilt-

---

what he was doing during his period of self-representation, (10) Petitioner displayed a defeatist demeanor but did not appear to be suffering from an unsound mind or mental illness, (11) the defense team's trial preparations began long before trial, and (12) throughout trial, Petitioner wrote coherent, relevant notes and passed them to defense counsel. S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at pp. 42-152/123-232.

Attorney Callahan testified without contradiction during the same proceeding that (1) while Petitioner displayed a nihilistic, fatalistic, or negative attitude at times, he never perceived that Petitioner was clinically depressed or required medical or psychological treatment, (2) Petitioner's emotional state went up and down throughout the course of his representation of Petitioner, (3) he informed Petitioner of the testimony Dr. Ferrell could furnish and sent Petitioner a copy of Dr. Ferrell's report, (4) he did interview Petitioner's mother over the phone, (5) he had been involved with forty-to-fifty death penalty cases prior to Petitioner. ten of which went to trial, (6) his voucher did not reflect all his work on Petitioner's case, (7) he wrote Petitioner multiple times asking for information on Petitioner's alibi, (8) initially, Petitioner did not furnish a true alibi, (9) eventually, Callahan made contact with Petitioner's purported alibi witness (Carlos castillo) who refused to furnish an alibi for Petitioner on the night of the murder, (10) he searched unsuccessfully for a writing in which Francisco Gonzales identified himself as "Pancho Loco," (11) neither of the attorneys for Petitioner's co-defendants would permit Callahan to interview their clients prior to trial, (12) he explained to Petitioner that Carlos Castillo could be subject to impeachment based upon a recording the prosecution had of a phone conversation between Carlos Castillo and Debbie Espinosa shortly after her arrest, and (13) Petitioner indicated he did not wish to present any evidence at trial regarding his background. S.F. State Habeas Hearing, Volume 3 of 7, testimony of Vincent D. Callahan, at pp. 152-71/233-52; Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 21-130/274-383; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 12-122/399-508.

innocence phase of trial, the disadvantages of Petitioner representing himself, whether to seek admission of Petitioner's federal Pre-Sentence Investigative Report, and the availability of mitigating evidence through Dr. Ferrell's testimony and agreements Petitioner's trial counsel reached with the prosecution to admit Petitioner's educational records.  More significantly, Petitioner presented the state habeas court, and presents this Court, with no evidence showing a reasonable probability that, but for the alleged failure by Petitioner's trial counsel to more thoroughly communicate with Petitioner face-to-face, the outcome of either phase of Petitioner's capital murder trial would have been any different.  Petitioner identifies no evidence suggesting he was unable to communicate any identifiable information to his trial counsel or that said counsel failed to communicate any relevant, material, information to Petitioner prior to trial.  Brevity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984).  Therefore, this Court  independently concludes this complaint satisfies neither prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

D.    **Failure to Interview Prosecution Witnesses**

1.    **The Complaint**

In his second assertion of ineffective assistance, Petitioner argues his trial counsel should have interviewed unidentified prosecution witnesses prior to trial.[37]

2.    **State Court Disposition**

Petitioner presented the same conclusory complaint as part of his multi-faceted ineffective assistance claim in his state habeas corpus proceeding.[38]  During Petitioner's state habeas corpus proceeding, attorney Callahan and attorney Harris testified without contradiction that (1) counsel for Petitioner's co-defendants Francisco Gonzales and Debbie Espinosa refused to permit Petitioner's counsel to interview their clients prior to Petitioner's trial and (2) they did not interview any of the prosecution's expert or forensic witnesses prior to trial because none of those witnesses furnished any evidence which linked Petitioner to Garcia's murder.[39]  The state habeas trial court found, in

---

[37] Petition, at pp. 16-20.

[38] State Habeas Transcript, at pp. 54-57.

[39] More specifically, attorney Harris testified (1) he was in contact with counsel for Petitioner's co-defendant Francisco Gonzales, (2) he reviewed the video recording of Debbie Espinosa's police interview, (3) he did not interview any prosecution witnesses prior to trial, and (4)  he could not recall any testimony at trial which surprised him. S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, at pp. 87/168, 90-91/171-72, 132/213, 145-46/226-27.

Attorney Callahan testified in pertinent part that (1) he did not interview any prosecution witnesses prior to trial, (2) the witnesses for Petitioner's accomplice witnesses intervened and refused to permit Callahan to interview their clients, and (3) he did not interview any of the forensic witness presented by the prosecution prior to trial because none of their testimony linked Petitioner to the offense.  S.F. State Habeas Hearing, Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 38-40/291-93; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 39-40/425-26.

pertinent part, that (1) Petitioner failed to demonstrate how a more thorough pretrial investigation would have benefitted him (2) Petitioner's trial counsel were aware of the testimony prosecution witnesses would give at trial and were not surprised by any testimony of prosecution witnesses whom they did not interview, (3) there was no physical evidence or forensic testing which inculpated Petitioner in Garcia's murder, (4) Petitioner presented no testimony during the state habeas corpus proceeding from any prosecution witness, (5) Petitioner failed to show how any pretrial interview of any prosecution witness would have benefitted Petitioner, (6) Petitioner failed to establish any prosecution witness furnished false testimony at trial or that any of these witnesses could have furnished any exculpatory testimony at trial, and (7) the accomplice witnesses, through their counsel declined to be interviewed by Petitioner's trial counsel.[40]  The state habeas trial court concluded this complaint failed to satisfy either prong of *Strickland* analysis.[41]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

3.     **AEDPA Analysis**

The state trial court's factual findings, expressly adopted by the Texas Court of Criminal Appeals, were fully supported by the evidence presented during Petitioner's state habeas corpus proceeding.  This Court has independently reviewed the record from Petitioner's state habeas corpus proceeding and finds no evidence in the record before the state habeas court, or any fact-specific allegations currently before this Court, showing either (1) any identified prosecution witness would

---

[40] State Habeas Transcript, at pp. 735-38.

[41] *Id.*

27

have been willing to grant Petitioner's trial counsel a pretrial interview, (2) Petitioner's trial counsel possessed, or through the exercise of due diligence could have obtained, any information suggesting a pretrial interview of any identified prosecution witness (other than Francisco Gonzales or Debbie Espinosa) might produce potential impeachment, exculpatory, or mitigating evidence, or (3) a pretrial interview of any prosecution witness who was available for such a pretrial interview would have produced any impeachment, exculpatory, or mitigating evidence or led to the discovery of same. Petitioner's trial counsel may not reasonably be faulted for failing to interview prosecution witnesses Gonzales and Espinosa prior to trial. The state habeas court reasonably found both of these prosecution witnesses refused, through their own defense counsel, to submit to an interview by Petitioner's trial counsel. A prosecution witness who does not wish to be interviewed by defense counsel prior to trial may not be required to do so. *United States v. Soape*, 169 F.3d 257, 271 n.9 (5th Cir.), *cert. denied*, 527 U.S. 1011 (1999); *United States v. Caldwell*, 750 F.2d 341, 346-47 (5th Cir. 1984) (criminal defendant possessed no constitutional right to interview government witness outside presence of federal or state district attorney), *cert. denied*, 471 U.S. 1007 (1985); *United States v. Rice*, 550 F.2d 1364, 1374 (5th Cir.) ("All that a defendant is entitled to is access to a prospective witness. This right, however, exists co-equally with the witnesses' right to refuse to say anything."), *cert. denied*, 434 U.S. 954 (1977).

Petitioner has failed to allege any specific facts showing his trial counsel were aware, or should have been aware, of any information prior to trial suggesting a pretrial interview of any *available* prosecution witness might benefit the defense. Likewise, Petitioner has failed to allege any specific facts showing a pretrial interview of any *available* prosecution witness would have produced impeachment, exculpatory, or mitigating evidence or led to the discovery of same. Thus,

Petitioner has failed to allege any specific facts showing his trial counsels' failure to interview any available prosecution witness prior to trial either (1) caused the performance of Petitioner's trial counsel to fall below an objective level of reasonableness or (2) "prejudiced" Petitioner within the meaning of *Strickland*.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

E.      **"Last Second" Trial Preparation**

1.      **The Complaints**

Citing the vouchers filed with the state trial court by Petitioner's trial counsel and notes found in the files of Petitioner's trial counsel, Petitioner argues his trial counsel undertook no trial preparation until ten days before jury selection, failed to adequate prepare to cross-examine prosecution witnesses, gave a "bad" opening statement at the guilt-innocence phase of trial, and asked questions during cross-examination which re-enforced the prosecution's case.[42]

2.      **State Court Disposition**

Petitioner presented the same multifarious set of ineffective assistance complaints in his state habeas corpus application.[43]   During Petitioner's state habeas corpus hearing, Petitioner's trial

---

[42] Petition, at pp. 20-27.

[43] State Habeas Transcript, at pp. 58-65.

counsel testified (1) their billing vouchers did not include all of the work they did on Petitioner's behalf, (2) they both believed preparation of written cross-examination questions was less helpful than listening attentively to the direct testimony of prosecution witnesses, (3) they both did substantial trial preparation long before jury selection began in Petitioner's trial, as was reflected in attorney Callahan's correspondence with Petitioner, (4) during the defense's opening statement, attorney Harris denied Petitioner was involved in Garcia's murder, (5) they both reviewed the prosecution's files, (6) they did not recall bolstering any prosecution witness, and (7) lead counsel for Petitioner began mentally preparing to cross-examine prosecution witnesses as soon as he was appointed as Petitioner's counsel.[44]   The state habeas trial court found (1) Petitioner failed to present any credible evidence showing Petitioner was prejudiced by any of the behavior about which Petitioner complained in this portion of Petitioner's multi-faceted ineffective assistance claim, (2) Petitioner's trial counsel prepared for trial independently and collectively and consulted regularly regarding strategies leading up to trial, (3) the fee vouchers submitted by Petitioner's trial counsel did not contain all work performed on Petitioner's behalf, and (4) Petitioner's trial counsel were adequately prepared for trial.[45]   The state habeas trial court concluded this complaint failed to satisfy either prong of *Strickland* analysis.[46]   The Texas Court of Criminal Appeals adopted the state trial

---

[44] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at pp. 44/125, 59/140, 77/158, 79/160, 84/165, 94-97/176-78, 137/218; Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 59/312, 64/317, 93-94/346-47, 103-06/356-59; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 17-24/404-10.

[45] State Habeas Transcript, at pp. 739-40.

[46] *Id.*

court's findings and conclusions and denied relief. *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

      3.    **AEDPA Analysis**

      The state trial court's factual findings, expressly adopted by the Texas Court of Criminal Appeals, were fully supported by the evidence presented during Petitioner's state habeas corpus proceeding. This Court has independently reviewed the record from Petitioner's state habeas corpus proceeding and finds no evidence in the record before the state habeas court, or any fact-specific allegations currently before this Court, showing either (1) the methods of pretrial preparation employed by Petitioner's trial counsel fell below an objective level of reasonableness or (2) Petitioner was "prejudiced" within the meaning of *Strickland* by any alleged deficiency in the pretrial preparation of Petitioner's trial counsel. Petitioner has not alleged any facts, much less furnished any evidence, showing that better or different pretrial preparation by Petitioner's trial counsel would have resulted in the discovery or elicitation of any additional impeachment or exculpatory evidence during the guilt-innocence phase of Petitioner's capital murder trial. For instance, while Petitioner faults Petitioner's trial counsel for failing to write out lengthy cross-examination questions prior to trial, Petitioner does not allege any specific facts, much less furnish any evidence, showing what additional or different questions Petitioner's trial counsel could have utilized to elicit additional impeachment or exculpatory testimony from any identified prosecution witness. Petitioner also furnished the state habeas trial court with no evidence showing Petitioner's trial counsel undertook no trial preparation until the eve of Petitioner's trial. The extensive correspondence between Petitioner and his lead trial counsel belies any such contention.

Petitioner did not present any witnesses to the state habeas court other than his own trial counsel.  Petitioner did not re-call any prosecution witness and elicit any additional, potentially beneficial, testimony from any of those witnesses.  This Court has independently reviewed the entirety of the record from Petitioner's capital murder trial.  Contrary to Petitioner's contentions in his federal habeas corpus petition, Petitioner's trial counsel's opening statement at the guilt-innocence phase of trial was clear and purposeful in that it (1) reminded the jury the prosecution bore the burden of proof, (2) pointed to Gonzales and Espinosa, rather than Petitioner, as the actual perpetrators of Garcia's murder, and (3) informed the jury the defense would make its case through the cross-examination of prosecution witnesses whom the defense considered to be less than credible.[47]  This Court concludes there was nothing objectively unreasonable with this concise opening statement.  The decision whether to present an opening statement *at all* falls within the zone of trial strategy.  *Murray v. Maggio*, 736 F.2d at 283.

Likewise, contrary to the suggestions contained in this portion of Petitioner's federal habeas corpus petition, Petitioner's trial counsel did elicit admissions from prosecution witnesses which did legitimately raise questions about those witness's credibility.  Francisco Gonzales admitted during his cross-examination that (1) he entered into a plea bargain with the State during jury selection at his own capital murder trial, (2) he had a prior conviction for burglary of a vehicle and was subsequently sent to prison after he violated the terms of his probated sentence, (3) he fathered three children but had never paid any child support for any of his children, (4) he initially denied any knowledge of Garcia's murder when confronted by the police,  (5) he initially told police he did not

---

[47] S.F. Trial, Volume 15, at pp. 23-24.

have a gun on the night of Garcia's murder, (6) he informed police he had possession of a gun on the night of Garcia's murder only after he entered into his plea agreement, (7) Petitioner told him that Espinosa was a "ho," and (8) he, Petitioner, and Espinosa planned to split the proceeds from the robbery of Garcia.[48]  Prosecution witness Debbie Espinosa admitted during her cross-examination by Petitioner's defense counsel that (1) she lied to the nearby home owners and 911 operator the night of Garcia's murder, (2) she lied to Garcia's friend Robert Jimenez, her own sister and family, and her own mother regarding her role in Garcia's murder, (3) she lied to the police at the crime scene the night of the murder, (4) she did not mention Gonzales' broken handgun in any of her statements to police, (5) it was dark at the time of Garcia's shooting, (6) she was in shock immediately after Garcia's murder, and (7) she did not recall telling a police detective that Petitioner had on latex gloves.[49]  Petitioner does not allege any specific facts, much less identify any evidence currently in the record, showing that additional or different cross-examination of Gonzales, Espinosa, or any other identifiable prosecution witness would have produced any additional impeachment or exculpatory evidence during the guilt-innocence phase of Petitioner's capital murder trial.

The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

---

[48] S.F. Trial, Volume 16, testimony of Francisco Gonzales, at pp. 134-51, 155-56.

[49] S.F. Trial, Volume 17, testimony of Debra Espinosa, at pp. 70-81.

F.     **Punishment Phase Complaints**

1.     **The Complaints**

In his fourth through seventh complaints of ineffective assistance, Petitioner argues his trial counsel failed to (1) adequately develop mitigating evidence and prepare for the punishment phase of Petitioner's trial, (2) utilize court-appointed forensic psychologist Dr. Jack Ferrell at the punishment phase of trial to present mitigating evidence regarding Petitioner's background, (3) introduce documentary evidence (including school records) during the punishment phase of trial through stipulations with the prosecution, and (4) interview Petitioner's family members and introduce mitigating evidence through their testimony at the punishment phase of trial.[50]

2.     **State Court Disposition**

Petitioner included the same group of complaints in his state habeas corpus application.[51] Petitioner's trial counsel testified without contradiction during Petitioner's state habeas corpus proceeding, in pertinent part, that (1) after Petitioner exercised his right to self-representation at the start of the punishment phase of his trial, his former trial counsel remained in the courtroom, took notes, but Petitioner did not request any assistance from them, (2) Dr. Ferrell was present at trial and prepared to testify on Petitioner's behalf, (3) Petitioner made it clear he did not wish to have any of his family testify regarding Petitioner's background,[52] (4) Petitioner's brother refused to cooperate

---

[50] Petition, at pp. 27-43.

[51] State Habeas Transcript, at pp. 65-82.

[52] The state habeas trial court had before it several letters written by Petitioner to attorney Callahan expressing Petitioner's desire to avoid the introduction of evidence at trial about his upbringing because he did not wish to make his mother look bad, including State Exhibit no. 48A, found at S.F. State Habeas Hearing, Volume 6 of 7, at pp. 645-46.  Nonetheless, attorney

with Petitioner's defense team's efforts to help Petitioner and Petitioner's mother would not respond to inquiries from Petitioner's defense team, (5) both Harris and Callahan were prepared prior to Petitioner's assertion of his right to self-representation to present mitigating evidence on Petitioner's behalf at the punishment phase of trial, (6) Callahan reached agreements with prosecutors to admit via stipulation at the punishment phase of trial Petitioner's school records and a portion of Petitioner's federal Pre-Sentence Investigative Report, (7) Petitioner's federal PSIR showed Petitioner had a troubled upbringing, (8) Callahan interviewed Petitioner's mother during a telephone conversation, (9) Callahan sent Petitioner a copy of Dr. Ferrell's report and wrote Petitioner several times to explain the contents of the report and the testimony Dr. Ferrell was prepared to give at trial, (10) Dr. Ferrell was prepared to testify on the issue of future dangerousness, (11) Callahan also informed Petitioner regarding the stipulations he has negotiated with prosecutors regarding the admission of Petitioner's records,[53] (12) Petitioner's exercise of his right to self-representation

---

Callahan continued to urge the need for testimony from Petitioner's family members. *See, e.g.,* State Exhibit nos. 67, found at S.F. State Habeas Hearing, Volume 6 of 7, at p. 689.

[53] The state habeas trial court also had before it State Exhibit nos. 45, 46, and 47A, which appear in S.F. State Habeas hearing, Volume 6 of 7, at pp. 632-33, 635, and 639-40. State Exhibit nos. 45 and 46 are a pair of letters from Callahan to Petitioner dated January 31 and February 11, 2005. In those two letters, Callahan explained he had reached an agreement with the prosecution to permit the admission by stipulation of documentary evidence which included Petitioner's federal PSIR but, after talking with Petitioner's federal defense counsel, Callahan was concerned about admitting Petitioner's federal PSIR because the PSIR reflected statements attributed to Petitioner in which Petitioner allegedly admitted to a law enforcement officer that he (Petitioner) robbed drug dealers. Petitioner responded in a letter dated February 14, 2005 (State Exhibit no. 47A), in which Petitioner denied making the statement about robbing drug dealers for a living but acknowledged his federal PSIR contained potentially harmful information in the form of statements regarding Petitioner's assaults upon Jessica Ramirez, the mother of one of Petitioner's sons. Petitioner did not introduce his federal PSIR into evidence during the state habeas corpus hearing or present any testimony from any witness concerning the contents of same. Thus, for purposes of this federal habeas corpus proceeding, this Court must take the uncontradicted information contained in the correspondence between Petitioner and attorney

prevented Petitioner's trial counsel from introducing Dr. Ferrell's testimony as well as introducing the mitigating documentary evidence which the prosecution had previously agreed to admit via stipulation, and (13) Petitioner wrote Callahan multiple times in response to letters from Callahan addressing the need for testimony from Petitioner's family and Petitioner stated he did not wish his family to testify at trial or for his trial counsel to present evidence about his background.[54]

The state habeas trial court found (1) Callahan believed it was important to present mitigating evidence through Petitioner's family members showing Petitioner's father abandoned Petitioner when Petitioner was a child, (2) Petitioner denied his father abandoned him and instructed Callahan not to present the testimony of Petitioner's family members, (3) nonetheless, Callahan attempted to contact Petitioner's family members, with little success, (4) Callahan contacted Dr. Ferrell, who was prepared to testify at trial regarding mitigating information he had learned concerning Petitioner's personal background, and (5) Petitioner presented no potentially mitigating evidence during the state habeas proceeding which might have been proffered at Petitioner's trial.[55]   The state habeas trial

---

Callahan at face value and assume Petitioner's federal PSIR contained both mitigating and aggravating evidence.

[54] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John Williams Harris, Jr., at pp. 50/131, 104-05/185-86, 121-22/202-03, 123/204, 126-27/207-08, 141/222; Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 32-37/285-90; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 37-38/423-24, 40-41/426-27, 48-52/434-38, 57-60/443-46, 63/449, 65/451, 68-69/454-55, 75/461, 80-81/466-67.
     More specifically, attorney Callahan testified without contradiction during Petitioner's state habeas corpus proceeding that (1) he repeatedly explained to Petitioner the need for testimony from Petitioner's family at the punishment phase of trial about Petitioner's background, (2) Petitioner wrote Callahan in February and March, 2005 and again in July, 2005 repeatedly insisting he did not wish his mother to testify, and (3) these communications were memorialized in State Exhibit nos. 48, 49, 51, 65, 67, and 68.  S.F. State Habeas Hearing, Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 68-69/454-55, 75/462, 80-81/466-67.

[55] State Habeas Transcript, at pp. 742-44.

court concluded this group of complaints did not satisfy either prong of *Strickland* analysis.[56]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

### 3.    **AEDPA Analysis**

The state habeas court's factual findings were fully supported by the uncontradicted testimony of Petitioner's trial counsel.  Petitioner failed to present the state habeas court with any documentary evidence reflecting additional mitigating evidence which could have been proffered at the punishment phase of Petitioner's trial or any testimony from Dr. Ferrell, any member of Petitioner's family, or any other witness with personal knowledge of Petitioner's background or any mitigating information regarding the Petitioner's character or the circumstances of Petitioner's offense.  Thus, Petitioner failed to satisfy the prejudice prong of *Strickland* analysis.  *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994) (holding, absent a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance).

Petitioner argues in his federal habeas corpus petition, without citation to any evidence properly before the state habeas court, that there was mitigating evidence available at the time of

---

[56] *Id.*, at p. 744.

Petitioner's capital murder trial which showed (1) Petitioner was raised by a single mother and had an unstable childhood with multiple moves, (2) while in school, Petitioner had social problems as a child, including fights and disputes that produced school counseling, and (3) Petitioner dropped out of school in the seventh grade and never earned a GED.[57]  In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the Petitioner's trial counsel chosen a different course).  *Wong v. Belmontes*, 558 U.S. at 20; *Wiggins v. Smith*, 539 U.S. at 534.

This Court independently concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to present unspecified mitigating evidence showing Petitioner had an unstable childhood, social problems at school, and failed to progress past the seventh grade the outcome of the punishment phase of Petitioner's capital murder trial would have been any different. The jury convicted Petitioner of capital murder at the guilt-innocence phase of trial after hearing testimony showing Petitioner fatally shot an unarmed Tommy Garcia, Jr. multiple times after demanding money from Garcia.  At the punishment phase of trial the prosecution presented uncontradicted testimony showing Petitioner (1) had never worked a legitimate job in his life, (2) robbed bar patrons with Francisco Garcia, (3) shot at a moving vehicle in an unprovoked assault and was convicted of aggravated assault,  (4) used his wife to acquire weapons and bullet proof vests while Petitioner was on parole and thereby violated the conditions of his parole, (5) together with Debra Espinosa planned several other robberies before the  robbery of Tommy Garcia, Jr., (6) shot a drug dealer in the face during a home invasion, (7) usually carried a firearm, (8) physically abused,

---

[57] Petition, at p. 31.

assaulted with a firearm, and kidnaped the mother of his second son, (9) violated the terms of his probation by taking the mother of his second son and their child to California and remaining there beyond the term Petitioner had been authorized to go there, (10) pointed a loaded firearm at the pregnant sister of his second son's mother, and (11) involved his wife in an attempt to pass a forged check.[58]

Moreover, the additional, potentially mitigating, evidence to which Petitioner vaguely alludes in his state and federal habeas pleading (but which Petitioner failed to present to the state habeas court) was double-edged in nature.  Any sympathy Petitioner might have hoped to engender in his jury by introducing testimony from family members, school records, or other evidence establishing Petitioner's "unstable" childhood, social problems as a child, and lack of education would have aided the prosecution in securing an affirmative answer to the future dangerousness special issue, as such evidence would have tended to show Petitioner had a long history of violence and difficulty conforming his behavior to social norms.  Petitioner did not present the state habeas court with any evidence showing he suffered from the types of severe intellectual deficiency and extreme abuse

---

[58] *See* notes 13-21, *supra*, and accompanying text.

present in *Williams v. Taylor*[59] or the extreme neglect present in *Wiggins v. Smith*.[60]  In stark contrast, Petitioner's trial counsel described Petitioner as intelligent and very communicative - testimony fully supported by this Court's independent review of the correspondence between Petitioner and lead defense counsel.  Petitioner presented the state habeas court with absolutely no evidence showing he ever suffered any abuse or neglect which approached the severity of the abuse or neglect identified present in *Williams* or *Wiggins*.

Given the offense, Petitioner's lengthy history of violent criminal behavior, the total absence of any evidence in the trial record or the record before the state habeas court showing Petitioner has ever expressed sincere contrition or genuine remorse for his murder of Garcia, and the double-edged nature of the additional mitigating evidence Petitioner argues should have been presented at his trial, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to present any of the comparatively weak, additional, mitigating evidence described by Petitioner in his pleadings herein, the jury's answers to the Texas capital sentencing special issues at the punishment phase of Petitioner's capital murder trial would have been different.

---

[59] In *Williams*, the defendant's trial counsel failed to present available mitigating evidence showing the defendant was borderline mentally retarded, did not advance beyond the six grade in school, had helped crack a prison drug ring, returned a prison guard's missing wallet, and had been described by prison officials as "least likely to act in a violent, dangerous or provocative way."  *Williams v. Taylor*, 529 U.S. at 396.  Williams' trial counsel also failed to present the capital sentencing jury with evidence showing the horrific, unsanitary, neglected conditions in which Williams had grown up, i.e., evidence showing Williams' alcoholic parents were unable to feed or clothe their children and the children in the household had to be hospitalized for their own alcohol abuse.  *Williams v. Taylor*, 529 U.S. at 396 n.19.

[60]  In *Wiggins*, there was evidence undiscovered by petitioner's trial counsel which showed: "Petitioner's mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food."  *Wiggins v. Smith*, 539 U.S. at 525.

More significantly, Petitioner's trial counsel cannot reasonably be faulted for failing to present any of the mitigating evidence available at the time of Petitioner's capital murder trial. Petitioner foreclosed the efforts of Petitioner's to present mitigating evidence on Petitioner's behalf when Petitioner exercised his constitutional right under *Faretta v. California*, 422 U.S. 806 (1975), to undertake self-representation during the punishment phase of his capital murder trial. "[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta v. California*, 422 U.S. at 834 n.46. Petitioner's complaints about the "performance" of his trial counsel in connection with the punishment phase of Petitioner's capital trial are, thus, non sequitur. *See Nixon v. Epps*, 405 F.3d 318, 325-26 (5th Cir. 2005) ("A defendant cannot block his counsel from attempting one line of defense at trial, and then on appeal assert that counsel was ineffective for failing to introduce evidence supporting that defense."), *cert. denied*, 546 U.S. 1016 (2006); *Roberts v. Dretke*, 356 F.3d 632, 638 (5th Cir. 2004) ("[W]hen a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel."), *cert, denied*, 544 U.S. 963 (2005).

Finally, Petitioner presented the state habeas court with no evidence showing his trial counsel's investigation into Petitioner's background failed to uncover any of the potentially mitigating evidence Petitioner now argues should have been presented during the punishment phase of Petitioner's capital murder trial. On the contrary, the correspondence between Petitioner and his lead defense counsel and the uncontradicted testimony of Petitioner's trial counsel during Petitioner's state habeas corpus proceeding establish (1) Petitioner's trial counsel were well aware

Petitioner had grown up in an unstable family environment and (2) they were ready, willing, and able to present mitigating testimony through Dr. Ferrell and mitigating documentary evidence in the form of school records showing Petitioner's difficult childhood.  Thus, Petitioner failed to present the state habeas court with any evidence establishing there was anything professionally deficient or objectively unreasonable with regard to the scope of Petitioner's trial counsels' investigation into Petitioner's background.

The state habeas trial court reasonably concluded Petitioner's complaints about the performance of his trial counsel at the punishment phase of trial failed to satisfy either prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

G.     **Filing a Frivolous Motion and Failing to File Needed Motions**

1.     **The Complaints**

In his eighth assertion of ineffective assistance, Petitioner argues his trial counsel (1) filed a frivolous motion seeking to exclude the guilt-innocence phase trial testimony of Petitioner's accomplices Gonzales and Espinosa, (2) should have filed a motion seeking notice of the

prosecution's plans to present evidence of Petitioner's convictions and uncharged misconduct, and (3) should have filed a motion requesting *Brady* information.[61]

### 2.   **State Court Disposition**

Petitioner presented the same arguments in his state habeas corpus application.[62]  Petitioner's trial counsel testified without contradiction during Petitioner's state habeas corpus proceeding that (1) they filed a pretrial motion seeking to exclude the testimony of Petitioner's accomplices and obtained a hearing on same, (2) the defense team filed a motion requesting judicial sentencing which was premised upon their request for a jury instruction on a lesser-included offense, (3) attorney Callahan requested Rule 404(b) information from the prosecution and received same without filing a written motion, which does not need to be in writing under applicable Texas law,[63] (4) Callahan furnished the Rule 404(b) information to Dr. Ferrell to help Dr. Ferrell prepare to testify regarding Petitioner's future dangerousness, and (5) after Callahan and Harris argued their motion to exclude the testimony of Gonzales and Espinosa, Petitioner wrote Callahan to express thanks for the unsuccessful effort.[64]  The state habeas trial court found and concluded (1) under Texas law, requests

---

[61] Petition, at pp. 43-47.

[62] State Habeas Transcript, at pp. 82-86.

[63] Rule 404(b) of the Texas Rules of Evidence provides evidence of other crimes, wrongs, or acts, while not admissible to prove the character of the person in order to show action in conformity therewith, may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident *provided, upon timely request by the accused in a criminal case,* reasonable notice is given to the accused of the intent to introduce such evidence during the State's case-in-chief.

[64] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at p. 118/199; Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 76/329, 91-92/344-45; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 41-42/427-28, 57-58/443-44, 78-79/46465.

for Rule 404(b) information need not be in writing and an oral request is sufficient,[65] (2) Callahan made an oral request and was provided responsive information by the State, (3) Petitioner failed to show any deficient performance or prejudice resulting from the use of the oral motion, as opposed to a written pleading, (4) Petitioner showed no prejudice arising from the filing of the allegedly frivolous motion to exclude the testimony of Petitioner's accomplices, and (5) Petitioner failed to question Petitioner's trial counsel regarding their failure to file a formal written motion requesting *Brady* information.[66]   The state habeas trial court concluded these complaints did not satisfy the prejudice prong of *Strickland*.[67]   The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.   *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

3.      **AEDPA Analysis**

The state habeas trial court's findings and conclusions regarding these complaints of ineffective assistance were fully supported by the evidence presented to that court.   Petitioner failed to allege any specific facts, much less present any evidence, before the state habeas court showing Petitioner was prejudiced within the meaning of *Strickland* by his trial counsel either (1) failing to

---

[65] The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions, including this one.   A state court's interpretation of state law binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1050, 178 L. Ed. 2d 870 (2011).

[66] State Habeas Transcript, at p. 747.

[67] *Id.*

44

file a written motion requesting Rule 404(b) information or (2) filing an unsuccessful motion seeking to exclude the testimony of Petitioner's accomplices.

This Court independently concludes there is no factual allegation, much less any evidence, currently before this Court showing the failure of Petitioner's trial counsel to file a written motion requesting the prosecution's disclosure of beneficial information pursuant to defense counsel either (1) caused the performance of Petitioner's trial counsel to fall below an objective level of reasonableness or (2) "prejudiced" Petitioner within the meaning of *Strickland*.  Few constitutional principles are more firmly established by Supreme Court precedent than the rule that 'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment, i.e., the rule announced in *Brady v. Maryland*, applies even when there has been no request by the accused.  *Banks v. Dretke*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976).  Thus, the prosecution was required by the rule in *Brady* and its progeny to disclose beneficial information to Petitioner's trial counsel *regardless of whether a formal request for same was ever filed*.  It was constitutionally unnecessary for Petitioner's trial counsel to formally move for disclosure of *Brady* material.  Their failure to do so did not cause their performance to fall below an objective level of reasonableness.  Nor has Petitioner alleged any specific facts, much less furnished any evidence, showing that, but for the failure of Petitioner's trial counsel to formally move for disclosure of *Brady*

information, the outcome of either phase of Petitioner's capital murder trial would have been any different.

The state habeas trial court reasonably concluded Petitioner's complaints about the filing of Petitioner's unsuccessful motion to exclude the testimony of Petitioner's accomplices and the failure of Petitioner's trial counsel to file written motions requesting disclosure of Rule 404(b) and *Brady* information did not prejudice Petitioner within the meaning of *Strickland*.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

H.      **"Lacking Knowledge and Skills in Capital Cases"**

1.      **The Complaints**

In his ninth assertion of ineffective assistance, Petitioner argues his trial counsel rendered ineffective assistance by (1) asking unspecified questions of prosecution witnesses which bolstered their credibility, (2) failing to "control" in an unspecified manner the testimony of the lead homicide detective and failing to properly object to unspecified testimony, (3) making a closing argument which was inconsistent with the defense's opening jury argument and conceded Petitioner's guilt, and (4) filing a frivolous motion (presumably the same motion to exclude the testimony of

Petitioner's accomplice witnesses discussed above) and failing to make requests for information from the prosecution.[68]

## 2.    State Court Disposition

Petitioner asserted or re-asserted these same arguments in his state habeas corpus application.[69]   Petitioner's state habeas counsel examined both of Petitioner's trial counsel quite extensively during Petitioner's state habeas corpus proceeding.   Petitioner's trial counsel testified without contradiction that (1) the defense's opening jury argument included assertions that Petitioner

---

[68] Petition, at pp. 48-49.

[69] State Habeas Transcript, at pp. 87-90.   Unlike in his federal habeas corpus petition, Petitioner's state habeas corpus application included references to previous pages in his pleading in which he furnished factual support for his otherwise conclusory assertions of ineffective assistance.   This Court had examined Petitioner's state habeas corpus application and will construe Petitioner's federal habeas corpus petition in light of the factual arguments Petitioner made in support of these same claims in the state habeas court.

In his state habeas corpus application, Petitioner identified several areas of cross-examination in which he criticized the performance of his trial counsel.   Specifically, Petitioner complained his trial counsel (1) asked prosecution witness Frank Russell about the credibility of prosecution witness Debra Espinosa (to which Russell replied he did not know Espinosa well enough to express an opinion on her credibility), (2) accused Russell of smoking marijuana on the night of Garcia's murder (an accusation Russell denied), (3) asked prosecution witness Robert Jimenez about Russell's credibility (to which Jimenez responded that he believed Russell to be truthful), (4) asked prosecution witness Debra Espinosa about the credibility of prosecution witnesses Francisco Gonzales, Lucinda Gonzales, Teresa Quintero, and Bryan Brown (Petitioner alleged Espinosa testified Francisco Gonzales, Lucinda Gonzales, and Quintero were truthful and Espinosa did not know Brown's reputation for truthfulness), (5) failed to cross-examine prosecution witness Debra Espinosa regarding her direct testimony that she was suffering from the effects of drug use and sleep deprivation on the night of Garcia's murder, (6) asked prosecution witness Timm Angell whether Debra Espinosa had been untruthful throughout her dealings with police (to which Petitioner alleged Angell responded that Espinosa had been truthful at the end of her multiple interviews), (6) asked Angell whether police ever obtained any information which led them to investigate other suspects in Garcia's murder, and (7) asked prosecution witness Danny Higginbotham whether Espinosa had any blood on her (which Higginbotham answered negatively).   State Habeas Transcript, at pp. 93-97.

was not involved in the offense, (2) they did not recall asking any questions on cross-examination which bolstered the credibility of prosecution witnesses, (3) the defense's closing argument offered Petitioner's jury alternate theories beneficial to Petitioner, i.e., the lack of credibility of key prosecution witnesses required a not guilty verdict as to capital murder and, alternatively, if Petitioner were guilty of an offense, it was only the lesser-included offense of murder which was committed in the heat of passion, and (4) Callahan's trial strategy during the cross-examination of prosecution witness Debra Espinosa was to deliberately misstate her testimony on direct examination in an attempt to confuse her.[70]  The state habeas trial court found and concluded (1) Petitioner's trial counsel had some success questioning prosecution witnesses about the credibility of other prosecution witnesses in that Frank Russell admitted he did not trust Debra Espinosa, (2) Petitioner's state habeas counsel questioned Petitioner's trial counsel about their cross-examination of only one prosecution witness - Debra Espinosa, (3) Callahan testified he attempted to confuse Espinosa on cross-examination by deliberately misstating her direct testimony or making other mistakes in his questions, (4) Callahan's strategy was unsuccessful but fell within the broad range of objectively reasonable professional performance, (5) Petitioner's complaints about the manner in which his trial counsel cross-examined prosecution witnesses did not overcome the presumption of reasonableness afforded strategic decisions by defense counsel, (6) Petitioner's trial counsel did not concede Petitioner committed capital murder during closing jury argument but, rather argued in the alternative that Petitioner was guilty, at most of only ordinary murder, not capital murder, and (7) the trial strategy underlying Petitioner's alternative closing jury argument at the guilt-innocence

---

[70] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John Williams Harris,, Jr., at pp. 50/140,  92/173, 137/218; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 76-77/462-63, 90/476.

phase of trial was objectively reasonable.[71]   The state habeas trial court concluded this group of

complaints did not satisfy either prong of *Strickland* analysis.[72]   The Texas Court of Criminal

Appeals adopted the state trial court's findings and conclusions and denied relief.   *Ex parte Juan*

*Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

      3.      **AEDPA Analysis**

During Petitioner's state habeas corpus proceeding, Petitioner did not call or examine any

of the prosecution witness from his trial whom he argued his trial counsel should have cross-

examined differently.   Petitioner offered the state habeas court no evidence showing that any

additional exculpatory, impeachment, or mitigating evidence would have been elicited had his trial

counsel cross-examined any prosecution witness at trial in a different manner.   Petitioner did not

even question his trial counsel during Petitioner's state habeas corpus proceeding regarding the

rationale behind or strategy underlying his trial counsel's cross-examination of any prosecution

witness, other than Debra Espinosa.   Under such circumstances, the state habeas court reasonably

concluded Petitioner's complaints about the manner in which his trial counsel cross-examined the

prosecution witnesses identified in Petitioner's state habeas corpus application failed to satisfy the

prejudice prong of *Strickland*.   *See Anderson v. Collins*, 18 F.3d at 1221 (ineffective assistance

complaints about trial counsel's failure to present evidence at trial must be supported by a showing

of exactly what the additional evidence would have been).

---

[71] State Habeas Transcript, at pp. 749-52.

[72] *Id.*, at pp. 751-52.

As explained above, Petitioner's trial counsel did elicit admissions from Espinosa on cross-examination that (1) she did not know Francisco Gonzales, Lucinda Gonzales, or Teresa Quintero and merely assumed they were truthful, (2) she did not know Bryan Brown at all, (3) she lied to many people, including her own family and the police, regarding her involvement in Garcia's murder, (4) she did not mention that Francisco Gonzales' gun was broken in any of her statements to police, (5) she was on crank and had not slept in days at the time of Garcia's murder, (6) she was in shock immediately after Garcia's murder, and (7) she did not believe she told detective Angell the Petitioner was wearing latex gloves at the time of Garcia's murder.[73]  Petitioner did not present any testimony or other evidence to the state habeas court suggesting a different manner or type of cross-examination of Debra Espinosa at the guilt-innocence phase of Petitioner's trial would have produced any additional testimony or admissions helpful to Petitioner.  Petitioner also failed to present the state habeas court with any evidence showing a different cross-examination of any other prosecution witness at the guilt-innocence phase of Petitioner's capital murder trial would have produced any additional exculpatory or impeachment evidence.  Petitioner's conclusory assertion in his federal habeas corpus petition that a "prepared cross-examination [of prosecution witnesses] would have won the day"[74] is wholly conclusory and unsupported by any evidence presented to the state habeas court.  *See Woodfox v. Cain*, 609 F.3d 774, 809 n.17 (5th Cir. 2010) (conclusory arguments are insufficient to support a claim of ineffective assistance of counsel for failing to present evidence); *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir.) (conclusory statements regarding the

---

[73] S.F. Trial, Volume 17, testimony of Debra Espinosa, at pp. 70-81.

[74] Petition, at p. 57.

content of uncalled witnesses' testimony are insufficient to demonstrate ineffective assistance), *cert. denied*, ___ U.S. ___, 131 S. Ct. 265, 178 L. Ed. 2d 1975 (2010).

Petitioner's conclusory complaints that his trial counsel failed to "control" in an unspecified manner the testimony of the lead homicide detective (presumably Timm Angell) and failed to properly object on unidentified grounds to unspecified testimony (presumably of this same witness) were not supported by any evidence presented during Petitioner's state habeas corpus proceeding. During cross-examination at the guilt-innocence phase of Petitioner's trial, Petitioner's trial counsel elicited testimony from Detective Angell that (1) Lucinda Gonzales' car (i.e., the vehicle driven by Teresa Quintero to the general location of Garcia's murder on the night of Garcia's murder with Petitioner and Francisco Gonzales as her passengers) disappeared from December, 2003 until April, 2005, (2) Francisco Gonzales was never completely truthful with police regarding Garcia's murder, (3) Espinosa was truthful regarding her role in Garcia's murder only toward the end of her multiple interviews, (4) Gonzales never told police that his gun was unloaded on the night of Garcia's murder, and (5) Espinosa told police she picked Garcia as the group's victim because she knew Garcia carried a lot of cash.[75]  Petitioner neither called Detective Angell to testify during Petitioner's state habeas corpus proceeding nor presented any other evidence showing either (1) any different form of cross-examination of Detective Angell during the guilt-innocence phase of Petitioner's capital trial would have produced any additional exculpatory or impeachment evidence or (2) any identified objection to any identified testimony by Detective Angell on direct examination would have resulted in the exclusion of any inculpatory testimony given by this witness.

---

[75] S.F. Trial, Volume 18, testimony of Timm Angell, at pp. 99-106.

As explained above, Attorney Harris' opening jury argument at the guilt-innocence phase of Petitioner's capital murder trial (1) reminded the jury the prosecution bore the burden of proof, (2) pointed to Gonzales and Espinosa, rather than Petitioner, as the actual perpetrators of Garcia's murder, and (3) informed the jury the defense would make its case through the cross-examination of prosecution witnesses whom the defense considered to be less than credible.[76]  Attorney Harris and Callahan's closing arguments for the defense at the guilt-innocence phase of Petitioner's trial (1) argued the Petitioner's accomplice witnesses (Francisco Gonzales and Debra Espinosa) gave testimony at trial which was inconsistent with each other's accounts of Garcia's fatal shooting and inconsistent with the physical evidence and, therefore, not credible, (2) discussed the accomplice witness rule as set forth in the trial court's jury instructions, (3) argued the accomplice witnesses' testimony was not sufficiently corroborated to be considered credible, (4) argued the prosecution had failed to carry its burden of proving Petitioner's guilt beyond a reasonable doubt, (5) argued the physical evidence did not link Petitioner to the crime scene, (6) attacked the credibility of other prosecution witnesses, (7) suggested that, even if the jury believed the testimony of Francisco Gonzales and Debra Espinosa, their testimony did not rule out the very reasonable inference that Petitioner shot Garcia *not* as part of a planned robbery but, rather, in an act of rage after witnessing Espinosa (Petitioner's lover) engaged in oral sex with Garcia, (8) argued Francisco Gonzales admitted to others in jail that he killed Garcia, and (9) argued the large amount of cash found on Garcia's body by medical examiner's personnel refuted the prosecution's contention that Garcia's murder occurred in the course of a robbery.[77]  Contrary to Petitioner's assertion in his federal habeas

---

[76] S.F. Trial, Volume 15, at pp. 23-24.

[77] S.F. Trial, Volume 20, at pp. 58-77.

corpus petition, at no point during closing argument at the guilt-innocence phase of Petitioner's capital murder trial did Petitioner's trial counsel concede Petitioner's guilt for the offense of capital murder.   There was also nothing logically inconsistent between the arguments Petitioner's trial counsel presented during their opening and closing jury arguments at the guilt-innocence phase of Petitioner's capital murder trial.

Petitioner presented the state habeas court with no evidence or fact-specific allegations showing a reasonable probability that, but for opening or closing arguments made by Petitioner's defense counsel at the guilt-innocence phase of Petitioner's capital murder trial, the outcome of that phase of trial would have been any different.   At the close of the guilt-innocence phase of Petitioner's capital murder trial, the state trial court instructed the jury that the statements and arguments made by counsel during trial or during jury argument, if not supported by evidence, "are to be wholly disregarded."[78]   Juries are presumed to follow their instructions.   *Zafiro v. United States*, 506 U.S. 534, 541 (1993).

Insofar as Petitioner re-urges his complaint about the filing of Petitioner's pretrial motion seeking to exclude the trial testimony of accomplice witnesses Francisco Gonzales and Debra Espinosa, for the reasons set forth in Section III.G.3. above, this complaint does not satisfy the prejudice prong of *Strickland* analysis.

The state habeas trial court reasonably concluded this group of Petitioner's conclusory complaints did not satisfy either prong of *Strickland* analysis.   The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the

---

[78] S.F. Trial, Volume 20, at p. 36.

course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States, nor (2) based on an unreasonable determination of the facts in light of the

evidence presented in the Petitioner's state habeas corpus proceeding.

I.      **Opening Jury Argument**

   1.      **The Complaints**

In his tenth assertion of ineffective assistance, Petitioner argues during opening jury argument

at the guilt-innocence phase of trial his trial counsel (1) should have pointed out that (a) DNA test

results on the ski mark were inconclusive, (b) no murder weapon was recovered, (c) Gonzales and

Espinosa were both arrested near the crime scene, (d) after their arrest both Gonzales and Espinosa

gave inconsistent statements to police, and (e) Gonzales and Espinosa were "filthy with guilt," and

(2) failed to attack the credibility of prosecution witnesses.[79]

   2.      **State Court Disposition**

Petitioner made the same arguments in his state habeas corpus application.[80] The state habeas

trial court found (1) the defense's opening jury argument included arguments that the evidence

would not show Petitioner guilty of capital murder and (2) there was nothing inconsistent between

the arguments contained in Petitioner's opening and closing jury arguments at the guilt-innocence

phase of trial.[81]  The state habeas trial court concluded Petitioner's complaints about his trial

---

[79] Petition, at pp. 49-52.

[80] State Habeas Transcript, at pp. 90-92.

[81] State Habeas Transcript, at p. 748.

counsel's opening jury argument satisfied neither prong of *Strickland* analysis.[82]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

3.  **AEDPA Analysis**

Attorney Harris' opening jury argument at the guilt-innocence phase of Petitioner's capital murder trial (1) reminded the jury the prosecution bore the burden of proof, (2) pointed to Gonzales and Espinosa, rather than Petitioner, as the actual perpetrators of Garcia's murder, and (3) informed the jury the defense would cross-examine prosecution witnesses who were less than credible.[83]  Thus, Petitioner's contention his trial counsel failed to attack the credibility of prosecution witnesses during opening jury argument is factually inaccurate.

The state habeas court reasonably concluded there was nothing objectively unreasonable with the opening jury argument made by Petitioner's trial counsel at the guilt-innocence phase of trial. This Court independently concludes the strategic decision by Petitioner's trial counsel to focus during opening jury argument on the ultimate credibility issues in the case, rather than to get bogged down in the details of physical and forensic evidence and other testimony yet to be presented to the jury, did not cause the performance of Petitioner's trial counsel to fall below an objective level of reasonableness.  Petitioner's jury was made aware through extensive testimony, including some elicited through cross-examination of prosecution witnesses, that (1) there was no physical or

---

[82] *Id.*, at p. 749.

[83] S.F. Trial, Volume 15, at pp. 23-24.

forensic evidence linking Petitioner to Garcia's murder,[84] (2) both Francisco Gonzales and Debra Espinosa were arrested in close proximity to the crime scene,[85] (3) no murder weapon was ever recovered,[86] (4) Gonzales and Espinosa gave inconsistent, openly conflicting, statements to police about their respective involvement in Garcia's murder,[87] and (5) both Gonzales and Espinosa later confessed they planned to rob Garcia.[88]  The failure of Petitioner's trial counsel to make these same arguments during opening jury argument did not cause the performance of Petitioner's trial counsel to fall below an objective level of reasonableness and did not "prejudice" Petitioner within the meaning of *Strickland*.

Petitioner did not examine Petitioner's trial counsel during Petitioner's state habeas corpus proceeding regarding the rationale or strategy underlying the defense's opening jury argument.  Nor did Petitioner present the state habeas court with any evidence establishing a reasonable probability that, but for the failure of Petitioner's trial counsel to argue during opening jury argument the

---

[84] S.F. Trial, Volume 18, testimony of Lonnie Ginsburg, at pp. 129-40, 145 (regarding the lack of physical or forensic evidence linking Petitioner to the crime scene).

[85] S.F. Trial, Volume 15, testimony of Danny Higginbotham, at pp. 203-05 (Gonzales spotted at Moursund and Gillette not far from crime scene shortly after the shooting); testimony of Julian Garza, at pp. 212-15 (Gonzales arrested after a brief chase not far from crime scene); testimony of Danny Higginbotham, at pp. 205-06 (Espinosa located at 526 E. Villaret near the crime scene shortly after the fatal shooting); testimony of Luis Tijerina, at pp. 231-33 (gun shot residue tests conducted on Gonzales after his arrest a few blocks from crime scene).

[86] S.F. Trial, Volume 18, testimony of Edward Williams Love, Jr., at p. 122 (on cross-examination - testimony that no handgun was ever tested against the bullets removed from Garcia's body); Volume 18, testimony of Timm Angell, at p. 80 (search for murder weapon unsuccessful).

[87] S.F. Trial, Volume 16, testimony of Francisco Gonzales, at pp. 138, 140-41, 147, 149; Volume 18, testimony of Debra Espinosa, at pp. 72, 75, 78, 81.

[88] S.F. Trial, Volume 18, testimony of Timm Angell, at pp. 75, 78-79.

absence of physical and forensic evidence linking Petitioner to Garcia's murder, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different.

For the foregoing reasons, as well as those set forth in Section III.H.3. above, the state habeas court reasonably concluded Petitioner's complaints about his trial counsel's opening jury argument at the guilt-innocence phase of trial fail to satisfy either prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

**J.      Failing to Investigate and Bolstering the Prosecution's Case**

**1.      The Complaints**

In his eleventh assertion of ineffective assistance, Petitioner complains his trial counsel (1) failed to interview any prosecution witnesses prior to trial, (2) asked prosecution witness Russell about the credibility of Espinosa, (3) accused Russell and Garcia of smoking marijuana on the night of Garcia's murder, (4) asked prosecution witness Jimenez about Russell's credibility, (5) asked prosecution witness Espinosa about the credibility of several other prosecution witnesses, (6) failed to question Espinosa about her testimony on direct examination that she had not slept in six days prior to Garcia's murder, or to explore the subject of sleep deprivation with the medical examiner, (7) repeatedly confused Lucinda Gonzales with Debra Espinosa during cross-examination of

prosecution witness Timm Angell, (8) asked prosecution witness Angell if there had been any other suspects, and (9) elicited testimony from prosecution witness Danny Higginbotham that Espinosa did not have blood on her.[89]

### 2.    **State Court Disposition**

Petitioner presented the same set of complaints in his state habeas corpus application.[90] Petitioner's state habeas counsel did not question Petitioner's trial counsel regarding most of the complaints Petitioner raised in this part of his state habeas corpus application.  The state habeas trial court found (1) Petitioner's trial counsel elicited testimony on cross-examination from prosecution witness Frank Russell that he did not trust Debra Espinosa and he had urged Garcia not to meet with Espinosa on the night of Garcia's murder, (2) Petitioner's trial counsel elicited testimony on cross-examination from prosecution witness Robert Jimenez that Russell was truthful, (3) the only prosecution witness about whose cross-examination Petitioner's trial counsel were questioned by Petitioner's state habeas counsel was Debra Espinosa, (4) Attorney Callahan's strategy in cross-examining Espinosa was to deliberately misstate or mis-characterize her testimony on direct examination in an attempt to confuse Espinosa, (5) while this strategy proved unsuccessful, it was not unreasonable, and (6) Petitioner presented no evidence showing what a "scripted cross-examination" or  "prepared cross-examination" would have produced from any prosecution witness.[91]  The state habeas trial court concluded Callahan's actions fell within the wide range of

---

[89] Petition, at pp. 52-57.

[90] State Habeas Transcript, at pp. 92-99.

[91] State Habeas Transcript, at pp. 749-50.

reasonable and professional assistance and none of Petitioner's complaints in this group satisfied either prong of *Strickland* analysis.[92]   The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.   *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

3.   **AEDPA Analysis**

Petitioner bears the burden of proving both prongs of *Strickland* analysis by a preponderance of the evidence.   *Rogers v. Quarterman*, 555 F.3d at 489; *Blanton v. Quarterman*, 543 F.3d at 235; *Montoya v. Johnson*, 226 F.3d at 408.   In the context of reviewing claims of ineffective assistance, the Supreme Court and Fifth Circuit have directed federal habeas courts to exercise great caution to avoid the distorting effects of hindsight.   *See Premo v. Moore*, 562 U.S. 115, ___, 131 S. Ct. 733, 741, 178 L. Ed. 2d 649 (2011) ("In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel."); *Bell v. Cone*, 535 U.S. 685, 698 (2002) ("In *Strickland* we said that '[j]udicial scrutiny of a counsel's performance must be highly deferential' and that 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"); *United States v. Juarez*, 672 F.3d 381, 386 (5th Cir. 2012) (quoting *Strickland* for the same principle).   It is incumbent upon this Court in addressing Petitioner's ineffective assistance claims, therefore, to make every effort to eliminate the distorting effects of hindsight and to remain aware that a "conscious and informed decision on trial tactics and strategy

---

[92] *Id.*, at pp. 750-51.

cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (quoting *Strickland*).  Thus, the burden is on Petitioner to show the performance of his trial counsel fell below an objective level of reasonableness in view of the circumstances as they existed at the time of Petitioner's trial.  *See Strickland v. Washington*, 466 U.S. at 689:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

As explained below, Petitioner failed to present the state habeas court with any evidence showing his trial counsel's performance fell below an objective level of reasonableness in view of the circumstances as they existed at the time of Petitioner's trial.  In fact, with the lone exception of Debra Espinosa, Petitioner made no genuine effort to present evidence showing why his trial counsel chose to cross-examine particular prosecution witnesses in any particular manner or what information said counsel had before them when making their determination as to how best to cross-examine prosecution witnesses.  Likewise, Petitioner's state habeas counsel presented the state trial court with no evidence showing there was any information reasonably available to Petitioner's trial counsel at the time of trial which made the methods of cross-examination actually utilized by Petitioner's trial counsel objectively unreasonable.

For instance, Petitioner complains his trial counsel questioned prosecution witnesses Frank Russell, Robert Jimenez, and Debra Espinosa regarding their knowledge of the credibility of other

prosecution witnesses.  Russell testified on cross-examination (1) he did not trust Espinosa but did not know much about her, (2) he did not know if Espinosa would tell the truth, (3) he was not familiar with Espinosa's character for being truthful, (4) he had heard things about Espinosa (specifically that she was promiscuous) which led him to not want her in his life, (5) he had a bad feeling when Espinosa called Garcia on the night of the murder, and (6) he urged Garcia not to meet Espinosa.[93]  Jimenez testified on cross-examination (1) Russell was truthful, (2) he was unfamiliar with Espinosa's reputation for truthfulness but he was aware she was a drug addict who had a reputation for being promiscuous, and (3) he did not know either Francisco Gonzales or Teresa Quintero.[94]  Espinosa testified on cross-examination (1) she believed Francisco Gonzales was truthful but did not know Teresa Quintero, (2) she really did not know Francisco Gonzales, Teresa Quintero, or Lucinda Gonzales and merely assumed they would be truthful, (3) she did not know Bryan Brown, and (4) she lied to many people, including her own family and the police, about her involvement in Garcia's murder.[95]  Petitioner alleged no specific facts, much less presented any evidence, before the state habeas court showing either (1) it was objectively unreasonable for Petitioner's trial counsel to have elicited the foregoing testimony or (2) Petitioner was "prejudiced' within the meaning of *Strickland* by the foregoing testimony.  Neither Russell nor Jimenez were complementary regarding Espinosa's reputation in the community and neither furnished any testimony which bolstered the credibility of either Espinosa or Francisco Gonzales.

---

[93] S.F. Trial, Volume 15, testimony of Frank Russell, at pp. 188-89, 197.

[94] S.F. Trial, Volume 16, testimony of Robert Jimenez, at pp. 51-53.

[95] S.F. Trial, Volume 17, testimony of Debra Espinosa, at pp. 70-73.

Petitioner also faults his trial counsel for suggesting during the cross-examination of Frank Russell that Russell and Garcia had been smoking marijuana on the evening of the murder.  Russell denied the suggestion.[96]  A San Antonio Police officer testified, however, that after the murder, a small amount of marijuana was found during an inventory search in the console of Garcia's vehicle.[97] Petitioner offered no factual allegations, much less any evidence, to the state habeas court suggesting it was objectively unreasonable for his trial counsel to have questioned Russell regarding possible marijuana use on the night of the murder.  Nor did Petitioner allege any facts showing how he was "prejudiced' within the meaning of *Strickland* by his trial counsel's suggestion to Russell.

Petitioner faults his trial counsel for failing to cross-examine Espinosa regarding her admission on direct examination that she had not slept for six days prior to Garcia's murder.[98] However, Petitioner ignores the fact his trial counsel did elicit testimony on cross-examination from Espinosa that (1) she told detective Angell that Garcia was her "fucking friend," (2) she had not slept in six days and was coming off drugs when she said that, and (3) during the robbery she was high on crank.[99]  Petitioner did not allege any facts, or present any evidence, before the state habeas court showing either (1) what additional questions his trial counsel should have asked Espinosa to elicit additional impeachment evidence or (2) how he was "prejudiced" within the meaning of *Strickland*

---

[96] S.F. Trial, Volume 15, testimony of Frank Russell, at p. 190.

[97] S.F. Trial, Volume 15, testimony of Matthew Podwika, at p. 155.

[98] Espinosa made that admission while attempting to explain why she had not told police the truth about the circumstances of Garcia's murder when she was first questioned by police. S.F. Trial, Volume 17, testimony of Debra Espinosa, at p. 49.

[99] S.F. Trial, Volume 17, testimony of Debra Espinosa, at pp. 74-75.  Espinosa made these admissions while attempting to explain, on cross-examination, why she had lied to the police and used salty language during her initial interview following Garcia's murder.

by his trial counsel's failure to further cross-examine Espinosa regarding her drug use or lack of sleep in the days leading up to Garcia's murder. Petitioner did not call Espinosa to testify during his state habeas corpus proceeding or present any other evidence to the state habeas court showing further cross-examination of Espinosa would have furnished additional exculpatory or impeachment evidence. Conclusory statements regarding the content of uncalled witnesses' testimony are insufficient to demonstrate ineffective assistance. *Gregory v. Thaler*, 601 F.3d at 353.

Petitioner complains his trial counsel failed to question the medical examiner as an expert witness regarding the effects of sleep deprivation. But Petitioner presented the state habeas court with no factual allegations, much less any evidence, showing what additional exculpatory or impeachment evidence would have been elicited at trial through cross-examination of the medical examiner or another medical expert on this subject. Thus, this complaint fails to satisfy the dual prongs of the *Strickland* analysis. *See United States v. Bernard*, 762 F.3d 467, 473 (5th Cir. 2014) (holding ineffective assistance complaints about uncalled witnesses must include specific allegations showing what additional evidence would have been furnished by the uncalled witnesses because a trial counsel's decision to call or not call a witness is considered to be essentially strategic and speculation as to what uncalled witnessers would have testified is too uncertain); *United States v. Fields*, 761 F.3d 443, 461 (5th Cir. 2014) (to prevail on an ineffective assistance complaint about an uncalled witness, "the Petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."); *Woodfox v. Cain*, 609 F.3d at 808 (holding the same and *quoting Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)); *Gregory v. Thaler*, 601 F.3d at 352 (holding the same).

Petitioner also faults the manner in which his trial counsel cross-examined Detective Angell, specifically complaining his trial counsel "got the facts blatantly wrong," repeatedly confused Lucinda Gonzales with Debra Espinosa, opened the door to permit Angell to assert Espinosa had been truthful with the police "toward the end" of her multiple interviews, and elicited testimony from Angell that there were never any suspects in Garcia's murder other than Petitioner.  Petitioner did not question Attorney Callahan during the state habeas corpus proceeding regarding the reasons, rationale, or strategy underlying his cross-examination of Detective Angell at Petitioner's capital murder trial.  Petitioner made no effort to ascertain whether Attorney Callahan was attempting to employ the same trial strategy with Detective Angell he employed while cross-examining Debra Espinosa, i.e., deliberately misstating facts in his cross-examination questions in an attempt to confuse the prosecution witness.  As to Petitioner's complaint about Angell's testimony that he believed Espinosa was being truthful "toward the end" of her multiple police interviews, that testimony must be viewed in the context of Espinosa's admissions during her own cross-examination by Petitioner's trial counsel that she repeatedly lied to the police and her own family regarding her role in Garcia's robbery and murder.  As to Petitioner's complaint about Angell's cross-examination testimony about the absence of other suspects, Angell's actual testimony was that he was aware of no other suspects besides those about whom the jury had already heard.[100]  By the time Angell testified at the guilt-innocence phase of Petitioner's capital murder rial, this would necessarily have included both Debra Espinosa and Francisco Gonzales.  Moreover, Petitioner presented the state habeas court with no factual allegations, much less any evidence, showing Petitioner was

---

[100] S.F. Trial, Volume 18, testimony of Timm Angell, at p. 107.

64

"prejudiced" within the meaning of *Strickland* by the manner in which his trial counsel cross-examined Detective Angell.

Petitioner complains his trial counsel elicited testimony from police officer Danny Higginbotham that Espinosa did not have any blood on her. On cross-examination, Higginbotham actually testified he observed no blood on Espinosa's clothing,[101] something readily apparent to the jury through (1) the admission of State Exhibit no. 59, a photograph of Debra Espinosa taken the night of Garcia's murder,[102] and (2) the previous testimony of prosecution witness John Medlick, who testified he saw no blood on Espinosa when she entered his residence to call police immediately after Garcia's shooting.[103] Thus, it was uncontradicted at trial that Espinosa had no blood on her person or clothes immediately after the murder. Petitioner presented the state habeas court with no evidence showing there was any conflicting evidence available at the time of trial showing Espinosa did, in fact, have blood on her clothes or person the night of Garcia's murder. Higginbotham's observation on cross-examination about the absence of blood on Espinosa was merely cumulative of other evidence already before the jury by that point in the guilt-innocence phase of Petitioner's trial. Petitioner did not question his trial counsel during Petitioner's state habeas corpus proceeding regarding why said counsel asked Higginbotham about Espinosa's appearance. Petitioner presented the state habeas court with no specific factual allegations, much less any evidence, showing

---

[101] S.F. Trial, Volume 15, testimony of Danny Higginbotham, at p. 209.

[102] Officer Higginbotham identified Espinosa as the female shown in State Exhibit no. 59. S.F. Trial, Volume 15, testimony of Danny Higginbotham, at p. 206.

[103] S.F. Trial, Volume 15, testimony of John Medlick, at p. 63.

Petitioner was "prejudiced" within the meaning of *Strickland* by the way his trial counsel cross-examined Higginbotham.

Petitioner also complains his trial counsel confused Garcia's gold chain with a silver chain while cross-examining prosecution witness Rudy Luna. In response to Attorney Callahan's leading cross-examination questions, Luna, an acquaintance of Garcia, testified (1) he observed Garcia on the day of the murder wearing a big silver chain around his neck, a big silver watch, and a big silver bracelet, (2) he did not recall seeing Garcia wearing a diamond earring, and (3) he and Garcia did not smoke marijuana together "that day."[104] Petitioner did not question his trial counsel during Petitioner's state habeas corpus proceeding about why said counsel cross-examined Luna in this manner. Petitioner made no effort to explore during his state habeas corpus proceeding whether Attorney Callahan was attempting to utilize the same trial strategy with Luna he had attempted to use with Espinosa, i.e., deliberately misstating facts in his cross-examination questions in an attempt to confuse the prosecution witness. Likewise, Petitioner offered the state habeas court no specific facts, much less any evidence, showing Petitioner was "prejudiced" within the meaning of *Strickland* by the way his trial counsel cross-examined Luna.

In conclusion, Petitioner failed to present the state habeas court with any factual allegations, much less any evidence, showing the manner in which his trial counsel cross-examined the prosecution witnesses discussed above was objectively unreasonable in light of the information then available to Petitioner's trial counsel. Petitioner's trial counsel reasonably could have believed the undisputed presence of marijuana in Garcia's vehicle after the murder justified directing cross-

---

[104] S.F. Trial, Volume 16, testimony of Rudy Luna, at pp. 24-26.

examination questions to Garcia's acquaintances, such as Russell and Luna, about their and Garcia's use of marijuana the date of the murder.  Petitioner made no effort during the state habeas corpus proceeding to present the state habeas court with factual allegations, much less any evidence, showing there was information available at the time of Petitioner's trial which rendered the cross-examination questions Petitioner's trial counsel asked prosecution witnesses either objectively unreasonable or potentially harmful to their efforts to earn Petitioner an acquittal or a conviction on a lesser-included offense, i.e., something less than capital murder.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

K.      **Conceding Guilt During Closing Jury Argument**

1.      **The Complaint**

In his twelfth assertion of ineffective assistance, Petitioner argues Attorney Callahan conceded Petitioner's guilt during closing jury argument at the guilt-innocence phase of Petitioner's capital murder trial based upon an apparent misunderstanding of applicable state law.[105]

2.      **State Court Disposition**

---

[105] Petition, at pp. 57-60.

Petitioner presented the same basic complaints in his state habeas corpus application.[106] During Petitioner's state habeas corpus proceeding, Attorney Harris testified he believed the defense's decision to present the jury with alternate theories which all required not guilty verdicts as to capital murder was a good strategy.[107]  Attorney Callahan testified during Petitioner's state habeas corpus proceeding (1) the defense requested and received a jury instruction on the lesser-included offense of murder, and (2) he believed it was possible some jurors might find the prosecution had failed to show robbery, thus making Petitioner guilty only of ordinary murder, especially when the issue of sudden passion was considered.[108]  The state habeas trial court found Petitioner's trial counsels' closing jury argument at the guilt-innocence phase of trial did not concede Petitioner's guilt on the charge of capital murder, or any other offense, but did argue in the alternative that if Petitioner were guilty of any offense it was ordinary murder, committed in the heat of passion and not capital murder committed in the course of a robbery.[109]  The state habeas trial court concluded the strategy underlying Petitioner's trial counsels' closing argument was both reasonable and sound.[110]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

---

[106] State Habeas Transcript, at pp. 99-102.

[107] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John Williams Harris, Jr., at pp. 92/173.

[108] S.F. State Habeas Hearing, Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 91-92/344-45; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 76-77/462-63.

[109] State Habeas Transcript, at pp. 751-52.

[110] *Id.*, at p. 752.

3.     **AEDPA Analysis**

The initial problem with this aspect of Petitioner's multi-faceted ineffective assistance claim is Petitioner's complaints focus exclusively upon the closing jury argument made by Attorney Callahan.  Petitioner ignores the fact Attorney Harris made the initial portion of closing argument for the defense at the guilt-innocence phase of Petitioner's capital murder trial and argued Petitioner was not guilty of any offense because the prosecution's accomplice witnesses were not credible and their trial testimony was insufficiently corroborated by other evidence.[111]  Attorney Callahan's concluding portion of the defense team's closing jury argument must be evaluated within that context.

More specifically, collectively, Attorney Harris and Attorney Callahan's closing arguments argued: (1) the Petitioner's accomplice witnesses (Francisco Gonzales and Debra Espinosa) gave testimony at trial which was inconsistent with each other's accounts of Garcia's fatal shooting and inconsistent with the physical evidence and, therefore, was not credible, (2) the accomplice witness rule as set forth in the trial court's jury instructions, (3) the accomplice witnesses' testimony was not sufficiently corroborated to be considered credible, (4) the prosecution had failed to carry its burden of proof beyond a reasonable doubt, (5) the physical evidence did not link Petitioner to the crime scene, (6) the credibility of other prosecution witnesses, (7) that, *even if the jury believed the testimony of accomplice witnesses Francisco Gonzales and Debra Espinosa*, their testimony did not rule out the very reasonable inference that Petitioner fatally shot Garcia *not* as part of a planned or attempted robbery but, rather, in an act of jealous rage after witnessing Espinosa (Petitioner's lover)

---

[111] S.F. Trial, Volume 20, at pp. 58-66.

engaged in oral sex with Garcia, (8) Francisco Gonzales admitted to others in jail he killed Garcia,

and (9) the large amount of cash found on Garcia's body by the medical examiner's personnel

refuted the prosecution's contention that Garcia's murder occurred in the course of a robbery.[112]

Contrary to Petitioner's assertion in his federal habeas corpus petition, at no point during closing jury

argument did either Attorney Harris or Attorney Callahan concede Petitioner was guilty of capital

murder, i.e., a murder committed in the course of a robbery or attempted robbery.[113]  The state trial

court's guilt-innocence phase jury charged instructed the jury on the lesser-included offense of

murder.[114]

       In this Circuit, complaints about a defense attorney's concession of the defendant's guilt as

to a lesser-included offense are reviewed under the familiar standard of *Strickland*.  *See Haynes v.*

*Cain*, 298 F.3d 375, 381 (5th Cir.) (holding situations in which defense counsel concedes the

defendant's guilt for only lesser-included offenses are viewed as tactical decisions which are properly

analyzed under *Strickland*), *cert, denied*, 537 U.S. 1072 (2002).  This Court has independently

---

[112] S.F. Trial, Volume 20, at pp. 58-77.

[113] Petitioner argues that Callahan's alternative argument that Petitioner was guilty of only murder, taken in conjunction with the testimony of the accomplice witnesses regarding the plan to rob Garcia and the provisions of Texas law making an intentional murder in the course of an attempted robbery a capital murder amounted to a concession Petitioner was guilty of capital murder.  However, Petitioner once again ignores the arguments made by both Attorney Harris and Attorney Callahan at closing jury argument that the trial testimony of neither Espinosa nor Francisco Gonzales were credible.  Instead, reasonably construed, Attorney Callahan's closing argument suggested in the alternative, even if the jury found Espinosa and Francisco Gonzales' testimony credible, Petitioner was still not guilty of capital murder because the evidence did not rule out a reasonable inference that the fatal shooting of Garcia was an act of jealous rage rather than part of a robbery or attempted robbery.  Attorney Callahan's closing argument cannot reasonably be construed as conceding Petitioner was guilty of an intentional murder committed in the course of an attempted robbery.

[114] Trial Transcript, at pp. 122-23, 126-28.

reviewed the entirety of the evidence from Petitioner's trial and the testimony of Petitioner's trial counsel during Petitioner's state habeas corpus proceeding and concludes the decision by Petitioner's trial counsel to request a lesser-included offense instruction on ordinary murder and to argue Petitioner was guilty, at most, of only ordinary murder did not cause the performance of said counsel to fall below an objective level of reasonableness. *See United States v. Short*, 181 F.3d 620, 624-25 (5th Cir. 1999) (defense counsel's concession during closing argument that defendant was involved in the drug trade, but not admitting commission of any specific Count of the indictment, was a reasonable strategic decision and a reasonable effort to enhance counsel's credibility with the jury to increase the likelihood the jury would accept his arguments regarding the more serious offenses), *cert. denied*, 528 U.S. 1091 (2000).  Moreover, this Court finds Petitioner failed to present any evidence to the state habeas court showing a reasonable probability that, but for Attorney Callahan's alternative concession that Petitioner might be guilty of ordinary murder, the outcome of the guilt-innocence phase of Petitioner's capital murder trial would have been any different.   Under Petitioner's extremely broad theory, any attorney who ever requested a lesser-included offense instruction and  argued in the alternative for a conviction only on the a lesser-included offense would necessarily be guilty of ineffective assistance. During closing jury argument, Petitioner's trial counsel argued, consistent with their opening argument, that Debra Espinosa and Francisco Gonzales were not credible witnesses and the prosecution had failed to carry its burden of proving guilt beyond a reasonable doubt.  While continuing to argue Espinosa and Francisco Gonzales were not credible, Callahan's closing argument offered Petitioner's jury a plausible alternate theory of Garcia's murder in which Petitioner acted solely out of jealous rage and not as part of a robbery or attempted robbery.

Under the circumstances of Petitioner's trial, the state habeas court reasonably concluded this jury argument was neither objectively unreasonable nor "prejudicial" within the meaning of *Strickland*.

Petitioner's trial counsel cannot reasonably be faulted for offering a plausible alternative factual theory in their closing jury argument which was clearly intended to help avoid Petitioner's conviction for capital murder. The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

## L.  **Failing to Object to Sleeping Jurors**

### 1.  **The Complaints**

In his thirteenth assertion of ineffective assistance, Petitioner argues his trial counsel failed to object when unidentified jurors fell asleep at both phases of trial.[115]

### 2.  **State Court Disposition**

Petitioner presented the same complaints in his state habeas corpus application.[116] Petitioner's co-counsel at trial, Attorney Harris, testified during Petitioner's state habeas corpus proceeding that (1) he had no recollection of having witnessed any sleeping or nodding jurors and (2) any juror who sleeps through the prosecution's presentation of its case-in-chief is good for the

---

[115] Petition, at pp. 60-62.

[116] State Habeas Transcript, at pp. 102-04.

defense.[117]  Attorney Callahan testified during Petitioner's state habeas corpus proceeding that (1) his notes indicated he observed a female juror whom he could not identify sleeping at three separate times on August 31, 2005 (i.e., during the punishment phase of trial) during the testimony of prosecution witnesses Patricia Castillo and John Corona, (2) at that time, he was no longer representing Petitioner as counsel of record, (3) he did recall a juror, possibly female, who appeared to be nodding off at an unidentified moment during the guilt-innocence phase of trial, and (4) he made a reference to jurors who had been asleep during his closing argument at the guilt-innocence phase of trial in an attempt to gain sympathy for Petitioner.[118]  The state habeas trial court found (1) the record was silent with regard to any jurors actually sleeping during trial, (2) the court did not recall witnessing any jurors sleeping, (3) Callahan's notes reflected that a juror slept during the prosecution's presentation of its case at the punishment phase of trial, (4) Callahan could not recall if any jurors were actually sleeping or simply not paying attention, (5) defense counsel is not concerned by a juror who fails to pay attention to the prosecution's case, (6) none of the jurors testified before the court during Petitioner's state habeas corpus proceeding, and (7) the record was insufficient to establish any juror actually slept during the defense's cross-examination of any prosecution witness or during the defense's presentation of its own case-in-chief.[119]  The state habeas trial court concluded there was no evidence the defense was negatively impact in any way by any

---

[117] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at pp. 46/127, 143/224.

[118] S.F. State Habeas Hearing, Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 80-82/333-35; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 86-89/472-75, 101/487.

[119] State Habeas Transcript, at p. 752.

sleeping juror and Petitioner's ineffective assistance claim lacked merit.[120]   The Texas Court of

Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte*

*Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

3.      **AEDPA Analysis**

Insofar as Petitioner argues his trial counsel rendered ineffective assistance by failing to

object to a juror allegedly sleeping during the punishment phase of Petitioner's capital murder trial,

that argument is without merit.  Petitioner represented himself during the punishment phase of his

capital murder trial.  "[A] defendant who elects to represent himself cannot thereafter complain that

the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"  *Faretta*

*v. California*, 422 U.S. at 834 n.46.  If, in fact, a juror slept during any portion of the punishment

phase of Petitioner's capital murder trial, under applicable Texas law, it was incumbent upon

Petitioner himself to call that fact to the state trial court's attention through a timely objection, a

motion for mistrial, a motion for new trial, making a statement in open court on the record which is

neither controverted nor disputed by opposing counsel or the trial court, or some other procedural

maneuver reasonably calculated to alert the trial court to the situation.  *See Thieleman v. State*, 187

S.W.3d 455, 457 (Tex. Crim. App. 2005) (defense counsel's statement on the record in open court

regarding an allegedly sleeping juror sufficient to furnish some evidence of the fact where neither

the prosecution nor the trial court contradicted or disputed defense's counsel's oral assertions in

support of defendant's motion for mistrial); *Menard v. State*, 193 S.W.3d 55, 59 (Tex. App. –

Houston [1st Dist.] 2006, *pet. ref'd*) (defendant waived complaint about allegedly sleeping juror by

---

[120] *Id.*, at pp. 752-53.

failing to move for mistrial, move for new trial, object to the juror's continued service, or make the trial court aware of the sleeping juror at the time the juror was asleep).  Petitioner did not do anything to alert the trial court to any allegedly sleeping juror during the punishment phase of trial.  Having exercised his right to self-representation recognized in *Faretta* throughout the punishment phase of his capital murder trial, Petitioner may not cast blame on his trial counsel for allegedly deficient performance occurring during the punishment phase of his trial.  *Faretta v. California*, 422 U.S. at 834 n.46.

Petitioner's complaint about his trial counsel's failure to object to an unidentified juror allegedly sleeping for an unspecified time during the guilt-innocence phase of his trial was unsupported in Petitioner's state habeas corpus proceeding by any direct evidence showing either (1) an identifiable juror actually fell asleep during a portion of the guilt-innocence phase of Petitioner's trial or (2) any juror slept through a portion of the guilt-innocence phase of trial during which Petitioner's trial counsel cross-examined a prosecution witness or presented the defense's case-in-chief.  Attorney Callahan testified during Petitioner's state habeas corpus proceeding that he recalled a female juror who appeared to nod off for an unspecified duration at an unidentified point during the guilt-innocence phase of Petitioner's trial.[121]  Petitioner offered the state habeas court no other evidence supporting this aspect of his sleeping-juror ineffective assistance complaint. The state trial judge could not recall observing any juror slept during the trial.[122]  Petitioner presented the state habeas court with no evidence showing any juror slept through lengthy or substantial

---

[121] S.F. State Habeas Hearing, Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 101/487.

[122] State Habeas Transcript, at p. 752.

portions of the guilt-innocence phase of Petitioner's trial or that any juror slept through any particularly critical portions of the guilt-innocence phase of Petitioner's trial.  In fact, Petitioner presented the state habeas court no evidence showing any juror slept through any of Petitioner's trial counsel's opening or closing arguments, cross-examination of prosecution witnesses, or presentation of the defense's witness.

As correctly argued by Respondent, the Texas authorities cited by Petitioner do not render Attorney Callahan's testimony conclusive on the subject and do not mandate an automatic mistrial in the event a juror is determined to have slept through a portion of a criminal trial.  *See Thieleman v. State*, 187 S.W.3d at 458 (holding even a defense counsel's undisputed and uncontradicted assertions on the record regarding a sleeping juror are not conclusive to prove the event actually occurred); *Menard v. State*, 193 S.W.3d at 60 (holding no abuse of discretion in the trial court's denial of defendant's motion for mistrial and refusal to dismiss juror, even where juror admitted to "dozing a couple of times," where juror asserted he nonetheless remained cognizant of what was going on, was able to hear the testimony, and asserted he would be able to render a fair verdict). Under Texas law, a mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile.  *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004);  *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999) ("a trial court may properly exercise its discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error."), *cert. denied*, 529 U.S. 1070 (2000).  Put somewhat differently, under Texas law, a mistrial is only appropriate in "extreme circumstances" for incurable and highly prejudicial errors.  *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

76

Several Texas intermediate appellate courts have applied the discretionary standard set forth in the Seventh Circuit's opinion in *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000),[123] to complaints about sleeping jurors. *See Kinsey v. State*, 2014 WL 2459690, *14 (Tex. App. – Eastland, May 22, 2014) (whether the defendant is entitled to a new trial "depends upon whether the juror missed large portions of the trial or whether the portions missed were particularly critical"); *Lopez v. State*, 2012 WL 104468, *1 (Tex. App. – Austin, January 11, 2012) ("The trial court should consider whether the sleeping juror missed large portions of the trial or whether the portions missed were particularly critical."); *Thieleman v. State*, 2006 WL 744282, *3 (Tex. App. – Fort Worth March 23, 2006, *pet. ref'd*) (holding trial court did not err in denying motion for mistrial made at conclusion of guilt-innocence phase of trial where no witnesses were called to elaborate upon defense counsel's assertion that a juror slept continuously throughout the trial and no bill of exception was made to develop a record); *Menard v. State*, 193 S.W.3d at 60 (no error in denying motion for mistrial where there was no evidence the juror missed large portions of the trial).  Thus, Texas law appears to focus on whether the presence of a sleeping juror actually prejudiced a criminal defendant's right to a fair trial by missing substantial or significant periods of the trial or by missing critical evidence or testimony.  Petitioner failed to present the state habeas court with any evidence showing any sleeping juror missing large portions of the guilt-innocence phase of Petitioner's trial, any juror slept continuously throughout trial, or any sleeping juror missed any identified "critical portions" of Petitioner's trial.  During his state habeas corpus proceeding, Petitioner offered only

---

[123] "If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury.  However, a court is not invariably required to remove sleeping jurors and a court has considerable discretion in deciding how to handle a sleeping juror."  *United States v. Freitag*, 230 F.3d at 1023 (citations omitted).

Attorney Callahan's vague recollection that a female juror nodded off for an undefined duration at some unspecified point during the guilt-innocence phase of trial.  Under such circumstances, the state habeas court reasonably concluded this aspect of Petitioner's multi-faceted ineffective assistance claim failed to satisfy either prong of *Strickland* analysis.  The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

M.    **Mishandling the Lone Defense Witness**

1.    **The Complaints**

In his fourteenth assertion of ineffective assistance, Petitioner complains his trial counsel (1) waited until after the start of the guilt-innocence phase of Petitioner's trial to interview defense witness "Ralph Perdigone,"[124] (2) included the wrong date in a question he asked this witness, (3) failed to adequately prepare this witness for cross-examination, and (4) should not have called this witness to testify at all because the witness had a lengthy criminal record and furnished testimony which was of only *de minimus* value in impeaching prosecution witness Francisco Gonzales.[125]

2.    **State Court Disposition**

---

[124] The correct spelling of the name of the lone defense witness who testified during the guilt-innocence phase of Petitioner's trial was "Ralph Edward Pedrigone."  S.F. Trial, Volume 20, testimony of Ralph Edward Pedrigone, at pp. 4-21.

[125] Petition, at pp. 62-64.

Petitioner raised the same complaints in his state habeas corpus application.[126]   During Petitioner's state habeas corpus proceeding, Attorney Callahan testified without contradiction (1) Petitioner wrote Callahan about a BCADC inmate who claimed to have heard Francisco Gonzales make inculpatory statements,[127] (2) Callahan wrote Petitioner and urged him to have the inmate in question write the District Attorney about the incident, (3) eventually, Petitioner secured a letter from the inmate (Pedrigone) which Callahan forwarded to the Bexar County District Attorney, and (4) Callahan had to make arrangements through the court coordinator to obtain Pedrigone's presence for trial.[128]   The state habeas trial court found (1) Pedrigone was confined in Kleburg County, (2) Attorney Callahan had to request Pedrigone's return to Bexar County, (3) Pedrigone did not return to Bexar County until August 25, 2005, (4) Callahan interviewed Pedrigone, and (5) Petitioner did not call Pedrigone to testify at the state habeas hearing or offer any evidence showing how Callahan prepared Pedrigone for trial.[129]   The state habeas trial court concluded Petitioner's complaints about

---

[126] State Habeas Transcript, at pp. 104-06.

[127] The voluminous correspondence between Petitioner and Attorney Callahan admitted into evidence during Petitioner's state habeas corpus hearing includes numerous discussions of Pedrigone's proposed testimony, including (1) a letter from Petitioner to Callahan dated June 14, 2004 (State Exhibit no. 25) in which Petitioner discusses Pedrigone [found at S.F. State Habeas Hearing, Volume 6 of 7, at pp. 588-89], (2) Petitioner's letter to Callahan dated June 21, 2004 (State Exhibit no. 27) discussing the defense team's investigator and Pedrigone, (3) Callahan's letter to Petitioner dated June 24, 2004 (State Exhibit no. 28) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 597] in which Callahan indicated he would forward Pedrigone's letter to the prosecution, and (4) Petitioner's letter to Callahan dated April 30, 2005 (State Exhibit 60) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 672].

[128] S.F. State Habeas Hearing, Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 46/432, 82-83/468-69.

[129] State Habeas Transcript, at pp. 753-54.

the handling of Pedrigone failed to satisfy the *Strickland* standard.[130]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

     3.     **AEDPA Analysis**

At trial, Pedrigone testified (1) he witnessed Francisco Gonzales state, in response to a television report on Garcia's murder, "That's the guy I killed.  I mean they killed," (2) Gonzales later told Pedrigone he had not meant his statement and only vaguely remembered it but did not want Pedrigone to testify about it, (3) Gonzales' nickname in the jail was "Pancho," (4) Pedrigone felt Gonzales was bragging when he made the statement in question, (5) Petitioner told Pedrigone that calls were made on Garcia's cell phone after Garcia's murder, (6) Pedrigone had multiple theft and forgery convictions and a conviction for escape, and (7) while Gonzales made the inculpatory statement in question, Gonzales immediately recanted same.[131]  Petitioner offered the state habeas court no evidence showing either (1) why his trial counsel believed Gonzales made his inculpatory statement on any particular date, (2) the steps his trial counsel took to prepare Pedrigone to testify and face cross-examination at Petitioner's trial, (3) the reasons why Petitioner's trial counsel chose to call Pedrigone to testify at Petitioner's trial, or (4) how Petitioner was "prejudiced" within the meaning of *Strickland* by Pedrigone's trial testimony.

Petitioner made no effort during his state habeas corpus proceeding to question his trial counsel regarding the manner in which said counsel interviewed Pedrigone prior to trial, the

---

[130] *Id.*, at p. 754.

[131] S.F. Trial, Volume 20, testimony of Ralph Edward Pedrigone, at pp. 4-21.

discussions Petitioner's trial counsel had with Pedrigone to prepare Pedrigone to testify, the reasons why Petitioner's trial counsel chose to call Pedrigone to testify at trial, the manner in which Petitioner's trial counsel questioned Pedrigone at trial, or the manner in which Petitioner's trial counsel prepared Pedrigone for potential cross-examination by the prosecution.  It is clear from the correspondence between Petitioner and Attorney Callahan that Petitioner considered what Pedrigone had to say very important and wished to have Pedrigone's testimony presented to his jury.[132] Petitioner, however, did not present the state habeas court with any evidence showing it was objectively unreasonable for Petitioner's trial counsel to call Pedrigone to testify about Gonzales' inculpatory statement or that a reasonable probability exists, but for the decision by Petitioner's trial counsel to call Pedrigone to testify, the outcome of either phase of Petitioner's capital murder trial would have been any different.  Petitioner does not allege any specific facts showing exactly what Attorney Callahan said or did during his pretrial interview with Pedrigone which caused the performance of said counsel to fall below an objective level of reasonableness.   In fact, during Petitioner's state habeas corpus proceeding, Petitioner made no effort to question Callahan or Pedrigone regarding exactly what information the two men shared during Pedrigone's pretrial interview.  Petitioner did not allege any specific facts, much less furnish the state habeas court with any evidence, showing additional or different questioning of Pedrigone by Callahan during Pedrigone's pretrial interview would have disclosed any information of which Callahan was unaware which might have proved helpful to the defense at Petitioner's trial.  Petitioner also presented the state habeas court with no testimony from Pedrigone or any other evidence suggesting that a different type of trial preparation or different type of pretrial interview of Pedrigone by Attorney Callahan

---

[132] *See* note 128, *supra*.

would have resulted in Pedrigone giving different testimony, either on direct or cross-examination, at Petitioner's capital murder trial.

Likewise, Petitioner presented the state habeas court with no evidence showing the decision by Petitioner's trial counsel to call Pedrigone to testify at the guilt-innocence phase of Petitioner's trial was either objectively reasonable or "prejudicial" to Petitioner within the meaning of *Strickland*. Pedrigone testified he heard Gonzales make, and then immediately recant, a clearly inculpatory statement. The state habeas court reasonably concluded Petitioner's complaints about Pedrigone's trial testimony and his trial counsel's decision to call Pedrigone to testify failed to overcome the strong presumption "that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. at 689.

The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

N.    **Mishandling the *Faretta* Issues**

1.    **The Complaints**

In his fifteenth assertion of ineffective assistance, Petitioner argues his trial counsel should have (1) objected to Petitioner's assertion at the punishment phase of trial of Petitioner's right to self-representation under *Faretta v. California*, 422 U.S. 806 (1975), as untimely and argued

82

Petitioner was too depressed to competently waive representation and adequately represent himself, and (2) requested the state trial court hold a hearing pursuant to *Faretta* when Petitioner first voiced complaints with the performance of Petitioner's trial counsel.[133]

### 2.    **State Court Disposition**

Petitioner presented the same complaints in his state habeas corpus application.[134]  During Petitioner's state habeas corpus proceeding, Attorney Harris testified without contradiction (1) he believed Petitioner knew well what he was doing when he invoked *Faretta*, (2) he believed Petitioner invoked *Faretta* because Petitioner, who had displayed a defeatist demeanor throughout trial, just gave up after the jury's verdict and wanted a sentence of death, (3) Petitioner said he wanted to die, (4) he believed Petitioner was not suffering from an unsound mind when Petitioner made his *Faretta* request, (5) Petitioner never indicated during the punishment phase of trial that he wanted the help of his former trial counsel, who remained in the courtroom for the punishment phase of trial, (6) he never observed anything in Petitioner's behavior which led him to believe Petitioner's *Faretta* request was the product of a mental illness, (7) he observed nothing in Petitioner's behavior during the punishment phase of trial which led him to believe Petitioner was suffering from a mental illness, (8) neither of Petitioner's trial counsel objected to Petitioner's exercise of his *Faretta* right as untimely, and (9) he found Petitioner to be intelligent and fully capable of communicating effectively with trial counsel throughout trial.[135]  Attorney Callahan testified (1) Petitioner's emotive

---

[133] Petition, at pp. 12, 64-65, 73-85.

[134] State Habeas Transcript, at pp. 106-08, 113-25.

[135] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at pp. 50/131, 121-28/202-09, 141/222, 143/224, 148-49/220-30.

state went up and down throughout Callahan's attorney-client relationship with Petitioner, (2) Petitioner's letters to Callahan contained many nihilistic, fatalistic, and negative comments, (3) he counseled Petitioner not to appear depressed or negative, especially at trial, (4) while Petitioner did appear to be in a depressed mind set, he never perceived that Petitioner's depression had reached the point that medical or psychological care was necessary, (5) during his initial meeting with Petitioner at the jail, Petitioner appeared "a bit cavalier," displaying a "hum drum" nonchalant attitude, and was unwilling to furnish details of his alibi defense, (6) Dr. Ferrell examined Petitioner prior to trial and concluded that, while Petitioner's mood was frustrated and mildly depressed, Petitioner's judgment appeared to be in normal limits, (7) Dr. Ferrell reported Petitioner's IQ was within the normal range, Petitioner did not appear to be suffering from any marked mental illness or distress or defect, and Petitioner was competent to stand trial, (8) Callahan's own observations of Petitioner were consistent with Dr. Ferrell's findings, (9) based upon Petitioner's flat affect during their first interview in the face of a serious criminal charge, Callahan suspected Petitioner might be anti-social, (10) Petitioner communicated to Callahan through letters that, if convicted, Petitioner wished to receive the death penalty rather than a life sentence, (11) Callahan wrote Petitioner advising Petitioner of the law applicable to self-representation, i.e., explaining Petitioner had the right to self-representation but not a right to hybrid representation, (12) while Petitioner did write Callahan stating he did not care what the District Attorney did to him, Callahan construed Petitioner's statement as reflecting Petitioner "being bummed out" and giving in to negativity, rather than as signs of clinical depression, (13) Petitioner's assertion of his right to self-representation foreclosed the defense team's efforts to

present mitigating evidence at the punishment phase of trial, and (14) during the punishment phase of trial, Petitioner continued to indicate he wanted to self-represent.[136]

The state habeas trial court found (1) Petitioner expressed his dissatisfaction with attorney Callahan long before trial, (2) Petitioner was informed he did not have the right to select his own defense counsel but did have the right to represent himself, (3) Petitioner did not assert his right to self-representation until the conclusion of the guilt-innocence phase of trial, (4) there was no evidence presented showing Petitioner suffered from a clinical diagnosis of depression, (5) both of Petitioner's trial counsel testified Petitioner (a) was alert and coherent throughout the guilt-innocence phase of trial, (b) was able to assist counsel during trial, and (c) understood the nature of the proceeding, (6) Petitioner appeared to be of sound mind when he made his request for self-representation, and (7) Petitioner presented the state habeas court with no evidence showing he was depressed to the point his mind, reasoning, or thought processes were impaired.[137]  The state habeas trial court also found (1) Petitioner wrote letters to the trial court dated January 16 and June 2, 2005 in which Petitioner requested the trial court dismiss attorney Callahan as Petitioner's lead counsel but (2) neither of these letters clearly or unequivocally indicated a desire by Petitioner to represent

---

[136] S/F. State Habeas Hearing, Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 26-20/279-82, 103-06/356-59; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 17-18/403-04, 21-23/407-09, 51-57/437-43, 60-62/446-48, 66-67/452-53, 75/461, 85/471, 87/473.
Callahan's letter to Petitioner dated January 31, 2005 (State Exhibit no. 45) [found at S.F. State Habeas Hearing, Volume 6 of 7, at pp. 632-33] includes Callahan's explanation of Petitioner's right to self-representation.  Petitioner wrote Callahan on May 3, 2005 (State Exhibit 62) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 678] regarding self-representation. Callahan wrote Petitioner back on May 13, 2005 (State Exhibit 64) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 683] advising Petitioner it was unwise for Petitioner to represent himself.

[137] State Habeas Transcript, at pp. 754-55.

himself.[138]   The state habeas trial court concluded Petitioner's ineffective assistance claim was without merit.[139]   The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

3.     **AEDPA Analysis**

Defendants have a Sixth Amendment right to represent themselves in a criminal proceeding. *See Faretta v. California*, 422 U.S. 806, 819-20 (1975) ("Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment.  The right to defend is given directly to the accused, for it is he who suffers the consequence if the defense fails.") (Footnote omitted); *Miller v. Thomas*, 714 F.3d 897, 903 (5th Cir. 2013) ("A criminal defendant has a constitutional right to self-representation at trial when he knowingly and intelligently waives the right to counsel."); *Batchelor v. Cain*, 682 F.3d 400, 406 (5th Cir. 2012) ("In *Faretta,* the Supreme Court announced that the right of a criminal defendant to represent himself at trial is implicit in the structure of the Sixth Amendment, and applies to state court proceedings through the Fourteenth Amendment."); *United States v. Long*, 597 F.3d 720, 723 (5th Cir.) ("A defendant  has a right to represent himself

---

[138] State Habeas Transcript, at pp. 758-59.

Petitioner's letter dated January 16, 2005 to the state trial court does not appear in the record from Petitioner's state trial court proceedings but is quoted verbatim in Petition, at p. 73 and in State Habeas Transcript, at p. 113.

On January 19, 2005, Petitioner filed a pro se motion dated January 16, 2005 to dismiss appointed counsel which appears in Trial Transcript, at pp. 13-16.

Petitioner's letter to the state trial court dated June 2, 2005 appears in Trial Transcript, at p. 27 and is quoted verbatim in Petition, at pp. 74-75 and in State Habeas Transcript, at p. 115.

[139] *Id.*, at p. 755.

at trial."), *cert. denied*, ___ U.S. ___, 130 S. Ct. 3524, 177 L. Ed. 2d 1105 (2010).  To exercise this

right, the defendant must knowingly and intelligently forego his right to counsel and must clearly and

unequivocally request to proceed pro se.  *United States v. Long*, 597 F.3d at 724; *United States v.*

*Cano*, 519 F.3d 512, 516 (5th Cir. 2008); *United States v. Kizzee*, 150 F.3d 497, 502 (5th Cir. 1998)

(recognizing there is a presumption against finding waiver of the right to counsel); *Burton v. Collins*,

931 F.2d 131, 133 (5th Cir.) ("To assert his right to self-representation, a defendant must 'knowingly

and intelligently' waive his right to counsel, and the request must be 'clear and unequivocal.'"), *cert.*

*denied*, 502 U.S. 1006 (1991).

The state habeas court's factual findings summarized above were fully supported by the

uncontradicted testimony of Petitioner's trial counsel and the documentary evidence admitted during

Petitioner's state habeas corpus proceeding.  Petitioner presented no testimony from himself or any

other witness indicating he intended his letters of January 16 or June 2, 2005 as requests to represent

himself.  In the letter of January 16, 2005, Petitioner expressed dissatisfaction over the fact he had

only seen Callahan once in the past 13 months, but he did not specifically discharge Callahan,

request new counsel, or specifically state that he intended to represent himself.

Petitioner's letter of June 2, 2005, did request the trial court to dismiss his court appointed

counsel, but did not state that he intended to represent himself.  It is settled law in this Circuit that

something more than just firing one's attorney is required before one "clearly and unequivocally"

requests to proceed pro se.  *See United States v. Long*, 597 F.3d at 724-25 (defendant's request to

fire one's counsel not a clear and unequivocal assertion of right to self-representation); *United States*

*v. Majors*, 328 F.3d 791, 794 (5th Cir. 2003) (defendant did not  clearly and unequivocally invoke

right to self-representation where (1) defendant's third attorney moved to withdraw prior to trial, (2)

trial court denied that motion, (3) defendant gave the trial court a letter on the day of trial complaining about his trial counsel's representation but not mentioning self-representation, and (4) on second day of trial, defense counsel's associate informed trial court defendant was dissatisfied and wished either to retain counsel or make closing argument himself); *Burton v. Collins*, 931 F.2d at 133-34 (defendant did not clearly and unequivocally waive right to counsel by spontaneously asking trial court "May I represent myself" after trial court denied defendant's request that his counsel be replaced) ; *Moreno v. Estelle*, 717 F.2d 171, 174-75 (5th Cir. 1983) (defendant did not waive right to counsel merely by telling court he wished his attorney to withdraw because "I feel she isn't helping me," "I can't get her to do anything," and "I don't want her."), *cert. denied*, 466 U.S. 975 (1984).  The state habeas court reasonably concluded Petitioner's letters did not clearly and unequivocally assert Petitioner's right to self-representation.

Petitioner was aware, at least as early as Petitioner received Callahan's letter dated January 31, 2005 (State Exhibit no. 45) of his right to self-representation.  Yet Petitioner presented the state habeas court with no evidence suggesting he ever made a clear or unequivocal request (to either the trial court or his trial counsel) to represent himself prior to the conclusion of the guilt-innocence phase of his capital murder trial.  Petitioner's trial counsel cannot reasonably be faulted for failing to request a *Faretta* hearing on Petitioner's behalf prior to trial when Petitioner never made a clear or unequivocal request to either of his trial counsel to undertake self-representation.

Petitioner also complains his trial counsel should have objected to, or otherwise opposed, Petitioner's request to represent himself at the start of the punishment phase of trial because the

request was untimely and Petitioner was "too depressed to make this decision."[140]  Petitioner argues

further, without any citation to authority, as follows: "Since Castillo made no opening or closing

statement and did not question any witness in sentencing, it can be inferred that he was too depressed

to perform sentencing without counsel, and thus he was not competent for self-representation."[141]

These arguments fail to satisfy the dual prongs of *Strickland* analysis for two, equally compelling

reasons.

First, Petitioner presented the state habeas court with no evidence showing he was, in fact,

suffering from a mental illness, defect, or other mental condition (including clinical depression) of

sufficient severity as to render Petitioner's waiver of his right to counsel involuntary or unknowing.

As explained above, both Attorney Harris and Attorney Callahan were aware  Petitioner (1) was

displaying what they termed a "negative," "defeatist," or "fatalistic" demeanor, (2) had expressed

a preference for a death sentence rather than a term of incarceration for life, and (3) did not wish to

have his family members testify at trial or to have any other evidence presented which might make

people feel sympathy for Petitioner.[142]  Nonetheless, neither attorney considered Petitioner to be

behaving in a manner which reflected mental illness or incompetence.  Moreover, Attorney Callahan

testified without contradiction during Petitioner's state habeas corpus proceeding that Dr. Ferrell

completed a mental health examination of Petitioner prior to trial and reported (1) while Petitioner

---

[140] Petition, at p. 65.

[141]  *Id.*

[142] In an undated letter Petitioner sent to Attorney Callahan sometime in late-February to early-March, 2005 (State Exhibit no, 48A) [S.F. State Habeas Hearing, Volume 6 of 7, at pp. 645-46], Petitioner clearly states he does not want his upbringing coming out at trial because it would make his mother look bad and he does not want anyone feeling sorry for him.

was frustrated and mildly depressed, Petitioner was nonetheless competent to stand trial, (2) Petitioner's IQ and judgment were within normal limits, and (3) Petitioner was not suffering from any marked mental illness, distress, or defect.[143]  Petitioner presented the state habeas court with no evidence showing Petitioner was, in fact, suffering from clinical depression or any other identifiable mental illness, defect, or impairment at the time Petitioner asserted his right to self-representation under *Faretta*.  Likewise, Petitioner presented the state habeas court with no evidence showing it was objectively unreasonable for Petitioner's trial counsel to have relied upon the conclusions of Dr. Ferrell regarding Petitioner's competence to stand trial and the absence of any mental illness affecting Petitioner's judgment.  Thus, Petitioner has failed to demonstrate the failure of his trial counsel to object to, or otherwise oppose, Petitioner's assertion of his right to self-representation fell outside the wide range of objectively reasonable professional legal assistance.

Second, as Respondent correctly argues, Petitioner has identified no legal authority which imposes a duty upon a criminal defense counsel to object on the basis of untimeliness to his client's assertion of the right recognized in *Faretta*.  Contrary to the implications underlying this aspect of Petitioner's multi-faceted ineffective assistance claim, defense counsel are not obligated to disregard a capital defendant's directive that defense counsel stand mute at sentencing.  *See Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) (recognizing neither the Supreme Court nor the Fifth Circuit has ever held that a lawyer provides ineffective assistance by complying with a capital murder defendant's clear and unambiguous instructions not to present evidence at the punishment

---

[143] S.F. State Habeas Hearing, Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 51-56/437-42.  Callahan also testified without contradiction that, based upon Petitioner's flat affect when confronted with the seriousness of the charge against him during their initial face-to-face meeting in December, 2003, Callahan suspected Petitioner was anti-social.  *Id.*, at p. 56/442.

phase of trial), *cert. denied*, 552 U.S. 1151 (2008).  Petitioner's action, in invoking his right to self-representation under *Faretta* at the start of the punishment phase of his capital murder trial, effectively ensured no mitigating evidence would be presented during the punishment phase of his capital murder trial.

The Fifth Circuit has recognized trial counsel is not ethically required to ignore his client's objection to the presentation of certain types of mitigating evidence.  *See, e.g., Nixon v. Epps,* 405 F.3d 318, 325-26 (5th Cir.) (holding the defendant cannot block his trial counsel from attempting one line of defense at trial and then argue on appeal his counsel was ineffective for failing to introduce evidence supporting that defense), *cert. denied*, 546 U.S. 1015 (2005); *Roberts v. Dretke,* 356 F.3d 632, 638 (5th Cir. 2004) (where a defendant forbids his trial counsel from interviewing family members, the defendant may not thereafter complain of ineffective assistance arising from the failure to discover mitigating evidence known to those same family members), *cert. denied,* 544 U.S. 963 (2005); *Dowthitt v. Johnson,* 230 F.3d 733, 748 (5th Cir. 2000) (holding trial counsel may not be held ineffective for honoring his client's wishes that his family members not be interviewed or called to testify at trial as long as the client made an informed decision), *cert. denied,* 532 U.S. 915 (2001); *Amos v. Scott,* 61 F.3d 333, 348-49 (5th Cir.) (holding no deficient performance or prejudice arose from trial counsel's failure to present a witness at the punishment phase of trial where the defendant strongly opposed having any witnesses testify on his behalf during the punishment phase and the defendant acknowledged same during a colloquy on the record in open court), *cert. denied,* 516 U.S. 1005 (1995).  Thus, Petitioner has identified no ethical obligation or other duty imposed upon a criminal defense counsel requiring said counsel to oppose his client's expressed desire not to present mitigating evidence at the punishment phase of a capital murder trial.

On the contrary, the Fifth Circuit has suggested a defense counsel is ethically obligated to follow a client's knowing directive not to present mitigating evidence. *See Autry v. McKaskle*. 727 F.2d 358, 362-63 (5th Cir.) (holding trial counsel ethically obligated to comply with defendant's knowing directive not to present mitigating evidence nor required to seek a competency hearing before complying with that directive), *cert. denied*, 465 U.S. 1085 (1984).  In their correspondence prior to trial, Attorney Callahan repeatedly advised Petitioner of the importance of presenting evidence of his background but Petitioner made very clear his wishes that his family members not be called to testify and that no other evidence concerning Petitioner's background be presented.[144]  Petitioner presented the state habeas court with no evidence showing it was objectively unreasonable for Petitioner's trial counsel to have remained mute when Petitioner exercised his right to self-representation under *Faretta*.

---

[144] Callahan first mentioned the need for testimony from Petitioner's family in a letter to Petitioner dated June 2, 2004 (State Exhibit 22) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 581].  After Petitioner indicated that he did not wish to have his federal PSIR introduced into evidence at trial, in a letter dated February 18, 2005, Callahan again emphasized the need for testimony from Petitioner's family to show the jury the dysfunctional nature of Petitioner's family life (State Exhibit 48) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 642].  Petitioner responded with an undated letter which made it clear Petitioner did not want his upbringing coming out at trial because it would make his mother look bad and he did not want anyone feeling sorry for him (State Exhibit 48A) [S.F. State Habeas Hearing, Volume 6 of 7, at pp, 645-46].  Callahan responded that he understood Petitioner's concerns about calling Petitioner's mother to testify at trial and Petitioner's desire not to present the Petitioner's federal PSIR (State Exhibit no. 41) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 650].  Nonetheless, in a trio of letters dated May 13, May 20, and July 8, 2005, Callahan subsequently attempted to convince Petitioner of the need for trial testimony from Petitioner's mother (State Exhibit nos. 64-65, 67) [S.F. State Habeas Hearing, Volume 6 of 7, at pp, 683, 685, 689].  Petitioner responded in a letter dated July 11, 2005 in which he stated he did not have his mother's address (State Exhibit no. 68) [S.F. State Habeas Hearing, Volume 6 of 7, at p. 689].

The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim in the course of Petitioner's state habeas corpus proceeding was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

O.      **Jury Selection**

1.      **The Complaints**

In his sixteenth assertion of ineffective assistance, Petitioner argues his trial counsel should have (1) objected during individual voir dire when the state trial court informed venire member (and later juror) Doris Cedillo that voir dire was running late that morning due to a mix-up at the jail, (2) accepted the prosecution's invitation to assert a challenge for cause to Ms. Cedillo, (3) challenged for cause or employed a peremptory strike against venire member Cedillo based upon the trial court's comments and Ms. Cedillo's confused answers given during individual voir dire, and (4) challenged for cause or employed a peremptory strike against venire member Arthur Carter based upon his answer to a question about future dangerousness.[145]

2.      **State Court Disposition**

a.      **Voir Dire of Venire Member Doris Cedillo**

---

[145] Petition, at pp. 66-68.

During individual voir dire examination on July 27, 2005, the state trial court made the

following comment upon the entry of venire member Cedillo into the courtroom:

> All right.  Ms. Cedillo, how are you this morning?  I'm sorry about the wait.
> Apparently there was a mix-up at the jail or something, so we're a little bit behind
> schedule.  I apologize for keeping you waiting.  And hopefully it won't happen
> again.[146]

The parties questioned Ms. Cedillo and she was briefly excused from the courtroom.[147]  At that point,

the following exchanges occurred:

> MR. LUNAN: Your Honor, I - - our of precaution, when the juror came in,
> you remarked that there was difficulty in starting because - - because there was a
> problem at the jail, and I'm concerned that it has a comment that has - -
>
> THE COURT: Was she in here when I said that?
>
> MR. LUNAN: Yes.
>
> THE COURT: Oh, I'm sorry.
>
> MR. LUNAN: If they wish to challenge for cause based on that issue, I don't
> object to that.
>
> THE COURT: I'm sorry, Denny.  It didn't even occur to me.
>
> MR. CALLAHAN: No objection to your remarks, Judge.

---

[146] S.F. Trial, Volume 5, voir dire examination of Doris Cedillo, at p. 3.

[147] During her voir dire examination, Ms. Cedillo testified in response to the prosecution's
voir dire questions, in pertinent part, that (1) she understood the Texas capital murder statute and
Texas capital sentencing special issues as explained by the prosecution, (2) she understood the
presumption of innocence and that the prosecution bore the burden of proof at trial, (3) she
needed more information before she could respond to a question as to whether she could
participate in a process which resulted in the execution of another human being, (4) she had
never really thought about her views on capital punishment, and (5) she could not answer a
question as to whether she could sit on a jury and answer questions which would decide whether
someone lived or died.  S.F. Trial, Volume 5, voir dire examination of Doris Cedillo, at pp. 7-32.
     In response to questions by Petitioner's trial counsel, Ms. Cedillo testified (1) she wanted
to serve on the jury, (2) her answers to certain questionnaire answers had not changed, and (3)
she would have the courage to stick to her views of what is true and not true if confronted by
eleven other persons who thought differently from her.  *Id.*, at pp. 32-34.

MR. LUNAN: We'll accept.

MR. CALLAHAN: We accept.[148]

### b.      Voir Dire of Venire Member Arthur Carter

During his voir dire examination by the prosecution, venire member Arthur Carter testified in pertinent part, that (1) he believed the death penalty should be available for intentionally taking a life while committing another felony, (2) he understood there was a presumption under Texas law in favor of a life sentence in capital murder cases, (3) he understood the State bore the burden of proof at the guilt-innocence of trial, (4) he understood the State bore the burden of proving at the punishment phase of trial that there was a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society, (5) he understood why it might be necessary for the prosecution to cut a deal with an accomplice to get testimony from that witness, and (6) he would not require the prosecution to prove premeditation as an element of capital murder.[149]  On examination by Petitioner's trial counsel, Mr. Carter testified (1) he was taking a pair of medications for a bad back and was uncertain whether they might impair his ability to focus while sitting for long periods, (2) he recognized there were reasons why a defendant might wish to chose not to testify at trial, (3) he would have no trouble following a jury instruction directing him not to consider as evidence the defendant's election not to testify, (4) he understood that the testimony of an accomplice had to be corroborated to support a conviction, (5) he did not feel the death penalty

---

[148] S.F. Trial, Volume 5, voir dir examination of Doris Cedillo, at pp. 34-35.

[149] S.F. Trial, Volume 5, voir dir examination of Arthur Carter, at pp. 108-31.

was appropriate in all cases, and (6) he did not feel the death sentence was appropriate in all capital murder cases.[150]

c.     **State Habeas Corpus Proceeding**

Petitioner presented the same ineffective assistance arguments as his fourth ground for relief in his state habeas corpus application.[151]  Petitioner did not question either of his trial counsel during his state habeas corpus proceeding regarding the reasons why said counsel chose not to challenge for cause or use peremptory challenges against either venire member Cedillo or Carter.[152]  Petitioner also failed to present the state habeas court with copies of the extensive juror questionnaires completed by either venire members Cedillo or Carter or any other member of Petitioner's jury venire.[153]  The state habeas trial court found, in pertinent part, that (1) there are a number of reasons

_____

[150] S.F. Trial, Volume 5, voir dir examination of Arthur Carter, at pp. 131-45.

[151] State Habeas Transcript, at pp. 133-36.

[152] S.F. State Habeas Hearing, Volume 3 of 7, testimony of John William Harris, Jr., at pp. 42-47/123-28, 58-62/139-43, 128-43/209-24; Volume 3 of 7, testimony of Vincent D. Callahan, at pp. 152-59/233-40, 160-67/241-48; Volume 4 of 7, testimony of Vincent D. Callahan, at pp. 21-42 /274-95, 51-82/304-35; Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 101-12/487-99, 115-18/501-04, 121-22/507-08.  Despite the extensive questioning of both of Petitioner's trial counsel during Petitioner's state habeas corpus proceeding, Petitioner never asked either of his trial counsel even a single question about their rational for their use of the defense's peremptory challenges or the reasons they chose not to challenge venire members Cedillo or Carter for cause.

[153] In July 7, 2005, the prosecution filed a motion in the state trial court asking the trial court to approve the use of an attached 29-page juror questionnaire.  Trial Transcript, at pp. 46-77.  The state trial court granted the prosecution's motion.  *Id.*, at p. 47.  A blank version of the juror questionnaire employed during jury selection at Petitioner's capital murder trial appears in Trial Transcript, at pp.48-76.
     This Court has previously pointed out the vital importance of reviewing venire members' questionnaires in capital murder cases when a federal habeas court is called upon to review the performance of trial counsel during jury selection:

why Petitioner's trial counsel may have found Ms. Cedillo to be agreeable and desire her to be on

the jury, (2) Ms. Cedillo did not have strong feelings about the death penalty, (3) she was reluctant

in her responses to questions by the prosecution regarding whether she could participate in a process

---

the failure of Petitioner to furnish this Court with the completed questionnaires filled out by Petitioner's entire jury venire effectively derives this Court of the ability to rationally evaluate the performance of Petitioner's trial counsel under the dual prongs of *Strickland* analysis, particularly under the objective reasonableness standard of the first prong of *Strickland.* The objective reasonableness of the extent to which Petitioner's trial counsel chose to question individual venire members regarding their views on the death penalty and other subjects necessarily turns, in part, upon the answers those same venire members wrote on their juror questionnaires. In the absence of the juror questionnaires filled out by the entire jury venire, Petitioner has completely failed to carry his burden of proof regarding his Sixth Amendment complaint about the performance of his trial counsel during voir dire.

*Garza v. Thaler*, 909 F.Supp.2d 578, 617 n.93 (W.D. Tex. 2012), *CoA denied*, 738 F.3d 669 (5th Cir. 2013), *cert. denied*, ___ U.S. ___, 134 S. Ct. 2876, ___ L. Ed. 2d ___ (2014).

The importance of furnishing a reviewing court with the juror questionnaires is highlighted in this case by the fact Petitioner's trial counsel questioned Ms. Cedillo during voir dire about her answers to her juror questionnaire. S.F. Trial, Volume 5, voir dire examination of Doria Cedillo, at pp. 32-33. In the absence of Ms. Cedillo's juror questionnaire, the exchanges between Ms. Cedillo and Attorney Callahan render it difficult for this Court, or any other reviewing court, to determine the import of Ms. Cedillo's answers to Attorney Callahan's voir dire questions.

This same principle applies to a federal habeas corpus petitioner's complaints about his trial counsel's failure to challenge for cause, or to exercise a peremptory challenge against, a particular venire member. When deprived of the ability to review the juror questionnaires completed by the entire jury venire, a federal habeas court is deprived of the ability to intelligently ascertain whether there were objectively reasonable reasons why defense counsel may have chosen to exercise their limited peremptory strikes against other members of the jury venire rather than the venire member or venire members identified by a petitioner in an ineffective assistance claim. As this Court has also noted, jury selection is more art than science. *Cordova v. Johnson*, 993 F.Supp. 473, 530 W.D. Tex. 1998), *CPC denied*, 157 F.3d 380 (5th Cir. 1998), *cert. denied*, 525 U.S. 1131 (1999). The presumption of reasonableness which is afforded trial counsel's strategic decision-making under *Strickland* applies with equal force to decisions regarding how to question venire members during voir dire and whether to challenge a particular venire member for cause or employ a peremptory challenge against a particular venire member. *See Neville v. Dretke*, 423 F.3d 474, 482-83 (5th Cir. 2005) (Petitioner was obligated to overcome the presumption that his trial counsel's decision not to question venire members regarding the issue of lupus was sound trial strategy).

97

whereby her vote could result in an execution, (4) the trial court's innocuous reference to a "mix-up at the jail" does not establish Ms. Cedillo was "tainted," (5) Ms. Cedillo's voir dire answers do not demonstrate any impartiality or prejudice toward Petitioner, and (6) venire member Carter's voir dire answers demonstrated he was not confused regarding either the burden of proof or the nature of the inquiry presented by the Texas capital sentencing special issue addressing future dangerousness.[154] The state habeas trial court concluded Petitioner's complaints about the performance of his trial counsel failed to satisfy the deficient performance prong of *Strickland* analysis.[155]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

### 3.    AEDPA Analysis

#### a.    No Deficient Performance

The state habeas court's factual findings regarding this aspect of Petitioner's multi-faceted ineffective assistance claims were fully supported by the evidence presented to the state habeas court summarized above and by the record from the voir dire examinations of venire members Cedillo and Carter.  The state habeas court reasonably concluded the trial judge's remark about a delay resulting from a mix-up at the jail did not "taint" Ms. Cedillo.  The remark did not ascribe fault for the delay to any person or party involved in Petitioner's case.  Furthermore, even a cursory review of the voir dire examination of venire member Cedillo reveals she demonstrated reluctance to answers voir dire questions which sought to inquire whether she could participate in a process which resulted in an

---

[154] State Habeas Transcript, at pp. 756-57.

[155] *Id.*, at pp. 757-58.

execution.[156]  Petitioner's trial counsel could reasonably have interpreted her reluctance to answer the prosecution's questions on that topic as indicating a reluctance on her part to impose the death penalty.  Petitioner did not furnish the state habeas court, and does not furnish this Court, with Ms. Cedillo's juror questionnaire answers.  Petitioner did not question his trial counsel about their decision-making during jury selection and specifically failed to question Petitioner's trial counsel as to why they chose not to challenge Ms. Cedillo for cause or to use a peremptory strike against her.  Under such circumstances, the state habeas court reasonably concluded Petitioner's complaints about his trial counsel's actions vis-a-vis Ms. Cedillo did not overcome the presumption of reasonableness afforded a trial counsel's strategic decision-making under *Strickland* and did not satisfy the first prong of the *Strickland* analysis.  *See Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013 (habeas petitioner failed to overcome the presumption that trial counsel's representation during voir dire fell within the wide range of reasonable professional assistance), *cert. denied*, ___ U.S. ___, 134 S. Ct. 2876, ___ L. Ed. 2d ___ (2014); *Neville v. Dretke*, 423 F.3d at 482-83 (habeas petitioner was obligated to overcome the presumption his trial counsel's decision not to question venire members regarding a particular topic was sound trial strategy).

Petitioner likewise failed to question his trial counsel regarding the rationale or strategy behind their decision not to challenge venire member Carter for cause or to exercise a peremptory challenge against him.  Petitioner failed to furnish the state habeas court and this Court with Mr. Carter's juror questionnaire answers.  The state habeas court correctly found Mr. Carter did not demonstrate any confusion regarding the nature of, nor burden of proof associated with, the Texas

---

[156] S.F. Trial, Volume 5, voir dire examination of Doris Cedillo, at pp. 22-27.

capital sentencing scheme's future dangerousness special issue.  This Court's independent review

of the voir dire examination of Mr. Carter confirms the state habeas court's finding that, as soon as

Mr. Carter responded to a lengthy question by the prosecutor regarding the future dangerousness

special issue with the answer "Possibility," the prosecutor immediately explained the special issue

required a higher standard than merely a possibility:

> Q.  And it will tell you that, look, you don't just decide how many of you want death and how many of you want life.  What you do is you answer these questions.  You answer these questions not based on what kind of result you want. You base the answer on what the evidence truly shows you.  Okay?  First question is asked: Is these a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society> It's also referred to as the future dangerousness question.
>
> If you look closely there at the words that are used, words like probability, and the word 'would' two times instead of "will." You can gather from that that it's not requiring the State to show you that the defendant will kill again.  It's saying the State must prove to you that there's a probability.
>
> A.  Possibility, yes.
>
> Q.  And probability is probably more than possibility, but certainly less than a certainty, would you agree?  So is there a probability that the defendant would. not necessarily will, but would commit criminal acts of violence.  Criminal acts of violence could be assaulting, or pushing, or threatening, or spitting on someone, or inciting a riot, any number of things that would constitute a continuing threat to society.[157]

Petitioner identifies nothing in venire member Carter's voir dire examination which suggests venire

member Carter remained confused about the plain language of the Texas capital sentencing scheme's

future dangerousness special issue after the prosecutor furnished the foregoing explanation.  Nor

does Petitioner identify anything in Carter's voir dire answers which indicates Carter suggested he

---

[157] S.F. Trial, Volume 5, voir dire examination of Arthur Carter, at pp. 121-22.

would automatically answer the future dangerousness special issue affirmatively.[158]  The state habeas court reasonably concluded Petitioner's complaints about his trial counsel's actions vis-a-vis venire member Carter failed to overcome the presumption of reasonableness afforded his trial counsel's strategic decision-making under *Strickland* and failed to satisfy the first prong of the *Strickland* analysis.

      b.    **No Prejudice**

Petitioner presented the state habeas court with no evidence, and presents this Court with neither specific factual allegations nor any evidence, showing either venire member Carter or venire member Cedillo possessed any disqualifying bias or was otherwise ineligible for serve as a juror at Petitioner's trial.  Petitioner does not allege any facts showing either of these venire members answered any voir dire question erroneously or deceptively.  Petitioner does not allege any facts showing either venire member had previously been convicted of a felony or was otherwise ineligible to serve as a juror at Petitioner's trial.  Nor does Petitioner allege either of these venire members possessed any disqualifying bias against Petitioner arising from their personal knowledge of the facts of Petitioner's offense, their relationship with any party or witness, or any other factor.  Insofar as Petitioner argues Carter or Cedillo were "confused" about the meaning or content of the Texas capital sentencing special issues during their voir dire examination, this Court independently concludes the state trial court properly instructed Petitioner's capital sentencing jury at the

---

[158] To the contrary, venire member Carter's voir dire answers appear to assert exactly the opposite, i.e., that he understood the prosecution bore the burden of proving future dangerousness and that there might be situations in which a person convicted of capital murder would no longer be a threat to commit criminal acts of violence.  S.F. Trial, Volume 5, voir dire examination of Arthur Carter, at pp. 123-25.

punishment phase of trial regarding the nature and burdens of proof relevant to the Texas capital sentencing special issues.[159] Juries are presumed to follow their instructions. *Zafiro v. United States*, 506 U.S. at 541.

Under clearly established federal law, "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980). The same standard applies to the exclusion of jurors in non-capital federal trials. *See United States v. Cooper*, 714 F.3d 873, 878 (5th Cir.) ("The Sixth Amendment right to an impartial jury requires the exclusion of a potential juror if his 'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*quoting Wainwright v. Witt*, 469 U.S. 412, 424 (1985)), *cert. denied*, ___ U.S. ___, 134 S. Ct. 313, 187 L. Ed. 2d 222 (2013). Petitioner alleges no facts showing either venire member Carter or Cedillo possessed any personal views which prevented or substantially impaired the performance of their duties as jurors at Petitioner's trial in accordance with their instructions and oaths. Under such circumstances, this Court independently concludes Petitioner's complaints about his trial counsels' actions during voir dire vis-a-vis venire members Cedillo and Carter fail to satisfy the prejudice prong of the *Strickland* analysis.

c.    **Conclusion**

The Texas Court of Criminal Appeals' rejection on the merits of this aspect of Petitioner's multi-faceted ineffective assistance claim was neither (1) contrary to, nor involved an unreasonable

---

[159] Trial Transcript, at pp. 141-50; S.F. Trial, Volume 22, at pp. 6-12.

application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

### P.  Cumulative Effect of Alleged Ineffective Assistance

#### 1.  The Complaint

In his final assertion of ineffective assistance, Petitioner cites to state law authority and argues "counsel's overall performance taken as a whole" can compel a finding of a constitutional violation.[160]

#### 2.  State Court Disposition

Petitioner presented the same basic argument in his state habeas corpus application.[161]  The state habeas trial court found Petitioner's ineffective assistance claims cumulatively satisfied neither prong of the *Strickland* analysis.[162]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

#### 3.  AEDPA Analysis

For the reasons set forth at length above, none of Petitioner's assertions of ineffective assistance by his trial counsel satisfy the prejudice prong of the *Strickland* analysis.  Most do not

---

[160] Petition, at pp. 68-72.

[161] State Habeas Transcript, at pp. 108-12.

[162] *Id.,* at p. 755.

even allege specific facts which show Petitioner's trial counsels' conduct fell below an objective level of reasonableness.  Under such circumstances, Petitioner's cumulative ineffective assistance claim is also without merit.  *See United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."), *cert. denied*, 549 U.S. 1343 (2007); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir.) (where Petitioner failed to demonstrate error by trial counsel, by definition, Petitioner failed to show that cumulative error of counsel deprived him of a fair trial), *cert. denied*, 531 U.S. 849 (2000).

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's cumulative ineffective assistance claim was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus  proceeding.

## IV. *Faretta* Claims

### A.   The Claims

In his second claim for relief herein, Petitioner argues the state trial court erred when it (1) failed to make a proper inquiry under *Faretta* after the Petitioner wrote the trial judge in January, 2005 complaining he had only seen attorney Callahan once and calling the trial judge's attention to Petitioner's pro se motion to dismiss counsel, (2) failed to make a proper inquiry under *Faretta* in June, 2005 when Petitioner wrote another letter to the trial judge and filed a generic motion to dismiss appointed counsel in which Petitioner complained he had lost faith in his counsel and no

longer trusted his counsel's advice, (3) misstated the law applicable to a *Faretta* claim, i.e., suggested the trial court could not deny Petitioner's request for self-representation made after the start of trial, and (4) granted Petitioner's request to represent himself at the punishment phase of trial without making any inquiry of Petitioner's trial counsel, without inquiring as to Petitioner's educational level, and without assuring that Petitioner's waiver of his right to counsel was voluntary, intelligent, and competently made.[163]

## B.   State Court Disposition

Petitioner first presented the state appellate courts with his complaints about the state trial court's disposition of Petitioner's pretrial requests for dismissal of his trial counsel and his complaint about the state trial court's granting Petitioner's request for self-representation as his second claim in his state habeas corpus application.[164]   The state habeas trial court found (1) Petitioner's letter of January 16, 2005 never directly, clearly, or unequivocally indicated a desire by Petitioner to represent himself at trial, (2) Petitioner's June 2, 2005 letter also did not clearly or unequivocally invoke the right to self-representation, (3) in a letter dated July 5, 2005, Petitioner expressed appreciation for the work of attorneys Callahan and Harris and apologized for Petitioner's earlier letters to the trial court, (4) neither of Petitioner's letters put the state trial court on notice that Petitioner wished to represent himself at trial, (4) while Petitioner did communicate at one point near the end of the guilt-innocence phase of trial that he did not wish to remain in the courtroom, Petitioner later changed his

---

[163] Petition, at pp. 72-85.

For unknown reasons, in his Answer, Respondent refers to Petitioner's *Faretta* claim as Petitioner's "claim four."   Respondent's Answer, filed January 23, 2014, ECF no. 22, at p. 19.

[164] State Habeas Transcript, at pp. 113-25.

mind and remained in the courtroom throughout the entirety of that phase of his trial, (5) when Petitioner requested to represent himself prior to the start of the punishment phase of trial, the trial court made a *Faretta* inquiry to ensure Petitioner understood the consequences of choosing self-representation at that point in the trial, (6) the trial court strongly urged Petitioner against self-representation, (7) the trial court specifically found Petitioner was knowingly and voluntarily waiving his right to counsel and choosing to represent himself, (8) the trial court asked Petitioner's trial counsel to remain in the courtroom and to be present in an advisory capacity in the event Petitioner needed advice, (9) Petitioner's trial counsel did not believe Petitioner was experiencing the kind of depression that might have rendered Petitioner disabled or require medical or psychological assistance, (10) there was no reason to believe Petitioner's "depression" influenced Petitioner's ultimate decision to represent himself at the punishment phase of trial, (11) the timing of Petitioner's request for self-representation was such that granting Petitioner's request was likely to cause only minimal disruption, delay, or jury confusion, (12) Petitioner presented no evidence showing his invocation of his right to self-representation was involuntary, the product of clinical depression, or caused by anything other than the free, voluntary, and informed choice of a properly admonished criminal defendant, and (13) Petitioner's trial counsel prepared for both phases of Petitioner's capital murder trial, were prepared to represent Petitioner during the punishment phase of trial, and actually attempted to assist Petitioner by offering advice and by encouraging Petitioner to call witnesses during the punishment phase of trial.[165]  The state habeas trial court concluded the trial court had not erred in failing to conduct a *Faretta* hearing prior to trial or in permitting

---

[165] State Habeas Transcript, at pp. 758-66.

Petitioner to represent himself at the punishment phase of trial.[166]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).  The Texas Court of Criminal Appeals also concluded Petitioner's second claim was procedurally barred.  *Id.*

C.   **Procedural Default**

Procedural default occurs where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the Petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). In either instance, the Petitioner is deemed to have forfeited his federal habeas claim.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Procedural defaults only bar federal habeas review when the state procedural rule which forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim.  *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

As Respondent correctly points out, the Texas Court of Criminal Appeals' conclusion that Petitioner's second claim in Petitioner's state habeas corpus application was procedurally barred forecloses federal habeas review of Petitioner's second claim for relief in this action.  Texas law provides that record-based claims (such as Petitioner's complaints herein about the state trial court's handling of his pretrial requests for dismissal of trial counsel and Petitioner's request for self-

---

[166] *Id.*, at p. 767.

representation) not raised on direct appeal will not be considered in state habeas corpus proceedings. *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (*citing Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996), *clarified on rehearing* February 4, 1998), *cert. denied*, 552 U.S. 1232 (2008). The Fifth Circuit recognizes the *Gardner* rule as an adequate state ground capable of barring federal habeas review. *Dorsey v. Quarterman*. 494 F.3d at 532; *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004).

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus Petitioner can show either (1) "cause and actual prejudice" for his default or (2) that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 262 (1989). To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine). In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335-36 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a Petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under applicable state law. *Sawyer v. Whitley*, 505 U.S. at 346-48. The Supreme Court explained in *Sawyer v. Whitley* this "actual innocence" requirement focuses on those elements which

108

render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Sawyer v. Whitley*, 505 U.S. at 347.  For the reasons discussed below, Petitioner may not circumvent the Texas Court of Criminal Appeals' procedural default ruling on Petitioner's *Faretta* claim by arguing his state appellate counsel was ineffective in failing to assert Petitioner's *Faretta* claim on direct appeal. Because Petitioner's *Faretta* claim possessed no arguable merit, there was nothing objectively unreasonable (nor prejudicial within the meaning of *Strickland*) with regard to the decision by Petitioner's state appellate counsel not to present same as part of Petitioner's direct appeal. Likewise, Petitioner has failed to allege any specific facts sufficient to satisfy the fundamental miscarriage of justice exception to the procedural default doctrine.

The United States Supreme Court has recognized an equitable exception to the doctrine of procedural default where a federal habeas corpus petition can make a showing that his failure to exhaust available state remedies *on a federal constitutional claim of ineffective assistance by trial counsel* resulted from deficient performance on the part of the petitioner's state habeas counsel. More specifically, the Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), carved out of the Supreme Court's procedural default jurisprudence a narrow exception for *claims of ineffective assistance by trial counsel* which were not raised in a convicted criminal defendant's state habeas corpus proceeding because of the ineffective assistance of the defendant's state habeas counsel.  *See Martinez v. Ryan*, 566 U.S. at ___, 132 S. Ct. at 1315 ("Inadequate assistance of counsel at initial review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial). In *Trevino v. Thaler*, ___ U.S. ___, ___, 133 S. Ct. 1911, 1912, 185 L. Ed. 2d 1044 (2013), the Supreme Court reaffirmed the narrow focus of its holding in *Martinez*:

109

"In *Martinez v. Ryan,* 566 U.S. 1, __, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272, this Court held that 'a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.'"

Petitioner's second claim herein does not present a complaint of ineffective assistance by Petitioner's trial counsel that was foreclosed from state habeas review by virtue of the ineffective assistance of Petitioner's state habeas counsel.  On the contrary, Petitioner's second claim herein consists of (1) a direct attack upon the actions of the Petitioner's state trial court in failing to hold a *Faretta* hearing in response to Petitioner's pretrial letters to the trial court and pretrial pro se motions to dismiss appointed counsel and (2) a direct attack upon the state trial court's decision [made after a formal *Faretta* hearing] to grant Petitioner's request for self-representation prior to the start of the punishment phase of Petitioner's capital murder trial.  As such, the Supreme Court's recent holdings in *Trevino v. Thaler, supra,* and *Martinez v. Ryan, supra*, have no application to Petitioner's procedural default on Petitioner's second claim herein.  Accordingly, Petitioner's second claim herein, i.e., his *Faretta* claims are procedural defaulted and not properly subject to federal habeas review.

D.    **Alternatively, No Merit**

The state habeas court's factual findings regarding the nature of Petitioner's pretrial letters and pro se motions requesting dismissal of Petitioner's court-appointed trial counsel were fully supported by the evidence presented before the state habeas court.  Petitioner presented the state habeas court with no evidence showing he intended his pretrial letters to the state trial court or his

110

pro se motions for dismissal of appointed counsel as requests to represent himself at trial.  For the reasons discussed in Section III.N.3. above, Petitioner's state trial court cannot be faulted for failing to hold a *Faretta* hearing in response to any of Petitioner's pretrial letters to the trial judge or Petitioner's pro se motions for dismissal of court-appointed trial counsel.  None of those letters or pro se motions reasonably alerted, much less clearly or unequivocally advised, the state trial court that Petitioner wished to represent himself at trial.

Furthermore, Petitioner presented the state habeas court with no evidence showing he was actually suffering from clinical depression or any other medical or mental condition which rendered Petitioner's request for self-representation prior to the state of the punishment phase of trial either involuntary, unknowing, or uninformed as to the consequences of that decision.  Petitioner's trial counsel testified during Petitioner's state habeas corpus proceeding that defense expert Dr. Jack Ferrell examined Petitioner prior to trial and found Petitioner competent to stand trial.[167]  Petitioner's trial counsel both testified during Petitioner's state habeas corpus proceeding that they believed Petitioner exercised his right of self-representation while mentally competent to do so and to ensure that Petitioner's family members were not called to testify during the punishment phase of Petitioner's trial.[168]

In his correspondence prior to trial, Attorney Callahan repeatedly advised Petitioner of the importance of presenting evidence of Petitioner's background but Petitioner made very clear his wishes that his family members not be called to testify and that no other evidence concerning

---

[167] S.F. State Habeas Hearing. Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 51-55/437-41.

[168] *See* notes 136-37, *supra*, and accompanying text.

Petitioner's background be presented.[169]   The state trial court properly admonished Petitioner regarding the potential consequences of choosing self-representation at the punishment phase of Petitioner's capital murder trial.[170]  The state trial court's colloquy with Petitioner included specific warnings and questions by the trial judge and acknowledgments by Petitioner that Petitioner understood (1) the jury could return a verdict at the conclusion of the punishment phase of trial resulting in a death sentence for Petitioner, (2) Petitioner was nonetheless asking to proceed without any help from anyone else, (3) despite Petitioner's lack of familiarity with the Rules of Evidence, if he chose self-representation, Petitioner would be required to conduct his own cross-examination of witnesses, (4) a trial lawyer would defend and represent Petitioner better than Petitioner could do so himself, and (5) the trial court was advising Petitioner not to proceed without the assistance of an attorney.[171]  At the conclusion of the colloquy, Petitioner specifically represented to the state trial court that (1) he was acting voluntarily, (2) he was emotionally, mentally, and psychologically in an appropriate place at that point to represent himself, and (3) there was nothing further he wanted to say to the court.[172]

During a *Faretta* hearing, the trial court must warn the defendant against the perils and disadvantages of self-representation.  *United States v. Hodges*, 460 F.3d 646, 650 (5th Cir. 2006); *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005).  As Respondent correctly points out,

---

[169] *See* note 146, *supra*.

[170] S.F. Trial, Volume 21, at pp. 3-7.

[171] *Id.*, at pp. 3-6.

[172] *Id.*, at p. 6.

however, the Supreme Court has not adopted "a sacrosanct litany" for warning defendants against

waiving their right to counsel.  *See United States v. Davis*, 269 F.3d 518, 519 n.11 (5th Cir. 2001)

(listing suggested questions for a *Faretta* hearing taken from *The Benchbook for U.S. District Court*

*Judges 1.02 (4th ed. 2000)* published by the Federal Judicial Center but recognizing this list is

merely suggestive and not mandatory).  Rather, the issue is more practical and less formalistic:

> For self-representation, a defendant must "knowingly and intelligently" forego counsel, and the request to proceed *pro se* must be "clear and unequivocal."  Before granting the request, the trial judge must caution the defendant about the dangers of such a course of action so that the record will establish that "he knows what he is doing and his choice is made with eyes open."  "In order to determine whether the right to counsel has been effectively waived, the proper inquiry is to evaluate the circumstances of each case as well as the background of the defendant."

*United States v. Martin*, 790 F.2d 1215, 1218 (5th Cir. 1986) (citations omitted), *cert. denied*, 479 U.S. 868 (1986).

> In determining whether a defendant has effectively waived the right to counsel, the district court must consider various factors, including defendant's age, education, background, experience, and conduct.  The court must ensure that the waiver is not the result of coercion or mistreatment, and must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practicality of waiving the right to counsel.

*United States v. Joseph*, 333 F.3d 587, 590 (5th Cir.), *cert. denied*, 540 U.S. 973 (2003).

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

*United States v. Davis*, 269 F.3d at 518 (*quoting Faretta v.* California, 422 U.S. at 835, 95 S. Ct. at 2541)).

Petitioner presented no testimony from himself or any other witness during his state habeas

corpus proceeding establishing he was mentally incompetent or suffering from coercion or duress

at the time he chose to represent himself during the punishment phase of his capital murder trial.

Petitioner also presented the state habeas court no evidence showing he was unaware of any of the

potential disadvantages or perils he faced if he chose to proceed to represent himself at the

punishment phase of his trial.  Nor did Petitioner present the state habeas court (or this Court) with

any specific facts showing Petitioner made his decision to represent himself at the punishment phase

of his capital murder trial without full knowledge of what he was doing and his eyes open.  Under

the such circumstances, the state trial court, and state habeas court, both reasonably concluded

Petitioner's invocation of his right to self-representation was voluntary, intelligent, and knowing.

### E.  **Conclusions**

Petitioner's second claim herein is procedurally defaulted and, alternatively, does not furnish

a basis for federal habeas corpus relief.  Insofar as Petitioner argues his waiver of his right to counsel

at the punishment phase of trial was other than voluntary, intelligent, and knowing, Petitioner

presented the state habeas court with no evidence supporting that claim and has alleged no specific

facts before this Court which refute Petitioner's representations to the contrary made on the record

before the state trial court.  Petitioner's second claim does not warrant federal habeas corpus relief.

### V. Ineffective Assistance by Appellate Counsel

### A.  **The Complaints**

In his third claim in this action, Petitioner argues his state appellate counsel, who also served

as Petitioner's lead trial counsel,  (1) failed to file an affidavit in support of Petitioner's motion for

new trial and failed to request a hearing on that motion, (2) had a conflict of interest in representing

Petitioner on direct appeal because Petitioner's state habeas counsel was asserting claims of

ineffective assistance by Petitioner's trial counsel, (3) failed to assert on direct appeal any claims of

ineffective assistance by Petitioner's trial counsel, (4) used a portion of a brief said counsel had filed

in a prior appeal (which had proven unsuccessful) in Petitioner's state appellate brief, (5) failed to

raise Petitioner's *Faretta* claims on direct appeal, (6) raised a non-meritorious point of error

complaining about the admission of Petitioner's accomplices' testimony at Petitioner's trial, and (7)

failed to file a petition for writ of certiorari with the United States Supreme Court.[173]

B.      **State Court Disposition**

Petitioner presented the same set of complaints about the performance of his state appellate

counsel as his third claim for state habeas corpus relief.[174]  Petitioner's state appellate counsel (who

also served as Petitioner's lead trial counsel) testified without contradiction during Petitioner's state

habeas corpus proceeding that (1) he included a point of error in Petitioner's appellate brief which

he had used without success in a previous appeal from a capital murder conviction and sentence of

death, (2) he permitted Petitioner's initial state habeas counsel, attorney Suzanne Kramer, to make

copies of Petitioner's letters to Callahan, and (3) he also included a point of error in Petitioner's brief

complaining about the trial court's denial of Petitioner's motion to exclude the testimony of

accomplice witnesses Francisco Gonzales and Debra Espinosa.[175]  Petitioner did not question his

state appellate counsel regarding why said counsel (1) chose to include, or not include, any particular

point of error in Petitioner's state appellate brief or motion for new trial, (2) failed to submit an

---

[173] Petition, at pp. 85-91.

[174] State Habeas Transcript, at pp. 126-33.

[175] S.F. State Habeas Hearing, Volume 5 of 7, testimony of Vincent D. Callahan, at pp. 110-15/496-501, 117/503, 121-22/507-08.

affidavit along with Petitioner's motion for new trial, or (3) failed to file a petition for writ of certiorari on Petitioner's behalf.  The state habeas trial court found (1) Attorney Callahan was aware that Attorney Kramer planned to raise a claim of ineffective assistance by trial counsel as part of Petitioner's state habeas corpus application and (2) aside from ineffective assistance, Petitioner did not identify any other grounds which Petitioner claimed should have been raised either in his motion for new trial or on direct appeal.[176]  The state habeas trial court concluded Petitioner's complaints of ineffective assistance by his state appellate counsel failed to satisfy either prong of the *Strickland* analysis.[177]  The Texas Court of Criminal Appeals adopted the state trial court's findings and conclusions and denied relief.  *Ex parte Juan Edward Castillo*, WR-70,510-01, 2012 WL 3999797 (Tex. Crim. App. Sept. 12, 2012).

C.     **Clearly Established Federal Law**

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013) ("A criminal defendant has a constitutional right to receive effective assistance of counsel on his first appeal.  In a direct appeal, ineffective assistance of counsel claims

---

[176] State Habeas Transcript, at pp. 767-68.

[177] *Id.*, at p. 768.

are governed by the standard established by the Supreme Court in *Strickland v. Washington.*" (Footnotes omitted)), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1292, 188 L. Ed. 2d 319 (2014); *Higgins v. Cain*, 720 F.3d 255, 261 n.8 (5th Cir.) ("The *Strickland* standard is used to evaluate claims for ineffective assistance of appellate counsel."), *cert.* denied, ___ U.S. ___, 134 S. Ct. 688, 187 L. Ed. 2d 557 (2013).  Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, i.e., whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" Petitioner, i.e., whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of Petitioner's appeal would have been different. *Smith v. Robbins*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d at 260-61; *Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d at 444.

Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U.S. at 288; *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Busby v. Dretke*, 359 F.3d at 714.  The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy.  *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, 463 U.S. at 751-52.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an informed decision that certain avenues will not prove fruitful.  *See Busby v. Dretke*, 359 F.3d at 714 (a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not be fruitful); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004) (holding the same).  Likewise, solid, meritorious arguments based on directly controlling

117

precedent should be discovered and brought to the appellate court's attention. *United States v. Reinhart*, 357 F.3d at 525; *Schaetzle v. Cockrell*, 343 F.3d at 445.

Where, as in Petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 & 482 (2000) (holding the dual prongs of *Strickland* apply to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*); *Busby v. Dretke*, 359 F.3d at 714-17 (applying dual prongs of *Strickland* to a complaint about appellate counsel's failure to present a point of error on appeal).

### D.   *Cuyler v. Sullivan* Inapplicable

Petitioner attempts to circumvent the foregoing legal principles by arguing because Petitioner's state appellate counsel (who had also served as Petitioner's lead trial counsel) (1) failed to assert any claims of ineffective assistance by trial counsel on direct appeal and (2) was aware Petitioner's state habeas counsel intended to raise claims of ineffective assistance by Petitioner's trial counsel, a conflict of interest arose which mandates a more stringent standard of review for Petitioner's complaints of ineffective assistance by his state appellate counsel under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).[178]

---

[178] Petition, at pp. 88-90.

The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *United States v. Bernard*, 762 F.3d 467, 476 (5th Cir. 2014); *United States v. Hernandez*, 690 F.3d 613, 618 (5th Cir. 2012); *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006). A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties. *United States v. Hernandez*, 690 F.3d at 618; *United States v. Burns*, 526 F.3d 852, 856 (5th Cir. 2008). "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *United States v. Scruggs*, 691 F.3d 660, 670 (5th Cir. 2012) (to prove ineffective assistance based on a conflict of interest, a criminal defendant must show "that an actual conflict of interest adversely affected his lawyer's performance"), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1282, 185 L. Ed. 2d 186 (2013); *United States v. Burns*, 526 F.3d at 856 ("To establish a Sixth Amendment violation on the basis of a conflict of interest the defendant must demonstrate: (1) that his counsel acted under the influence of an actual conflict; and (2) that the conflict adversely affected his performance at trial."). The *Cuyler* standard differs substantially from the *Strickland* test in that *Cuyler* requires no showing of "prejudice." *See Strickland v. Washington*, 466 U.S. at 692 (recognizing prejudice is presumed under the *Cuyler* test only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."); *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002) ("When a defendant has been able to show that his counsel 'actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance,' constitutional error has occurred

and prejudice is inherent in the conflict."); *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (discussing the distinction between the *Cuyler* and *Strickland* tests).

In *Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995)(*en banc*), *cert. denied*, 517 U.S. 1157 (1996), the Fifth Circuit rejected a broad-ranging application of the *Cuyler* standard to complaints of ineffective assistance arising from alleged conflicts of interest by defense counsel. *See Beets v. Scott*, 65 F.3d at 1268 (holding that not every potential conflict, even in multiple client representation cases, is an "actual conflict' for Sixth Amendment purposes). Subsequently, the Fifth Circuit has consistently refused to apply the *Cuyler* test outside the context of multiple representation situations. *See*, *e.g.*, *United States v. Bernard*, 762 F.3d at 476 (in cases other than multiple representation, the standard for testing conflict of interest arises under *Strickland*); *Bostick v. Quarterman*, 590 F.3d 303, 306 n.2 (5th Cir. 2009) (In the absence of a *Cuyler v. Sullivan* actual conflict, a defendant who claims his attorney had a conflict of interest must show a reasonable probability that the conflict prejudiced the defense, undermining the reliability of the proceeding); *United States v. Garza*, 429 F.3d 165, 172 (5th Cir. 2005) ("*Cuyler* only applies where an attorney was effectively, if not technically, representing multiple clients in the same proceeding."), *cert. denied*, 546 U.S. 1220 (2006); *United States v. Newell*, 315 F.3d at 516 (holding *Strickland* "more appropriately gauges an attorney's alleged conflict of interest arising not from multiple client representation but from a conflict between the attorney's personal interest and that of his client"); *Perillo v. Johnson*, 205 F.3d at 781 ("An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.").

120

Petitioner does not allege any specific facts showing Attorney Callahan was actively representing multiple parties with conflicting interests at the time he prepared and filed Petitioner's state appellate brief. As a result, Petitioner's allegations of a conflict of interest on the part of Callahan, as well as Petitioner's other complaints about the performance of his state appellate counsel, must be reviewed under the *Strickland* standard.

E.     **AEDPA Analysis**

Petitioner alleged no specific facts and introduced no evidence before the state habeas court establishing that Attorney Callahan represented multiple parties in the same proceeding or otherwise engaged in multiple representations of the nature which require analysis of his conflict of interest claim under the *Cuyler* test. The state habeas court may not be faulted for applying the dual prongs of *Strickland* to Petitioner's complaints about the performance of his state appellate counsel. Petitioner has failed to allege any specific facts showing his state appellate counsel labored under an actual conflict of interest or that any act or omission on the part of Petitioner's state appellate counsel "prejudiced" petition within the meaning of *Strickland*.

Petitioner offered the state habeas court little evidence regarding the rationale or strategy behind the decisions made by Attorney Callahan in perfecting Petitioner's appeal and filing Petitioner's state appellate brief, other than Callahan's testimony that he felt his constitutional challenge to the death penalty possessed merit despite the fact the same claim had previously been denied by the Texas Court of Criminal Appeals. Attorney Callahan admitted his point of error challenging the constitutionality of the Texas capital sentencing scheme had proved unsuccessful in a past capital murder appeal but he felt it nonetheless possessed merit. Petitioner alleged no specific

121

facts, and presented the state habeas court with no evidence, showing a reasonable probability exists that, but for Callahan's inclusion of his constitutional challenge to the Texas death penalty, the outcome of Petitioner's direct appeal would have been any different.  The inclusion of points of error in an appellate brief which have previously been rejected by the appellate courts does not, per se, cause the performance of an appellate counsel to fall outside the broad range of objectively reasonable appellate performance.  The state habeas court reasonably concluded Petitioner's complaints about Attorney Callahan's inclusion in Petitioner's state appellate brief of a challenge to the constitutionality of the Texas death penalty did not satisfy either prong of *Strickland* analysis.

Petitioner's complaints about Callahan's failure to assert points of error on direct appeal premised upon allegations of ineffective assistance by trial counsel are equally unavailing.  The Texas Court of Criminal Appeals has long noted the practical difficulty in addressing ineffective assistance claims raised on direct appeal.  *See Menefield v. State*, 363 S.W.2d 591, 592-93 (Tex. Crim. App. 2012) ("'Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped.'" (*quoting Thompson v. State*, 9 S.W.3d 808. 813 (Tex. Crim. App. 1999)); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (holding the same). In addition, Callahan testified during Petitioner's state habeas corpus proceeding that he was aware Petitioner's initial state habeas counsel planned to assert claims of ineffective assistance by Petitioner's trial counsel in the state habeas corpus proceeding.  Under such circumstances, the state habeas court could reasonably have believed it was objectively reasonable for Petitioner to forego assertion on direct appeal of Petitioner's then-undeveloped ineffective assistance claims.  Moreover, in view of this Court's independent conclusion that none of Petitioner's complaints about the performance of his trial counsel satisfied the prejudice prong of *Strickland*, Petitioner's complaints

about the failure of his state appellate counsel to assert the same claims on direct appeal likewise

fails to satisfy the prejudice prong of *Strickland*.  There is no reasonable probability that, but for the

failure of Petitioner's state appellate counsel to raise on direct appeal meritless points of error

complaining about the performance of Petitioner's trial counsel , the outcome of Petitioner's appeal

would have been any different.  *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir.) ("failure to assert

a meritless objection cannot be grounds for a finding of deficient performance."), *cert. denied*, ___

U.S. ___, 133 S. Ct. 179, 184 L. Ed. 2d 90 (2012); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th

Cir. 2009) (holding failure to raise a meritless objection  does not satisfy the deficient performance

prong of *Strickland*), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1050, 178 L. Ed. 2d 870 (2011); *Wood

v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) (failure to raise futile or meritless objections is

not ineffective lawyering), *cert. denied*, 552 U.S. 1314 (2008).  The state habeas court reasonably

concluded Petitioner's complaints about the failure of his state appellate counsel to include

Petitioner's complaints about the performance of his trial counsel as points of error on direct appeal

failed to satisfy either prong of *Strickland* analysis.

While Petitioner complains Callahan did not accompany Petitioner's motion for new trial

with an affidavit, Petitioner alleges no facts suggesting exactly what information such an affidavit

should have contained or explain how inclusion of such an affidavit could possibly have altered the

outcome of Petitioner's direct appeal.  Petitioner complains Callahan did not raise claims of

ineffective assistance by Petitioner's trial counsel in Petitioner's motion for new trial but, as

explained above, Petitioner alleges no facts showing he was adversely affected by the failure of

Callahan to assert any identified ineffective assistance claim in Petitioner's motion for new trial.  As

explained in Section III above, none of the assertions of ineffective assistance by Petitioner's trial

counsel which Petitioner has raised before either the state habeas court or this Court satisfy the prejudice prong of *Strickland* analysis. Attorney Callahan cannot reasonably be faulted for failing to present claims of ineffective assistance, either in Petitioner's motion for new trial or on direct appeal, which possessed no arguable merit. *Clark v. Thaler*, 673 F.3d at 429*; Peredes v. Quarterman*, 574 F.3d at 291; *Wood v. Quarterman*, 503 F.3d at 413. For the reasons discussed in Section IV above, attorney Callahan can also not reasonably be faulted for failing to present Petitioner's *Faretta* claims as part of Petitioner's direct appeal. Those claims were likewise without merit. Thus, Petitioner has failed to allege any facts showing he was "adversely affected" by any decisions made by Callahan, when acting as Petitioner's state appellate counsel.

Finally, Petitioner's complaint that his state appellate counsel failed to file a petition for writ of certiorari possesses no arguable merit. A criminal defendant who has been furnished court-appointed assistance on direct appeal does not possess a constitutional right to the assistance of counsel to pursue discretionary state appeals or applications for review before the United States Supreme Court. *Pennsylvania v. Finley*, 481 U.S. 551, 555-56 (1997); *Wainwright v. Torna*, 455 U.S. 586, 587 (1982); *Ross v. Moffitt*, 417 U.S. 600, 610 (1974); *Clark v. Johnson*, 227 F.3d 273, 283 (5th Cir. 2000), *cert, denied*, 531 U.S. 1167 (2001). Petitioner's court-appointed state appellate counsel had no duty to pursue certiorari review on Petitioner's behalf.

The Texas Court of Criminal Appeals' rejection on the merits, in the course of Petitioner's state habeas corpus proceeding, of Petitioner's complaints of ineffective assistance by his state appellate counsel was neither (1) contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) based on

an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

## VI. *Giglio/Napue* Perjured Testimony Claim

A.     **The Claim**

In his fourth and final claim for federal habeas corpus relief, Petitioner argues his conviction violates due process principles because, in June, 2013, former prosecution witness Gerardo Gutierrez claimed he committed perjury during Petitioner's 2005 capital murder trial.[179]

B.     **Procedural Default on Unexhausted Claim**

Petitioner did not fairly present this claim to the Texas Court of Criminal Appeals in either his direct appeal or state habeas corpus proceeding.  Thus, Petitioner has failed to exhaust state appellate and state habeas corpus remedies with regard to this claim.  The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred under the procedural default doctrine. *See, e.g., Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014) (federal habeas corpus petition procedurally defaulted on ineffective assistance claim by failing to present the claim to the Texas Court of Criminal Appeals); *Reed v. Stephens*, 739 F.3d 753,780 (5th Cir. 2014) (unexhausted federal habeas corpus claim procedurally defaulted)*, cert. filed June 17, 2014 (no. 13-1509)*; *Trottie v. Stephens*, 720 F.3d 231, 248 (5th Cir. 2013) (Petitioner procedurally defaulted on ineffective assistance claim by asserting a new factual basis to support the claim which rendered same unexhausted), *cert. denied*, ___ U.S. ___, 134 S. Ct. 1540, 188 L. Ed. 2d 562 (2014).  Because this claim is not framed in terms of ineffective assistance

---

[179] Petition, at pp. 92-94.

by Petitioner's state trial counsel, the Supreme Court's holdings in *Trevino* and *Martinez* afford Petitioner no relief from his procedural default. *See Garza v. Stephens*, 739 F.3d at 676 (to establish cause sufficient to overcome a procedural default, the Petitioner must show (1) his claim of ineffective assistance of counsel at trial is substantial - i.e., has some merit - and (2) that habeas counsel was ineffective in failing to present those claims in Petitioner's first state habeas corpus proceeding). Moreover, as explained below, because this claim lacks any arguable merit, Petitioner cannot demonstrate cause for his procedural; default by showing his state appellate or state habeas counsel rendered ineffective assistance by failing to raise this claim on direct appeal or in Petitioner's state habeas corpus proceeding.

## C.      **No Merit on *De Novo* Review**

Under the AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) ("28 U.S.C. § 2254(b) (1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court."), *cert. denied*, 543 U.S. 835 (2004); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir. 2003) ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."), *cert. denied*, 540 U.S. 956 (2003); *Mercadel v. Johnson*, 179 F.3d 271, 276-77 (5th Cir. 1999); 28 U.S.C. § 2254(b)(1)(A). However, 28 U.S.C. §2254(b) (2) empowers a federal habeas court to deny an unexhausted claim on the merits. *Avila v. Quarterman*, 560 F.3d 299, 310 n.8 (5th Cir.), *cert. denied*, 556 U.S. 993 (2009); *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008), *cert, denied*, 555 U.S. 1219 (2009); *Mercadel v. Johnson*, 179 F.3d at 276-77.

126

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264, 269-70 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio v. United States*, 405 U.S. at 153-54; *Canales v. Stephens*, 765 F.3d 551, 573 (5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th Cir.) ("The Supreme Court has held that the Due Process Clause is violated when the government knowingly uses perjured testimony to obtain a conviction."), *cert. denied*, ___ U.S. ___, 132 S. Ct. 854, 181 L. Ed. 2d 551 (2011); *Reed v. Quarterman*, 504 F.3d 465, 473 (5th Cir. 2007).

Petitioner alleges no specific facts showing the prosecution or any representative of the State possessed any information at the time of Petitioner's capital murder trial suggesting Gutierrez's testimony was in any way factually inaccurate. Instead, Petitioner relies exclusively upon a Ninth Circuit opinion (*Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010)) which holds that a conviction or sentence based on false material evidence violates due process principles regardless of the prosecution's knowledge of the inaccuracy of the evidence. Neither Supreme Court precedent nor Fifth Circuit precedent require reversal of criminal convictions obtained through allegedly false testimony or evidence without a showing the prosecution either knowingly presented the false evidence or knowingly failed to correct false testimony. *Napue v. Illinois*, 360 U.S. at 269; *United*

127

*States v. Fields*, 761 F.3d 443, 477 (5th Cir. 2014) ("'To establish a due process violation based on the government's use of false or misleading testimony, [a defendant] must show that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false.'" (*quoting United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004)).  Because Petitioner has alleged no facts showing anyone on the prosecution team or representing the State was aware at the time of Petitioner's capital murder trial of any material factual inaccuracy in Gutierrez's trial testimony, Petitioner's *Giglio/Napue* claim does not warrant federal habeas corpus relief.

D.   **Conclusions**

Petitioner procedurally defaulted on his unexhausted *Giglio-Napue* claim.  This claim lacks any arguable merit because Petitioner has failed to allege any specific facts showing the prosecution or any State representative knew prior to Gutierrez's 2013 affidavit that Gutierrez gave testimony at Petitioner's capital murder trial which was factually inaccurate.

### VII. Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing for the purpose of permitting him to develop the factual and evidentiary bases for his claims herein.

> [U]nder AEDPA, a habeas petitioner who has failed to develop the factual basis of a claim in state court must show two things to be granted an evidentiary hearing. First, the petitioner has to show either that the claim relies on 1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or 2) "a factual predicate that could not have been previously discovered through the exercise of due diligence."  Second, the petitioner has to show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

*Hoffman v. Cain*, 752 F.3d 430, 437-38 (5th Cir. 2014).

With regard to those claims herein on which Petitioner obtained a ruling on the merits from the Texas Court of Criminal Appeals in the course of Petitioner's state habeas corpus proceeding, i.e., all of Petitioner's complaints of ineffective assistance by his trial or state appellate counsel, Petitioner is not entitled to an evidentiary hearing in this Court. *See Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398-1401, 179 L. Ed. 2d 557 (2012) (holding an evidentiary hearing is unnecessary when a state court has rejected a claim on the merits and federal habeas review of that rejection is governed by §2254(d) (1)); *Clark v. Thaler*, 673 F.3d 410, 416-17 (5th Cir.) (no evidentiary hearing or factual development in federal court where the claim was adjudicated on the merits in state court), *cert. denied*, ___ U.S. ___, 133 S. Ct. 179, 184 L. Ed. 2d 90 (2012); *Pape v. Thaler*, 645 F.3d 281, 288 (5th Cir. 2011) (holding the same), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1100, 181 L. Ed. 2d 987 (2012).   Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a Petitioner made insufficient effort to prove in state proceedings. *Cullen v. Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1401; *Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S. Ct. 1739, 185 L. Ed. 2d 798 (2013).

Thus, Petitioner is not entitled to a federal evidentiary hearing on any of his ineffective assistance claims herein, all of which were litigated to a resolution on the merits in Petitioner's state habeas corpus proceeding.   Petitioner's second claim herein presents purely legal, record-based, arguments which do not require factual development.   Petitioner's final claim, his unexhausted, procedurally defaulted, *Giglio-Napue* claim, is unaccompanied by any specific facts sufficient to warrant federal habeas corpus relief.

Moreover, 28 U.S.C. Section 2254(e) (2) restricts this Court's ability to hold an evidentiary hearing even when a claim has not been fully adjudicated on the merits by a state court. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the Petitioner's factual allegations which, if true, would entitle the applicant to federal habeas relief."). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*  This Court has examined *de novo* the merits of Petitioner's second and fourth claims herein, assumed the accuracy of the facts Petitioner alleges in support of these claims (except where refuted by the record from Petitioner's state trial court, state direct appeal, and state habeas proceedings), conducted a *de novo* review of same, and has determined Petitioner has failed to allege any facts which would entitle him to federal habeas relief.  Therefore, Petitioner is not entitled to a federal evidentiary hearing on any of these claims. *See Spence v. Johnson*, 80 F.3d 989, 1000 (5th Cir. 1996) (holding in a pre-AEDPA case that a federal habeas Petitioner must allege facts which, if proved, would entitle him to relief before the Petitioner is entitled to a federal evidentiary hearing and that the federal court need not "blindly accept speculative and inconcrete claims as the basis to order a hearing"), *cert, denied*, 519 U.S. 1012 (1996).

## VIII. Certificate of Appealability

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA").  *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997) (recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change

in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d 43, 45 (5th Cir. 1997) (holding the standard for obtaining a CoA is the same as for a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA.  *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998).  Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus Petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA.  *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); 28 U.S.C. §2253(c) (2).  Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000) (holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted).  In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone.  *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v. Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Murphy v. Johnson*, 110 F.3d 10, 11 n.1 (5th Cir. 1997); 28 U.S.C. §2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983).

To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at 282; *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. at 484; *Barefoot v. Estelle*, 463 U.S. at 893 n.4. This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas Petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338 (*quoting Slack v. McDaniel*, 529 U.S. at 484); *accord Tennard v. Dretke*, 542 U.S. at 282. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack*

*v. McDaniel*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, 558 U.S. 993 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).  Nonetheless, a CoA is not automatically granted in every death penalty habeas case.  *See* Miller-El v. Cockrell 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

While it might be possible to quibble over the state habeas court's applications of the deficient performance prong of the *Strickland* test to Petitioner's complaints of ineffective assistance by his trial counsel, reasonable minds could not disagree over this Court's conclusion that the state habeas court reasonably concluded all of Petitioner's complaints of ineffective assistance by his trial counsel failed to satisfy the prejudice prong of *Strickland*.  Likewise, reasonable minds could not disagree that Petitioner's complaints about the performance of his state appellate counsel also fail to satisfy the prejudice prong of *Strickland*.  Reasonable minds also could not disagree with this court's conclusions that Petitioner procedurally defaulted on both his *Faretta* claims and his unexhausted *Giglio-Napue* claim.  Petitioner is not entitled to a CoA on any of his claims herein.

This Court independently reviewed the entire record from Petitioner's trial, direct appeal, and state habeas corpus proceeding and concludes Petitioner's ineffective assistance complaints all fail to satisfy the prejudice prong of the *Strickland* analysis.   Viewed in the light most favorable to the jury's verdict, the evidence of Petitioner's guilt was overwhelming.   At the punishment phase of Petitioner's trial, the jury was furnished with a wealth of information concerning Petitioner's long history of violent criminal behavior.

Accordingly, it is hereby **ORDERED** that:

1.  All relief requested in Petitioner's federal habeas corpus petition, June 28, 2013, ECF no. 12, is **DENIED**.

2.  Petitioner is **DENIED** a Certificate of Appealability on all claims herein.

3.  Petitioner's request for an evidentiary hearing is **DENIED**.

4.  All other pending motions are **DISMISSED AS MOOT**.

It is so ORDERED.

SIGNED this 12th day of November, 2014.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE